UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    CRIMINAL NO. 3:12CR238 (JBA)

        v.

LAWRENCE HOSKINS                            August 29, 2014

**GOVERNMENT'S RESPONSE**
**<u>TO DEFENDANT'S PRETRIAL MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.      Introduction ........................................................................................................... 1

II.     Background .......................................................................................................... 2

        A.      The Tarahan Bribery Scheme .................................................................. 2

        B.      The Defendant Leaves Alstom ................................................................. 4

        C.      The Indictment and the Defendant's Arrest ............................................ 6

III.    The Defendant Did Not Withdraw From the Conspiracy ................................... 7

        A.      The Defendant's Claim of Withdrawal is Premature .............................. 8

        B.      Even On the Limited Facts Presented Here, the Defendant Did Not Withdraw
                From the Conspiracy .............................................................................. 15

        C.      Withdrawal is Not a Defense to the Substantive Counts in the Indictment .......... 23

IV.     The Defendant Violated the FCPA .................................................................... 24

        A.      Relevant Law ......................................................................................... 24

                1.      The FCPA .................................................................................... 24

                2.      Sufficiency of an Indictment ...................................................... 28

        B.      The Defendant Was an Agent of a Domestic Concern ......................... 29

                1.      The Indictment Is Sufficient ....................................................... 30

                2.      The Indictment Goes Beyond the Minimum Pleading Requirements ............ 31

                3.      The FCPA Is Not Unconstitutionally Vague ............................... 36

        C.      The FCPA Applies Extraterritorially ..................................................... 37

        D.      The Defendant Is Not Part of an Excepted Class of Persons ............................. 43

V.      The Money Laundering Counts Are Properly Venued in the District of Connecticut ..... 47

VI.     Conclusion ......................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Chevron Corp. v. Donziger,*
    974 F. Supp. 2d 362 (S.D.N.Y. 2014)...................................................................... 38

*Cleveland v. Caplaw Enterprises,*
    448 F.3d 518 (2d Cir. 2006)................................................................ 29, 34, 35

*CutCo Indus. v. Naughton,*
    806 F.2d 361 (2d Cir. 1986).......................................................................... 34

*Duncan v. Walker,*
    533 U.S. 167 (2001)....................................................................................... 42

*Gebardi v. United States,*
    287 U.S. 112 (1932)................................................................................. 43, 44

*Hamling v. United States,*
    418 U.S. 87 (1974)......................................................................................... 28

*Hernandez v. United States,*
    300 F.2d 114 (6th Cir. 1962) ........................................................................ 34

*Hyde & Schneider v. United States,*
    225 U.S. 347 (1912).......................................................... 15, 16, 17, 18

*Kollias v. D & G Marine,*
    Maint., 29 F.3d 67 (2d Cir. 1994) ................................................................ 40

*Leary v. United States,*
    395 U.S. 6 (1969)........................................................................................... 11

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998)......................................................................................... 42

*Mancuso v. Douglas Elliman, LLC,*
    808 F. Supp. 2d 606 (S.D.N.Y. 2011).......................................................... 35

*Morrison v. Nat'l Austl. Bank Ltd.,*
    561 U.S. 247 (2010)................................................................................. 38, 40

*Morton's Market, Inc. v. Gustafson's Dairy, Inc.,*
    198 F.3d 823 (11th Cir. 1999) ...................................................................... 22

*Pasquantino v. United States,*
    544 U.S. 349 (2005)....................................................................................... 38

*Salinas v. United States,*
    522 U.S. 52 (1997)......................................................................................... 43

*Screws v. United States,*
    325 U.S. 91 (1945)......................................................................................... 36

*Smith v. United States,*
    133 S. Ct. 714 (2013)............................................................................... passim

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012)............................................................................. 35

*United States v. Alfonso,*
    143 F.3d 772 (2d Cir. 1998).................................................................... 28, 30

*United States v. Amen,*
    831 F.2d 373 (2d Cir. 1987).................................................................... 44, 47

*United States v. Antar,*
    53 F.3d 568 (3d Cir. 1995)............................................................................. 19

*United States v. Approximately $25,829,681.80 in Funds,*
    98 CIV. 2682 (LMM), 1999 WL 1080370 (S.D.N.Y. Nov. 30, 1999)................... 39

*United States v. Arocena,*
    778 F.2d 943 (2d Cir. 1985)........................................................................... 23

*United States v. Barletta,*
    644 F.2d 50 (1st Cir. 1981)............................................................................ 11

*United States v. Battle,*
    473 F. Supp. 2d 1185 (S.D. Fla. 2006) .................................................... 10, 14

*United States v. Bellomo,*
    263 F. Supp. 2d 561 (E.D.N.Y. 2003) ............................................................ 48

*United States v. Berger,*
    22 F. Supp. 2d 145 (E.D.N.Y. 1998) ................................................................ 9

*United States v. Berger,*
    224 F.3d 107 (2d Cir. 2000)........................................................................... 19

*United States v. Bergrin,*
    650 F.3d 257 (3d Cir. 2011)........................................................................... 28

*United States v. Bodmer,*
    342 F. Supp. 2d 176 (S.D.N.Y. 2004)......................................................... passim

*United States v. Borelli,*
   336 F.2d 376 (2d Cir. 1964)........................................................................ 9, 14, 16, 22

*United States v. Burks,*
   678 F.3d 1190 (10th Cir. 2012) ............................................................................. 24

*United States v. Cabrales,*
   524 U.S. 1 (1998)................................................................................................. 49

*United States v. Carnesi,*
   461 F. Supp. 2d 97 (E.D.N.Y. 2006) ..................................................................... 9

*United States v. Castle,*
   925 F.2d 831 (5th Cir. 1991) ........................................................................... 25, 45

*United States v. Cianchetti,*
   315 F.2d 584 (2d Cir. 1963).................................................................................... 8

*United States v. Cohen,*
   427 F.3d 164 (2d Cir. 2005)................................................................................. 40

*United States v. Consolidated Laundries Corporation,*
   291 F.2d 563 (2d Cir. 1961).................................................................................... 8

*United States v. Covington,*
   395 U.S. 57 (1969)............................................................................................... 11

*United States v. Diaz,*
   176 F.3d 52 (2d Cir. 1998).................................................................................... 9

*United States v. Dinero Express, Inc.,*
   313 F.3d 803 (2d Cir. 2002)................................................................................. 49

*United States v. Elder,*
   90 F.3d 1110 (6th Cir. 1996) .............................................................................. 13

*United States v. Erb,*
   543 F.2d 438 (2d Cir. 1976)................................................................................. 23

*United States v. Esquenazi,*
   752 F.3d 912 (11th Cir. 2014) ............................................................................. 26

*United States v. Fernandez-Torres,*
   604 F. Supp. 2d 356 (D.P.R. 2008).................................................................... 12

*United States v. Flores,*
   404 F.3d 320 (6th Cir. 2005) .............................................................................. 11

*United States v. Gardley*,
  No. 2:10cr236(GMN), 2013 WL 4786208  (D. Nev. Sept. 5, 2013) ........................................ 10

*United States v. Gilboe*,
  684 F.2d 235 (2d Cir. 1982), ........................................................................................ 38, 39

*United States v. Goldberg*,
  401 F.2d 644 (2d Cir. 1968) ......................................................................................... 20, 21

*United States v. Grimmett*,
  (Grimmett I), 150 F.3d 958 (8th Cir. 1998) ...................................................................... 11

*United States v. Grimmett*,
  (Grimmett II), 236 F.3d 452 (8th Cir. 2001) ................................................................. 11, 12

*United States v. Harris*,
  79 F.3d 223(2d Cir. 1996), ............................................................................................... 48

*United States v. Harris*,
  959 F.2d 246 (D.C. Cir. 1992) .......................................................................................... 44

*United States v. Heicklen*,
  858 F. Supp. 2d 256 (S.D.N.Y. 2012) ............................................................................... 36

*United States v. Ivanov*,
  175 F. Supp. 2d 367 (D. Conn. 2001) ................................................................................ 39

*United States v. Kay*,
  359 F.3d 738 (5th Cir. 2004) ................................................................... 25, 30, 31, 40

*United States v. Kim*,
  246 F.3d 186 (2d Cir. 2001) ............................................................................................. 39

*United States v. Kim*,
  No. 09cr1160, 2010 WL 1780959  (S.D.N.Y. May 4, 2010) ................................................. 31

*United States v. Lahey*,
  967 F. Supp. 2d 731 (S.D.N.Y. 2013) ................................................................................ 31

*United States v. Lake*,
  472 F.3d 1247 (10th Cir. 2007) ........................................................................................ 46

*United States v. LaSpina*,
  299 F. 3d 165 (2d Cir. 2002) ............................................................................................ 28

*United States v. Lothian*,
  976 F.2d 1257 (9th Cir. 1992) .......................................................................................... 24

*United States v. Lyttle*,
   667 F.3d 220 (2d Cir. 2012) .......................................................................... 8

*United States v. Metter*,
   860 F. Supp. 2d 205 (E.D.N.Y. 2012) ........................................................ 47

*United States v. Nerlinger*,
   862 F.2d 967 (2d Cir. 1988)................................................................... 20, 21

*United States v. Ngige*,
   No. 2:12CR98(JAW), 2013 WL 950689  (D. Me. Mar. 12, 2013)............................. 10

*United States v. Paladino*,
   401 F.3d 471 (7th Cir. 2005) ........................................................ 16, 17, 18

*United States v. Perez*,
   575 F.3d 164 (2d Cir. 2009)................................................................... 28, 30

*United States v. Piervinanzi*,
   23 F.3d 670 (2d Cir. 1994)........................................................................ 49

*United States v. Pino-Perez*,
   870 F.2d 1230 (7th Cir. 1989) .................................................................. 44

*United States v. Read*,
   658 F.2d 1225 (7th Cir. 1981) .................................................................. 24

*United States v. Resendiz-Ponce*,
   549 U.S. 102 (2007)................................................................................... 28

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007)...................................................................... 31

*United States v. Rowland*,
   No. 3:14cr79, 2014 WL 3341690  (D. Conn. Jul. 8, 2014) ......................... 28, 30, 36

*United States v. Ruffin*,
   613 F.2d 408 (2d Cir. 1979)...................................................................... 47

*United States v. Saavedra*,
   223 F.3d 85 (2d Cir. 2000)........................................................................ 50

*United States v. Searles*,
   No. 7CR195(CVE), 2009 WL 302306  (N.D. Okla. Feb. 6, 2009) ........................ 10

*United States v. Shaw*,
   106 F. Supp. 2d 103 (D. Mass. 2000) ........................................... 10, 13, 22

*United States v. Smith*,
  198 F.3d 377 (2d Cir. 1999)........................................................................... 49

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)...................................................................................... 44

*United States v. Southard*,
  700 F.2d 1 (1st Cir. 1983)............................................................................. 44

*United States v. Stavroulakis*,
  952 F.2d 686 (2d Cir. 1992)......................................................................... 28

*United States v. Steele*,
  685 F.2d 793 (3d Cir. 1982)......................................................................... 22

*United States v. Stephenson*,
  895 F.2d 867 (2d Cir. 1990)......................................................................... 39

*United States v. Stone*,
  444 F. Supp. 1254 (E.D. Wisc. 1978),.......................................................... 10

*United States v. Stroh*,
  No. 3:96CR139(AHN), 2000 WL 1833397 (D. Conn. Nov. 3, 2000) ........................... 9, 13, 14

*United States v. Svoboda*,
  347 F.3d 471 (2d Cir. 2003)......................................................................... 49

*United States v. Tannenbaum*,
  934 F.2d 8 (2d Cir. 1991)............................................................................. 43

*United States v. United States Gypsum Co.*,
  438 U.S. 422 (1978)...................................................................................... 16

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013)........................................................................... 39

*United States v. Villanueva*,
  408 F.3d 193 (5th Cir. 2005) ........................................................................ 40

*United States v. Weingarten*,
  632 F.3d 60 (2d Cir. 2011)........................................................................... 40

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003)........................................................................... 40

*Urban Assocs. v. Standex Elecs., Inc.*,
  216 Fed. Appx. 495 (6th Cir. 2007)............................................................. 29

Statutes

15 U.S.C. § 78dd-1 ................................................................................................ 25, 41

15 U.S.C. § 78dd-2 ............................................................. 6, 25, 27, 38, 41, 42

15 U.S.C. § 78dd-3 .................................................................... 26, 41, 42, 45

15 U.S.C. § 78m ....................................................................................................... 46

18 U.S.C. § 2 ................................................................................................ 6, 43, 46

18 U.S.C. § 371 ................................................................................................ 6, 43

18 U.S.C. § 1504 ...................................................................................................... 36

18 U.S.C. § 1956 ....................................................................... 6, 39, 48, 50

18 U.S.C. § 3292 ........................................................................................... 6, 8

18 U.S.C. § 3292(c) ................................................................................................ 8

21 U.S.C. § 848 ...................................................................................................... 46

26 U.S.C. § 4744 .................................................................................................... 11

Rules

F.R.E. 404(b) ............................................................................................................ 3

Fed. R. Crim. P. 12(b)(2) ................................................................................... 8

The Government submits this memorandum in opposition to the Defendant's Motion to Dismiss the Second Superseding Indictment (Docket No. 149).

