UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| *v.* | Civil No. 3:12cr238 (JBA) |
| LAWRENCE HOSKINS | December 29, 2014 |

**RULING ON DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

Defendant Lawrence Hoskins moves [Doc. # 149] to dismiss the Second Superseding Indictment [Doc. # 50] ("the Indictment") charging him with conspiring to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371 (Count One); substantive violations of the FCPA, in violation of 15 U.S.C. § 78dd-2 and 18 U.S.C. § 2 (Counts Two through Seven); conspiring to launder money, in violation of 18 U.S.C. § 1956(h) (Count Eight); and substantive money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) and 18 U.S.C. § 2 (Counts Nine through Twelve).

Defendant contends that the Indictment must be dismissed in its entirety because (1) he withdrew from the charged conspiracy outside of the limitations period;  (2) the Indictment fails to adequately allege that he was an agent of a domestic concern, which is an element of a FCPA offense; (3) alternatively, if he is an agent of a domestic concern, the FCPA is unconstitutionally vague as applied; (4) the FCPA does not apply extraterritorially to non-U.S. citizens; (5) venue is not proper in this District for the money-laundering counts; and (6) alternatively, if venue lies in this District, the money-laundering counts are multiplicitous with the FCPA counts.  For the reasons that follow, Defendant's motion is denied.

I.      **Background**

On July 30, 2013, a grand jury sitting in New Haven, Connecticut, returned the twelve-count Indictment against Mr. Hoskins alleging that he participated in a bribery scheme that spanned from 2002 through 2009 for Alstom Power, Inc. ("Alstom Power U.S."), a company headquartered in Windsor, Connecticut, to secure a $118 million project to build power stations for Indonesia's state-owned and state-controlled electricity company, Perusahaan Listrik Negara ("PLN"), known as the Tarahan Project. (Indictment ¶¶ 2–10, 26.)   Mr. Hoskins and his co-defendants are alleged to have arranged, scheduled, and caused payments to Indonesian government officials in exchange for their assistance in awarding the contract to Alstom Power U.S. and its partners. (*Id.*)

From October 2001 through August 2004, Mr. Hoskins, was employed as a Senior Vice President for the Asia Region by Alstom Holdings S.A. ("Alstom"), a French holding company that is alleged to have acted through its subsidiaries, including Alstom Power U.S., "without distinction" between the different entities. (*Id.* ¶¶ 2, 7.)   Mr. Hoskins, a citizen of the United Kingdom, worked in Paris for Alstom and never traveled to the United States in connection with his employment.[1]   (*Id.*; Hoskins Aff. [Doc. #149] ¶¶ 2, 4, 9.)   His role in the alleged conspiracy was to approve the selection of and authorize payments to two third-party consultants retained for the purpose of making

---

[1] Mr. Hoskins was arrested on April 23, 2014 upon entering the United States Virgin Islands en route to Dallas to visit his son and contends that he was unaware of the Indictment prior to his arrest.  (Hoskins Aff. ¶ 13.)

illegal payments to officials of the Indonesian government in order to secure a contract for the Tarahan Project.[2]  (*Id.* ¶¶ 4, 6–7, 13.)

In August 2004, while the charged conspiracy was in progress, Mr. Hoskins resigned from Alstom in order "to pursue other [business] opportunities." (Hoskins Aff. ¶ 5 & Ex. 2.)  In his affidavit submitted in support of this motion, Mr. Hoskins represents that after his resignation from Alstom, he was in contact with his former colleagues on only three occasions:  (1) in October 2004, he attended a farewell lunch in his honor in Paris; (2) in December 2004, his former secretary circulated a holiday greeting via email to his former colleagues; and (3) in June 2007, Mr. Hoskins "met with a few Alstom executives (none alleged to be co-conspirators) in Paris as a courtesy to [his] former boss . . . to hear a pitch for [his] return to Alstom in the United Kingdom," which Mr. Hoskins had indicated beforehand he was unlikely to be interested in and ultimately did not pursue.  (Hoskins Aff. ¶ 10–11.)  Mr. Hoskins avers that he does not own any Alstom stock and has not received any money or benefits from Alstom after his resignation with the exception of a "small pension" that he and Alstom contributed to during his 35 months of employment, but which neither contributed to after his resignation.  (*Id.* ¶ 12.)

