UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2015 APR 15 P 1: 28

U.S. DISTRICT COURT
HARTFORD CT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO.: 3:12CR238 (JBA) |
| v. | VIOLATION: |
| LAWRENCE HOSKINS | 18 U.S.C. § 371 (Conspiracy)<br>15 U.S.C. § 78dd-2 (Foreign Corrupt Practices Act)<br>18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)<br>18 U.S.C. § 1956(a)(2)(A) (Money Laundering) |

## THIRD SUPERSEDING INDICTMENT

The Grand Jury charges:

## COUNT ONE
(Conspiracy)

At all times relevant, unless otherwise specified:

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

2.      Alstom S.A. ("Alstom"), which has been charged separately, was headquartered in France.  Alstom was in the business of providing power generation and transportation related services around the world, including Indonesia.  Alstom had sales of roughly €17 billion annually and roughly 75,000 employees in over seventy countries.  Shares of Alstom's stock

were listed on the New York Stock Exchange until August 2004. Accordingly, until August 2004, Alstom was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a). Alstom had direct and indirect subsidiaries in various countries around the world, including a subsidiary in Connecticut, Alstom Power, Inc. ("Alstom Power US"), described in more detail below. Other subsidiaries of Alstom included Alstom Network Schweiz AG, formerly known as Alstom Prom AG ("Alstom PROM"), PT Energy Systems Indonesia ("Alstom Indonesia"), Alstom Ltd, formerly known as Alstom UK Ltd ("Alstom UK"), and Alstom Resources Management S.A. in France. Reflecting the close relationship between them, Alstom and its subsidiaries, including Alstom Power US, Alstom PROM, and Alstom Indonesia, were often referred to by Alstom employees as "Alstom" without distinction. Through its subsidiaries, Alstom bid on projects to secure contracts to perform power-related and transportation-related services, including for state-owned entities. Alstom maintained a department called International Network that supported its subsidiaries' efforts to secure contracts around the world. International Network was organized by geographic region.

3.     The defendant, LAWRENCE HOSKINS ("HOSKINS"), was employed by Alstom UK but was assigned to Alstom Resources Management S.A. in France. HOSKINS worked in Alstom's International Network and was the Senior Vice President for the Asia region. In that capacity, HOSKINS performed functions and support services for and on behalf of various other Alstom subsidiaries, including Alstom Power US, as described more fully below.

4.     Marubeni, which has been charged separately, was a trading company headquartered in Japan that did business around the world, including Indonesia. Marubeni and its subsidiaries and joint ventures had trading transactions of roughly $74 billion annually and

roughly 24,000 employees in over 70 countries. In conducting its business, Marubeni received assistance from its subsidiaries and joint ventures, including Marubeni Power Systems Corporation ("MPSC"), a wholly owned subsidiary of Marubeni that shared its offices with Marubeni and acted as an agent on Marubeni's behalf.

5.     The Tarahan Project (or "Tarahan") was a project to provide power-related services to the citizens of Indonesia that was bid and contracted through Indonesia's state-owned and state-controlled electricity company, Perusahaan Listrik Negara ("PLN"), valued at roughly $118 million. PLN was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), and 78dd-3(f)(2). PLN was responsible for sourcing the Tarahan Project.

6.     Alstom and its subsidiaries, including Alstom Power US, Alstom PROM, and Alstom Indonesia, partnered with Marubeni and its subsidiaries, including MPSC (collectively, the "Consortium"), in the bidding and carrying out of the Tarahan Project in Indonesia. Alstom and its subsidiaries were to provide boiler-related services in connection with the Tarahan Project while Marubeni was to manage all works, including auxiliary equipment and civil building and installation work.

7.     The Consortium retained two consultants, described in more detail below as "Consultant A" and "Consultant B," to assist them in obtaining the Tarahan Project contract. The consultants' primary purpose was not to provide legitimate consulting services to the Consortium but was instead to pay bribes to Indonesian officials who had the ability to influence the award of the Tarahan Project contract.

8.     HOSKINS, in his capacity as Senior Vice President for the Asia Region at Alstom, was one of the people responsible for approving the selection of, and authorizing

payments to, Consultants A and B, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.

9.      The Consortium first retained Consultant A in or around late 2002.  Consultant A was to receive a commission based on the overall value of the Tarahan Project contract, from which he was expected to pay bribes to Indonesian officials.  However, through the course of 2003, HOSKINS and other employees of the Consortium came to the conclusion that Consultant A was not effectively bribing key Indonesian officials.  Accordingly, in or around September or October 2003, HOSKINS and other employees of the Consortium informed Consultant A that Consultant A would be responsible only for paying bribes to Official 1, a Member of the Indonesian Parliament described in more detail below, and that the Consortium would retain another consultant to pay bribes to PLN officials.  Shortly thereafter, the Consortium sent Consultant A an amended consulting agreement, reducing the amount of Consultant A's commission to reflect Consultant A's reduced responsibilities, and retained Consultant B to bribe PLN officials.

10.      The Consortium were ultimately awarded the Tarahan Project contract and made payments to the aforementioned "consultants," including payments to Consultant A, who then used a portion of these commission payments to pay bribes to Official 1.

<u>The Defendants and Their Co-Conspirators</u>

11.      Alstom and several of its subsidiaries were involved in the bidding and carrying out of the Tarahan Project in Indonesia.  The subsidiaries included Alstom Power US, which was headquartered in Windsor, Connecticut, incorporated in Delaware, and thus a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-

2(h)(1)(B); Alstom PROM, which was headquartered in Switzerland; and Alstom Indonesia, which was headquartered in Indonesia.  Alstom Power US and Alstom PROM were in the business of providing power generation related services around the world.  Alstom Indonesia was in the business of providing power generation related services in Indonesia.

