UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| *v.* | Criminal No. 3:12cr238 (JBA) |
| LAWRENCE HOSKINS | August 13, 2015 |

**RULING ON DEFENDANT'S SECOND MOTION TO DISMISS THE INDICTMENT**

Defendant Lawrence Hoskins moves [Doc. # 254] to Dismiss Count One of the Third Superseding Indictment [Doc. # 209] on the basis that it charges a legally invalid theory that he could be criminally liable for conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, *et seq.*, even if the evidence does not establish that he was subject to criminal liability as a principal, by being an "agent" of a "domestic concern." Relatedly, the Government moves [Doc. # 232] *in limine* to preclude Defendant from arguing to the jury that it must prove that he was the agent of a domestic concern because the Government contends that Defendant can also be convicted under theories of accomplice liability. For the reasons that follow, Defendant's Motion to Dismiss Count One of the Third Superseding Indictment will be granted in part to preclude Defendant's FCPA conspiracy prosecution from being de-linked from proof that he was an agent of a domestic concern and the Government's Motion *in Limine* is denied.

**I.     Background**

The facts of this case are set forth in detail in the Ruling [Doc. # 190] on Defendant's First Motion to Dismiss the Indictment and will be repeated only as necessary for the legal analysis herein. Briefly, Mr. Hoskins is alleged to have participated

in a bribery scheme that spanned from 2002 through 2009 for Alstom Power, Inc. ("Alstom Power U.S."), a company headquartered in Windsor, Connecticut, to secure a $118 million project to build power stations for Indonesia's state-owned and state-controlled electricity company, Perusahaan Listrik Negara, known as the Tarahan Project.

From October 2001 through August 2004, Mr. Hoskins was employed as a Senior Vice President for the Asia Region by Alstom UK and assigned to Alstom Resources Management S.A. in France where he is alleged to have "performed functions and support services for and on behalf of various other Alstom subsidiaries, including Alstom Power US." (3d Indictment ¶ 3.) It is alleged that Mr. Hoskins's "responsibilities at Alstom included oversight of the hiring of consultants in connection with Alstom's and Alstom's subsidiaries' efforts to obtain contracts with new customers and to retain contracts with existing customers in Asia, including the Tarahan Project" and "[t]hus HOSKINS was an agent of a 'domestic concern,' Alstom Power US, as that term is used in the FCPA." (*Id.* ¶¶ 3, 13.) It is in this capacity that Mr. Hoskins is alleged to have been responsible for approving and authorizing payments to "consultants" retained for the purpose of "pay[ing] bribes to Indonesian officials who had the ability to influence the award of the Tarahan Project contract." (*Id.* ¶¶ 7–8.)

On July 31, 2014, Defendant Hoskins moved [Doc. # 149] to dismiss the Second Superseding Indictment [Doc. # 50] in its entirety, contending, in relevant part, that the indictment failed to allege that Mr. Hoskins, as an employee of a non-U.S. Alstom subsidiary, could have been an "agent of a domestic concern" subject to liability under the FCPA. The Court denied [Doc. # 190] Defendant's motion, holding that the indictment alleged that Mr. Hoskins worked as an agent of Alstom Power U.S. despite being

2

employed by an overseas subsidiary and the "existence of an agency relationship is a 'highly factual' inquiry" and it was "for a jury at trial in the first instance, and not the Court on a motion to dismiss, to determine whether the Government has proven Defendant to have been an 'agent'" of Alstom Power U.S. (Ruling on 1st Mot. Dismiss at 14–16.)

As relevant here, the Third Superseding Indictment altered the charging language of Count One, the FCPA conspiracy count, which originally charged Mr. Hoskins with "being a domestic concern and an employee and agent of [Alstom Power U.S.]" and replaced it with the allegation that Mr. Hoskins conspired by acting "together with" a domestic concern to violate 15 U.S.C. § 78dd-2 (prohibiting domestic concerns from using interstate commerce corruptly to promise, authorize, or give anything of value to a foreign official) and 15 U.S.C. § 78dd-3 (prohibiting any person from taking acts in furtherance of the corrupt scheme while in the United States). (*Compare* 2d Indictment ¶ 26(a), *with* 3d Indictment ¶ 26(a).)[1] Defendant now moves to dismiss only Count One of the Third Superseding Indictment.

