UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| *v.* | Criminal No. 3:12cr238 (JBA) |
| LAWRENCE HOSKINS | August  14, 2015 |

**RULING ON DISCOVERY MOTIONS
AND THE GOVERNMENT'S MOTION *IN LIMINE***

Defendant Lawrence Hoskins moves to Compel the Production of *Brady* Material
and Rule 16 Discovery by the Government [Doc. # 204], the issuance of a Rule 17
Subpoena for Alstom [Doc. # 206], and the issuance of Letters Rogatory [Doc. # 205]
directed at Alstom entities abroad, both of which Alstom moves [Doc. # 229] to quash.
The Government moves [Doc. # 231] *in limine* to preclude Defendant from offering
evidence regarding whether he acted as an agent of a domestic concern on projects other
than the one charged in the indictment.

For the reasons that follow, Defendant's motions seeking discovery and Alstom's
Motion to Quash are granted in part and denied in part and the Government's Motion *in
Limine* regarding evidence of uncharged projects is granted in part and denied in part.

I.      **Discussion**[1]

Defendant has filed three discovery motions largely seeking evidence that he
contends would support his defense that he was not an agent of Alstom Power, U.S., a

---

[1] The facts of this case are set forth in the Ruling [Doc. # 270] on Defendant's
Second Motion to Dismiss the Indictment.

domestic concern: a Motion [Doc. # 204] to Compel the Production of *Brady* Material and Rule 16 Discovery from the Government; a Rule 17 Motion [Doc. # 206] for the Issuance of Subpoena directed at Alstom Power, U.S.; and a Motion [Doc. # 205] for the Issuance of Letters Rogatory to (1) the appropriate judicial authority of the French Republic for assistance in obtaining documentary evidence from Alstom S.A. and (2) the appropriate judicial authority of the Swiss Confederation for assistance in obtaining documentary evidence from Alstom Network Schweiz AG. The Government opposes [Doc. # 211] these motions and Alstom has moved [Doc. # 229] to quash the subpoena and opposes the issuance of letters rogatory. Relatedly, the Government moves [Doc. # 231] *in limine* to preclude Defendant "from offering evidence that he was or was not acting as an agent in connection with various Alstom projects other than the Tarahan Project." (Mot. at 2.)

Because the Government's Motion *in Limine* helps to illustrate the boundaries of relevancy applicable to the documents sought by Defendant, it will be discussed first followed by Defendant's discovery motions.

### A.     Motion *in Limine*

The Government moves "to preclude the defendant from offering evidence that he was or was not acting as an agent in connection with various Alstom projects other than the Tarahan Project," contending that such evidence "is of no consequence in determining whether the defendant is guilty of the charges in the Indictment" and instead "'the relevant inquiry for agency liability is whether the agency relationship existed with regard to the specific transaction or transactions that gave rise to the claim.'" (Gov't's Mot. at 1, 3 (quoting *Jurimex Kommerz Transit G.M.B.H. v. Case Corp.*, No. 06-3523,

2007 WL 2153278, at *3 (3d Cir. July 27, 2007) (emphasis omitted).) Defendant has indicated that one of his central defenses at trial will be that the Government has failed to prove that he is an "agent" of a domestic concern under the FCPA. (*See, e.g.,* Def.'s Mem. Supp. Mot. Compel *Brady* [Doc. # 204-1] ("Def.'s *Brady* Mot.") at 1 ("The sole basis for applying the [FCPA] to this case is the allegation that over a decade ago, when Mr. Hoskins worked at Alstom's headquarters in Paris, he served as an agent of a domestic concern, Alstom's subsidiary in Windsor, Connecticut. It is no secret that Mr. Hoskins flatly denies that allegation, and a critical aspect of his defense turns on disputing that characterization.").) He does not appear to dispute the premise of the Government's argument, i.e., that it need only prove "that Mr. Hoskins was an agent of the Windsor subsidiary in connection with the Tarahan project" as opposed to other projects, but nevertheless maintains that "evidence of Mr. Hoskins's broader job responsibilities" would "shed light on the relationship between Mr. Hoskins and [Alstom Power U.S.] within usual agency principles." (Def.'s Opp'n at 8); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014) ("One may be an agent for some business purposes and not others so that the fact that one may be an agent for one purpose does not make him or her an agent for every purpose." (quoting 2A C. J. S., Agency § 43, p. 367 (2013))).

