UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:12CR238 (JBA) |
| v. | |
| LAWRENCE HOSKINS | August 27, 2015 |

**GOVERNMENT'S MOTION TO RECONSIDER ORDER GRANTING, IN PART,
DEFENDANT'S SECOND MOTION TO DISMISS**

The Government respectfully submits this motion to reconsider the Court's Order Granting, in Part, the Defendant's Second Motion to Dismiss and denying the Government's motion *in limine* to preclude the defendant from arguing that agency is the only basis upon which the defendant may be convicted of the substantive FCPA charges (Doc. 270).

## I.     Introduction

On August 13, 2015, the Court granted, in part, the defendant's motion to dismiss Count 1 of the Third Superseding Indictment, and denied the Government's motion *in limine* regarding the substantive FCPA counts, holding that under *Gebardi v. United States*, 287 U.S. 112 (1932), the defendant cannot be criminally liable for conspiring to violate or aiding and abetting a violation of 15 U.S.C. § 78dd-2 (the first object of Count 1 and the statutory basis for Counts 2-7) unless he was acting as an "agent" of a "domestic concern" in connection with the alleged unlawful scheme. The Court also held that the second object of Count 1—15 U.S.C. § 78dd-3 (the territorial provision of the FCPA)—was subject to the *Gebardi* principle because the defendant himself never took acts in furtherance of the alleged unlawful scheme while in the territory of the United States.

The Government does not seek to repeat the same arguments it made in its opposition brief. However, the Government respectfully seeks to address key issues that it believes warrant additional attention, as the Court's decision rests on arguments made in the defendant's reply brief which the Government did not have an opportunity to address. The Government respectfully submits that the additional information contained herein—analysis of additional language from the legislative history of the FCPA and the OECD Convention—is important to the consideration of the significant legal issues at stake. The Government believes this additional information demonstrates that Congress did not intend the anomalous result of creating liability for foreign nationals low level enough to be controlled by U.S. companies and U.S. persons, but not for high

1

level foreign nationals who caused, or acted through, U.S. companies and U.S. persons to violate the FCPA.[1]

## II. Additional Information Regarding the FCPA, Legislative History, and the OECD

The Government respectfully submits that the legislative history, context, purpose, and language of the FCPA makes plain that Congress did not intend to distinguish between foreign nationals low level enough to be considered "agents," on the one hand, and high level foreign nationals acting for, with or through a domestic concern to violate the FCPA, on the other.[2]

### a. The 1977 Legislative History

In its opposition brief, the Government cited to language contained in the House Report and Senate Report which provided that "[t]he concepts of aiding and abetting and joint participation would apply to a violation under this bill in the same manner in which those concepts have always applied in both SEC civil actions and in implied private actions brought under the securities laws generally." H.R. Rep. No. 95-640, at 8 (1977) (attached as Ex. 1); *see also* S. Rep. No. 94-1031, at 7 (1976) (attached as Ex. 2). The defendant in his reply brief and the Court in its decision refer to a mark-up session that occurred after the publication of this Senate Report but prior to the publication of the House Report, and concluded that the mark-up session indicated a desire by Congress to dispense with accomplice liability and instead delineate the only individuals it wished to be covered by the statute. The Government did not have an opportunity to address this argument and believes that the surrounding and subsequent legislative history makes clear that

---

[1] For purposes of preserving its position, the Government also respectfully maintains and relies upon the arguments it has previously set forth in its submissions addressing these issues.

[2] The Government understands the Court to interpret the term "agent" in the FCPA as requiring a level of control by the domestic concern, as opposed to "one who is authorized to act for or in place of another; a representative." Black's Law Dictionary, Eighth Edition, 68 (2004); Webster's Second New International Dictionary 48 (1959). The Government will address its position regarding the definition of agency in the context of proposed jury instructions.

2

Congress intended aiding and abetting and conspiracy liability to apply to foreign nationals when it first enacted the bill in 1977.

>   The transcript of the mark-up session provides as follows:
>
> > I believe this amendment also reflects the Administration's position in recommending that individuals be covered. Indeed, I believe that the Committee last year intended to cover individuals; however, it wasn't specifically stated. They were intended to be covered as aiders, abettors and conspirators and so on and so forth, and this makes clear that they are covered directly and also it makes it clear that they are covered in their capacity in acting on behalf of the company. That is to say, if they are acting on their own, it isn't covered either to themselves nor what I believe would be attributed to the company in that circumstance.

