| | |
|---|---|
| UNITED STATES OF AMERICA | |
| *v.* | Criminal No. 3:12cr238 (JBA) |
| LAWRENCE HOSKINS | August 19, 2019 |

### RULING DENYING DEFENDANT'S MOTION TO DISMISS

Mr. Hoskins moves to dismiss the Third Superseding Indictment with prejudice "based on violations of his right to a fair and speedy trial." (Def.'s Mot. to Dismiss [Doc. # 503] at 1.) He argues that dismissal is warranted for violation of his Speedy Trial Act (STA) rights and his Fifth and Sixth Amendment rights. (*Id.*) For the reasons that follow, Defendant's Motion to Dismiss is denied.

## I. Background

The Court assumes the parties' familiarity with the facts of this case and provides only a timeline of events relevant to the Defendant's Motion to Dismiss. The offense conduct allegedly committed by Mr. Hoskins occurred most recently in 2004. (Mem. Supp. Mot. to Dismiss [Doc. # 503-1] at 1.) The alleged conspiracy spanned from 2002 to 2009. (Gov't Opp. to Def.'s Mot to Dismiss [Doc. # 511] at 3.) The Government began investigating Alstom several years later, eventually making several requests to foreign authorities pursuant to Mutual Legal Assistance Treaties (MLAT) between 2010 and 2013, which tolled the statute of limitations. (Def.'s Mem. at 6.) On July 30, 2013, Mr. Hoskins was indicted. (*Id.*) He was arrested upon his entry into the U.S. Virgin Islands on April 23, 2014. (*Id.* at 6-7.) He was detained in St. Thomas and Puerto Rico for twenty-seven days before his first appearance in this District on May 19, 2014. (*Id.* at 7.)

Jury selection was initially set for July 9, 2014. (*Id.*) On June 3, 2014, Mr. Hoskins moved unopposed to continue the pending deadlines and trial schedule because, "given the large volume of discovery, the large amount of time that has passed since the alleged conduct by Mr. Hoskins and the foreign location of documents and witnesses that may be material to the defense, counsel needs additional time to prepare for trial, conduct and review discovery and file appropriate pretrial motions." (Mot. for Extension [Doc. # 118] at 2-3.) That motion sought a jury selection date of October 29, 2014, (*id.* at 1), but during the resulting scheduling teleconference, the parties discussed alternative dates, (Tr. of 6/6/14 Teleconf. [Doc. # 135]).

The Court questioned whether the October 29 date was "realistic" and asked the parties to identify a "final schedule so that everybody can work around that." (*Id.* at 2:20-3:6, 9:25-10:2.) Defense counsel responded that he was "in the process of getting up to speed in the matter, and . . . at this point we don't have a firm grasp on exactly how long it will take us to get through all of the discovery" but "recognize[d] it is quite voluminous" and was "mindful that counsel for [co-defendant] Mr. Pomponi needed additional time." (*Id.* at 3:15-20.) Mr. Morvillo explained that the Defendant had initially "agreed with the government to an October 29th proposed date for jury selection" for purposes of "judicial efficiency, given that the co-defendant in this case [Mr. Pomponi] is scheduled to go to trial at that time" and because "there was a possibility that [Mr. Hoskins] might want to proceed to trial more quickly" given that he was "required to stay in the United States for the pendency of these proceedings." (*Id.* at 3:21-4:4.) Defense counsel concluded that "[r]ealistically, though . . . October 29th is an overly optimistic date should this proceed to trial." (*Id.* at 4:5-7.) "If circumstances were such that Mr. Hoskins desired an early trial, or a quicker trial, we would, of course, proceed, for judicial efficiency purposes, with Mr. Pomponi to trial [on November 3, 2014]," but, Mr. Morvillo continued, "I do believe that under

the circumstances if trial is necessary in this matter that would be overly optimistic on our behalf." (*Id.* at 4:15-21.) Defense counsel reiterated that "it is very unlikely that if this case proceeds to trial that we would be prepared to proceed in November." (*Id.* at 8:10-12.) Mr. Morvillo explained that "it may be my client's desire to try to see if there can be an earlier resolution" but shared "candidly" that his conversations with Mr. Hoskins "indicate to me that he would much prefer for us to have sufficient time to prepare rather than rush it." (*Id.* at 8:13-18.) Defense counsel indicated that "in the range of four to six months' additional time would probably be required." (*Id.* at 8:24-25.) In support of that time range, Mr. Morvillo explained that the "totality" of Mr. Hoskins' emails had not been produced by Alstom, "and, therefore, it's quite possible that we will be seeking to take some discovery or obtain discovery from outside of the U.S. . . . [a]nd so that's just but one example. I think there may be other examples of additional discovery we may be seeking." (*Id.* at 9:5-14.) Defense counsel remarked that a date around May 2015 "would be far preferable, and, frankly, obtainable."

The Government responded that "efficiency would likely dictate that if we could try [Mr. Hoskins and Mr. Pomponi] together then we should try them together" because of significant overlap in witnesses and evidence. (*Id.* at 5:3-9.) The Government argued that "it would make sense to try them together unless, of course, you know, it turns out that Mr. Hoskins needs such additional time" that a joint trial would not be possible given the scheduling of Mr. Pomponi's trial. (*Id.* at 5:9-15.) It concluded that "at least until Mr. Hoskins makes a decision that he does or does not want the use of speedy trial, in the colloquial sense, does or does not want a speedy trial to at least have himself the option of being able to get back to England," a November 2014 trial date "was a logical date." (*Id.* at 5:16-24.) Counsel for the Government indicated its preference to set an earlier "interim date to see where the defendant is at that point," but if the Court wanted to

set a final date further out, requested a June 2015 date due to scheduling concerns. (*Id.* at 10:16-11:4.)

Pursuant to that teleconference, trial was continued until June 2, 2015. (*Id.* at 17:3-4; Order Granting Def.'s Mot. for Extension [Doc. # 123].) Defendant waived his STA rights for the period from June 10, 2014 through June 2, 2015, (Waiver [Doc. # 131]), and the Court entered an order excluding that time, (STA Order [Doc. # 137]).

