UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | Criminal No. 3:12cr238 (JBA) |
|---|---|
| v. | |
| LAWRENCE HOSKINS | August 23, 2019 |

**RULING ON DEFENDANT'S MOTION FOR WITHDRAWAL INSTRUCTION**

Mr. Hoskins moves "for a pretrial ruling regarding the Court's jury instruction on the elements of the withdrawal defense . . . [and] a ruling that the withdrawal defense is applicable to aiding-and-abetting liability, and a ruling precluding the government from offering evidence regarding Mr. Hoskins's receipt of a pension following his August 2004 resignation from Alstom to defeat his withdrawal defense." (Mot. for Withdrawal Instr. [Doc. # 448] at 1.) The government opposes, arguing that Defendant's motion "reflects a mistaken view of the law and the facts." (Govt. Opp. to Withdrawal Instruction [Doc. # 478] at 2.)

**I. Background**

Defendant argues that the "operative facts underpinning [his] withdrawal defense are largely undisputed." (Mem. Supp. Mot. for Withdrawal Instruction [Doc. # 448-1] at 1.) "Mr. Hoskins worked for Alstom for less than three years, from October 2001 to August 2004, when he resigned from his position at the company and severed all ties to Alstom, the alleged conspiracy and his alleged coconspirators. The original indictment against Mr. Hoskins was returned on July 30, 2013, almost nine years later." (*Id.*) "[T]he most recent overt act in furtherance of the conspiracy in which Mr. Hoskins is alleged to have engaged occurred on March 30, 2004, five months before his resignation" from Alstom, and "[e]ach of the substantive counts in the indictment relates to specific wire transfers of which Mr. Hoskins had no

knowledge or personal involvement, and that substantially post-date Mr. Hoskins's employment with Alstom." (*Id.* at 1-2.) "The wire transfers alleged in the FCPA counts occurred between November 2005 and October 2009 . . . and the wire transfers alleged in the money laundering counts occurred between December 2005 and March 2007." (*Id.* at 2.)

The Government alleges that between 2002 and 2004, "acting on behalf of Alstom Power US," Mr. Hoskins "helped negotiate contracts with two consultants to funnel bribes to Indonesian officials so that Alstom Power US would win a contract to build the Tarahan power station." (Govt. Opp. to Withdrawal Instruction at 1.) The terms of the contracts which Defendant helped negotiate allegedly "made clear that once Alstom won the Tarahan project in July 2004, Alstom's obligation to funnel bribes through consultants was triggered and would occur over several years." (*Id.*) The Government explains that when Defendant "left Alstom in August 2004, his role—and that of most, if not all, of his co-conspirators—was principally fulfilled" already and the subsequent "bribe payments that were set in motion were triggered automatically by time-based milestones." (*Id.*)

Mr. Hoskins explains that because it is "clear that [his] personal involvement in the conduct at issue ceased long before the inception of the limitations period," he will "argue that the charges against him are time-barred, making his withdrawal defense a central issue at trial" which will "turn on whether [his] resignation from Alstom and severing of ties with his alleged co-conspirators operated as an effective withdrawal from the alleged conspiracy." (Mem. Supp. Mot. for Withdrawal Instruction at 2.) He concludes that his withdrawal "was effective on August 31, 2004, and absolves [him] from culpability for any subsequent acts of his alleged coconspirators, and triggers the five-year statute-of-limitations period, which thus expired on August 31, 2009 (four years before Mr. Hoskins was first indicted)." (*Id.*)

2

## II. Discussion

Defendant raises three issues: first, the proper content of the jury instruction regarding withdrawal; second, whether a withdrawal jury instruction should be given as to the counts for which aiding and abetting is the alleged basis of liability; and third, whether his receipt of a pension from Alstom after his resignation impacts his claimed withdrawal such that evidence of those pension payments is admissible. (*Id.* at 2-3.) Mr. Hoskins asks the Court for a pretrial ruling on these issues because they will "affect the parties' presentation of evidence and trial strategy." (*Id.* at 4.)

The Government disputes the content of Defendant's proposed instruction, argues that no withdrawal instruction should be given regarding aiding and abetting, and argues that evidence of the Alstom pension is admissible. (Gov't Opp. at 1-2.)