## I.   <u>Introduction</u>

The defendant seeks to have the Court take the extraordinary step of dismissing the Indictment against him at this pretrial phase based on his interpretation of the legal import of certain allegations contained in the Indictment, supplemented by his own selective version of events contained in an affidavit attached to his motion.  The Indictment, however, sets forth more than sufficient facts to support the charged crimes.  Moreover, at trial the Government expects to present substantial additional evidence supporting the charges, including facts that bear directly on the arguments raised by the defendant in his motion.  The defendant's motion thus represents a novel effort to – in effect – invent and obtain summary judgment in the criminal process based on the claim that he has established the factual basis for his defenses.  For good reason, the law provides that only after the Government has presented its case should a judge and jury grapple with the legal and factual sufficiency of that evidence.  Thus, the defendant's motion should be denied.  Even addressing the merits of his arguments at this premature stage, however, the defendant's motion should fail.

In particular, the defendant's motion fails because: (1) the issue of withdrawal is necessarily a factual one to be decided by a jury and, nonetheless, the defendant did not withdraw from the charged conspiracies; (2) the Indictment has adequately alleged, and the Government will prove at trial, that the defendant was an "agent" of a domestic concern under the Foreign Corrupt Practices Act ("FCPA"), the charged conduct is domestic (not extraterritorial), and Congress has not specially excepted the defendant from prosecution under the FCPA and, thus, he can be liable for causing, aiding and abetting, or conspiring to commit an

1

FCPA violation even if he is not guilty as a principal; and (3) the Indictment alleges continuing transactions (the bribe payments) that were initiated from Connecticut and alleges that the defendant aided and abetted the transactions through acts in Connecticut, and thus the money laundering charges are properly venued in the District of Connecticut.

## II.   <u>Background</u>

### A.   **The Tarahan Bribery Scheme**

This case arises out of a bribery scheme to secure a $118 million power project for Alstom Power, Inc. ("Alstom Power US"), a company headquartered in Windsor, Connecticut, to build power stations for the government of Indonesia.  Second Superseding Indictment ("Ind.") ¶¶ 2-10.   Defendant Lawrence Hoskins, with the help of his co-conspirators, arranged, scheduled, and caused bribe payments to a high-ranking member of the Indonesian Parliament and officials at the state-owned and state-controlled electricity company in Indonesia in exchange for their assistance in awarding the contract to Alstom Power US and its partners.  *Id.*

The defendant was employed by Alstom Holdings S.A. ("Alstom"), a holding company that acted through its subsidiaries, including Alstom Power US.  *Id.* ¶ 2.  Alstom and its subsidiaries acted as one cohesive unit, and Alstom (the parent) was not an operating entity.  *Id.* Rather, its subsidiaries bid on power and transportation projects around the world.  *Id.*  Thus, any benefit to the parent holding company from these projects flowed indirectly through its subsidiaries.  One such project was the Tarahan Project, to build boiler-based power stations for the government of Indonesia through its state-owned and state-controlled electricity company ("PLN").  *Id.* ¶ 4.  The project was bid on and carried out by Alstom Power US and a consortium partner, Marubeni Corporation, with support from other Alstom subsidiaries, including a subsidiary in Indonesia ("Alstom Indonesia") and another in Switzerland.  *Id.* ¶ 5.

The defendant was assigned to a service division within Alstom called "International

Network," which was responsible for supporting sales efforts on behalf of Alstom's operating entities, i.e., its subsidiaries. *Id.* ¶ 13. The defendant was responsible for overseeing International Network's sales support efforts for project bids in the Asia region. *Id.* ¶ 2. In that capacity, the defendant was responsible for seeking out, negotiating agreements with, and causing payments to third-party consultants that assisted the relevant subsidiaries in securing the projects on which they were bidding. *Id.* ¶ 13. In many cases, the consultants that the defendant helped select and approve did nothing more than act as intermediaries for bribe payments to government officials in exchange for their assistance in helping the defendant and Alstom's subsidiaries secure the projects they were seeking to obtain. *Id.* at 13.[1]

In connection with the Tarahan Project, the defendant spent more than three years working on behalf of Alstom Power US. To that end, the defendant assisted in retaining and negotiating a consulting agreement with a consultant based in Maryland ("Consultant A") on behalf of Alstom Power US. *Id.* ¶ 6, 7. However, when it became clear to the defendant and others at Alstom Power US and Alstom Indonesia that Consultant A was not effectively bribing the key Indonesian government officials, the defendant and his co-conspirators reduced Consultant A's commission and made him responsible only for bribing the high-ranking member of Parliament ("Official 1") and brought on Consultant B to bribe officials at PLN. *Id.* ¶ 9.

The consulting agreements for Consultant A and Consultant B that the defendant negotiated were both signed by Alstom Power US and neither was signed by or referenced

---

[1] The Government has provided to the defendant a detailed notice pursuant to F.R.E. 404(b) of "other act" evidence that may be introduced at trial. For example on April 7, 2003 Power Company Employee A sent an e-mail to the defendant regarding the Muara Tawar (Indonesia) Project bid, stating, "On my discussion with [Power Company Employee B] last Saturday I agree to make an attempt to influence [an Indonesian official] through other channel as discussed between our team and Marubeni. I told [Power Company Employee B] that I will deal with [Consultant B] later on how the 3rd party should be covered."). As another example, on October 23, 2003 defendant Pomponi sent an e-mail to another Alstom employee, copying the defendant, regarding the Sipat (India) Project bid, stating, "I really start to question the ability of our friends..........[sic] or are they just sitting back and expecting to be a collection agency!!" As these e-mails are replete with references to uncharged individuals, they have not been attached here, but are available for the Court's review.

Alstom (the parent).  *See* Ex. 1; Ex. 2.  Both agreements contained a provision titled, "NO UNLAWFUL PAYMENTS," which expressly prohibited the use of "a means of commerce or communication to or within the United States, directly or indirectly" to bribe a foreign official. *See* Ex. 1 at 4-5; Ex. 2 at 5-6.  Nonetheless, both consultants were retained by the defendant and others principally to bribe Indonesian officials.

Even after the retention of Consultant B, however, the defendant took additional steps to ensure that the key officials were bribed in an effective and timely manner.  The defendant and his co-conspirators deviated from Alstom's regular policy of paying the consultant on a pro-rata basis (each time that Alstom Power US received a payment from PLN) and instead instituted a schedule to front-load the payments to Consultant B so that he could pass on the bribes more quickly.  Ind. ¶¶ 65-67, 70-78.  The bribe payments that the defendant and his co-conspirators arranged to be paid to government officials in Indonesia through Consultant A and Consultant B were initiated from Alstom Power US in Connecticut.  *Id.* ¶¶ 83-85, 93, 94-97.

In furtherance of the scheme, the defendant engaged in over 100 e-mail communications and telephone calls with Alstom Power US employees based in the United States.  The defendant and his co-conspirators were successful in their endeavor, securing the lucrative project, and the bribes were paid out as planned.  *Id.* ¶¶ 6, 83-85, 93, 94-97.  The Tarahan Project contract itself was by and between PLN, Alstom Power US, Alstom Indonesia, and Marubeni Corporation.  Ex. 3 at 1, 7.  Alstom (the parent) was not a party to the contract.  *Id.*

### B.    The Defendant Leaves Alstom

After the defendant helped Alstom Power US secure the Tarahan Project, and after he scheduled the bribe payments to be made over the life of the project, the defendant received a new business opportunity.  In an e-mail to several Alstom employees, including Power Company Employee A, the defendant stated, "I have many good memories of Alstom and probably would

have stayed if the company's response to my push for a new challenge had been a bit faster." Ex. 4. However, before leaving, the defendant made sure to congratulate his co-conspirators on a job well-done, expressed his wish that the Tarahan Project serve as a jumping-off point in Indonesia, gave parting advice to maintain the relationship with PLN on future projects, and urged that they stay in touch.

In an e-mail to Power Company Employee A, for example, the defendant wrote, "our efforts paid off after a lot of hard work by many people and I hope that Tarahan will be the start of many future successes for Alstom in Indonesia." Defendant's Exhibit ("Def. Ex.") 3. In an e-mail to co-defendant Frederic Pierucci, the defendant stated, "Great news on Tarahan after all the efforts over several years." Def. Ex. 2.

To ensure that his co-conspirators did not fail to capitalize on the success of the Tarahan Project, the defendant sent yet another e-mail to Power Company Employee A, stating, "If you agree [an Alstom employee] should visit regularly and with you, [Power Company Employee B], [another co-conspirator] and Bill [Pomponi] and others continue the close relationship with PLN and others. As you know [the Alstom employee] has had a preliminary discussion on a coal project and we should consider how to follow this up…Will let you know my new contact details – stay in touch." Def. Ex. 4.

The defendant also sent e-mails making sure that if anyone needed to contact him they would have access to his "new co-ordinates," expressing that he "look[ed] forward to reading of Alstom's continued resurgence in the next few years," Def. Ex. 5, and that he "hope[s] that Alstom continues to prosper," Def. Ex. 5.

According to the defendant, in 2007, while the Tarahan Project and associated bribe payments were still ongoing, he communicated and met with several executives at Alstom to

discuss the possibility of returning to Alstom.  Def. Aff. ¶ 10(c).  Some of these executives were involved in the bribery scheme.

### C.     The Indictment and the Defendant's Arrest

When the Government began investigating this case, it sought evidence from various countries, including Switzerland (where Alstom maintained the consultancy agreements and other correspondence relating to the Tarahan Project), Indonesia, and Singapore (where Consultant B maintained his bank account).  The Government obtained orders pursuant to 18 U.S.C. § 3292, tolling the statute of limitations in this case for the shorter of three years or the time it took to receive the evidence sought.  The first request, to Switzerland, was transmitted on September 22, 2010, and the tolling order reflects tolling beginning on that date.  Switzerland provided responses to the request on December 23, 2013.  The Government has provided the tolling applications and tolling orders to the defendant, confirmed that the evidence was not received until December 23, 2013, and pointed the defendant to examples of the evidence relating to the defendant and the Tarahan Project that were received on that date.

On July 30, 2013, a grand jury sitting in New Haven, Connecticut, returned a twelve-count second superseding Indictment against Lawrence Hoskins.  The Indictment charges the defendant with conspiring to violate the FCPA, in violation of 18 U.S.C. § 371, substantive violations of the FCPA, in violation of 15 U.S.C. § 78dd-2 and 18 U.S.C. § 2, conspiring to launder money, in violation of 18 U.S.C. § 1956(h), and substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) and 18 U.S.C. § 2.  The co-defendants in this case have pleaded guilty.  Frederic Pierucci, the head of global boiler sales who was based at Alstom Power US during the scheme, pleaded guilty on July 29, 2013, to Counts 1 and 2 of the first superseding indictment.  William Pomponi, a vice president of regional sales at Alstom Power US, pleaded guilty on July 18, 2014, to Count 1 of the Indictment.  David Rothschild, a vice

president of regional sales at Alstom Power US, pleaded guilty to a one-count information charging him with conspiracy to violate the FCPA.

After the return of the Indictment, an arrest warrant was issued for the defendant, who is a citizen of the United Kingdom. The Government then undertook the lengthy process of requesting extradition. Following approvals from the Departments of Justice and State, a formal extradition request was sent to the United Kingdom. On or about April 10, 2014, an arrest warrant was issued for the defendant by a duly authorized court in the United Kingdom. On April 23, 2014, the defendant was arrested upon his arrival into the United States Virgin Islands.

## III.    **The Defendant Did Not Withdraw From the Conspiracy**

The defendant's claim that he withdrew from the charged offenses prior to the beginning of the statute of limitations period fails on two principal grounds. First, the defendant's contention that he withdrew from the FCPA and money laundering conspiracies upon his resignation from Alstom is a factual issue that he must prove to a jury at trial. Indeed, there are myriad factual disputes implicated by the defendant's untested, self-serving, and inadmissible affidavit. Second, on the limited record before the Court, there is no evidence to support a factual finding of withdrawal "as a matter of law." To the contrary, the defendant was a principal player in the hiring of consultants to bribe Indonesian officials, and he specifically negotiated terms that would involve payments well beyond his ultimate resignation from Alstom. Upon his resignation, he not only did nothing to discourage his colleagues from paying on the agreements he negotiated, but he offered them encouragement and advice on continued success. The defendant's arguments to the contrary misinterpret the applicable law and the sparse factual record. Finally, the defendant's withdrawal argument bears only on conspiracy and has no effect on the substantive money laundering and FCPA counts.