---

[2] The co-defendants in this case have all pled guilty.  Frederic Pierucci, the head of global boiler sales who was based at Alstom Power U.S. during the scheme, pled guilty [Doc. # 44] on July 29, 2013, to Counts One and Two of the first superseding indictment. William Pomponi, a vice president of regional sales at Alstom Power U.S., pled guilty [Doc. # 142] on July 18, 2014, to Count One of the Indictment. David Rothschild, a vice president of regional sales at Alstom Power U.S., pled guilty to a one-count information charging him with conspiracy to violate the FCPA.  *See United States v. Rothschild*, No. 12cr223 (JBA) [Doc. # 7]; (Notice of Related Case [Doc. # 185]).

## II.     Discussion

"It is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States,* 418 U.S. 87, 117 (1974)).   Although "an indictment must 'charge[] a crime with sufficient precision'" to satisfy these two requirements, it "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id.* (quoting *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir. 1992)) (alterations in original).   "[T]he government need not particularize all of its evidence."  *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991).

"Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . ., the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment" and the allegations in the indictment must be accepted as true.  *Alfonso*, 143 F.3d at 776–77 (reversing dismissal of an indictment when the district court "looked beyond the face of the indictment and drew inferences as to the proof that would be introduced by the government at trial" to satisfy an element of the charge); *accord Costello v. United States*, 350 U.S. 359, 363 (1956) (If "valid on its face," a grand jury indictment "is enough to call for trial of the charge on the merits.") (internal citations omitted)).

### A.      Withdrawal from a Conspiracy

Defendant contends that the Indictment must be dismissed because his resignation from Alstom and severing of ties with his alleged co-conspirators establish his withdrawal from the charged conspiracy as a matter of law and thus the applicable five-year statute of limitations expired on all charges prior to return of the Indictment.  *See* 18 U.S.C. § 3282.  Federal Rule of Criminal Procedure 12(b)(1) provides that a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."[3]  A statute of limitations defense can be raised pretrial, but it "may be premature if the indictment is facially sufficient and the defendant's argument in favor of dismissal requires a determination of factual issues."  *United States v. FNU LNU*, No. 06-CR.-846 (DAB), 2007 WL 1149261, at *2 (S.D.N.Y. Apr. 12, 2007).

There is no dispute that Mr. Hoskins resigned from Alstom on August 31, 2004.  Thus, if as Mr. Hoskins contends, his resignation constituted withdrawal from the charged conspiracy, the applicable statute of limitations would have expired on August 31, 2009, four years before Mr. Hoskins was indicted on July 30, 2013.  *See Smith v. United States*, 133 S. Ct. 714, 719 (2013) ("Withdrawal . . . provides a complete defense when the withdrawal occurs beyond the applicable statute-of-limitations period.").

---

[3] Effective December 1, 2014, after the instant motion was filed, amendments to Rule 12 became effective.  Because the amendment to Rule 12(b)(1) only alters the language slightly but "[n]o change in meaning is intended," Fed. R. Crim. P. 12(b)(1) advisory committee's note, the Court will apply the current version, *see Matter of Jones*, 970 F.2d 36, 38 (5th Cir. 1992) (noting "the general rule that courts apply procedural rules as they exist at the time of decision, as long as no manifest injustice results").

In *Smith*, the Supreme Court clarified that withdrawal is an affirmative defense that a defendant bears the burden of proving by a preponderance of the evidence. 133 S. Ct. at 720. To meet this burden, a defendant must show more than the "mere cessation of activity;" "there must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) (quoting *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964) (alterations omitted)). In other words, "[p]assive nonparticipation . . . is not enough;" " there must be 'affirmative action . . . to disavow or defeat the purpose' of the conspiracy." *Smith*, 133 S. Ct. at 720 (quoting *Hyde v. United States*, 225 U.S. 347, 369 (1912)).[4]

In outlining the contours of a withdrawal defense based on resignation from a "criminal enterprise," the Second Circuit has adopted the following principles:

_____

[4] Defendant incorrectly posits that *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) rejected the "disavow or defeat" test articulated in *Hyde v. United States*, 225 U.S. 347 (1912) when it held that jury instructions requiring that a defendant show that he "affirmatively notified each other member of the conspiracy [that] he will no longer participate" or "make disclosures of the illegal scheme to law enforcement officials" were invalid because they placed "confining blinders . . . on the jury's freedom to consider evidence regarding the continuing participation of alleged conspirators in the charged conspiracy." *U.S. Gypsum Co.*, 438 U.S. at 463–64. The Supreme Court did not specifically reject the "disavow or defeat" test, but noted that "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *Id.* at 464–65. Furthermore, the "disavow or defeat" test has been reiterated a number of times since *U.S. Gypsum Co.*, including by the Supreme Court in *Smith* in 2013 and the Second Circuit in *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) ("[To establish withdrawal, the defendant] was required to present evidence of some affirmative action that he took to disavow or defeat the purpose of the conspiracy." (internal quotation marks omitted)).

 (1) resignation from the enterprise does not, in and of itself, constitute withdrawal from a conspiracy as a matter of law; (2) total severing of ties with the enterprise may constitute withdrawal from the conspiracy; however (3) even if the defendant completely severs his or her ties with the enterprise, the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations.

*Berger*, 224 F.3d at 119 (quoting *United States v. Antar,* 53 F.3d 568, 583 (3d Cir. 1995)).

Defendant acknowledges that his resignation from Alstom does not establish his withdrawal from the charged conspiracy as a matter of law (Def.'s Mem. Supp. [Doc. # 149-1] at 16), but contends that the Court can "assume that the Indictment's allegations are true, including the existence, objects, duration, and membership of the alleged conspiracy" (Reply [Doc. # 174] at 6) and that he can establish withdrawal "if he proves by a preponderance of the evidence that he: (i) terminated his employment ties with Alstom in a manner reasonably calculated to reach his alleged co-conspirators; (ii) did nothing post-resignation to participate in or otherwise promote the alleged conspiracy; and (iii) received no additional benefits from the alleged conspiracy's continued operation after his resignation." (Def.'s Mem. Supp. at 16).

But the facts supporting this withdrawal defense are not and need not be pled in the indictment, *see United States v. Sisson*, 399 U.S. 267, 288 (1970) ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses."), and the Government has not made a full proffer of the evidence that it intends to present at trial for its case-in-chief or in opposition to Defendant's affirmative defense, and it disputes the inferences that Defendant asks the Court to draw from the limited evidence before it (*see* Gov't's Opp'n [Doc. # 161] at 15).  Instead, Defendant asks

the Court to consider the selective recitation of evidence that he has submitted, namely his affidavit describing the circumstances of his departure from Alstom, in which he represents that he has "not communicated with or received anything of value from any of the" alleged co-conspirators since his resignation.  (Hoskins Aff. ¶ 12.)  He maintains that "[a]ny disputes over the import or credibility of any of those . . . facts can be resolved without a full trial."  (Reply at 6.)

However, the Court cannot make such factual determinations pretrial because "[t]here is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context."  *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005).  A court can dismiss an indictment pretrial for legal deficiencies, such as where it "fails to allege a crime within the terms of the applicable statute," *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012), and "may make preliminary findings of fact necessary to decide the legal questions" presented by a motion under Rule 12 of the Federal Rules of Criminal Procedure, but "the court may not invade the province of the ultimate finder of fact," *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (internal quotation marks omitted).

Where a defendant asserts an affirmative defense that is not plain from the face of the indictment and that he or she bears the burden of proving, there must usually be a factual determination of the merits of the charged offense, which must be made at trial by the jury in the first instance.  *See United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995) ("A defendant is not entitled to raise in a pretrial motion the question whether the government breached an agreement with him if the agreement provides a defense to liability for the crimes charged in the indictment [i.e., that he acted with public authority];

resolution of that question requires trial of the general issue and is not properly decided in a pretrial motion."); *see also United States v. Bicoastal Corp.*, 819 F. Supp. 156, 158 (N.D.N.Y. 1993) (because withdrawal is an affirmative defense "the defendants could escape trial only by a method analogous to civil summary judgment"); *United States v. Gardley*, No. 2:10-CR-236-GMN-PAL, 2013 WL 4786208, at *3 (D. Nev. Sept. 5, 2013) ("[A]n evidentiary hearing would not be an appropriate method to adjudicate the merits of Defendant's withdrawal defense," because "the Court may not invade the province of the ultimate finder of fact.").