12.     Marubeni acted as the partner of Alstom, Alstom Power US, Alstom PROM, and Alstom Indonesia in the bidding and carrying out of the Tarahan Project in Indonesia.  Marubeni made payments to Consultant A through a bank account at the Bank of New York in New York, knowing that a portion of the payments to Consultant A was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.  In addition, Marubeni, through its employees and agents, attended meetings with Alstom employees in Windsor, Connecticut, in connection with the Tarahan Project.  Thus, Marubeni was a "person," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-3(f)(1).

13.     HOSKINS was a Senior Vice President for the Asia region in International Network.  HOSKINS's responsibilities at Alstom included oversight of the hiring of consultants in connection with Alstom's and Alstom's subsidiaries' efforts to obtain contracts with new customers and to retain contracts with existing customers in Asia, including the Tarahan Project in Indonesia.  Thus, HOSKINS was an agent of a "domestic concern," Alstom Power US, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  HOSKINS was responsible for retaining Consultant A and Consultant B for the Tarahan Project, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.

14.     William Pomponi, who has been charged separately, was a Vice President of Regional Sales at Alstom Power US and a U.S. citizen.   Thus, Pomponi was a "domestic concern" and an employee and agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).   Pomponi's responsibilities at Alstom Power US included obtaining contracts with new customers and retaining contracts with existing customers in various countries, including obtaining and retaining the contract for the Tarahan Project from PLN in Indonesia.   Pomponi was one of the people responsible for approving the actions of, and authorizing payments to, Consultants A and B, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.

15.     Frederic Pierucci ("Pierucci"), who has been charged separately, held executive level positions at Alstom, including Vice President of Boiler Global Sales.   During the relevant time period, Pierucci was assigned to Alstom Power US and was a U.S. resident.   Pierucci's responsibilities included oversight of Alstom Power US's efforts to obtain contracts with new customers and to retain contracts with existing customers around the world, including obtaining and retaining the contract for the Tarahan Project from PLN in Indonesia.   Pierucci was one of the people responsible for approving the selection of, and authorizing payments to, Consultants A and B, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.

16.     David Rothschild ("Rothschild"), who has been charged separately, was a Vice President of Regional Sales at Alstom Power US and a US citizen.   Rothschild's responsibilities at Alstom Power US included obtaining contracts with new customers and retaining contracts

with existing customers in various countries, including obtaining the contract for the Tarahan Project from PLN in Indonesia.  Rothschild was one of the people responsible for retaining and approving the actions of Consultant A, knowing that a portion of the payments to Consultant A was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.

17.    "Alstom Indonesia Employee A," an individual whose identity is known to the Grand Jury, was the General Manager at Alstom Indonesia.  Alstom Indonesia Employee A's responsibilities at Alstom Indonesia included obtaining contracts with new customers and retaining contracts with existing customers in Indonesia, including obtaining and retaining the contract for the Tarahan Project from PLN in Indonesia.  Alstom Indonesia Employee A was one of the people responsible for retaining Consultants A and B, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.

18.    "Alstom Indonesia Employee B," an individual whose identity is known to the Grand Jury, was a director of sales at Alstom Indonesia.  Alstom Indonesia Employee B's responsibilities at Alstom Indonesia included obtaining contracts with new customers and retaining contracts with existing customers in Indonesia, including obtaining and retaining the contract for the Tarahan Project from PLN in Indonesia.  Alstom Indonesia Employee B was one of the people responsible for retaining Consultants A and B, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium.

19.    "Marubeni Employee A," an individual whose identity is known to the Grand Jury, was a senior manager at MPSC.  Marubeni Employee A's responsibilities at MPSC

included obtaining contracts with new customers and retaining contracts with existing customers on behalf and for the benefit of Marubeni in various countries, including obtaining and retaining the contract for the Tarahan Project from PLN in Indonesia. Marubeni Employee A was one of the people responsible for retaining Consultants A and B on behalf of Marubeni, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to the Consortium. In this capacity, Marubeni Employee A was acting as an agent of Marubeni.

20.     "Consultant A," an individual whose identity is known to the Grand Jury, was a consultant who purportedly provided consulting related services on behalf of the Consortium in connection with the Tarahan Project in Indonesia. In reality, Consultant A was retained for the purpose of paying bribes to Indonesian government officials, including Official 1 and Official 2, described more fully below.

21.     "Consultant B," an individual whose identity is known to the Grand Jury, was a consultant who purportedly provided consulting related services on behalf of the Consortium in connection with the Tarahan Project in Indonesia. In reality, Consultant B was retained for the purpose of paying bribes to officials at PLN, including Official 2 and Official 3, described more fully below.

<u>The Foreign Officials</u>

22.     "Official 1," an individual whose identity is known to the Grand Jury, was a Member of Parliament in Indonesia and had influence over the award of contracts by PLN, including on the Tarahan Project.

23.     "Official 2," an individual whose identity is known to the Grand Jury, was a high-ranking official at PLN and had broad decision-making authority and influence over the award of contracts by PLN, including on the Tarahan Project.

24.     "Official 3," an individual whose identity is known to the Grand Jury, was an official at PLN and a high-ranking member of the evaluation committee for the Tarahan Project. Official 3 had broad decision-making authority and influence over the award of the Tarahan contract.