---

[1] The Third Superseding Indictment still alleges that "HOSKINS was an agent of a 'domestic concern,' Alstom Power US, as that term is used in the FCPA" (3d Indictment ¶ 13) and charges substantive violations of the FCPA and aiding and abetting, in violation of 15 U.S.C. § 78dd-2 and 18 U.S.C. § 2 (Counts 2–7). The Government maintains that it still intends to prove that Defendant acted as an agent of a domestic concern liable as a principal for the substantive FCPA counts charged in the indictment. (Gov't's Opp'n [Doc. # 262] at 15 n.5.) In addition to the FCPA counts, the indictment charges conspiracy to launder money, in violation of 18 U.S.C. § 1956(h) (Count 8), and substantive money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 1956(a)(2)(A) & § 2 (Counts 9–12).

II.      **Discussion**

Defendant contends that with the Third Superseding Indictment "the government makes plain . . . its view of the law" that Mr. Hoskins "could be prosecuted for conspiracy to violate the FCPA even when he himself was not subject to the statute." (Def.'s Mem. Supp. [Doc. # 254-1] at 4.) The Government maintains that the Third Superseding Indictment is adequately pled under the governing pleading standards and faults Defendant for attempting "to assign to the Government a particular 'view of the law' based on [the] change" from the Second to Third Superseding Indictments. (Gov't's Opp'n at 8–9.). But the Government acknowledges that its theory is that "even were the jury to find that the defendant was not an 'agent' of a domestic concern, [it] may still convict the defendant on one or more of the remaining accomplice theories," i.e., "aiding and abetting, causing, and *Pinkerton*" liability and moves *in limine* to preclude Defendant from arguing to the contrary. (Gov't's Mot. to Preclude Def. from Arguing that Agency is Sole Basis for Conviction [Doc. # 232] at 4, 7.)

Therefore, these two motions put before the Court the question of whether a non-resident foreign national could be subject to criminal liability under the FCPA, even where he is not an agent of a domestic concern and does not commit acts while physically present in the territory of the United States, under a theory of conspiracy or aiding and

abetting a violation of the FCPA by a person who is within the statute's reach.[2] The Court concludes that the answer is "no" and that accomplice liability cannot extend to this Defendant under such circumstances and thus Defendant's Motion to Dismiss Count One is granted in part and the Government's Motion *in Limine* is denied.

A.    FCPA

As explained in greater detail below, the FCPA in its current form prohibits bribery of foreign governmental officials and has three jurisdictional bases: (1) where a "domestic concern"[3] or U.S. "issuer" of securities, or any officer, director, employee, or

---

[2] The Government maintains that Count One of the Third Superseding Indictment is valid because it complies with "the very liberal pleading standards of Fed. R. Crim. P. 7(c), particularly in the context of conspiracy" and thus the Government's motion *in limine* is the proper method for resolving this question. (Gov't's Opp'n at 6., 9 n.2.) However, Defendant's argument is that Count One is deficient as a matter of law, which is properly raised on a pretrial motion to dismiss. *See United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."); Fed. R. Crim. P. 12 (b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."). The Court likewise disagrees with the Government's contention that Defendant's motion "is an unwarranted attempt to re-litigate" matters addressed by the Ruling on Defendant's First Motion to Dismiss. (Gov't's Opp'n at 9.) Defendant's First Motion contended only that the indictment failed to adequately allege that he was an agent of a domestic concern and that § 78dd-2(a) of the FCPA did not apply extraterritorially to non-U.S. persons who were agents of domestic concerns (*see* Def.'s Mem. Supp. 1st Mot. Dismiss [Doc. # 149-1] at 28–30, 35) and not the issue presented here, which is whether Defendant can be convicted under an accomplice liability theory even if his agency is not proven.