The FCPA does not define the term "agent" and "[w]here no definition is provided, courts first 'consider the ordinary, common-sense meaning of the words,'" *United States v. Bodmer*, 342 F. Supp. 2d 176, 183 (S.D.N.Y. 2004) (quoting *United States v. Dauray,* 215 F.3d 257, 260 (2d Cir. 2000)), and "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established

meaning of these terms." *N.L.R.B. v. Amax Coal Co., a Div. of Amax*, 453 U.S. 322, 329 (1981).

The term "agent" has a settled definition at common law and the existence of an agency relationship is a "highly factual" inquiry, considering factors, such as "the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006) (quoting *Columbia Broad. Sys., Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 375 (2d Cir. 1975)).

The Third Superseding Indictment charges that Mr. Hoskins was an agent of a domestic concern because in his capacity as Senior Vice President for the Asia region at Alstom UK, he was responsible for "Alstom's and Alstom's subsidiaries' efforts to obtain contracts with new customers and to retain contracts with existing customers in Asia, including the Tarahan Project" and for overseeing the hiring of the consultants allegedly used by Alstom Power U.S. to make corrupt payments. (3d Indictment [Doc. # 209] ¶¶ 3, 13.) Although evidence bearing upon whether or not Defendant acted as an agent for Alstom Power U.S. for the Tarahan Project is indisputably highly relevant, Defendant maintains that evidence of his involvement in other projects for which he is not charged is also relevant because "the other projects are a part of a landscape of evidence that defined Mr. Hoskins's function within the Alstom conglomerate" and "will most vividly show that he occupied a position of prominence in the Alstom network, befitting his title as a headquarters executive. Only against this landscape can Mr. Hoskins's role at Alstom

be properly understood; it is the context necessary for assessing his relationship with [Alstom Power U.S.] and seeing through the claim that he was [its] agent." (Def.'s Opp'n [Doc. # 248] at 2.)

Under Fed. R. Evid. 401, evidence "is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 403, however, provides that even relevant evidence may be excluded from trial "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Although the jury will ultimately be asked to determine only if the Government has proved that Mr. Hoskins was an agent for Alstom Power U.S. on the Tarahan Project, evidence bearing upon Mr. Hoskins's overall relationship with Alstom Power U.S. has potential circumstantial relevance to whether the relationship between Alstom Power U.S. and Defendant on the Tarahan Project conformed to their historical practices. The Second Circuit has recognized that relevant factors in determining whether an agency relationship exists include "the situation of the parties" and "their relations to one another" as well as "the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done." *Cleveland*, 448 F.3d at 522 (quoting *Columbia Broad. Sys., Inc.,* 522 F.2d at 375–76). Under Rule 403, however, there are limits to the scope of evidence presented that is not directly related to the allegations in the indictment. Therefore, while Defendant can offer evidence bearing upon his relationship with Alstom

Power U.S. as demonstrated by his work for this entity on non-Tarahan projects, if any, he may not offer evidence of his involvement with other Alstom subsidiaries on non-Tarahan projects. Whatever minimal relevance such evidence might have, Rule 403 mandates its exclusion because the probative value of such evidence is substantially outweighed by a risk of undue delay, confusing the issues, and misleading the jury.[2] Allowing Defendant to introduce evidence relating to dozens of other complicated projects that are not charged in the indictment would greatly expand the scope of this case without assisting the jury in determining whether the Government has proven that Mr. Hoskins was the agent of a domestic concern for the Tarahan Project. Therefore, the Government's Motion *in limine* is granted in part and denied in part insofar as Defendant will be allowed to offer evidence of his relationship with Alstom Power U.S., if any, beyond just his dealings on the Tarahan Project.