Markup Session on S. 305, Corporate Bribery, S. Comm. on Banking, Hous. and Urban Affairs, 95th Cong. 12 (1977) (attached as Ex. 3). The Government respectfully submits that Congress did not indicate in this section of the transcript that it was dispensing with aiding and abetting or conspiracy liability for those individuals not enumerated in the statute. Rather, a discussion following this excerpt reveals that the "purpose" of "this amendment" was to cover "a situation in which an employee . . . as opposed to an officer or director—that is, somebody who has substantial responsibility, but just as an ordinary employee" carries out the bribe payment. *Id*. at 13. Congress was focused on making clear that lower level employees should also be criminally liable, not just individuals with substantial authority, and that a rogue employee who acts entirely on his or her own would not face liability or cause his or her company to face liability.

There are several points beyond the transcript of the mark-up session that support the Government's argument. First, the House Report that was released five months *after* this mark-up session contained the exact same reference to aiding and abetting and conspiracy liability that appeared in the prior Senate Report. H.R. Rep. No. 95-640, at 8 ("The concepts of aiding and abetting and joint participation would apply to a violation under this bill in the same manner in

3

which those concepts have always applied in both SEC civil actions and in implied private actions brought under the securities laws generally."). The accompanying bill attached to this House Report already covered individuals, so if Congress only intended to cover those enumerated individuals, the House Report would not have included the aiding and abetting language. *Id.* at 2 (proscribing corrupt payments by officers, directors, or "any natural person in control of such an issuer"). Thus, this reinforces the proposition that the mark-up session was focused on clarifying liability for lower level employees, and not eliminating aiding and abetting liability for those not covered directly by the bill.

Second, in the final Conference Report, which discusses the instances in which the House receded to the Senate and vice versa, there is no reference to eliminating the concepts of aiding and abetting or conspiracy liability that were enunciated in the House Report, and there was no reference to the House receding to the Senate's list of individuals. The Court noted in its decision that Congress, in the Conference Report, specifically chose to exclude "foreign subsidiaries" of U.S. companies. In so doing, "the conferees recognized the inherent jurisdictional, enforcement, and diplomatic difficulties raised by the inclusion of foreign subsidiaries of U.S. companies in the direct prohibitions of the bill." H.R. Rep. No. 95-831, at 14 (1977) (Conf. Rep.) (attached as Ex. 4). However, Congress was not dissuaded by such difficulties with respect to foreign national individuals. Immediately following this sentence in the Conference Report, Congress stated that the same difficulties "may not be present in the case of individuals who are U.S. citizens, nationals, or residents," and then provided: "Therefore, individuals *other than those specifically covered by the bill* (e.g., officers, directors, employees, agents, or stockholders acting on behalf of an issuer or domestic concern) will be liable when they act in relation to the affairs of any foreign subsidiary of an issuer or domestic concern if they are citizens, nationals, or residents of the United States.

4

In addition, the conferees determined that *foreign nationals or residents otherwise under the jurisdiction of the United States would be covered by the bill in circumstances where an issuer or domestic concern engaged in conduct proscribed by the bill.*" *Id.* (emphasis added).

Third, in the final Senate Report, after the mark-up session, the Senate made clear the limits of FCPA jurisdiction, and by negative implication did not remove aiding and abetting liability: "The committee has recognized that the bill would not reach all corrupt overseas payments. For example, the bill would not cover payments by foreign nationals acting solely on behalf of foreign subsidiaries where there is no nexus with U.S. interstate commerce or the use of U.S. mails and where the issuer, reporting company, or domestic concern had no knowledge of the payment." S. Rep. No. 95-114, at 11 (1977) (attached as Ex. 5).