Following motion practice and discovery requests "highlighting that the issue of Mr. Hoskins' agency would be central to his defense," the Government sought and a grand jury returned the Third Superseding Indictment, which was filed on April 15, 2015. (Def.'s Mem. at 7-8; Third Superseding Indictment [Doc. # 209].) One week later, on April 21, 2015, Defendant moved again to postpone the trial, seeking a six-month continuance "in order to allow counsel to prepare adequately for trial" "in light of the tremendous volume of discovery produced to date, the age, complexity and international scope of the allegations, the volume and likely relevance of discovery yet to be produced, the new superseding indictment and the motions, analyses, investigation and other tasks remaining to be completed." (Second Mot. for Extension [Doc. # 214] at 5.) The Government opposed that motion, arguing that Defendant's claimed reasons "do not justify a continuance" and requesting that trial proceed as scheduled on June 2, 2015. (Gov't Opp. to Second Mot. for Extension [Doc. # 224] at 1.) The Government "noted that it had produced fulsome and early discovery in this case and that discovery was complete with the exception of remaining Jencks Act material." (Gov't Opp. at 5 (citing *id.* at 2).) On May 21, 2015, the Court granted Defendant's Second Motion for Extension of Time, setting a November 30, 2015 trial date "in order to allow Defendant adequate time to prepare his defense in light of the recently filed Third Superseding Indictment, ongoing discovery efforts, and the Court's own trial

schedule." (Order Granting Def.'s Second Mot. for Extension [Doc. # 243] at 2.) Mr. Hoskins waived his STA rights for the period of time through November 30, 2015, (Waiver [Doc. # 247]), and the Court entered an order excluding that time (STA Order [Doc. # 251]).

On August 14, 2015, the Court granted in part Defendant's motion to dismiss Count One of the Third Superseding Indictment "to preclude Defendant's FCPA conspiracy prosecution from being de-linked from proof that he was an agent of a domestic concern." (Ruling on Def.'s Second Mot. to Dismiss [Doc. # 270] at 1.) The Government moved for reconsideration of this order on August 27, 2015. (Mot. for Reconsid. [Doc. # 273].)

On August 15, 2015, the Court granted in part several motions by Defendant which sought additional discovery, based on the Court's conclusion that "Defendant will be allowed to offer evidence of his relationship with Alstom Power U.S., if any, beyond just his dealings on the Tarahan Project" in order to argue that he was not an agent of a domestic concern for that project. (Ruling on Discovery Mots. and Gov't Mot. in Limine [Doc. # 272] at 6.) The Court "outline[d] what it considers to be the contours of relevancy and materiality that will limit Defendant's document requests" and granted some of Defendant's discovery requests in keeping with that outline. (*Id.* at 12.)

"Immediately following" that discovery ruling, "the Government consulted with Alstom and understood that they would be searching for responsive documents in all locations where such documents may exist, including the United States, Indonesia, the United Kingdom, Switzerland, and France." (Gov't Status Report on Disc. of French Docs. [Doc. # 307] at 1.) Alstom "produced to the Government, and the Government [] in turn produced to the defendant (typically the same day or the following day), all of the documents deemed responsive by Alstom from all countries except for France." (*Id.*) As to the French documents, the Government

"underst[ood] that Alstom had people in France searching for responsive documents within two weeks of the Court's order," and the Government "submitted for approval an MLAT request to France" once it "learned from Alstom that there were potentially responsive document in France." (*Id.*) After undergoing Department of Justice internal procedures, the MLAT request was "formally received by the French Central Authority on September 30, 2015." (*Id.* at 2.) The "French Government made the request to Alstom under the MLAT on October 14, 2015." (*Id.*)

On November 6, 2015, when the Government had not yet received from France the documents sought by the Defendant, the Court continued the November 30, 2015 trial date to April 18, 2016. (Def's Mem. at 10; Sched. Order [Doc. # 317].) Mr. Hoskins waived his STA rights for the period through April 18, 2016, (Waiver [Doc. # 316]), and the Court entered an order excluding that time, (Order [Doc. # 324]).

"The government finally produced to Mr. Hoskins certain French documents relating to agency—which it had received via the MLAT Request served in September 2015—on March 1, 2016." (Def.'s Mem. at 10 (internal citation omitted).) Following a telephonic status conference on March 2, 2016, the Court continued trial to June 6, 2016. (Amended Sched. Order [Doc. # 339].) The Defendant executed a waiver of his STA rights for that time period (Waiver [Doc. # 341]), and the Court entered an order excluding that time, (STA Order [Doc. # 343]).

The Court denied the Government's motion for reconsideration of its ruling on the motion to dismiss on March 16, 2016, ([Doc. # 342]), and the Government filed its notice of appeal regarding that order and the Court's August 27, 2015 order on April 1, 2016, (Not. of Appeal [Doc. # 344]). The Government's opening appellate brief was filed several months later, on September 9, 2016; on March 2, 2017, the Second Circuit heard oral argument; and on August

24, 2018, the Second Circuit issued its opinion in this matter. (Def.'s Mem. at 10-11.) The Second Circuit's mandate issued on October 31, 2018. (Mandate [Doc. # 437].)

Following a telephonic scheduling conference held on September 12, 2018, the Court set a trial date of March 11, 2019. (Sched. Order [Doc. # 431].) During that teleconference, the Court indicated a preference for a trial date as early as December 2018 given the age of this case, but counsel for Mr. Hoskins requested an April 2019 trial date due to defense counsel's schedule, "given other pressing matters," and because "it will take a little bit of time for us to dust off the file and prepare for trial." (Tr. of 9/12/18 Conf. at 5:6-6:2.) After attempting to find an earlier date in January or February 2019 that would work for all parties, (id. at 6:3-8, 10:22-11:7), the Court acquiesced to counsel's request and agreed to set a March 2019 trial date, (id. at 12:4-8). Mr. Hoskins did not file any waiver of his STA rights with regard to that time period. The Court memorialized its reasoning, set forth on the record of September 12, 2018, in a ruling excluding the period of time through March 11, 2019 from the Defendant's STA clock. (STA Order [Doc. # 513].)