### A. Withdrawal Instruction

Mr. Hoskins argues that under *United States v. Berger*, 224 F.3d 107, 119 (2d Cir. 2000), the jury should be instructed[1] that withdrawal from a criminal conspiracy can occur when a defendant: 1) "resign[s] from a criminal enterprise"; 2) does not "take any subsequent acts to

---

[1] Defendant's proposed jury instruction includes in pertinent part:

Once a person joins a conspiracy, that person remains a member until he withdraws from it. Any withdrawal must be complete and it must be done in good faith. A person can withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his participation in, and efforts to promote, the conspiracy. Resignation from a business does not, by itself, necessarily constitute withdrawal. However, resignation from a business may constitute withdrawal if the defendant establishes that he: 1) openly severed ties with his alleged co-conspirators; 2) performed no further acts in furtherance of the conspiracy; and 3) received no further benefit from the conspiracy's operations.

(Def.'s Mem. at 7-8.)

promote the conspiracy"; and 3) does not "receive any additional benefits from the company." (Def.'s Mem. at 4.) In support of his proposed instruction, Defendant argues that "resignation from a business" constitutes "withdrawal as a matter of law when that resignation 'foreclosed [the defendant's] continuing role . . . [in the scheme] and relinquished any claim to subsequent profits.'" (*Id.* at 5 (quoting *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988)).) Mr. Hoskins also requests that the Court instruct the jury "as to the five-year statute of limitations period for the charged crimes, the date upon which the original indictment was returned and the date of the inception of the limitations period, and the elements that the defendant must prove by a preponderance of the evidence to establish withdrawal from a conspiracy." (*Id.* at 7.)

The Government responds[2] that the withdrawal defense requires "some act to disavow or defeat the purpose" of the conspiracy and that the withdrawal instruction should incorporate that

---

[2] The Government's proposed jury instruction includes in pertinent part:

The statute of limitations is a law that puts a limit on how much time the government has to obtain an indictment. This can be a defense, but the defendant has the burden of proving to you that he did in fact withdraw from the conspiracy, and that he did so before September 22, 2005.

Once a person joins a conspiracy, that person remains a member until he withdraws from it. Any withdrawal must be complete and it must be done in good faith.

For a defendant to show that he withdrew from the conspiracy, proof merely that he ceased conspiratorial activity is not enough. He must also show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy or an act that was intended to defeat the purpose of the conspiracy. The defendant may do this either by (1) making a clean breast to the authorities, or by (2) both severing ties with his co-conspirators and also communicating his abandonment of the criminal enterprise and its purpose in a manner reasonably calculated to reach co-conspirators. Where a defendant by his conspiratorial actions sets in motion events that are designed to have effect

4

standard. (Gov't Opp. at 3 (citing *Hyde & Schneider v. United States*, 225 U.S. 347 (1912); *Smith v. United States*, 568 U.S. 106 (2013)).) Withdrawal, the Government argues, "carries no talismanic formula, so long as the defendant establishes that he engaged in 'affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators.'" (*Id.* (quoting *United States v. United States Gypsum Co.*, 438 U.S. 422, 464-64 (1978).) The Government also argues that Mr. Hoskins' resignation from Alstom represents mere cessation of criminal activity, which is insufficient to demonstrate withdrawal from a conspiracy and therefore does not support Defendant's requested instruction. (*Id.* at 4.)

The parties' dispute centers primarily on the interpretation and impact of *Berger* and *Nerlinger*. But neither of these two cases squarely confronts the question here: whether resignation from a legitimate corporation through and for which the alleged conspiracy was conducted can constitute the affirmative step required for withdrawal from a conspiracy.

Mr. Hoskins argues that "[r]ead together, *Nerlinger* and *Berger* show that in the corporate context, resignation, with no further action to support the conspiracy and no further benefit from the conspiracy, will constitute disavowal when that resignation forecloses the defendant's continuing participation in the conspiracy." (Def.'s Reply [Doc. # 482] at 2.) The Government argues that those cases do not alter the standard requirements for proving withdrawal.