### A.      The Defendant's Claim of Withdrawal is Premature

Fed. R. Crim. P. 12(b)(2) permits a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."  While a pretrial motion to dismiss on statute of limitations grounds is permissible, an indictment survives attack where it charges at least one overt act within the limitations period.  *See United States v. Cianchetti*, 315 F.2d 584, 589 (2d Cir. 1963).  Similarly, the defendant may place the statute of limitations at issue at trial, which obligates the Government to prove to a jury only that "the conspiracy continued past the statute-of-limitations period."  *Smith v. United States*, 133 S. Ct. 714, 721 (2013).

Here, the defendant's motion to dismiss the Indictment on statute of limitations grounds does not – and indeed cannot – rely on the face of the Indictment, which is clearly not subject to a facial attack. *See Cianchetti*, 315 F.2d at 589.[2]  Faced with a timely Indictment, the defendant then proceeds outside of the factual allegations in the Indictment and alleges that he effectively withdrew from the conspiracy on the date of his resignation from Alstom on August 31, 2004.

Unlike in the case of a facial challenge to the statute of limitations, "it is clear that a confederate, once shown to have been such, has the burden of satisfying the trier of fact that he had withdrawn from the enterprise."  *United States v. Consolidated Laundries Corporation*, 291 F.2d 563, 573 (2d Cir. 1961).  The principle that it is the defendant's burden to prove his withdrawal has long been the precedent of this circuit and was recently reaffirmed by the Supreme Court.  *See Smith*, 133 S. Ct. at 721 (rejecting shift of burden to the Government after

---

[2] In this case, the Government obtained multiple orders of suspension, pursuant to 18 U.S.C. § 3292, which suspended the statute of limitation for three years based upon requests for evidence in foreign countries.  *See* 3:10MC151(AWT); 3:12MC12(AWT); *see also* 18 U.S.C. § 3292(c); *United States v. Lyttle*, 667 F.3d 220, 224 (2d Cir. 2012).  The tolling orders were provided to the defendant on May 16, 2014, with the initial production of discovery, and specifically identified by bates number.  In response to a request from the defendant, on July 23, 2014, the Government provided the underlying motions for tolling and confirmation that the foreign countries did not return the evidence in less than three years from the request.  The defendant, in his motion, does not challenge the validity of the tolling orders or their applicability in this case.

the defendant makes a prima facie showing of withdrawal).

Courts within this circuit have made clear that the issue of whether a defendant effectively withdrew from a conspiracy prior to the statute of limitations period is one that "will be decided by the jury on the basis of all of the evidence." *United States v. Stroh*, No. 3:96CR139(AHN), 2000 WL 1833397, at *4 (D. Conn. Nov. 3, 2000) (Nevas, J.) ("Because the facts relating to Stroh's affirmative defenses of withdrawal and statute of limitations are inevitably bound up with the evidence pertaining to the conspiracy itself, those issues can not be decided as a matter of law after a short fact-finding hearing."); *see also United States v. Carnesi*, 461 F. Supp. 2d 97, 99 (E.D.N.Y. 2006) ("The allegations raised in the Defendant's motion, specifically whether the Defendant actually participated in the conspiracy and whether he withdrew from the conspiracy, are issues of fact for the jury to decide."); *United States v. Berger*, 22 F. Supp. 2d 145, 154 (E.D.N.Y. 1998) (holding that a claim of withdrawal prior to the limitations period was not properly brought as a motion to dismiss and that "[a] properly instructed jury will decide whether [the defendant] withdrew from the conspiracy and ceased all activity in the other charged offenses and whether that withdrawal was prior to the statute of limitations period").[3]

Indeed, the Second Circuit has recognized that withdrawal is a fact-intensive inquiry that is wrapped up in the proof of the underlying conspiracy. In *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1998), the court held that "[t]he issue of whether a conspirator's incarceration establishes withdrawal from the conspiracy must be decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence." (internal quotes omitted). Similarly, in *United States v. Borelli*, 336 F.2d 376, 390 (2d Cir.

---

[3] The defendant in *Berger* does not appear to have appealed the district court's ruling on the pretrial motion to dismiss. The Second Circuit later affirmed the conviction and, in so doing, focused on the full record of evidence of withdrawal that was presented at trial. *United States v. Berger*, 224 F.3d 107 (2d Cir. 2000).

1964), the court granted a retrial on other grounds and held that, although the court could not address withdrawal prior to trial, "if on retrial [the defendant] chooses to place the [proof of his withdrawal] in evidence, this will raise a question for the jury on the issue of his withdrawal."

Not surprisingly, courts in other circuits have reached the same conclusion. *See United States v. Gardley*, No. 2:10cr236(GMN), 2013 WL 4786208 at *3 (D. Nev. Sept. 5, 2013) (rejecting defendant's request for an evidentiary hearing to resolve withdrawal and citing *Smith*, 133 S. Ct. at 718-20, for the proposition that "withdrawal is an affirmative defense to be raised at trial, not in a motion to dismiss"); *United States v. Ngige*, No. 2:12CR98(JAW), 2013 WL 950689 at *2 (D. Me. Mar. 12, 2013) (relying on *Smith*, 133 S. Ct. at 720, and holding that "whether [the defendant] will be able to establish the demanding defense of withdrawal is a matter for a jury to decide upon hearing evidence, not for a judge to decide upon reviewing memoranda"); *United States v. Searles*, No. 7CR195(CVE), 2009 WL 302306 at *3 (N.D. Okla. Feb. 6, 2009) ("[Defendant] may be entitled to an instruction at trial concerning his alleged withdrawal from the conspiracy, but it would inappropriate for the Court to resolve this fact issue on a pretrial motion."); *United States v. Battle*, 473 F. Supp. 2d 1185, 1206 (S.D. Fla. 2006) (holding that defendant's affirmative defense of withdrawal cannot be decided as a matter of law because such a defense "requires scrutiny of all of the pertinent facts in each case, including the scope of the conspiratorial agreement"); *United States v. Shaw*, 106 F. Supp. 2d 103, 123 (D. Mass. 2000) ("Defendant's contention that he effectively withdrew from the conspiracy…relies on issues of fact that must be submitted to a jury."); *United States v. Stone*, 444 F. Supp. 1254, 1256 (E.D. Wisc. 1978), *aff'd*, 588 F.2d 834 (7th Cir. 1978) (refusing to consider a defendant's pretrial claim of withdrawal based principally on "the uncontradicted statements in his affidavit" because the affirmative defense of withdrawal "is not one which is capable of determination

without a trial of the general issue in this case").

In the face of this overwhelming consensus, the defendant attempts to weave together a series of inapt precedents – none of which deal with the issue of withdrawal – that stand for the unremarkable proposition that a court may decide at the pretrial stage uniquely legal questions unrelated to the facts of the case or in situations where the parties have stipulated to the relevant facts.  *See United States v. Covington*, 395 U.S. 57, 60 (1969) (holding that right against self-incrimination was an absolute bar to prosecution under 26 U.S.C. § 4744 because compliance with the statute would subject taxpayer to prosecution by various authorities); *Leary v. United States*, 395 U.S. 6, 26-27 (1969) (companion to *Covington*); *United States v. Flores*, 404 F.3d 320, 327 (6th Cir. 2005) (finding "an alien who has been granted limited temporary authorization" is not "immune to prosecution under § 922(g)(5)(A)"); *United States v. Bodmer*, 342 F. Supp. 2d 176, 181 (S.D.N.Y. 2004) (addressing the strictly legal question of whether the pre-1998 version of the FCPA applied criminally or only civilly to "employees and agents").[4]

In fact, the defendant was able to unearth only two cases in which a court decided the issue of withdrawal before trial – cases that are so clearly distinguishable and equivocal in their rulings that the defendant relegated them to a footnote in his memorandum.  First, in *United States v. Grimmett (Grimmett I)*, 150 F.3d 958 (8th Cir. 1998), the court held that where the defendant entered a conditional plea of guilty and where the Government did not dispute the defendant's version of the facts, the court could determine in a pretrial motion the issue of withdrawal.  *Id.* at 962.  Importantly, the Government and defendant "both agreed to have the issue decided by the magistrate judge upon stipulated facts and the testimony of Grimmett's stepfather." *United States v. Grimmett (Grimmett II)*, 236 F.3d 452, 457 n.3 (8th Cir. 2001)

---

[4] The defendant also cites *United States v. Barletta*, 644 F.2d 50, 58-60 (1st Cir. 1981), which was a case in which the court permitted the Government to demand that the district court rule in advance of trial on the admissibility of evidence in the setting of a retrial and stipulated set of facts.

(Murphy, J., dissenting).  After the magistrate judge and district court ruled on the stipulated set of facts, the court of appeals noted, "[g]iven the fact intensive nature of conspiracy withdrawal issues, there is always a question whether they should be resolved before or at trial," but "[t]he government does not raise that procedural issue, and we decline to consider it."  *Id.* at 454 n.2. Finally, in reviewing the district court's ruling, the Eighth Circuit employed the burden-shifting standard – whereby the defendant need only establish a prima facie showing of withdrawal before the burden of proof shifts to the Government to rebut that showing – that the Supreme Court has since soundly rejected.  *Compare id.* at 454 *with Smith*, 133 S. Ct. at 721.

The other case cited by the defendant, *United States v. Fernandez-Torres*, 604 F. Supp. 2d 356 (D.P.R. 2008), is equally distinguishable.  There, the Government again stipulated to the relevant facts and essentially conceded withdrawal after interviewing a cooperating witness, who confirmed that the defendant had communicated to his co-conspirators prior to the limitations period that he would no longer participate in any bank robberies.  *Id.* at 359; 362-63 (United States Magistrate's Recommendation).  Absent the concession, the recommending Magistrate would not have dismissed the case.  *Id.* at 362.  As far as the Government can tell, *Fernandez-Torres* has not been cited by a single court since its 2008 decision.  Thus, at most, the case stands for the limited proposition that a motion to dismiss may be properly brought where the Government stipulates to a set of facts and concedes the basis for a defense of withdrawal.[5]

It is perhaps no coincidence, then, that all but one of the cases cited later by the defendant in his analysis of withdrawal are *post-trial* appeals challenging convictions.  The one case cited by the defendant in his analysis that is a pretrial case, *United States v. Shaw*, rejected the

---

[5] As in *Grimmett*, the court also employed the burden-shifting standard that has since been rejected by *Smith*.  *See Fernandez-Torres*, 604 F. Supp. 2d at 362 ("[T]here was a total lack of evidence to meet defendant Fernandez-Torres's initial burden for the requested dismissal.").

defendant's motion as inappropriate before trial and held that withdrawal "relies on issues of fact that must be submitted to a jury." 106 F. Supp. 2d at 123.  In sum, where the defendant raises an issue of withdrawal that is contested by the Government, the issue "can not be decided as a matter of law after a short fact-finding hearing."  *Stroh*, 2000 WL 1833397 at *4.

The intensely factual nature of a withdrawal claim is particularly clear in this case.   The defendant asks this Court to rely on his 13-paragraph affidavit describing the circumstances of his departure from Alstom and alleging the lack of further interaction with his colleagues, as well as a handful of cherry-picked e-mails.  The Government is entitled to test before a jury the veracity and completeness of the defendant's evidence and the inferences that the defendant claims it warrants, and also to present to a jury its own witness testimony and documents.

For example, the defendant cites a 2007 meeting – while the Tarahan conspiracy was still ongoing – with Alstom executives as a "courtesy" to his former boss to discuss the possibility of returning to Alstom in the United Kingdom.  Def. Aff. ¶ 10(c).  The Government should be permitted to cross-examine the defendant, should he take the stand, regarding the nature and purpose of that meeting.  That cross-examination should take place in front of a jury – the ultimate arbiter of credibility and finder of facts in any criminal case.  *See, e.g.*, *United States v. Elder*, 90 F.3d 1110, 1122 (6th Cir. 1996) (holding jury, as arbiter of witness credibility, was entitled to reject as incredible the defendant and his witnesses on the issue of withdrawal).

Moreover, the Government intends to present evidence that the defendant's former boss approved the same corrupt consultancy agreements and payments as did the defendant and thus the defendant's agreement to attend such a meeting is inconsistent with a repudiation of the bribery scheme.  For example, both the defendant and his former boss gave their approvals to the agreements and terms of payment with Consultant A and Consultant B, respectively, through

13

"Consultancy Agreement File Sheet[s]."   The Government should be permitted to present witness testimony that a number of the executives with whom the defendant met participated in multiple bribe schemes with the defendant on behalf of Alstom entities.  The Government will also seek to present testimony of other co-conspirators who will confirm that which is made clear in the defendant's own exhibits – by his departure he did not intend that the bribery scheme would end, but rather that it would continue as he pursued greener pastures.  *See Battle*, 473 F. Supp. 2d at 1206 ("[Defendants] did not advocate that the conspiracy should cease or that others should leave.").