Despite the absence of a summary judgment procedure in criminal cases, some courts have dismissed an indictment pretrial where the government stipulates to or does not contest the relevant facts. *See, e.g., Alfonso*, 143 F.3d at 776–77; *Yakou,* 428 F.3d at 246 (holding that because the government failed to object to the defendant's interpretation of the evidence, the facts were "undisputed" and dismissal of the indictment pretrial was appropriate); *United States v. Grimmett*, 236 F.3d 452, 457 n.3 (8th Cir. 2001) (the parties "agreed to have the issue [of withdrawal] decided by the magistrate judge upon stipulated facts"); *United States v. Fernandez-Torres,* 604 F. Supp. 2d 356, 359 (D.P.R. 2008) (indictment dismissed where the government proffered the facts supporting a withdrawal defense pretrial). *But see United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) (a court cannot dismiss an indictment pretrial even where the government has proffered the relevant facts). In contrast, the Government has made no such stipulation or proffer in this case.

Defendant maintains that pretrial adjudication is nevertheless appropriate because of the "unique set of circumstances that make[s] Mr. Hoskins's withdrawal

defense independent from the evidence of the conspiracy alleged." (Reply at 6 n.6.)  Even if true, Defendant offers no authority suggesting that the Court can without the Government's consent make a pretrial factual determination of an affirmative defense that would otherwise be decided by the jury at trial.  *Cf.* Fed. R. Crim. P. 23(a)(3) (requiring the government's consent to a non-jury trial).

Nor does the Supreme Court's holding in *Smith* "make[] a withdrawal defense more conducive to pre-trial determination," as Defendant maintains.  (Reply at 5.)  It simply resolved a circuit split and adopted the Second Circuit's "long-standing precedent that withdrawal from a conspiracy is an affirmative defense which the defendant must prove by a preponderance of the evidence."  *United States v. Hamilton*, 538 F.3d 162, 173 (2d Cir. 2008); *Smith*, 133 S. Ct. at 718.  Notably, the other cases cited by Defendant addressing withdrawal were post-trial challenges to the sufficiency of the evidence.  *Cf.* *Berger*, 224 F.3d at 118 (2d Cir. 2000) ("The evidence supports the jury's apparent conclusion that Goldstein's resignation did not amount to a disavowal of the conspiracy."); *United States v. Goldberg*, 401 F.2d 644, 649 (2d Cir. 1968) ("[T]here is uncontroverted, affirmative evidence that Scheftel abandoned the illegal enterprise 'in a manner reasonably calculated to reach co-conspirators.'").

At trial, Mr. Hoskins will have the opportunity to offer an evidentiary basis for his defense that he withdrew from the charged conspiracy for assessment by the jury. Notwithstanding Defendant's characterization of his post-resignation activities, the Government identifies a number of factual disputes that must be resolved at trial, such as whether, in resigning from Alstom, Mr. Hoskins "intend[ed] that the bribery scheme would end" or rather "that it would continue as he pursued greener pastures"; whether

Defendant's attendance at the 2007 meeting with his former boss at Alstom "is inconsistent with a repudiation of the bribery scheme" because the Government claims to have evidence that he met with executives who had participated in the bribery scheme with him; and whether Defendant continued to benefit from his Alstom pension which the Government claims was tied to "Alstom's continued prosperity, including through the award of the Tarahan project and other corrupt deals."[5]  (Gov't's Opp'n at 13–14.) Because Defendant's withdrawal and statute of limitations defenses require the resolution of factual disputes, they must be decided by a jury in the first instance on the basis of a full evidentiary record.

### B.  Withdrawal as to Substantive Counts

The Government maintains that even if Defendant could prove his withdrawal from the charged conspiracy, it would not be a defense to the substantive FCPA and money laundering counts under a theory of aiding and abetting because the statute of limitations for aiding and abetting does not toll until the substantive crimes are complete. (Gov't's Opp'n at 23.)  "[I]t is unsettled if a defendant can withdraw from aiding and