25.     Official 1, Official 2, and Official 3 were each a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1), 78dd-2(h)(2), and 78dd-3(f)(2).

<u>The Conspiracy</u>

26.     From in or around 2002, and continuing through in or around 2009, in the District of Connecticut, and elsewhere, HOSKINS did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate and agree with Alstom, Alstom Power US, Alstom PROM, Alstom Indonesia, Pierucci, Pomponi, Rothschild, Alstom Indonesia Employee A, Alstom Indonesia Employee B, Marubeni, Marubeni Employee A, Consultant A, Consultant B, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     together with a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered,

given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist HOSKINS, Alstom, Alstom Power US, Alstom PROM, Alstom Indonesia, Pierucci, Pomponi, Rothschild, Alstom Indonesia Employee A, Alstom Indonesia Employee B, Marubeni, Marubeni Employee A, Consultant A, Consultant B, and others in obtaining and retaining business for and with, and directing business to, the Consortium, and others, in violation of Title 15, United States Code, Section 78dd-2(a); and

b.      while in the territory of the United States, willfully and corruptly to make use of the mails and means and instrumentalities of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist HOSKINS, Alstom, Alstom Power US, Alstom PROM, Alstom Indonesia, Pierucci,

Rothschild, Pomponi, Alstom Indonesia Employee A, Alstom Indonesia Employee B, Marubeni, Marubeni Employee A, Consultant A, Consultant B, and others in obtaining and retaining business for and with, and directing business to, the Consortium, and others, in violation of Title 15, United States Code, Section 78dd-3(a).

### Purpose of the Conspiracy

27.     The purpose of the conspiracy was to make corrupt payments to a Member of Parliament in Indonesia, officials at PLN, and other foreign officials in order to obtain and retain business related to the Tarahan Project.

### Manner and Means of the Conspiracy

28.     The manner and means by which HOSKINS and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

29.     HOSKINS, together with others, while in the District of Connecticut and elsewhere, discussed in person, via telephone, and via electronic mail ("e-mail") the need to obtain the contract to perform power-related services on the Tarahan Project.

30.     HOSKINS, together with others, while in the District of Connecticut and elsewhere, discussed in person, via telephone, and via e-mail making bribe payments to government officials in Indonesia, including Official 1, Official 2, and Official 3, among others, in order to obtain the Tarahan Project contract.

31.     HOSKINS, together with others, while in the District of Connecticut and elsewhere, offered to pay, promised to pay, and authorized the payment of bribes, directly and indirectly, to and for the benefit of government officials in Indonesia, including Official 1, Official 2, and Official 3, among others, in order to obtain the Tarahan Project contract.

32.     HOSKINS, together with others, while in the District of Connecticut and elsewhere, discussed in person, via telephone, and via e-mail the manner and means by which the bribe payments were to be paid.

33.     HOSKINS, together with others, while in the District of Connecticut and elsewhere, attempted to conceal the payments to foreign officials by entering into consulting agreements with Consultant A and Consultant B in order to disguise the bribe payments to the foreign officials, including Official 1, Official 2, and Official 3, among others.

34.     HOSKINS, together with others, while in the District of Connecticut and elsewhere, caused bribe payments to be wired from the bank accounts of the Consortium to the bank accounts of Consultant A and Consultant B for the purpose of making payments to foreign officials, including Official 1, Official 2, and Official 3, among others, in exchange for the officials' assistance in securing the Tarahan Project contract.

Overt Acts

35.     In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the District of Connecticut and elsewhere, at least one of the following overt acts, among others:

*Consultant A is Retained to Pay Bribes to Indonesian Officials*

36.     On or about February 27, 2002, Alstom Indonesia Employee B sent an e-mail to Rothschild, stating, "Approaching [Official 1] still in the stages to motivate him be [sic] in our loop, if he was able to meet [Official 2] last week end [sic] just matter of introducing of himself that he will be as our sponsor.  We will identify when he will be seriously [sic] to meet [Official 2] to specific discussion for Tarahan, before it happen [sic] we should provide him more detail info regarding [a competitor of Alstom]."

37.     On or about June 14, 2002, Rothschild sent an e-mail to Alstom Indonesia Employee B, copying Alstom Indonesia Employee A, with the subject line reading the first name of Official 1, and stating, "Pls start the paper work for using [Official 1's] representative company to assist in the BD [business development] effort.  If you need help with this let me know soon."

38.     In or around July 2002, Marubeni Employee A and other employees of Marubeni traveled to Connecticut to attend meetings with employees of Alstom Power US in connection with the Tarahan Project.

39.     On or about August 8, 2002, Alstom Indonesia Employee B sent an e-mail to Rothschild, to which he attached a document explaining, among other things, that Official 1 was a "[k]ey legislator" and "Vice chairman of [the] Parliament commission 8 dedicated for Power & Energy" who had "[e]asy direct access personally to PLN Board" and who could exert "direct influence to PLN ([Official 2] and [another official])" and "utiliz[e] his comission [sic] 8 forum to influence PLN Board" and Ministries.

40.     On or about August 22, 2002, Alstom Indonesia Employee A sent an e-mail to HOSKINS, Pierucci, and Rothschild, stating, "Referring to our discussion of 8-August-2002, it is now 2 weeks away from the tender submission date.  Your position concerning the representation is urgently needed.  Currently, we are working with [Official 2] and [Official 3] in PLN on our 'competition', nevertheless, we would need a stronger push now.  Appreciate your decision a.s.a.p."