[3] A domestic concern is defined as an "individual who is a citizen, national, or resident of the United States" and "any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States, or which is organized under the laws of a State of the United States or a territory, possession, or commonwealth of the United States." 15 U.S.C. § 78dd-2(h)(1).

agent thereof (regardless of their nationality) makes use of U.S. interstate commerce in furtherance of a corrupt payment, 15 U.S.C. §§ 78dd-1(a), 78dd-2(a); (2) where a U.S. citizen, national, or resident acts outside the United States in furtherance of a corrupt payment, regardless of whether they make use of U.S. interstate commerce, *id.* § 78dd-2(i); and (3) where any other person, while in the territory of the United States, acts in furtherance of a corrupt payment, regardless of nationality and the use of interstate commerce, *id.* § 78dd-3.

Defendant maintains that these provisions demonstrate that "Congress deliberately intended to exclude [non-resident foreign nationals] from the statute's reach so long as they did not act while in the territory of the United States (Section 78dd-3) and did not fall into an enumerated class of persons with threshold ties to a U.S. securities issuer (Section 78dd-1) or U.S. domestic concern (Section 78dd-2)" and "the government cannot nullify that intent by charging such individuals with conspiracy to violate that statute." (Def.'s Mem. Supp. at 5–7.) The Government does not dispute the premise of Defendant's argument—that if Defendant is not proven to be an agent of a domestic concern, he cannot be held liable directly under the FCPA—but it maintains that "[a]s a general rule, the conspiracy and accomplice liability statutes apply to classes of persons who lack the capacity to commit a violation of the underlying substantive crime" and the two narrow exceptions to this rule do not apply in this case. (Gov't's Opp'n at 1.)

### B.   The *Gebardi* Principle

Theories of accomplice liability under the general conspiracy statute, 18 U.S.C. § 371, and aiding and abetting statute, 18 U.S.C. § 2, generally apply across the United States Code to impose liability upon those who conspire with or aid and abet in the

commission of any federal crime.[4] Thus, ever since 18 U.S.C. § 2 was enacted in 1909, "every time Congress has passed a new criminal statute the aider and abettor provision has automatically kicked in and made the aiders and abettors of violations of the new statute punishable as principals." *United States v. Pino-Perez*, 870 F.2d 1230, 1233 (7th Cir. 1989). Likewise, 18 U.S.C. § 371, which has existed in essentially the same form since 1867, generally criminalizes a conspiracy to commit any federal offense. *Gebardi v. United States*, 287 U.S. 112, 121 n.4 (1932); *Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.").

In *Gebardi*, the Supreme Court considered whether a woman could be convicted of conspiracy to violate the Mann Act, which outlaws transporting across state lines "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose'" where she acquiesced to her own transport. 287 U.S. at 118 (quoting 18 U.S.C. § 398(2)). The Supreme Court explained that the conspiracy statute generally prohibits conspiring to commit any crime and the "[i]ncapacity of one to commit the substantive offense does not necessarily imply that he may with impunity conspire with others who are able to commit it," because "it is the collective planning of criminal conduct at which the statute aims." *Id.* at 120–21. Thus, for example, the Supreme Court explained, it is a

---

[4] The conspiracy statute provides that it is a criminal offense for "two or more persons [to] conspire . . . to commit any offense against the United States" where one such person has done "any act to effect the object of the conspiracy." 18 U.S.C. § 371. The aiding and abetting statute states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission" or "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2.

crime for a bankrupt to conceal property from a trustee, which can necessarily only be committed by a bankrupt, but a non-bankrupt person can be charged with conspiring to conceal such property. *Id*. at 121 n.5.

However, *Gebardi* reasoned that "Congress set out in the Mann Act to deal with cases which frequently, if not normally, involve consent and agreement on the part of the woman to the forbidden transportation" and "[y]et this acquiescence . . . was not made a crime under the Mann Act itself." *Id.* 119, 121. Thus, a woman not subject to liability as a principal under the Mann Act could not be charged with conspiracy to violate the Act, because the Supreme Court "perceive[d] in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished," which would be "contravene[d]" if such "immunity" could be "withdraw[n] by the conspiracy statute." *Id.* at 123.