---

[2] Defendant maintains that the Government's proffer that pursuant to Fed. R. Evid. 404(b) it intends to introduce evidence of Defendant's work on four other projects for Alstom demonstrates that not all evidence relating to non-Tarahan projects "will *confuse* the issues, *mislead* the jury, cause *undue* delay, or *waste* time." (Def.'s Opp'n at 12.) However, as the Government notes, Rule 404(b) specifically allows evidence of other acts to be introduced for certain limited purposes while Defendant much more broadly seeks to introduce evidence of other projects as "context" that have little or no probative value. The Government also maintains that "much" of its non-Tarahan-related evidence is admissible even without resort to Rule 404(b) because it is "inextricably intertwined with the charged conduct," such as "several e-mails discussing which consultant could most effectively funnel bribes to various officials" for both the Tarahan Project and another uncharged project that Defendant sent "to many of the same co-conspirators regarding the use of the same consultants to bribe the same officials." (Gov't's Reply [Doc. # 258] at 2, 9–10.)

**B.      Legal Standard for Discovery**

The Government's disclosure requirements are governed by both statutory and constitutional dimensions. Pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny, the Government's obligations "are seemingly well-established." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). The "prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *Id.* "*Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment material," *id.*, and did not create a "general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Rather, *Brady* requires the prosecution to disclose only evidence that is "material" either to guilt or to punishment "to ensure that a miscarriage of justice does not occur." *United States v. Bagley,* 473 U.S. 667, 675 (1985). Evidence is material in the *Brady* context only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012).

Federal Rule of Criminal Procedure 16(a)(1)(E) provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

"Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."[3] *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (quoting *United States v. Ross*, 511 F.2d 757, 762–63 (5th Cir. 1975)). Evidence need not necessarily be admissible under *Brady* so long as it is "material and favorable" and "'could lead to admissible evidence.'" *Mahaffy*, 693 F.3d at 131 (quoting *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)).

Rule 17 of the Federal Rules of Criminal Procedure governs the issuance of subpoenas *duces tecum* in federal criminal proceedings and provides in relevant part that:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c).

The purpose of a Rule 17(c) subpoena is to implement the Sixth Amendment guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, but it

---

[3] Likewise, this District's Standing Order on Discovery requires the Government within 14 days of arraignment to furnish a defendant with documents "which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant," D. Conn. Crim. App'x (5), a list of witnesses to be called at trial, *id.* (9), and all *Giglio* and *Brady* material, *id.* (10)–(11). Counsel for both parties have a continuing duty "to reveal immediately to opposing counsel all newly-discovered information or other material within the scope of this Standing Order." *Id.*(D).

"was not intended to provide an additional means of discovery," *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). Rather, its "chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials" rather than having the items brought into court only after trial had commenced. *Id.* & n.5.

"[T]he court may quash or modify the subpoena if compliance would be unreasonable or oppressive," Fed. R. Crim. P. 17(c)(2), and to defeat a motion to quash the Supreme Court has required a party seeking disclosure to show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*United States v. Nixon*, 418 U.S. 683, 700 (1974) (footnote omitted). To satisfy this burden, Defendant "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."[4] *Id.*

---

[4] While *Nixon* involved a subpoena by the Special Prosecutor directed at President Nixon, the case was "not by its terms limited to subpoenas issued by the Government," *United States v. Binday*, No. 12 CR 152 (CM), 2013 WL 4494659, at *1 (S.D.N.Y. Aug. 15, 2013), and neither the Supreme Court nor the Second Circuit have addressed whether a different standard applies to third party subpoenas sought by a criminal defendant. District courts in this Circuit have nearly universally applied the *Nixon* analysis to all subpoenas. *See Id.*; *United States v. Ferguson*, No. CRIM. 3:06CR137(CFD), 2007 WL 2815068, at *3 (D. Conn. Sept. 26, 2007) ("All district courts within this Circuit . . . have applied *Nixon* to assess the validity of 17(c) subpoenas issued to third parties." (collecting cases)).