Finally, the Fifth Circuit twice cited and interpreted the aiding and abetting passage of legislative history relied upon by the Government that the defendant argued was dispensed with by the mark-up session. *See United States v. Castle*, 925 F.2d 831, 832 n.1 (5th Cir. 1991); *see also United States v. McLean*, 738 F.2d 655, 659 n.9 (5th Cir. 1984) ("The legislative history [of the 1977 FCPA] indicates that aiding and abetting charges may be brought under the Act. ('The concepts of aiding and abetting and joint participation would apply to a violation under this bill....') H.R. Rep. No. 640, 95th Cong., 1st Sess. 8. Indeed, absent an express provision to the contrary, aiding and abetting is included as an offense of every federal crime." (citing cases)). The Government respectfully submits that if the mark-up session overrode this portion of the legislative history, the Fifth Circuit would not have twice referred to it as relevant to the enacted statute.

Thus, the Government respectfully submits that the 1977 legislative history supports the proposition that conspiracy and aiding and abetting liability apply not just to foreign nationals who were sufficiently low level to be controlled by domestic concerns and U.S. issuers, but also to high

5

level foreign nationals who, although not controlled by the domestic concern, either acted on its behalf or caused it to violate the FCPA.

> b. The OECD Convention and the 1998 Amendments

As the Court notes in its decision, "the 1998 amendments to the FCPA were 'enacted to ensure the United States was in compliance with its treaty obligations'" under the OECD Convention. Doc. 270 at 17 (quoting *United States v. Esquenazi*, 752 F.3d 912, 923 (11th Cir. 2014)). Article 1 of the OECD Convention, however, requires as follows:

> Each Party shall take any measures necessary to establish that complicity in, including incitement, aiding and abetting, or authorisation of an act of bribery of a foreign public official shall be a criminal offence.

Organisation for Economic Co-operation and Development, Convention on Combating Bribery of Foreign Public Officials in International Business Transactions art. 1.2, Dec. 17, 1997 (hereinafter OECD Convention) (attached as Ex. 6).

Although the Court aptly notes in its decision that Article 1 is "cabined by Article 4 of the Convention, addressing jurisdiction," (Doc. 270 at 19), the jurisdictional provision of the OECD Convention requires each member state to establish jurisdiction "when the *offense* is committed in whole or *in part* in its territory." OECD Convention, art 4.1 (emphasis added). This requires the establishment of jurisdiction broader than requiring the physical presence of the individual within the territory while carrying out the act in furtherance of the corrupt payment, and is consistent with long-standing principles of criminal jurisdiction under U.S. law which do not require an individual to be physically present in the United States while committing acts in furtherance of the crime.

In transmitting the OECD Convention to Congress for its ratification, the President of the United States expressed his view that the FCPA as it existed prior to the 1998 amendments was already subject to aiding and abetting liability, including for foreign nationals "affiliated with"

6

companies covered by the FCPA. In his letter, the President explained that, "[w]hile the Convention is largely consistent with existing U.S. law, my Administration will propose certain amendments to the FCPA to bring it into conformity with and to implement the Convention." Message from the President of the United States Transmitting the Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, May 1, 1998, S. TREATY DOC. No. 105-43 (1998), at III (attached as Ex. 7). With respect to the bribery offense and aiding and abetting and conspiracy, the President's message stated as follows:

> Such bribery is further defined in Article 1(2) to include complicity in, including incitement, aiding and abetting, or authorization of an act of bribery of a foreign public official. Attempt and conspiracy to bribe a foreign public official must also be criminalized by each Party to the same extent that attempt and conspiracy to bribe a public official of such Party are criminal offenses. This language is generally consistent with U.S. law. However, to comply fully with the Convention, which covers bribes by 'any person,' the United States will have to expand the scope of the FCPA to encompass bribes paid by foreign persons who are not *affiliated with* issuers that have securities registered under the Exchange Act.

*Id.* at VI (emphasis added).

The President's message made the same point with respect to the jurisdictional requirement of the OECD Convention, again pointing out that the existing territorial element of the FCPA covered "foreign persons affiliated with [U.S.] issuers":

> Current U.S. law governing foreign bribery contains a territorial element and is generally limited to bribery by U.S. persons and foreign persons affiliated with issuers that have securities registered under the Exchange Act. To implement fully the Convention, the United States will have to expand the FCPA to encompass acts within its territory by other foreign persons.

*Id.* at VII.

In the final House and Senate Reports, Congress stated that the 1998 amendments were designed to conform the FCPA "to the requirements of and to implement the OECD Convention."