On January 10, 2019, during a telephonic scheduling conference, the trial date was continued to September 9, 2019 due to health issues of counsel which made the March 2019 trial date unworkable. In accommodating the Government's request to delay, the Court again expressed concern over delay and the need to proceed quickly to trial and encouraged the parties to pick an earlier date. (Tr. of 1/10/19 Conf. at 6:20-22 ("Okay. But a September trial date is so far away on this old case. Why do we have to push it out that far?"), 7:14-20 ("so when you say trial would be inconvenient, that makes me want to know what that means, because this case really does have to take priority over other cases, given its age and given the fact that we had what I

thought was a firm date. . . . why is it that we can't try the case in June?"), 8:8-9 ("So let me move to August. What about August?").) The parties resisted the Court's efforts to set an earlier date. "Under the circumstances, Mr. Hoskins consented to the adjournment." (Def.'s Mem. at 11.) Mr. Hoskins did not file any waiver of his STA rights with regard to that time period. The Court memorialized its reasoning, set forth on the record of January 10, 2019, in a ruling excluding the period of time from March 11, 2019 through September 9, 2019 from the Defendant's STA clock. (STA Order [Doc. # 513].)

The parties each filed several motions in limine on March 1, 2019.

On July 3, 2019, the Court held a telephonic scheduling conference during which the parties discussed ongoing production of documents. The Government represented that it "ha[s], of course, turned over what Alstom has provided to us." (Tr. of 7/3/19 Teleconf. [Doc. # 500] at 5:9-10.) The Government explained that "since the GE acquisition of Alstom Power, . . . most of the documents that had previously been produced to us have gone over and are in the possession of GE." (*Id.* at 5:11-14.) The Government continued:

> They are in the process as of recently – I say recently – a few months ago – made a production to us consistent with an internal investigation that they conducted, and I anticipate they're going to and have given us additional documents that we will provide to counsel. Again, I don't think there's *Brady* material in there, but consistent with our practice all along to provide the – to provide counsel for the Defendant everything that we receive from the company, we will continue to do that.

(*Id.* at 5:15-23.) Counsel for the Government explained further:

> the French documents, the drive that was located by Alstom that has Mr. Hoskins' – a set of Mr. Hoskins' e-mails for the relevant years that was in France, from which we were able to cull a certain number of documents through the MLAT, at least some significant portion of that I understand now has been transferred to GE as part of that purchase or acquisition, and we are in the process of getting

whatever they got and turning it over to the Defense. In fact, I had a conversation with GE yesterday, trying to understand exactly what it is that they have. But it will be, from an initial understanding, a whole host of irrelevant things, but there will be some things that are related to Tarahan. The principal relevant documents have already been turned over, because they would have hit on whatever search terms were used when we did this back in 2014 or 2015. But there will be additional discovery. As I said I'm trying to understand what it is they have, so that I can adequately convey that information to counsel. . . . what I'm suggesting here is that the e-mail drive that was the source of the French – the litigation around the French documents is essentially going to be made available to us. And we will produce that . . . And that was, I think, a mailbox – Mr. Hoskins' mailbox. So I can't imagine what's more relevant than that, both in terms of incriminating and exculpatory evidence.

(*Id.* at 9:20-10:13, 20:16-23.)

During that call, the Government explained its approach to producing documents to the defense by saying, "we have tried to be incredibly accommodating over time to Defense document request that we think are reasonable . . . we have made incredibly broad requests. We've asked for everything we could, related to these cases in the grander schemes." (*Id.* at 14:22-15:6.) The Government indicated its intent to produce the documents recently received from GE by "very early next week." (*Id.* at 22:20-21.)

On July 8, 2019, approximately two months before the September 9, 2019 trial date, "the government produced 33,000 of Mr. Hoskins' emails . . . nearly 24,000 of which had never been produced before." (Reply Supp. Mot. to Dismiss [Doc. # 512] at 8; *see* Gov't Opp. at 34 n.2.) The Government explains that after it "received these materials" from GE, "it sought to understand their origin and contents in order to locate discovery material (if any) so as not to provide the defense voluminous unnecessary material in advance of trial (and consistent with what the Court previously ruled was discoverable)." (Gov't Opp. at 34 n.2.) But apparently instead of continuing that review to determine "origin and contents," the Government then

opted to provide the entire file on July 8, 2019 in light of the fact that (1) the status conference with the Court where the defense made clear that it would not take the Government's word for whether a particular document was discoverable under the Court's order; and (2) the Government did not want to wait further for GE to provide additional answers given the proximity of the trial.

(*Id.*) The Government states that "many of these documents have no bearing on the case" but acknowledges that "approximately 20,972 unique documents" which "had not been previously produced" were included in the July 8 production. (*Id.*)

Defense counsel represents that an initial review of the recent production "has already turned up highly relevant documents, at least some of which should have been identified and produced in connection with the" 2015 MLAT request, including

among others: a previously unproduced organizational chart, which is directly responsive to the Court's August 14, 2015 discovery order . . . ; (ii) emails relating to Mr. Hoskins's schedule concerning events that are a key focus of the government's allegations; and (iii) multiple documents critical to impeachment of cooperating witnesses.

(*Id.* at 9.)

A July 17, 2019 letter from the Government explained the current status of discovery from GE/Alstom:

We have asked again to have the entire French LN file[1] produced, but GE has informed the Government that it cannot produce the entire original dataset to the

---

[1] The "French LN file" is "a Lotus Notes file that had been maintained by Alstom in France" which was "the source of" some previously produced documents "which the Government obtained via [2015 MLAT] requests." (Ex. C at 1.) The Government had previously "attempted to obtain the entire French LN file to accord with both [defense] discovery concerns and our search for relevant evidence," but "France was unwilling to send us the entire French LN file" and sent instead only "several thousand documents . . . that addressed issues related to the crimes under investigation as well as to areas requested by you, to the extent allowed by the Court." (*Id.*) The Government "learned from" GE in "early April 2019" that GE "had documents in their possession from the French LN file that they had received in connection with the

government in the United States because of French data privacy and blocking statutes, which would be triggered by a government request. It is our understanding that GE believed it could expatriate the GE-HOSKINS documents from France to the United States because GE sought those documents on its own, it is not a state actor, and it was not acting at our request. However, GE is willing to make the entire original French LN file of 41,911 documents available in France for review by a designee of Mr. Hoskins. If Mr. Hoskins wants to use any of the 8,385 documents from French LN file not contained in the twenty-ninth production, Mr. Hoskins can discuss with GE regarding how to get those documents to the United States. At this time, the Government does not anticipate making any additional discovery productions.

(Ex. C (Ltr. From R. Zink) to Reply [Doc. # 512-3] at 3.)