---

> beyond his active participation, the defendant's affirmative act of withdrawal must be aimed at weakening or undermining the foreseeable consequences of his own participation in the conspiracy.

(Gov't Opp. at 12-13.)

5

In *Berger*, the Second Circuit upheld defendant David Goldstein's conviction by jury verdict, rejecting his claim that he had proved withdrawal from the conspiracy as a matter of law by offering evidence of his resignation. *See Berger*, 224 F.3d at 118 ("We believe that the jury was entitled to find that Goldstein's resignation from [Toldos Yakov Yosef Seminary ("TYY")] was insufficient to constitute withdrawal from the conspiracy."). Goldstein had resigned by letter from TYY, which "never existed except on paper" for purposes of the defrauding federal grant programs and avoiding tax liability. *Id.* at 111-12. Goldstein argued that the resignation letter effectuated his withdrawal from the conspiracy and "provide[d] conclusive evidence that his involvement in the charged criminal conduct had ended" by the date of that letter. *Id.*

The *Berger* court concluded that the "evidence support[ed] the jury's apparent conclusion that Goldstein's resignation did not amount to a disavowal of the conspiracy," explaining that it is "well-established that '[m]ere cessation of activity is not enough to start the running of the statute [of limitations]; there must also be affirmative action, either the making of a clean breast to authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators.'" *Id.* (quoting *Borelli*, 336 F.2d at 388). That court continued:

> Our case law strongly suggests that resignation from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law; more is required. Specifically, the defendant must not take any subsequent acts to promote the conspiracy, see *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir.1988) (resignation plus actions that "disabled [defendant] from further participation" in the conspiracy established withdrawal); *United States v. Goldberg*, 401 F.2d 644, 649 (2d Cir.1968) (resignation plus the absence of any subsequent activity in furtherance of the conspiracy established withdrawal), and must not receive any additional benefits from the conspiracy, see *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir.1992) (no withdrawal where defendant resigned from corrupt law firm but continued to receive a percentage of recoveries).

*Id.* at 118-19. The Second Circuit went on to "agree with the Third Circuit's more explicit statement of these principles" in *United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995):

> (1) resignation from the enterprise does not, in and of itself, constitute withdrawal from a conspiracy as a matter of law; (2) total severing of ties with the enterprise may constitute withdrawal from the conspiracy; however (3) even if the defendant completely severs his or her ties with the enterprise, the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to receive benefits from the conspiracy's operations.

Because Goldstein had taken acts inconsistent with a "total severing of ties with the enterprise" after his resignation, the jury was entitled to find that he had not withdrawn from the conspiracy. *Berger*, 224 F.3d at 119.

Mr. Hoskins argues that *Berger* indicates that resignation from a business, when combined with a total severing of ties and the receipt of no future benefits from the conspiracy, is sufficient to prove withdrawal and thus requests that the jury be instructed on the elements of that method of withdrawal. (Def.'s Mem. at 4-5.) The Government points out that TYY merely functioned to aid the conspiracy and was not a legitimate business operation, unlike Alstom, an otherwise legitimate business. The Government argues that this difference is crucial because Goldstein's resignation from TYY reasonably signaled his resignation from the criminal enterprise itself, while Mr. Hoskins' resignation from Alstom indicated his intent to pursue different career opportunities and did not necessarily indicate that he intended to disavow the conspiracy. (Gov't Opp. at 6-7.)

In *Nerlinger*, the defendant had participated in a fraud with coworkers at a financial institution. 862 F.2d at 970. To participate, the defendant was required to open an account at that institution through which the fraud could be conducted. *Id.* The defendant later resigned from that institution for reasons unrelated to the fraud and closed the account several weeks later. *Id.*

After Nerlinger closed his account, the fraud continued through the accounts of other conspirators. *Id.*

Because "[w]ithdrawal from a conspiracy requires affirmative action to disavow or defeat the purpose of the conspiracy," the question in *Nerlinger* was "whether [the defendant's] closing of the account constitutes an 'affirmative action' in light of the rules that mere cessation of conspiratorial activity is not enough." *Id.* at 974. The Second Circuit held that the defendant had withdrawn from the criminal conspiracy when he resigned from his job and closed the account through which he participated in the fraud "because it disabled him from further participation and made that disability known to" the leader of the conspiracy. *Id.*