Similarly, the Government should be entitled to challenge the defendant's untested assertions regarding the nature and import of his Alstom pension.  The Government intends to introduce evidence that Alstom not only contributed to the pension at the time of the defendant's employment, but also within the past few years.  Thus, the defendant benefited from Alstom's continued prosperity, including through the award of the Tarahan project and other corrupt deals.

The defendant's motion is also inappropriate for pretrial adjudication because "the facts relating to [his] affirmative defenses of withdrawal and statute of limitations are inevitably bound up with the evidence pertaining to the conspiracy itself."  *Stroh*, 2000 WL 1833397 at *4. The defendant helped select the two consultants who were tasked with paying bribes to Indonesian officials, and scheduled the payments to those consultants to continue long after the defendant's departure.  *See* Ind. ¶ 7.  The defendant's claim of withdrawal, which includes no contention that he attempted to undo those contracts or their prospective payments, can only be considered in the context of his role and participation in the scheme.  *See Borelli*, 336 F.2d at 388-89.  Thus to decide the defendant's motion before trial would place the Court in the role of factfinder of the ultimate issue – whether and to what extent the defendant was a part of the

charged conspiracy; the nature and scope of the conspiracy; what foreseeable results flowed from the defendant's membership in the conspiracy; and any interplay between the evidence bearing on such issues and any evidence of withdrawal.

Finally, while the Government has made plain here that there are many factual disputes that remain to be resolved regarding the defendant's claim of withdrawal, it has neither provided an exhaustive list nor proffered all the evidence it intends to introduce either in its case-in-chief or its rebuttal case, should the defendant raise such a defense. The Government has gone above and beyond the requirements of Rule 16 and has provided virtually all of the evidence it has gathered in this case that is remotely relevant to Tarahan and the defendant, along with extensive indices and guides to navigate that evidence. Now the defendant asks the Court to require that the Government (nine months prior to trial) identify both the evidence on which it would rely to rebut a prospective affirmative defense as well as all of its principal arguments against withdrawal. Neither is required under Rule 16, and the defendant has not cited a single case in support of such a proposition.

### B. Even On the Limited Facts Presented Here, the Defendant Did Not Withdraw From the Conspiracy

Not only does the defendant incorrectly invite this Court to settle a fact-intensive jury question as a matter of law prior to trial, he does so based upon on a standard that misinterprets and misapplies the law of the Supreme Court and this circuit. Under the proper standard, even upon the limited set of facts before the Court, the defendant cannot establish withdrawal.

The Supreme Court held long ago that "[h]aving joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until [the defendant] does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law." *Hyde & Schneider v. United States*, 225 U.S. 347, 369 (1912).

In *United States v. United States Gypsum Co.*, 438 U.S. 422, 464-65 (1978), the Court reaffirmed the *Hyde* "disavow and defeat" standard and clarified that withdrawal carries no talismanic formula, so long as the defendant establishes that he engaged in "affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators."  Just last year, the Court – in assigning the burden of proving withdrawal solely to the defendant – again reaffirmed *Hyde*, stating that "'to avert a continuing criminality,' there must be 'affirmative action…to disavow or defeat the purpose of the conspiracy.'"  *Smith*, 133 S. Ct. at 720 (quoting *Hyde*, 225 U.S. at 369).    Thus, the defendant must prove that he acted affirmatively "to disavow or defeat the purpose of the conspiracy."

This circuit, in applying the *Hyde* standard, has made it clear that a defendant's withdrawal must exhibit a disavowal of the criminal activity itself, and place the burden of continuing the conspiracy on unrelated acts of other co-conspirators.  Thus, in *Borelli*, the court found that a defendant had not withdrawn from a drug conspiracy, even where he terminated all relations with his criminal associates, "so long as any of the contraband obtained during his participation was being sold."  336 F.2d at 389; *see also id.* at 388 n.8 ("When conspirators have set a dynamite machine with a timed fuse in position to blow up a building and go away and leave it to do its destructive work in due course of time, they are continuing in their purpose and are in the actual execution of that purpose every moment of time until the machine explodes.").

Where a defendant resigns from a criminal enterprise in a way that does not interfere with or disavow that which was set in motion during his active involvement, he cannot claim that it was unforeseeable that the natural ends of the conspiracy would be carried to fruition after he resigned.  In *United States v. Paladino*, 401 F.3d 471, 479 (7th Cir. 2005), the Seventh Circuit explained that a defendant is obligated to communicate his withdrawal in a manner likely to

impede the continuation of the conspiracy.  "By communicating his withdrawal to the other members of the conspiracy, a conspirator might so weaken the conspiracy, or so frighten his conspirators with the prospect that he might go to the authorities in an effort to reduce his own liability, as to undermine the conspiracy."  *Id.* at 479-80.  The court found that the defendant "neither informed on the conspiracy so that the government could apprehend the other conspirators and by doing so prevent it from inflicting the losses that his own conduct had set the stage for, nor took any other measure to weaken the conspiracy; and so he remained liable for foreseeable losses inflicted by the conspiracy after his expulsion."  *Id.* at 480.

Here, the purpose of the charged conspiracy was the bribery of Indonesian officials to secure a power contract.  *See* Ind. ¶ 27.  To that end, the defendant spent more than three years putting the scheme in place, retaining the two bribe-paying consultants and establishing terms of payments that caused the bribes to be paid on a set schedule over the course of the Tarahan Project.  *See, e.g.*, *id.* ¶¶ 30, 66-70, 73, 83-85, 94-97.  There is no question that the defendant reasonably foresaw the overt acts in furtherance of that purpose that continued beyond his departure from Alstom, because the continued payments were contractually obligated by the very consultancy agreements that he negotiated during his employment.  *See id.* ¶ 7.  Thus, to avoid responsibility for conduct that occurred after his departure from Alstom, the defendant would first have to prove to a jury that he acted affirmatively "to disavow or defeat the purpose of the conspiracy," in this case the bribery of Indonesian officials to obtain and retain the Tarahan Project.  *Hyde* 225 U.S. at 369.

The evidence proffered by the defendant does nothing of the kind.  The defendant's departure from Alstom was not akin to a repudiation or disavowal of the criminal conspiracy; to the contrary, his departure e-mails actually encouraged his co-conspirators to continue down the

road he helped pave with bribery.  The defendant's farewell e-mail to co-defendant Pierucci stated: "Great news on Tarahan after all the efforts over several years."  Def. Ex. 2.  The defendant wrote to co-conspirator Power Company Employee A, "As you say our efforts paid off after a lot of hard work by many people and I hope that Tarahan will be the start of many future successes for Alstom in Indonesia."  Def. Ex. 3.  In a follow-up e-mail to Power Company Employee A, the defendant actually gave advice on how to maintain the close relationship with PLN, the Indonesian power company whose officials were bribed by the defendant and others to secure the Tarahan Project: "If you agree [an Alstom employee and co-conspirator] should visit regularly and with you, [Power Company Employee B], [another co-conspirator] and Bill [Pomponi] and others continue the close relationship with PLN and others.  As you know [the Alstom employee] has had a preliminary discussion on a coal project and *we* should consider how to follow this up…Will let you know my new contact details – stay in touch."  Def. Ex. 4 (emphasis added).

Nowhere does the defendant even hint that his departure was either a rejection of the conspiracy's corrupt practices or aimed at preventing the further payments to officials that he arranged.  Rather, it is clear that it had nothing to do with the conspiracy and everything to do with a better business opportunity, as he wrote, "I have many good memories of Alstom and probably would have stayed if the company's response to my push for a new challenge had been a bit faster."  Ex. 4.  In sum, the defendant's resignation from Alstom did nothing to "disavow or defeat the purpose of the conspiracy," *Hyde*, 225 U.S. at 369; it did nothing to "weaken the conspiracy" or otherwise affect the defendant's liability for "foreseeable losses inflicted by the conspiracy" after his departure, *Paladino*, 401 F.3d at 480; and in fact the defendant encouraged his co-conspirators to continue their conduct.

Evidently conscious that his departure e-mails did nothing to repudiate the Tarahan bribery scheme, the defendant is forced into the unsustainable argument that his resignation from Alstom, coupled with his communication to some co-workers that he was leaving Alstom, amounted to withdrawal under the law.  To support his argument, the defendant relies on a reading of the case law that would create a disparate standard for establishing withdrawal in cases where a defendant resigns from a job.  The defendant's reading, however, so dilutes clear and repeated Supreme Court precedent on the issue of withdrawal as to render it in direct conflict with that precedent.  There is simply no legal or logical support for a bifurcated standard.

For example, the defendant relies heavily on *United States v. Berger*, 224 F.3d 107 (2d Cir. 2000), for the proposition that "resigning from a business enterprise will constitute an affirmative act inconsistent with the object of the conspiracy sufficient to withdraw from a conspiracy operating within that enterprise," as long as the defendant does not promote or benefit from the conspiracy after he withdraws.  Defendant's Memorandum ("Def. Mem.") at 15.  Yet the defendant misstates the test as outlined in *Berger*.  Indeed, *Berger*'s formulation begins: "resignation from a *criminal* enterprise, standing alone, does not constitute withdrawal as a matter of law."  224 F.3d at 118 (emphasis added).  In *Berger*, the defendant resigned, not from a legitimate business organization at which criminal conduct was occurring, but rather from a fictional entity – "TTY" – that was the vehicle for the fraudulent scheme.  *Id*. at 118.  In other words, the fictional TYY was coextensive with the criminal conspiracy itself.  Moreover, the court in *Berger* also required (1) the "total severing of ties with the enterprise," and (2) that the defendant not act in furtherance of the conspiracy or "receive benefits from the conspiracy's operations."  *Id.* at 119 (quoting *United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995)).

The defendant here does not meet any of these elements, much less all of them.  As

discussed above, the defendant did not resign from the criminal enterprise, but rather from Alstom.  Far from the "total severing of ties," the defendant congratulated his co-conspirators on the Tarahan Project, gave them advice on how to continue their success, asked them to "stay in touch," communicated and met with Alstom executives in 2007 (while the bribe payments were still ongoing) to discuss the possibility of returning to Alstom, and still receives a pension from Alstom that includes contributions from Alstom made possible by the conspiracy's success.[6]

Neither *United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988) nor *United States v. Goldberg*, 401 F.2d 644 (2d Cir. 1968), the two other cases from this circuit relied upon by the defendant, support a different conclusion.  In *Nerlinger*, the defendant participated in a scheme whereby he opened an account with his employer, a commodity-futures trading firm, in the name of his then-fiancée.  862 F.2d at 970.  The defendant played a narrow role in the conspiracy, however, linked only to the account that was used to receive profits of fraudulent trades as part of a conspiracy led by a head trader, and out of which the defendant received a cut of the proceeds.  *Id*.  The defendant left his employer and closed the account prior to the beginning of the limitations period, and the conspiracy continued using other unrelated accounts with other unrelated traders, to which the defendant was not connected and from which the defendant received no proceeds.  *Id*.  In holding that the defendant withdrew from the conspiracy, the court held that the defendant's resignation, alone, was insufficient to disavow the scheme.  *Id*. at 975.  However, once the defendant closed the account, which constituted the extent of his participation in the conspiracy, the continuity of the scheme depended on the acts of other co-conspirators to funnel new trades through unrelated accounts, and the court found that the defendant could not

---

[6] Indeed, the court in *Berger* upheld the jury's rejection of the withdrawal defense because the defendant's resignation letter helped to further the goals of the conspiracy by repeating the lies on which the fraud was based, and failed to advise the government agency responsible for the defrauded grant program of the fraud.  *Id.* at 119.  Likewise, the defendant here made no attempt to warn his superiors about the illegal conduct occurring at Alstom, and his resignation e-mails lauded the result of the bribery scheme.

20

be liable for acts that were beyond his role in the conspiracy. *Id.* at 974. Here, the payments to the consultants were contractually obligated based upon the conspiracy's activity during the defendant's active involvement. The defendant is not charged with conspiratorial liability for new bribery schemes or new consultant contracts that took place after he left, only with the making good on agreements he negotiated.

Similarly, in *Goldberg*, defendant Scheftel was a salesman in a "boiler room operation" who received from his boss Goldberg "lead cards," created by Goldberg, that contained the names of people who would be targeted for sales of near-worthless stock. 401 F.2d at 646. If Scheftel was successful in making a sale, he would return the card to Goldberg, who would attempt to "load" the customer with additional stock. *Id.* at 646-47. Importantly, the entire organization for which they worked, managed by Goldberg, was criminal in its operation. *Id.* at 646. The court held that the defendant's resignation from the criminal enterprise, and notice to the NASD and his customers, was sufficient to show "affirmative evidence that Scheftel abandoned the illegal enterprise in a manner calculated to reach co-conspirators." *Id.* at 649. In finding withdrawal, the court distinguished *Borelli* and its "time-bomb" analogy, explaining that the lead cards were not prepared or controlled by Scheftel and would do no further "destructive work" absent further action by Goldberg after Scheftel's departure. *Id.* at 649. The court suggested, however, that the defendant would have been liable had Goldberg made additional sales to Scheftel's customers after his departure, noting that there was "no evidence that any 'loads' were placed with any one of Scheftel's customers after the cutoff date." *Id.*

Unlike in *Goldberg* and *Berger*, the defendant's resignation from Alstom, a multinational corporation and global leader in power generation and transportation, was not a rejection of the criminal enterprise. And unlike Scheftel in *Nerlinger*, the defendant here is charged with

criminal acts directly attributable to, and foreseeable from, his criminal conduct.  *See Borelli*, 336 F.2d at 389 ("[A] finding that [defendant] terminated all relations with his associates…would not constitute an effective withdrawal so long as any of the contraband obtained during [defendant's] participation was being sold.").