---

[5] Defendant contends that "in the more than one million pages of discovery and witness statements produced by the government to date, there is *not one* document demonstrating that Mr. Hoskins had *any* involvement or contact with the conspiracy or any conspirators after his departure from Alstom" (Def.'s Mem. Supp. at 18) and "there is simply no evidence that Mr. Hoskins promoted or benefited from the alleged conspiracy after he departed Alstom in 2004" (Reply at 4).  However, the absence of evidence known to Defendant to support an affirmative defense is not grounds to dismiss the Indictment. *See Sisson*, 399 U.S. at 288.  Furthermore, the Government contends that Defendant's own exhibits demonstrate that he did not intend for his departure to spell the end of the bribery scheme by, for example, sending an email to a co-conspirator at Alstom's Indonesian subsidiary encouraging him to "continue the close relationship with PLN and others" after Mr. Hoskins's departure.  (Ex. 4 to Hoskins Aff.; Gov't's Opp'n at 14.)

abetting a crime.  Unlike a conspiracy, which by its very nature involves an agreement that can be refuted, accomplice liability can arise from merely encouraging the principal. Given the relatively minor participation that can trigger accomplice liability, it is unclear what actions an individual may take—if any—to immunize himself from liability for a crime that he previously enabled." *United States v. Burks*, 678 F.3d 1190, 1195 (10th Cir. 2012) (internal citations omitted); *see also United States v. Giovenco*, No. 11 CR 316-3, 2013 WL 4552338, at *3 n.3 (N.D. Ill. Aug. 28, 2013) (noting split of authority and collecting cases).[6]

In *United States v. Arocena*, the Second Circuit noted without elaboration that "withdrawal is not a defense to the substantive crime of aiding and abetting a murder." 778 F.2d 943, 948 n.3 (2d Cir. 1985) (citing *United States v. Read*, 658 F.2d 1225, 1240 (7th Cir. 1981)).  *Read*, however, reasoned that a "party's 'withdrawal' from a scheme [to defraud] is . . . no defense to the crime [of fraud] because membership in the scheme is not an element of the offense."  658 F.2d at 1240.  After *Smith,* however, where the Supreme Court held that "[w]ithdrawal does not negate an element of the conspiracy crimes charged" but rather is an affirmative defense that "presupposes that the defendant

---

[6] Defendant contends that "*Smith* demonstrates that a defendant cannot be held responsible for substantive crimes committed by co-conspirators after his withdrawal and, further, that withdrawal also triggers the statute of limitations with respect to any other charges."  (Reply at 7.)  Although *Smith* noted that "[w]ithdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy," 133 S. Ct. at 719, the Supreme Court was referring to *Pinkerton* liability whereby "a conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes."  *United States v. Masotto*, 73 F.3d 1233, 1241 (2d Cir. 1996) (internal quotation marks omitted).

committed the offense," 133 S. Ct. at 714, 719, it is no longer clear whether the reasoning of *Read*, relied upon by the Second Circuit in *Arocena*, remains viable.

The Tenth Circuit has concluded that "it is conceivable that a defendant could withdraw from aiding and abetting a Dyer Act violation," prohibiting interstate transportation of stolen vehicles, but that the defendant bore the burden of proving withdrawal and failed to do so. *Burks*, 678 F.3d at 1196. The Ninth Circuit assumed in dicta that a person could withdraw from being an accomplice. *United States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir. 1992) ("Withdrawal is traditionally a defense to crimes of complicity: conspiracy and aiding and abetting.").

A fully informed examination of the elements of the substantive crimes in light of the trial evidence is necessary for the Court to adequately apply the reasoning of *Smith* and *Arocena*. The parties have not cited any cases examining accomplice withdrawal in an FCPA or money laundering case and "[e]very court to foreclose the withdrawal defense to an accomplice has closely examined the elements and nature of the underlying crime limited their holding to that crime." *Burks*, 678 F.3d at 1196. *Arocena* explicitly referred only to murder, and *Read* relied on the fact that a "scheme to defraud and conspiracy embrace analogous, but not identical, concepts."[7] *Read*, 658 F.2d at 1239.

---

[7] Likewise in *Van Riper v. United States*, 13 F.2d 961, 963 (2d Cir. 1926), the Second Circuit implied that a defendant could not be held liable for fraudulent mailings after he discontinued the firm he was operating and no longer had any connection with his co-schemers' subsequent activities, noting that "[s]uch a scheme, when shared among several, becomes a conspiracy, so that in fact the conspiracy count adds nothing of substance to the charge, except as it relieves the prosecution of the necessity of showing the connection of all the defendants to be charged at the date of the posting of the letters laid in the indictment."