41.     On or about August 26, 2002, Rothschild sent an e-mail to Marubeni Employee A discussing that Pomponi would be replacing Rothschild on the Tarahan Project, in which Rothschild stated, "Please rest assured that Alstom still considers this project most important and

is pursuing it most aggressively....I have brefed [sic] [Pomponi] on the specific Tarahan issues, the bidding history, arrangement with Marubeni and [Alstom Indonesia], and also the arrangement with [Official 1].  Please feel confident in discussing these with Bill [Pomponi]."

42.    On or about August 26, 2002, Rothschild forwarded to Pomponi and another employee of Alstom Power US the e-mail referenced in Paragraph 41 above.

43.    On or about August 28, 2002, Pierucci responded to the e-mail from Alstom Indonesia Employee A referenced in Paragraph 40 above, and stated, "Please go ahead and finalise the consultancy agreement.  Please send me the key data so that I can approve it officially."

44.    On or about August 28, 2002, Rothschild sent an e-mail to Alstom Indonesia Employee A, copying Pomponi, Pierucci, and Alstom Indonesia Employee B, in response to Pierucci's e-mail referenced in Paragraph 43 above, and stated, "Regarding [Pierucci's] below message, Pls do not finalize anything yet with the Rep.  I spoke with Fred [Pierucci] right after he sent the note and we have concerns about 1) politician vs. businessman, 2) upfront expenses, 3) right person vs. another choice.  Part of this comes from discussions from Marubeni....We would like to discuss with you on Friday evening Jkt time."

45.    On or about September 4, 2002, Alstom Indonesia Employee A sent an e-mail to Rothschild, copying Pierucci, in which Alstom Indonesia Employee A stated, "we have met [Official 1] to confirm whether he is comfortable with your suggested approach on Representation issue (through [Consultant A])."

46.    In or around late 2002, the Consortium retained Consultant A, agreeing to pay Consultant A three percent of the Tarahan Project contract value as a commission.

47.     On or about December 3, 2002, Alstom Indonesia Employee A sent an e-mail to HOSKINS discussing the Tarahan Project and another project with PLN, including whether to retain Consultant A in connection with the other project, stating, "[Official 1] is a member of INDONESIA Parliament, precisely he is the Vice Chairman of Commission VIII, a commission in charge of handling Power Issues....Besides his function in the Parliament, he has long well established relationship with [Official 2] (PLN President Director).  As a Vice Chairman of Commission VIII he certainly have [sic] an influence in PLN.  He is not an agent but one of the players....[L]ooking in to [Consultant A's] performance in Tarahan, we need to think twice prior taking him into consideration [for the other PLN project]....As the [Tarahan] project proceed, it shown that [Consultant A] has been unable to fulfil [sic] his tasks and our expectation, he has no grip on PLN Tender team at all.  Basically, his function is more or less similar to cashier which I feel we pay too much."

48.     On or about December 19, 2002, Pomponi sent an e-mail to Pierucci and other employees of Alstom with the subject, "Tarahan status," stating, "[m]et our friends on the evaluation team and they will still be helping us combat FW [a competitor of Alstom].  We nmeed [sic] to feed some more info and I'll discuss at home.  Upper echelon covered as well."

49.     On or about January 6, 2003, a Marubeni employee sent an e-mail to Pomponi, Rothschild, Alstom Indonesia Employee B, another employee of Alstom Power US, copying Marubeni Employee A and other Marubeni employees, and stated "I do hope our collaboration for 2003 to be very constructive and successful.  Regarding our project, we would like to clarify as follows...Any feed back from [Consultant A]."

50.     On or about January 29, 2003, a Marubeni employee sent an e-mail to Pomponi and two other employees of Alstom Power US, copying Rothschild, Marubeni Employee A, and

other Marubeni employees, and stated, "We would like to ask [Consultant A] to force PLN to issue below clarification for further discount."

51.     On or about April 16, 2003, Consultant A sent an e-mail to Marubeni Employee A and another Marubeni employee, blind copying Rothschild, and stated, "I would greatly appreciate the opportunity to meet with you prior to my departure at the end of next week."

### _Consultant B is Retained to Pay Bribes to PLN Officials_

52.     In or about August 2003, Consultant A had a meeting with Pomponi in which Consultant A told Pomponi that members of the PLN evaluation committee were unhappy with the amount of money they were receiving and that Consultant A needed to pay additional money to members of the evaluation committee.

53.     On or about August 12, 2003, Consultant A sent an e-mail to Pierucci about another upcoming project at PLN, stating, "PLN people are upset with us that we told them we only need marginal support from them and now putting everything on them.  They are comparing the success fee for Tarahan and [the other project] and asking why they are so much different."

54.     On or about September 16, 2003, Marubeni Employee A sent an e-mail to Pomponi and Pierucci, copying Alstom Indonesia Employee A, Alstom Indonesia Employee B, and other employees of Marubeni and Alstom Power US, stating that the PLN evaluation team had provided negative feedback and that, "Yesterday, before Mr. Pomponi's leaving, we had wrap up meeting among [Alstom Power US, Alstom Indonesia, Marubeni] and our agent.  Most of attendee except [Marubeni], had considered the current movements are under well controllable.  There were no actual clear evidence to prove our advantageous or our controllable situation at all."