Thus, the *Gebardi* principle is that where Congress chooses to exclude a class of individuals from liability under a statute, "the Executive [may not] . . . override the Congressional intent not to prosecute" that party by charging it with conspiring to violate a statute that it could not directly violate. *United States v. Castle*, 925 F.2d 831, 833 (5th Cir. 1991); *see also United States v. Bodmer*, 342 F. Supp. 2d 176, 181 n.6 (S.D.N.Y. 2004) ("In *Gebardi,* the Supreme Court held that where Congress passes a substantive criminal statute that excludes a certain class of individuals from liability, the Government cannot evade Congressional intent by charging those individuals with conspiring to violate the same statute."). The *Gebardi* principle also applies to aiding and abetting liability. *United States v. Amen*, 831 F.2d 373, 381 (2d Cir. 1987).

In determining whether the *Gebardi* principle applies, the question is "not whether Congress *could have*" reached a certain class of individuals under the conspiracy or aiding and abetting statutes, "but rather whether Congress *intended to do so,* or more specifically, whether Congress intended the general conspiracy statute" to apply to these individuals.[5] *Castle*, 925 F.2d at 835 (emphasis in original).

The Government maintains that *Gebardi* recognized only a "narrow exception to [the] long-established legal principle" that "the conspiracy and accomplice liability statutes apply to classes of persons who lack the capacity to commit a violation of the underlying substantive crime." (Gov't's Opp'n at 1.) It maintains that this exception only "applies in two limited circumstances: (1) where a class of person is a *necessary party* to the crime and was specifically excluded from prosecution for the substantive violation by Congress (*e.g.*, the foreign official who receives the bribe payment under the FCPA, or the woman who is transported across state lines under the Mann Act); or (2) where the substantive statute was enacted to protect the class of person to which the individual belongs (*e.g.*, victims)." (*Id.* at 1–2 (emphasis in original).) Defendant maintains that *Gebardi* applies whenever "Congress affirmatively chooses to exclude a certain class of individuals from liability under a criminal statute." (Def.'s Mem. Supp. at 19.)

---

[5] Defendant acknowledges that the "conspiracy and aiding-and-abetting offenses are not predicated upon capacity to commit the underlying crime" (Reply at 11) and his argument is solely one of legislative intent. The Government cites over 20 cases in support of the undisputed point, i.e., what Congress *could* do, not what it *did* do, and contends that Defendant "aims to undo decades of Second Circuit case law" by arguing "that *Gebardi* applies anytime a class of persons are exempted from coverage as principals under the substantive statute." (Gov't's Opp'n at 15–21.) This is not Defendant's argument and thus this portion of the Government's argument misses the mark.

The Court agrees with Defendant that the Government's interpretation of *Gebardi* is too narrow and that while the two "[f]actual scenarios . . . posited by the government bring Congress's intent into view and, thereby, make it easier to glean the existence of an affirmative legislative policy," Congressional intent can be evident in other circumstances. (Reply at 12.) For example, in *Amen*, the Second Circuit applied *Gebardi* and held that a person who was not the head of a criminal enterprise could not be subject to the drug "kingpin" statute's sentencing enhancement under a theory that he aided and abetted a violation, because "[w]hen Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense." 831 F.2d at 381.

The Second Circuit's reasoning was not, as the Government maintains, that a violation of the kingpin statute requires "the participation of two classes of persons—those who lead a criminal enterprise, on the one hand, and those who are led, on the other" and that "Congress chose only to provide for an enhanced punishment of one of those necessary parties." (Gov't's Opp'n at 21–22.) Rather, the Second Circuit reasoned that while the statute's "legislative history makes no mention of aiders and abettors, it

makes it clear that the purpose . . . was not to catch in the [kingpin] net those who aided and abetted the supervisors' activities." *Amen*, 831 F.2d at 382.[6]

### C.    Application

The clearest indication of legislative intent is the text and structure of the FCPA, which carefully delineates the classes of people subject to liability and excludes non-resident foreign nationals where they are not agents of a domestic concern or did not take actions in furtherance of a corrupt payment within the territory of the United States. *See Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 739 (1989) ("The starting point for [the] interpretation of a statute is always its language.").