"Letters rogatory are the medium, in effect, whereby one country, speaking through one of its courts, requests another country, acting through its own courts and by methods of court procedure peculiar thereto and entirely within the latter's control, to assist the administration of justice in the former country." *United States v. Al Fawwaz*, No. S7 98 CRIM. 1023 LAK, 2014 WL 627083, at *2 (S.D.N.Y. Feb. 18, 2014) (internal quotation marks omitted). District courts have both statutory and inherent authority to issue letters rogatory and whether to do so rests within a district court's discretion. *Id.; 28* U.S.C. § 1781. The standard for issuance of a letter rogatory is the same as if the evidence were located in the United States, *United States v. Korogodsky*, 4 F. Supp. 2d 262, 265 (S.D.N.Y. 1998), and thus Defendant must satisfy the requirements of Fed. R. Crim. P. 17 and *Nixon* to obtain evidence from Alstom that is located abroad.

### C.   Application

Defendant's three motions seek 33 categories of documents, invoking four procedural mechanisms—*Brady*, Rules 16 and 17, and letters rogatory. (*See* Def.'s *Brady* Mot. at 16 n.5 & Ex. F (Feb. 4, 2015 ltr. David Raskin to David E. Novick); Subpoena to Alstom [Doc. # 206-2]; Proposed Letters Rogatory [Doc. ## 205-3, 205-4].) The Government represents that it has produced over one million pages of documents obtained from Alstom, its worldwide subsidiaries, and potential witnesses in the case, including 15,000 records relating to the Tarahan Project; approximately 100 reports of witness interviews, records from financial institutions, the defendant's personnel file; hundreds of organizational charts; and thousands of documents related to the retention and function of consultants such as those accused of carrying out the alleged bribery scheme. (Gov't's Opp'n at 4–5.) While the sheer volume of documents produced does not

establish whether the Government has met its disclosure obligations, the Government further represents that it has "produced to [Defendant] everything in [its] possession related to this case" (Mar. 18, 2015 email David Novick to Alejandra de Urioste, *et al.*, Ex. H to Def.'s *Brady* Mot.) and is willing to request additional documents from Alstom that Defendant believes are relevant so long as they are identified with "sufficient specificity."[5] (Feb. 20, 2015 ltr. Daniel S. Kahn, *et al.* to David Raskin, *et al.*, Ex. G to Def.'s *Brady* Mot. at 1). The Government acknowledges that its *Brady* obligations "exist independent of any formal request" by Defendant and thus that if any additional "discoverable material comes into [its] possession" it must be disclosed to Defendant.[6] (*Id.*)

The Court will now address each of Defendant's outstanding requests.[7] (*See* Def.'s *Brady* Mot. at 16 n.5 & Ex. F (Ltr. David Raskin to David E. Novick, Feb. 4, 2015).)

---

[5] As the Government notes, specificity of requests is particularly important in this case because "Alstom is a multi-national company with 110,000 employees, and likely tens of millions of documents residing in its more than 70 overseas offices." (Gov't's Opp'n at 17.)

[6] Alstom S.A.'s Plea Agreement requires that "upon request" it must provide the Government with "any document, record or other tangible evidence about which the [Government] may inquire of" it related to corrupt payments. Plea Agmt. [Doc. # 5], *United States v. Alstom S.A.*, 14cr246 (JBA) (D. Conn. Dec. 14, 2014). Because the Court concludes that Defendant's requests largely fail to meet the requirements of specificity and relevancy, it need not decide whether the terms of this agreement bring documents held by Alstom into the "possession, custody, and control" of the Government under Rule 16, *see United States v. Stein*, 488 F. Supp. 2d 350, 355 (S.D.N.Y. 2007), or *Brady*. Additionally, the Government has indicated that it is willing to request from Alstom documents that do meet the requirements for disclosure. (*See* Feb. 20, 2015 ltr. Daniel S. Kahn, *et al.* to David Raskin, *et al.*, at 1); *cf. Stein*, 488 F. Supp. 2d at 355.