H.R. Rep. No. 105-802, at 11 (1998) (attached as Ex. 8); *see also* S. Rep. No. 105-277, at 1 (1998) (attached as Ex. 9).  Congress echoed the notion that "the territorial basis for jurisdiction should be interpreted broadly so that an extensive physical connection to the bribery act is not required." H.R. Rep. No. 105-802, at 22; *see also* S. Rep. No. 105-277, at 6.

Against this backdrop, Congress enacted a "new section" in the FCPA to exert territorial jurisdiction over those foreign nationals not affiliated with domestic concerns or U.S. issuers—15 U.S.C. § 78dd-3—but in so doing provided the following caveat:

> Although this section limits jurisdiction over foreign nationals and companies to instances in which the foreign national or company takes some action while physically present within the territory of the United States, Congress does not thereby intend to place a similar limit on the exercise of U.S. criminal jurisdiction over foreign nationals and companies under any other statute or regulation.

S. Rep. No. 105-277, at 6; *see also* H.R. Rep. No. 105-802, at 22.

The Government submitted in its opposition brief that Congress was, through this statement, clarifying that aiding and abetting and conspiracy would apply to foreign nationals acting together with domestic concerns and U.S. issuers to violate the FCPA.  *See* Doc. 262 at 29. The Court disagreed, stating:  "The more logical conclusion given the context is that Congress was clarifying that while the newly-added 15 U.S.C. § 78dd-3 only provided for liability of foreign nationals for their acts within the territory of the United States, Congress did not intend to impose such a territorial limitation under 15 U.S.C. § 78dd-2 for foreign nationals who were agents, officers, directors, employees or stockholders of domestic concerns."  Doc. 270 at 18 n.11.

The Government respectfully submits that if Congress had meant "any other statute or regulation" to refer only to the other provisions of the FCPA, it would have done so by using the same language it used to refer to those provisions throughout the legislative history.  Throughout the legislative history both the Senate and House referred to 78dd-1, 78dd-2, and 78dd-3 as

8

"sections" or "provisions" of the FCPA, not as "any other statute or regulation." The very first sentence of the portion of the legislative history establishing 78dd-3, in both the House and Senate Reports, stated: "Section 4 creates a new *section* in the FCPA, § 104A, providing for criminal and civil penalties over persons not covered under *existing FCPA provisions* regarding issuers and domestic concerns." H.R. Rep. No. 105-802, at 21 (emphasis added); *see also* S. Rep. No. 105-277, at 5. Similarly, in the sentence immediately following the caveat regarding "any other statute or regulation," the House and Senate again both referred to 78dd-1 and 78dd-2 as the "existing FCPA provisions." H.R. Rep. No. 105-802, at 22; *see also* S. Rep. No. 105-277, at 6.

Thus, the legislative history strongly suggests that Congress was not referring to 78dd-1 or 78dd-2 when it referred to "any other statute or regulation." Moreover, a plain reading of the phrase "any other statute or regulation" would include all other statutes and regulations. Although this does not, *a fortiori*, mean that 18 U.S.C. §§ 371 and 2 would apply, given that these statutes are presumed to apply to the entirety of the criminal code; given the OECD Convention's requirement that jurisdiction attach to offenses that occur in part in the territory of the United States (not linking such jurisdiction to the physical presence of the individual bribe-payor) and the requirement that all member states criminalize the authorization of, aiding and abetting of, and conspiracy to commit, such bribery offenses; given Congress's acknowledgment that the territorial basis for jurisdiction should be interpreted broadly; and given the language in the 1977 legislative history regarding coverage of foreign nationals and aiding-and-abetting and conspiracy liability; the Government respectfully submits that Congress was not expressing a desire to insulate from aiding and abetting and conspiracy liability foreign nationals committing crimes together with domestic concerns, but rather was clarifying that it did intend such foreign nationals to be covered by "any other statute or regulation."

9

Faced with a treaty obligation to interpret the territorial basis for jurisdiction broadly, the Government respectfully submits that Congress did not intend to abandon long-standing principles of criminal jurisdiction, which permit the prosecution of foreign nationals who never step foot in the United States but carry out part of the crime in the United States. *See, e.g.*, Doc. 190 at 19; *United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982) (finding jurisdiction under the wire fraud statute satisfied even though the defendant was a "nonresident alien whose acts occurred outside the United States and had no detrimental effect within the United States").