"Two days after receiving" that July 17 letter from the Government, Mr. Hoskins' counsel "urgently sought to understand, among other things, the circumstances of the disclosure of these documents by GE and whether any other potentially relevant documents (such as the email archives of alleged coconspirators or of Mr. Hoskins's colleagues within Alstom's International Network) might be available." (Reply at 8 (citing Ex. D (Ltr. From C. Morvillo to L. Laryea) to Reply [Doc. # 512-4]).) In that letter, defense counsel expressed their "astonish[ment]" at the "long delay" between acquisition of these documents from GE and production to the defense, especially because defense counsel has "always understood, as the government confirmed on the July 3 call with the Court, that it is the government's practice 'to provide counsel for the Defendant everything that we receive from the company.'" (Ex. D at 2.) Defense counsel represents that "[t]wo weeks have passed, and the government has yet to respond to Mr. Hoskins's letter." (*Id.*)

---

acquisition of Alstom Power, but that much of the file was unrelated to any issue at trial" and the Government subsequently asked GE to "produce the entire file and to provide more information about the material." (*Id.* at 1-2.)

At Oral Argument on August 7, 2019, the Government described the newly produced material as "by and large, you know, a lot of irrelevant material that the Government didn't necessarily think was worthwhile turning over in advance of this trial without, again, knowing more," but acknowledged that "maybe there were things that were relevant, in particular 404(b) matters, a lot of which had been" previously turned over. (Tr. of 8/7/19 Oral Arg. at 10:5-11.) The Government acknowledged that it "probably should have [realized] earlier" that Mr. Hoskins would expect all documents from that production to be turned over to the defense and that "obviously if we had known in April we were going to" conclude that all documents should be turned over "in the beginning of July, we would have turned it over earlier, but we didn't." (*Id.* at 10:21-23, 11:9-11.)

On August 13, 2019, Mr. Hoskins moved to continue the September 2019 trial date "by two months, to a date on or after November 4, 2019" because "it will take approximately two more months to complete the review of the" files produced by the Government to the Defendant in July 2019. (Mot. for Continuance [Doc. # 519] at 1, 6.) Defendant explained that "[t]hese documents contain highly relevant information that is material to the defense" and the review of those documents "cannot be completed in advance of the current trial date." (*Id.* at 6.) Mr. Hoskins was "willing to execute a waiver of his Speedy Trial Act rights from the date of [that] motion through and including any adjourned trial date that the court sets." (*Id.* at 7.)

The Government objected to a continuance given its "strongly-held position that a continuance here is not appropriate, not necessary" because "the Defense will have had, by the time of trial, this particular production for two months, which is more than enough time . . . ." (Tr. of 8/14/19 Teleconf. at 4:1-5.) The Government argued that the July 2019 production "is a very small percentage of the overall production that [the defense] has gotten in this case" and

that documents produced for the first time in July are generally not relevant in this case. (*Id.* at 4:11-21.)

The Government also noted that "we are now in a new paradigm where the Defendant has now asserted his Speedy Trial right . . . which then puts the Government and the Court on notice . . . and, so, the Government and the Court need to be diligent in, I think protecting that right." (*Id.* at 6:18-25.) Defense counsel explained that the motion for continuance "should not affect" consideration of Mr. Hoskins' assertion of a Sixth Amendment violation "because we believe that in order to exercise Mr. Hoskins' right to a fair trial, we need additional time to review these materials." (*Id.* at 10:12-20.) "Despite the fact that we do believe that he's been prejudiced by the age of this case," defense counsel continued, "we're forced to make this application," which is "another example" of Defendant being "forced to seek more time to exercise [his] rights" by the Government's actions. (*Id.* at 11:9-22.)

## II. Discussion

The Speedy Trial Act, the due process clause of the Fifth Amendment, and the Sixth Amendment each provide defendants with distinct rights which impact their path to trial. In his motion to dismiss, Mr. Hoskins alleges violations of all three. The Government responds that Defendant has not demonstrated a violation of his rights on any of these three grounds.

### A. Speedy Trial Act

Under the Speedy Trial Act, a defendant must be brought to trial within 70 days of indictment. 18 U.S.C. § 3161(c)(1). A defendant is entitled to dismissal (with or without prejudice) if that deadline is not met. 18 U.S.C. § 3162(a)(2). However, the statute automatically excludes time which therefore does not count against the defendant's 70-day speedy trial clock for various reasons, including "delay resulting from any interlocutory appeal," 18 U.S.C. §

3161(h)(1)(C), "delay resulting from any pretrial motion . . . ," 18 U.S.C. § 3161(h)(1)(D), and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court," 18 U.S.C. § 3161(h)(1)(H). Courts may also consider certain enumerated factors and circumstances and thus determine that a trial continuance serves the "ends of justice" in a way that "outweigh[s] the best interest of the public and the defendant in a speedy trial." *Id.* The time of any such continuance will not count against the Defendant's speedy trial clock. *Id.*

Although "time may not be excluded based on the ends-of-justice unless the district court indicates at the time it grants the continuance that it is doing so upon a balancing of the factors specified by section 3161(h)(8)," *United States v. Tunnessen*, 763 F.2d 74, 78 (2d Cir. 1985), the court meets its obligations so long as the required ends-of-justice finding is "made, if only in the judges' mind, before granting the continuance." *Zedner v. United States*, 547 U.S. 489, 506-507 (2006). Those findings must "be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." *Id.* at 507. "[F]ailure to utter the magic words 'ends-of-justice' at the time of ordering the continuance is not necessarily fatal," especially where the "parties and their counsel all understood from" colloquy on the record "that the judge was concerned over speedy trial considerations, that the time until trial was being excluded, and that various interests, including the needs of counsel for more time to prepare, were being balanced against the concern over delay." *United States v. Breen*, 243 F.3d 591, 596-97 (2d Cir. 2001); *see Tunnessen*, 763 F.2d at 78 ("a later recording of the precise findings required by the Act will in most cases provide the reviewing court with an adequate record for review" but dismissing for STA violation when, at time of continuance, no party had requested a continuance and district court did not discuss § 3161(h)(8) factors).

Mr. Hoskins argues that dismissal is "mandated as a matter of law" based on the passage of a cumulative 201 days of speedy trial clock time. He argues that the fifteen days from the day after his initial appearance in this District to the date of his first motion for continuance in 2014 and the 186 days from the issuance of the Second Circuit mandate on October 31, 2018 to the date his motion to dismiss was filed were neither excluded nor excludable from his speedy trial clock. (Def.'s Mem. at 16; *see* Gov't Opp. at 12-13.) The Government responds that Mr. Hoskins is not entitled to dismissal under the STA because only those initial fifteen days should be counted toward Defendant's speedy trial clock, and thus that clock has not yet expired. (Gov't Opp. at 12-17.)