Mr. Hoskins argues that *Nerlinger*, like *Berger*, shows that "[i]n the context of a conspiracy operating through a business enterprise, a defendant can establish withdrawal by openly resigning from and severing ties with the business, refraining from taking any further actions in support of the conspiracy, and avoiding any further benefit from the conspiracy." (Def.'s Mem. at 6-7.) The Government responds that "in *Nerlinger* it was not the defendant's 'resignation from a business' that led to a finding of withdrawal, as Hoskins claims." (Gov't Opp. at 8.) Instead, the Government argues, Nerlinger's actions constituted withdrawal because once he closed the account, "the continuity of the scheme depended on the acts of other co-conspirators to funnel new trades through unrelated accounts, independent acts for which the defendant could not be held liable." (*Id.*) Defendant responds that the facts here are similar to those in *Nerlinger* "because when Mr. Hoskins resigned, he took an affirmative act that made it impossible for him to continue to further the conspiracy. Just like that defendant in *Nerlinger* did when he closed that, quote/unquote, dummy account." (Tr. of 8/7/19 Oral Arg. [Doc. # 524] at 68:18-22.)

8

Mr. Hoskins requests an instruction, based largely on *Berger* and *Nerlinger*, which explains to the jury that

> resignation from a business may constitute withdrawal if the defendant establishes that he: 1) openly severed ties with his alleged co-conspirators; 2) performed no further acts in furtherance of the conspiracy; and 3) received no further benefit from the conspiracy's operations.

(Def.'s Mem. at 7-8.) The Government's opposition to this requested instruction is based primarily on asserted factual differences between this case and *Berger* and *Nerlinger*. And although the Government acknowledges that "in some cases a resignation may be inconsistent with the object of a conspiracy," it argues that "that is not true here" in light of what the "evidence at trial will show." (Gov't Opp. at 6-12.) Because the applicability of the *Berger* and *Nerlinger* holdings to this case will be informed by the evidence at trial, the Court cannot determine pre-trial whether this portion of Defendant's requested withdrawal instruction should be given to the jury.

Separately, Mr. Hoskins' proposed jury instruction acknowledges that a defendant "can withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his participation in, and efforts to promote, the conspiracy." But it omits related language which immediately follows in standard withdrawal instructions in this Circuit: "In other words, the defendant must have demonstrated some type of positive action that disavowed or defeated the purpose of the conspiracy." 19-10 Modern Federal Jury Instructions—Criminal, ¶ 19.01 (Matthew Bender). Even *Berger* and *Nerlinger*, on which Defendant heavily relies, do not support this omission. *See Berger*, 224 F.3d at 118 (describing conviction despite claims of withdrawal as "the jury's apparent conclusion that Goldstein's resignation did not amount to a disavowal of the conspiracy"); *Nerlinger*, 862 F.3d at 974 ("Withdrawal from a conspiracy requires 'affirmative

9

action . . . to disavow or defeat the purpose' of the conspiracy.'" (quoting *United States v. James*, 609 F.3d 36, 41 (2d Cir. 1979))). To the extent that Mr. Hoskins argues that *Berger* and *Nerlinger* establish an alternative method of withdrawal which does not require an affirmative act to disavow or defeat the purpose of the conspiracy and that he is entitled to a jury instruction which omits that language, his argument is unavailing.

Mr. Hoskins also challenges the portion of the Government's proposed instruction which reads:

> The defendant may do this either by (1) making a clean breast to the authorities, or by (2) both severing ties with his co-conspirators and also communicating his abandonment of the criminal enterprise and its purpose in a manner reasonably calculated to reach co-conspirators.

(Gov't Opp. at 12-13.) He argues that this "formulation is overly restrictive and improperly limits the jury's consideration," relying on *United States Gypsum Co.*, 438 U.S. at 464. (Def.'s Reply at 4.)