The decisions in *Berger*, *Goldberg*, and *Nerlinger* should not serve to weaken the standard set forth by the Supreme Court on numerous occasions in the way the defendant suggests.  Indeed, *Smith* was decided just last year and made clear that "a defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it….His individual change of heart (assuming it occurred) could not put the conspiracy genie back in the bottle.  We punish him for the havoc wreaked by the unlawful scheme, whether or not he remained actively involved.  It is his withdrawal that must be active, and it [is] his burden to show that."  *Id.* at 721 (emphasis in original).

The selected out-of-circuit cases relied upon by the defendant, all decided post-trial, also do not rescue his claim.  *See United States v. Steele*, 685 F.2d 793, 804 (3d Cir. 1982) (applying a now-overruled withdrawal standard to find that the Government had not brought forward evidence to carry its burden to disprove withdrawal); *see also Morton's Market, Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999) (finding in a civil case that withdrawal can be found only where the defendant "can demonstrate that he retired from the business, severed all ties to the business, and deprived the remaining conspirator group of the services which he provided to the conspiracy"); *Shaw*, 106 F. Supp. 2d at 123 (rejecting withdrawal argument at pretrial stage because the issue "must be submitted to a jury," and stating that a jury would have to consider "whether defendant's retirement from [the enterprise] was an affirmative act that disavowed or defeated the purpose of the conspiracy, in light of the case law

that says that mere cessation of conspiratorial activity is not enough to effect a withdrawal").

In sum, the defendant was a principal orchestrator of the consultancy agreements that funneled bribes to Indonesian officials. He walked away from Alstom for a better business opportunity without disavowing the scheme, without impeding in any way the future payments he set in motion, and while still encouraging his colleagues to continue the same work. Leaving for another time the question of whether the defendant is even entitled to a jury instruction on withdrawal, and even assuming withdrawal could be adjudicated as a pretrial motion, the facts of this case do not support a finding of withdrawal.

### C.    Withdrawal is Not a Defense to the Substantive Counts in the Indictment

Finally, the defendant's motion assumes, without explanation, that his withdrawal defense applies equally to all counts of the Indictment. Def. Mem. at 9. Withdrawal from a conspiracy, however, is not a defense to the substantive FCPA and money laundering violations.

The statute of limitations for aiding and abetting a crime does not begin to run until the substantive crime is complete; it is irrelevant whether the defendant's actions aiding the crime took place prior to the limitations period. *See United States v. Erb*, 543 F.2d 438, 446 (2d Cir. 1976) (holding that the statute of limitations did not bar conviction for aiding and abetting the filing of a false registration statement where, even though the defendant's conduct occurred prior to the limitations period, the filing took place within the period). Indeed, as there is no aiding and abetting liability without the substantive crime, the "period of limitation [begins] to run only when the crime [is] complete," i.e., when substantive crime is committed. *Id.*

While withdrawal can be a defense to the crime of conspiracy, courts – including in this circuit – have held that withdrawal is not available as a defense to substantive charges, including through aiding and abetting liability. *See, e.g.*, *United States v. Arocena*, 778 F.2d 943, 948 n.3 (2d Cir. 1985) (finding no error where the district court failed to instruct the jury on withdrawal

23

related to a substantive count "because withdrawal is not a defense to the substantive crime of aiding and abetting a murder"); *United States v. Read*, 658 F.2d 1225, 1239-40 (7th Cir. 1981) (holding that "[a] party's 'withdrawal' from a scheme is [] no defense to the crime because membership in the scheme is not an element of the offense"); *but see United States v. Burks*, 678 F.3d 1190, 1195-96 (10th Cir. 2012) (declining to adopt a categorical rule that one cannot withdraw from aiding and abetting a criminal violation); *United States v. Lothian*, 976 F.2d 1257, 1263 (9th Cir. 1992) (analogizing fraud scheme to conspiracy for withdrawal purposes).

Here, where the substantive charges require neither membership in a conspiracy nor in a scheme to defraud, there can be no withdrawal.

## IV.   **The Defendant Violated the FCPA**

The defendant's contention that the FCPA violations must be dismissed is based on a series of flawed inter-dependent arguments.  The defendant's claim that he cannot be held liable as an agent of Alstom Power US relies on formalistic notions of agency law, without regard to the actual facts alleged in the Indictment.  The defendant's argument that the FCPA does not apply extraterritorially is both incorrect and irrelevant, because the Indictment charges domestic conduct.  Finally, the defendant is not part of any class of persons excepted from prosecution under the FCPA.  In effect, the defendant seeks to create a special class of persons immune from FCPA prosecution: a class of foreign nationals at the highest reaches of business organizations who can cause U.S. persons to bribe with impunity.  Contrary to the defendant's contention, there is no such loophole in the federal criminal code, and the courts have not fashioned one.

### A.   **Relevant Law**

#### 1.   The FCPA

In his motion, the defendant purports to outline the "limits" of the FCPA, yet cites no support for his reading of the statute.  The courts of appeals that have interpreted the FCPA, and

the detailed legislative record provided by the Congresses that enacted and amended it, undercut the defendant's novel and cramped interpretation of the statute's reach.

"Congress enacted the FCPA in 1977, in response to recently discovered but widespread bribery of foreign officials by United States business interests. Congress resolved to interdict such bribery, not just because it is morally and economically suspect, but also because it was causing foreign policy problems for the United States." *United States v. Kay*, 359 F.3d 738, 746 (5th Cir. 2004).

As initially constituted, the FCPA prohibited, *inter alia*, domestic concerns (i.e., U.S. persons or entities), or "any officer, director, employee, or agent of such domestic concern," from making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the giving of anything of value to a foreign official in order to obtain or retain business. *See* 15 U.S.C. § 78dd-2(a).[7]  The Fifth Circuit noted in construing the FCPA that Congress intended the statute to apply to "virtually every person or entity involved, including foreign nationals who participated in the payment of the bribe when the U.S. courts had jurisdiction over them," with the sole exception of the foreign officials receiving the bribe. *United States v. Castle*, 925 F.2d 831, 835 (5th Cir. 1991).  However, the original statute distinguished between foreign nationals who acted as "officers or directors" of domestic concerns, on the one hand, and "employees or agents" of domestic concerns, on the other. *See, e.g.*, *Bodmer*, 342 F. Supp. 2d at 182-83.  At the time, "employees and agents" could only be held civilly liable while "officers and directors" were subject to criminal prosecution. *Id.*

---

[7] The FCPA likewise prohibited U.S. issuers and their officers, directors, employees, and agents from engaging in the same misconduct, *see* 15 U.S.C. § 78dd-1, but that provision is not at issue in this case.

Notably, for purposes of the present motion, Congress amended the FCPA in 1998 "to ensure the United States was in compliance with its treaty obligations….In joining the OECD Convention, the United States agreed to 'take such measures as may be necessary to establish that it is a criminal offence under [United States] law for *any person* intentionally to'" bribe a foreign official to obtain or retain business. *United States v. Esquenazi*, 752 F.3d 912, 923 (11th Cir. 2014) (citations omitted and emphasis added).[8]

The 1998 amendments expanded the jurisdictional reach of the FCPA in three significant ways.  Congress added territorial jurisdiction to address those taking action "while in the territory" of the United States in furtherance of corrupt payments, expanded the criminal reach of the FCPA over "agents" of domestic concerns to cover foreign nationals, and added nationality jurisdiction over U.S. issuers and domestic concerns irrespective of whether they used instrumentalities of interstate commerce in the bribery scheme.

First, Congress added 15 U.S.C. § 78dd-3, which prohibited those individuals or entities that did not already fall under other provisions of the statute from taking action "while in the territory" of the United States in furtherance of corrupt payments.  According to Congress: "This section closes the gap left in the original FCPA and implements the OECD Convention's requirement that Parties criminalize bribery by 'any person.'…The new offense complies with this section by providing for criminal jurisdiction in this country over bribery by foreign nationals of foreign officials when the foreign national takes some act in furtherance of the bribery within the territory of the United States."  S. Rep. No. 105-277 at 4 (1998); H.R. Report No. 105-802 at 23 (1998).

---

[8] The Organisation for Economic Cooperation and Development ("OECD") was founded in 1961 to stimulate economic progress and world trade.  The Anti-Bribery Convention requires OECD parties to criminalize the bribery of foreign public officials in international business transactions.  There are 41 parties to the Convention: 34 OECD member countries (including the United States) and seven non-OECD member countries (Argentina, Brazil, Bulgaria, Colombia, Latvia, the Russian Federation, and South Africa).

Second, Congress amended 15 U.S.C. § 78dd-2 to make clear that foreign nationals acting as "agents" of domestic concerns could be criminally prosecuted for violating the FCPA if they used some manner or means of interstate commerce: "Presently, foreign nationals who are employees or agents (as opposed to officers or directors) are subject only to civil sanctions. Eliminating this preferential treatment implements the OECD Convention's requirement that '[e]ach Party shall take such measures as may be necessary to establish that it is a criminal offense under its law for any person to [make unlawful payments].'''  S. Rep. No. 105-277 at 4; H.R. Report No. 105-802 at 22; *see also Bodmer*, 342 F. Supp.2d at 181.  Unlike in §78dd-3, however, there is no requirement that these foreign-national agents act "while in the territory" of the United States when carrying out the corrupt act.

Third, Congress provided for an additional jurisdictional basis through nationality jurisdiction.  According to Congress, this "implements the OECD Convention by creating a new additional basis for jurisdiction over foreign bribery by U.S. persons."  S. Rep. No. 105-277 at 3; H.R. Report No. 105-802 at 21.  Under this new provision, "a U.S. person violates the FCPA if it makes any of the payments prohibited under the existing statute outside of the United States, irrespective of whether in doing so it makes any use of the mails or means or instrumentality of interstate commerce."  S. Rep. No. 105-277 at 3-4; H.R. Report No. 105-802 at 21-22.

Thus, after the 1998 amendments, there are three jurisdictional bases under the FCPA: (1) where domestic concerns or issuers, or any officer, director, employee, or agent thereof (regardless of their nationality) make use of U.S. interstate commerce in furtherance of the corrupt payment; (2) where U.S. persons act outside the United States in furtherance of the corrupt payment, regardless of whether they make use of U.S. interstate commerce; and (3)

where all other persons, while in the territory of the United States, act in furtherance of the corrupt payment, regardless of whether they make use of U.S. interstate commerce.

2.    <u>Sufficiency of an Indictment</u>

"It is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  Moreover, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. LaSpina*, 299 F. 3d 165, 177 (2d Cir. 2002) (internal quotes omitted).

Thus, an indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Alfonso*, 143 F.3d at 776 (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)).  So long as the indictment meets these two requirements, it cannot be dismissed merely because the government has not alleged additional facts.  *United States v. Rowland*, No. 3:14cr79, 2014 WL 3341690 at *8 (D. Conn. Jul. 8, 2014) (Arterton, J.) (citing *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007)).  Indeed, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial…the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  *United States v. Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009) (quoting *Alfonso*, 143 F.3d at 776-77).

"Only if 'a charging document fails to state an offense [because] the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation' is dismissal of an indictment appropriate."  *Rowland*, 2014 WL 3341690 at *6 n.3 (quoting *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011)).

28

**B.      The Defendant Was an Agent of a Domestic Concern**

The defendant first challenges the Indictment based on its characterization of him as an "agent" of a domestic concern.  Understanding that his motion cannot succeed if he challenges the factual evidence supporting a finding that he acted as an agent of a domestic concern, the defendant attempts instead to frame his motion as "a matter of statutory interpretation."  Def. Mem. at 26 n.1.  Saying it is so, however, does not make it so.

The defendant does not contest the criminal nature of the conduct in this case – bribes paid by and on behalf of Alstom Power US to a high-ranking member of Indonesian Parliament and PLN officials in order to secure the Tarahan Project.  Nor does he dispute that he was acting on behalf of Alstom Power US.  He is, thus, left to claim that he could not, as a matter of law, have been "controlled" by Alstom Power US because he was an executive at Alstom (the parent).  But the defendant does not cite any support for the proposition that an employee or executive of a parent company is incapable, *as a matter of law*, of acting as an agent of a subsidiary, particularly where the parent is a non-operating holding company and the defendant's job is to perform work for the subsidiaries.  Such a result would run afoul of the axiomatic principle that, "[i]n determining the existence of an agency relationship…substance controls over form…." *Urban Assocs. v. Standex Elecs., Inc.*, 216 Fed. Appx. 495, 510 (6th Cir. 2007); *see Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 523 (2d Cir. 2006) (holding that the analysis of "control" and agency is "highly-factual and often nuanced").