### C.      FCPA Counts

#### 1.      *Agent of a Domestic Concern*

The FCPA provides that it "shall be unlawful for any domestic concern . . . or for any officer, director, employee, or agent of such domestic concern . . . to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to" a foreign official.  15 U.S.C. § 78dd-2(a).

As Defendant acknowledges, the Indictment alleges that he "was an agent of a 'domestic concern,' [Alstom Power U.S.], as that term is used in the FCPA."  (Indictment ¶ 13.)  He nevertheless contends that "because the Indictment *by its own words* describes him as something other than an 'agent,'" it is facially deficient and has "failed to allege a crime."  (Reply at 8–9.)  Citing *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012), Defendant maintains that despite the conclusory allegation that he is an "agent," the Court can dismiss the indictment as "legally insufficient" because the "question is purely one of reading the allegations against the statute and the ordinary meaning of the term 'agent'" and "[w]hat the Indictment describes does not satisfy *any* rational definition of agency."  (Reply at 9.)

In *Aleynikov*, the Second Circuit held that an indictment was "legally insufficient" where it charged the defendant with theft of "computer source code" under the National Stolen Property Act, 18 U.S.C. § 2314, which criminalizes interstate transportation of any stolen "goods, wares, merchandise, securities or money."  The Second Circuit held the "plain and ordinary meaning" of the statute demonstrated that it applied only to tangible

14

items and that "source code" did not constitute "goods," "wares," or "merchandise." 676 F.3d at 74–79. Mr. Hoskins contends that, as in *Aleynikov,* what is actually claimed in the Indictment is inconsistent with the definition of "agent" as used in the FCPA, because the Indictment alleges that he was acting as an executive at Alstom, the parent company, and merely approved and authorized the payments made by its U.S. subsidiaries and thus "none of the characteristics that subordinate an agent to a principal are part of the description of Mr. Hoskins's conduct in this case." (Def.'s Mem. Supp. at 29.)

The FCPA does not define the term "agent" and "[w]here no definition is provided, courts first 'consider the ordinary, common-sense meaning of the words,'" *United States v. Bodmer*, 342 F. Supp. 2d 176, 183 (S.D.N.Y. 2004) (quoting *United States v. Dauray,* 215 F.3d 257, 260 (2d Cir. 2000)), and "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *N.L.R.B. v. Amax Coal Co., a Div. of Amax*, 453 U.S. 322, 329 (1981).

The existence of an agency relationship is a "highly factual" inquiry, considering factors, such as "the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006) (quoting *Columbia Broad. Sys., Inc. v. Stokely–Van Camp, Inc.,* 522 F.2d 369, 375–76 (2d Cir. 1975)).

While Mr. Hoskins is alleged to have been employed by non-"domestic concern" Alstom, rather than its domestic subsidiary Alstom Power U.S., based in Connecticut, the Indictment alleges that Mr. Hoskins "was responsible for retaining consultants in connection" with the efforts of both Alstom and Alstom Power U.S.'s "efforts to obtain and retain contracts in Asia, including Consultant A and Consultant B for the Tarahan Project, knowing that a portion of the payments" was intended to be bribes, and outlines Defendant's efforts on behalf of Alstom Power U.S. in this regard. (Indictment ¶¶ 13, 58, 66–67, 69–70.)

Unlike in *Aleynikov* where the court could independently determine without any factual record if "computer source code" was a "good" as used in the statute, whether Mr. Hoskins acted as an agent of Alstom Power U.S. despite being titled as an executive of its parent company is necessarily the kind of factual question that cannot be decided pre-trial.[8]  Defendant does not offer authority to support his argument that an employee or executive of a parent company is incapable, *as a matter of law*, of functioning as an agent for a subsidiary, particularly where the parent is a non-operating holding company that operates through its subsidiaries "without distinction." (Indictment ¶¶ 2, 7.) Thus, it is for a jury at trial in the first instance, and not the Court on a motion to dismiss, to determine whether the Government has proven Defendant to have been an "agent" of Alstom U.S. Power.

---

[8] *Aleynikov* was decided post-trial but both parties "frame[d] their arguments in terms of the sufficiency of the indictment rather than the sufficiency of the evidence," and the Second Circuit noted that "the result and analysis would be the same under either formulation." 676 F.3d at 76 n.3.