55.     On or about September 16, 2003, Pierucci forwarded the e-mail referenced in Paragraph 54 above to Pomponi and Consultant A, copying Alstom Indonesia Employee A, Alstom Indonesia Employee B, and other employees of Alstom, and stated, "When we spoke on Friday , [sic] you both told me that everything was under control in the evaluation . . . . Now, if the infos below are correct, we are not only evaluated number 2 but by a huge margin (almost $40M!!!!!!!!!!!!!!!!)   HOW CAN THAT BE??   I thought we were controlling what was happening in Palembang??????  Please check asap if teh [sic] below infos are correct and give me by tomorrow a plan to recover this.  WE CAN NOT LOOSE [sic] THIS PROJECT!"

56.     On or about September 18, 2003, an employee at Alstom Indonesia sent an e-mail to Alstom Indonesia Employee B and another Alstom employee regarding a meeting with employees of Alstom and Marubeni and members of PLN, stating, "PLN has expressed their concerns over our 'agent'.  They did not like the approach made by the agent.  More importantly, they concern [sic] whether they can count on the agent or not in regards to 'rewards' issue.  They concern [sic] that if we have won the job, whether their rewards will still be satisfactory or this agent only give them pocket money and disappear.  Nothing has been shown by the agent that the agent is willing to spend money....As things still changes [sic] (until the contract signed), if we are not careful, PLN personnel can take negative actions against us to secure their 'personal interest'.  During the discussion, Marubeni questioned why we knew many things when the issues were already on the table, not when they were still preliminary.  I also see that our friends are not interested to give details, I think we need to establish other contacts."  (Emphasis in original).

57.     On or about September 25, 2003, Marubeni Employee A sent an e-mail to Pomponi, Pierucci, Alstom Indonesia Employee A, Alstom Indonesia Employee B, and another

Alstom employee, copying other employees from Marubeni, stating, "As you can understand, unfortunately our agent almost did not execute his function at all, so far.  In case we don't take immediate action now now [sic], we don't have any chance to get this project forever.  We shall not wait for coming of decision maker any more.  Please direct your opinion to your Representative today."

58.     In or around September or October 2003, HOSKINS, Pierucci, Marubeni Employee A, and other employees of the Consortium told Consultant A at a meeting in Indonesia that: (i) they were going to retain another consultant to pay bribes to officials at PLN in connection with the Tarahan Project; (ii) Consultant A needed to pay bribes only to Official 1; and (iii) Consultant A's commission, therefore, would be cut from three percent of the total value of the contract to one percent.

59.     On or about October 1, 2003, Marubeni Employee A, on behalf of Marubeni, sent a letter to Consultant B regarding the Tarahan Project, and stated, "With reference to our discussion regarding the captioned project, we are pleased to confirm the agreement between us. In the event that we are successful, we confirm that we will pay a total of two percent (2%) of the contract price (not including VAT) for our scope of work to you for the various services you are providing.  The details of this agreement will be formalized in a Service Agreement."

60.     In or around October 2003, Alstom sent an amended consulting agreement to Consultant A in connection with the Tarahan Project reflecting the reduced commission rate of one percent.

61.     On or about October 8, 2003, Consultant A sent an e-mail to Pierucci stating, "The contract is basically fine.  [Official 1] is trying to verify that in case he has to do horse trading with [another official], the expenses are not coming from my contract but he has not

managed to talk to [Official 2] directly, in part because he does not want to address the issue directly. I have one minor comment though. Could you fix the payment dates for the 30% and 70%? FIrst [sic] portion at the activation of the contract, when it is signed and the down payment is made and the second one four months or six months thereafter. Given the nature of my involvement (or lack of) with PLN under the new scheme, my friend and I do not want to be involved in the PLN performance and payment issues. Finally, I have not been able to get a contract out of Marubeni even though they keep saying there is no problem. They also told [Official 2] that they do not have a firm commitment to me yet and that has not sat well with [Official 1]. So please give them a nodge [sic]. Hopefully we can sign both contracts at the same time."

62. On or about November 2, 2003, Pomponi sent an e-mail to Marubeni Employee A and another Marubeni employee, copying Pierucci, Alstom Indonesia Employee A, Alstom Indonesia Employee B, and another Alstom Power US employee, stating, "I spoke with [Consultant B] today to receive any updates...He indicated he did not foresee any problems at this point with his contacts."

63. On or about December 9, 2003, Marubeni and Consultant A entered into a consulting agreement in connection with the Tarahan Project reflecting a commission rate of one percent.

64. On or about February 23, 2004, Pomponi sent an e-mail to Alstom Indonesia Employee B, Marubeni Employee A, and another Alstom employee, copying Alstom Indonesia Employee A, stating, "Understand that Mitsubishi has retained some lobbyist from the government (higher/more powerful than [another official's] position) to support their efforts on

[the Tarahan Project].  Pls urgently check this out and have [Consultant B] re-evaluate our support to PLN."

65.      On or about March 3, 2004, Alstom Indonesia Employee A sent an e-mail to HOSKINS, stating, "Last Monday we sent Tarahan CA [consultancy agreement] to [Consultant B], he immediately feel [sic] cornered after reading the ToP [terms of payment] which said 'prorata'.  When I talked to him on the phone I said that I will look at it and I thought it should not be that bad.  I then looked into Tarahan ToP (see attached) and realise that the project payment is spread over 3.5 year!  You would understand why he is worry [sic], he is willing to pre-finance his scope, fulfilling his commitment up-front (prior he get paid) to get the right 'influence', but certainly not waiting 2 to 3 years to get paid while most of his scope completed in the beginning."