In *United States v. Castle*, 925 F.2d 831, 832 (5th Cir. 1991), the Fifth Circuit applied *Gebardi* to conclude that another class of individuals not subject to liability as

---

[6] The Seventh Circuit reached a contrary result regarding the same statute in *United States v. Pino-Perez*, 870 F.2d 1230, 1234 (7th Cir. 1989) and criticized the Second Circuit's approach because it "could even be interpreted to mean that unless a specific intent to punish aiders and abettors appears in the legislative history of a criminal statute, section 2(a) does not apply to that statute; aiding and abetting violations of the statute is not a crime." In its analysis, the Seventh Circuit instead applied a "more modest version of the approach" which still looked to congressional intent but resolved "[d]oubt about Congress's intentions . . . in favor of aider and abettor liability" and required "an affirmative legislative policy to create an exemption from the ordinary rules of accessorial liability." *Id.* (quoting *United States v. Falletta,* 523 F.2d 1198, 1200 (5th Cir. 1975)). Without any specific mention of aiding and abetting liability in the legislative history, the Seventh Circuit found "no more reason to infer from its legislative history an intent to preclude aider and abettor liability than there would be to draw such an inference from the legislative history of any other federal criminal statute." *Id.* As discussed below, even under the Seventh Circuit's approach, this Court would reach the same result because its conclusion does not depend on the absence of an explicit discussion in the FCPA's legislative history of an intent to impose accomplice liability but rather multiple indicators of an affirmative legislative intent to exclude a specific group of non-resident foreign nationals from liability under the FCPA as principals or otherwise.

principals under the FCPA—the foreign officials who accept bribes—could not be prosecuted for conspiracy to violate the FCPA. The Fifth Circuit found an intent in the FCPA to exclude the foreign bribe recipients because, in enacting the FCPA in 1977 in the aftermath of the Watergate scandal, Congress was principally "concerned about the domestic effects of such payments," such as "the distortion of, and resulting lack of confidence in, the free market system within the United States." *Id.* at 834–35.

Congress was aware that it "could, consistently with international law, reach foreign officials in certain circumstances," but it was also concerned about "the 'inherent jurisdictional, enforcement, and diplomatic difficulties' raised by the application of the bill to non-citizens of the United States" and decided not to do so. *Id.* at 835 (quoting H.R.Conf.Rep. No. 831, 95th Cong., 1st Sess. 14, *reprinted in* 1977 U.S.Code Cong. & Admin.News 4121, 4126).[7] From the text of the statute and the legislative history expressing concern about reaching non-citizens, the Fifth Circuit found "in the FCPA what the Supreme Court in *Gebardi* found in the Mann Act: an affirmative legislative policy to leave unpunished a well-defined group of persons who were necessary parties to the acts constituting a violation of the substantive law." *Id.* at 836.

---

[7] In *United States v. Bodmer*, 342 F. Supp. 2d 176, 181 (S.D.N.Y. 2004), the court considered "whether prior to the 1998 amendments, foreign nationals who acted as agents of domestic concerns, and who were not residents of the United States, could be criminally prosecuted under the FCPA." There, the government conceded the point that it now apparently contests: "that if the FCPA's criminal penalties did not apply to" to the defendant directly—which the court concluded they did not—the charges "must be dismissed pursuant to" *Gebardi* and *Castle*. *Bodmer*, 342 F. Supp. 2d at 181.

D.      **Legislative History of 1977**

Although the text and structure of the FCPA provide strong indication that Congress did not intend for non-resident foreign nationals to be subject to the FCPA unless they were agents of a domestic concern or acted in the territory of the United States, the Court also considers the legislative history of the Act.

While the extensive legislative history of the enactment of the FCPA in 1977 and its amendments in 1998 identified by the parties contain little discussion of accomplice liability, that which does exist is consistent with what the plain text and structure of the final enactment implies regarding the limits of liability for non-resident foreign nationals. The initial version of the Senate bill introduced by the Committee on Banking, Housing and Urban Affairs on June 2, 1976 made it unlawful for any U.S. "issuer" or "domestic concern" to use any means or instrumentality of interstate commerce to authorize or pay a bribe. S. 3664, 94th Cong. (1976) (Ex. 9 to Def.'s Mem. Supp.). "Domestic concern" was defined to include (1) U.S. citizens and nationals and (2) entities owned or controlled by U.S. citizens and nationals that were either incorporated in or had a principal place of business in the United States. *Id.* at 7.