[7] Except where noted Defendant's request to the Government and Alstom are substantially identical. (*See* Def.'s Mem. Supp. Rule 17 Mot. [Doc. # 206-1] at 2 n.2 & Mem. Supp. Ltrs. Rogatory [Doc. # 205-1] at 1 n.1.)

Because these requests for the most part seek broad categories of documents rather than specific items and do not appear to account for the large volume of discovery that Defendant has already received, the Court will again outline what it considers to be the contours of relevancy and materiality that will limit Defendant's document requests. Evidence regarding Mr. Hoskins's work on non-Tarahan projects for non-Alstom Power U.S. subsidiaries is not relevant or, to the extent there is any minimal probative value in such evidence, it is substantially outweighed by the Fed. R. Evid. 403 considerations. But Defendant is entitled to discovery regarding his relationship with Alstom Power U.S., if in fact he had any dealings with this entity outside of the Tarahan Project, because this prior course of dealings could provide context and be circumstantially relevant to his relationship with Alstom Power U.S. and whether he was its agent on the Tarahan Project. *See Cleveland*, 448 F.3d at 522.

### *[2.a] "Records of Mr. Hoskins's communications, including, without limitation, e-mails, letters, telephone logs and recordings of telephone calls."*

This broad request for all communications by Mr. Hoskins regardless of subject matter or counterparty is not *Brady* or Rule 16 or 17 material on its face in that it requests complete categories of documents without specificity or regard to whether such documents are material or exculpatory. The Government represents that it has produced all of Defendant's relevant communications relating to the Tarahan Project (except for documents awaiting approval from the French government under a mutual legal assistance treaty request) and that it previously tried unsuccessfully to produce to Defendant a broader set of his communications, but the French authorities agreed only to produce what is relevant to this case under its blocking statute. (Gov't Opp'n at 30–31.)

Defendant maintains that "any information tending to show that Mr. Hoskins consented to act as the agent of a non-U.S. person or entity would be favorable and material to Mr. Hoskins['s] defense" because it "would make it less likely that Mr. Hoskins consented to act on behalf of, or under the control of, a 'domestic concern.'" (Def.'s *Brady* Mot. at 16.)

Neither *Brady* nor Rules 16 and 17 create a general right to discovery in criminal cases, *see Weatherford*, 429 U.S. at 559, and Defendant must request documents with sufficient specificity to show that the evidence sought is material to his defense and admissible or exculpatory, *see United States v. Mendinueta-Ibarro*, 956 F. Supp. 2d 511, 513 (S.D.N.Y. 2013) ("[T]he party's Rule 17(c) subpoena must be able to reasonably specify the information contained or believed to be contained in the documents sought rather than merely hope that something useful will turn up." (internal quotation marks and alterations omitted)). Defendant's broad-brush argument fails to meet this requirement.

### *[2.b] "All e-mails and other records of communications involving any alleged co-conspirator, whether indicted or unindicted, related to the Tarahan project."*

This request likewise broadly seeks all documents related to the Tarahan Project, which was a multi-year complex construction project, without regard to whether the documents are relevant or material. (*See* Alstom Mot. Quash at 13.) The Government and Alstom represent that they have produced to Defendant all communications "related to the Tarahan Project bribery scheme, consultancy agreements, and bidding process," but they object to Defendant's request for "*all* communications about the Tarahan Project, including those that he was not a part of and that have nothing to do with the bribery

scheme, consultancy agreements, or bidding process." (Gov't's Opp'n at 31–32.) This would include approximately 200,000 records relating to the construction of the plant that are likely not relevant to this case, including technical, engineering and construction documents. (Alstom Mot. Quash at 13.) While Defendant maintains that these documents will provide "context" and bear upon whether an agency relationship existed (Def.'s *Brady* Mot. at 17), this request strikes far too broadly and will not be granted in its current form.