This is particularly true where, as here, Congress did extend jurisdiction over foreign national agents and employees who never stepped foot in the United States. As discussed below, nothing in the text, structure or legislative history of the FCPA supports an outcome where a high level foreign national can orchestrate a conspiracy carried out by lower level U.S. residents acting within the United States and evade prosecution, while lower level foreign nationals can be punishable for carrying out the same scheme orchestrated by a high level U.S. resident.

    c.   <u>The Statutory Scheme of the FCPA and Congress's Objectives</u>

The Court in its decision recognized that the FCPA applies to directors, officers, employees and agents of a domestic concern "regardless of nationality." Doc. 270 at 15 n.10, 18. Assuming that the Court interprets "agent" to require a level of control by the domestic concern, the Government respectfully submits that the relevant question, then, is whether there is anything in the text, structure or legislative history of the FCPA that would suggest that, although Congress clearly intended to make lower level foreign nationals (employees or agents controlled by U.S. issuers and domestic concerns) criminally liable for violating the FCPA, it expressed a reason to treat differently foreign nationals who cause U.S. persons or companies to commit such violations.

In other words, a foreign national agent who never steps foot in the United States but who receives an e-mail from his U.S. employer ordering him to pay a bribe, and who takes some act in furtherance of that bribe may be criminally liable under the FCPA.  The Government respectfully submits that nothing in the legislative history of the FCPA suggests that if the roles were reversed—and the foreign national abroad sends e-mails to the U.S. and causes the U.S. agent to carry out the bribe scheme—the foreign national should be treated disparately from his lower level counterpart.  To the contrary, the legislative history of the FCPA suggests the exact opposite.

In enacting the 1977 bill, Congress expressed its "concern that in some instances a low-level employee or agent of the corporation—perhaps the person who is designated to make the payment—might otherwise be made the scapegoat for the corporation." H.R. Rep. No. 95-640, at 11; *see also* Markup Session on S. 305, Corporate Bribery, S. Comm. on Banking, Hous. and Urban Affairs, 95th Cong., 12-15 (expressing concerns about the "hapless employee at the end of the trail" as opposed to the person who "ordered him to do it").  Congress, in fact, sought to protect these lower level foreign national employees and agents by providing for disparate (i.e. more lenient) treatment of them under the statute.

In 1998, Congress eliminated this disparity and clearly criminalized the conduct of foreign national agents and employees of domestic concerns.  *See, e.g.*, H.R. Rep. No. 105-802, at 20 (noting that the amendment "eliminat[es] the current disparity in treatment between U.S. nationals that are employees or agents of domestic concerns and foreign nationals that are employees or agents of domestic concerns").  Congress did not, however, provide any basis to subject *only* lower level foreign nationals controlled by domestic concerns to criminal liability while immunizing higher level foreign nationals causing a U.S.-based employee or agent to violate the FCPA.  Indeed, the "inherent jurisdictional, enforcement, and diplomatic difficulties" would be the same

11

regardless of whether the foreign national acts as a principal to violate the FCPA or whether the foreign national acts as an accomplice to do so.[3]

Otherwise, a foreign national CEO of a foreign company which has a U.S. subsidiary could originate, plan, and cause the carrying out of a massive bribery scheme through the U.S. subsidiary so that the CEO's company would reap all the profits. The CEO could send dozens of e-mails to the United States in furtherance of the corrupt scheme and could arrange a meeting in the United States between his employees and the foreign official to make the bribe payment. The CEO could wire the bribe money to the United States with an accompanying instruction to "pay this money to the official or I will fire you." But the CEO would escape liability while all of his employees and agents could be prosecuted.

The Government respectfully submits that Congress did not go so far as to depart from well-established principles of criminal law under which courts have consistently recognized the liability of conspirators and accomplices, including in statutes that proscribe conduct by defined classes of persons, in order to exclude this class of high level foreign nationals who cause U.S. persons to violate the law. *Gebardi*, *Castle*, and *Amen* all rested on a clear intention by Congress to be doing just that. In *Gebardi*, the Supreme Court relied on the fact that the individual being charged was both a "necessary party" to the transaction as well as a victim of it. *See Gebardi*, 287 U.S. at 122-23. In *Castle*, the Fifth Circuit relied on the "necessary party" holding of *Gebardi* in finding that Congress sought to exclude from liability foreign officials—i.e. that foreign officials were "a well-defined group of persons who were necessary parties to the acts constituting a