As to the time between the issuance of the Second Circuit mandate, on October 31, 2018, and the filing of the parties' motions in limine on March 1, 2019, the Government argues that period is excludable from Mr. Hoskins' speedy trial clock because the Court, at the time it granted defense counsel's request to set a March 2019 trial date during the September 12, 2018 conference, "clearly balanced the STA interests and contemplated the appropriate ends-of-justice findings," (Gov't Opp. at 14), and later memorialized those findings in a written order, (STA Order), which excluded this time period from Defendant's STA clock. Because the time between the mandate and the filing of motions in limine was properly excluded, *see Zedner*, 547 U.S. at 507; *Breen*, 243 F.3d at 596-97, that period does not count toward Mr. Hoskins' speedy trial clock.

As to the time between the filing of motions in limine on March 1, 2019 and the filing of Defendant's motion to dismiss on July 15, 2019, the Government argues that period is excluded from Mr. Hoskins's speedy trial clock because the filing of motions in limine tolls a defendant's speedy trial clock. *See* 18 U.S.C. § 3161(h)(1)(D) ("The following periods of delay shall be

excluded in computing the time within which . . . the trial . . . must commence: . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion . . . "). On March 1, 2019, Defendant filed three and the Government filed seven motions in limine, all pending and scheduled for oral argument at the time Mr. Hoskins filed his motion to dismiss. ([Docs. # 448, 449, 450, 454, 455, 457, 458, 459, 460, 461].) The time from the filing of those motions through their "prompt disposition" is excluded from Mr. Hoskins' speedy trial clock. Moreover, this period of time was also excluded from the Defendant's speedy trial clock as a result of the Court's balancing of factors during the January 10, 2019 scheduling teleconference and the subsequent memorialization of that decision. (STA Order.)

Because the period of time since the issuance of the mandate is excluded from Mr. Hoskins' speedy trial clock, only fifteen days have yet counted against the STA's seventy-day limit, (*see* Appendix A to Def.'s Mem. [Doc. # 503-7]), and Mr. Hoskins has not suffered any violation of his rights ensured by the Speedy Trial Act.[2]

## B. Fifth Amendment

The due process clause of the Fifth Amendment "has a limited role to play in protecting against oppressive delay," but "statutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee[] against bringing overly stale criminal charges." *United States v. Lovasco*, 431 U.S. 783, 789 (1977) (internal quotation omitted) (considering "the circumstances in which the Constitution requires that an indictment

---

[2] Because the Court finds that Mr. Hoskins' STA rights have not been violated, it does not address his additional arguments under the STA regarding prejudice and the circumstances of delay.

be dismissed because of delay between the commission of an offense and the initiation of prosecution"). "[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim," and courts must also "consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790. The "defendant bears the heavy burden of proving both that he suffered actual prejudice because of the alleged pre-indictment delay *and* that such delay was a course intentionally pursued by the government for an improper purpose" in order to demonstrate a Fifth Amendment violation. *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999). "[T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." *Lovasco*, 431 U.S. at 790. Rather, courts should "determine only whether" the delayed indictment "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Id.* (internal quotation and citations omitted).

Mr. Hoskins complains that the "government did not begin to investigate Alstom until 2009 . . . and did not serve its first MLAT Requests to France until 2010." (Def.'s Mem. at 18.) He argues that this "extreme pre-indictment delay" caused him "serious prejudice due to the staleness of the charges; his ability to defend himself has been irreparably damaged by the passage of time, both pre- and post-indictment, and he has suffered, and continues to suffer, 'non-trial prejudice.'" (Def.'s Mem at 16, 22.) Specifically, he asserts that the delay caused "key witnesses' recollections regarding Mr. Hoskins's role" to "substantially degrade[]."[3] (*Id.* at 23.) He also argues that the delay has prevented him from being able to, as the Supreme Court requires,

---

[3] Defendant's memorandum argues the alleged STA, Fifth Amendment, and Sixth Amendment violations in tandem, but in analyzing Mr. Hoskins Fifth Amendment claim, the Court considers only the prejudice which, according to Mr. Hoskins, derives from *pre-indictment* delays.

"request documents with specificity" under Federal Rule of Criminal Procedure 17 because "his recollection has faded." (*Id.* at 24-25.) Defendant also asserts that the "sheer length of the delay in this case suggests that Mr. Hoskins's defense has been prejudiced far beyond even the particularized assertions above." (*Id.* at 27.)

The Government argues that Mr. Hoskins has demonstrated neither that the Government intentionally delayed for an improper purpose nor that he suffered prejudice from the pre-indictment delay. (Gov't Opp. at 24-28.) As to the purpose for the delay in indicting Mr. Hoskins, the Government points out that Defendant "has proffered no evidence that the Government intentionally delayed his prosecution to gain a tactical advantage," and that, "[i]n fact, one of the defendant's main complaints is that the Government should have sought and obtained more foreign-based evidence" before seeking an indictment. (*Id.* at 24 (citing Def.'s Mem. at 9-10, 23-25).) The Government explains that the pre-indictment delay was necessary because "this was a complicated case to investigate and uncover precisely *because of* the defendant's and his co-conspirators' actions," since the "multi-year scheme was devised to conceal the illegal nature of the conduct." (*Id.* at 25.)

In the absence of any argument by Mr. Hoskins as to any intentional pre-indictment delay by the Government for any improper purpose,[4] (*see* Def.'s Mem. at 18 ("Mr. Hoskins does not allege an 'evil motive' on the part of the government")), and in light of Mr. Hoskins' own acknowledgement of the difficulty faced by the Government in acquiring information necessary

---

[4] In support of his contention that an improper purpose by the Government is not necessary to justify dismissal, Mr. Hoskins cites only cases which considered dismissal for STA violations, not Fifth Amendment violations, which are decided under a different standard. (Def.'s Mem. at 18.)

to support an indictment and prosecution, (*see id.*), the Court disagrees with Mr. Hoskins' assertion that the pre-indictment delay was "extreme" and unwarranted.

Moreover, although the passage of time may cause witnesses' memories to fade, Mr. Hoskins provides no support for the suggestion that the pre-indictment fading of memories in this case was so severe or unusual that to permit trial in this case to proceed would "violate[] those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Lovasco*, 431 U.S. at 790 (reversing dismissal for pre-indictment delay despite defendant's claims of prejudice caused by loss of witnesses). Thus Mr. Hoskins' Fifth Amendment claim fails.