> In *United States Gypsum Co.*, the jury was instructed that
>
> To withdraw, a defendant *either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence, or he must make disclosures of the illegal scheme to law enforcement officials.*
>
> Thus, once a defendant is shown to have joined a conspiracy, in order for you to find he abandoned the conspiracy, the evidence must show that the defendant took some definite, decisive step, indicating a complete disassociation from the unlawful enterprise.

438 U.S. at 463-64 (emphasis in original). The Supreme Court deemed that instruction improper because it "limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal from the conspiracy" even though "[n]othing . . . in the

10

case law suggests, much less commands, that such confining blinders be placed on the jury's freedom to consider evidence regarding the continuing participation of alleged conspirators in the charged conspiracy." *Id.* at 464. "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal." *Id.* at 464-65. Unnecessarily "confining" instructions regarding the requirements of withdrawal will be avoided by omitting this portion of the Government's requested instruction.

Consistent with *United States Gypsum Co.*, the model withdrawal instruction presents these methods of withdrawal as examples of the affirmative act required, not as absolute requirements of a successful withdrawal defense. *See* 19-10 Modern Federal Jury Instructions ("(*If applicable*: By way of example, a defendant may withdraw from a conspiracy by: giving a timely warning to the proper law enforcement officials; or wholly depriving his prior efforts of effectiveness in the commission of the crime; or making appropriate efforts to prevent the commission of a crime; or by doing acts that are inconsistent with the object(s) of the conspiracy and making reasonable efforts to communicate those acts to his co-conspirators.)").

Defendant also challenges the portion of the Government's proposed instruction which reads:

> Where a defendant by his conspiratorial actions sets in motion events that are designed to have effect beyond his active participation, the defendant's affirmative act of withdrawal must be aimed at weakening or undermining the foreseeable consequences of his own participation in the conspiracy.

(Gov't Opp. at 12-13.) He argues that this "time bomb" theory of conspiracy and withdrawal "ignores the actual allegations in the indictment, which describe numerous actions by alleged co-conspirators post-Mr. Hoskins['] resignation that were required to facilitate the allegedly corrupt

payment." (Def.'s Reply at 6.) Because the applicability of this instruction will depend, at least in part, on the evidence at trial, the Court declines to determine pre-trial whether this portion of the Government's proposed withdrawal instruction will be given to the jury.

### B. Withdrawal and Aiding and Abetting Liability

The parties also dispute whether the affirmative defense of withdrawal is applicable as a matter of law to the counts of the indictment that charge Mr. Hoskins under an aiding and abetting theory of liability.

Mr. Hoskins argues that two cases, *Smith v. United States* and *Rosemond v. United States*, make clear that he is entitled to a withdrawal instruction as to the aiding and abetting counts. The Government argues that the withdrawal defense is generally not available for aiding and abetting liability, and even if it could be in some cases, the facts of this case do not entitle Mr. Hoskins to such an instruction.

In *Smith v. United States*, the Supreme Court held that withdrawal, which "presupposes that the defendant committed the offense," does not negate an element of conspiracy but rather is an affirmative defense which "terminates the defendant's liability for postwithdrawal acts of his co-conspirators." 568 U.S. 106, 110-11. But the defendant "remains guilty of conspiracy" even when successful withdrawal "terminates [his] liability for postwithdrawal acts of his co-conspirators." *Id.* at 111.

In *Rosemond v. United States*,[3] the Supreme Court considered whether the defendant's conduct was sufficient to support an aiding and abetting-based conviction under 18 U.S.C. §

---

[3] As Defendant notes, "[t]here is some disagreement among courts regarding wither *Rosemond*'s advance knowledge requirement applies only to crimes that relate to 'combinations' of offenses, such as Section 924(c), or to all criminal violations." (Def.'s Mem. at 10 n.5 (citing

12

924(c) for using a gun in connection with a drug trafficking crime. 572 U.S. 65, 67 (2014). Aiding and abetting liability generally requires that the defendant (1) take an affirmative act in furtherance of the offense (2) with intent to facilitate the offense's commission. *Id.* at 71. The Supreme Court considered, for purposes of a § 924(c) conviction based on aiding and abetting liability, whether the defendant need intend only to facilitate a drug trafficking crime or must also intend that a firearm be used in the commission of that crime. *Id.* at 72.