The defendant's argument, then, necessarily rests on the facts of the case, and must fail for two reasons: (1) the Indictment need do nothing more than track the statutory language and provide a time and date for the defendant's criminal conduct; and (2) the Indictment, nonetheless, makes clear that the defendant was an agent of Alstom Power US.

1.      The Indictment Is Sufficient

As an initial matter, the Indictment here sufficiently pleads the "elements of the offense charged," fairly informs the defendant "of the charge against which he must defend," and enables "him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Alfonso*, 143 F.3d at 776.   It does not, and need not, detail all the information that the Government will present at trial to prove each element, nor rule out potential defenses.  *See, e.g.*, *Perez*, 575 F.3d at 166-67; *Rowland*,  2014 WL 3341690 at *6.

The Indictment alleges that the defendant "was an agent of a 'domestic concern,' Power Company Connecticut, as that term is used in the FCPA."   Ind. ¶ 13.   Power Company Connecticut (Alstom Power US) is alleged to have been "headquartered in Windsor, Connecticut, incorporated in Delaware, and thus a 'domestic concern,' as that term is used in the FCPA."  *Id.* ¶ 11.  In Counts Two through Seven (the substantive FCPA counts), the Indictment tracks the statutory language, alleging that on or about the specific dates set forth in each count, the defendant and a co-defendant acted as "employees and agents of a domestic concern."  *Id.* ¶ 102.  The Indictment need allege nothing more than this in order to comply with the pleading requirements.  *See, e.g.*, *Rowland*,  2014 WL 3341690 at *8 ("Although Defendant is correct that the Superseding Indictment does not specifically allege how Mr. Rowland caused a false filing with the FEC, it need not do so.").

This is particularly true where, as here, the element about which the defendant complains does not go to the "core of criminality" of the FCPA.  "When the FCPA is read as a whole, its core of criminality is seen to be bribery of a foreign official to induce him to perform an official duty in a corrupt manner."  *Kay*, 359 F.3d at 761.  The Fifth Circuit in *Kay* held that the FCPA's "core of criminality" does not include the business nexus element (i.e. what business the defendant was seeking to obtain through the bribery and how the bribery helped obtain that

business); rather, this element "serves to delimit the scope of the FCPA." *Id.* (concluding "the indictment's paraphrasing of the FCPA's business nexus element passes the test for sufficiency, despite alleging no details regarding what business is sought or how the results of the bribery are meant to assist"); *see also United States v. Kim*, No. 09cr1160, 2010 WL 1780959 at *2 (S.D.N.Y. May 4, 2010) ("Indictment need only allege 'the core of criminality the government intend[s] to prove' at trial." (quoting *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007))). The element challenged by the defendant – being an agent of a domestic concern – is certainly no more "core" to the FCPA's criminality than the business nexus element, and similarly serves only to "delimit" its application.  Indeed, the defendant has not argued otherwise.

Thus, even if the Indictment here had merely tracked the statutory language, it would have sufficed for purposes of the present motion.  *See, e.g.*, *United States v. Lahey*, 967 F. Supp. 2d 731, 739 n.5 (S.D.N.Y. 2013) (finding defendants' contention that they could not have been "employed for" prohibited persons within the meaning of the bodyguard statute, as a matter of law, was not appropriate for pretrial determination, and was only addressed by the court in the context of their constitutional arguments, noting, "a stand-alone argument about what the statute requires would be better presented not as a challenge to the Superseding Indictment, but instead as an argument as to what the Government must show by way of proof…").

## 2.    The Indictment Goes Beyond the Minimum Pleading Requirements

The 34-page Indictment in this case goes well beyond the minimum pleading requirements; rather, it makes clear that the defendant, in connection with the Tarahan Project, was an agent of Alstom Power US.

Alstom (the parent) was not itself an operating entity, and acted only through its subsidiaries, including Alstom Power US.  Ind. ¶ 2.  Indeed, Alstom appeared nowhere on the Tarahan Project contract or on the consultancy agreements with Consultant A or Consultant B.

31

*See, e.g.*, Exs. 1, 2, 3.   Yet the defendant spent more than three years negotiating these agreements and the terms of the bribe payments to secure the Tarahan Project for Alstom Power US.   *See* Ind. ¶¶ 13, 58, 66-67, 69-70.   The Indictment further cites e-mails in which the defendant is being directed by, or seeking concurrence from, employees of Alstom Power US in connection with the bribery scheme.   For example, in one such e-mail, the defendant asks William Pomponi – a regional sales manager at Alstom Power US – whether Pomponi could give the "all clear" to change the terms of payment for Consultant B to ensure timely bribe payments.   *Id.* ¶ 73.   In another e-mail the Government will introduce at trial, Pomponi instructs the defendant to send a retention letter to Consultant B: "Based upon our telecon Sunday, pls go ahead, using today's date, and issue the fax officially to [Consultant B].   Pls send copy via LN attachment to myself."   Ex. 5.[9]   The defendant is receiving instructions and seeking concurrence from employees at Alstom Power US, a clear indication of "control" over the defendant.

In support of his argument that he was in a position of "predominance" over Alstom Power US, the defendant misconstrues the allegations contained in the Indictment.   To prove that he could not, as a matter of law, have been "controlled" by Alstom Power US, he claims in his brief that his responsibilities "included 'oversight' of the subsidiaries' business efforts in Asia."   Def. Mem. at 28.   In fact, the Indictment alleges that his responsibilities included "oversight of Parent Company's [Alstom's] and Parent Company's subsidiaries' efforts to obtain contracts with new customers…."   Ind. ¶ 13.   By the defendant's own reasoning, then, the defendant could not have been "controlled" by the parent company either, because he had "oversight" of *its* sales efforts in Asia.   This is clearly an over-reading of the term "oversight" and under-reading of the term "control."   More fundamentally, the very indicia of "control" to which the defendant points

---

[9] These e-mails are merely illustrative and by no means a full proffer of the Government's evidence.   The Government will seek to introduce at trial a number of e-mails and witness testimony that establish the defendant was "controlled" by Alstom Power US, that go well beyond the allegations contained in the Indictment.

– "oversight," "approving," and "authorizing" – are actions that a high-level employee *of Alstom Power US* would take.  One who oversees a company's sales efforts in a particular region and authorizes and approves payments to a consultant retained by that company would fit squarely within the definition of an employee or agent of that company.

The defendant also claims that, in one e-mail, Pomponi "asks whether certain payment terms 'would be acceptable' to Mr. Hoskins."  Def. Mem. at 29.  The actual language in the Indictment, however, reveals a different scenario.  The defendant had relayed terms of payment that Consultant B was requesting, Ind. ¶ 67, and Pomponi responded, stating, "I have seen your response and wish to offer the following as our compromise to [Consultant B's] proposal….Pls advise if these you think would be acceptable??" *id.* ¶ 70.  An e-mail in which Pomponi asks whether the defendant thinks a counter-proposal to Consultant B would be acceptable to Consultant B hardly exhibits "control" over Pomponi, much less Alstom Power US.

Lastly, the defendant asserts that, in an e-mail, "[o]ne subsidiary employee, for instance, advises Mr. Hoskins that his 'position' on a consultancy is needed and asks for Mr. Hoskins's 'decision a.s.a.p.'"  Def. Mem. at 29.  However, the "subsidiary employee" is not an employee of Alstom Power US, but rather of Alstom Indonesia, and the e-mail is sent to the defendant *and* to Frederic Pierucci and Dave Rothschild (both Alstom Power US employees).  Ind. ¶ 40.  The defendant is being addressed *together with* Alstom Power US employees by an Indonesia-based employee who is seeking their collective approval.

The defendant's misinterpretation of the allegations in the Indictment reveals the fundamental flaw in his argument.  The defendant's argument depends on an interpretation of facts – and, here, only those included in the Indictment without regard to the evidence the Government will seek to admit at trial – that requires inferences to be drawn in his favor.  But

this analysis is necessarily factual.  In an attempt to escape this unavoidable conclusion, the defendant strains to fit the allegations of the indictment into his theory of events, posits an overly rigid definition of "control," and hides behind a formalistic application of the law based on his job title within Alstom's corporate structure.

Indeed, the defendant's apparent definition of "control" is inconsistent with Second Circuit precedent holding that control "may be very attenuated." *Caplaw Enterprises*, 448 F.3d at 522 ("Nevertheless, the control asserted need not 'include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.'" (quoting  Restatement (Second) of Agency § 14 cmt. a.)).  It would be odd, indeed, if the defendant could arrange for bribe payments on behalf of Alstom Power US in order to help Alstom Power US secure a $118-million project, receive instructions from Alstom Power US employees and spend three plus years working collaboratively with them to accomplish the corrupt end, but nonetheless be freed from liability on a narrow reading of "control."  *See CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (reversing district court decision in personal jurisdiction context because court "insist[ed] upon a greater degree of control than that which is required by common law agency rules," and finding that "[u]nder traditional agency law, joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others").[10]  In fact, Black's Law Dictionary, Webster's New International Dictionary (First, Second, and Third Editions), and the Merriam-Webster online dictionary set forth definitions of agency that contain no reference to an element

---

[10]  The defendant cites to a number of authorities, including the Department's FCPA Guidance, that address principles of agency in the context of fiduciary relationships and vicarious liability.  However, where one party is being held responsible for the acts of another party, it logically follows that a higher degree of control would be warranted.  *See, e.g.*, *Hernandez v. United States*, 300 F.2d 114, 120 (6th Cir. 1962) ("Vicarious liability follows from the principal's power to control.").  This ensures that an imputation of liability is appropriate and fair.  The defendant, however, is being held accountable for his own actions.

of "control" at all.  Rather, "agent" is defined as "one who is authorized to act for or in place of another; a representative."  Black's Law Dictionary, Eighth Edition, 68 (2004); *see also* Webster's Second New International Dictionary 48 (1959) (defining "agent" as "one who acts for, or in the place of, another, by authority from him" and comparing it to "servant," which "implies one who works under the direct employment and control of the principal").[11]

The defendant likewise relies on his formal job title.  But the definition of "control" is a functional one, not a formalistic one.  *See, e.g.*, *Caplaw Enterprises*, 448 F.3d at 523 (reversing district court's dismissal of complaint because issue of "control" was a factual one and holding that "[s]lavish deference to contractual language is inappropriate in the highly-factual and often nuanced agency analysis"); *Mancuso v. Douglas Elliman, LLC*, 808 F. Supp. 2d 606, 629 (S.D.N.Y. 2011) ("Agency is a highly factual inquiry and can turn on a number of factors, including the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done." (internal quotes omitted)).

The cases cited by the defendant do not dictate a different outcome – indeed, none involves the issue of agency at all.  Rather, they stand for the unremarkable proposition that an indictment can be challenged pretrial when the conduct alleged is not a crime under the statute. *See United States v. Aleynikov*, 676 F.3d 71, 77 (2d Cir. 2012) (addressing whether a computer

---

[11] The defendant cites to none of these sources, but instead relies upon Merriam-Webster's Law Dictionary (1996) for a definition of "agent" that includes the element of "control."  The defendant omits, however, that the definition he cites is the third definition provided, after two preceding definitions which do not include any reference to the element of "control."  In reviewing these dictionary definitions of agency, the Government does not mean to suggest that the concept of control has no place in an analysis of whether an agency relationship has been established; rather, these definitions simply help to demonstrate that in seeking a dismissal of the FCPA charges – based on the position that categorically, as an employee of a parent business organization, the defendant could never be an agent of the parent's subsidiary regardless of the facts that might ultimately be proven at trial – the defendant treats "control" as a narrow and formalistic requirement, rather than as a functional and fact-dependent issue.

"source code" that the defendant was alleged to have stolen "constituted stolen 'goods,' 'wares,' or 'merchandise' within the meaning of the NSPA," and citing a Supreme Court decision for the proposition that theft of "purely intangible property is beyond the scope of the NSPA"); *United States v. Heicklen*, 858 F. Supp. 2d 256, 275 (S.D.N.Y. 2012) (finding 18 U.S.C. § 1504, a federal jury tampering statute, applies to "a specific case pending before [a] juror" and not to public distribution of pamphlets outside a courthouse advocating general juror nullification).

The Indictment has adequately alleged, and the Government will prove at trial, that the defendant was as an agent of Alstom Power US.  Ultimately, such a question "is an issue for the jury to determine at trial on the basis of the evidence, not for the Court on a pre-trial motion to dismiss." *Rowland*, 2014 WL 3341690 at *6.