2.      *Constitutional Challenge*

Next, Defendant contends that if the FCPA can be interpreted to include him within the definition of an agent of a domestic concern, the statute is "unconstitutionally vague as" applied, because "Mr. Hoskins could not have had fair notice that his conduct as a member of the parent company—overseeing, approving, and authorizing certain activity of subsidiary companies—could somehow result in a conclusion that he was acting under the control of a subsidiary company." (Def.'s Mem. Supp. at 30.)

A constitutional vagueness challenge seeks to bar enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). A "'junior version of the vagueness doctrine,' . . . resolv[es] ambiguity in a criminal statute as to apply it only to conduct clearly covered" and precludes any "novel construction" or application. *Id.* While parties making a facial challenge to a statute can potentially prevail if they show that a statute "provides insufficient notice to some people" of what is prohibited, those making an as-applied challenge must show that "it provided insufficient notice to the plaintiffs as to the specific" conduct. *Dickerson v. Napolitano*, 604 F.3d 732, 745–46 (2d Cir. 2010).

Defendant does not contend that the FCPA is vague as to the conduct prohibited—bribery of foreign officials—or that the term "agent" is necessarily ambiguous. Rather, Defendant contends that the FCPA is unconstitutionally vague as applied to him because (1) applying the term "agent" to Mr. Hoskins, "contravenes the statute's plain meaning;" (2) "because the term agent is facially clear, any interpretation

drawing Mr. Hoskins within its scope would constitute judicial overreach;" and (3) "any contrary interpretation of the term 'agent' as used in the FCPA would render that term ambiguous and, as such, the rule of lenity would apply."  (Def.'s Mem. Supp. at 31–33.)

The Government counters that "the defendant's conduct is unambiguous: he corruptly negotiated consultancy agreements to conceal a considerable bribe scheme whereby Alstom Power US bribed a high-ranking member of the Indonesian Parliament and PLN officials.  In so doing, he had over 100 communications to and from the US persons on whose behalf he worked, arranged a sham consulting agreement with a US resident, and set up a schedule of the bribe payments to be paid out of Connecticut by Alstom Power US to the US consultant."  (Gov't's Opp'n at 36.)

Defendant's vagueness argument is a subspecies of his argument that he does not fall within the definition of the term "agent" and the resolution of his "as applied" challenge will require a more expansive factual record to be developed at trial regarding the "highly factual" nature of the alleged agency relationship.  *See Cleveland*, 448 F.3d at 522; *see also United States v. Milani*, 739 F. Supp. 216, 217 (S.D.N.Y. 1990) ("In the absence of a plenary trial record this Court is unable to rule on whether the statute is impermissibly vague as applied to defendant.  Surely it is not void on its face.").  Thus, Defendant's Motion to Dismiss based on this constitutional challenge is denied.

3.     *Extraterritorial Application*

Defendant contends that the FCPA does not apply extraterritorially to non-U.S. persons, such as himself.  (Def.'s Mem. Supp. at 35.)  However, the Indictment charges domestic conduct, alleging that "in the District of Connecticut and elsewhere, HOSKINS and POMPONI, being domestic concerns and employees and agents of a domestic

concern, did willfully use and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of" a payment to a foreign official. (Indictment ¶ 102.)  That Mr. Hoskins may have never entered the United States in connection with his Alstom employment (Hoskins Aff. ¶ 9) is not dispositive because his physical presence within the United States is not required where the Indictment alleges that he used domestic wire transfers to promote the conspiracy, *see Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 666 (2d Cir. 1983) ("[T]he Government may punish a defendant in the same manner as if it were present in the jurisdiction when the detrimental effects occurred [there]."); *United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982) (holding that jurisdiction under the wire fraud statute "is satisfied by defendant's use of the wires to obtain the proceeds of his fraudulent scheme" even where the defendant was a "nonresident alien whose acts occurred outside the United States and had no detrimental effect within the United States").

### D.     Venue for Money Laundering Charges

Finally, Defendant contends that venue for the money laundering counts is not proper in the District of Connecticut, because "[t]here is no allegation that the predicate financial transactions were conducted in the District of Connecticut" and "the Indictment alleges, instead, that the transactions were conducted (*i.e.*, initiated) from Maryland by a third-party consultant (long after Mr. Hoskins left Alstom)."  (Def.'s Mem. Supp. at 39.) As the Government notes, the money laundering statute provides that venue lies in "any district in which the financial or monetary transaction is conducted," 18 U.S.C. § 1956(i)(1)(A), and that, "a transfer of funds from [one] place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who

19

conducts[9] . . . any portion of the transaction may be charged in any district in which the transaction takes place," 18 U.S.C. § 1956(i)(3).