66.      On or about March 10, 2004, Pomponi sent an e-mail to HOSKINS, Pierucci, and others, stating, "I have [Alstom Indonesia Employee A] out in Indonesia negotiating the CA Terms with [Consultant B].  As you know, the Tarahan estimate can not [sic] tolerate such advance payments and I'm not sure how we can accommodate this."

67.      On or about March 18, 2004, HOSKINS responded to the e-mail from Pomponi referenced in Paragraph 66 above, stating, "Not sure where we are with this but for your info [Consultant B] is also requesting tougher terms on other projects at the moment.  I cannot comment on your cash flow but my advice in this instance is to go with latest recommendation . . . [Consultant B] has a lot of work to do to support us in negotiation and he (and others) are slightly negative at the moment on Alstom support."

68.      On or about March 19, 2004, Consultant A sent an e-mail to Pierucci, stating, "I am back from Indonesia.  I have mentioned the following to Bill [Pomponi].  But it is important

that you also are aware of it. We need a very strong support from [Official 2] to counter Mitsubishi's lobbeying [sic] against us. I am not convinced that he is happy enough with us to provide the support. [Official 1] is also unhappy because he thinks Alstom has not firmly indicated its support to [Official 2]. Please verify that we have talked to [Official 2]…Please talk to Bill [Pomponi] about the detail."

69.     On or about March 20, 2004, Pierucci forwarded to HOSKINS and Alstom Indonesia Employee A, copying Pomponi, the e-mail from Consultant A referenced in Paragraph 68 above, and stated, "See attached. Please check this again urgently with [Consultant B]."

70.     On or about March 22, 2004, Pomponi sent an e-mail to HOSKINS, stating, "I have seen your response and wish to offer the following as our compromise to [Consultant B's] proposal[.] Instead of this could we suggest something like:

    -40% at receipt by ALSTOM of the down payment

    -Additional 40% at receipt by ALSTOM at month 12

    -Additional 15% at receipt by ALSTOM at month 18

    -Last 5% at the end of the contractual obligations

Pls advise if these you think would be acceptable??"

71.     On or about March 22, 2004, Pomponi sent an e-mail to Marubeni Employee A, copying Pierucci and another Marubeni employee, stating, "I am trying to get agreement with [Consultant B] but he's objecting strongly and asking for 'front-end' payments which affect our cash flow. I consider both you and I as having similar payment schemes for [Consultant B], therefore pls share with me your proposal and idea. Do you have agreement yet with [Consultant B] for your portion?? Pls consider this as an urgent request and respond at your most earliest convenience."

21

72.     On or about March 23, 2004, Marubeni Employee A responded to the e-mail referenced in Paragraph 71 above, stating, "Regarding payment terms and conditions for [Consultant B], I have not yet discussed in detail with [Consultant B] during your absence from Indonesia…I think some consistency of response to [Consultant B] shall be necessary to get their compromise and to finalize the issues."

73.     On or about March 30, 2004, HOSKINS sent an e-mail to Pomponi and Pierucci, addressed to Pomponi, stating, "To clear up any confusion.  You proposed an 18 month schedule but it will not fly in Indonesia at this time.  In my discussion with Fred [Pierucci] and mails as per attached I recommended that we go with the latest proposal: 40/35/20/5.  Marubeni wait for us and will follow suit.  We are all agreed the terms are lousy but there is no choice.  [Alstom Indonesia Employee A] sees [Official 2] tomorrow and needs to confirm this position.  Can you give him the all clear today?"

74.     On or about March 30, 2004, Pomponi sent an e-mail in response to HOSKINS's e-mail described in Paragraph 73 above, stating, "Approval has just come regarding the terms (40/35/20/5).  Yes, I agree they are lousy but as you and I talked last week, we both believe we have no choice.  I will send a separate message to [Alstom Indonesia Employee A, Alstom Indonesia Employee B, Marubeni Employee A, and another Marubeni employee] regarding the T/P to insure we get [Consultant B's] signature and follow-up action with our friends.  A note from you as well to [Marubeni Employee A and the other Marubeni employee] would be helpful given [Marubeni's] thus far objections to such 'front-end' loading of payments."

75.     On or about March 30, 2004, Pomponi sent an e-mail to Marubeni Employee A, copying HOSKINS, Pierucci, Alstom Indonesia Employee A, and another Marubeni employee, stating, "As we discussed last week by telephone, [Consultant B] is requiring 95% payment

within the first 12 months of the contract.  I stated that this was a problem for ALSTOM however after speaking with [Alstom Indonesia Employee A] and Lawrence Hoskins, I am now convinced that this mode of payment is necessary for the continuation of [Consultant B's] effectiveness….As mentioned by you last week, [Marubeni] confirmed to follow ALSTOM's actions and conclusions for the [Consultant B] Agreement."

76.     On or about March 30, 2004, Marubeni Employee A responded to the e-mail from Pomponi referenced in Paragraph 75 above, stating, "I understand.  We follow you.  I will try to finalize the agreement at earliest possible time."

77.     On or about March 30, 2004, Pomponi sent an e-mail to HOSKINS, Pierucci, and Alstom Indonesia Employee A, stating, "Approval…has finally been received this morning authorizing the requested Terms of Payment.  Pls proceed with this ASAP to obtain the CA signing by [Consultant B] in order for [Consultant B's] effectiveness to continue."