An amendment to the Senate bill[8] responded to a request by the administration of President Carter "to clearly cover under the bill individuals making payments" that was not "crystal clear" in the original version. Markup Session on S. 305, Senate Comm. on Banking, Housing and Urban Affairs, 95th Cong., 8 (Apr. 6, 1977) (Ex. 11 to Def.'s Mem.

---

[8] Although the Senate unanimously voted to pass S. 3664, the House did not vote on the bill before its adjournment in October 1976 and a substantially identical version of the Senate bill was reintroduced the following session on January 18, 1977 as S. 305. *See* S. REP. 95-114, at *2 (1977), *reprinted in* U.S.C.C.A.N. 4098, 4100.

Supp.). The definition of domestic concern was left unchanged, but the proposal added that officers, directors, employees and stockholders acting on behalf of U.S. issuers or domestic concerns, irrespective of nationality, would be liable for making bribes on behalf of the company. S. Rep. No. 95-114, at 11; 123 Cong. Rec. 13817 (1977) (Ex. 13 to Def.'s Mem. Supp.). Although the Carter Administration requested that liability be extended to foreign subsidiaries of U.S. companies, Markup Session on S. 305 at 9, the Senate declined to do so, S. Rep. No. 95-114.

A competing House bill introduced on February 22, 1977 provided for broader liability for non-resident foreign nationals than the Senate bill, proposing liability not just for non-U.S. officers, directors, and employees of domestic concerns, but also (1) any "agent" of a U.S. issuer or domestic concern who "carried out" a bribe and (2) officers, directors, and employees of foreign affiliates irrespective of nationality. H.R. 3815 §§ 30A(c)(2), 3(c)(2), 3(f)(2)(A), 95th Cong. (1977) (Ex. 14 to Def.'s Mem. Supp.).

The FCPA as enacted included elements from both the Senate and House bills, extending liability to agents of domestic concerns as the House proposed, but limiting criminal liability of agents and employees of domestic concerns to a person who was a "United States citizen, national, or resident or is otherwise subject to the jurisdiction of

the United States,"[9] and predicated such person's criminal liability on a finding that the domestic concern itself had violated the statute.[10] 15 U.S.C. § 78dd-2(b)(1)(B)(3) (1977).

The final bill excluded foreign affiliates of U.S. companies, as the Senate proposed, which the House Conference Report described as a "recogni[tion] [of] the inherent jurisdictional, enforcement and diplomatic difficulties raised by the inclusion of foreign subsidiaries of U.S. companies in the direct prohibitions of the bill." H.R. Conf. Rep. No. 95-831, at *14. The Report explained, however, that because U.S. citizens, nationals, and residents were defined as domestic concerns, they could be liable for engaging in bribery "indirectly" through another person and that the "jurisdictional, enforcement and diplomatic difficulties" that applied to extending liability to foreign subsidiaries did not apply to "citizens, nations, or residents of the United States." *Id.*

The Government notes that early versions of the Senate and House committee reports discussed accomplice liability:

> The committee fully recognizes that the proposed law will not reach all corrupt payments overseas. For example, Sections 2 and 3 would not permit prosecution of a foreign national who paid a bribe overseas acting entirely on his own initiative. The committee notes, however, that in the majority of bribery cases investigated by the SEC some responsible official

---

[9] The 1998 amendments to the FCPA, discussed *infra*, removed the phrase "otherwise subject to the jurisdiction of the United States" from the statute and therefore this phrase does not apply to Defendant. The court in *Bodmer* concluded that the phrase was ambiguous but appeared to refer to personal jurisdiction and thus was "a wholly unnecessary clause" because the issue of personal jurisdiction generally does not arise in criminal cases. 342 F. Supp. 2d at 188.

[10] Officers or directors of a domestic concern were subject to criminal liability regardless of nationality. 15 U.S.C. § 78dd-2(b)(1)(B) (1977). Similarly, all directors, employees, and agents of a domestic concern were subject to civil liability regardless of nationality. *Id.* § 78dd-2(b)(1)(A).