*[2.c] "Documents and information relevant to whether Mr. Hoskins acted on behalf of Alstom Power [U.S.] and/or subject to the control of Alstom Power Inc., in connection with the Tarahan project or any other project."*

*[2.d] "Documents and information relevant to whether Mr. Hoskins acted on behalf of any subsidiary of Alstom S.A. and/or subject to the control of any subsidiary, in connection with the Tarahan project or any other project."*

*[2.e] "Documents and information demonstrating the agency relationships and the apportionment of control between and among Alstom S.A. and its direct and indirect subsidiaries."*

*[2.f] "Documents and information demonstrating the agency relationships and the apportionment of control between and among the Alstom International Network and Alstom S.A., Alstom, Inc., Alstom Power Inc., PT Alstom Indonesia, Alstom PT Energy Systems Indonesia and any other Alstom entity that employed any alleged co-conspirator, whether indicted or unindicted (collectively, the 'Alstom Companies')"; and*

*[2.g] "Documents and information demonstrating the apportionment of control between and among Alstom Power International Operations and the Alstom International Network, and/or the apportionment of control between and among Alstom Power International Operations and the Alstom Companies."*

These requests, too, are overbroad and lack specificity and would call for the production of many documents that are unlikely to have any relevance, including

documents related to projects and Alstom subsidiaries that have nothing to do with this case. Defendant has failed to narrowly target or specifically identify which additional documents beyond the already produced Tarahan Project documents he still seeks.

*[2.h] "Organization charts and other documents and information demonstrating the structure and/or reporting lines of the Alstom Companies, Alstom International Network and Alstom Power International Operations"; and*

*[2.i] "Organization charts and other documents and information demonstrating the structure and/or reporting lines of employees within the Alstom Companies, Alstom International Network and Alstom Power International Operations, including, without limitation, documentation sufficient to show the names of all individuals with direct or indirect supervisory authority over Mr. Hoskins and/or any of his alleged co-conspirators, whether indicted or unindicted, from the 'line' level to the 'chief' level, and the apportionment of supervisory authority among those individuals."*

While organizational charts that bear upon whether Mr. Hoskins was an agent of a domestic concern are clearly relevant and material, Defendant acknowledges that such documents have already been produced but maintains that he has not received "a single conglomerate-wide organizational chart that shows where Mr. Hoskins sat from a hierarchical perspective vis-à-vis the Windsor personnel and that is what Mr. Hoskins needs for trial." (Def.'s Reply [Doc. # 225] at 13.) If this specific organizational chart exists or if there are other charts that show Defendant's organizational role, including in relation to Alstom Power U.S., which have not yet been produced, they must now be produced.

 *[2.j] "Documents and other information describing Mr. Hoskins's role and responsibilities, and/or the role and responsibilities of Area Senior Vice Presidents more generally."*

*[2.k] "Performance reviews and similar evaluations of Mr. Hoskins's performance and/or the performance of any of his alleged co-conspirators, whether indicted or unindicted"[8]; and*

*[2.l] "Performance reviews and similar evaluations that Mr. Hoskins completed in respect of others, or that any of his alleged co-conspirators, whether indicted or unindicted, completed in respect of others."*

The Government and Alstom represent that they have produced personnel files for Defendant and his alleged co-conspirators at Alstom Power U.S., including Frederic Pierucci, David Rothschild, and William Pomponi, which would include performance reviews, and have also produced documents that describe Mr. Hoskins's role at Alstom Power U.S. and the role and responsibilities of an Area Senior Vice President more generally. (Gov't's Opp'n at 34–35; Alstom Mot. Quash at 17–18.) Defendant maintains that additional performance reviews are relevant to the agency issue, because they "will reflect who controlled whom" and Defendant believes that "additional performance reviews exist" based on a reference made in a produced document to a witness's bonus compensation that is not contained in the personnel files produced thus far. (Def.'s Opp'n to Alstom at 25–26.) To the extent that the personnel files produced to date are not complete, the Government and Alstom must complete them. Otherwise, Defendant must provide greater specificity as to what additional material documents are requested.

---

[8] Defendant's subpoena to Alstom over-broadly seeks performance reviews from "any employee of an Alstom subsidiary or Alstom affiliate who was based outside the United States, any employee of Marubeni Corporation or any employee of a subsidiary or affiliate of Marubeni Corporation . . . related to the Tarahan project." (Subpoena ¶ 2.)