---

[3] The courts have routinely upheld the prosecution of all classes of foreign nationals under a variety of statutes. Thus, the Government respectfully submits that the purpose for enumerating classes of covered persons was not to avoid such difficulties, but rather to tether criminal liability to U.S. issuers (§ 78dd-1), domestic concerns (§ 78dd-2) and persons taking actions while in the United States (§ 78dd-3) so as to avoid universal jurisdiction.

violation of the substantive law" that Congress affirmatively chose to "leave unpunished." *Castle*, 925 F.2d at 836.[4]  And in *Amen*, the Second Circuit found that Congress was clearly seeking to codify a sentencing enhancement for kingpins in a statutory scheme that *already covered all members* of the criminal enterprise—including aiders and abettors and conspirators.  *See United States v. Amen*, 831 F.2d 373, 382 (2d Cir. 1987) ("[T]he purpose of making CCE a new offense rather than leaving it as sentence enhancement was not to catch in the CCE net those who aided and abetted the supervisors' activities, but to correct its possible constitutional defects by making the elements of the CCE triable before a jury.").  There is no such clear indication by Congress that it desired under the FCPA to distinguish between and among foreign nationals who facilitate bribery by domestic concerns and U.S. issuers.

Indeed, such a reading of the FCPA would create an unwarranted anomaly in the law that would reward foreign national ring-leaders of the U.S. bribery scheme but punish the foreign national underlings.  The Government respectfully submits that Congress did not intend such a result, and that the *Gebardi* principle was not meant to be applied in a way to lead to such a result.  *See, e.g.*, *United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) ("A statute should be interpreted in a way that avoids absurd results." (quotation marks and citations omitted)).[5]

---

[4] Notably, the Fifth Circuit did not rest its holding on the notion that Congress intended to cover only those individuals enumerated in the statute, and noted that Congress intended the FCPA to reach "as far as possible."  *Castle*, 925 F.2d at 835.

[5] The Second Circuit's definition of "agency" makes clear that control "may be very attenuated," *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006), and that "joint participation in a partnership or joint venture establishes 'control' sufficient to make each partner or joint venturer an agent of the others," *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).  Thus, certainly high level executives can still act as agents of domestic concerns.  However, the term "agent" would still not cover the foreign national leader of a bribery scheme who causes U.S. persons to violate the FCPA on his or her behalf.  Although the Government intends to prove at trial that, in his role assisting and supporting Alstom Power, Inc. in retaining the bribe-paying consultants and securing the Tarahan Project, the defendant was not too "high level" to be considered an agent, the Government understands the defendant to be arguing that he was too high level in the Alstom organization to be "controlled" by Alstom Power, Inc., and thus the Government's brief is responsive to that position.

### III.     Conclusion

Wherefore, based on the foregoing, the United States respectfully requests that the Court reconsider its decision granting, in part, the defendant's motion to dismiss and denying the Government's motion *in limine* to preclude the defendant from arguing that agency is the only basis upon which the defendant may be convicted of the substantive FCPA charges and provide the Government an opportunity for oral argument.

Respectfully submitted,

| | |
|---|---|
| ANDREW WEISSMANN | MICHAEL J. GUSTAFSON |
| CHIEF, FRAUD SECTION | FIRST ASSISTANT U.S. ATTORNEY |
| Criminal Division | District of Connecticut |
| United States Department of Justice | |
| | |
| /s/ | /s/ |
| | |
| DANIEL S. KAHN | DAVID E. NOVICK |
| ASSISTANT CHIEF | ASSISTANT U.S. ATTORNEY |
| Fraud Section, Criminal Division | 157 Church St., 25th Floor |
| U.S. Department of Justice | New Haven, Connecticut 06510 |
| 1400 New York Avenue, N.W. | Tel. (203) 821-3700 |
| Washington, D.C. 20005 | Federal Bar No. phv02874 |
| Tel. (202) 616-3434 | |
| Federal Bar No. phv04243 | |

CERTIFICATION OF SERVICE

       This is to certify that on August 27, 2015, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

       BY:    ____/s/_____
                DAVID E. NOVICK
                ASSISTANT UNITED STATES ATTORNEY