### C. Sixth Amendment

The Sixth Amendment guarantees "the right to a speedy and public trial." U.S. Const. amend. VI. This Sixth Amendment right protects defendants against post-indictment delays. *See United States v. Marion*, 404 U.S. 307 (1971). To determine whether delays in reaching trial violate the Sixth Amendment, the Supreme Court set forth a four-part balancing test in *Barker v. Wingo*, 407 U.S. 514 (1972). The factors courts should consider include: 1) the length of the delay; 2) "the reason the government assigns to justify the delay"; 3) "the defendant's responsibility to assert his right"; and 4) prejudice suffered by the defendant due to the delay. *Barker*, 407 U.S. at 530-32. None of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." Barker, 407 U.S. at 533. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.*

### 1. Length of Delay

The length of delay serves as a "triggering mechanism" which requires courts to balance the other factors. *Barker*, 407 U.S. at 530, 92 S.Ct. 2182. "[T]he length of delay that will provoke" an inquiry into the other three factors "is necessarily dependent upon the peculiar circumstances of the case." *Id.* at 530-31. For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Id.* at 531.

Mr. Hoskins asserts that the time which has passed since the alleged offense conduct weighs heavily in favor of dismissal. (Def.'s Mem. at 16-17.) The Government does not dispute that a lengthy period of time has passed, though it focuses appropriately on only the time between indictment and trial, not the time since the offense conduct, in light of the Sixth Amendment's attachment at the time of indictment. (*See* Gov't Opp. at 29.)

The *Barker* Court called the "well over five year[]" delay in that case "extraordinary." 407 U.S. at 533. The "over four and one-half year[]" delay in *New Buffalo Amusement Corp* was "unquestionably substantial" and "weigh[ed] heavily" in support of the defendant in that case. 600 F.2d at 377. Even the 20-month delay in *Vispi* was "unduly long" given the "circumstances" of that case, which included a "period of approximately 4 to 5 years between the government's discovery of the alleged offense and its filing of the information" which "gave the government ample time in which to investigate and marshal its evidence for an immediate trial following its filing of the information" and charges which were "simple and uncomplicated." 545 F.2d at 333.

Here, the Court agrees with Mr. Hoskins that the passage of over six years between indictment and the operative trial date of September 9, 2019[5] is sufficient to trigger consideration

---

[5] Following Mr. Hoskins' Motion to Continue ([Doc. # 519]), trial was rescheduled to begin on October 28, 2019. But at the time Mr. Hoskins' motion to dismiss was filed, trial was

of the three additional *Barker* factors and weighs in Defendant's favor, though the weight of this delay is tempered by the complex nature of the charges.

### 2. Reasons for Delay

"[D]ifferent weights should be assigned to different reasons" for the delay which the Government offers. *Barker*, 407 U.S. at 531. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government" but a "more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered." *Id.* And "[f]inally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

The Government argues that it "does not bear the burden for the vast majority of the delay" because: 1) it "made prompt and diligent efforts to extradite the defendant from the United Kingdom" in order to minimize the delay between indictment and arrest; 2) the "defendant requested all the continuances during th[e] period" between his arrest and the Government's notice of appeal "because his counsel needed additional time to review discovery and prepare for trial"; 3) "an interlocutory appeal by the Government is a valid reason that justifies delay," especially where a portion of the district court's opinion was reversed on appeal and the government's decision to appeal was therefore not frivolous; and 4) "each [party] requested one of the [post-appeal] continuances." (Gov't Opp. at 30-36.)

Mr. Hoskins "does not allege an 'evil motive' on the part of the government," (Def.'s Mem. at 18), and has not proffered any evidence to suggest that the Government "deliberate[ly] attempt[ed] to delay the trial in order to hamper the defense." But Mr. Hoskins argues that the

---

scheduled to begin on September 9, 2019, and therefore that is the operative trial date in considering Defendant's motion to dismiss.

Government is responsible for the lengthy delays in other ways, including slow gathering and production of documents from foreign sources and "pursuing a defective theory of FCPA liability through a motion to dismiss, a motion to reconsider, and an interlocutory appeal." (*Id.* at 18-19.)

The Government's appeal was in part successful and was not frivolous, and as such it is a "valid" reason for which delay was justified. *See United States v. Loud Hawk*, 474 U.S. 302, 315 (1986); *United States v. Hoskins*, 902 F.3d 69, 98 (2d Cir. 2018) (Lynch, J., concurring) ("I regard this as a close and difficult case."). That appeal accounts for approximately 30 months of delay in this case, between the Government's filing of its Notice of Appeal of April 1, 2016 and the issuance of the Second Circuit's mandate on October 31, 2018, leaving approximately 43 months remaining between indictment on July 30, 2013 and trial on September 9, 2019.

Mr. Hoskins acknowledges that he sought many of the delays in this case but argues that the Government should nonetheless be held responsible for those delays because they were ultimately caused by the Government. Specifically, Defendant cites the Government's "failure" to seek documents related to agency status prior to indicting him, which caused him to have to request those documents himself, its "failure . . . to charge a . . . legally cognizable FCPA violation that required Mr. Hoskins to take the time to seek to enforce his rights," (Tr. of 8/7/19 Oral Arg. at 38:9-19), and its late production of evidence which required additional time for defense counsel to review, (Def.'s Mem. at 18).

The Government responds that it sought to help Mr. Hoskins by facilitating requests for discovery which Mr. Hoskins would not otherwise have acquired, arguing that it should not be held accountable for the delays that resulted from such assistance:

> I slightly disagree with the premise that it is the Government's actions or inactions that led to his desire to ask for additional time. There were documents out there. If you took the Government out of the picture entirely -- you know, one of the

things that the Defendant was seeking to do was send letters rogatory. If the Defendant had sent letters rogatory, I think there's a question as to whether the defendant would ever have gotten documents at all. And I think many courts proceed to trial with or without those documents. And I think that would have been very likely what would have happened here had the Government not gone through the extraordinary step of reaching out to France, without getting into the diplomatic back and forth, really going to bat to get these documents.