Generally, as to the "affirmative act" requirement of aiding and abetting liability, a defendant "can be convicted as an aider and abettor without proof that he participated in each and every element of the offense," even if his aid "relates only to one (or some) of a crime's phases or elements." *Id.* at 73 (internal quotation omitted). But as to the intent requirement, aiding and abetting liability requires "a state of mind extending to the entire crime," even if the affirmative act taken is only in furtherance of one element or portion of the crime. *Id.* at 76. The "intent must go to the entire crime charged." *Id.* The Supreme Court further explained that this "intent requirement [is] satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Id.* at 77. Therefore, "a defendant may be convicted of aiding and abetting a § 924(c) violation only if his intent reaches beyond a simple drug sale, to an armed one," and evidence of the defendant's advance "know[ledge] that one of his confederates will carry a gun" combined with active participation in the drug transaction meets this standard. *Id.* at 76, 78. Similarly, a defendant may be convicted of aiding and abetting mail fraud where "he took part in the fraud knowing that his confederate would take care of the mailing." *Id.* at 77 (internal quotation omitted). The *Rosemond* Court

cases).) For purposes of considering Defendant's requested instruction, the Court assumes without deciding that *Rosemond* applies to the charges against Mr. Hoskins.

concluded that "for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Id.*

The language in *Rosemond* on which Mr. Hoskins bases his argument comes as part of the explanation for the requirement of "advance knowledge" that a gun will be used during the drug transaction:

> . . . knowledge enables him to make the relevant legal (and indeed, moral) choice. When an accomplice knows beforehand of a confederate's design to carry a gun, he can attempt to alter that plan or, if unsuccessful, withdraw from the enterprise; it is deciding instead to go ahead with his role in the venture that shows his intent to aid an *armed* offense. But when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime.

*Id.* at 78. Therefore, to have the requisite intent for aiding and abetting, a defendant must have "knowledge at the time the accomplice can do something with it—most notably, opt to walk away." *Id.* But an aider and abettor may not escape liability by "joining in a dangerous criminal scheme but evading its penalties by leaving use of the gun to someone else. Aiding and abetting law prevents that outcome, so long as the player knew the heightened stakes when he decided to stay in the game." *Id.* at 80.

Mr. Hoskins argues that "taken together," *Smith* and *Rosemond* "hold that a defendant who affirmatively decides to withdraw from further participation in an offense—thereby relinquishing the relevant intent—cannot be liable for the subsequent acts of his purported accomplices." (Def.'s Mem. at 10.) He contends that to "find otherwise would eviscerate *Rosemond*'s holding that an aider-and-abettor must possess the requisite intent to facilitate 'the specific and entire crime charged,' and must have sufficient advance knowledge of the scope of the crime in order to permit him to decide whether or not to withdraw from or continue in the

14

course of conduct." (*Id.*) Defendant argues specifically that to prove aiding and abetting liability on the FCPA and money laundering counts, "the government must establish that" the actions allegedly taken by Mr. Hoskins during his employment at Alstom which facilitated the later wire transfers were done "with intent to facilitate 'the specific and entire crime charged.'" (*Id.* at 12.) "Thus," Mr. Hoskins concludes, if he "withdrew from the scheme before these specific transactions were even contemplated, let alone completed, the government could not establish that he acted with the requisite intent to be liable as an accomplice." (*Id.*)

But Defendant's argument conflates the intent requirement of aiding and abetting liability with the applicability of the withdrawal defense to the aiding and abetting counts. Under *Rosemond*, Defendant is correct that in order to prove that Mr. Hoskins aided and abetted as charged, the Government must establish that his affirmative acts were done with intent to facilitate the specific and entire crime charged. But this requirement is clearly incorporated, as in *Rosemond*, as part of the intent element of aiding and abetting liability and not as the basis for a withdrawal defense.