### 3.    The FCPA Is Not Unconstitutionally Vague

The application of the FCPA to the defendant does not render the statute unconstitutionally vague.  As described above, the defendant's conduct is unambiguous: he corruptly negotiated consultancy agreements to conceal a considerable bribe scheme whereby Alstom Power US bribed a high-ranking member of the Indonesian Parliament and PLN officials.  In so doing, he had over 100 communications to and from the U.S. persons on whose behalf he worked, arranged a sham consulting agreement with a U.S. resident, and set up a schedule of the bribe payments to be paid out of Connecticut by Alstom Power US to the U.S. consultant.  To suggest the defendant was not on notice that he could be subject to the FCPA is simply not supported by the facts.  *See, e.g.*, *Screws v. United States*, 325 U.S. 91, 102-03 (1945) ("[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law.").

Indeed, the very consulting agreements that the defendant negotiated included a prohibition of the very conduct he now claims is vague. In a section titled, "NO UNLAWFUL PAYMENTS," the agreement provided that, "in connection with performance of such services, the CONSULTANT will not use a means of commerce or communication to or within the United States, directly or indirectly, to" make a payment to a government official. Exs. 1, 2.

At the time of the alleged conduct, the OECD Convention, to which the United States, France, and the United Kingdom (among many others) were parties, prohibited the exact conduct at issue here, as did Alstom's internal policies and codes. The conduct was likewise illegal in Indonesia; in fact, Official 1 was recently convicted for taking the bribes the defendant and his co-conspirators are alleged to have paid.[12]

Finally, the very definition of "agent" that the defendant claims to be "counter-intuitive" is found in every recognized dictionary. According to the defendant, the only "reasonable" interpretation of "agent" is the third definition in Merriam-Webster's Dictionary of Law – not the definitions that precede it, or the definitions found in mainstream dictionaries.

## C.      The FCPA Applies Extraterritorially

The defendant next argues that the FCPA – a statute that prohibits *foreign* bribery – does not apply extraterritorially. The defendant's argument is legally incorrect and is, moreover, inapposite because the charged conduct is domestic.

As an initial matter, the Court need not address the question of extraterritorial application of the FCPA because the defendant is charged with *domestic* criminal conduct – causing wire transfers from Connecticut to the consultants for the purpose of bribing foreign officials. *See* Ind. ¶ 102. The Indictment alleges that, over a more than three-year span, the

---

[12] Emir Moeis, a senior member of Indonesian Parliament who led several commissions, including the Commission on Energy, was prosecuted by Indonesia's Corruption Eradication Commission and was convicted at trial.

defendant orchestrated a bribery scheme that had its focal point in the United States, negotiated bogus consulting agreements with a U.S. consultant based in Maryland for the purpose of concealing the bribes, established terms of payments that caused the bribes to be paid from Connecticut on a set schedule, and sent and received repeated e-mails to and from the United States in furtherance of the corrupt scheme. *See, e.g.*, *id.* at ¶¶ 30, 66-67, 69-70, 73, 83-85, 94-97, 102. Thus, the defendant "ma[d]e use of the mails or any means or instrumentality of interstate commerce" in furtherance of the corrupt payments, which is all that is required for an agent of a domestic concern to violate the FCPA. 15 U.S.C. § 78dd-2(a).

Because the charged conduct is domestic, there is no need to address the extraterritorial application of the statute. *See Pasquantino v. United States*, 544 U.S. 349, 371 (2005) ("[The defendants'] offense was complete the moment they executed the scheme inside the United States….This domestic element of petitioners' conduct is what the Government is punishing in this prosecution..."); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 271-72 (2010) (distinguishing *Pasquantino* on the ground that the wire fraud scheme was completed based on conduct in the United States); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 596 (S.D.N.Y. 2014) ("Because all of the conduct material to elements of the Travel Act occurred within the United States, the presumption against extraterritoriality does not apply.").

The defendant's reliance on the claim (supported by his own affidavit) that he was not physically present in the United States when taking these U.S. acts has no impact on the domestic nature of his offense. This very argument has been rejected by the Second Circuit in analogous cases involving statutes that criminalize the use of interstate wires. In *United States v. Gilboe*, 684 F.2d 235 (2d Cir. 1982), *cert. denied*, 459 U.S. 1201 (1983), for example, the defendant argued that "the district court did not have jurisdiction over the offenses charged

because he was a nonresident alien whose acts occurred outside the United States and had no detrimental effect within the United States." *Id.* at 237.  The Second Circuit made clear that under the wire fraud statute, it was "defendant's use of the wires to obtain the proceeds of his fraudulent scheme" that conferred jurisdiction, regardless of where the defendant was when he made use of those wires.  *Id.* at 237-38; *see also United States v. Ivanov*, 175 F. Supp. 2d 367, 371 (D. Conn. 2001) (Thompson, J.) (finding jurisdiction where defendant, although physically present in Russia throughout scheme, accessed computers in Connecticut with intent to defraud); *United States v. Approximately $25,829,681.80 in Funds*, 98 CIV. 2682 (LMM), 1999 WL 1080370, at *3 (S.D.N.Y. Nov. 30, 1999) ("[A] lack of physical activity in the United States in this case is not fatal to jurisdiction….The parties initiating the fund transfers 'acted electronically' within the United States, and such action is sufficient to constitute 'conduct' for purposes of 18 U.S.C. § 1956."); c*f. United States v. Kim*, 246 F.3d 186, 193 (2d Cir. 2001) (finding venue for wire fraud charges proper even though defendants were not physically present in that district); *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990) (finding venue for bribery case proper because defendant "entered" the district "by telephone").

The only difference between the present case and the cases cited above is that the defendant did not merely use U.S. wires to carry out an otherwise wholly foreign crime.  As described above, the scheme had its base in the United States.

However, the defendant's argument must also fail because, unlike the Rule 10b-5 charges at issue in both *Morrison* and *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013), the FCPA is not silent as to its extraterritorial application.  Indeed, the FCPA, on its face, unquestionably applies extraterritorially.  The Supreme Court clarified in *Morrison* that "we do not say…that the presumption against extraterritoriality is a 'clear statement rule,' if by that is meant a

requirement that a statute say 'this law applies abroad.'  Assuredly context can be consulted as well."  561 U.S. at 265; *see also United States v. Weingarten*, 632 F.3d 60, 65 (2d Cir. 2011) (citing *Kollias v. D & G Marine Maint.*, 29 F.3d 67, 73 (2d Cir. 1994) for the proposition that "Supreme Court precedents indicate that 'reference to nontextual sources is permissible' and that 'all available evidence' should be considered in determining whether a statute applies abroad.").

Just as, for example, "the context of immigration statutes make it natural to expect that Congress intends for them to reach extraterritorial conduct," *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005), it is natural to expect that Congress intends the FCPA to reach extraterritorial conduct.  *See id.* ("It is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders."); *see also United States v. Cohen*, 427 F.3d 164, 169 (2d Cir. 2005) ("Congress is presumed to intend extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where restricting the statute to United States territory would severely diminish the statute's effectiveness." (quoting *United States v. Yousef*, 327 F.3d 56, 87 (2d Cir. 2003)).

The FCPA proscribes payments to *foreign* officials to obtain "business in that country." *Kay*, 359 F.3d at 749.  Not surprisingly, then, the legislative history for the FCPA is replete with references to extraterritorial application. *See, e.g.*, House Report No. 95-640 (1977) ("The essential elements of these prosecutions will presumably take place on foreign soil."); *see also* Senate Report No. 95-114 (1977) ("The committee has recognized that the bill would not reach *all* corrupt overseas payments.  For example, the bill would not cover payments by foreign nationals acting *solely on behalf of foreign subsidiaries where there is no nexus with U.S.*

40

*interstate commerce or the use of U.S. mails and where the issuer, reporting company, or domestic concern had no knowledge of the payment*." (emphasis added)).

To support his argument, the defendant does not cite to a single case analyzing the FCPA, nor to the legislative history grounding its enactment.  Instead, he cites his own affidavit, and points to only one provision of the FCPA, claiming that it implicitly limits the extraterritorial application of the FCPA's remaining provisions.  *See* Def. Mem. at 34-35.  Yet this provision of the FCPA provides for an *alternative* basis of jurisdiction for U.S. persons who act outside the United States even though they do not make use of U.S. interstate commerce.  In fact, the provision is titled, "Alternative Jurisdiction."  *See* 15 U.S.C. § 78dd-2(i).  According to Congress, this provision does not restrict any other provision of the FCPA, but rather "implements the OECD Convention by creating a new *additional* basis for jurisdiction over foreign bribery by U.S. persons."  S. Rep. No. 105-277 at 3; H.R. Report No. 105-802 at 21 (emphasis added).  Under this additional basis for jurisdiction, a U.S. person can violate the FCPA if it makes prohibited payments outside of the United States, "*irrespective of whether in doing so it makes any use of the mails or means or instrumentality of interstate commerce*."  S. Rep. No. 105-277 at 3-4; H.R. Report No. 105-802 at 21-22 (emphasis added).

Contrary to the defendant's assertion, then, the nationality or "alternative" jurisdiction provision does not set the outer boundaries of the extraterritorial reach of the FCPA's general provisions.  Rather, it creates an additional basis for jurisdiction for a U.S. person or entity that acts wholly outside the United States without any use of U.S. interstate commerce.

Indeed, at the very same time Congress added this alternative jurisdiction provision, it made two other notable changes.  First, Congress added 15 U.S.C. § 78dd-3, which prohibited those individuals or entities that were not already covered by § 78dd-1 or § 78dd-2 from taking

action "while in the territory" of the United States in furtherance of corrupt payments to foreign officials, irrespective of whether the foreign national made use of "the mails or any means or instrumentality of interstate commerce."  Second, Congress amended 15 U.S.C. § 78dd-2, the statute at issue here, to make clear that foreign nationals acting as "agents" of domestic concerns could be criminally prosecuted for violating the FCPA so long as they made use of "the mails or any means or instrumentality of interstate commerce."

Unlike in 15 U.S.C. § 78dd-3, the amended provision of § 78dd-2 *does not require* that the foreign national agent act "while in the territory," but *does require* the use of "the mails or any means or instrumentality of interstate commerce."  If foreign national "agents" of domestic concerns could only be held criminally liable for acts that they take while in the territory of the United States, this would render Congress's amendment to § 78dd-2 wholly superfluous, because such conduct was covered by the addition of § 78dd-3.  Thus, in order to give effect to every provision of the FCPA, the statute cannot be read as the defendant suggests.  *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.  We are thus reluctant to treat statutory terms as surplusage in any setting." (internal citations and quotes omitted)); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36 (1998) (noting the "central tenet of interpretation, that a statute is to be considered in all its parts when construing any one of them").

The defendant's proposed reading, therefore, is not only inconsistent with the clear statutory language, but would undo that which Congress specifically set out to do through the 1998 amendments – broaden the FCPA to cover additional conduct, including the exact conduct at issue here.  Congress has provided three standard and independent bases for jurisdiction under the FCPA.  Despite the defendant's unsupported claim to the contrary, no one jurisdictional basis

42

limits any other.   The defendant, therefore, cannot escape accountability by resort to the presumption against extraterritoriality.

### D.        The Defendant Is Not Part of an Excepted Class of Persons

The defendant's next argument is dependent upon the acceptance of his previous two.  He asserts that, if he did not act as an "agent" of a domestic concern, and if the FCPA does not apply extraterritorially, then he cannot be prosecuted for causing, aiding and abetting, or conspiring to commit an FCPA violation because he is part of a class of persons that has been excepted from prosecution by Congress.   The gaping loophole on which he attempts to rely would render wholly meaningless the conspiracy and accomplice liability statutes; not surprisingly, neither Congress nor the courts have endorsed that outcome.   To the contrary, Congress, in enacting the 1998 amendments to the FCPA, expressed its intention that prosecution of foreign nationals under all other statutes and regulations, which necessarily would include 18 U.S.C. § 371 and 18 U.S.C. § 2, should not be premised on their physical presence in the United States.

The general rule in conspiracy and accomplice liability cases is that one who is incapable of committing a particular offense may still be guilty of conspiring to commit, causing, or aiding and abetting that offense.  *See, e.g.*, *Salinas v. United States,* 522 U.S. 52, 64 (1997) (noting in the bribery context that "[a] person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense"); *United States v. Tannenbaum*, 934 F.2d 8, 14 (2d Cir. 1991) ("One purpose of 18 U.S.C. § 2 is to enlarge the scope of criminal liability under existing substantive criminal laws so that a person who operates from behind the scenes may be convicted even though he is not expressly prohibited by the substantive statute from engaging in the acts made criminal by Congress." (citation omitted)).