The Indictment alleges that, "HOSKINS . . ., while located in the District of Connecticut and elsewhere, directed the wire transfer of, and caused to be wired, money from [Alstom U.S. Power's] and Consortium Partner's bank accounts in New York to Consultant A's bank account in Maryland for the purpose of concealing and disguising the bribe payments to Official 1." (Indictment ¶ 107.)   Under 18 U.S.C. § 1956(i)(3) venue lies in the District of Connecticut.   *See United States v. Harris*, 79 F.3d 223, 231 (2d Cir. 1996) ("[W]e do not interpret the movements of funds from New York to Connecticut and then from Connecticut to Switzerland as two separate events.   While the scheme was implemented in two stages, each stage was an integral part of a single plan to transfer funds 'from a place in the United States to or through a place outside the United States.'").

In his reply brief, Defendant contends for the first time that if the Government's theory is accepted—that the money-laundering counts charge a "continuing transaction" begun in Connecticut and completed in Indonesia, making venue proper in this District—then the money-laundering counts and the FCPA counts are necessarily multiplicitous. (Reply at 14.)   "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed."   *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).

---

9 The term "conducts" is defined as including "initiating, concluding, or participating in initiating, or concluding a transaction."   18 U.S.C. § 1956(c)(2).

"[T]he standard for analyzing whether offenses are the same in law is the same-elements test established in *Blockburger v. United States,* [284 U.S. 299, 304 (1932)]," *United States v. Basciano,* 599 F.3d 184, 196–97 (2d Cir. 2010), which is "a rule for divining congressional intent," *Lewis v. United States,* 523 U.S. 155, 182 (1998). The *Blockburger* inquiry "asks whether 'each offense contains an element not contained in the other,' and provides that, if not, 'they are the same offence and double jeopardy bars additional punishment and successive prosecution.'" *Basciano,* 599 F.3d at 197 (quoting *United States v. Dixon,* 509 U.S. 688, 696 (1993). "[I]f each section requires proof of at least one fact that the other does not, there are two offenses, and it is presumed that the legislature intended to authorize prosecution and punishment under both. In that circumstance, the imposition of multiple punishments does not violate the Double Jeopardy Clause." *United States v. Khalil,* 214 F.3d 111, 118 (2d Cir. 2000).

Defendant does not contend that the *Blockburger* test is violated, but instead that "the Supreme Court has recognized that when one charge may be subsumed by another, it is appropriate to look beyond the statutory elements to consider the substance of the allegations." (Reply at 14 (citing *Whalen* v. *United States*, 445 U.S. 684, 694 (1980) and *United States* v. *Ben Zvi*, 168 F.3d 49, 57–58 (2d Cir. 1999)). However, the Second Circuit has subsequently rejected *Zvi*, noting that "to the extent that *Zvi* suggested that 'sometimes the facts at hand' may require a finding of multiplicity, such an approach would be inconsistent with *United States v. Dixon,* 509 U.S. 688 (1993), which overruled the fact-based 'same-conduct' test articulated in *Grady v. Corbin,* 495 U.S. 508, 521–22, (1990), and restored the *Blockburger* 'same-elements' test." *United States v. Weingarten*, 713 F.3d 704, 710 n.5 (2d Cir. 2013).

21

Furthermore, the pretrial dismissal of the Indictment on the basis of multiplicity would be "premature," because "[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006). "Where two statutory sections operate independently of one another, 'there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes.'" *Id.* (quoting *Ball v. United States,* 470 U.S. 856, 860 (1985)). If the jury convicts on more than one multiplicitous count, Defendant's right not to suffer multiple punishments for the same offense can "be protected by having the court enter judgment on only one of the multiplicitous counts." *Id.* Thus, Defendant's challenge to the Indictment on the basis of multiplicity fails.

## III.   Conclusion

For the reasons set forth above, Defendant's Motion [Doc. # 149] to Dismiss is DENIED.

IT IS SO ORDERED.

   /s/

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 29th day of December, 2014.