78.     On or about March 31, 2004, Alstom Indonesia Employee A responded to the e-mail from Pomponi referenced in Paragraph 77 above, stating, "I will mentioned [sic] our position to [Official 2] and [Consultant B] this afternoon.  Furthermore I would suggest you to contact [the employee at Alstom PROM responsible for consultancy agreements] with a request to make the necessary CA changes (ToP) and ask her to send me the revised CA asap.  Once the revised agreement arrived I will obtain [Consultant B's] signature.  Mean while [sic] I will give [Official 2]/[Consultant B] my word."

79.     In or around October 2004, employees of Marubeni traveled to Connecticut to attend meetings with employees of Alstom Power US in connection with the Tarahan Project.

80.     On or about May 22, 2005, after the Consortiumwas awarded the Tarahan Project contract, Consultant A sent an e-mail to Pomponi, stating, "I will call you this week and find out

the amount of invoice I need to submit to you, as the contract amount you sent me is for the entire contract."

81.     On or about December 8, 2005, Consultant A sent an e-mail to Pomponi, stating, "Good morning from Jakarta.  [An official from PLN] keep contacting me and asking for ...support.  He has not been contacted by you or your local team.  Could you please give him a call and let him know I have nothing to do with him.  It is really important."  (Ellipses in original).

82.     On or about December 9, 2005, Pomponi forwarded to Alstom Indonesia Employee A and Alstom Indonesia Employee B, copying Pierucci, the e-mail from Consultant A referenced in Paragraph 81, and stated, "This has gone on way too long.  Please take care of this. Please advise when this is completed and settled.  As you are fully aware, [Consultant A] has nothing to do with PLN.  There was a complete and clear division of responsibility."

*Payments from Alstom to Consultant A to Bribe Official 1*

83.     On or about November 16, 2005, Alstom Power US caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

84.     On or about January 4, 2006, Alstom Power US caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

85.     On or about March 7, 2007, Alstom Power US caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

86.     On or about October 23, 2008, Consultant A contacted Pomponi, who no longer was employed by Alstom Power US, and asked Pomponi for help in getting Consultant A's final invoice paid by Alstom Power US.

87.     On or about October 23, 2008, Pomponi sent an e-mail to an employee at Alstom Power US, stating, "How have you been [] and assume your [sic] still the $$$'s man!!  I've been in touch with [Consultant A] over the last couple of years and today he had sent me a quick note to investigate his final payment which he claims is overdue.  He had made his submittal of his final invoice over ~ 11 months ago.. [sic] Would you pls investigate and advise accordingly."

88.     On or about October 24, 2008, Pomponi sent an e-mail to Consultant A and stated, "I contacted the office to determine the delay in your final payment.  No word yet."

89.     On or about September 3, 2009, Consultant A sent an e-mail to Pomponi, stating, "I still have not been paid by [Alstom Power US] for my last invoice.  With [Rothschild] and [another employee] out of the office, I do not know anyone else there."

90.     On September 4, 2009, Pomponi sent an e-mail to Pierucci, stating, "I know this is no longer under your responsibility but [Consultant A] has once again contacted me given NON PAYMENT of his final invoice.  [Rothschild] was his only contact but as you know is no longer employed [] so no one in Windsor can give any assistance.  Please see what you can do to help."

91.     On or about September 4, 2009, Pierucci sent an e-mail in response to Pomponi's e-mail described in Paragraph 90 above, stating, "I know.  [Consultant A] contacted me already.  I will see what I can do."

92.     On or about September 4, 2009, Pomponi sent an e-mail to Consultant A, forwarding the e-mail from Pierucci described in Paragraph 91 above, stating, "Hope[] Fred [Pierucci] can help and not just 'blow'n smoke.'"

93.     On or about October 5, 2009, Alstom Power US caused a wire transfer in the amount of $66,688 from the company's bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

*Payments from Alstom to Consultant B to Bribe Officials at PLN*

94.     On or about July 20, 2005, Alstom Power US caused a wire transfer in the amount of $418,906 from the company's bank account in New York to Alstom PROM's bank account in Zurich, Switzerland, which amount was transferred by Alstom PROM to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

95.     On or about July 26, 2005, Alstom Power US caused a wire transfer in the amount of $114,598 from the company's bank account in New York to Alstom PROM's bank account in Zurich, Switzerland, which amount was transferred by Alstom PROM to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

96.     On or about March 28, 2006, Alstom Power US caused a wire transfer in the amount of $466,816 from the company's bank account in New York to Alstom PROM's bank account in Zurich, Switzerland, which amount was transferred by Alstom PROM to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

97.     On or about December 6, 2006, Alstom Power US caused a wire transfer in the amount of $266,752 from the company's bank account in New York to Alstom PROM's bank account in Zurich, Switzerland, which amount was transferred by Alstom PROM to Consultant B's bank account in Singapore for the purpose of paying bribes to officials at PLN.

*Payments from Marubeni to Consultant A to Bribe Official 1*

98.    On or about June 30, 2005, Marubeni caused a wire transfer in the amount of $151,781.70 from a bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

99.    On or about December 28, 2005, Marubeni caused a wire transfer in the amount of $154,462.30 from a bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

100.    On or about November 14, 2008, Marubeni caused a wire transfer in the amount of $51,549.79 from a bank account in New York to Consultant A's bank account in Maryland for the purpose of paying bribes to Official 1.

All in violation of Title 18, United States Code, Section 371.

<u>COUNTS TWO THROUGH SEVEN</u>
(Foreign Corrupt Practices Act)

101.    Paragraphs 1 through 25 and 27 through 100 are realleged and incorporated by reference as though fully set forth herein.