> or employee of the U.S. parent company had knowledge of the bribery and either explicitly or implicitly approved the practice. Under the bill as reported, such persons could be prosecuted. The concepts of aiding and abetting and joint participation would apply to a violation under this bill in the same manner in which those concepts have always applied in both SEC civil actions and in implied private actions brought under the securities laws generally.

H.R. Rep. No. 95-640, at 8 (1977); S. Rep. No. 94-1031, at 7 (1976).

As discussed above, this legislative history discussing an early version of the bill was later clarified in response to concerns by the Carter Administration that the extent of individual liability (including for U.S. nationals) was not "crystal clear." Rather than resorting to concepts of accomplice liability, the enacted version specifically delineated the extent of individual liability by "mak[ing] it clear that" the delineated individuals were "covered directly." Markup Session on S. 305, Senate Comm. on Banking, Housing and Urban Affairs, 95th Cong., 8, 12 (Apr. 6, 1977). Therefore, the discussion of accomplice liability cited by the Government does not suggest that Congress intended for those who were excluded from direct liability under the Act to be subject to accomplice liability but only shows that Congress considered imposing individual liability based on concepts of accomplice liability but instead chose to do so directly and carefully delineated the class of persons covered to address concerns of overreaching.

Thus, as in *Amen* and *Gebardi*, even absent explicit discussion in the legislative history of accomplice liability, the carefully-crafted final enactment evinces a legislative intent to cabin such liability. *See Amen,* 831 F.2d at 382; *Gebardi*, 287 U.S. at 123. As the Fifth Circuit explained, when Congress "listed all the persons or entities who could be prosecuted" under the FCPA, it "intended that these persons would be covered by the Act

16

itself, without resort to the conspiracy statute" and, as in *Gebardi*, that intent cannot be circumvented by resort to conspiracy and aiding and abetting liability. *Castle*, 925 F.2d at 836.

### E.      1998 Amendments

While the Government argues that the original version of the FCPA in 1977 provided for accomplice liability, it maintains that after the 1998 amendments to the FCPA "Congress unequivocally provided that it intended the accomplice liability and conspiracy statutes to apply to foreign nationals not otherwise subject to the FCPA as principals." (Gov't's Opp'n at 27.) The 1998 amendments to the FCPA were "enacted to ensure the United States was in compliance with its treaty obligations," *United States v. Esquenazi*, 752 F.3d 912, 923 (11th Cir. 2014), after the United States ratified the Organization for Economic Cooperation and Development's Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention"). Dec. 17, 1997, S. Treaty Doc. No. 105–43, 37 I.L.M.; International Anti–Bribery and Fair Competition Act of 1998, Pub.L. No. 105–366, 112 Stat. 3302.

The OECD Convention required each signatory country to "take such measures as may be necessary to establish that it is a criminal offence under its law for any person intentionally" to bribe foreign officials. OECD Convention art. 1.1. In response, the 1998 amendments expanded the scope of liability in three ways. First, Congress added 15 U.S.C. § 78dd-3(a), which prohibited those individuals or entities that did not already fall under other provisions of the statute from taking action "while in the territory" of the

United States in furtherance of corrupt payments. 15 U.S.C. § 78dd-3(a).[11] Second, the 1998 amendments eliminated a disparity in penalties between U.S. and foreign nationals acting as agents of domestic concerns whereby previously foreign nationals were subject only to civil penalties. The amendment made clear that foreign nationals acting as agents of domestic concerns could be criminally prosecuted for violating the FCPA if they used some manner or means of interstate commerce. 15 U.S.C. § 78dd-2. Third, Congress provided for nationality jurisdiction[12], providing that it "shall also be unlawful for any United States person to corruptly do any act outside the United States in furtherance of" a foreign bribe. 15 U.S.C. § 78dd-2(i)(1); *see also* S. REP. 105-277, at \*2–3 (1998) (describing these three changes to the FCPA as being intended "to conform it to the requirements of and to implement the OECD Convention").