**[2.m] "Documents and other information reflecting policies for hiring, appraisal and termination of employees within Alstom International Network and the Alstom Companies."**

The Government does not dispute (Gov't Opp'n at 35) that these documents as they relate to the relationship between Defendant and Alstom Power U.S. are relevant to the question of agency as "[t]he requirement that an agent be subject to the principal's control assumes that the principal is capable of providing instructions to the agent and of terminating the agent's authority." Restatement (Third) Of Agency § 1.01 cmt. c. To the extent that there are policies that are not specific to Alstom Power U.S. but apply across all Alstom subsidiaries, including Alstom Power U.S., such policies would be relevant and must be produced. *See, e.g., Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1243 (N.D. Cal. 2004) (noting that "the degree to which [parent company] set or participated in setting policy" for subsidiary was relevant to determining whether the subsidiary acted as the parent company's agent).

**14. [2.n] "Documents and other information reflecting policies specifying the entities responsible for paying Mr. Hoskins's salary and the salaries of alleged co-conspirators."**

**15. [2.o] "Records of complaints, whether formal or informal, regarding Mr. Hoskins's performance of his duties and/or any of his alleged co-conspirators' performance of their duties, whether those co-conspirators are indicted or unindicted."**

The Government and Alstom maintain that the personnel files of Defendant and his charged co-conspirators would contain the requested information regarding salaries and formal complaints. (Gov't Opp'n at 36; Alstom Mot. Quash 18.) Defendant maintains that informal complaints not contained in a personal file are also relevant to the "question of agency and, in particular, will illustrate who controlled whom, whether

on a permanent or interim basis." (Def.'s Opp'n to Alstom at 28.) While this may be true, Defendant does not identify what could constitute an "informal complaint" that would not be in a personnel file nor does he identify any specific documents he is seeking. To the extent that there are any written complaints or documents memorializing non-written complaints by or about Defendant or his alleged co-conspirators made to management at Alstom Power U.S. other than through the formal process, they must be produced.

*[2.p]* *"Project reviews and other documents and information with respect to Tarahan and/or other projects and/or sales opportunities involving Mr. Hoskins that demonstrate the roles and responsibilities of those working on behalf of the Alstom Companies and/or the apportionment of control among them."*

*[2.q]* *"E-mails and other records of communications involving Alstom International Network personnel regarding consultancy agreements, representation agreements, fiduciary agreements, fund administration agreements and/or the hiring and/or retention of third-party agents."*

*[2.r]* *"Documents and other information reflecting the authorization process within the Alstom Companies for consultancy agreements, representation agreements, fiduciary agreements and/or fund administration agreements, including the internal steps required for initial authorization to enter any such agreement and/or the internal steps to be taken to overrule an initial denial of authorization to enter any such agreement";*

*[2.s]* *"Minutes, summaries and descriptions of executive group meetings or conferences (sometimes referred to as meetings or conferences of the 'Alstom Cadre') at which consultancy agreements, representation agreements, fiduciary agreements, fund administration agreements, the Tarahan project and/or the hiring of and/or payments to consultants and/or third-party representatives were discussed"; and*

*[2.t]* *"Documents sent by the Representation and Compliance function of Alstom International Network . . . that concern consultancy agreements, representation agreements, fiduciary agreements, fund administration agreements, the Tarahan project, Pirooz Sharafi, Azmin Aulia and/or the hiring of and/or payments to consultants and/or third-party representatives."*

*[2.u]* *"Consultancy agreements, representation agreements, fiduciary agreements and fund administration agreements entered by the Alstom Companies between November 1, 2001 and August 31, 2004, which involve counterparties located in the Asia-Pacific region, and/or work being performed by the Alstom Companies in the Asia-Pacific region"; and*

*[2.ee]* *"Consultancy agreements or representation agreements signed by Pirooz Sharafi or Azmin Aulia that are not otherwise captured by the requests above."*

The Government represents that many such documents have already been produced as part of the records relating to the Tarahan Project. (Gov't Opp'n at 36–38.)