(Tr. of 8/7/19 Oral Arg. at 19:4-19.) The Government also complains that Mr. Hoskins' overbroad discovery requests produced additional delay or caused the acquisition of discovery to take longer than necessary. (Gov't Opp. at 33 ("To make matters worse, the defendant never once provided specific documents he believed he was entitled to, only providing general categories of documents that the Government then diligently sought out and obtained through [MLAT] requests to France.").)

The most recent continuance, from September to October 2019, clearly aligns with the Defendant's position that he has requested continuances only as a result of Government conduct, as no such continuance likely would have been necessary had the Government turned over the July 2019 production to the Defendant in a more timely manner. This unnecessary delay was in direct contravention of the Government's repeated intention "to provide counsel for the Defendant everything that we receive from the company." (Tr. of 7/3/19 Teleconf. at 5:15-23.)

But the Court agrees with the Government that to the extent it undertook to assist the Defendant in acquiring international discovery which he requested instead of leaving him to pursue the letters rogatory process or other slower methods of obtaining international documents, the Government is not responsible for delays which resulted from those efforts. For example, the Defendant's 2015 discovery motions sought to acquire documents through subpoenas and letters rogatory, but the Government offered "to request additional documents

from Alstom that Defendant believes are relevant so long as they are identified with 'sufficient specificity.'" (Ruling on Discovery Mots. and Gov't Mot. in Limine at 11.) The Government "[i]mmediately . . . consulted with Alstom and understood they would be searching for" documents responsive to that discovery ruling, and "[o]nce the Government learned from Alstom that there were potentially responsive documents in France, the Government submitted for approval an MLAT request to France." (Gov't Status Report on Disc. of French Docs. at 1.) The Court continued trial from November 2015 to April 2016 to await the results of that MLAT request, which sought documents requested by Mr. Hoskins. (*See* Sched. Order [Doc. # 317].) And when the results of that MLAT were received on March 1, 2016, the Court postponed trial once again, from the April 2016 date previously set to June 6, 2016, following a teleconference with the parties. (Amended Sched. Order [Doc. # 339].) The Government filed its interlocutory appeal shortly thereafter, beginning another series of delays.

The post-appeal delays are attributable in part to both the Government and the Defendant. During the September 2018 scheduling teleconference, the Defendant requested an April 2019 trial, repeatedly pushing back on the Court's desire to schedule an earlier trial and resulting in a March 2019 trial date. (*See* Tr. of 9/12/18 Conf.) And in January 2019, the Government sought to further delay trial until September 2019 due to significant health issues of Government counsel.

The delays in this case have been caused by a variety of reasons, including the "valid" but lengthy delay due to the interlocutory appeal; some "neutral" delays caused by the Government but not done deliberately to hamper the defense, including the delayed production of documents in July 2019 and the January 2019 request for a September trial date; and significant delays attributable to the Defendant's litigation efforts. In considering the many delays throughout this

litigation and the sources of those delays, the Court concludes that the second factor weighs neither for nor against the Defendant.

### 3. Defendant's Assertion of His Speedy Trial Right

The "failure to assert the right" to a speedy trial "will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker*, 407 U.S. at 532. Mr. Hoskins concedes that he "has not previously asserted his right to a speedy trial," but argues that he "has repeatedly raised the inherent unfairness in defending against such old allegations." (Def.'s Mem. at 20 n.8.) He therefore asks the Court to find that his "delay in making a prior demand for a speedy trial is not sufficient to vitiate a violation of [his] Sixth Amendment rights." (*Id.* (quoting *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 378 (2d Cir. 1989)).) As the Government points out, "[t]hese complaints did not put the Government or the court on notice that the defendant was asserting his right to a speedy trial," especially because Mr. Hoskins "lodged these arguments to support his position that he should not have to stand trial at all," not to request that he be put to trial more quickly, (Gov't Opp. at 36), and while often requesting continuances and executing STA waivers. Although this factor will not entirely prevent Mr. Hoskins from asserting a Sixth Amendment claim, it weighs heavily against him.

### 4. Prejudice

Court must consider three interests which may be prejudiced by trial delays: "(i) prevent[ing] oppressive pretrial incarceration; (ii) minimiz[ing] anxiety and concern of the accused; and (iii) limit[ing] the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. Of these factors, the third is "the most serious." *Id.* Mr. Hoskins claims that he has suffered prejudice of all three types.

First, though Mr. Hoskins was "held in pretrial detention after his arrest for 27 days," the Court disagrees with his suggestion that that period of pretrial detention was "oppressive" or otherwise prejudicial. Second, Mr. Hoskins asserts that "[i]n the nearly six years that this case has been pending, [his] life has revolved around this case" in a way that has "caused immeasurable stress and anxiety." (Def.'s Mem. at 28.) The Court does not question that Mr. Hoskins has endured considerable stress, although Mr. Hoskins acknowledges that the "Court has been generous in permitting Mr. Hoskins to travel, attend significant family functions and spend time with an ailing parent," and he has similarly been permitted to reside outside the United States while this case is pending. (*Id.*)

Third, Mr. Hoskins argues that his ability to defend himself has been impaired by the delay between indictment and trial given the deterioration of witness memory, the unavailability of witnesses, and his declining ability to recall details with the specificity necessary to aid in his own defense. [6] He identifies witnesses who are no longer available for trial, (Def.'s Mem. at 25-26), and cites witness statements which suggest an inability to recall details of the alleged conduct, (*id.* at 23). But Mr. Hoskins' own argument makes clear that the pre-indictment delay, not any post-indictment delay actionable under the Sixth Amendment, caused most of the prejudice suffered due to deteriorating witness memories. (*Id.* (citing witness conversations in 2010, before the indictment in this case, and concluding, "Thus, nine years ago, even before the original indictment was sought, key witnesses' recollections regarding Mr. Hoskins' role had already substantially degraded.").)

---

[6] Any prejudice suffered by Mr. Hoskins as a result of *pre*-indictment delay will not be considered in relation to his Sixth Amendment claim. (*See* Def.'s Mem. at 23.)

And as the Government points out, Mr. Hoskins has not demonstrated how he is prejudiced by the unavailability of witnesses who he argues would have been available had the case been tried earlier. He claims that Mr. Pomponi "would have known that Mr. Hoskins was not an agent of this entity" that Mr. Pierucci's "testimony would establish that Mr. Hoskins was not an agent of domestic concern" without offering any further support for those assertions.[7] In response to the Court's inquiries at oral argument, defense counsel explained that "we believe that, subject to cross-examination, both Mr. Pierucci and Mr. Pomponi would provide exculpatory evidence to Mr. Hoskins on the issue of agency" but provided no additional detail and did not identify the basis for that belief. (Tr. of 8/7/19 Oral Arg. at 45:14-46:7.)