*Rosemond* makes clear that in discussing the mental state required for guilt under an aiding and abetting theory, the Supreme Court did not implicitly apply the withdrawal defense to aiding and abetting through its single use of the word "withdraw." The Supreme Court in *Rosemond* contemplated that, with advance knowledge that his confederate planned to use a gun, the defendant would have had the opportunity to "withdraw" from participating in the transaction. In other words, had he chosen to "withdraw" prior to the transaction, the defendant *would not have committed the affirmative act* which is the basis of aiding and abetting liability. The *Rosemond* Court made clear that its decision was intended to allow an individual who "knows beforehand" of his confederate's plan to use a gun during a drug transaction to "attempt

15

to alter [the] plan or, if unsuccessful, withdraw from the enterprise." 572 U.S. at 78. "[T]hat means knowledge at a time the accomplice can do something with it—most notably, opt to walk away." *Id.* Thus *Rosemond* deals with the question of knowledge, and the opportunity to act upon that knowledge, *before the charged crime has been committed*. But *Smith* made clear that "withdrawal presupposes that the defendant committed the offense" and *later* took some act to withdraw from the conspiracy. 568 U.S. at 111. Thus Defendant's argument that "*Smith*, together with the Supreme Court's more recent decision in *Rosemond*, affirms that the withdrawal defense is applicable to aiding-and-abetting liability," (Def.'s Mem. at 9), is unconvincing. Mr. Hoskins has not demonstrated that a withdrawal instruction should be given to the jury with regard to the aiding and abetting counts.

### C. Pension Evidence

Finally, the parties dispute whether the Government should be permitted to introduce evidence that, after resigning from Alstom, Mr. Hoskins continued to receive payments from two pensions to which he and Alstom had contributed while he was employed there. Mr. Hoskins explains:

> The pensions were unrelated to the success or failure of any particular project and were not tied to Alstom's overall financial performance. Nonetheless, the government has previously indicated that it might seek to introduce proof of the receipt of pension payments as evidence that Mr. Hoskins benefitted from the operation of the alleged conspiracy after he resigned from Alstom. (See Opp. Br. 14.) Since the pension payments are completely unrelated to the charged offenses, the Court should preclude the government from introducing evidence of the pensions pursuant to Federal Rules of Evidence 402 and 403. . . . Evidence of Mr. Hoskins's pension is irrelevant because the pension did not constitute a benefit stemming from the alleged conspiracy. Further, admission of this evidence would waste time and risk misleading or confusing the jury, so it is therefore also inadmissible under Rule 403.

(Def.'s Mem. at 13-14.) Mr. Hoskins argues that "serial payments" which are "'lengthy, indefinite, ordinary, typically noncriminal and unilateral' do not constitute continuing economic benefits of a conspiracy." (*Id.* at 14 (quoting *United States v. Grimm*, 738 F.3d 498, 503 (2d Cir. 2013).)

The Government makes two arguments. First, it argues that Mr. Hoskins' receipt of the pension is "inconsistent with his claim [in support of his withdrawal defense] that he severed ties with" the conspiracy, (Gov't Opp. at 23), especially in light of the Defendant's argument that "what [the Government] allege[s] is that the Defendant participated in a conspiracy that was wholly dependent on his position as an Alstom employee. So we have truly a conspiracy that is conducted through a business, and really in all respects is coterminous with the Defendant's Alstom employment," (Tr. of 8/7/19 Oral Arg. [Doc. # 524] at 66:18-23.) Second, the Government also argues that because "Hoskins' compensation—and thus his pension—was dependent on the continued operation of Alstom and its subsidiaries, which in turn was dependent on securing large power projects," Defendant continued to receive benefits from the conspiracy beyond his resignation. (*Id.* at 25.)

But at oral argument on August 7, the Government acknowledged that evidence of the pension might not be relevant, depending upon what arguments are made at trial, what other evidence is presented at trial, and what instruction the Court intends to give the jury on withdrawal. (*See* Tr. of 8/7/19 Oral Arg. at 95:21-97:7.) The admissibility of evidence regarding Defendant's receipt of pension payments from Alstom will thus await determination at trial.

## III. Conclusion

For the foregoing reasons, Defendant's Motion for a Withdrawal Instruction [Doc. # 448] is granted in part and denied in part. The withdrawal instruction given to the jury will be consistent with this ruling, but its precise contours and content will be determined at trial.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of August 2019.