In *Gebardi v. United States*, 287 U.S. 112 (1932), the Supreme Court created an exception to this general principle in the limited circumstance where Congress criminalizes an

act that necessarily requires the participation of two persons and chooses to cover only one of those persons. *Id.* at 123 ("We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter."). For the *Gebardi* court, it was the "inseparable" nature of the act – the man transporting and the woman being transported – and the necessary participation of both in that act, that led the court to conclude that Congress intended one not to be prosecuted. *Id.*

Subsequent Supreme Court and circuit cases have embraced this principle in the appropriately limited and unusual circumstances outlined in *Gebardi*. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 246 (1940) (distinguishing *Gebardi* as a case "where the participation of those…against whom the judgment of conviction was reversed was necessary for the existence of the crime charged"); *United States v. Pino-Perez*, 870 F.2d 1230, 1231-32 (7th Cir. 1989) ("When a 'crime is so defined that participation by another is necessary to its commission,' that other participant is not an aider and abettor." (quoting *United States v. Southard*, 700 F.2d 1, 20 (1st Cir. 1983)); *United States v. Amen*, 831 F.2d 373, 381 (2d Cir. 1987) ("When Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense.").[13]

Yet the defendant is neither part of a class of persons that Congress excluded from coverage under the FCPA, nor is he a necessary participant in the FCPA violation. The

---

[13] Several circuit opinions restricted their reading of *Gebardi* to apply only to those individuals who were victims of the very statute they were being prosecuted for conspiring to violate. *See, e.g.*, *United States v. Harris*, 959 F.2d 246, 263 (D.C. Cir. 1992) ("[O]ne recognized exception to the general rule 'embraces criminal statutes enacted to protect a certain group of persons thought to be in need of special protection.' (citing cases)). Most circuits, however, have embraced this exception together with the "necessary participation" reading of *Gebardi*. Regardless, the defendant is clearly not a victim of the FCPA, and under any reading of *Gebardi*, he remains subject to prosecution for all of the charges set forth in the Indictment.

defendant clearly is not part of any class of persons that Congress has excluded from coverage under the FCPA.  To the contrary, Congress expressly chose to subject individuals like the defendant to prosecution under the FCPA.  The Court need look no further than *Castle*, the very case upon which the defendant so heavily relies, to reach this conclusion.  In describing the legislative history of the FCPA, the Fifth Circuit stated: "In the conference report, the conferees indicated that the bill would reach as far as possible, and listed all the persons or entities who could be prosecuted.  *The list includes virtually every person or entity involved, including foreign nationals who participated in the payment of the bribe when the U.S. courts had jurisdiction over them*."  925 F.2d at 835 (citing H.R.Conf.Rep. No. 831) (emphasis added).

The court then proceeded to distinguish Congress's intent as it applied to foreign officials – the category of defendants at issue in *Castle*.  "Yet the very individuals whose participation was required in every case – the foreign officials accepting the bribe – were excluded from prosecution for the substantive offense.  Given that Congress included virtually every possible person connected to the payments except foreign officials, it is only logical to conclude that Congress affirmatively chose to exempt this small class of persons from prosecution."  *Id.* at 835. *Castle*, therefore, does not support the defendant's argument but rather undermines it.

Congress later answered the defendant's argument even more unequivocally when it passed the 1998 amendments to the FCPA.  In enacting 15 U.S.C. § 78dd-3, the territorial jurisdiction provision of the FCPA, Congress pronounced that, "[a]lthough this section limits jurisdiction over foreign nationals and companies to instances in which the foreign national or company takes some action while physically present within the territory of the United States, *Congress does not thereby intend to place a similar limit on the exercise of U.S. criminal jurisdiction over foreign nationals and companies under any other statute or regulation*."  S.

45

Rep. No. 105-277 at 5; H.R. Report No. 105-802 at 23 (emphasis added).  Thus, more than merely leaving undisturbed the general principle that 18 U.S.C. §§ 2 and 371 shall apply to those statutes enacted in their wake, Congress provided an unambiguous statement that it intended them to apply in cases just such as this.  *See also Bodmer*, 342 F.Supp.2d at 188-89 (holding that Congress, through the 1998 amendments, "clarified that the FCPA's criminal penalties apply to any natural person who is subject to the jurisdiction of the United States courts").

The defendant's argument separately fails because he is not a "necessary party" to an FCPA violation.  The defendant is but one of many conspiring bribe-payors, none of whose involvement is necessary to the crime.  In *United States v. Lake*, 472 F.3d 1247 (10th Cir. 2007), two defendants were charged with conspiring to circumvent the internal controls of a publicly traded company under 15 U.S.C. § 78m.  The defendants argued, just as the defendant argues here, that the statute "limit[ed] liability to only the actual perpetrator of the deed, excusing any coconspirator (or aider or abettor, for that matter)."  *Lake*, 472 F.3d at 1266.  The Tenth Circuit rejected this argument, reasoning that "in both [*Gebardi* and *Castle*] the role of the defendant coconspirator was so central to the commission of the substantive offense that the failure of the statute defining the substantive offense to prohibit that role explicitly was a compelling indication of legislative intent not to punish such a coconspirator.  The defendants here, however, have not argued, and could not argue, that their alleged roles in criminal violations of 15 U.S.C. § 78m(b)(2) are of that nature.  The involvement of one defendant as a coconspirator was hardly essential for the other defendant to commit the substantive circumvention offense."  *Id.* at 1265.

The defendant's reliance on *Amen* is, therefore, misplaced, as it simply applies the same principles as in *Gebardi* and *Castle* in the context of the Kingpin statute, 21 U.S.C. § 848, a statute that necessarily requires one who leads and one who is led.  The Second Circuit

concluded that, "[w]hen Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense.  Here Congress defined the offense as leadership of the enterprise, necessarily excluding those who do not lead."  *Amen*, 831 F.2d at 381 (internal citations omitted).[14]

As a result, even if the Court or jury were to find that the defendant did not act as an agent of Alstom Power US, he still could be found guilty of conspiracy, causing, and aiding and abetting an FCPA violation.  *See, e.g.*, *United States v. Ruffin*, 613 F.2d 408, 413 (2d Cir. 1979) (holding that a person can be convicted of aiding and abetting or causing a violation "even though he may lack the capacity to violate the substantive criminal statute").

## V.    The Money Laundering Counts Are Properly Venued in the District of Connecticut

Lastly, the defendant claims that the money laundering counts (both substantive and conspiracy) are not properly brought in the District of Connecticut.  The defendant, however, bases his argument on an incorrect portrayal of the Indictment.  The defendant caused the wire transfers to be made on a set schedule from Connecticut to the middleman, for the purpose of transferring the money to Official 1 in Indonesia.  These wire transfers constituted one continuing transaction.

For purposes of venue, an indictment need only allege venue broadly.  *See, e.g.*, *United States v. Metter*, 860 F. Supp. 2d 205, 207 (E.D.N.Y. 2012) (rejecting defendant's pretrial challenge to venue as "frivolous" because the indictment "states that the conduct at issue

---

[14] Nor does the district court's decision in *Bodmer* support the defendant's argument.  The defendant in that case was a foreign national charged with conspiracy based on his acts as an agent of a U.S. company before the 1998 amendments to the FCPA made clear that foreign nationals could be held criminally liable for such conduct.  The court held that, while prior to 1998 it was not clear whether Congress intended "employee or agent" foreign nationals to be criminally prosecuted, in 1998, Congress "made clear that foreign nationals acting as agents of domestic concerns are subject to the FCPA's criminal liability provisions."  *Bodmer*, 342 F. Supp. 2d at 181.  If anything, then, *Bodmer* only further supports the position that Congress did not intend the defendant here to be excepted from prosecution even if he were not liable as a principal.

occurred 'within the Eastern District of New York and elsewhere'"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 579 (E.D.N.Y. 2003) (same).

The money laundering statute provides venue in "any district in which the financial or monetary transaction is conducted."  18 U.S.C. § 1956(i)(1)(A).  The statute further provides that, "[f]or purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction.  Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place."  18 U.S.C. § 1956(i)(3).

According to the defendant, "[t]here is no allegation that the predicate financial transactions were conducted in the District of Connecticut; the Indictment alleges, instead, that the transactions were conducted (*i.e.* initiated) from Maryland by a third-party consultant."  Def. Mem. at 39.  This is simply incorrect.  The money laundering charges (Counts Eight through Twelve) incorporate by reference all the other factual allegations in the Indictment, *see* Ind. ¶¶ 103, 112, which are replete with references to the fact that the bribe payments were initiated from Connecticut, and were transferred to Maryland for the purpose of continuing the transfer of bribe payments to Official 1 in Indonesia, *see, e.g.*, *id.* ¶¶ 83-85, 93.  Indeed, the "Manner and Means" section of the money laundering conspiracy (Count Eight) alleges that, "HOSKINS…, while located in the District of Connecticut and elsewhere, directed the wire transfer of, and caused to be wired, money from Power Company Connecticut's and Consortium Partner's bank accounts in New York to Consultant A's bank account in Maryland for the purpose of concealing and disguising the bribe payments to Official 1."  *Id.* ¶ 107; *see also id.* ¶ 106.

The allegations in the Indictment thus sufficiently allege a continuing transaction that properly is venued in the District of Connecticut.  *See, e.g.*, *United States v. Harris*, 79 F.3d 223,

231 (2d Cir. 1996), *cert. denied*, 519 U.S. 851 (1996) (finding that the transfer of funds from New York to Connecticut, and then from to Connecticut to Switzerland, constituted a single transfer under § 1956(a)(2) because, "[w]hile the scheme was implemented in two stages, each stage was an integral part of a single plan to transfer funds 'from a place in the United States to or through a place outside the United States'"); *see also United States v. Dinero Express, Inc.*, 313 F.3d 803, 806 (2d Cir. 2002) ("[W]e held in [*Harris*] that a multi-step plan to transfer money from one location to another should be viewed as a single 'transfer' under § 1956(a)(2)."). [15]

The defendant's reliance on *United States v. Cabrales*, 524 U.S. 1, 5 (1998), is therefore misplaced because the defendant in *Cabrales* was charged with money laundering in Missouri "for transactions which began, continued, and were completed only in Florida." *See also id.* at 8-9. No such limiting set of facts is present here.

Venue is also proper in the District of Connecticut because the defendant is charged with aiding and abetting the money laundering. *See United States v. Smith*, 198 F.3d 377, 384-85 (2d Cir. 1999) ("The government need not also prove venue with respect to the accessorial acts individually because the aiding and abetting charge against Smith not only describes his involvement in the scheme but also provides an additional location where Smith can be tried."); *see also United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) ("[V]enue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue."). Although the defendant, relying on his own affidavit, claims

---

[15] The Government notes that a monetary transfer that is the basis of an international promotional money laundering transaction charge under § 1956(a)(2)(A) can also serve as the basis of a separate charge alleging as an offense the very specified unlawful activity being promoted. *See, e.g.*, *United States v. Piervinanzi*, 23 F.3d 670, 679 (2d Cir. 1994) (rejecting defendant's merger argument because the act of attempting to fraudulently transfer funds out of the bank (the bank fraud) was analytically distinct from the attempted transmission of those funds overseas (the § 1956(a)(2)(A) violation), and was therefore itself independently illegal).

that he took no acts in Connecticut, the Indictment alleges that he caused the payments to be made from Connecticut on a set schedule. *See, e.g.*, *id.* at ¶¶ 102, 106-107. This is more than sufficient to allege aiding and abetting in Connecticut.

Finally, the conspiracy charge is independently venued properly in the District of Connecticut. Despite the fact that the defendant appears well aware that money laundering offenses have their own venue provision, *see, e.g.*, Def. Mem. at 38, the defendant instead relies on *United States v. Saavedra*, 223 F.3d 85 (2d Cir. 2000), a racketeering case not subject to the money laundering venue provision, to pronounce a different standard for venue. The money laundering venue provision, however, clearly states that "[a] prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), *or in any other district where an act in furtherance of the attempt or conspiracy took place*." 18 U.S.C. § 1956(i)(3) (emphasis added). As already described, the defendant took many such acts in the District of Connecticut.

**VI.**   **Conclusion**

Wherefore, based on the foregoing, the United States respectfully submits that the Court should deny the defendant's motion in its entirety.

Respectfully submitted,

| | |
|---|---|
| JEFFREY H. KNOX | MICHAEL J. GUSTAFSON |
| CHIEF, FRAUD SECTION | FIRST ASSISTANT U.S. ATTORNEY |
| Criminal Division | District of Connecticut |
| United States Department of Justice | |
| /s/ | /s/ |
| DANIEL S. KAHN | DAVID E.NOVICK |
| ASSISTANT CHIEF | ASSISTANT U.S. ATTORNEY |
| Fraud Section, Criminal Division | 157 Church St., 25th Floor |
| U.S. Department of Justice | New Haven, Connecticut 06510 |
| 1400 New York Avenue, N.W. | Tel. (203) 821-3700 |
| Washington, D.C.  20005 | Federal Bar No. phv02874 |
| Tel. (202) 616-3434 | |

CERTIFICATION OF SERVICE

This is to certify that on August 29, 2014, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


BY:     _____/s/_____
        DAVID E. NOVICK
        ASSISTANT UNITED STATES ATTORNEY

51