102.    On or about the dates set forth below, in the District of Connecticut and elsewhere, HOSKINS, being an agent of a domestic concern and by aiding and abetting a domestic concern, did willfully use and cause to be used and aid and abet the use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist HOSKINS, Pomponi, Alstom, Alstom Power US, Alstom PROM, Alstom Indonesia, Pierucci, Rothschild, Alstom Indonesia Employee A, Alstom Indonesia Employee B, Marubeni, Marubeni Employee A, Consultant A, Consultant B, and others in obtaining and retaining business for and with, and directing business to, the Consortium, and others, as follows:

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| Two | 11/16/2005 | Employees of Alstom Power US, while in Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland. |
| Three | 1/4/2006 | Employees of Alstom Power US, while in Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland. |
| Four | 3/28/2006 | Employees of Alstom Power US, while in Connecticut, caused a wire transfer in the amount of $466,816 from the company's bank account in New York to Alstom PROM's bank account in Zurich, Switzerland, which amount was transferred by Alstom PROM to Consultant B's bank account in Singapore. |
| Five | 12/6/2006 | Employees of Alstom Power US, while in Connecticut, caused a wire transfer in the amount of $266,752 from the company's bank account in New York to Alstom PROM's bank account in Zurich, Switzerland, which amount was transferred by Alstom PROM to Consultant B's bank account in Singapore. |
| Six | 3/7/2007 | Employees of Alstom Power US, while in Connecticut, caused a wire transfer in the amount of $200,064 from the company's bank account in New York to Consultant A's bank account in Maryland. |
| Seven | 10/5/2009 | Employees of Alstom Power US, while in Connecticut, caused a wire transfer in the amount of $66,688 from the company's bank account in New York to Consultant A's bank account in Maryland. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

<u>COUNT EIGHT</u>
(Conspiracy to Commit Money Laundering)

103.     Paragraphs 1 through 25 and 27 through 100 are realleged and incorporated by reference as though fully set forth herein.

104.     From in or around 2002, and continuing through in or around 2009, in the District of Connecticut and elsewhere, HOSKINS did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Alstom, Alstom Power US, Alstom PROM, Alstom Indonesia, Pierucci, Pomponi, Rothschild, Alstom Indonesia Employee A, Alstom Indonesia Employee B, Marubeni, Marubeni Employee A, Consultant A, Consultant B, and others known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, namely:

a.     to knowingly transport, transmit and transfer monetary instruments and funds from a place in the United States to a place outside the United States, with the intent to promote the carrying on of a specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b.     to engage in a monetary transaction by, through and to a financial institution, in and affecting interstate and international commerce, in criminally derived property that was of a value greater than $10,000.00, that is, the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, such property having been derived from specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1957.

<u>Manner and Means of the Conspiracy</u>

105.     The manner and means by which HOSKINS and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

106.    HOSKINS, while located in the District of Connecticut and elsewhere, together with others, discussed in person, via telephone, and via e-mail the instructions for sending money to Consultant A's bank account in Maryland.

107.    HOSKINS, while located in the District of Connecticut and elsewhere, together with others, directed the wire transfer of, and caused to be wired, money from Alstom Power US's and Marubeni's bank accounts in New York to Consultant A's bank account in Maryland for the purpose of concealing and disguising the bribe payments to Official 1.

108.    Consultant A took a portion of the money paid to Consultant A's bank account in Maryland and engaged in monetary transactions designed to conceal the source of the moneys and the fact that they were bribes to Official 1.

109.    Consultant A took a portion of the money paid to Consultant A's bank account in Maryland and engaged in monetary transfers designed to promote the payment of bribes through international monetary transfers for the benefit of Official 1.

110.    Consultant A took a portion of the money paid to Consultant A's bank account in Maryland and engaged in monetary transactions of a value greater than $10,000 using criminally derived property.

111.    HOSKINS, while located in the District of Connecticut and elsewhere, together with others, directed the wire transfer of, and caused to be wired, money from Alstom PROM's and Marubeni's bank accounts to Consultant B's bank account for the purpose of concealing and disguising the bribe payments to foreign officials at PLN, including Official 2 and Official 3, among others.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS NINE THROUGH TWELVE
(Money Laundering)

112.    Paragraphs 1 through 25, 27 through 100, and 105 through 111 are realleged and incorporated by reference as though fully set forth herein.

113.    On or about the dates set forth below, in the District of Connecticut and elsewhere, HOSKINS did knowingly transport, transmit, and transfer, and aid, abet, and cause others to transport, transmit, and transfer, and attempt to transport, transmit, and transfer the following monetary instruments and funds from a place in the United States, namely Maryland, to a place outside the United States, namely Indonesia, intending that each of the transactions, in whole and in part, promote the carrying on of specified unlawful activity, that is, a felony violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Nine | 12/14/2005 | Wire transfer in the amount of $100,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |
| Ten | 3/1/2006 | Wire transfer in the amount of $100,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |
| Eleven | 8/8/2006 | Wire transfer in the amount of $80,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Twelve | 3/9/2007 | Wire transfer in the amount of $80,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

A TRUE BILL

/ s /

FOREPERSON

MICHAEL J. GUSTAFSON
FIRST ASSISTANT U.S. ATTORNEY
DISTRICT OF CONNECTICUT

ANDREW WEISSMANN
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY

DANIEL S. KAHN
ASSISTANT CHIEF