---

[11] The Senate Committee Report for 15 U.S.C. § 78dd-3 explains that "this section limits jurisdiction over foreign nationals and companies to instances in which the foreign national or company takes some action while physically present within the territory of the United States," but "Congress does not thereby intend to place a similar limit on the exercise of U.S. criminal jurisdiction over foreign nationals and companies under any other statute or regulation." S. Rep. 105-277, 6. The Government suggests that in referring to "any other statute or regulation," *id.*, "Congress provided an unambiguous statement that it intended" 18 U.S.C. §§ 2 and 371 would "apply to foreign nationals who are otherwise not covered by the FCPA as principals." (Gov't's Opp'n at 29.) The more logical conclusion given the context is that Congress was clarifying that while the newly-added 15 U.S.C. § 78dd-3 only provided for liability for foreign nationals for their acts within the territory of the United States, Congress did not intend to impose such a territorial limitation under 15 U.S.C. § 78dd-2 for foreign nationals who were agents, officers, directors, employees or stockholders of domestic concerns.

[12] Nationality jurisdiction is one of the "well-recognized bases of criminal jurisdiction" in which a nation "provides for jurisdiction over extraterritorial acts committed by [its] own citizen." *United States v. Yousef*, 327 F.3d 56, 91 n.24 (2d Cir. 2003).

The Government maintains that because the OECD Convention required each signatory country to make it a "criminal offense under its law for *any person*" to pay a foreign bribe, OECD Convention, art. 1.1 (emphasis added), the "1998 amendments expanded the jurisdictional reach of the FCPA to cover any person over whom U.S. courts have jurisdiction" and a contrary interpretation "would place the United States in violation of its treaty obligations" (Gov't's Opp'n at 28, 30). While the Supreme Court has admonished that "courts should be most cautious before interpreting . . . domestic legislation in such manner as to violate international agreements," *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995), this Court does not agree with the Government's contention that the OECD Convention required or even contemplated the extent of liability sought by the Government here by using the term "any person."

Rather, the OECD's reference to "any person" is cabined by Article 4 of the Convention, addressing jurisdiction, which provides that each signatory "shall take such measures as may be necessary to establish its jurisdiction over the bribery of a foreign public official when the offense is [1] committed in whole or in part in its territory" (OECD Convention, art. 4.1) or [2] by its own nationals while abroad (*id.*, art. 4.2). Therefore, there is no indication that the OECD Convention requires the United States to

prosecute foreign bribery committed abroad by non-resident foreign nationals who conspire with United States citizens.[13]

Based on the text and structure of the FCPA and the legislative history accompanying its enactment and its amendment, the Court concludes that Congress did not intend to impose accomplice liability on non-resident foreign nationals who were not subject to direct liability.[14] Count One will not be dismissed in its entirety, however, because if the Government proceeds under the theory that Mr. Hoskins is an agent of a domestic concern and thus subject to direct liability under the FCPA, *see* Note 1, *supra*, the *Gebardi* principle would not preclude his criminal liability for conspiring to violate the FCPA. The Government may not argue, however, that Defendant could be liable for conspiracy even if he is not proved to an agent of a domestic concern.

---

[13] *Bodmer*, cited by the Government, does not undermine this conclusion. In *Bodmer*, the court concluded "that in 1977, Congress likely intended that the FCPA's criminal sanctions applied to non-resident foreign nationals who properly appeared in United States courts," but the defendant was an agent of a domestic concern and thus the court did not address the liability of those who were not agents. 342 F. Supp. 2d at 181.

[14] The Government maintains that the second object of the charged conspiracy, that Defendant conspired "while in the territory of the United States" to violate the FCPA under § 78dd-3 (3d Indictment ¶ 26(b)), is unchanged from the Second Superseding Indictment and should not be dismissed (Gov't's Opp'n at 9). However, it is undisputed that Mr. Hoskins never entered the territory of the United States and thus could not be prosecuted directly under this section. Therefore, *Gebardi* applies to the second as well as the first charged object of the conspiracy in that if Congress intended to limit liability under this section to those within the territory of the United States, the Government cannot circumvent this intention by resort to the conspiracy statute. *See United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) ("Generally, the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute.").

III.    **Conclusion**

For the reasons set forth above, Defendant's Motion [Doc. # 254] to Dismiss Count One of the Third Superseding Indictment is GRANTED in PART and the Government's Motion [Doc. # 232] *in Limine* to Preclude Defendant from Arguing that Agency is Sole Basis for Conviction is DENIED.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 13th day of August, 2015.