To the extent that any additional relevant documents relating to the Tarahan Project have not been produced, they must be provided. Those that do not relate to Tarahan or Alstom Power U.S. are not relevant and Defendant's request is denied as to those requests.

### [2.v–2.dd] Alstom Policy Documents

Defendant contends that these "nine requests ask for various Alstom policy documents that we know to exist based on the discovery provided to date, either in their entirety or as they relate to 'consultancy agreements, representation agreements, fiduciary agreements, fund administration agreements and/or the hiring of and/or payments to consultants and/or third-party representatives'" and that "any policy documents tending to show that Mr. Hoskins . . . was not under a duty to follow lawful instructions from the Windsor subsidiary . . . would be favorable and material to Mr. Hoskins's defense, because they would make it less likely that he was an agent of a domestic concern." (Def.'s *Brady* Mot. at 26.) The Government represents that it has produced all of the specific policy documents requested by Defendant. (Gov't's Opp'n at 38–40.) Defendant suggests that the policy documents that have already been produced reference additional documents that were not produced, suggesting that the production it received was incomplete, but Defendant does not specify any additional requested documents. (Def.'s Opp'n to Alstom Mot. Quash at 32.) To the extent that Defendant can identify specific and material documents within this category, he may renew his motion; otherwise this request is denied.

***[2.ff]*** ***"Discoverable reports of interviews with any of Mr. Hoskins's alleged co-conspirators, whether indicted or unindicted, conducted by the Federal Bureau of Investigation and/or the Department of Justice, which have not been produced to date."***

The Government responds that it has already "produced approximately 100 reports of interviews and will continue to appropriately produce any such reports." (Gov't Opp'n at 40.) The sheer number of reports already produced, however, provides no indication of how many such reports remain to be produced. To the extent that any discoverable reports of interview have not been produced, they must be and Defendant's request is granted.

***[2.gg]*** ***"Records of communications between the government and attorneys representing any Alstom entity, any witness or any co-conspirator, whether indicted or unindicted, regarding the government's investigation and/or the allegations in the Indictment."***

Defendant contends that this request "goes to one of the foundational questions at the heart of the issues presented by" his discovery motions: "What precisely did the government ask for and what did Alstom do to locate, gather and produce to the government information relevant to Mr. Hoskins's alleged status as an agent of [Alstom Power U.S.]?" (Def.'s Opp'n to Alstom Mot. Quash at 33–34.) The jury, however, will weigh the facts and quality of the Government's evidence against Mr. Hoskins, including potential bias of Alstom witnesses against him, but not the adequacy of the Government's investigation. *See United States v. Armstrong*, 517 U.S. 456, 462 (1996) ("[I]n the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief. While it might be argued that as a general matter, the concept of a 'defense' includes any claim that is a 'sword,' challenging the prosecution's conduct of the case, the

term may encompass only the narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged."). Thus, Defendant's request for all communications between Alstom and the Government sweeps far too broadly and fails to show relevance and Defendant must identify specific documents and show they are material to a legally cognizable defense in any renewed motion for such materials.

## II.      Conclusion

For the reasons set forth above, Defendant's Motion [Doc. # 204] to Compel the Production of *Brady* Material and Rule 16 Discovery by the Government, Rule 17 Motion [Doc. # 206] for Production of Evidence by Alstom, and Motion [Doc. # 205] for the Issuance of Letters Rogatory and Alstom's Motion [Doc. # 229] to Quash are GRANTED in PART and DENIED in part. The Government's Motion [Doc. # 231] *in Limine* to Preclude Defendant from Offering Evidence Concerning Agency in Connection with Projects other than the Tarahan Project is GRANTED in part to the extent that it applies to evidence about subsidiaries other than Alstom Power U.S. on projects other than Tarahan. However, to provide the context for assessing Defendant's agency relationship with Alstom Power U.S., documents relating to Defendant's dealings with this domestic concern beyond the Tarahan Project may be introduced as evidence if they are shown at trial to be relevant.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14th day of August, 2015.