Mr. Hoskins claims further that "other witnesses' memories have also faded" and "[o]ther potential witnesses are also unavailable" but fails to offer additional detail. (Def.'s Mem. at 25-26.) He identifies certain individuals whom he "has no means of locating" but does not indicate what testimony they would offer or the source of any belief that any of these missing witnesses would aid his defense. (*See id.*)

When asked by the Court during oral argument on the Motion to Dismiss to provide "specificity . . . on exactly how the delay since Indictment has impaired the defense," defense counsel responded:

> I think that the Defense has been impaired by the fact that we are now 17 -- 15 to 17 years after the fact, that we're now two months before trial getting Mr. Hoskins' own emails. The opportunity to use those documents, to meaningfully discover new evidence, prepare for trial, try to refresh Mr. Hoskins' recollection is -- is all but lost. And, so, I would start by saying that the impairment to the

---

[7] Mr. Hoskins does not argue that testimony consistent with the claim in Mr. Pierucci's book is his only or best method of proving Mr. Hoskins' role at Alstom and therefore has not demonstrated prejudice.

> Defense is based, in part, on the age of the allegations and, in part, due to the lack of access to relevant evidence.

(Tr. of 8/7/19 Oral Arg. at 52:7-22.) But, in the context of a Sixth Amendment claim and in the absence of any convincing explanation as to how the "lack of access to relevant evidence" was caused or worsened *by the passage of time since the indictment in this case*, the Court need not consider whether Mr. Hoskins has been prejudiced by that claimed lack of access. And any prejudice suffered "by the fact that [Mr. Hoskins is] now . . . two months before trial getting Mr. Hoskins' own emails" has now been remedied by the Court's granting Defendant's motion to continue the September 2019 trial date.

Defense counsel responded further to the Court's request for "specificity" as to the impairment of the defense due to delays by arguing that

> Mr. Hoskins is living proof of the significant challenges faced by foreign nationals defending charges in the United States that are premised on old extraterritorial conduct with limited -- or more limited access to evidence than similarly situated U.S. defendants. Just take these e-mails, for example. If this was a U.S. defendant, he probably would have his e-mails. But because of the French blocking statute, Mr. Hoskins is only getting his e-mails now. And, so, when the lack of evidence -- of access to evidence is combined with the sheer amount of time that has passed since Mr. Hoskins' alleged conduct, and the anxiety of being a stranger in a strange land defending these allegations, we submit that the prejudice here can't be cured and requires a dismissal.

(*Id.* at 53:17-54:6.) But this alleged prejudice similarly lacks any meaningful causal link to the delay between indictment and trial, and thus it is not grounds for dismissal on a Sixth Amendment claim. Mr. Hoskins' claims of prejudice are more properly linked, as plainly stated by defense counsel, to "the significant challenges faced by foreign nationals defending charges in the United States." Defendant emphasizes the special importance of access to evidence "[w]ith allegations of 15 to 17 years old," but does not offer any specific explanation of why the claimed

difficulties in refreshing witness recollections about or tapping into the Defendant's memory of "complex events from 2002 to 2004" are more significant in 2019 than they might have been had trial followed the 2012 indictment in this case more closely. (*Id.* at 54:10-22.) In the absence of any convincing argument as to why those challenges are caused or worsened *by the passage of time since the indictment in this case* and not by the challenges inherent in an FCPA prosecution or any alleged pre-indictment delays, this claimed prejudice does not factor into the Sixth Amendment analysis.

The Court understands that the significant passage of time since the indictment could result in deterioration of memory for both witnesses and Mr. Hoskins, especially in a case where the facts at issue are complex. *See Barker*, 407 U.S. at 532 ("If witnesses die or disappear during a delay, the prejudice is obvious," as it is if "defense witnesses are unable to recall accurately events of the distant past."). But in the absence of more specific claims about memories lost post-indictment, the significance of missing witnesses, or causal links between claimed lack of access to evidence and post-indictment delays, Mr. Hoskins has not demonstrated any significant impairment of his defense for Sixth Amendment purposes.

The Court recognizes the anxiety associated with awaiting trial for many years and that delay can "compromise[] the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett v. United States*, 505 U.S. 647, 655 (1992). But given Defendant's failure to demonstrate with specificity any impairment to his defense linked to post-indictment delays, any prejudice Mr. Hoskins has suffered weighs only slightly in his favor. *See United States v. King*, 560 F.2d 122, 130 (2d Cir. 1977) (rejecting claim of prejudice where defendants were "basically unable to say with any specificity or assurance what [the deceased potential witness] would have said on the stand or how his testimony would have aided their case").

### 5. Balancing the *Barker* Factors

None of these four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with" other relevant circumstances. *Barker*, 407 U.S. at 533. First, the six-year period between indictment and trial certainly weighs in Defendant's favor, although that delay weighs less heavily here than it otherwise might, given the complexity of this case. *Id.* (finding a five year delay between arrest and trial "extraordinary"). Second, in the absence of any claims of improper intent behind any delays caused by the Government, and given the Defendant's many requests for continuances throughout this litigation and the validity of the more than two-year delay caused by a non-frivolous interlocutory appeal, the second factor does not weigh in Mr. Hoskins' favor. Third, Mr. Hoskins' failure to assert his speedy trial rights, including his repeated waiver of his speedy trial rights for significant portions of the six-year period, weighs heavily against him. Fourth, Mr. Hoskins has demonstrated only minimal prejudice suffered as a result of the delay between indictment and trial.

Like in *Barker*, "[t]he difficulty of balancing these factors is illustrated by this case, which" the Court "consider[s] to be close." *Id.* But in weighing these four factors, the *Barker* court placed heavy weight on "the fact that [the defendant] did not want a speedy trial," where he had competent counsel for the duration of the case but had taken "no action . . . that could be construed as the assertion of the speedy trial date" and on the fact "that prejudice was minimal." *Id.* at 534. As in *Barker*, the combination of Mr. Hoskins' failure to assert that right and the failure to demonstrate significant prejudice suffered as a result of post-indictment delays makes clear that dismissal is not warranted under the Sixth Amendment.

### III. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss [Doc. # 501] is DENIED.

IT IS SO ORDERED.

_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 19th day of August 2019.