1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2

3    _____
                                    )
4    UNITED STATES OF AMERICA,      )
                                    ) No. 3:12-CR-238 (JBA)
5              Plaintiff,           )
                                    ) November 1, 2019
6                                   )
     v.                             ) 9:31 a.m.
7                                   )
                                    ) 141 Church Street
8                                   ) New Haven, Connecticut
     LAWRENCE HOSKINS,              )
9                                   )
               Defendant.           )
10   _____)

11

12

                         JURY TRIAL
13
                        VOLUME V
14

15

16

17   B E F O R E:

18        THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
                        AND A JURY
19

20

21

22

23

24        Official Court Reporter:
          Melissa J. Cianciullo, RMR, CRR, CRC
25        (203) 606-1794

```
 1   A P P E A R A N C E S:

 2   For the Government:

 3         DAVID E. NOVICK, AUSA
           U.S. Attorney's Office - NH
 4         157 Church Street, 23rd Floor
           New Haven, CT 06510
 5         (203) 821-3700
           E-mail: david.novick@usdoj.gov
 6
           DANIEL S. KAHN, ESQ.
 7         LORINDA LARYEA, ESQ.
           U.S. Department of Justice
 8         Fraud Section, Criminal Division
           1400 New York Avenue, N.W.
 9         Room 11308
           Washington, D.C., 20005
10         Email: daniel.kahn@usdoj.gov
                   lorinda.laryea@usdoj.gov
11
     For the Defendant:
12
           CHRISTOPHER J. MORVILLO, ESQ.
13         DANIEL SILVER, ESQ.
           BENJAMIN K. PEACOCK, ESQ.
14         Clifford Chance US LLP - NY
           New York, NY 10019-6131
15         (212) 878-8000
           E-mail: christopher.morvillo@cliffordchance.com
16                 daniel.silver@cliffordchance.com
                   benjamin.peacock@cliffordchance.com
17
           BRIAN E. SPEARS, ESQ.
18         Spears Manning & Martini LLC
           2425 Post Road, Suite 203
19         Southport, CT 06890
           (203) 292-9766
20         E-mail: bspears@spearsmanning.com

21                                                        09:31

22                                                        09:31

23

24

25
```

1               I N D E X                                    09:31

2                                                            09:31

3   WITNESS:  LARRY E. PUCKETT                    PAGE        09:31

4   Continued Direct Examination by Ms. Laryea    823        14:58

5   Cross-Examination by Mr. Silver               898        14:58

6   Redirect Examination by Ms. Laryea            939        14:58

7                                                            14:58

8   WITNESS:  SPECIAL AGENT JEFFREY COLEMAN                  12:20

9   Direct Examination by Mr. Novick              946        12:20

10                                                           12:20

11                                                           12:20

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                  (Call to Order, 9:31 a.m.)                    12:20

2                  (Outside the presence of the Jury and          12:20

3       witness.)                                                 09:31

4            THE COURT:  Good morning, Counsel, ladies and        09:31

5       gentlemen.  Good morning, Mr. Hoskins.                    09:31

6            All right.  I understand the government              09:31

7       has -- please be seated -- has matters to raise.          09:31

8       We -- our jurors are not all here.                        09:31

9            So, Mr. Novick?                                      09:31

10           MR. NOVICK:  Thank you, Your Honor.                  09:31

11           Your Honor, just to -- the first thing I'd           09:31

12      like to talk about with the Court is just to discuss      09:31

13      again the issue of Exhibit 453.  It's still the           09:31

14      government's position that -- that was where we ended     09:31

15      yesterday, the e-mail from Reza Moenaf to Frederic        09:31

16      Pierucci forwarding an e-mail from Winan Kusno with       09:31

17      regard to the Tarahan Project and, among other            09:32

18      things, issues with agents.                               09:32

19           So as we explained yesterday, Your Honor,            09:32

20      it's our expectation that there will be, through the      09:32

21      testimony of the witness, an independent basis to         09:32

22      show that Mr. Kusno was a knowing participant in the      09:32

23      conspiracy.  But I don't actually think, Your Honor,      09:32

24      that we need to get that far.  I think that we have       09:32

25      been laboring under a false understanding or a            09:32
```

1  misunderstanding of the law advanced by the defense a    09:32
2  couple days ago when we began the discussion of what    09:32
3  is required with regard to 801(d)(2)(E) statements.    09:32
4  　　　　And in part, Your Honor, I'd add, this is the    09:32
5  problem with raising these things as we go.    09:32
6  　　　　So we did some research last night, and I    09:32
7  just wanted to share with the Court what we found,    09:32
8  which is that -- not that there needs to be    09:32
9  independent corroboration of the declarant's    09:32
10  participation of the conspiracy, but that there needs    09:33
11  to be independent corroboration of the conspiracy and    09:33
12  the defendant's participation in the conspiracy.  And    09:33
13  for that principle, Your Honor, I would cite to and    09:33
14  can pass up copies of, in a moment, *United States v.*    09:33
15  *Tellier*, T-e-l-l-i-e-r, that's 83 F.2d 578 which    09:33
16  says, among other things, extrajudicial statements by    09:33
17  coconspirator --    09:33
18  　　　　THE COURT:  That's Second Circuit, I'm    09:33
19  assuming.    09:33
20  　　　　MR. NOVICK:  Second Circuit, yeah.  I'm    09:33
21  sorry, Your Honor.  Second Circuit 1996,    09:33
22  extrajudicial statements by coconspirator may be    09:33
23  admitted if the government establishes by a    09:33
24  preponderance of the evidence that there was a    09:33
25  conspiracy, that both the declarant and the party    09:33

1    against who the statements are offered were members        09:34

2    of the conspiracy and the statements were made during        09:34

3    and in furtherance of the conspiracy citing        09:34

4    Bourjaily.  In making these preliminary factual        09:34

5    determinations under Federal Rule of Evidence 104A,        09:34

6    the Court may consider the hearsay statements        09:34

7    themselves; however, these hearsay statements are        09:34

8    presumptively unreliable and for such statements to        09:34

9    be admissible, there must be some independent        09:34

10   corroborating evidence of the defendant's        09:34

11   participation in the conspiracy.        09:34

12        The second case that I would cite for the        09:34

13   same proposition, Your Honor, is *United States v.*        09:34

14   *Gigante*, also known as "Chin."  That's 166 F. 3d 75,        09:34

15   1999, Second Circuit.  And there -- and the pincite        09:34

16   is page 82.        09:34

17        The conspiracy between the declarant and the        09:34

18   defendant need not be identical to any conspiracy        09:35

19   that's specifically charged in the indictment.  In        09:35

20   addition, while the hearsay statement itself may be        09:35

21   considered in establishing the existence of the        09:35

22   conspiracy, there must be some independent        09:35

23   corroborating evidence of the defendant's        09:35

24   participation in the conspiracy.        09:35

25        Your Honor, so, again, based on the law, it's        09:35

1    the government's position that the corroboration          09:35
2    that's needed is the existence of the conspiracy and     09:35
3    here, it's the same conspiracy that's been the           09:35
4    subject of this trial and the defendant's                09:35
5    participation in it.                                     09:35
6         And certainly the testimony of David               09:35
7    Rothschild at a minimum, but also the testimony of       09:35
8    Edward Thiessen, the myriad other e-mails with regard    09:35
9    to this conspiracy are evidence of both the              09:35
10   defendant's participation in it and the existence of    09:35
11   the conspiracy which, again, we only need to prove by   09:35
12   a preponderance of the evidence.                        09:35
13        And I would just add, sure, in looking at          09:36
14   the -- putting the corroboration issue aside, looking   09:36
15   at the face of the e-mail here to prove Mr. Kusno's     09:36
16   participation in the conspiracy, the face of the        09:36
17   e-mail is clear when he says, "The concern that if we   09:36
18   have won the job, whether the rewards will be           09:36
19   satisfactory or this agent only give them pocket        09:36
20   money and disappear, nothing has been shown by the      09:36
21   agent that the agent is willing to spend money."  And   09:36
22   then continues later, "I strongly recommend that        09:36
23   AP/MC takes this seriously and guarantee that proper    09:36
24   actions will be taken."                                 09:36
25        So the face of the document, Your Honor, is        09:36

| | |
|---|---|
| 1 | evidence of Mr. Kusno's participation in the | 09:36 |
| 2 | conspiracy with the defendant, and the existence of | 09:36 |
| 3 | the conspiracy and the defendant's participation | 09:36 |
| 4 | therein are amply corroborated by all of the other | 09:36 |
| 5 | evidence the Court has seen and, at any rate, the | 09:36 |
| 6 | Court need not make a final finding on this until the | 09:37 |
| 7 | end of trial if the defendant asks for a Geaney | 09:37 |
| 8 | finding. | 09:37 |
| 9 | Oh, last point, Your Honor.  I'm sorry.  The | 09:37 |
| 10 | fact of Mr. -- I know counsel has raised the issue of | 09:37 |
| 11 | us identifying who and -- who is and who is not a | 09:37 |
| 12 | coconspirator.  Mr. Kusno was identified anonymously | 09:37 |
| 13 | as an indicting coconspirator in the indictment, | 09:37 |
| 14 | Paragraph 56 of the indictment which references this | 09:37 |
| 15 | e-mail which they have been on notice of for many | 09:37 |
| 16 | years now.  As Your Honor knows, an overt act can | 09:37 |
| 17 | only be done by a coconspirator.  So this is not a | 09:37 |
| 18 | mystery and the fact that we are now having to | 09:37 |
| 19 | litigate this piecemeal is, I think is a problem -- | 09:37 |
| 20 | is problematic and I think inappropriate. | 09:37 |
| 21 | But at any rate, under the law, I think that | 09:38 |
| 22 | the document is admissible as a coconspirator | 09:38 |
| 23 | statement. | 09:38 |
| 24 | THE COURT:  In terms of Paragraph 56, is that | 09:38 |
| 25 | Employee E is -- | 09:38 |

```
 1            MR. NOVICK:  No.  He is the -- an employee at      09:38
 2   Alstom Indonesia sent an e-mail to Alstom Employee B.      09:38
 3   So he is the employee at Alstom Indonesia.  He was a      09:38
 4   project manager.                                          09:38
 5            THE COURT:  And that's the Winan.                 09:38
 6            MR. NOVICK:  That's right, Your Honor.            09:38
 7            THE COURT:  Kusno.                                09:38
 8            MR. NOVICK:  And the last point I'd make,         09:39
 9   Your Honor, is even if we needed independent              09:39
10   corroboration of Mr. Kusno's participation in the         09:39
11   conspiracy, we have both the forward by Reza Moenaf       09:39
12   to Fred Pierucci verifying that this was Winan's          09:39
13   report from the meeting last night.  And then 454         09:39
14   which has Reza Moenaf forwarding to Mr. Hoskins the       09:39
15   same notes and commenting on them, "Below are Winan's     09:39
16   report from the meeting, et cetera."                      09:39
17            So to the extent that the concern is the         09:39
18   reliability of the statement, you have two other --       09:39
19   excuse me.  You have two other e-mails in which it's      09:39
20   being reiterated and being -- his participation, his      09:39
21   knowledge is being reinforced by other participants      09:40
22   in the conspiracy.                                        09:40
23            That's all, Your Honor.  Thank you.              09:40
24            THE COURT:  All right.  Our jurors are all       09:40
25   present at this point.  But briefly, why don't I hear     09:40
```

1    Mr. Silver.                                              09:40

2            MR. SILVER:  Thank you, Your Honor.  Just       09:40

3    briefly, and we can --                                  09:40

4            THE COURT:  Did you have cases to hand up,       09:40

5    Mr. Novick?                                             09:40

6            MR. NOVICK:  Yes, Your Honor.  I can do that     09:40

7    right now.                                              09:40

8            MR. SILVER:  So I think to start with the        09:40

9    last point or the second to last point that            09:40

10   Mr. Novick raised, I think Paragraph 56 of the          09:40

11   indictment actually leads to exactly the opposite       09:40

12   conclusion that Mr. Novick suggested.  I think that     09:40

13   it's the unidentified employee at Alstom Indonesia,     09:40

14   who apparently was Mr. Kusno sending this e-mail is     09:40

15   clearly not identified as a coconspirator in the        09:40

16   indictment.  He's in fact not even listed as an         09:40

17   Alstom Indonesia Employee A, B or C.  He's not an       09:40

18   identified individual at all, let alone identified as   09:41

19   a coconspirator.  So I certainly disagree with the      09:41

20   characterization of the indictment put us on notice     09:41

21   that the government would claim that Mr. Kusno was a    09:41

22   coconspirator.                                          09:41

23          On the first point regarding the need for        09:41

24   independent corroboration of Mr. Kusno's membership    09:41

25   in the conspiracy, our understanding of the law is      09:41

1    quite contrary to that which Mr. Novick has just                09:41

2    advanced.  We just looked very quickly at the cases             09:41

3    that Mr. Novick cited while he was talking and it               09:41

4    appears that those cases, the issue at issue in those           09:41

5    cases was not the membership from the conspiracy of             09:41

6    the declarant, but rather the membership of the                 09:41

7    conspiracy of the defendant.                                    09:41

8            So in those cases, that's what was discussed,           09:41

9    but they certainly don't imply, on our reading, that            09:41

10   there is not a need for independent corroboration of           09:41

11   the declarant's membership in the conspiracy.  And I           09:41

12   think that, in fact, is the conclusion that's drawn            09:41

13   directly from Rule 801(d)(2)(E) itself.  If you look           09:42

14   at the text that follows 801(d)(2)(E), it says, "The           09:42

15   statement must be considered but does not by itself            09:42

16   establish," and then it has a list of different                09:42

17   things, "the existence of the conspiracy or                    09:42

18   participation in it."                                          09:42

19           Now, I guess the government would contend              09:42

20   that that means only the defendant's participation.            09:42

21   But I think that the contrary conclusion is much more          09:42

22   obvious from the text of the rule.                             09:42

23           So we'd certainly like the opportunity to              09:42

24   respond more fully after having digested the case --           09:42

25           THE COURT:  You know what?  That should have           09:42

| | |
|---|---|
| 1 | been done a long time ago. | 09:42 |
| 2 | MR. SILVER: Your Honor, I -- | 09:42 |
| 3 | THE COURT: We've got a witness on the stand. | 09:42 |
| 4 | We've got an exhibit that's going to be used with | 09:42 |
| 5 | this witness. You've known about this e-mail. And I | 09:42 |
| 6 | don't understand why we are getting this ten minutes | 09:42 |
| 7 | into our trial day. | 09:42 |
| 8 | MR. SILVER: Your Honor, I raised this issue | 09:42 |
| 9 | yesterday as soon as I realized -- well, the | 09:42 |
| 10 | government didn't tell me they were taking a witness | 09:42 |
| 11 | out of order. We had been told that a different | 09:42 |
| 12 | witness would precede Mr. Puckett. They didn't tell | 09:43 |
| 13 | us that they weren't going to do that. | 09:43 |
| 14 | So as soon as I realized Mr. Puckett would be | 09:43 |
| 15 | next and realized they had not laid a foundation with | 09:43 |
| 16 | Mr. Thiessen, who I expected would testify about | 09:43 |
| 17 | Mr. Kusno but did not, that then made this issue ripe | 09:43 |
| 18 | and I raised it as soon as we knew it was going to | 09:43 |
| 19 | come up with Mr. Puckett later that afternoon. So | 09:43 |
| 20 | I -- that was -- | 09:43 |
| 21 | THE COURT: I didn't get anything from you | 09:43 |
| 22 | last night. | 09:43 |
| 23 | MR. SILVER: No. I raised this yesterday at | 09:43 |
| 24 | the break, Your Honor. | 09:43 |
| 25 | THE COURT: Right. | 09:43 |

848

1      MR. SILVER:  That was when it became apparent          09:43

2   to us.                                                    09:43

3      THE COURT:  Right.  Nobody has been shy about          09:43

4   filing things late in the day and the night and so        09:43

5   forth.                                                    09:43

6      MR. SILVER:  Well, that's correct, Your               09:43

7   Honor.                                                    09:43

8      THE COURT:  So I'm going to just proceed with          09:43

9   the jury right now.  I'm going to take a look at          09:43

10  these cases.  If there are any other cases you want       09:43

11  to cite, I will take a look at them and I will try to     09:43

12  understand whether the government is right that there     09:43

13  is no need for independent corroboration of the          09:43

14  declarant's participation in the conspiracy, only        09:44

15  independent corroboration of the defendant's             09:44

16  participation in the conspiracy versus the               09:44

17  defendant's position that the cases that the             09:44

18  government cites do not stand for the proposition        09:44

19  that there's no need for independent corroboration of    09:44

20  the declarant's membership in the conspiracy.            09:44

21     Do I have the positions stated at least               09:44

22  generally correctly?                                      09:44

23     MR. NOVICK:  You do, Your Honor.  And I               09:44

24  think -- depending on how the Court rules, I think        09:44

25  this may hopefully be academic in the sense that,        09:44

| | |
|---|---|
| 1 | number one, I think you'll get a foundation from the | 09:44 |
| 2 | witness and, number two, as I said before, I think | 09:44 |
| 3 | that forwarding of this e-mail twice by Mr. Moenaf | 09:44 |
| 4 | and his comments on it are independent.  Those are | 09:44 |
| 5 | separate statements are independent corroboration of | 09:45 |
| 6 | the defendant's -- excuse me, of the declarant's | 09:45 |
| 7 | participation in the conspiracy. | 09:45 |
| 8 | The only other point I would add in response | 09:45 |
| 9 | to counsel is an overt act cannot be committed by | 09:45 |
| 10 | someone who is not a coconspirator.  It is very clear | 09:45 |
| 11 | that in Paragraph 36, this is an e-mail referenced -- | 09:45 |
| 12 | excuse me, 45.  I'm sorry, Your Honor.  Thirty-five | 09:45 |
| 13 | states that at least one of the coconspirators | 09:45 |
| 14 | committed or caused to be committed at least one of | 09:45 |
| 15 | the following overt acts, and then in Paragraph 56 is | 09:45 |
| 16 | reference to this e-mail sent by Mr. Kusno. | 09:45 |
| 17 | That's all, Your Honor.  Thank you. | 09:45 |
| 18 | THE COURT:  All right.  Let's bring in the | 09:45 |
| 19 | jury, please. | 09:45 |
| 20 | I'm sorry.  Does defense have any cases to | 09:45 |
| 21 | cite that are contrary -- either contrary to Geaney | 09:45 |
| 22 | or Tellier or that stand for the affirmative | 09:46 |
| 23 | proposition that there is need for independent | 09:46 |
| 24 | corroboration? | 09:46 |
| 25 | MR. SILVER:  We'll look right now, Your | 09:46 |

| | | |
|---|---|---|
| 1 | Honor.  If we can find any, we'll provide them to you | 09:46 |
| 2 | before lunch. | 09:46 |
| 3 | MR. NOVICK:  Your Honor, one other issue, and | 09:46 |
| 4 | I don't want to hold the jury, I think that we can | 09:46 |
| 5 | potentially take this up after this witness, is an | 09:46 |
| 6 | issue as to Special Agent Coleman's testimony who I | 09:46 |
| 7 | believe will be the next witness. | 09:46 |
| 8 | The government had made a motion to preclude | 09:46 |
| 9 | evidence or argument related to the government's | 09:46 |
| 10 | charging decisions in the case.  As it appears right | 09:46 |
| 11 | now, we do not intend to call Mr. Sharafi.  I believe | 09:46 |
| 12 | that any questioning of the agent or any evidence | 09:46 |
| 13 | regarding the government's decision with regard to a | 09:46 |
| 14 | nonprosecution agreement or decision not to charge is | 09:46 |
| 15 | entirely irrelevant. | 09:46 |
| 16 | Case law and the evidence certainly seems to | 09:46 |
| 17 | support that were he cooperating at the time the | 09:47 |
| 18 | coconspirator statements were made, and I would point | 09:47 |
| 19 | out there are very few coconspirator statements by | 09:47 |
| 20 | Mr. Sharafi, if any, in the case at this point, the | 09:47 |
| 21 | only thing that would be relevant would be whether he | 09:47 |
| 22 | was a cooperator at the time he made those statements | 09:47 |
| 23 | and he clearly was not.  And so I don't see anything | 09:47 |
| 24 | that would bear on his credibility that would come | 09:47 |
| 25 | from examination or evidence related to his -- his | 09:47 |

1   nonprosecution agreement.                              09:47

2        THE COURT:  Is there a distinction between       09:47

3   the government's decision not to charge him versus     09:47

4   the fact that he had a nonprosecution agreement?       09:47

5        MR. NOVICK:  I think there are two issues         09:47

6   there, Your Honor.  I think on both scores, the        09:47

7   defendant should not be allowed to inquire.  On the    09:47

8   issue of who we decided to charge, we've already       09:48

9   briefed that and our position is clear.  And I don't   09:48

10  think anything that's come up during the trial has     09:48

11  changed that to the point where the Court ought to     09:48

12  allow that.                                            09:48

13       And with regard to his nonprosecution            09:48

14  agreement, as Your Honor is aware, that's an issue of  09:48

15  credibility.  He's not a witness at the trial.  As     09:48

16  far as Rule 806, goes only to -- it would only be      09:48

17  relevant to his credibility if one of his statements   09:48

18  was made at a time -- when his coconspirator           09:48

19  statements was made at a time when he was cooperating  09:48

20  such that it would undermine the credibility of the    09:48

21  coconspirator statements.  We don't have that          09:48

22  situation here.                                        09:48

23       THE COURT:  Mr. Spears.                          09:49

24       MR. SPEARS:  Thank you, Your Honor.  We do        09:49

25  intend to explore with Special Agent Coleman the       09:49

1  circumstances surrounding Mr. Sharafi's entry into                09:49
2  the nonprosecution agreement.  I don't know -- we                 09:49
3  perhaps don't need to hold the jury up at this time.              09:49
4  But I did want to note that that is an area of                    09:49
5  cross-examination I intended to get into.                         09:49
6       And I would also note that yesterday evening                 09:49
7  we reached out to the government in regards to the                09:49
8  remaining e-mails that apparently are going to come              09:49
9  in through Special Agent Coleman.  There still are               09:49
10 about a hundred or so exhibits.  And we don't know               09:49
11 whether the government intends to put all of those in            09:49
12 through Special Agent Coleman.  I would imagine that             09:49
13 they don't.                                                       09:49
14      So we had asked them to identify which ones                 09:49
15 they do intend to elicit through or offer through               09:49
16 Special Agent Coleman so that we could have a                    09:49
17 dialogue with them perhaps at lunchtime about whether           09:49
18 and to what extent we're going to have any objections           09:49
19 to those now that it's clear what foundations exist             09:49
20 and do not exist.                                                 09:50
21      MR. NOVICK:  Respectfully, Your Honor,                      09:50
22 that's -- it is absurd to suggest that in the middle            09:50
23 of the government trying to prepare its case, put on            09:50
24 its case after we've been asking for five weeks with            09:50
25 regard to a relatively -- given the number of                    09:50

1    documents in this case, a relatively small universe        09:50
2    of documents and asking for them to articulate their       09:50
3    objections.                                                 09:50
4          The government is not, in the middle of its           09:50
5    preparation, going to break and discuss with               09:50
6    counsel -- counsel is aware of the exhibits.  If they      09:50
7    have objections to the exhibits, they can make them        09:50
8    to -- they can discuss them with us.  We've been here      09:50
9    waiting for those all along and they have decided not      09:50
10   to do that.  It's not up to us to identify for them       09:50
11   which witness is going to put in which documents.         09:50
12   They have objections.  They're more than welcome to       09:50
13   raise them with us.                                        09:50
14         Your Honor, there is one case that I found,          09:50
15   an unreported case that I found which deals with the      09:51
16   same point with regard to Sharafi's testimony, and       09:51
17   I'll just hand it up and we can discuss it if the        09:51
18   Court wishes.                                              09:51
19         THE COURT:  All right.                               09:51
20         MR. NOVICK:  It's *United States v. Basciano*,       09:51
21   B-a-s-c-i-a-n-o.  It is 2007 WL 1791221.                  09:51
22         THE COURT:  Thank you.  Please bring in the         09:51
23   jury.  Yes.  Would you bring in Mr. Puckett, please.     09:51
24         MR. KAHN:  We're doing so, Your Honor.  Thank       09:51
25   you.                                                       09:51

| | | |
|---|---|---|
| 1 | (Jury entered the proceedings, 9:52 a.m.) | 09:52 |
| 2 | THE COURT:  All right.  Please be seated, | 09:52 |
| 3 | ladies and gentlemen.  We will proceed with direct | 09:52 |
| 4 | examination of Mr. Puckett by Ms. Laryea. | 09:52 |
| 5 | MS. LARYEA:  Thank you, Your Honor. | 09:52 |
| 6 | CONTINUED DIRECT EXAMINATION OF LARRY E. PUCKETT | 09:52 |
| 7 | BY MS. LARYEA: | 09:52 |
| 8 | Q.   Good morning. | 09:53 |
| 9 | A.   Good morning. | 09:53 |
| 10 | THE COURT:  You'll note that I turned up the | 09:53 |
| 11 | microphone over there, so hopefully you will not have | 09:53 |
| 12 | to hear from me consistently about keeping voices up, | 09:53 |
| 13 | but keep your voice up anyhow. | 09:53 |
| 14 | MS. LARYEA:  May I, Your Honor? | 09:53 |
| 15 | THE COURT:  You may. | 09:53 |
| 16 | BY MS. LARYEA: | 09:53 |
| 17 | Q.   Mr. Puckett, yesterday you testified that you | 09:53 |
| 18 | worked for Alstom Power, Inc., around -- in the | 09:53 |
| 19 | 2000s, correct? | 09:53 |
| 20 | A.   Correct. | 09:53 |
| 21 | Q.   From your time at Alstom, are you familiar | 09:53 |
| 22 | with a group called International Network? | 09:53 |
| 23 | A.   Yes, I am. | 09:53 |
| 24 | Q.   Did International Network build anything? | 09:53 |
| 25 | A.   No. | 09:53 |

1    Q.    Back in the 2002, 2004 time frame, what was                09:53
2    International Network's role?                                     09:53
3    A.    International Network's role was to provide                 09:53
4    support to the business units in terms of sales, in              09:53
5    terms of local relationships.  It was basically set              09:53
6    up to provide local input, regional input to the                 09:54
7    business units.                                                  09:54
8    Q.    Did you ever work for International Network?                09:54
9    A.    Yes, I did.                                                 09:54
10    Q.    What was your position when you worked for                 09:54
11    International Network?                                            09:54
12    A.    I was director of sales.                                   09:54
13    Q.    In what country did you work when you worked               09:54
14    for International Network?                                        09:54
15    A.    When I worked for International Network, I                  09:54
16    was in the U.S. based in Houston.                                09:54
17    Q.    Around when did you hold this position in                  09:54
18    International Network?                                            09:54
19    A.    1991 and '92.                                              09:54
20    Q.    '91 to '92?                                                09:54
21    A.    No.  I'm sorry.  2001 to 2002.                             09:54
22    Q.    Okay.  Where did International Network's                   09:54
23    funding come from?                                               09:54
24    A.    It came from the business units.                          09:54
25    Q.    And while you were working for International               09:54

| | | |
|---|---|---|
| 1 | Network, how was your salary computed? | 09:54 |
| 2 | A.    My salary was computed on a basis salary. | 09:54 |
| 3 | MR. SILVER:  Objection.  Relevance, Your | 09:54 |
| 4 | Honor. | 09:54 |
| 5 | MS. LARYEA:  It goes -- Your Honor, it goes | 09:54 |
| 6 | to how International Network employees get paid, what | 09:55 |
| 7 | their salary is based on. | 09:55 |
| 8 | THE COURT:  I'll allow the question.  There's | 09:55 |
| 9 | been a lot about the funding of it.  There's been a | 09:55 |
| 10 | lot about the responsibilities.  I'm going to permit | 09:55 |
| 11 | the question. | 09:55 |
| 12 | MS. LARYEA:  Thank you, Your Honor.  Let me | 09:55 |
| 13 | repeat the question. | 09:55 |
| 14 | BY MS. LARYEA: | 09:55 |
| 15 | Q.    While you were working for International | 09:55 |
| 16 | Network, how was your salary computed? | 09:55 |
| 17 | A.    I had base salary and if we were fortunate | 09:55 |
| 18 | enough to sell a piece of equipment or a plant, I | 09:55 |
| 19 | received a commission. | 09:55 |
| 20 | Q.    So you received a commission based on selling | 09:55 |
| 21 | equipment, you said, right? | 09:55 |
| 22 | A.    Yes. | 09:55 |
| 23 | Q.    Was your commission tied to sales targets? | 09:55 |
| 24 | A.    Yes, tied to sales targets as well. | 09:55 |
| 25 | Q.    Was it tied to how the business units that | 09:55 |

857

1    you were helping sell products did?                      09:55

2        A.    Yes.                                           09:55

3        Q.    Mr. Puckett, I want to talk a bit about the    09:55

4    Tarahan Project.  Where was the project located?         09:55

5        A.    In Sumatra, Indonesia.                         09:55

6        Q.    And what was being built?                      09:55

7        A.    It was a power plant, basically comprised of   09:55

8    two circulating fluidized bed boilers.                   09:56

9        Q.    And you mentioned yesterday that PLN was the   09:56

10   customer for this power plant, correct?                  09:56

11       A.    Correct.                                       09:56

12       Q.    What was PLN going to do with the electricity  09:56

13   that was being generated at the power plant?             09:56

14       A.    Provide electricity to the people and         09:56

15   businesses and companies in Indonesia in Sumatra.       09:56

16       Q.    And you mentioned that Alstom Power, Inc.,     09:56

17   bid on the Tarahan Project, right?                       09:56

18       A.    Yes.                                           09:56

19       Q.    Were there other companies interested in      09:56

20   winning the Tarahan Project?                             09:56

21       A.    Yes.                                           09:56

22       Q.    Who were Alstom Power, Inc.'s, main           09:56

23   competitors?                                             09:56

24       A.    Main competitors was a consortium of Foster   09:56

25   Wheeler and Mitsubishi Corporation.                      09:56

1    Q.    You mentioned a consortium, Foster Wheeler

2  and Mitsubishi, two different companies?

3    A.    Two different companies.

4    Q.    Were they working together?

5    A.    Working together.

6    Q.    Did Alstom Power, Inc., work alone to try to

7  win the Tarahan Project?

8    A.    No.    It was a consortium of Alstom Power,

9  Inc., and Marubeni Corporation, and also PT Energy

10  Systems Indonesia referred to as PTESI.

11    Q.    So let's talk a little bit about each of the

12  company's roles.

13        What products was Alstom Power, Inc.,

14  supposed to provide for the project?

15    A.    Alstom Power, Inc., was providing a boiler --

16  boilers and the auxiliaries, as well as the fuel, the

17  fuel supply system and environmental control system.

18    Q.    And you mentioned Marubeni was one of the

19  other companies?

20    A.    Yes.

21    Q.    What product was Marubeni --

22    A.    Marubeni was providing the balance of plant

23  and the steam turbine generator.

24    Q.    And did Marubeni have employees dedicated to

25  trying to win the Tarahan Project?

09:56
09:56
09:56
09:56
09:56
09:56
09:56
09:56
09:56
09:56
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57
09:57

```
1    A.    Yes, they did.                                    09:57

2    Q.    And you mentioned a third company was part of     09:57

3  the consortium.  What was the name of that third         09:57

4  company?                                                  09:57

5    A.    PT Energy Systems, Alstom Energy Systems          09:57

6  Indonesia.                                                09:57

7    Q.    Was that referred to by a shorthand?              09:57

8    A.    Yes.                                              09:57

9    Q.    What was that shorthand?                          09:57

10    A.    PTESI.                                           09:58

11    Q.    What products was PTESI supposed to provide      09:58

12  for the plant?                                           09:58

13    A.    PTESI was a manufacture fabricator and was       09:58

14  basically going to provide boiler components, boiler     09:58

15  parts for the project.                                   09:58

16    Q.    Was there a lead member of this consortium of    09:58

17  three companies?                                         09:58

18    A.    Alstom Power, Inc.                               09:58

19    Q.    Why was -- what did it mean to be the lead?      09:58

20    A.    Basically you define basic strategy.  You        09:58

21  would lead in proposal strategy as well as sales and     09:58

22  evaluation strategy.                                     09:58

23    Q.    Why was Alstom Power, Inc., the lead of this     09:58

24  consortium?                                              09:58

25    A.    Well, Alstom Power, Inc., had been in            09:58
```

| | |
|---|---|
| 1 | Indonesia for -- since 1985 through the former | 09:58 |
| 2 | companies, had a lot of experience with -- with | 09:58 |
| 3 | boiler plants, particularly in Indonesia. | 09:58 |
| 4 | Q.    You said Alstom Power, Inc., had been in | 09:59 |
| 5 | Indonesia since 1985.  Was this back when it was | 09:59 |
| 6 | called Combustion Engineering? | 09:59 |
| 7 | A.    Yes. | 09:59 |
| 8 | Q.    And did International Network have a role in | 09:59 |
| 9 | the efforts to win the Tarahan contract? | 09:59 |
| 10 | A.    International Network had a role in almost | 09:59 |
| 11 | every attempt to sell a project.  A gentleman by the | 09:59 |
| 12 | name of Eko Sulianto worked for International | 09:59 |
| 13 | Network, Indonesian local, but had a role to provide | 09:59 |
| 14 | intelligence, relationships, everything local, | 09:59 |
| 15 | everything regional to the business units. | 09:59 |
| 16 | Q.    Are you familiar with an individual named | 09:59 |
| 17 | Lawrence Hoskins? | 09:59 |
| 18 | A.    Yes. | 09:59 |
| 19 | Q.    How are you familiar with him? | 09:59 |
| 20 | A.    I'm familiar with him through -- mainly | 09:59 |
| 21 | through communication, written communication. | 09:59 |
| 22 | Q.    What was Mr. Hoskins' position at Alstom? | 09:59 |
| 23 | A.    I believe he was a senior vice president over | 09:59 |
| 24 | the Asia Pacific region. | 10:00 |
| 25 | Q.    And what was Mr. Hoskins' role on the Tarahan | 10:00 |

1    Project?

2        A.    Mr. Hoskins' role on the Tarahan Project is

3    to support AP -- Alstom Power, Inc., and support the

4    sale of the project.

5        Q.    Are you familiar with an individual named

6    Reza Moenaf?

7        A.    Yes.

8        Q.    Who -- what was Reza Moenaf's role at Alstom?

9        A.    He -- he was country manager for

10   International Network, country manager of Indonesia.

11   He was also president of PT Energy Systems Indonesia.

12       Q.    And as the country manager for Indonesia, who

13   did Mr. Moenaf report to?

14       A.    He reported to Lawrence Hoskins.

15       Q.    Now, you mentioned an individual by the name

16   of Eko Sulianto?

17       A.    Yes.

18       Q.    Who did Eko Sulianto report to?

19       A.    He reported to Reza Moenaf.

20       Q.    Did Reza Moenaf and Eko Sulianto have a role

21   on the Tarahan Project?

22       A.    Yes.

23       Q.    Mr. Puckett, how did you become involved in

24   the Tarahan Project?

25       A.    Well, I was working in Houston.  But the head

10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:00
10:01
10:01
10:01
10:01

1    of sales, global sales for Alstom Boilers asked me to    10:01

2    come back to Indonesia for a short while to help out    10:01

3    on a project where I knew the owner fairly well.  It    10:01

4    was a pulp and paper project.  And while I was there    10:01

5    working on the pulp and paper project, Fred Pierucci,    10:01

6    head of sales at Alstom Power, Inc., asked me to step    10:01

7    in and help support the Tarahan Project until the    10:01

8    lead salesman could be -- be in Indonesia.    10:01

9    Q.    And you mentioned Fred Pierucci.  Can you    10:01

10    remind the jury, what was his position again?    10:01

11    A.    He was global vice president of sales and    10:01

12    marketing for the utility boiler group.    10:01

13    Q.    What company did Mr. Pierucci work for?    10:02

14    A.    Alstom Power, Inc.    10:02

15    Q.    And where was Mr. Pierucci based?    10:02

16    A.    Windsor, Connecticut.    10:02

17    Q.    You said you were asked to fill in.  Who were    10:02

18    you asked to fill in for?    10:02

19    A.    A gentleman by the name of Bill Pomponi.    10:02

20    Q.    And what was Bill Pomponi's role on the    10:02

21    Tarahan Project?    10:02

22    A.    Bill Pomponi's role was to be the lead    10:02

23    sales -- salesperson working for the business unit.    10:02

24    Q.    And where was -- sorry, Mr. Puckett.    10:02

25         Where was Bill Pomponi based?    10:02

1    A.    He was based out of Windsor, Connecticut as    10:02

2    well.    10:02

3    Q.    So if you were filling in, how long did you    10:02

4    actually work on the Tarahan Project?    10:02

5    A.    About six weeks, six or seven weeks.    10:02

6    Q.    Who were you reporting to while you were    10:02

7    working on the Tarahan Project?    10:02

8    A.    Fred Pierucci.    10:02

9    Q.    Did you report to anyone in International    10:02

10   Network in connection with your work on the Tarahan    10:02

11   Project?    10:02

12   A.    No, I didn't.    10:02

13   Q.    Mr. Puckett, I want to show you what has been    10:02

14   marked as Government's Exhibit 445 for    10:03

15   identification.  What is this document?    10:03

16   A.    It's an e-mail from Frederic Pierucci to    10:03

17   myself, William Pomponi, Eko Sulianto, P. Sharafi,    10:03

18   with a copy to Ion Sculy and Reza Moenaf.    10:03

19   Q.    What is the subject of the e-mail?    10:03

20   A.    The subject is Indonesia Tarahan coal-fired    10:03

21   Power Station 3 and 4, Lot 3, boiler package.    10:03

22   Q.    And the date of the e-mail?    10:03

23   A.    August 22, 2003.    10:03

24       MS. LARYEA:  At this time, the government    10:03

25   moves to admit Government's Exhibit 445.    10:03

1       MR. SILVER:  No objection, Your Honor.                    10:03

2       THE COURT:  Full exhibit.                                 10:03

3   BY MS. LARYEA:                                                10:03

4   Q.    Mr. Puckett, one of the recipients of this             10:03

5   e-mail that you read is psharafi@msn.com.  Who is            10:03

6   psharafi@msn.com?                                            10:04

7   A.    It's Pirooz Sharafi who was consultant on --           10:04

8   consultant for the Alstom consortium for the Tarahan         10:04

9   Project.                                                     10:04

10  Q.    Mr. Puckett, do you see that Mr. Pierucci is           10:04

11  forwarding another e-mail?                                   10:04

12  A.    Yes.                                                   10:04

13  Q.    And he's forwarding another e-mail that he             10:04

14  sent?                                                        10:04

15  A.    Yes.                                                   10:04

16  Q.    Who is Mr. Pierucci writing the e-mail to?             10:04

17  Who is in the "to" line?                                     10:04

18  A.    Kusunoki Junji.                                        10:04

19  Q.    Who is Mr. Kusunoki Junji?                             10:04

20  A.    He was a Marubeni employee, actually sales            10:04

21  manager living in Jakarta, Indonesia, working               10:04

22  exclusively on the Tarahan Project.                          10:05

23  Q.    Mr. Puckett, can you read the last line of            10:05

24  Mr. Pierucci's e-mail to Kusunoki Junji?                     10:05

25  A.    Yes.  "During Bill's absence, Larry will act          10:05

1  as the sales lead on Alstom side."    10:05

2      Q.    Now, Mr. Puckett, is this around the time    10:05

3  that you became involved in the Tarahan Project?    10:05

4      A.    Yes, it is.    10:05

5      Q.    And can you read what the date is again for    10:05

6  the jury?    10:05

7      A.    August 22, 2003.    10:05

8      Q.    Now, looking at the top e-mail from Fred to a    10:05

9  number of people including yourself, can you read    10:05

10  that e-mail, please?    10:05

11      A.    Yes.  "We need to show one face towards MC    10:05

12  and PLN during this very sensitive period.  During    10:05

13  Bill's absence, I absolutely want to have Larry to    10:05

14  coordinate all lobbying actions regarding this    10:06

15  important project.  Please make sure that this is    10:06

16  strictly followed.  Fred."    10:06

17      Q.    What does MC mean?    10:06

18      A.    Marubeni Corporation.    10:06

19      Q.    And when Mr. Pierucci says "we need to show    10:06

20  one face towards MC and PLN during this very    10:06

21  sensitive period," what is that referring to?    10:06

22      A.    It's referring to the evaluation period when    10:06

23  PLN was evaluating the proposals from the different    10:06

24  company consortiums.    10:06

25      Q.    Why was the evaluation period very sensitive?    10:06

1    A.    Well, the evaluation period is very sensitive    10:06

2    because the evaluation factors could swing up and    10:06

3    down depending on a number of factors.  You could    10:06

4    be -- have a -- high evaluation factors one day and    10:06

5    low the next.  It all depended on who your friends    10:07

6    were in PLN.    10:07

7    Q.    And this is evaluating who had the best offer    10:07

8    for the project?    10:07

9    A.    Evaluating who had the best offer.    10:07

10    Q.    Now, Mr. Pierucci says "regarding this    10:07

11    important project."  Why was Tarahan an important    10:07

12    project?    10:07

13    A.    Well, Alstom hadn't won a project in    10:07

14    Indonesia in quite a while.  They had a long history    10:07

15    there but hadn't won a project.  And also it was    10:07

16    another reference plant for our circulating fluidized    10:07

17    bed technology with two CFBs.  It was an important    10:07

18    project politically for Fred Pierucci to put this    10:07

19    to -- to book this project.    10:07

20    Q.    These two individuals, Eko Sulianto and Reza    10:07

21    Moenaf, you mentioned they worked in Indonesia for    10:08

22    Alstom, correct?    10:08

23    A.    Correct.    10:08

24    Q.    Had these two individuals been working on the    10:08

25    Tarahan Project before you arrived in August 2003?    10:08

1    A.    Yes.                                          10:08

2    Q.    Why did Mr. Pierucci want -- why did          10:08

3    Mr. Pierucci want you to coordinate all lobbying    10:08

4    actions regarding this important project instead of 10:08

5    Mr. Sulianto and Mr. Moenaf?                        10:08

6    A.    There was a number of reasons.  Marubeni      10:08

7    wants someone from Alstom -- since Alstom was       10:08

8    consortium leader, wanted someone from Alstom Power 10:08

9    being there.  And I was already there and I had     10:08

10   experience in Indonesia and experience with PLN.    10:08

11   That's the reason he wanted me to coordinate the -- 10:08

12   all the activities.                                 10:09

13   Q.    And Mr. Pirooz Sharafi, you mentioned he was  10:09

14   a consultant on the Tarahan Project.  Did you know  10:09

15   Mr. Sharafi before this project?                    10:09

16   A.    Yes.                                          10:09

17   Q.    How did you know him?                         10:09

18   A.    He was a consultant on some other projects    10:09

19   historically for Alstom and ABB, and he had other   10:09

20   business endeavors in Indonesia.  He was in Indonesia 10:09

21   quite a bit.                                        10:09

22   Q.    Who hired Mr. Sharafi as a consultant on the  10:09

23   Tarahan Project?                                    10:09

24   A.    Fred Pierucci.                                10:09

25   Q.    When was that decision made relative to when  10:09

```
1   you started working on the project?              10:09
2       A.    Sometime before I started working on the   10:09
3   project, several months.                         10:09
4       Q.    Did you have any -- did you have any    10:09
5   conversations with other members of the team about  10:09
6   Sharafi when you started working on the Tarahan   10:09
7   Project?                                          10:10
8       A.    Yes.                                    10:10
9       Q.    Who did you have those conversations with?  10:10
10      A.    Eko Sulianto, Reza Moenaf and Bill Pomponi.  10:10
11      Q.    What did you tell them?                  10:10
12      A.    I told them that I didn't think much of  10:10
13  Pirooz Sharafi being our consultant.             10:10
14      Q.    Why did you not think much of him?      10:10
15      A.    I didn't trust the man.                 10:10
16      Q.    Mr. Puckett, I am showing you what has been  10:10
17  marked as Government's Exhibit 446.  What is this  10:10
18  document?                                         10:10
19      A.    It's an e-mail from Lawrence Hoskins to Fred  10:10
20  Pierucci.                                         10:10
21      Q.    What's the date of the e-mail?          10:10
22      A.    The date of the e-mail is August 29, 2003.  10:10
23      Q.    And the subject?                        10:10
24      A.    The subject is Tarahan.                 10:10
25            MS. LARYEA:  At this time, the government  10:10
```

| | |
|---|---|
| 1 | moves to admit Government's Exhibit 446. | 10:10 |
| 2 | MR. SILVER:  Your Honor, no objection to | 10:10 |
| 3 | admission but would just request that the witness be | 10:10 |
| 4 | restricted to only reading from the document since he | 10:11 |
| 5 | was never copied on it. | 10:11 |
| 6 | THE COURT:  Do you have any further plan than | 10:11 |
| 7 | that? | 10:11 |
| 8 | MS. LARYEA:  No, Your Honor.  I expect him | 10:11 |
| 9 | to -- | 10:11 |
| 10 | THE COURT:  Okay.  You may proceed. | 10:11 |
| 11 | BY MS. LARYEA: | 10:11 |
| 12 | Q.   Mr. Puckett, can you please read the first | 10:11 |
| 13 | paragraph? | 10:11 |
| 14 | A.   Yes.  "Fred, understand on above that | 10:11 |
| 15 | Marubeni pressing us to make bid EXTN (tomorrow) | 10:11 |
| 16 | without increasing price but Windsor wish to increase | 10:11 |
| 17 | price by $2.4 million.  Also understand from Reza | 10:11 |
| 18 | that we have significant price advantage over FW at | 10:11 |
| 19 | this stage and, therefore, he supports principle of | 10:11 |
| 20 | improving price, but not as part of the bid extension | 10:11 |
| 21 | process.  Reza believes we will get the increase | 10:11 |
| 22 | during negotiations and is checking with the team as | 10:11 |
| 23 | to whether they can guarantee this." | 10:11 |
| 24 | Q.   Mr. Puckett, while you were working on the | 10:12 |
| 25 | Tarahan Project, did you ever hear the acronym FW? | 10:12 |

1      A.    Yes.                                          10:12

2      Q.    What was that a reference to when you heard   10:12

3  it?                                                     10:12

4      A.    Foster Wheeler.                               10:12

5      Q.    What was Foster Wheeler's connection to the   10:12

6  Tarahan Project?                                        10:12

7      A.    They were bidding against us on the Tarahan   10:12

8  Project.                                                10:12

9      Q.    Mr. Puckett, what is a bid extension?         10:12

10      A.    A bid extension is you have a bid date by     10:12

11  specification, a bid due date, and you ask for an       10:12

12  extension of that date.                                 10:12

13      Q.    This e-mail mentions a $2.4 million price     10:12

14  increase issue.  Did you become aware of such an        10:12

15  issue when you started working on the Tarahan           10:12

16  Project?                                                10:12

17      A.    Yes, I did.                                   10:12

18      Q.    What did -- what was the issue?               10:12

19      A.    The issue was -- I forget what kind of        10:12

20  equipment it was.  But it was a $2.4 million            10:12

21  oversight that Alstom didn't include in their           10:13

22  proposal.                                               10:13

23      Q.    What would be the significance of increasing  10:13

24  Alstom's price by 2.4 million at a bid extension        10:13

25  phase?                                                  10:13

1    A.    Well, at that time we were getting feedback                10:13
2    that the bids were very close, they could go either              10:13
3    way, and we certainly didn't want to add $2.4 million            10:13
4    more to our price with the bid extension.  And Alstom            10:13
5    was really pushing to add to the price.  And Reza and            10:13
6    myself was advocating, no, we don't want to increase             10:14
7    the price now.  It's something we don't want to do.              10:14
8    Q.    Because you were afraid if you increased the               10:14
9    price, it would --                                               10:14
10    A.    We'd lose the job, lose the project.                      10:14
11    Q.    Looking at the last paragraph of this e-mail,             10:14
12    can you please read it for the jury?                            10:14
13    A.    "If Reza puts his name to guaranteeing the                10:14
14    increase during negotiation, can Windsor be                     10:14
15    persuaded?  Or do you have other ideas?  Lawrence."             10:14
16    Q.    Mr. Puckett, while you were working at                    10:14
17    Alstom, did you ever hear the short term "Windsor"?             10:14
18    A.    Yes.                                                      10:14
19    Q.    What was that a reference to?                             10:14
20    A.    "Windsor" basically referred to Windsor,                 10:14
21    Connecticut, the home base of Alstom Power, Inc.                10:14
22    Q.    Now, when this says "can Windsor be                       10:14
23    persuaded," can you remind the jury, who was in                 10:15
24    charge of the Tarahan bidding process?                         10:15
25    A.    Fred Pierucci.                                           10:15

1    Q.    And which Alstom entity was in charge of the    10:15

2    Tarahan bidding project?    10:15

3    A.    Alstom Power, Inc.    10:15

4    Q.    And who had the decision-making authority as    10:15

5    to whether to add this $2.4 million increase at a bid    10:15

6    extension phase?    10:15

7    A.    Fred Pierucci.    10:15

8    Q.    And why?    10:15

9    A.    Because he controlled strategy, negotiation    10:15

10   tactics.  He controlled how we were going to    10:15

11   approach -- how we were going to approach the project    10:15

12   in terms of strategy and so forth.    10:15

13   Q.    Mr. Puckett, I am showing you what has been    10:15

14   marked as Government's Exhibit 451 for    10:15

15   identification.  What is this document?    10:15

16   A.    This is an e-mail from Fred Pierucci to Will    10:16

17   Pomponi, P. Sharafi, with a copy to me, Ion Sculy,    10:16

18   Reza Moenaf, Eko Sulianto, Lauren Buika and Steven    10:16

19   Sheckler.    10:16

20   Q.    What is the date of this e-mail?    10:16

21   A.    The date is 16 September, 2003.    10:16

22   Q.    And the subject?    10:16

23   A.    Tarahan coal-fired P/S Lot 3 critical    10:16

24   situation.    10:16

25       MS. LARYEA:  At this time, the government    10:16

1    moves for the admission of Government's Exhibit 451.    10:16

2         MR. SILVER:  No objection, Your Honor.    10:16

3         THE COURT:  451 is a full exhibit.    10:16

4  BY MS. LARYEA:    10:16

5    Q.    Mr. Puckett, first let's talk about who    10:16

6  Mr. Pierucci is e-mailing.  Can you remind the jury    10:16

7  who is William Pomponi?    10:16

8    A.    Yes.  Will Pomponi is the lead salesman for    10:17

9  the Tarahan Project representing Alstom Power, Inc.    10:17

10    Q.    And who is psharafi@msn.com?    10:17

11    A.    It's Pirooz Sharafi, the consultant for the    10:17

12  Tarahan Project.    10:17

13    Q.    Can you please read the highlighted portion    10:17

14  of the e-mail?    10:17

15    A.    Yes.  "When we spoke on Friday, you both told    10:17

16  me that everything was under control in the    10:17

17  evaluation and convinced me that there was no need to    10:17

18  have somebody from Windsor in Indonesia next week    10:17

19  even though I proposed to have Larry to replace    10:17

20  Bill."    10:17

21    Q.    Why did Mr. Pierucci want somebody from    10:17

22  Windsor in Indonesia?    10:17

23    A.    He wanted someone from Windsor to control the    10:17

24  activities and also placate Marubeni.  Marubeni was    10:17

25  very nervous unless someone from Alstom Power, Inc.,    10:18

874

1    was there in Jakarta.

2        Q.    Can you please read the rest of this e-mail

3    that you see on the screen zoomed?

4        A.    Yes.    "Now if the infos below are correct, we

5    are not only evaluated number 2 but by huge margin,

6    almost $40 million.    How can that be?    I thought we

7    were controlling what was happening in Palembang.

8    Please check ASAP if the below infos are correct and

9    give me by tomorrow a plan to recover this.    We

10    cannot lose this project."

11        Q.    What is Palembang?

12        A.    Palembang is a city in Sumatra where PLN was

13    stationed.    The PLN evaluation team was stationed in

14    Palembang in Sumatra to evaluate the proposals on

15    Tarahan.

16        Q.    Now, when Mr. Pierucci says, "I thought we

17    were controlling what was happening in Palembang,"

18    how was Alstom controlling what was happening in

19    Palembang?

20        A.    It was to get our friends' help, friends in

21    PLN and the government to help us with evaluation

22    credits and factors and to basically give negative

23    evaluation factors to Foster Wheeler.

24        Q.    And how were you going to get this help?

25        A.    Through the consultant.

10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:18
10:19
10:19
10:19
10:19
10:19
10:19
10:19
10:19
10:19
10:19
10:19

1    Q.    And how was the consultant going to get this    10:19

2    help?    10:19

3    A.    Paid bribes.    10:19

4    Q.    And when Mr. Pierucci says "we cannot lose    10:19

5    this project," can you remind the jury again, why was    10:19

6    Tarahan so important?    10:19

7    A.    It was -- at that point Fred had promised the    10:19

8    project, that we would win it to upper management.    10:20

9    And it was just a project we needed to win in    10:20

10    Southeast Asia, particularly Indonesia.  And it    10:20

11    gave -- it would be a good -- another good reference    10:20

12    plant for our technology.    10:20

13    Q.    For Alstom Power, Inc.?    10:20

14    A.    For Alstom Power, Inc.    10:20

15    Q.    I am showing you what has been marked as    10:20

16    Government's Exhibit 452 for identification.  What is    10:20

17    this document?    10:20

18    A.    It's an e-mail from Junji Kusunoki to    10:20

19    Frederic Pierucci with a copy to Bill -- William    10:20

20    Pomponi, myself, Eko Sulianto, Reza Moenaf,    10:20

21    Mizushima, Saito Toru, Shoji Tatsuya, Tsuzaki Suguru,    10:21

22    Yamamoto Takeshi is the last one.    10:21

23    Q.    What is the date of this e-mail?    10:21

24    A.    18 September 2003.    10:21

25    Q.    And the subject?    10:21

1    A.    The subject is Tarahan coal-fired P/S Lot 3        10:21

2    critical situation.                                       10:21

3         MS. LARYEA:  At this time, the government           10:21

4    moves to admit Exhibit 452.                               10:21

5         MR. SILVER:  No objection, Your Honor.              10:21

6         THE COURT:  Full exhibit.                           10:21

7    BY MS. LARYEA:                                            10:21

8    Q.    Can you please read the first sentence of          10:21

9    Kusunoki's e-mail?                                        10:21

10   A.    "This morning I tried to reconfirm today's         10:21

11   meeting with Mr. EW secretary.  Final as a result the    10:22

12   meeting has postponed to sometime in tonight at          10:22

13   Palembang.  So I have booked same flight of EW to        10:22

14   Palembang at 5 p.m. Eastern -- ETD Jakarta."             10:22

15   Q.    Who is Mr. EW?                                      10:22

16   A.    That's Mr. Eddie Widiono who was president of      10:22

17   PLN.                                                      10:22

18   Q.    What influence, if any, did Mr. Widiono have       10:22

19   on awarding PLN projects like Tarahan?                   10:22

20   A.    Well, he was the president of PLN, so he had       10:22

21   a lot of influence.                                       10:22

22   Q.    Can you read the highlighted portion starting      10:22

23   with "I already talked"?                                 10:22

24   A.    "I already talked with Messrs. Eko and Larry       10:22

25   about this matter and they intend to go to Palembang     10:23

| | |
|---|---|
| 1 | with me, same flight, and attend the meeting.  We | 10:23 |
| 2 | shall do our best at Palembang.  Mr. Saito of | 10:23 |
| 3 | Marubeni will meet some persons in charge from | 10:23 |
| 4 | PLN/TEPCO tonight, so please let us rearrange the | 10:23 |
| 5 | time of telephone conference tonight now scheduled at | 10:23 |
| 6 | 18:30 Indonesia Standard Time.  Mr. Pierucci also go | 10:23 |
| 7 | to Palembang, same flight." | 10:23 |
| 8 | Q.    This e-mail mentions that a Mr. Saito of | 10:23 |
| 9 | Marubeni will meet with some persons in charge from | 10:23 |
| 10 | PLN.  Did you ever get a report of what happened at | 10:23 |
| 11 | that meeting? | 10:23 |
| 12 | A.    Yes, we did. | 10:23 |
| 13 | Q.    I am showing you what has been marked for | 10:23 |
| 14 | identification as Government's Exhibit 453.  What is | 10:23 |
| 15 | this document? | 10:24 |
| 16 | A.    It's an e-mail from Reza Moenaf to Frederic | 10:24 |
| 17 | Pierucci with a hidden copy to Eko Sulianto and to | 10:24 |
| 18 | me. | 10:24 |
| 19 | Q.    What is the subject of the e-mail? | 10:24 |
| 20 | A.    Tarahan visit Palembang 17/9 report. | 10:24 |
| 21 | Q.    What's the date? | 10:24 |
| 22 | A.    September 18, 2003. | 10:24 |
| 23 | Q.    Mr. Puckett, do you see that Mr. Moenaf is | 10:24 |
| 24 | forwarding an e-mail from someone named Winan Kusno? | 10:24 |
| 25 | A.    Yes. | 10:24 |

1    Q.    Who is Winan Kusno?                          10:24

2    A.    Winan Kusno is a sales engineer, project     10:24

3  manager working for Reza Moenaf.                      10:24

4    Q.    Did he work on the efforts to win the Tarahan 10:24

5  contract?                                             10:24

6    A.    Yes, he did.                                  10:24

7    Q.    Did he know that Alstom had hired a           10:24

8  consultant to try to win that contract?              10:25

9    A.    Yes, he did.                                  10:25

10        MR. SILVER:  Objection.  Foundation, Your      10:25

11  Honor.                                               10:25

12        THE COURT:  Would you give the foundation?     10:25

13        MS. LARYEA:  Yeah.                             10:25

14        THE COURT:  How does he know?                  10:25

15  BY MS. LARYEA:                                       10:25

16    Q.    Do you know whether Mr. Kusno knew that      10:25

17  consultants were hired on the Tarahan Project?       10:25

18    A.    Yes.                                         10:25

19    Q.    Do you know whether Mr. Kusno knew what the  10:25

20  consultants were hired to do?                        10:25

21    A.    Yes.                                         10:25

22        MR. SILVER:  Objection, foundation, Your       10:25

23  Honor.                                               10:25

24        THE COURT:  Let's just get a yes or no and     10:25

25  then you can establish the foundation of why -- how  10:25

879

| | | |
|---|---|---|
| 1 | he knows.  Okay? | 10:25 |
| 2 | MS. LARYEA:  Let me repeat the question. | 10:25 |
| 3 | BY MS. LARYEA: | 10:25 |
| 4 | Q.   Did you know whether Mr. Kusno knew what the | 10:25 |
| 5 | consultants were supposed to do on the Tarahan | 10:25 |
| 6 | Project? | 10:25 |
| 7 | A.   Yes.  Reza Moenaf had given them specific -- | 10:25 |
| 8 | MR. SILVER:  Objection.  There's no question | 10:25 |
| 9 | pending.  The next question has to come next. | 10:25 |
| 10 | THE COURT:  Let's have the next question, | 10:25 |
| 11 | please. | 10:25 |
| 12 | BY MS. LARYEA: | 10:25 |
| 13 | Q.   How did you know that Mr. Kusno knew what | 10:25 |
| 14 | consultants were supposed to do on the Tarahan | 10:26 |
| 15 | Project? | 10:26 |
| 16 | A.   Reza Moenaf and Eko Sulianto had instructed | 10:26 |
| 17 | Winan and the other sales engineers that worked for | 10:26 |
| 18 | them as to who was a consultant and what his job was. | 10:26 |
| 19 | MR. SILVER:  I'm sorry, Your Honor.  The | 10:26 |
| 20 | witness still hasn't said how he knows that. | 10:26 |
| 21 | BY MS. LARYEA: | 10:26 |
| 22 | Q.   Did you work -- Mr. Puckett, you mentioned | 10:26 |
| 23 | that you worked on the Tarahan Projects around this | 10:26 |
| 24 | time, correct? | 10:26 |
| 25 | A.   Yes. | 10:26 |

1    Q.    In Indonesia?                                    10:26

2    A.    Yes.                                             10:26

3    Q.    Did you work with Reza Moenaf on this            10:26

4    project?                                               10:26

5    A.    Yes.                                             10:26

6    Q.    Now, you mentioned that Reza Moenaf had          10:26

7    instructed Winan and others about the consultants and 10:26

8    what they were supposed to do.  How do you know that? 10:26

9    A.    Reza told me.                                    10:26

10   Q.    And the instructions that Reza had given         10:26

11   about the consultant --                                10:27

12         MS. LARYEA:  At this time, Your Honor, the       10:27

13   government moves to admit Government's Exhibit 453.    10:27

14         MR. SILVER:  Objection on 801(d)(2)(E)           10:27

15   grounds, Your Honor.                                   10:27

16         THE COURT:  All right.  We've had that           10:27

17   discussion.  I'm going to admit 453.  To the extent    10:27

18   it needs to be conditional in light of our colloquy    10:27

19   earlier, it will be.  But you may proceed.             10:27

20         MS. LARYEA:  Thank you, Your Honor.              10:27

21   BY MS. LARYEA:                                         10:27

22   Q.    Can you please read the e-mail from Reza to      10:27

23   Fred that I have highlighted?                          10:27

24   A.    Yes.  "Fred, following is Winan's (APESI PM      10:27

25   in Palembang) report from the meeting last night with 10:27

1    Muliyono, Saito (Marubeni) and Firman plus Sirait    10:28

2    PLN.  Since the report contains sensitive    10:28

3    information, please handle it accordingly.  Reza."    10:28

4    Q.    Now, Reza mentioned to Fred, you see here,    10:28

5    Winan's report from the meeting with Palembang.  Is    10:28

6    Reza forwarding an e-mail from Winan?    10:28

7    A.    Yes.    10:28

8    Q.    And this e-mail you mentioned is from Winan    10:28

9    Kusno.  What is the subject?    10:29

10    A.    The subject is Tarahan visit Palembang 17/9    10:29

11    report.    10:29

12    Q.    At this time, Mr. Puckett, I am showing you    10:29

13    what has been marked --    10:29

14         MR. KAHN:  It's not in evidence.  It's not in    10:29

15    evidence.    10:29

16         MS. LARYEA:  Yeah.  I'm sorry.    10:29

17    BY MS. LARYEA:    10:29

18    Q.    What is -- I'm showing you another exhibit    10:29

19    that is marked for identification as Government's    10:29

20    Exhibit 454.  What is this document?    10:29

21    A.    This is an e-mail from Reza Moenaf to    10:29

22    Lawrence Hoskins.    10:29

23    Q.    What's the subject of the e-mail?    10:29

24    A.    Tarahan visit Palembang 17/9 report.    10:29

25    Q.    What's the date?    10:29

1    A.    The date is September 18, 2003.                    10:30

2          MS. LARYEA:   At this time, Your Honor, the        10:30

3    government moves to admit Government's Exhibit 454.      10:30

4          MR. SILVER:   Same objection as to the prior      10:30

5    e-mail, Your Honor.   It's another version of the same  10:30

6    e-mail.                                                  10:30

7          THE COURT:   All right.   I'm going to admit it    10:30

8    conditionally as we've discussed.                       10:30

9    BY MS. LARYEA:                                           10:30

10   Q.    Mr. Puckett, I want to show you the document       10:30

11   you received from Reza Moenaf which is Government's      10:30

12   Exhibit 453.   That's the one on top.   Do you see       10:30

13   that?                                                    10:30

14   A.    Yes.                                               10:30

15   Q.    And this at the bottom is Government's             10:30

16   Exhibit 454.   This is the e-mail that Reza Moenaf       10:31

17   sent to Mr. Hoskins.   Do you see that?                  10:31

18   A.    Yes.                                               10:31

19   Q.    What do you notice about the date of the           10:31

20   e-mails?                                                 10:31

21   A.    The same dates.                                    10:31

22   Q.    What do you notice about the subject of the        10:31

23   e-mail?                                                  10:31

24   A.    Same subject.                                      10:31

25   Q.    Now, let's look at the substance of the            10:31

1    e-mail that went to you and to the defendant                10:31

2    Mr. Hoskins.  Now, again, comparing the two e-mails,       10:31

3    the one you received and the one Mr. Hoskins               10:32

4    received, do you see that same report from Winan           10:32

5    Kusno?                                                      10:32

6        A.    Yes.                                             10:32

7        Q.    The same report about the Tarahan visit          10:32

8    Palembang 17/9 report?                                     10:32

9        A.    Yes.  It's the same.                             10:32

10       Q.    So same e-mail that Winan sent about this        10:32

11   report was sent to you and to the defendant, correct?      10:32

12       A.    Correct.                                         10:32

13       Q.    Now let's look at the substance of Winan's       10:32

14   report.  Let's look at the second page of Winan's          10:32

15   report about that meeting in Palembang with PLN that       10:33

16   went to you and the defendant.                             10:33

17       A.    Yes.                                             10:33

18       Q.    Can you read the highlighted part of this        10:33

19   paragraph?                                                 10:33

20       A.    "PLN has expressed their concerns over our       10:33

21   agent.  They did not like the approach made by the         10:33

22   agent.  More importantly, they concern whether they        10:33

23   can trust on the agent or not in regards to rewards        10:33

24   issue.  They concern that if we have won the job,          10:34

25   whether their rewards will still be satisfactory or        10:34

1    this agent only give them pocket money and    10:34

2    disappear."    10:34

3        Q.    Okay.  I will stop you there, Mr. Puckett.    10:34

4            Who is the agent on the Tarahan?    10:34

5        A.    Pirooz Sharafi.    10:34

6        Q.    And now here when you see "more importantly    10:34

7    they concern whether they can trust on the agent or    10:34

8    not in regards to the rewards issue," what did you    10:34

9    understand as the rewards issue?    10:34

10        A.    I understood it to be bribes.    10:34

11        Q.    The next sentence, "They concern that if we    10:34

12    have won the job, whether their rewards will still be    10:34

13    satisfactory or this agent will only give them pocket    10:34

14    money and disappear."    10:34

15            What is the job that is being referenced to    10:34

16    here?    10:35

17        A.    The job is the Tarahan Project.    10:35

18        Q.    Can you now read the remainder of this    10:35

19    paragraph starting with "nothing."    10:35

20        A.    "Nothing has been shown by the agent that the    10:35

21    agent is willing to spend money.  Our friend are not    10:35

22    comfortable with this.  This issue they brought up to    10:35

23    me (in fact, they mentioned this two times) since    10:35

24    they knew that AP appointed the agent.  In critical    10:35

25    situation like this, I strongly recommend that AP/MC    10:35

1    takes this seriously and guarantee that proper                    10:35

2    actions will be taken.  As things still changes                   10:35

3    (until the contract signed), if we are not careful,               10:35

4    PLN personnel can take negative actions against us to             10:35

5    secure their personal interest."                                  10:35

6    Q.    Now, here it mentions -- now, here it                       10:36

7    mentions that "AP appointed the agent."  Who is AP?               10:36

8    A.    Alstom Power, Inc.                                          10:36

9    Q.    Why was Alstom Power, Inc., the one who                     10:36

10   appointed the agent?                                             10:36

11   A.    Because they're the leader of the consortium               10:36

12   is one.  They had experience in Indonesia before and             10:36

13   they were familiar with Pirooz Sharafi, the agent.               10:36

14   Q.    Now, here it says, "I strongly recommend that              10:36

15   AP/MC takes this seriously and guarantee that proper             10:36

16   actions will be taken."                                          10:36

17         Who is MC?                                                 10:36

18   A.    MC is Marubeni Corporation.                                10:36

19   Q.    Why was it up to Alstom Power, Inc., and                   10:36

20   Marubeni to take proper actions with respect to the             10:36

21   agent?                                                           10:37

22   A.    Because they were the two main consortium                  10:37

23   partners and provided most of the funding for the               10:37

24   agent, Alstom Power making the decision about the               10:37

25   agent.                                                           10:37

1    Q.    And can you remind the jury, which Alstom    10:37
2    company was in charge of the Tarahan Project?    10:37
3    A.    Alstom Power, Inc., based in Windsor,    10:37
4    Connecticut.    10:37
5    Q.    Now, the last sentence.  "As things still    10:37
6    changes (until the contract signed), if we are not    10:37
7    careful, PLN personnel can take negative actions    10:37
8    against us to secure their personal interest."    10:37
9        When it says "until the contract is signed,"    10:37
10   what contract are they -- is being referred to here?    10:37
11   A.    The contract for the Riau Andalan -- I mean    10:37
12   the contract for the Tarahan Project.    10:37
13   Q.    And when it says "the PLN personnel can take    10:37
14   negative actions to secure their personal interest,"    10:38
15   what did you understand that to mean?    10:38
16   A.    I understood that to mean that PLN can work    10:38
17   with Foster Wheeler, Mitsubishi, their consultant to    10:38
18   secure their personal interests.    10:38
19   Q.    What is their personal interests?    10:38
20   A.    Money.    10:38
21   Q.    Can you please now read Reza Moenaf's e-mail    10:38
22   to the defendant when he forwards this report?    10:38
23   A.    Yes.  "Lawrence, below are Winan's (our PM in    10:38
24   Palembang) report from meeting he had with Marubeni    10:38
25   and PLN last night.  As you will notice, we have a    10:38

1    serious agent problem (as predicted earlier).  I have        10:39
2    alert and discuss this issue with Fred many times but        10:39
3    it seems Windsor will or cannot make any changes.  I         10:39
4    have sent this report to Fred separately.  For the           10:39
5    time being, I kindly request you not to discuss it           10:39
6    with Fred.  I will try to call you and seek for your         10:39
7    advice on how we can improve the situation.  Reza."          10:39
8        Q.    Again, can you remind the jury the shorthand       10:39
9    reference to Windsor, what is that a reference --            10:39
10       A.    Alstom Power, Inc., boiler division.               10:39
11       Q.    And here it says, "Windsor will or cannot          10:39
12   make any changes."                                           10:39
13             Which Alstom entity decided whether to hire        10:39
14   or fire a consultant on the Tarahan Project?                 10:39
15       A.    Alstom Power, Inc.                                 10:39
16       Q.    I am now showing you what has been marked for      10:40
17   identification as Government's Exhibit 456.  What is         10:40
18   this document?                                               10:40
19       A.    This is an e-mail from Junji Kusunoki to Fred     10:40
20   Pierucci, William Pomponi, myself, Eko Sulianto, Reza       10:40
21   Moenaf.                                                      10:40
22       Q.    What is the subject of this e-mail?               10:40
23       A.    Tarahan coal-fired P/S Lot 3/draft price          10:40
24   evaluation report confidential.                             10:40
25       Q.    What's the date of this e-mail?                   10:40

1    A.    September 25, 2003.                                    10:40

2          MS. LARYEA:  At this time, the government            10:40

3    moves to admit Government's Exhibit 456.                   10:40

4          MR. SILVER:  No objection, Your Honor.               10:41

5          THE COURT:  Full exhibit.                            10:41

6    BY MS. LARYEA:                                             10:41

7    Q.    Mr. Puckett, can you please read the first           10:41

8    sentence of the e-mail?                                    10:41

9    A.    "As you can understand, unfortunately our            10:41

10   agent almost did not execute his function at all so        10:41

11   far."                                                      10:41

12   Q.    When it says our agent did not execute his           10:41

13   function at all so far, what did you understand that       10:41

14   to mean?                                                   10:41

15   A.    He didn't make the right promises to the             10:41

16   right people.                                              10:41

17   Q.    Promises to do what?                                 10:41

18   A.    Pay money.                                           10:41

19   Q.    To what people?                                      10:41

20   A.    To PLN and other employees of the government         10:41

21   of Indonesia.                                              10:41

22   Q.    Can you read the remainder of the e-mail,            10:41

23   please.                                                    10:41

24   A.    "In case we don't take immediate action now,        10:41

25   now we don't have any chance to get this project           10:42

889

1    forever.  We shall not wait for coming of decision        10:42

2    maker any more.  Please direct your opinion to your       10:42

3    representative today.  Best regards, J. Kusunoki,         10:42

4    Marubeni Jakarta."                                        10:42

5        Q.   And when Kusunoki said "we shall not wait for    10:42

6    coming of decision maker any more," who did you           10:42

7    understand the decision maker to be?                      10:42

8        A.   Fred Pierucci.                                   10:42

9        Q.   Why was Fred Pierucci the decision maker?        10:42

10       A.   Because he was head of sales for this            10:42

11   project.  This was his project.                           10:42

12       Q.   And which Alstom entity did Mr. Pierucci work    10:42

13   for?                                                      10:42

14       A.   Alstom Power, Inc.                               10:42

15       Q.   And where was Mr. Pierucci based?                10:42

16       A.   In Windsor, Connecticut.                         10:42

17       Q.   I am showing you what has been marked for        10:42

18   identification as Government's Exhibit 457.  What is      10:43

19   this document?                                            10:43

20       A.   It's an e-mail from Inez Lapian to Fredric       10:43

21   Pierucci, William Pomponi, Ion Sculy, Lawrence            10:43

22   Hoskins and hidden copy to Reza Moenaf.                   10:43

23       Q.   What is the subject?                             10:43

24       A.   Subject is Tarahan 3 and 4.                      10:43

25       Q.   And the date of the e-mail?                      10:43

1    A.    Date of the e-mail is September 25, 2003.    10:43

2    Q.    Who is Inez Lapian?    10:43

3    A.    Inez Lapian was my secretary when I was in    10:43

4  Indonesia.    10:43

5    Q.    Can you read the -- sorry.    10:43

6        MS. LARYEA:  At this time, the government    10:43

7  moves to admit Government's Exhibit 457.    10:43

8        MR. SILVER:  No objection.    10:43

9        THE COURT:  Full exhibit.    10:43

10 BY MS. LARYEA:    10:44

11   Q.    Can you read the first sentence of this    10:44

12 e-mail?    10:44

13   A.    "Note, my laptop modem is shot.  Inez is    10:44

14 forwarding my fax via her LN."    10:44

15   Q.    What is LN?    10:44

16   A.    Lotus Notes.    10:44

17   Q.    Now, you mentioned that this e-mail said it    10:44

18 came from Inez Lapian, but who was the e-mail    10:44

19 actually from?    10:44

20   A.    The e-mail was actually from me and I faxed    10:44

21 the e-mail to Inez and she retyped it on Lotus Notes.    10:44

22   Q.    Can you please read the highlighted    10:44

23 paragraph?    10:44

24   A.    "Last evening 9/24/03 Marubeni's T. Yamamoto,    10:44

25 H. Mizushima and J. Kusunoki asked to alert with    10:44

 1    Alstom's R. Moenaf, E. Sulianto and L. Puckett.  The      10:44

 2    subject of discussion was the increasingly negative       10:44

 3    direction of the project's evaluation and report to       10:45

 4    PLN board of directors Jakarta headquarters.  Draft       10:45

 5    report scheduled to be submitted to PLN Pusat 9/26/03     10:45

 6    coupled with the recent information that the key          10:45

 7    Eddie W. to the project success is not pleased with       10:45

 8    our agent's commitment and actions taken thus far."       10:45

 9        Q.    Can you remind the jury, who is Eddie W.?       10:45

10        A.    Eddie Widiono, the president of PLN.            10:45

11        Q.    Why was Eddie Widiono the key to the            10:45

12    project's success?                                        10:45

13        A.    He was president of PLN and he carried a lot    10:45

14    of influence.                                             10:45

15        Q.    Influence on what?                              10:45

16        A.    On the evaluation of the project.              10:45

17        Q.    Influence on who won the Tarahan Project?       10:45

18        A.    Oh, yes.  Yes.                                  10:45

19        Q.    What did you mean when you said that "Eddie     10:45

20    Widiono was not pleased with our agent's commitment       10:45

21    and actions taken thus far"?                              10:46

22        A.    He wasn't happy with what promises Pirooz       10:46

23    Sharafi had made to him, and he didn't see any            10:46

24    evidence that Pirooz was going to take care of the        10:46

25    proper bribe.                                             10:46

1    Q.    Can you read the next paragraph, please.    10:46

2    A.    "Marubeni made clear their position that the    10:46

3    consortium should take immediate measures to    10:46

4    terminate our agreement with Mr. P., negotiate and    10:46

5    settlement and engage a new representative to turn    10:46

6    the situation around."    10:46

7    Q.    Who is Mr. P.?    10:46

8    A.    Pirooz Sharafi.    10:46

9    Q.    Can you read the next sentence, please.    10:46

10    A.    "Marubeni pressed Puckett and Moenaf to    10:46

11    convince Alstom Windsor, particularly Fred Pierucci,    10:46

12    to agree to take this immediate action."    10:47

13    Q.    What is Alstom Windsor?    10:47

14    A.    It's Alstom Power, Inc., Windsor,    10:47

15    Connecticut.    10:47

16    Q.    Why did you and Mr. Moenaf need to convince    10:47

17    Alstom Windsor to take immediate action on the agent    10:47

18    issue?    10:47

19    A.    It was Fred's call to take any action on the    10:47

20    consultant's role or nonrole.    10:47

21    Q.    Can you read the next sentence.    10:47

22    A.    "Reza and Mizushima then met separately where    10:47

23    Reza suggested that we not take any action now to    10:47

24    replace Mr. P, the situation could be salvageable.    10:47

25    Mizushima agreed subject to a meeting ASAP with Fred    10:47

1    to discuss and agree on a path forward which would    10:47
2    include a meeting with Fred and Lawrence Hoskins with    10:47
3    Eddie W. scheduled as soon as possible."    10:48
4        Q.    Now, why would Mizushima want a meeting ASAP    10:48
5    with Fred Pierucci to discuss and agree on a path    10:48
6    forward on the agent issue?    10:48
7        A.    Mizushima knew that Fred called the shots as    10:48
8    far as the strategy on the project and as far as a    10:48
9    consultant or agent.    10:48
10       Q.    Now, it says Mizushima would -- "the path    10:48
11   forward would include a meeting with Fred and    10:48
12   Lawrence Hoskins with Eddie W."?    10:48
13       A.    Yeah.    10:48
14       Q.    Why would Mr. Hoskins attend a meeting with    10:48
15   Eddie W.?    10:48
16       A.    Lawrence Hoskins was, I think, a senior vice    10:48
17   president with IN and would have -- probably had -- I    10:48
18   don't know, but maybe had meetings with Eddie Widiono    10:48
19   before.    10:48
20            MR. SILVER:  Objection to speculation, Your    10:48
21   Honor.    10:48
22            THE COURT:  Sustained.    10:48
23            THE WITNESS:  But he's a high-level executive    10:48
24   meeting with the president of Indonesia along with    10:49
25   Fred wanting to show some continuity.    10:49

1    BY MS. LARYEA:                                          10:49

2        Q.    President of Indonesia or president of PLN?   10:49

3        A.    President of PLN.  I'm sorry.                 10:49

4        Q.    What happened after this e-mail with respect 10:49

5    to your role on the Tarahan Project?                   10:49

6        A.    I repatriated back to Houston, Texas.        10:49

7        Q.    And after you left Indonesia, did you ever   10:49

8    receive information on the Tarahan bidding process?    10:49

9        A.    Yes.                                          10:49

10       Q.    Who did you speak to regarding the Tarahan   10:49

11   bid?                                                   10:49

12       A.    Reza and Eko and Bill Pomponi.               10:49

13       Q.    Did you speak with Reza Moenaf, Eko Sulianto 10:49

14   and Bill Pomponi about what happened with              10:49

15   Mr. Sharafi?                                           10:49

16       A.    Yes.                                          10:49

17       Q.    What did you hear?                            10:49

18       A.    I heard that they cut Mr. Sharafi's          10:49

19   commission to 1 percent and hired a new consultant    10:50

20   and his commission would be 2 percent.                10:50

21       Q.    And what did you hear about what the         10:50

22   consultant was supposed to do with his -- the new     10:50

23   consultant was supposed to do with his 2 percent      10:50

24   bribe -- 2 percent commission?                        10:50

25       A.    Well, I didn't -- I didn't hear it directly. 10:50

1    But his function was to --

2         MR. SILVER:  Well, objection to foundation,

3    Your Honor.

4         THE COURT:  I'm sorry.  Did you want to

5    rephrase that question in terms of his knowledge of

6    the new consultant's function.

7    BY MS. LARYEA:

8    Q.   What was your understanding of what the new

9    consultant would be doing?

10   A.   My understanding --

11        MR. SILVER:  Objection to foundation, basis

12   for the understanding, Your Honor.

13        THE COURT:  Can you lay that?

14        MS. LARYEA:  Yeah.

15   BY MS. LARYEA:

16   Q.   Mr. Puckett, you mentioned that you worked on

17   the Tarahan Project in Indonesia around this time?

18   A.   Yes.

19   Q.   Before, correct?  And while you were working

20   on the Tarahan Project, you were involved in

21   discussions about consultants, right?

22   A.   Correct.

23   Q.   And these discussions, did you have an

24   understanding based on these discussions as to what

25   the consultants were hired to do on the Tarahan

10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:50
10:51
10:51
10:51

1    process -- project?                                                    10:51

2      A.    Consultants were hired to pay bribes to the                    10:51

3    right people in PLN and the government of Indonesia                    10:51

4    to secure a good evaluation and win -- ultimately to                   10:51

5    winning the project.                                                   10:51

6      Q.    Based on your time working on the Tarahan                      10:51

7    bidding efforts and your understanding and                            10:51

8    involvement in hiring consultants to pay bribes, what                  10:51

9    was your understanding of what this new consultant                     10:51

10   would be doing?                                                        10:51

11     A.    Paying bribes to the right people.                             10:51

12     Q.    Mr. Puckett, did you receive -- did you                        10:51

13   personally receive any kickbacks in connection to the                 10:51

14   Tarahan Project?                                                       10:51

15     A.    No.                                                            10:51

16     Q.    Did you ultimately leave Alstom?                               10:51

17     A.    Yes, I did.                                                    10:51

18     Q.    When did you leave Alstom?                                     10:51

19     A.    2005.                                                          10:51

20     Q.    What were the circumstances of your                            10:51

21   departure?                                                            10:52

22     A.    I asked to be laid off.                                        10:52

23     Q.    Did you have any involvement in the Tarahan                    10:52

24   Project after you left Alstom?                                         10:52

25     A.    No.                                                            10:52

1    Q.    Did you make any efforts to get Pirooz
2  Sharafi paid after you left Alstom?
3    A.    No.
4    Q.    Did you make any efforts to help the second
5  consultant get paid after you left Alstom?
6    A.    No.
7    Q.    Mr. Puckett, did Lawrence Hoskins ever tell
8  you he was leaving Alstom?
9    A.    No.
10    Q.    Did you even know he left Alstom?
11    A.    No, I didn't.
12    Q.    Did he know that you worked at least for a
13  brief period on the Tarahan Project, efforts to win
14  the Tarahan Project?
15    A.    Assume by e-mail communication he did.
16    Q.    You were both copied on e-mails regarding
17  Tarahan?
18    A.    Right.
19    Q.    E-mails we just looked at?
20    A.    Right.
21    Q.    In fact, this last e-mail that we just looked
22  at, one of the people you had your secretary send it
23  to was Mr. Hoskins, correct?
24    A.    Right.
25    Q.    Did Mr. Hoskins ever tell you that he

10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:52
10:53
10:53

1    disapproved of making payments to foreign officials?    10:53
2        A.    No.    10:53
3        Q.    Did he ever tell you that he wished he had    10:53
4    not approved the consulting agreements on Tarahan?    10:53
5        A.    No.    10:53
6        Q.    Did anyone ever tell you that Mr. Hoskins did    10:53
7    not want Alstom to pay bribes to government    10:53
8    officials?    10:53
9        A.    No.    10:53
10        Q.    Did Mr. Hoskins ever do anything that made    10:53
11    you think that he did not approve of paying bribes to    10:53
12    government officials?    10:53
13        A.    No.    10:53
14            MS. LARYEA:  Thank you, Your Honor.    10:53
15            All right.  Cross-examination.    10:53
16        CROSS-EXAMINATION OF LARRY E. PUCKETT    10:53
17    BY MR. SILVER:    10:53
18        Q.    Good morning, Mr. Puckett.    10:54
19        A.    Good morning.    10:54
20        Q.    My name is Dan Silver.  I represent Lawrence    10:54
21    Hoskins.    10:54
22            We've never met before; is that right?    10:54
23        A.    No, we haven't.    10:54
24        Q.    In fact, you've never met Mr. Hoskins before,    10:54
25    correct?    10:54

899

1    A.    Not that I recall.                                    10:54

2    Q.    And to the best of your recollection, you           10:54

3    never spoke on the phone with Mr. Hoskins either          10:54

4    before; is that correct?                                  10:54

5    A.    Right.                                              10:54

6    Q.    So really aside from being copied on a few          10:54

7    e-mail chains with him in 2003, you had no further        10:54

8    interactions with Mr. Hoskins during your time at         10:54

9    Alstom; is that right?                                    10:54

10   A.    Right.                                              10:54

11   Q.    So Ms. Laryea asked you a series of questions       10:54

12   now about whether Mr. Hoskins contacted you when he       10:54

13   left Alstom to tell you he was leaving and you said       10:54

14   he did not, right?                                        10:54

15   A.    Correct.                                            10:54

16   Q.    It would have been kind of strange if he            10:54

17   contacted you out of the blue and told you good-bye       10:54

18   since you didn't know him to begin with, right?           10:54

19   A.    We didn't -- we weren't on that kind of a           10:54

20   communication basis.                                      10:55

21   Q.    Right.  So you agree that it would have been        10:55

22   very strange for him to call you up or send you an        10:55

23   e-mail out of the blue and tell you he was leaving        10:55

24   when you had really no relationship with him at all,      10:55

25   right?                                                    10:55

1     A.     Yes.                                                    10:55

2     Q.     Okay.  So, Mr. Puckett, you have had a number           10:55

3  of meetings with the government prior to testifying             10:55

4  here today; isn't that right?                                   10:55

5     A.     Right.                                                  10:55

6     Q.     And those meetings began way back in 2012; is          10:55

7  that right?                                                      10:55

8     A.     That's correct.                                        10:55

9     Q.     And in preparation for your testimony more             10:55

10  recently, you've had a series of meetings with the             10:55

11  government; is that right?                                      10:55

12     A.     Right.                                                 10:55

13     Q.     How many meetings would you say you've had            10:55

14  with them since this summer?  More than five, less             10:55

15  than five?                                                      10:55

16     A.     Five or six.                                          10:55

17     Q.     Five or six.  And each one was maybe two or           10:55

18  three hours long.  Would you agree with that?                  10:55

19     A.     Yes.                                                   10:55

20     Q.     Okay.  And they've discussed with you your            10:55

21  testimony that you gave in this trial; is that right?          10:55

22     A.     Yeah.  We discussed the testimony.                    10:55

23     Q.     And they showed you e-mails including the             10:55

24  e-mails that you were shown during your direct                 10:56

25  testimony; is that right?                                      10:56

1    A.    Correct.                                                    10:56

2    Q.    Okay.  You were first contacted by the FBI in              10:56

3  April of 2012; is that right?                                      10:56

4    A.    To the best of my recollection.                            10:56

5    Q.    And when they first contacted you, you said               10:56

6  you'd prefer to speak to them with an attorney,                    10:56

7  right?                                                             10:56

8    A.    Right.                                                      10:56

9    Q.    And then you retained counsel and had a                    10:56

10  subsequent meeting with them in more detail to talk               10:56

11  about these issues; isn't that right?                             10:56

12    A.    Yes.                                                       10:56

13    Q.    And that meeting, that first substantive                  10:56

14  actual interview was in the summer of 2012; is that               10:56

15  right?                                                             10:56

16    A.    I think so.                                                10:56

17    Q.    Okay.  And then you met with them a few more              10:56

18  times in 2012 and '13, correct?                                   10:56

19    A.    Yes.                                                       10:56

20    Q.    And then you entered into a cooperation and               10:56

21  plea agreement with the government in 2013, correct?              10:56

22    A.    Yes.                                                       10:56

23    Q.    And those were the documents that we saw                  10:56

24  during your direct testimony, I believe, yesterday,               10:57

25  right?                                                            10:57

1    A.    Yes.                                          10:57

2    Q.    But you did not actually go to court and      10:57

3    plead guilty in 2013, did you?                      10:57

4    A.    No.                                           10:57

5    Q.    So essentially you were waiting for the       10:57

6    government to tell you that it was time --          10:57

7         MS. LARYEA:  Object, Your Honor.  We have      10:57

8    gone down this path with another witness and decided 10:57

9    the issue of the delay was not an appropriate line of 10:57

10   cross-examination.                                  10:57

11        MR. SILVER:  Your Honor, I don't intend to     10:57

12   ask the witness about the reasons for the delay, but 10:57

13   I think the timeline is important here.             10:57

14        THE COURT:  You may proceed.                   10:57

15        MR. SILVER:  Thank you, Your Honor.            10:57

16   BY MR. SILVER:                                      10:57

17   Q.    So just to back up a step, so you signed your 10:57

18   cooperation agreement in 2013, right?              10:57

19   A.    Correct.                                      10:57

20   Q.    But you didn't actually go to court and enter 10:57

21   your guilty plea until just a few months ago in July 10:57

22   of this year, right?                                10:57

23   A.    Yes.                                          10:57

24   Q.    So about a six-year -- five- to six-year      10:57

25   delay, correct?                                     10:57

1    A.    Yes.                                              10:57

2    Q.    And during that time period you were            10:57

3  essentially waiting for the government to tell you       10:57

4  that they were requesting that you come to court and     10:57

5  plead guilty, right?                                     10:58

6          MS. LARYEA:  Objection, Your Honor.  Again --   10:58

7          THE COURT:  I'm going to sustain that            10:58

8  objection.                                               10:58

9          MR. SILVER:  Okay.  We'll move on.               10:58

10 BY MR. SILVER:                                           10:58

11   Q.    You were willing to plead guilty at any time     10:58

12 during that period?                                      10:58

13         MS. LARYEA:  Objection, Your Honor.              10:58

14         THE COURT:  Sustained.                           10:58

15 BY MR. SILVER:                                           10:58

16   Q.    Okay.  Have you testified in any other           10:58

17 proceedings related to this case, Mr. Puckett?           10:58

18   A.    No, I haven't.                                   10:58

19   Q.    So the main purpose of your cooperation, as      10:58

20 you understand it, is to testify in this trial; isn't    10:58

21 that right?                                              10:58

22   A.    No.  The cooperation includes a lot more than    10:58

23 that.  But part of it is testifying in this trial.       10:58

24   Q.    Well, you met with the government many times     10:58

25 as you described, right?  Correct?  You have to          10:58

1    answer verbally.                                          10:58

2        A.    Correct.                                        10:58

3        Q.    And they asked you questions about the          10:58

4    Tarahan Project and your time at Alstom, right?           10:58

5        A.    Correct.                                        10:58

6        Q.    And I'm sure they told you to be truthful at    10:58

7    all times, right?                                         10:58

8        A.    Correct.                                        10:58

9        Q.    And part of your cooperation agreement is you   10:58

10   have to be available to testify when asked, right?        10:58

11       A.    Correct.                                        10:58

12       Q.    And this is the only time the government has    10:59

13   asked you to testify in any proceeding; isn't that        10:59

14   right?                                                    10:59

15       A.    Yes.                                            10:59

16       Q.    And you know that, as set forth in your         10:59

17   cooperation agreement, the government can decide          10:59

18   whether or not to make what's called a 5K motion for      10:59

19   you, right?  Are you familiar with that term, "5K         10:59

20   motion"?                                                  10:59

21       A.    No, I'm not.                                    10:59

22       Q.    Okay.  Well, the government can decide          10:59

23   whether or not to make a motion to the Court when         10:59

24   you're sentenced, correct?                                10:59

25       A.    Correct.                                        10:59

1    Q.    And what that motion does is allow the Judge,    10:59

2    if she chooses, to impose a lower sentence on you    10:59

3    than you would otherwise receive, right?    10:59

4    A.    Correct.    10:59

5    Q.    And it's up to the government to decide    10:59

6    whether or not to do that, correct?    10:59

7    A.    Yes.    10:59

8    Q.    Okay.  And obviously your testimony in this    10:59

9    trial is extremely important to you as to whether or    10:59

10   not you will in fact get that 5K motion from the    10:59

11   government, right?    10:59

12   A.    It certainly -- yes, it's important.    10:59

13   Q.    Okay.  You're hoping that if you do get that    10:59

14   5K motion, you will avoid any jail time at all,    11:00

15   right?    11:00

16   A.    Yes.    11:00

17   Q.    Okay.  You pled guilty to a single FCPA    11:00

18   conspiracy count; is that right, Mr. Puckett?    11:00

19   A.    Yes.    11:00

20   Q.    You were not charged with or pled guilty to    11:00

21   any specific, what we call, substantive FCPA    11:00

22   offenses, right?    11:00

23   A.    Correct.    11:00

24   Q.    No specific wire transfers or bribe payments    11:00

25   at all, correct?    11:00

1    A.    Correct.                                                    11:00

2    Q.    Okay.  You also were not charged with money                11:00

3    laundering, correct?                                             11:00

4    A.    Correct.                                                    11:00

5    Q.    And did not plead guilty to any money                      11:00

6    laundering-related crimes; isn't that right?                     11:00

7    A.    Correct.                                                    11:00

8    Q.    Okay.  And there's no mention in your plea or              11:00

9    cooperation agreement of money laundering, right?                11:00

10   A.    No.                                                        11:00

11   Q.    So you didn't receive any immunity or                      11:00

12   coverage, as they say, for that in your agreements,              11:00

13   right?                                                           11:00

14   A.    Right.                                                     11:00

15   Q.    I want to ask you some questions about some                11:00

16   of the other people involved in the Tarahan Project.            11:00

17         Let's start with Dave Rothschild.  Who is                  11:01

18   Dave Rothschild?                                                 11:01

19   A.    Dave Rothschild is a former colleague of mine             11:01

20   with Alstom Power, Inc.                                          11:01

21   Q.    And did you work closely with Mr. Rothschild              11:01

22   over the years?                                                  11:01

23   A.    Yes.  But starting -- really starting in 1995            11:01

24   when I moved to Indonesia.                                       11:01

25   Q.    So starting in '95, you worked closely with               11:01

| | |
|---|---|
| 1 | him and then up until about when? | 11:01 |
| 2 | A.    Up until about four or five years ago. | 11:01 |
| 3 | Q.    Okay.  Four or five years ago.  So you | 11:01 |
| 4 | continued to stay in touch with him after you left | 11:01 |
| 5 | Alstom in 2005; is that right? | 11:01 |
| 6 | A.    Yes. | 11:01 |
| 7 | Q.    And did you work with him after 2005 or it | 11:01 |
| 8 | was just a personal relationship? | 11:01 |
| 9 | A.    Personal relationship. | 11:01 |
| 10 | Q.    Okay.  And would you say you and | 11:01 |
| 11 | Mr. Rothschild were good friends? | 11:01 |
| 12 | A.    Yeah, we were friends. | 11:01 |
| 13 | Q.    Are you still friendly with Mr. Rothschild | 11:01 |
| 14 | now? | 11:01 |
| 15 | A.    No. | 11:01 |
| 16 | Q.    Why is that? | 11:02 |
| 17 | A.    He took part in recording conversations that | 11:02 |
| 18 | we had. | 11:02 |
| 19 | Q.    So he secretly recorded his conversations | 11:02 |
| 20 | with you; is that right? | 11:02 |
| 21 | A.    Secretly recorded, right. | 11:02 |
| 22 | Q.    And because of that, you no longer are | 11:02 |
| 23 | friends with him, right? | 11:02 |
| 24 | A.    Right. | 11:02 |
| 25 | Q.    Now, Mr. Rothschild was very close with | 11:02 |

| | | |
|---|---|---|
| 1 | Pirooz Sharafi, correct? | 11:02 |
| 2 | A.    Yes. | 11:02 |
| 3 | Q.    What was your opinion of Mr. Sharafi? | 11:02 |
| 4 | A.    It wasn't very positive. | 11:02 |
| 5 | Q.    I think you said on direct that you didn't | 11:02 |
| 6 | trust him, correct? | 11:02 |
| 7 | A.    I didn't trust him. | 11:02 |
| 8 | Q.    And -- | 11:02 |
| 9 | A.    I didn't like him or trust him. | 11:02 |
| 10 | Q.    And why was that, Mr. Puckett? | 11:02 |
| 11 | A.    It's hard to explain.  It's kind of not | 11:02 |
| 12 | tangible but ... | 11:02 |
| 13 | Q.    Do your best, sir. | 11:02 |
| 14 | A.    He would always talk about having all these | 11:02 |
| 15 | relationships throughout government, throughout | 11:03 |
| 16 | Indonesia and other parts of Asia, and I never | 11:03 |
| 17 | believed these tall tales that he was telling. | 11:03 |
| 18 | Q.    So you didn't think he told the truth; is | 11:03 |
| 19 | that correct? | 11:03 |
| 20 | A.    Right. | 11:03 |
| 21 | Q.    And, in fact, at times you even suspected | 11:03 |
| 22 | that he might be pocketing some of his commission | 11:03 |
| 23 | fees; isn't that right? | 11:03 |
| 24 | A.    Yes. | 11:03 |
| 25 | Q.    Okay.  Now, you testified a bit on direct | 11:03 |

909

1    about your time in the International Network; isn't          11:03

2    that right?                                                  11:03

3       A.    Yes.                                                11:03

4       Q.    And I think you said you worked there, I           11:03

5    guess, for about a year in 2001 to 2002; is that            11:03

6    right?                                                       11:03

7       A.    Correct.                                           11:03

8       Q.    Was that a full-time assignment or were you        11:03

9    sort of filling multiple --                                 11:04

10      A.    Full-time assignment.                              11:04

11      Q.    Okay.  And you were based in the States at         11:04

12   that time, you said?                                        11:04

13      A.    Houston, Texas.                                    11:04

14      Q.    And who were you reporting to during that          11:04

15   period?                                                     11:04

16      A.    I was reporting to a gentleman by the name of      11:04

17   Michael Salerno.                                            11:04

18      Q.    Okay.  And was he based in the U.S. or was         11:04

19   he --                                                       11:04

20      A.    He was based in the U.S.                           11:04

21      Q.    And what was his position?                         11:04

22      A.    His position was director of -- director --        11:04

23   regional director of IN.                                    11:04

24      Q.    Regional director of IN.  And do you happen        11:04

25   to know who he -- who his boss was at the time?             11:04

1    A.    His boss was -- I can't recall.  Basically    11:04

2    head of IN over North America.    11:04

3    Q.    Okay.    11:04

4    A.    But I can't recall his name.    11:04

5    Q.    And you never worked in Paris for    11:04

6    International Network, did you?    11:04

7    A.    No.    11:04

8    Q.    You never worked in Paris at corporate    11:04

9    headquarters for Alstom at all; is that right?    11:04

10    A.    Not at all.  Just for meetings.    11:04

11    Q.    Just sorry?    11:04

12    A.    Just for meetings.    11:05

13    Q.    So you went there for meetings from time to    11:05

14    time.  Okay.  And did you know that Mr. Hoskins' boss    11:05

15    within International Network was Etienne Dé?  Did you    11:05

16    know that?    11:05

17    A.    Repeat that, please.    11:05

18    Q.    Did you know that Mr. Hoskins, his    11:05

19    supervisor, his boss in International Network was a    11:05

20    man named Etienne Dé, were you aware of that?    11:05

21    A.    I'm aware of that now that you reminded me.    11:05

22    Q.    Okay.  So you'd heard that name before?    11:05

23    A.    I've heard that name before.    11:05

24    Q.    Okay.  And at the time you worked in    11:05

25    International Network, in fact, Mr. Dé was the head    11:05

| | |
|---|---|
| 1 | of the entire International Network operation; isn't | 11:05 |
| 2 | that right? | 11:05 |
| 3 |   A.   I believe so. | 11:05 |
| 4 |   Q.   Okay.  But you were a few levels down the | 11:05 |
| 5 | chain from him and so did not have any direct | 11:05 |
| 6 | interaction with him; is that right? | 11:05 |
| 7 |   A.   Right. | 11:05 |
| 8 |   Q.   Okay. | 11:05 |
| 9 |      THE COURT:  If you move to a new area, | 11:05 |
| 10 | Mr. Silver, we're going to need to take a recess. | 11:05 |
| 11 | All right? | 11:05 |
| 12 |      MR. SILVER:  Sure. | 11:06 |
| 13 |      THE COURT:  So we're going to take a | 11:06 |
| 14 | 15-minute recess, ladies and gentlemen.  Leave your | 11:06 |
| 15 | notebooks here. | 11:06 |
| 16 |      (Jury exited the proceedings, 11:06 a.m.) | 11:06 |
| 17 |      THE COURT:  All right, Mr. Puckett.  You may | 11:06 |
| 18 | step down for 15 minutes.  Don't discuss your | 11:06 |
| 19 | testimony with anyone, please. | 11:06 |
| 20 |      THE WITNESS:  Thank you, Your Honor. | 11:06 |
| 21 |      THE COURT:  Thank you.  We will stand in | 11:06 |
| 22 | recess for ten minutes. | 11:06 |
| 23 |      (Recess taken from 11:06 a.m. to 11:40 a.m.) | 11:06 |
| 24 |      THE COURT:  Please be seated, ladies and | 11:40 |
| 25 | gentlemen. | 11:40 |

912

```
 1            All right.  Please bring in the jury.  And we      11:40
 2   will recess at 12:50.                                       11:40
 3            (Jury entered the proceedings, 11:40 a.m.)         11:40
 4            THE COURT:  All right.  Please be seated,          11:41
 5   ladies and gentlemen.  We'll continue with                 11:41
 6   cross-examination of Mr. Puckett by Mr. Silver.            11:41
 7            MR. SILVER:  Thank you, Your Honor.                11:41
 8   BY MR. SILVER:                                              11:41
 9   Q.    Mr. Puckett, I had asked you a couple                 11:41
10   questions about International Network.  I just want        11:41
11   to go back to that topic briefly.                          11:41
12            So Mr. Hoskins was the area senior vice            11:41
13   president for International Network for the Asia            11:41
14   Pacific region in 2003; isn't that right?                  11:41
15   A.    Yes.                                                  11:41
16   Q.    And you're aware also from your own time at          11:41
17   International Network that International Network had        11:41
18   its own reporting structure separate from the              11:42
19   business units; isn't that correct?                        11:42
20   A.    Correct.                                             11:42
21   Q.    And so as we were discussing before we broke,        11:42
22   Mr. Hoskins had a boss in Paris who was the head of        11:42
23   International Network, correct?                             11:42
24   A.    Correct.                                             11:42
25   Q.    And that person was Etienne Dé, right?               11:42
```

913

1    A.    Yes.                                                      11:42

2    Q.    The sales team on the Tarahan Project                    11:42

3    reported to Alstom Power, Inc., in Windsor; isn't             11:42

4    that correct?                                                  11:42

5    A.    Correct.                                                 11:42

6    Q.    And you yourself became the sales lead for a            11:42

7    short period of time in -- in August and September of         11:42

8    2003, right?                                                   11:42

9    A.    Correct.                                                 11:42

10   Q.    And I think you said on direct, your boss,             11:42

11   the person who you reported to in that role was Fred          11:42

12   Pierucci, correct?                                            11:42

13   A.    Right.                                                   11:42

14   Q.    Mr. Hoskins, of course, did not report to              11:42

15   Fred Pierucci, right?                                          11:42

16   A.    For the Tarahan Project, it wasn't report              11:42

17   but --                                                        11:42

18   Q.    That's not my question, sir.                           11:42

19         My question is:  Everyone at Alstom has a               11:42

20   boss, right?  You worked there for a long time,               11:43

21   right?                                                        11:43

22   A.    Right.                                                   11:43

23   Q.    And so the whole time you worked there, you            11:43

24   had at least one boss, maybe sometimes two bosses,            11:43

25   right?                                                        11:43

1    A.    Right.                                              11:43

2    Q.    And Mr. Hoskins' boss was not Fred Pierucci,        11:43

3  right?                                                     11:43

4    A.    Correct.                                            11:43

5    Q.    Okay.  And, in fact, International Network          11:43

6  did not report to anyone within Alstom Power, Inc.;       11:43

7  isn't that correct?                                        11:43

8    A.    Correct.                                            11:43

9    Q.    Okay.  So when you became temporarily              11:43

10  assigned to the Tarahan Project in 2003, you already     11:43

11  testified that Pirooz Sharafi had been already           11:43

12  selected as the outside agent on the project, right?     11:43

13    A.    Yes.                                               11:43

14    Q.    And Pirooz Sharafi was hired to do both           11:43

15  legitimate things and illegitimate things; isn't that    11:43

16  correct?                                                  11:43

17    A.    That's correct.                                    11:44

18    Q.    And what were some of the legitimate things       11:44

19  that he was hired to do in your understanding?           11:44

20    A.    Relationships, develop close relationships        11:44

21  like with Eddie Widiono and other high-level             11:44

22  officials.                                                11:44

23    Q.    And can you just explain what you mean by         11:44

24  that?  I mean, why couldn't you go out and just          11:44

25  develop those relationships or why couldn't Reza         11:44

1    Moenaf go out and do it or someone else?    11:44

2    A.    Well, he did.  But typically the consultant    11:44

3    has very close relationships.  They develop into    11:44

4    family relationships, close relationships with    11:44

5    government employees.    11:44

6    Q.    And why does that -- again, putting aside    11:44

7    anything that was illegitimate that Sharafi was hired    11:44

8    to do, why does having legitimate close relationships    11:44

9    matter in that business?    11:44

10    A.    Well, sure it matters in influencing the bid.    11:44

11    He wants to help -- the official wants to help his    11:44

12    friend.    11:44

13    Q.    Okay.  So, for example, Sharafi would have    11:44

14    been helpful in arranging meetings; is that fair to    11:44

15    say?    11:44

16    A.    Correct.    11:44

17    Q.    And would have been helpful in providing    11:44

18    information to Alstom Power, Inc., and the other    11:45

19    consortium members about how the decision-making    11:45

20    process was going; is that fair to say?    11:45

21    A.    It's fair to say as far as he knew.    11:45

22    Q.    As far as he knew, right, or as far as he    11:45

23    claimed to know, right?    11:45

24    A.    Right.    11:45

25    Q.    And that kind of insight and those kinds of    11:45

916

1    relationships is something that Alstom Power, Inc. --    11:45

2    neither Alstom Power, Inc., nor its consortium    11:45

3    members has internally.  That's why they had to turn    11:45

4    to someone like Sharafi to provide that information;    11:45

5    isn't that correct?    11:45

6        A.    Yeah.  Well, you had both.  Basically we had    11:45

7    relationships with Marubeni and Alstom Power, Inc.,    11:45

8    and PTESI had their own relationships.  But you also    11:45

9    used the relationship as a consultant because it's on    11:45

10   a personal basis.    11:45

11       Q.    Okay.  Because his relationships were    11:45

12   presumably stronger than or at least he claimed they    11:45

13   were stronger than the relationships --    11:45

14       A.    Right.    11:46

15       Q.    -- that anyone at PTESI like Reza Moenaf or    11:46

16   anyone else had on the bidding team; is that right?    11:46

17       A.    Correct.    11:46

18       Q.    Okay.  So, Mr. Puckett, in your testimony on    11:46

19   direct yesterday and today, I think actually just    11:46

20   today, you read from and reviewed various e-mails    11:46

21   related to Tarahan that you had not been copied on    11:46

22   originally, correct?    11:46

23       A.    Correct.    11:46

24       Q.    And in your prep sessions with the    11:46

25   government, they showed you various e-mails that you    11:46

1    had not been copied on originally back in -- back in    11:46

2    2003, correct?    11:46

3       A.    May have.  Most of them I had been copied on,    11:46

4    either hidden copied or copied.    11:46

5       Q.    Okay.  But, I mean, the ones they showed you    11:46

6    in court today, presumably they'd showed you those    11:46

7    before in preparing your testimony, right?    11:46

8       A.    Yes.    11:46

9       Q.    Okay.  And when you first began meeting with    11:46

10   the government, you had some difficulty remembering    11:46

11   some details regarding the Tarahan bidding process,    11:46

12   right?    11:46

13      A.    Yes.    11:46

14      Q.    Which is certainly understandable considering    11:46

15   that it happened 15 years ago, right?    11:46

16      A.    Correct.    11:47

17      Q.    Did you learn any new facts from the    11:47

18   government by reviewing these documents that you    11:47

19   hadn't seen before that you were not privy to back    11:47

20   during your time working on the Tarahan bid?    11:47

21      A.    I didn't learn them from the government, but    11:47

22   I learned them from the documents that the government    11:47

23   provided me.  The documents refreshed my memory,    11:47

24   rejogged my memory.  As a matter of fact, without the    11:47

25   documents, I wouldn't have remembered many of the    11:47

1    details at all.                                                    11:47

2        Q.    Okay.  In particular --                                  11:47

3        A.    But the more I looked at them, the more it               11:47

4    came back to me.                                                   11:47

5        Q.    Right.  But in particular, you did not know              11:47

6    the name of the second consultant who was hired to                 11:47

7    replace Sharafi.  That was not a name that you knew                11:47

8    back in 2003, correct?                                             11:47

9        A.    Exactly.                                                  11:47

10       Q.    Okay.  But you learned that from being shown             11:47

11   documents by the government in preparing for your                  11:47

12   testimony, correct?                                                11:47

13       A.    No.                                                      11:47

14       Q.    You didn't learn that for the first time when           11:47

15   the government showed you that e-mail?                             11:47

16       A.    I didn't know the name of the -- still don't            11:47

17   know the name of the second consultant.                            11:47

18       Q.    Okay.  Well, why don't we bring up what's               11:48

19   already in evidence as 461-T.                                      11:48

20             MR. SILVER:  Can you just maybe expand the               11:48

21   top half of that e-mail, please.                                   11:48

22   BY MR. SILVER:                                                     11:48

23       Q.    This is an e-mail the government showed you              11:48

24   during your preparation; isn't that correct?                       11:48

25             MS. LARYEA:  Objection, foundation.                      11:48

919

```
 1          THE COURT:  Well, it's a question.  Is it?      11:48
 2   Did you get shown this?                                11:48
 3          THE WITNESS:  I'm trying to read it, Your       11:48
 4   Honor.                                                 11:48
 5   BY MR. SILVER:                                         11:48
 6      Q.   Yeah, take a look at it.                       11:48
 7      A.   And see if I can recall being shown this.      11:48
 8          THE COURT:  Take your time.  The question is    11:48
 9   whether the government showed it to you during your    11:48
10   preparation.                                           11:48
11          THE WITNESS:  Yes, ma'am.  Yes, Your Honor.     11:48
12          MR. SILVER:  It's in evidence, Your Honor.      11:48
13          THE WITNESS:  I've never seen this document.    11:48
14   BY MR. SILVER:                                         11:48
15      Q.   You don't recall being shown that document by  11:48
16   the government during --                               11:49
17      A.   I do not recall being shown that document.     11:49
18      Q.   Okay.  Let me just -- you attended a meeting   11:49
19   with the government on August 12th of this year;       11:49
20   isn't that correct?                                    11:49
21      A.   Could be.  Very well be.  I don't remember     11:49
22   the exact date.                                        11:49
23      Q.   Okay.  Well, when you attend the meetings      11:49
24   with the government, they took notes; isn't that       11:49
25   right?                                                 11:49
```

```
 1    A.    Yes.                                              11:49
 2    Q.    Okay.  And they made reports regarding those      11:49
 3  meetings, correct?                                        11:49
 4    A.    Correct.                                          11:49
 5    Q.    Okay.  So would it refresh your recollection,     11:49
 6  sir, if I showed you a report from the meeting on         11:49
 7  August 12, 2009, as to whether or not you were shown      11:49
 8  this e-mail during that -- during that meeting?           11:49
 9  Would that refresh your recollection?                     11:49
10    A.    Yes.                                              11:49
11    Q.    Okay.                                             11:49
12          MR. SILVER:  I'd like to show the witness --      11:49
13  if I could approach, Your Honor, that would be            11:49
14  easier.  It's just a hard copy of the August 12,          11:49
15  2019, 302.                                                11:50
16          THE COURT:  His testimony was he never saw        11:50
17  it, not that he doesn't have a recollection.              11:50
18          MS. LARYEA:  Yes, Your Honor.                     11:50
19  BY MR. SILVER:                                            11:50
20    Q.    Your testimony today is that you never were       11:50
21  shown this document during your prep, sir?                11:50
22    A.    No.  I've never seen the document.  I never       11:50
23  was shown the document.                                   11:50
24    Q.    Okay.  And your testimony is that you were        11:50
25  not shown a document that revealed to you the name of     11:50
```

1   the second consultant during your prep sessions?    11:50

2     A.    Right.    11:50

3           MR. SILVER:  Okay.  I'll move on, Your Honor.    11:50

4   BY MR. SILVER:    11:50

5     Q.    I'd like to bring up what's already in    11:50

6   evidence as Exhibit 445, please.    11:50

7           MR. SILVER:  If we could just expand the top    11:50

8   part of that e-mail, just the first part of the    11:50

9   chain.  Yeah.    11:50

10  BY MR. SILVER:    11:50

11    Q.    I believe you reviewed this e-mail during    11:50

12  your direct testimony, Mr. Puckett.  This is an    11:51

13  e-mail from Mr. Pierucci to you and others from    11:51

14  August of -- August 22, 2003, correct?    11:51

15    A.    Correct.    11:51

16    Q.    And it reads in part, "I absolutely want to    11:51

17  have Larry coordinate all lobbying actions regarding    11:51

18  this important project," referring to Tarahan, right?    11:51

19    A.    Correct.    11:51

20    Q.    And your understanding is that when    11:51

21  Mr. Pierucci said he wanted you to coordinate all    11:51

22  lobbying actions, he was referring to both legitimate    11:51

23  lobby activities, correct?    11:51

24    A.    Correct.    11:51

25    Q.    As well as illegitimate activities, correct?    11:51

1    A.    Correct.                                                      11:51

2    Q.    And that comports with your understanding of                 11:51

3    what Sharafi was doing as well, correct?                           11:51

4    A.    Correct.                                                      11:51

5    Q.    Thank you.                                                    11:51

6         MR. SILVER:  Could we pull up 451 which is in                  11:51

7    evidence.  And you could just expand the -- yeah,                   11:51

8    from the beginning of the e-mail down to "we cannot                 11:51

9    lose this project."  Thank you.  Thanks.                           11:52

10   BY MR. SILVER:                                                      11:52

11   Q.    So this is an e-mail, Mr. Puckett, from                       11:52

12   Mr. Pierucci to a bunch of people including yourself                11:52

13   from September 16th of 2003, correct?                              11:52

14   A.    Correct.                                                      11:52

15   Q.    And in this e-mail, Mr. Pierucci was quite                    11:52

16   upset because he and you had received information                   11:52

17   that the Alstom bid was being ranked as more                       11:52

18   expensive as second in the evaluation process, right?              11:52

19   A.    Right.                                                        11:52

20   Q.    Okay.  And in the e-mail he says, among other                11:52

21   things, Mr. Pierucci said, "I thought we had control               11:52

22   in Palembang," correct?                                            11:52

23   A.    Right.                                                        11:52

24   Q.    And it's your understanding that when he said               11:52

25   that, he was referring to legitimate lobbying efforts             11:52

1    that were giving the consortium, in his words,          11:52
2    control over the evaluation process, right?            11:52
3        A.    Legitimate and illegitimate.                 11:52
4        Q.    Okay.  Because they were -- both types of     11:53
5    efforts were going on simultaneously, right?           11:53
6        A.    Exactly.                                      11:53
7        Q.    Thank you.                                    11:53
8             MR. SILVER:  You can take that down,           11:53
9    Ms. Goodwin.  Thank you.                               11:53
10   BY MR. SILVER:                                          11:53
11       Q.    You were asked some questions during your    11:53
12   direct testimony about an individual named Winan       11:53
13   Kusno.  Do you recall discussing him?                  11:53
14       A.    Uh-huh.                                       11:53
15       Q.    And he was someone who worked for Alstom     11:53
16   PTESI, correct?                                        11:53
17       A.    Correct.                                      11:53
18       Q.    So he was a few levels down but under Reza   11:53
19   Moenaf, right?                                         11:53
20       A.    Right.                                       11:53
21       Q.    Did you personally ever have any discussions 11:53
22   with Winan Kusno about bribery?                        11:53
23       A.    Not personal discussions, no.                11:53
24       Q.    Okay.  Did you -- and that would be either in 11:53
25   person or on the phone, correct?                       11:53

1    A.    No.                                                    11:53

2    Q.    Did you ever attend any meetings with Winan            11:53

3    Kusno in which bribery was discussed?                        11:53

4    A.    No.                                                    11:53

5    Q.    Other than the e-mails that the government             11:53

6    showed you during your direct testimony, do you             11:53

7    recall ever receiving any other e-mail communications       11:54

8    from Winan Kusno that had -- to your view, in your          11:54

9    understanding related to bribery?                           11:54

10   A.    No.  That's the only one I received.                  11:54

11   Q.    Okay.                                                  11:54

12   A.    I knew he was working on the project.                 11:54

13   Q.    Okay.  And did Reza Moenaf or anyone else at          11:54

14   Alstom PTESI ever tell you specifically that they had      11:54

15   had communications with Winan Kusno about bribery?         11:54

16   A.    No.                                                    11:54

17   Q.    Okay.  Let's move to Exhibit 456 which I             11:54

18   believe is already in evidence.                             11:54

19         MR. SILVER:  And if we could just expand the          11:54

20   top, the text, not the "to" line, but just that text.      11:54

21   Yeah.  Exactly.  Okay.                                      11:54

22   BY MR. SILVER:                                              11:54

23   Q.    This was an e-mail that you also, I believe,         11:54

24   discussed during your direct testimony, Mr. Puckett,      11:54

25   from one of the Marubeni representatives to               11:55

1    Mr. Pierucci and Mr. Pomponi, correct?                11:55

2        A.    Correct.                                     11:55

3        Q.    And you were copied as well, correct?        11:55

4        A.    Correct.                                     11:55

5        Q.    And this was the e-mail.  It's from September  11:55

6    of '03 where Marubeni provides a draft copy of the    11:55

7    PLN evaluation report reflecting the fact that Alstom  11:55

8    has been ranked second, right?                         11:55

9        A.    Correct.                                     11:55

10       Q.    Mr. Hoskins was not copied on this e-mail,   11:55

11   right?                                                 11:55

12       A.    Not that I'm aware of.                        11:55

13       Q.    Okay.  Well, we can -- if you want to pull up  11:55

14   the "from" and "to" lines just to confirm that.  He's  11:55

15   not copied there, right, Mr. Puckett?                   11:55

16       A.    No, he's not.                                 11:55

17       Q.    Okay.  And you never discussed with           11:55

18   Mr. Hoskins the fact that the bid evaluation was        11:55

19   going poorly, correct?                                  11:55

20       A.    No, I didn't.                                 11:55

21       Q.    Okay.  In fact, you never had any discussions  11:55

22   with him at all about Tarahan or anything else,         11:55

23   right?                                                  11:55

24       A.    Right.                                        11:55

25       Q.    Okay.  Why don't we go to 457 in evidence,    11:55

1  please.                                                    11:56

2       MR. SILVER:  Why don't we just pull up for            11:56

3  now that very first line of the e-mail about the           11:56

4  laptop modem.  Thank you.                                  11:56

5  BY MR. SILVER:                                             11:56

6    Q.    So, Mr. Puckett, this was an e-mail that you       11:56

7  talked about during your direct testimony which your      11:56

8  secretary sent on your behalf, right?                     11:56

9    A.    Yes.                                               11:56

10   Q.    September 25th of 2003.  And in the e-mail,        11:56

11 your secretary says "my laptop modem is shot."  That      11:56

12 sort of -- what that means is that your laptop modem       11:56

13 was shot, right?                                           11:56

14   A.    Right.                                             11:56

15   Q.    Meaning that it wasn't working, right, and,       11:56

16 therefore, you asked your secretary to send this          11:56

17 message on your behalf via her e-mail account,            11:56

18 correct?                                                   11:56

19   A.    Correct.                                           11:56

20   Q.    So back in 2003, this was before the era of       11:56

21 broadband wireless access, right?                         11:57

22   A.    Right.                                             11:57

23   Q.    So this was dial-up modems, correct?              11:57

24   A.    Right.                                             11:57

25   Q.    So when you were traveling, for example, like     11:57

1    at the time of this e-mail in Indonesia, you didn't                11:57

2    have e-mail access all the time, right?                            11:57

3        A.    Right.                                                    11:57

4        Q.    And you would rely on your laptop and have to            11:57

5    physically log in via dial-up modem to send and                    11:57

6    receive e-mails, correct?                                          11:57

7        A.    Correct.                                                  11:57

8        Q.    And so presumably when you were having                   11:57

9    meetings and you were on the road, you wouldn't be                 11:57

10   checking or responding to e-mails all the time,                    11:57

11   right?                                                             11:57

12       A.    Correct.                                                  11:57

13       Q.    You would do so -- would you even do so once             11:57

14   a day or was it even less than that?                               11:57

15       A.    Three or four times a day.                               11:57

16       Q.    Three or four times a day, yeah.  Sort of at            11:57

17   the hotel or the office?                                           11:57

18       A.    Hotel or at the office.                                  11:57

19       Q.    No smartphone back then, right?                          11:57

20       A.    No smartphone.                                           11:57

21       Q.    Okay.  You can --                                        11:57

22            MR. SILVER:  Please bring the exhibit back               11:57

23   but not the call out.  If you could just pull up the               11:58

24   "from" and "to" headings.  Yeah.  You -- if you                    11:58

25   scroll down a little bit more, I want to make sure he              11:58

928

1    saw the whole thing.  Yeah.                               11:58

2    BY MR. SILVER:                                            11:58

3        Q.    So you copied Mr. Hoskins on this e-mail,       11:58

4    correct?                                                  11:58

5        A.    Correct.                                        11:58

6        Q.    Or you directed your secretary to do so when    11:58

7    she sent it on your behalf, right?                        11:58

8        A.    Right.                                          11:58

9        Q.    And the only reason you did that is because     11:58

10   Mr. Moenaf had asked you to copy Mr. Hoskins, right?      11:58

11       A.    I don't recall that's the only reason I did     11:58

12   that.                                                     11:58

13       Q.    Well, other than sending this e-mail, you'd     11:58

14   never sent any other e-mails to Mr. Hoskins, right?      11:58

15       A.    Right.  But I don't recall if Reza asked me     11:58

16   to send this to Lawrence or not.  I just don't           11:58

17   recall.                                                   11:58

18       Q.    Okay.  So you don't recall even why you         11:58

19   copied Mr. Hoskins on this?                               11:58

20       A.    Well, I copied Mr. Hoskins on this because it   11:58

21   was a -- very pertinent to information that was going     11:59

22   back and forth.  This was a very, as we said,            11:59

23   sensitive time and I felt like he should know about      11:59

24   this information.                                         11:59

25       Q.    Okay.  But you don't recall the fact that it    11:59

929

```
1    was Mr. Moenaf who asked you to copy him?          11:59

2        A.    I don't recall.                          11:59

3        Q.    Okay.  You, of course, never discussed the   11:59

4    contents of this e-mail with Mr. Hoskins either,   11:59

5    right?                                              11:59

6        A.    No, I didn't.                             11:59

7              MR. SILVER:  Okay.  If you could remove that  11:59

8    call out and just bring up the -- sure.  If you could  11:59

9    just highlight the main text of the e-mail, so     11:59

10   beginning "last evening" down to the end.  Yeah.   11:59

11   Thank you.                                          11:59

12   BY MR. SILVER:                                      11:59

13       Q.    Okay.  Now, in the e-mail you refer to -- 11:59

14   it's in the bottom of the first paragraph, "our    11:59

15   agent's commitment and actions taken thus far,"    11:59

16   correct?                                            11:59

17       A.    Correct.                                  11:59

18       Q.    And that's referring to Mr. Sharafi's efforts  11:59

19   at that time, right?                                11:59

20       A.    Correct.                                  11:59

21       Q.    And by "commitment," again, you're referring  11:59

22   here to both the legitimate work that he was supposed  12:00

23   to be doing, as well as the illegitimate work; isn't  12:00

24   that right?                                         12:00

25       A.    Exactly.                                  12:00
```

1    Q.    Okay.  So often in these, in this and other    12:00

2    communications, those two topics would be essentially    12:00

3    intertwined; is that fair to say?    12:00

4    A.    Fair to say.    12:00

5    Q.    Okay.    12:00

6        MR. SILVER:  You can remove that exhibit.    12:00

7    Thank you.    12:00

8    BY MR. SILVER:    12:00

9    Q.    So Mr. Moenaf had never wanted Mr. Sharafi to    12:00

10    be the agent on Tarahan to begin with; isn't that    12:00

11    correct?    12:00

12    A.    Correct.    12:00

13    Q.    He had wanted to have his choice instead of    12:00

14    Mr. Sharafi, correct?    12:00

15    A.    His recommendation, yes.    12:00

16    Q.    Okay.  And that turned out to be this guy    12:00

17    Azmin whose name you didn't recall, right?    12:00

18    A.    Right.    12:00

19    Q.    Okay.  And that was because, to your    12:00

20    understanding, Reza was very close to Azmin Aulia;    12:00

21    isn't that right?    12:01

22    A.    I didn't know that.    12:01

23    Q.    Okay.  What was your understanding why he    12:01

24    wanted Azmin to be the agent instead of Sharafi?    12:01

25    A.    I can only speculate that he thought he would    12:01

1    be the right guy.                                          12:01

2        Q.    I don't want you to speculate.  But isn't it    12:01

3    true that you suspected that Reza wanted Azmin to be       12:01

4    the agent because you thought that he might have --        12:01

5    he Reza, might have some sort of a side arrangement        12:01

6    with Azmin; isn't that right?                              12:01

7             MS. LARYEA:  Objection, Your Honor.               12:01

8             THE COURT:  Basis?                                12:01

9             MS. LARYEA:  He said "you suspected."             12:01

10            THE COURT:  I'm going to sustain the              12:01

11   objection.  He says he didn't know the name until         12:01

12   even now.                                                  12:01

13            MR. SILVER:  I can back up and try to lay a       12:01

14   better foundation, Your Honor.                             12:01

15            THE COURT:  Let's stay away from suspicions       12:01

16   and get into knowledge.                                    12:01

17            MR. SILVER:  Sure.                                12:01

18   BY MR. SILVER:                                             12:01

19       Q.    So, Mr. Puckett, you knew there was a second    12:01

20   agent being discussed on Tarahan, right?                   12:01

21       A.    Yes, I did.                                      12:01

22       Q.    And of course you knew that ultimately that     12:01

23   second agent was in fact brought into the deal as          12:01

24   well, right?                                               12:01

25       A.    Yes.  I found that out later.                   12:01

1    Q.    And you also knew that Reza Moenaf from the        12:01

2    beginning had been pushing to have this other agent      12:02

3    selected instead of Mr. Sharafi, right?                  12:02

4    A.    Actually, I did not know that.  I didn't know       12:02

5    he'd been pushing for this other guy.                    12:02

6    Q.    Well, when did you learn that he had been          12:02

7    pushing for the other guy?                               12:02

8    A.    After it was done.  I didn't know his name.         12:02

9    Q.    Okay.  Well, you didn't know his name, but         12:02

10   you did learn that Mr. Moenaf had been pushing to        12:02

11   select this other guy from the beginning, correct?       12:02

12   A.    Yes.  From the beginning, I don't know when         12:02

13   the beginning is.  At some point Reza was pushing for    12:02

14   this guy.                                                12:02

15       MS. LARYEA:  Objection.  He has not clarified        12:02

16   with the defendant when he found out that Reza was       12:02

17   pushing for this guy.                                    12:02

18       THE COURT:  I think it is important to               12:02

19   clarify that.  So, Mr. Silver, if you could ask a few    12:02

20   more questions with that -- in that regard.             12:02

21       MR. SILVER:  Yes.                                    12:02

22   BY MR. SILVER:                                           12:02

23   Q.    When did you find out that Reza Moenaf was         12:02

24   pushing for the other agent to be selected instead of   12:02

25   Mr. Sharafi?                                             12:02

1    A.    Probably two or three weeks before the    12:02

2    meeting they had to straighten out the agent    12:02

3    situation.    12:03

4    Q.    So two or three weeks.  But -- so around    12:03

5    August or September?    12:03

6    A.    That's when I found out that Reza was pushing    12:03

7    for a certain guy.  But I didn't pay any attention to    12:03

8    what his name was.    12:03

9    Q.    Okay.  That's fine.  And isn't it true, sir,    12:03

10   that your understanding of why Reza wanted the other    12:03

11   guy was because Reza had a close relationship with    12:03

12   him, right?    12:03

13   A.    I didn't know that.    12:03

14   Q.    But when --    12:03

15   A.    I didn't know Reza had a close relationship    12:03

16   with him.    12:03

17   Q.    Okay.    12:03

18   A.    I knew that -- I found out that Reza wanted    12:03

19   to use this guy.  I didn't know about the close    12:03

20   relationship or how close or if it was just business    12:03

21   or personal.  I didn't know that.    12:03

22   Q.    Okay.  And isn't it true, Mr. Puckett, that    12:03

23   your understanding of why Reza wanted to use this    12:03

24   other guy was because you thought Reza had some sort    12:03

25   of --    12:03

1      MS. LARYEA:  Objection, Your Honor.  He said          12:03

2  he does not know.                                          12:03

3      THE COURT:  I sustain the objection.                   12:03

4      MR. SILVER:  Okay.                                     12:03

5  BY MR. SILVER:                                             12:04

6    Q.   I'll move on, Mr. Puckett.                          12:04

7      MR. SILVER:  Could we bring up what's in               12:04

8  evidence as Exhibit 660-B, Slide 23.                       12:04

9  BY MR. SILVER:                                             12:04

10   Q.   Mr. Puckett, take a look at this document           12:04

11  which is in evidence.  This is an approval process        12:04

12  chart for Alstom International Network with respect        12:04

13  to the hiring of outside agents; isn't that correct?      12:04

14   A.   Correct.                                            12:04

15   Q.   Correct?  Yes?                                      12:04

16   A.   Correct.                                            12:04

17   Q.   And if you look under "approvals,"                  12:04

18  International Network, specifically it says               12:04

19  "approvals by IN," International Network, "area           12:04

20  senior VP and senior VP."  So area senior VP, that       12:05

21  would be Mr. Hoskins, correct?                            12:05

22   A.   Correct.                                            12:05

23   Q.   And as reflected in this chart, it was a           12:05

24  necessary step in the hiring of any outside agent to     12:05

25  have the approval of the International Network area       12:05

| | | |
|---|---|---|
| 1 | SVP, right? | 12:05 |
| 2 | A.    Well, it was a necessary step by charter. | 12:05 |
| 3 | Q.    By charter, you said? | 12:05 |
| 4 | A.    I mean by -- just like this approval process, | 12:05 |
| 5 | I think this is part of air pollution control, but it | 12:05 |
| 6 | would apply for Alstom in general.  But Tarahan was a | 12:05 |
| 7 | unique case.  Fred Pierucci made a decision.  I don't | 12:05 |
| 8 | know if he made a decision with Lawrence's approval | 12:05 |
| 9 | or not. | 12:05 |
| 10 | Q.    Okay.  Well -- | 12:05 |
| 11 | A.    But Fred Pierucci made a decision who the | 12:05 |
| 12 | agent would be. | 12:06 |
| 13 | THE COURT:  Wait.  Let him finish his answer, | 12:06 |
| 14 | please.  "I don't know if he made a decision with | 12:06 |
| 15 | Lawrence's approval or not."  Did you have something | 12:06 |
| 16 | further to say?  "But Fred Pierucci made a decision | 12:06 |
| 17 | who the agent would be." | 12:06 |
| 18 | THE WITNESS:  Right. | 12:06 |
| 19 | THE COURT:  Is there something further? | 12:06 |
| 20 | THE WITNESS:  No, ma'am.  That, actually -- | 12:06 |
| 21 | yes, ma'am, it is. | 12:06 |
| 22 | Fred Pierucci made that decision and it | 12:06 |
| 23 | would -- that decision would stay whether Lawrence | 12:06 |
| 24 | approved or not.  If Lawrence didn't approve, really | 12:06 |
| 25 | strongly didn't approve to Fred's decision, he would | 12:06 |

1  have had to have gone to his boss and his boss would    12:06

2  have had to go to the head of the boiler group and    12:06

3  there would have been a discussion.    12:06

4  BY MR. SILVER:    12:06

5    Q.    Uh-huh.    12:06

6    A.    And Fred secured -- he won that argument that    12:06

7  we know Indonesia better than anyone.    12:06

8        MR. SILVER:  Move to strike the last answer    12:06

9  on basis, Your Honor.  He's talking about what Fred    12:06

10 Pierucci knew or understood.    12:06

11       MS. LARYEA:  Your Honor, he asked a question.    12:06

12       MR. SILVER:  Yes.  The witness gave a    12:06

13 nonresponsive question at the end.    12:06

14       MS. LARYEA:  Your Honor, he asked about    12:07

15 approval and the process and this is the witness's    12:07

16 understanding of the approvals and the process.    12:07

17       MR. SILVER:  The witness began speaking about    12:07

18 Fred Pierucci's understanding without any basis as to    12:07

19 how he was aware of that.    12:07

20       THE COURT:  I'm sorry for the delay.  This is    12:08

21 just messed up.    12:08

22       So the questioning started out with    12:09

23 Mr. Puckett saying, "Well, it was a necessary step by    12:09

24 charter."    12:09

25       "QUESTION:  By charter, you said?"    12:09

937

| | |
|---|---|
| 1 | And he goes on.  It seems responsive to the | 12:09 |
| 2 | question of what in essence he meant by "by the | 12:09 |
| 3 | charter."  So why don't you proceed with your next | 12:09 |
| 4 | question. | 12:09 |
| 5 | MR. SILVER:  Thank you, Your Honor. | 12:09 |
| 6 | BY MR. SILVER: | 12:09 |
| 7 | Q.    So, Mr. Puckett, you yourself worked in | 12:09 |
| 8 | International Network, right? | 12:09 |
| 9 | A.    Yes. | 12:09 |
| 10 | Q.    For about a year.  And you also worked on the | 12:09 |
| 11 | Tarahan Project as well, correct? | 12:09 |
| 12 | A.    Yes. | 12:09 |
| 13 | Q.    And you were involved in some of the | 12:09 |
| 14 | agent-related issues on Tarahan, right? | 12:09 |
| 15 | A.    Yes. | 12:09 |
| 16 | Q.    And you certainly were aware, sir, that one | 12:09 |
| 17 | of the -- one of the roles of International Network | 12:10 |
| 18 | was to approve the hiring of outside agents and | 12:10 |
| 19 | consultants on all Alstom projects around the world; | 12:10 |
| 20 | isn't that right? | 12:10 |
| 21 | A.    That is correct. | 12:10 |
| 22 | Q.    And there -- it was a multistep process | 12:10 |
| 23 | involving approvals at many levels, both within | 12:10 |
| 24 | International Network and within the business unit; | 12:10 |
| 25 | isn't that right? | 12:10 |

1    A.    That's correct.

2    Q.    Okay.  And this chart that we're looking at

3    here reflects that multistep approval process, does

4    it not?

5    A.    It reflects the process.  This is what I mean

6    by as charter, Your Honor.  What I mean is that

7    this -- some business units, whether you're working

8    with consultants in the U.S. or consultants

9    internationally, took it as a guideline.  They knew

10   who they wanted, the business unit, whether you're

11   selling a steam turbine or a boiler or air pollution

12   control equipment.  He knew which agent he wanted.

13   He already knew.  And he might try to get --

14   politically try to get IN to agree, yeah, he is a

15   good guy, we agree.  But if it came down to a real

16   disagreement, the business would win out.

17   Q.    Okay.  If that --

18   A.    I mean by charter and by guideline, this is

19   the guideline.

20   Q.    Okay.  And so as you said, if there was a

21   disagreement somewhere along the way.  So if, for

22   example, the business unit and International Network

23   and their approval role could not come to an

24   agreement, right, then what would have to happen is

25   they would have to go up their respective reporting

12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:10
12:11
12:11
12:11
12:11
12:11
12:11
12:11
12:11
12:11
12:11
12:11
12:11
12:11

| | | |
|---|---|---|
| 1 | lines, correct, to a more senior level, correct? | 12:11 |
| 2 | A.    Correct. | 12:11 |
| 3 | Q.    Where those reporting lines met, right? | 12:11 |
| 4 | A.    Correct. | 12:11 |
| 5 | Q.    Because everyone ultimately meets somewhere | 12:11 |
| 6 | up the approval chain, right? | 12:11 |
| 7 | A.    Correct. | 12:11 |
| 8 | Q.    And try to overrule that decision, correct? | 12:11 |
| 9 | A.    Exactly. | 12:11 |
| 10 | Q.    Okay.  To your knowledge, that did not happen | 12:11 |
| 11 | on the Tarahan case, correct? | 12:11 |
| 12 | A.    To my knowledge, it did not. | 12:12 |
| 13 | Q.    Okay. | 12:12 |
| 14 | MR. SILVER:  Just one moment, Your Honor. | 12:12 |
| 15 | Nothing further, Your Honor. | 12:12 |
| 16 | THE COURT:  Redirect? | 12:12 |
| 17 | Help yourself to water. | 12:12 |
| 18 | THE WITNESS:  I just did, Your Honor.  Thank | 12:12 |
| 19 | you. | 12:12 |
| 20 | THE COURT:  There's a tricky top to that | 12:12 |
| 21 | pitcher. | 12:12 |
| 22 | THE WITNESS:  It's clear anyway. | 12:12 |
| 23 | REDIRECT EXAMINATION OF LARRY E. PUCKETT | 12:12 |
| 24 | BY MS. LARYEA: | 12:12 |
| 25 | Q.    Mr. Puckett, Mr. Silver asked you on | 12:12 |

| | | |
|---|---|---|
| 1 | cross-examination whether Mr. Hoskins reported to | 12:12 |
| 2 | Mr. Pierucci.  Do you remember that question? | 12:12 |
| 3 | A.    Yes. | 12:13 |
| 4 | Q.    And you started answering that -- about how | 12:13 |
| 5 | it worked on the Tarahan Project, correct?  And | 12:13 |
| 6 | Mr. Silver didn't let you finish that answer.  Can | 12:13 |
| 7 | you finish that answer now? | 12:13 |
| 8 | MR. SILVER:  Objection to the | 12:13 |
| 9 | characterization. | 12:13 |
| 10 | THE COURT:  Sustained. | 12:13 |
| 11 | BY MS. LARYEA: | 12:13 |
| 12 | Q.    How did it work on the Tarahan Project with | 12:13 |
| 13 | respect to Mr. Hoskins and Mr. Pierucci? | 12:13 |
| 14 | A.    Well, Mr. Hoskins didn't call the shots or | 12:13 |
| 15 | the strategy on Tarahan.  Fred Pierucci would call -- | 12:13 |
| 16 | he was in control.  So in that sense, Mr. Hoskins | 12:13 |
| 17 | would have been reporting to Fred on the Tarahan | 12:13 |
| 18 | Project. | 12:13 |
| 19 | MR. SILVER:  Objection as nonresponsive, Your | 12:13 |
| 20 | Honor. | 12:13 |
| 21 | MS. LARYEA:  That was -- | 12:13 |
| 22 | THE COURT:  I think it's -- how did it work | 12:13 |
| 23 | on the Tarahan Project with respect -- no.  That's | 12:13 |
| 24 | appropriate.  Overruled. | 12:13 |
| 25 | BY MS. LARYEA: | 12:13 |

941

1    Q.    Now, Mr. Silver also asked you whether the    12:14

2    term "commitment" in the e-mail that Ms. Lapian sent    12:14

3    on your behalf meant both legitimate and illegitimate    12:14

4    work.  Do you remember that question?    12:14

5    A.    Yes.    12:14

6    Q.    I want to show you what has been admitted as    12:14

7    Government's Exhibit 454.  This is the e-mail that    12:14

8    Reza forwards to Mr. Hoskins with the report from    12:14

9    Winan Kusno, correct?    12:14

10    A.    I don't see it.    12:14

11    THE COURT:  It's not --    12:14

12    MS. LARYEA:  I'm sorry.    12:14

13    THE COURT:  It's still not up.    12:14

14    MS. LARYEA:  Do I have to --    12:14

15    BY MS. LARYEA:    12:14

16    Q.    This is an e-mail from Reza to Mr. Hoskins,    12:14

17    correct?    12:14

18    A.    Yes.    12:14

19    Q.    And going to the second page of the e-mail,    12:14

20    this contains the paragraph regarding the rewards    12:14

21    issue, correct?    12:15

22    A.    Correct.    12:15

23    MS. LARYEA:  One minute, Your Honor.    12:15

24    BY MS. LARYEA:    12:15

25    Q.    Now, on this, Mr. Puckett, can you read the    12:15

1    sentence "they concern that if we have won the job,"          12:15

2    could you read that sentence?                                 12:15

3        A.    Yes.    "They concern that if we have won the        12:15

4    job, whether the rewards will still be satisfactory           12:15

5    or this agent only give them pocket money and                 12:15

6    disappear."                                                   12:16

7        Q.    And this sentence doesn't use the word              12:16

8    "commitment," correct?                                        12:16

9        A.    No, it does not.                                    12:16

10       Q.    It talks about pocket money, right?                 12:16

11       A.    Correct.                                            12:16

12       Q.    And, again, Mr. Puckett, this is an e-mail          12:16

13   that Reza forwarded on to the defendant Lawrence              12:16

14   Hoskins; is that right?                                       12:16

15       A.    Correct.                                            12:16

16             MS. LARYEA:  Thank you, Your Honor.                 12:16

17             MR. SILVER:  Just very, very briefly, Your          12:16

18   Honor.  Thank you.  You can remove that.                      12:16

19     CONTINUED CROSS-EXAMINATION OF LARRY E. PUCKETT             12:16

20   BY MR. SILVER:                                                12:16

21       Q.    Mr. Puckett, you just said that for purposes        12:16

22   of the Tarahan Project, in your view, effectively             12:16

23   Mr. Hoskins reported to Mr. Pierucci.  That was your          12:16

24   testimony just now, correct?                                  12:16

25       A.    Correct.                                            12:16

1    Q.    But Mr. Pierucci couldn't fire Mr. Hoskins,      12:16

2  could he?                                                 12:16

3    A.    No.                                               12:16

4    Q.    He couldn't reassign Mr. Hoskins, could he?       12:16

5    A.    No.                                               12:16

6    Q.    He couldn't demote Mr. Hoskins, could he?         12:16

7    A.    Could not.                                        12:16

8    Q.    Couldn't affect Mr. Hoskins' compensation,        12:16

9  could he?                                                 12:17

10   A.    Could not.                                        12:17

11   Q.    Okay.  What you meant was that Mr. Pierucci       12:17

12 was the lead on the bidding process for the project,      12:17

13 correct?                                                  12:17

14   A.    Correct.                                          12:17

15   Q.    And Mr. Hoskins in his role as SVP                12:17

16 International Network had an approval function to          12:17

17 approve the hiring of outside agents, correct?            12:17

18   A.    In support of the business group.  But part       12:17

19 of it was approval of an outside agent.                   12:17

20   Q.    Part of it was an approval role, but he had       12:17

21 to approve the hiring of outside agents, right?           12:17

22   A.    Right.                                            12:17

23   Q.    And if there had been a disagreement, you         12:17

24 said, correct?  If there had been a disagreement,         12:17

25 which there was not in this instance, right?              12:17

| | |
|---|---|
| 1 | A.    No, not that I'm aware of. | 12:17 |
| 2 | Q.    Okay.  But had there been one, Mr. Pierucci | 12:17 |
| 3 | would have had to go up his chain, right, to Paris to | 12:17 |
| 4 | try to find someone who was senior to Mr. Hoskins in | 12:17 |
| 5 | Mr. Hoskins' reporting line, right? | 12:17 |
| 6 | A.    Right. | 12:17 |
| 7 | Q.    To try to override that reporting decision, | 12:17 |
| 8 | correct? | 12:17 |
| 9 | A.    Correct. | 12:17 |
| 10 | Q.    And to your knowledge, that did not happen on | 12:17 |
| 11 | Tarahan, right? | 12:17 |
| 12 | A.    That did not happen. | 12:17 |
| 13 | MR. SILVER:  Thank you, Your Honor. | 12:17 |
| 14 | THE COURT:  Are we finished? | 12:18 |
| 15 | MS. LARYEA:  One more question, Your Honor. | 12:18 |
| 16 | MR. SILVER:  Object to reredirect, Your | 12:18 |
| 17 | Honor. | 12:18 |
| 18 | THE COURT:  Overruled. | 12:18 |
| 19 | FURTHER REDIRECT EXAMINATION OF LARRY E. PUCKETT | 12:18 |
| 20 | BY MS. LARYEA: | 12:18 |
| 21 | Q.    I just have one question, Mr. Puckett. | 12:18 |
| 22 | Mr. Silver mentioned Mr. Hoskins's approval | 12:18 |
| 23 | in the hiring consultants.  Who had the ultimate | 12:18 |
| 24 | decision on which consultant was hired on the Tarahan | 12:18 |
| 25 | Project? | 12:18 |

| | | |
|---|---|---|
| 1 | MR. SILVER:  Objection, asked and answered. | 12:18 |
| 2 | This was covered, I believe, in both direct and | 12:18 |
| 3 | redirect, Your Honor. | 12:18 |
| 4 | THE COURT:  Wait.  It may be asked and | 12:18 |
| 5 | answered.  Isn't your objection that it's beyond the | 12:18 |
| 6 | scope of your recross? | 12:18 |
| 7 | MR. SILVER:  Yes, Your Honor.  That too. | 12:18 |
| 8 | THE COURT:  That I will sustain. | 12:18 |
| 9 | MR. SILVER:  Thank you. | 12:18 |
| 10 | MS. LARYEA:  Thank you, Your Honor. | 12:18 |
| 11 | THE COURT:  All right, then.  Mr. Puckett, | 12:18 |
| 12 | thank you very much. | 12:18 |
| 13 | THE WITNESS:  Thank you, Your Honor. | 12:18 |
| 14 | THE COURT:  You are excused.  You may leave | 12:18 |
| 15 | and we'll ask the government to call its next | 12:18 |
| 16 | witness. | 12:18 |
| 17 | THE WITNESS:  Thank you, Your Honor. | 12:18 |
| 18 | MR. NOVICK:  Your Honor, we call Special | 12:19 |
| 19 | Agent Jeffrey Coleman. | 12:19 |
| 20 | THE COURT:  All right.  Please raise your | 12:19 |
| 21 | right hand. | 12:20 |
| 22 | (WITNESS SWORN.) | 12:20 |
| 23 | THE CLERK:  Please be seated.  And please | 12:20 |
| 24 | state your name for the record, spelling your first | 12:20 |
| 25 | and last name, and giving the town of employment. | 12:20 |

| | |
|---|---|
| 1 | THE WITNESS:  Full name is Jeffrey Coleman. | 12:20 |

1      THE WITNESS:  Full name is Jeffrey Coleman.                    12:20

2 First name is spelled J-e-f-f-r-e-y, last name is                   12:20

3 C-o-l-e-m-a-n, and I am employed in Washington, D.C.                12:20

4      THE COURT:  You may proceed.                                   12:20

5      MR. NOVICK:  Thank you, Your Honor.                            12:20

6 DIRECT EXAMINATION OF SPECIAL AGENT JEFFREY COLEMAN                 12:20

7 BY MR. NOVICK:                                                      12:20

8    Q.    Sir, what's your current job title?                        12:20

9    A.    Supervisory special agent.                                 12:20

10   Q.    With the Federal Bureau of Investigation?                  12:20

11   A.    Yes, sir.                                                  12:20

12   Q.    How long have you been a supervisory special               12:20

13 agent?                                                             12:20

14   A.    Just a few months.                                        12:20

15   Q.    And how long have you been a special agent                 12:20

16 with the FBI in general?                                           12:20

17   A.    Eleven years.                                              12:20

18   Q.    Can you tell the jury basically your                       12:21

19 educational background?                                            12:21

20   A.    I received an undergraduate degree in history              12:21

21 and philosophy from the University of North Carolina,              12:21

22 and a law degree from the University of Virginia.                  12:21

23   Q.    Since you joined the FBI, have you received                12:21

24 law enforcement training?                                          12:21

25   A.    Yes, I have.                                               12:21

1    Q.    A very brief overview of that training for    12:21

2    the jury?    12:21

3    A.    I received the basic new-agent training,    12:21

4    which is six months in Quantico, Virginia, followed    12:21

5    by periodic training in laws and statutes related to    12:21

6    work that I do, which is primarily foreign bribery    12:21

7    and money laundering cases.    12:21

8    Q.    In the course of your eleven years in law    12:21

9    enforcement, have you been involved in a number of    12:21

10    different investigations?    12:21

11    A.    Yes, I have.    12:21

12    Q.    Some of those led to criminal charges?    12:21

13    A.    Yes, they did.    12:21

14    Q.    And have some of those led -- and have some    12:21

15    of those involved instances where charges were not    12:21

16    brought?    12:21

17    A.    Yes.    12:21

18    Q.    Are you currently assigned to a particular    12:21

19    group within the FBI?    12:21

20    A.    Yes, I am.    12:21

21    Q.    And what is that?    12:21

22    A.    The International Corruption Unit.    12:21

23    Q.    Okay.  Where is that located?    12:21

24    A.    That's located in FBI headquarters in    12:21

25    Washington, D.C.    12:22

1    Q.    And how long have you been working on

2  international corruption cases?

3    A.    Over ten years.

4    Q.    So almost all the time you've been with the

5  FBI?

6    A.    Yes, sir.

7    Q.    As a special agent with the FBI in the

8  International Corruption Unit, what are your

9  responsibilities?

10    A.    My -- as an agent, my responsibilities were

11  to investigate allegations pertaining to foreign

12  bribery, usually U.S. companies and businesses, and

13  agents of those U.S. companies and businesses paying

14  bribes to government officials overseas, and also

15  when foreign officials bring their elicit assets to

16  the United States, efforts to seize those assets and

17  repatriate them to the countries from which they were

18  stolen.

19    Q.    And your involvement in the -- or assignment

20  to the International Corruption Unit is what brings

21  you here with us today?

22    A.    Yes, it is.

23    Q.    At some point were you assigned to work on a

24  case involving Alstom Power, Inc., and related

25  companies?

12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:22
12:23

1    A.    Yes, sir, I was.                                    12:23

2    Q.    Approximately when were you assigned as the         12:23

3  lead case agent?                                            12:23

4    A.    April of 2015.                                      12:23

5    Q.    And prior to that, did you have some                12:23

6  involvement with the case?                                 12:23

7    A.    A little, yes.                                      12:23

8    Q.    Okay.  But there were other case agents who         12:23

9  handled the case from its inception?                       12:23

10    A.    There were, yes.                                   12:23

11    Q.    Since you joined the case as lead case agent,      12:23

12  have you participated in gathering and reviewing           12:23

13  documents?                                                 12:23

14    A.    Yes, I have.                                       12:23

15    Q.    Have you participated in interviewing              12:23

16  witnesses?                                                 12:23

17    A.    Yes, I have.                                       12:23

18    Q.    In addition to other agents who have done          12:23

19  that as well?                                              12:23

20    A.    Yes, sir.                                          12:23

21    Q.    And are you prepared today to provide the          12:23

22  jury with a number of documents that have been            12:23

23  gathered in the investigation over time?                  12:23

24    A.    Yes, I am.                                         12:23

25    Q.    And are there different types of documents         12:23

1    that you've reviewed in the course of the                    12:23

2    investigation that we're going to talk about today?          12:23

3       A.    Yes, there are.                                     12:23

4       Q.    All right.  Now, as part of your                    12:23

5    responsibilities with regard to documents, have you          12:23

6    reviewed e-mails?                                            12:24

7       A.    Yes, I have.                                        12:24

8       Q.    And did you gather or review e-mails in             12:24

9    relation in particular to the Tarahan Project?               12:24

10      A.    Yes, I did.                                         12:24

11      Q.    As well as other projects in Indonesia?            12:24

12      A.    Yes, sir.                                           12:24

13      Q.    Principally, where did the e-mails that you         12:24

14   reviewed come from?                                          12:24

15      A.    Principally they were produced by Alstom and       12:24

16   its various subsidiaries to us over several years,           12:24

17   also some from Marubeni, some from --                        12:24

18      Q.    Other sources?                                      12:24

19      A.    Other sources, yes.                                 12:24

20      Q.    Okay.  So I want to -- there's a binder in          12:24

21   front of you, and I'm going to talk to you about some        12:24

22   of the documents in there.                                   12:24

23      A.    Yes, sir.                                           12:24

24      Q.    Did you review e-mails related to the               12:24

25   defendant's role on the Tarahan Project in its early         12:24

| | | |
|---|---|---|
| 1 | stages? | 12:24 |
| 2 | A.    Yes, I did. | 12:24 |
| 3 | Q.    Take a look first at Exhibit 410 for | 12:24 |
| 4 | identification.  What is that? | 12:24 |
| 5 | A.    This is an e-mail from Lawrence Hoskins to | 12:24 |
| 6 | Roger Beyer sent the 20th of August 2002, subject: | 12:25 |
| 7 | "Indonesia Tarahan." | 12:25 |
| 8 | MR. NOVICK:  Your Honor, I offer 410. | 12:25 |
| 9 | MR. SPEARS:  No objection, Your Honor.  I | 12:25 |
| 10 | just note that it's not showing on our screen. | 12:25 |
| 11 | THE COURT:  It's not showing on mine either. | 12:25 |
| 12 | Is it on everyone's screen now?  Not on the jury's. | 12:25 |
| 13 | Well, I'm going -- there's no objection, so I'll | 12:25 |
| 14 | admit 410. | 12:25 |
| 15 | BY MR. NOVICK: | 12:25 |
| 16 | Q.    When it comes up on this screen, I'll have | 12:25 |
| 17 | you read the document for us.  Go ahead. | 12:25 |
| 18 | THE COURT:  Is it up on the juror's screen? | 12:25 |
| 19 | Okay.  Good.  All right.  You may proceed. | 12:25 |
| 20 | BY MR. NOVICK: | 12:25 |
| 21 | Q.    Go ahead, Special Agent. | 12:25 |
| 22 | A.    "Roger, Fred P asked me to check with Reza on | 12:25 |
| 23 | latest position on Tarahan.  I spoke with Reza and | 12:25 |
| 24 | Eko and game plan is to get Mitsui out, corruption | 12:25 |
| 25 | scandal, et cetera, leaving likely bids from | 12:25 |

1    ourselves and FW Finland next month.  Spec apparently    12:25

2    does not allow Indian/Chinese/Korean components.  We    12:26

3    then plan to appoint Emir who I understand has been    12:26

4    previously used by G segment on a fee plus expenses    12:26

5    basis.  We also need Marubeni help to put pressure on    12:26

6    JBIC end to help our cause.  Fred will pass through    12:26

7    Paris next week and I will brief him.  Let me know if    12:26

8    you have any knowledge/views on Emir or JBIC issues.    12:26

9    Lawrence."    12:26

10    Q.    Okay.  Next, in addition to reviewing    12:26

11    documents related to the defendant's role on Tarahan,    12:26

12    did you also review documents related to the    12:26

13    defendant's role on Muara Tawar?    12:26

14    A.    Yes, I did.    12:26

15    Q.    Okay.  And in particular with regard to on    12:26

16    the subject of the selection of consultants?    12:26

17    A.    Yes, sir.    12:26

18    Q.    Now, we saw some of those e-mails already    12:26

19    during the course of the trial, and I want to put up    12:26

20    what's already in evidence, Exhibit 422.  Do you    12:27

21    recall seeing this e-mail earlier in the trial?    12:27

22    A.    Yes, sir, I do.    12:27

23    Q.    All right.  And who is it from and to?    12:27

24    A.    It's from Reza Moenaf to Lawrence Hoskins.    12:27

25    Q.    And it's on December 3, 2002, at 2:45 a.m.;    12:27

1  is that right?                                          12:27

2       A.    Yes, sir.                                    12:27

3       Q.    And the first line -- first couple lines     12:27

4  reads, "Lawrence, Emir Moeis is a member of Indonesia   12:27

5  parliament, precisely he is the vice chairman of        12:27

6  Commission VIII, a commission in charge of handling     12:27

7  power issues."                                          12:27

8             Did I read that correctly?                   12:27

9       A.    Yes, sir, you did.                           12:27

10      Q.    Okay.  And I want to just take a step back.   12:27

11  So we said that that's on December 3rd, correct?       12:27

12      A.    Yes, sir.                                     12:28

13      Q.    So let's take a look now for identification,  12:28

14  Exhibit 421.  What is that?                            12:28

15      A.    This is an e-mail from Lawrence Hoskins to    12:28

16  Reza Moenaf sent December 2, 2002, subject: "MT."      12:28

17      Q.    Okay.                                         12:28

18            MR. NOVICK:  I'd offer this, Your Honor, 421. 12:28

19            MR. SPEARS:  No objection, Your Honor.        12:28

20            THE COURT:  Full exhibit.                     12:28

21  BY MR. NOVICK:                                          12:28

22      Q.    All right.  First let's take a look at the    12:28

23  date.  When is that in relation to Exhibit 422, that    12:28

24  long e-mail about Muara Tawar that we just looked at?   12:28

25      A.    That's the previous day.                      12:28

1    Q.    Okay.  This -- in other words, 421 is the          12:28

2    previous day?                                            12:28

3    A.    Yes, sir.                                          12:28

4    Q.    All right.  And what is -- what is the             12:28

5    message here from Mr. Hoskins to Reza?                   12:28

6    A.    "Visitors are Mr. Pirooz and Dr. Amir.             12:28

7    Please advise any comments."                            12:29

8    Q.    Okay.  And then the following day is sent          12:29

9    Exhibit 422 that's in evidence, correct?                12:29

10   A.    Yes, sir.                                          12:29

11   Q.    And that's a lengthy e-mail regarding, among      12:29

12   other things, Emir Moeis?                                12:29

13   A.    Yes, sir, it is.                                   12:29

14   Q.    Is there also reference here to Pirooz?           12:29

15   A.    Yes, sir.                                          12:29

16   Q.    Okay.  And then just looking down further,        12:29

17   additional information about Pirooz Sharafi.  One        12:29

18   moment, please.  There we go.  And just read the         12:29

19   last -- the few highlighted lines I have there           12:29

20   beginning with "As the project."                         12:29

21        MR. SPEARS:  Your Honor, I'm going to object        12:29

22   as to cumulative.  This language has already been        12:30

23   presented through a different witness.                   12:30

24        THE COURT:  Well, it has.  I'm assuming that        12:30

25   Mr. Novick will be using this in a different way than    12:30

1    just reading it; is that correct?                    12:30

2         MR. NOVICK:  Your Honor, my intention, this     12:30

3    is a summary witness, to -- in many ways the exhibits 12:30

4    have come in piecemeal through the witnesses who are  12:30

5    available.  This is pointing out the other e-mails    12:30

6    that haven't come in and the relationships of those   12:30

7    to this.  So, yes, I'm using it for a different       12:30

8    purpose than has already been disclosed for.          12:30

9         MR. SPEARS:  Your Honor, it sounds like          12:30

10   closing argument.                                     12:30

11        MR. NOVICK:  It's not closing argument.  I'm     12:30

12   not actually asking him to interpret anything, Your   12:30

13   Honor.                                                12:30

14        THE COURT:  All right.  I'm going to permit      12:30

15   this questioning.  Go ahead.  Overruled.              12:30

16   BY MR. NOVICK:                                        12:30

17   Q.   Go ahead and read that highlighted section.      12:30

18   A.   "As the project proceed, it shown that Pirooz    12:30

19   has been unable to fulfill his tasks and our          12:30

20   expectation.  He has no grip on PLN tender team at    12:30

21   all.  Basically his function is more or less similar  12:30

22   to cashier which I feel we pay too much.  I still do  12:30

23   not understand why B-Seg has pushed so hard to        12:31

24   appoint him as agent."                                12:31

25   Q.   Now, following this, I want to direct you --     12:31

1    I'm going to put 422 on the left side of the screen,       12:31

2    and now on the right side of the screen put up an          12:31

3    exhibit which is not yet in evidence which is 423.         12:31

4    Let me try that again.                                     12:31

5            Okay.  Taking a look at 423 and actually          12:31

6    423-T which is the translation, what is that?             12:31

7    A.    This is an e-mail from Reza Moenaf to Eko            12:31

8    Sulianto sent the 3rd of December, 2002, subject:         12:32

9    "Muara Tawar."                                            12:32

10           MR. NOVICK:  Okay.  I'd offer 423 and 423-T.      12:32

11           MR. SPEARS:  No objection, Your Honor.            12:32

12           THE COURT:  Full exhibits.                        12:32

13   BY MR. NOVICK:                                            12:32

14   Q.    All right.  The bottom portion -- let me ask        12:32

15   you this:  Is this forwarding an earlier e-mail from      12:32

16   Reza Moenaf?                                              12:32

17   A.    Yes, it is.                                         12:32

18   Q.    And is -- comparing the two documents in 422        12:32

19   and 423-T, are those the same e-mails?                    12:32

20   A.    Yes, it is.                                         12:32

21   Q.    Okay.  So let's focus on the forward here.          12:32

22   What does Reza write to Eko here?                         12:32

23   A.    "Brother, I also talked to Lawrence."              12:32

24   Q.    Okay.  All right.  The next e-mail, keeping         12:32

25   again in line with also in evidence 424 on the           12:33

| | | |
|---|---|---|
| 1 | right-hand side of the screen. | 12:33 |
| 2 | THE COURT:  Has 424 actually been admitted? | 12:33 |
| 3 | MR. NOVICK:  I believe it has been.  I recall | 12:33 |
| 4 | offering it, Your Honor. | 12:33 |
| 5 | MR. SPEARS:  I think that's correct, Your | 12:33 |
| 6 | Honor. | 12:33 |
| 7 | THE COURT:  All right.  Then we will clear | 12:33 |
| 8 | our records and have it as a full exhibit. | 12:33 |
| 9 | BY MR. NOVICK: | 12:33 |
| 10 | Q.    All right.  So this e-mail here is from Reza | 12:33 |
| 11 | Moenaf to Goran Ehren and Mr. Hoskins, correct? | 12:33 |
| 12 | A.    Yes, and Mr. Sulianto. | 12:34 |
| 13 | Q.    And Mr. Sulianto, entitled "Muara Tawar crash | 12:34 |
| 14 | program"? | 12:34 |
| 15 | A.    Yes, sir. | 12:34 |
| 16 | Q.    And then it has a discussion below with | 12:34 |
| 17 | regard to Eddie's advice is to cover three main | 12:34 |
| 18 | areas, PPE engineering division, which is the | 12:34 |
| 19 | evaluator, Commission VIII, Emir and RI-1; is that | 12:34 |
| 20 | right? | 12:34 |
| 21 | A.    Yes, sir. | 12:34 |
| 22 | Q.    What is the date on this e-mail here? | 12:34 |
| 23 | A.    December 4, 2002. | 12:34 |
| 24 | Q.    Okay.  So now it's the following day or the | 12:34 |
| 25 | day after the longer e-mail about Pirooz Sharafi and | 12:34 |

1    Emir Moeis, correct?                                    12:34

2       A.    Yes, sir.                                       12:34

3       Q.    Let's take a look now at Exhibit 425 not in     12:34

4    evidence yet.  And, actually, 425 and an attachment,    12:34

5    425-A.  Do you see those documents?                     12:35

6       A.    Yes, sir, I do.                                 12:35

7       Q.    What's 425?                                     12:35

8       A.    425 is an e-mail from Lawrence Hoskins to       12:35

9    Roger Beyer dated the 5th of December 2002, subject:    12:35

10   "MT" with an attachment RM MT.doc.                       12:35

11            MR. NOVICK:  Okay.  Your Honor, I'd offer 425    12:35

12   and 425-A.                                               12:35

13            MR. SPEARS:  No objection.                       12:35

14            THE COURT:  Full exhibits.                       12:35

15   BY MR. NOVICK:                                           12:35

16      Q.    All right.  So, first, what's the date of       12:35

17   this document, the e-mail?  It says December 5, 2002?    12:35

18      A.    Yes, sir.                                        12:35

19      Q.    So that is, again, a couple days -- the         12:35

20   following day from Exhibit 424 and a couple days         12:36

21   after that longer e-mail about Emir Moeis?               12:36

22      A.    Yes, sir.                                        12:36

23      Q.    And we said it had an attachment.  Let's take   12:36

24   a look at the attachment.  Hard to read, but does        12:36

25   this appear to be a screenshot?                          12:36

1    A.    Yes, it is.                                      12:36

2    Q.    Okay.  Let me see if I can blow up a little      12:36

3  bit more of it.  What is this a screenshot of or what    12:36

4  does it appear to be a screenshot of?                    12:36

5    A.    It appears to be a screenshot of the e-mail      12:36

6  that's shown in Exhibit 424.                             12:36

7    Q.    Okay.  So that e-mail about Eddie's advice is    12:36

8  to cover three main areas; is that right?                12:36

9    A.    Yes, sir.                                        12:36

10    Q.    Okay.  All right.  Let's take a look now at     12:36

11  Exhibit 427 for identification.  What is this?          12:37

12    A.    This is an e-mail from Lawrence Hoskins to      12:37

13  Roger Beyer dated the 9th of December 2002 regarding    12:37

14  MT express.                                             12:37

15          MR. NOVICK:  Your Honor, I'd offer 427.         12:37

16          MR. SPEARS:  No objection, Your Honor.          12:37

17          THE COURT:  Full exhibit.                       12:37

18  BY MR. NOVICK:                                          12:37

19    Q.    All right.  You said it's from Mr. Hoskins      12:37

20  December 9th, so a few days after the e-mails we just   12:37

21  looked at?                                              12:37

22    A.    Yes, sir.                                       12:37

23    Q.    To Roger Beyer, re:  MT express.  It appears    12:37

24  to be imbedding a prior e-mail from Roger Beyer to      12:37

25  Lawrence Hoskins, copying Reza Moenaf, correct?         12:38

```
1    A.    Yes, sir.                                        12:38

2    Q.    On the same day?                                 12:38

3    A.    Yes, sir.                                        12:38

4    Q.    All right.  Let's take a look at the e-mail      12:38

5    first.  Can you read for us what I've just culled out 12:38

6    here?                                                  12:38

7    A.    "I was called by G. Ragagnin who said that      12:38

8    after a joint review with S. Hatt and P. Anglaret,    12:38

9    the segment's concern is that Dr. Emir who has been   12:38

10   coming to Paris on the initiative invitation of       12:38

11   E. Widiono and/or Pirooz Sharafi might feel more      12:38

12   comfortable to work through Pirooz rather than via    12:38

13   Andi Salim as suggested by E. Widiono to Reza.  The   12:38

14   concern is if we do not choose Pirooz, we might not   12:38

15   have the full support from Dr. Amir or in the worst   12:38

16   case, Pirooz might turn Dr. Emir away from Alstom.  I 12:38

17   have given both Philippe and Giuseppe detailed        12:38

18   explanations why we believe Edie's proposal --        12:38

19   Eddie's proposal to be the preferred one, but could  12:39

20   not fully convince them."                             12:39

21   Q.    Okay.  Now let's take a look at the last few     12:39

22   lines of the e-mail continues.                        12:39

23   A.    "Therefore, I am now suggesting that Reza        12:39

24   should find out if in fact Dr. Emir would feel as     12:39

25   comfortable with Andy Salim as with Pirooz Sharafi.   12:39
```

1    How would Dr. Emir react if Alstom's interests were        12:39
2    to be represented via Andi Salim after he has been         12:39
3    introduced to Alstom by Pirooz?  The segment is            12:39
4    requiring an immediate answer on this issue.  Roger."      12:39
5       Q.   And this is an e-mail, you said -- this            12:39
6    imbeds an e-mail from Roger Beyer to Lawrence              12:39
7    Hoskins, correct?                                          12:39
8       A.   Yes, sir.                                          12:39
9       Q.   And it says that the segment is requiring an       12:39
10   immediate answer on this issue?                            12:39
11      A.   It does.                                           12:39
12      Q.   Okay.  The next exhibit, 428 for                   12:40
13   identification, what is this?                              12:40
14      A.   This is an e-mail from Lawrence Hoskins to         12:40
15   Roger Beyer with a copy to Hoskins and Reza Moenaf         12:40
16   sent on the 10th of December 2002, re:  MT express.        12:40
17           MR. NOVICK:  All right.  I'd offer 428.            12:40
18           MR. SPEARS:  No objection.                         12:40
19           THE COURT:  Full exhibit.                          12:40
20   BY MR. NOVICK:                                             12:40
21      Q.   I'm going to put 427 on the left-hand side         12:40
22   and 428 on the right-hand side.  All right.  Just          12:40
23   looking at the tops, top of 427 and the top of 428,        12:40
24   are they the same subjects a day later?                    12:40
25      A.   Yes, sir.                                          12:40

1    Q.    And does 428 appear to be a response to 427?          12:40

2    A.    It does.                                              12:41

3    Q.    Can you go ahead and read Mr. Hoskins'                12:41

4    message to Mr. Beyer?                                       12:41

5    A.    "Roger, understood.  I had some of the same           12:41

6    concerns and was trying to contact Reza yesterday          12:41

7    before I made any move with Pirooz.  We can go either      12:41

8    way, but my understanding from Reza was that Eddie         12:41

9    proposed route was the optimum one.  I agree we need       12:41

10   to be clear that there is no downside with Amir or         12:41

11   separately on Tarahan.  We should finalize with Reza       12:41

12   today.  Lawrence."                                         12:41

13   Q.    Okay.  Next let's take a look at 433 for             12:41

14   identification.  What is this?                             12:41

15   A.    It's an mail from Lawrence Hoskins to                12:41

16   Philippe Anglaret, Giuseppe Ragagnin, copied to           12:42

17   Stefan Hatt and Goran Ehren, sent on the 30th of          12:42

18   December 2002, subject:  "MT Indonesia."                   12:42

19        MR. NOVICK:  I'd offer 433, Your Honor.               12:42

20        MR. SPEARS:  No objection.                            12:42

21        THE COURT:  433 is a full exhibit.                    12:42

22   BY MR. NOVICK:                                             12:42

23   Q.    Can you read the highlighted portion for us?         12:42

24   A.    "Update re the above in case you are not up          12:42

25   to speed.  Meetings PLN, Marubeni, Emir, et cetera,       12:42

1    all as planned just before Christmas.  Local bids to    12:42

2    be requested mid-Jan to be submitted by mid-Feb.    12:42

3    Preference for Pirooz involvement expressed in first    12:42

4    meeting was questioned in later meetings and    12:42

5    subsequent advice from Reza is that further    12:42

6    discussions have concerned that Gajendra, Azmin Aulia    12:42

7    should be involved, not Pirooz."    12:42

8        Q.    Again, the subject here is, MT Indonesia,    12:42

9    correct?    12:42

10        A.    Yes, sir.    12:42

11        Q.    All right.  Let's move away from Muara Tawar    12:42

12    for a moment and go back to the subject of Tarahan.    12:43

13            Had you gathered documents related to the    12:43

14    locations of the consultant's company specific to    12:43

15    Pirooz Sharafi?    12:43

16        A.    Yes, sir, we did.    12:43

17        Q.    Where did he live?    12:43

18        A.    He lived in Bethesda, Maryland.    12:43

19        Q.    Let's take a look now at Exhibit 437 for    12:43

20    identification.  What is this?    12:43

21        A.    This is an e-mail from Lawrence Hoskins to    12:43

22    Bruno Kaelin with a copy to Veronique Etienne, sent    12:43

23    on the 21st of January 2003, subject:  "Tarahan 3, 4    12:43

24    consultancy agreement."    12:43

25            MR. NOVICK:  I offer 437.    12:43

```
 1              MR. SPEARS:  No objection.              12:43

 2              THE COURT:  Full exhibit.               12:43

 3   BY MR. NOVICK:                                     12:43

 4      Q.    All right.  Is this a three-page document 12:43

 5   that -- or longer than that, four-page document that 12:43

 6   includes an e-mail chain?                          12:43

 7      A.    Yes, it is.                               12:43

 8      Q.    Okay.  I want to start on the third page of 12:43

 9   the document.  Do you see an e-mail there from     12:44

10   Mr. Hoskins to Bruno Kaelin re Indonesia?          12:44

11      A.    Yes, I do.                                12:44

12      Q.    On March 1, 2003?  Well, I should say January 12:44

13   3, 2003?                                           12:44

14      A.    Yes, sir.                                 12:44

15      Q.    Okay.  Can you read the e-mail for us?    12:44

16      A.    "Bruno, for info following recent         12:44

17   discussions.  I am in Jakarta again next week to put 12:44

18   appropriate systems in place.  Will advise further. 12:44

19   Did Mr. Sharafi contact you re Tarahan?  Lawrence." 12:44

20      Q.    Now let's go up a page to the next e-mail up 12:44

21   the chain from Bruno Kaelin to Lawrence Hoskins, copy 12:44

22   Veronique Etienne, January 3, 2003?                12:44

23      A.    Yes, sir.                                 12:45

24      Q.    Go ahead and read that e-mail for us?     12:45

25      A.    "Lawrence.  Yes, he sent me the completed 12:45
```

1    agent profile for his very small company in                    12:45

2    Baltimore, Maryland, with a branch office in                   12:45

3    Washington.  But for the time being, no keys have              12:45

4    been sent by Alstom, Inc., Fred Pierucci.  I                   12:45

5    understand that the Tarahan job is boiler supply from          12:45

6    the U.S. to Indonesia.  As I said before, it would             12:45

7    make more sense to have an agent in Indonesia where            12:45

8    Sharafi's company has obviously an office.  As you             12:45

9    know, we do not like to have a U.S. domiciliated               12:45

10   company as consultant with payment in the U.S. and             12:45

11   most probably in USD.  Could we talk about this                12:45

12   issue?"                                                        12:45

13       Q.    Okay.  Now, the next e-mail up, response from        12:45

14   Mr. Hoskins, January 15, 2003; is that right?                  12:45

15       A.    Yes, sir.                                            12:45

16       Q.    Go ahead.                                            12:45

17       A.    "Bruno, I talked to Reza and his financial           12:45

18   controller Lars Olssen on this subject to establish            12:45

19   whether they could implement an agreement locally in           12:45

20   Indonesia.  They were uneasy about dealing with a              12:46

21   local company but thought an arrangement with                  12:46

22   Singapore may work.  Reza is going to check with               12:46

23   Pirooz to see if he has a company in Singapore.  I             12:46

24   will revert when we have further info.  Lawrence. "            12:46

25       Q.    Now let's go to the top page.  Let's go to           12:46

1    the top e-mail from Mr. Hoskins to Mr. Kaelin copying          12:46

2    Veronique Etienne.  Just read that first e-mail for            12:46

3    us.                                                            12:46

4        A.    "Bruno, Reza came back to say that Pirooz has        12:46

5    company in Indonesia but only local personal bank A/C          12:46

6    in Singapore.  Reza was assuming we could go for an            12:46

7    arrangement Alstom Prom Pirooz local company in                12:46

8    Indonesia.  I think this is probably the simplest              12:46

9    route now subject to receiving keys.  Lawrence."               12:46

10       Q.    All right.  Let's now move to Exhibit 439 for        12:47

11   identification.  What's this?                                  12:47

12       A.    This is an e-mail from Bruno Kaelin to               12:47

13   Frederic Pierucci with a copy to Lawrence Hoskins and          12:47

14   Veronique Etienne, sent on the 12th of February 2003,          12:47

15   subject is Tarahan 3/4 consultancy agreement.                  12:47

16            MR. NOVICK:  Your Honor, I offer Exhibit 439.         12:47

17            MR. SPEARS:  No objection.                            12:47

18            THE COURT:  Full exhibit.                             12:47

19   BY MR. NOVICK:                                                 12:47

20       Q.    I'm just going to have you focus here.  Is           12:47

21   this a response to an earlier e-mail from Reza Moenaf          12:47

22   to Bruno Kaelin copying Lawrence Hoskins?                      12:47

23       A.    Yes, it is.                                          12:47

24       Q.    All right.  Just read the first paragraph            12:47

25   there, "Dear Bruno."                                           12:47

1    A.    "Dear Bruno, we met Pirooz twice on this    12:47

2    issue.  In the first meeting we informed him that it    12:47

3    is not possible to use his U.S. company for this    12:47

4    project and suggested him, if he has one, to use    12:48

5    either a Singapore or Indonesian company.  He    12:48

6    confirmed to have and Indonesian company and would    12:48

7    consider using it.  He also questioned why this was    12:48

8    not discussed in Paris.  He will to contact Lawrence    12:48

9    Hoskins on this issue."    12:48

10    Q.    All right.  Now let's look at 440 for    12:48

11    identification.  What's that?    12:48

12    A.    This is an e-mail from Bruno Kaelin to Fred    12:48

13    Pierucci with a copy to Lawrence Hoskins sent on the    12:48

14    18th of February 2003, subject:  "Tarahan."    12:48

15    Q.    And is this responding to -- is this e-mail    12:48

16    responding to an earlier e-mail from Fred Pierucci to    12:48

17    Bruno Kaelin?    12:48

18    A.    Yes, it is.    12:48

19         MR. NOVICK:  I'd offer 440.    12:48

20         MR. SPEARS:  No objection, Your Honor.    12:48

21    BY MR. NOVICK:    12:48

22    Q.    All right.  Let's take a look at the first    12:48

23    e-mail from Pierucci to Kaelin, subject:  "Tarahan."    12:49

24    Go ahead.    12:49

25    A.    "Bruno, can you please let me know if U.S.    12:49

1   company is okay for the consultant.  The agreement      12:49

2   will be ready on Thursday or Friday for me to take      12:49

3   back.  Thanks.  Fred."                                  12:49

4       Q.   And then is there a response above that with   12:49

5   regard to the consultancy agreement?                    12:49

6       A.   Yes, there is.                                 12:49

7       Q.   All right.  Go ahead and read that to close    12:49

8   the loop on this particular subject.                    12:49

9       A.   "Frederic, in this specific case, I propose    12:49

10  an agreement between Alstom Power, Inc., and the        12:49

11  agent directly.  In this case the U.S. company makes    12:49

12  sense, although its structure is very weak.  Do not     12:49

13  forget, you will have to make sure that the             12:49

14  remuneration, which is quite important, has to be       12:49

15  justified and documented.  I have prepared the file     12:49

16  and it is now in the approval process in IN, Lawrence   12:49

17  Hoskins and Etienne Dé.  I therefore cannot commit on   12:49

18  any date but we do our best.  Regards, Bruno."          12:49

19      Q.   In fact, was the consultancy agreement that    12:50

20  was entered into --                                     12:50

21           MR. SPEARS:  Objection.                        12:50

22           MR. NOVICK:  What's the --                     12:50

23           MR. SPEARS:  I hear a leading question         12:50

24  coming, Your Honor.  Objection.                         12:50

25           THE COURT:  You know, we need to stop for      12:50

| | | |
|---|---|---|
| 1 | lunch right now.  So I think we'll stop and be back | 12:50 |
| 2 | no later than ten past 2.  All right?  Enjoy the not | 12:50 |
| 3 | rainy day. | 12:50 |
| 4 | (Jury exited the proceedings, 12:50 p.m.) | 12:50 |
| 5 | THE COURT:  All right.  Agent Coleman, you | 12:50 |
| 6 | may step down and you may leave and be back at 2:10. | 12:51 |
| 7 | Thank you. | 12:51 |
| 8 | (Out of the presence of the witness.) | 12:51 |
| 9 | MR. SILVER:  Your Honor, if we may before we | 12:51 |
| 10 | break, we'd like to provide the Court with additional | 12:51 |
| 11 | authority on the issue raised this morning regarding | 12:51 |
| 12 | the 801(d)(2)(E) issue.  I have two cases that I | 12:51 |
| 13 | think are directly responsive to the cases that were | 12:51 |
| 14 | presented by the government this morning. | 12:51 |
| 15 | THE COURT:  On the issue of whether it's | 12:51 |
| 16 | required that there be independent corroboration? | 12:51 |
| 17 | MR. SILVER:  Yes, Your Honor. | 12:51 |
| 18 | MR. NOVICK:  The government's position at | 12:51 |
| 19 | this point, although I'm happy to engage in the | 12:51 |
| 20 | academic question, is that it's moot.  I think there | 12:51 |
| 21 | was sufficient foundation laid.  In addition, as we | 12:51 |
| 22 | argued earlier, this is forwarded twice, additional | 12:51 |
| 23 | messages from Reza Moenaf reinforcing that this was | 12:51 |
| 24 | in fact Winan Kusno's report and that he was at this | 12:51 |
| 25 | meeting.  Those are separate statements. | 12:51 |

970

```
 1           THE COURT:  But why does that -- Kusno was at      12:52

 2   the meeting.                                               12:52

 3           MR. NOVICK:  He's essentially adopting saying      12:52

 4   that these are the notes of this meeting.  He is           12:52

 5   essentially another coconspirator --                       12:52

 6           THE COURT:  Why --                                 12:52

 7           MR. NOVICK:  -- saying that there's a serious      12:52

 8   agent problem in the -- it's not just that he is           12:52

 9   saying at the meeting.  It's that he is reporting a        12:52

10   serious agent problem in it.                               12:52

11           THE COURT:  I understand what the text is.         12:52

12   But the substance of whether or not -- I thought you       12:52

13   were just saying even if independent corroboration         12:52

14   were required, you believe you've satisfied that.          12:52

15   But I didn't understand this last line.  Was that on       12:52

16   whether independent corroboration is required or           12:52

17   whether you've shown it?                                   12:52

18           MR. NOVICK:  I think what I was trying to          12:52

19   argue, Your Honor, is that even if it was required,        12:52

20   we have established independent corroboration.  So         12:53

21   getting the first box may be unnecessary at this           12:53

22   point given the state of the record.                       12:53

23           THE COURT:  May I have your cases, please?         12:53

24           MR. SILVER:  Yes, Your Honor.  I'll just read      12:53

25   the titles for the record.  So the one is a Second         12:53
```

1    Circuit case from 2008 in re terrorist bombings of                    12:53
2    U.S. embassies in East Africa.  That's 522 F.3d 93.                   12:53
3    The other is a Southern District of New York District                 12:53
4    Court case from 2005, *U.S. v. Saneaux* and it's 392 F.               12:53
5    Supp. 2d 506.  And I'll hand those up now.                            12:53
6           It actually appears, Your Honor, to be quite                   12:53
7    clear.  It looks like what happened is that the Rule                  12:53
8    801(d)(2)(E) prior to 2011 actually explicitly said                   12:53
9    that independent corroboration was required both for                  12:53
10   the declarant's membership in the conspiracy and the                  12:54
11   defendant's.                                                          12:54
12          And in 2011, the rule was slightly modified,                   12:54
13   but the notes say that they were stylistic changes                    12:54
14   only and not meant to change the meaning of the rule.                 12:54
15   So it's really kind of black-letter law, Your Honor,                  12:54
16   that there must be independent corroboration for the                  12:54
17   declarant's membership.                                               12:54
18          THE COURT:  Thank you.                                         12:54
19          Now, before we break for lunch, I would like                   12:54
20   to understand further about the question that we                      12:54
21   reserved on regarding the examination of Agent                        12:54
22   Coleman and what the defendant intends to attempt to                  12:54
23   elicit with respect to -- I guess it's Sharafi and                    12:54
24   his nonprosecution agreement.  I don't know if                        12:55
25   there's anything broader than that.  Who will --                      12:55

| | | |
|---|---|---|
| 1 | Mr. Spears? | 12:55 |
| 2 | MR. SPEARS:  Yes, Your Honor.  Thank you.  So | 12:55 |
| 3 | we did intend to address with Agent Coleman the | 12:55 |
| 4 | nonprosecution agreement, the terms of that.  I would | 12:55 |
| 5 | note that at the outset that the government has | 12:55 |
| 6 | elicited testimony from Rothschild, for example, on | 12:55 |
| 7 | direct examination about the fact that they used | 12:55 |
| 8 | Sharafi to record Rothschild.  And even on the direct | 12:55 |
| 9 | of Coleman we just heard in the very beginning, that | 12:55 |
| 10 | Agent Coleman talked about circumstances in which | 12:55 |
| 11 | charges were not brought against. | 12:55 |
| 12 | THE COURT:  So in general terms, the | 12:55 |
| 13 | existence of the nonprosecution agreement certainly | 12:55 |
| 14 | is already in evidence, the nature of it? | 12:55 |
| 15 | MR. SPEARS:  Your Honor, it -- | 12:55 |
| 16 | MR. NOVICK:  I don't think that's -- I don't | 12:55 |
| 17 | think counsel is arguing that because I don't think | 12:56 |
| 18 | that that's true.  The reference to charges -- | 12:56 |
| 19 | THE COURT:  All right.  Let me get -- let | 12:56 |
| 20 | me -- so, Mr. Spears, you want to offer what? | 12:56 |
| 21 | MR. SPEARS:  So we believe that it's relevant | 12:56 |
| 22 | to the investigative -- | 12:56 |
| 23 | THE COURT:  And the "it" is what? | 12:56 |
| 24 | MR. SPEARS:  It is the terms of the | 12:56 |
| 25 | nonprosecution agreement, including the fact that | 12:56 |

1    Mr. Sharafi by agreement was not prosecuted for FCPA                  12:56

2    violations and money laundering, and including the                   12:56

3    provisions through which he has agreed to testify at                 12:56

4    the government's direction, including his -- the fact                12:56

5    that he testified in the grand jury.  Not getting                    12:56

6    into the substance of it, but -- so the basic                        12:56

7    outlines of the nonprosecution agreement is what we                  12:56

8    intend to address with Agent Coleman.                                12:56

9           THE COURT:  And what is it that you think                     12:56

10   that's relevant to given that the government has                     12:56

11   announced that Sharafi will not be testify -- will                   12:57

12   not be called?                                                       12:57

13          MR. SPEARS:  Thank you, Your Honor.  It's                     12:57

14   relevant to addressing the genesis of the                           12:57

15   investigation, the investigative techniques that were               12:57

16   used subsequently.  The government built its                        12:57

17   investigation on their initial debriefings with                     12:57

18   Mr. Sharafi that were made under this nonprosecution                 12:57

19   agreement, and it goes to the credibility of the                    12:57

20   investigation and in our view, goes to sort of the                  12:57

21   classic cross-examination on investigative                          12:57

22   techniques, what was used, what wasn't used.                        12:57

23          And to add to that, Your Honor, the evidence                 12:57

24   has shown as well that the government's own                         12:57

25   cooperating witnesses have said that they distrust                  12:57

974

1    the very witness that lies at the core of their case.    12:57

2    And it just seems to be classic cross-examination.    12:58

3    They offer a case agent to talk about their    12:58

4    investigation, and we should be entitled to explore    12:58

5    the techniques that were used and that weren't used.    12:58

6         THE COURT:  So the jury gets an instruction    12:58

7    that they're -- it's not -- I'm not quite sure how it    12:58

8    reads, but that it's not a concern to the jury what    12:58

9    investigative techniques the government used or did    12:58

10   not use, only whether the evidence derived from their    12:58

11   techniques satisfied the standard of beyond a    12:58

12   reasonable doubt.    12:58

13        So explain to me why you think that you    12:58

14   should be entitled to explore techniques used and    12:58

15   techniques that weren't used when the Court is going    12:59

16   to be telling them that that's actually not their    12:59

17   province.    12:59

18        MR. SPEARS:  Your Honor, it goes to the    12:59

19   credibility of the investigation and the quality of    12:59

20   the evidence.    12:59

21        THE COURT:  So tell me about this credibility    12:59

22   of the investigation.  You're not claiming it's    12:59

23   credibility of Sharafi because he's not even going to    12:59

24   testify.  Give me a little better sense of why it    12:59

25   goes to the quality of the evidence that's before the    12:59

1    jury.                                                      12:59

2         MR. SPEARS:  Thank you, Your Honor.  This --          12:59

3    the chronology of this investigation was that it          12:59

4    began with Sharafi and it began with the                  13:00

5    nonprosecution agreement.  And from there it led to       13:00

6    the recording of Rothschild, and we know what the         13:00

7    chronology is from that point forward.                    13:00

8         But when the government's very own witnesses          13:00

9    are saying that the witness that it based its             13:00

10   investigation on is untrustworthy, that goes to the       13:00

11   credibility of the investigation and the -- it's just     13:00

12   challenging the basic core of the government's case.      13:00

13        THE COURT:  But that's where you're losing           13:00

14   me, so please explain.  You say that because Sharafi      13:00

15   wasn't trustworthy and everybody was telling -- I         13:00

16   don't know whether you're claiming that they told the     13:00

17   government that.  But why does that discredit what --     13:00

18   the investigation that's independent of Sharafi           13:01

19   thereafter, why does that discredit that part of the      13:01

20   investigation?                                            13:01

21        So you start out with a bad witness and,             13:01

22   nonetheless, you carry out your investigation and you     13:01

23   get some good witnesses.  So that's the link I don't      13:01

24   understand.                                               13:01

25        MR. SPEARS:  Your Honor, I appreciate the            13:01

 1    question.  It just seems sort of -- sort of                    13:01

 2    fundamental almost in a cross-examination of a case            13:01

 3    agent who's now marshaling their investigation.                13:01

 4    Right now, it's happening.                                     13:01

 5            And I tried to object to it, but he's                   13:01

 6    marshaling the evidence that we can't come back and            13:01

 7    say, well, but there were other problems with your             13:01

 8    case, weren't there?  And to have struck a deal with           13:01

 9    Sharafi and to now apparently not be calling him when          13:02

10    they have -- they have the ability to present his              13:02

11    testimony to this jury, the jury should know that.             13:02

12    The jury should know that.                                     13:02

13            THE COURT:  Should know that they have the             13:02

14    ability to present it?                                         13:02

15            MR. SPEARS:  Yes.                                      13:02

16            THE COURT:  Do you not?                                13:02

17            MR. NOVICK:  Of course they do, Your Honor.            13:02

18    If they want to call him, I'm more than happy to               13:02

19    cross-examine him.                                             13:02

20            THE COURT:  You're not looking for a missing           13:02

21    witness instruction?                                           13:02

22            MR. SPEARS:  Your Honor, I think that's a              13:02

23    separate question, I think, that we may need to                13:02

24    address.                                                       13:02

25            THE COURT:  Do you have the capacity to                13:02

1  call -- to subpoena Sharafi and get him here?    13:02

2          MR. SPEARS:  I don't know where he is.    13:02

3          MR. NOVICK:  They don't even need to subpoena    13:02

4  him, Judge.  I will --    13:02

5          THE COURT:  What?    13:02

6          MR. NOVICK:  They don't even need to subpoena    13:02

7  him.  I will make him -- I'll have him come here.  If    13:02

8  they want to give a subpoena, we'll serve it.    13:02

9          THE COURT:  All right.  Let me just hear --    13:02

10 let me just take for the time being an assumption    13:02

11 that it's not that Sharafi is unavailable.    13:03

12          But what's the government's response to    13:03

13 Mr. Spears' argument that when you start out with    13:03

14 tainted material, your investigation is resultingly    13:03

15 potentially tainted and the jury is entitled to hear    13:03

16 that?    13:03

17          MR. NOVICK:  Your Honor, the case and the    13:03

18 trial is about the evidence before the jury and the    13:03

19 evidence to the witnesses and the evidence of the    13:03

20 documents.  And to the extent that he wants to employ    13:03

21 Sharafi against those witnesses, he can call them and    13:03

22 do that, put that evidence in.    13:03

23          There's no taint here in the way there would    13:03

24 be a Fourth Amendment taint from a search.  There's    13:03

25 no fruit of the poisonous tree just because we got    13:03

1    information early in the investigation from Sharafi.    13:03

2    I think it's entirely inaccurate to characterize us    13:04

3    as basing our trial case here against Mr. Hoskins on    13:04

4    Mr. Sharafi, evidenced by the fact that we have no    13:04

5    intent or in our view need to call him.    13:04

6         As far as Special Agent Coleman being a --    13:04

7    testifying about the investigation, that's just    13:04

8    patently not true.  I've not asked him how did this    13:04

9    investigation began.  In fact, in part because it's    13:04

10   irrelevant, in part because that's a long story, Your    13:04

11   Honor, that takes us onto a long sideshow and is    13:04

12   entirely irrelevant, involves issues of international    13:04

13   cooperation and MLATs, much of which Your Honor is    13:04

14   already aware of that I don't think is relevant for    13:04

15   the jury consideration as to the quality of the    13:04

16   government's evidence in this case.    13:04

17        I have no intention of asking Special Agent    13:04

18   Coleman anything other than what I'm doing now, which    13:04

19   is to read documents that we intend to put into    13:04

20   evidence.  I may ask him to read documents that    13:05

21   compare one to the other.  I may have transition    13:05

22   questions that are designed just to tell the jury    13:05

23   where I'm going next, which I can eliminate if need    13:05

24   be, and he's going to be a summary witness.  He's    13:05

25   going to put in some summary charts.    13:05

1       He is not talking about the history of the          13:05

2  investigation.  He is not talking about anything like    13:05

3  that.  There is zero, there is no fundamental            13:05

4  component to being allowed to explore the initiation     13:05

5  of investigation any more than in a wiretap trial        13:05

6  that the government is not obliged to put on or talk      13:05

7  about any informant who may have provided information     13:05

8  in the early stages.  It's just -- I'm not aware of       13:05

9  any fundamental rule that the counsel is referring       13:05

10  to.                                                       13:05

11       MR. SPEARS:  Your Honor, if I can just             13:05

12  respond.                                                  13:05

13       THE COURT:  You may.                               13:05

14       MR. SPEARS:  It is a standard                      13:05

15  cross-examination technique, for example, to get into    13:05

16  the absence of recordings, and surely that's an          13:05

17  appropriate grounds for cross.  It's the same thing      13:06

18  here.  Where is Sharafi --                               13:06

19       MR. NOVICK:  Why is that --                        13:06

20       MR. SPEARS:  -- when the government can --         13:06

21  he's obligated under the agreement to appear at their    13:06

22  direction and that's what the nonprosecution             13:06

23  agreement sets forth.                                     13:06

24       MR. NOVICK:  Our decision as to whether to         13:06

25  call him -- so then he's asking for a missing witness    13:06

1    charge, Judge, and that is inappropriate here.  He is        13:06

2    equally available to both parties.  The government's        13:06

3    decision as to who they call is entirely irrelevant        13:06

4    to the jury's consideration.        13:06

5          MR. SPEARS:  And the reason the government        13:06

6    doesn't want this evidence in is because they know        13:06

7    how valuable it is to us in terms of exposing the        13:06

8    problems with their investigation.        13:06

9          MR. NOVICK:  Then they can call him.  Then        13:06

10   they could call him.        13:06

11         THE COURT:  I have your case --        13:06

12         MR. SPEARS:  Put the nonprosecution agreement        13:06

13   in?        13:06

14         MR. NOVICK:  Then call him to testify.        13:06

15         THE COURT:  I have your briefings from the        13:06

16   motion in limine.  I will go back and refresh my        13:07

17   recollection on that.  I have your arguments.  I        13:07

18   understand what your respective positions are.  Thank        13:07

19   you.        13:07

20         MR. SPEARS:  Thank you, Your Honor.        13:07

21         THE COURT:  Why don't we plan to come back at        13:07

22   2, and hopefully I will be ready to talk to you.  All        13:07

23   right.  Thank you.  We stand in recess.        13:07

24         (Lunch recess from 1:07 p.m. to 2:24 p.m.)        13:07

25         THE COURT:  All right.  Please be seated,        14:24

| | | |
|---|---|---|
| 1 | ladies and gentlemen.  I'm prepared -- I have | 14:24 |
| 2 | prepared a ruling on the issue of the admissibility | 14:24 |
| 3 | of 453 and 454.  I'm going to give that to you after | 14:24 |
| 4 | the jury goes home. | 14:24 |
| 5 | Let's bring the jury back and continue with | 14:24 |
| 6 | the testimony of Agent Coleman.  I have some further | 14:24 |
| 7 | questions with respect to what the defense intends | 14:24 |
| 8 | because -- intends to ask and why.  But we'll go over | 14:24 |
| 9 | that after the jury goes home.  All right? | 14:24 |
| 10 | MR. NOVICK:  Your Honor, I'm sorry.  One -- | 14:24 |
| 11 | because I don't know what the Court's ruling is on | 14:24 |
| 12 | the document, I do have another document that I could | 14:24 |
| 13 | put in through Special Agent Coleman with Winan Kusno | 14:24 |
| 14 | on it.  I wasn't intending to because I didn't think | 14:25 |
| 15 | it was important to my case, but it certainly has | 14:25 |
| 16 | reference to Mr. Kusno being -- | 14:25 |
| 17 | THE COURT:  I want to get -- I'm sorry.  I | 14:25 |
| 18 | want to get the jury back in here.  I know we're not | 14:25 |
| 19 | going to finish Agent Coleman today. | 14:25 |
| 20 | MR. NOVICK:  No, we're not. | 14:25 |
| 21 | THE COURT:  Okay. | 14:25 |
| 22 | (Jury entered the proceedings, 2:25 p.m.) | 14:25 |
| 23 | THE COURT:  All right.  Please be seated, | 14:25 |
| 24 | ladies and gentlemen.  Mr. Novick will continue with | 14:25 |
| 25 | the direct examination of Mr. Coleman. | 14:26 |

1          You may proceed.                                    14:26

2          MR. NOVICK:  Thank you, Your Honor.                 14:26

3    BY MR. NOVICK:                                            14:26

4      Q.    Special Agent Coleman, we had left off on        14:26

5    Exhibit 440 which is in evidence.                         14:26

6          MR. NOVICK:  440, yeah.                             14:26

7    BY MR. NOVICK:                                            14:27

8      Q.    All right.  So we had left off here on this      14:27

9    e-mail from Bruno Kaelin to Fred Pierucci, copying        14:27

10   Mr. Hoskins on February 18, 2003, correct?                14:27

11     A.    Yes, sir.                                         14:27

12     Q.    It was discussing -- I'm not going to have        14:27

13   you read it again.  But in short, it was discussing       14:27

14   using Sharafi's U.S. company for the consultancy          14:27

15   agreement.  Is that right in general terms?               14:27

16     A.    Yes, it is.                                       14:27

17     Q.    Okay.  So take a look now at Exhibit 53 for       14:27

18   identification.  What is this?                            14:27

19     A.    It's a consultancy agreement between Alstom       14:27

20   Power, Inc., and Pacific Resources, Inc.                  14:27

21     Q.    All right.  As regards the Tarahan contract?      14:27

22     A.    Yes, it is.                                       14:27

23     Q.    And what's the date of it?                        14:27

24     A.    Third of March 2003.                              14:27

25         MR. NOVICK:  Your Honor, I'd offer Exhibit          14:27

```
 1    53.                                                    14:28
 2            MR. SPEARS:  No objection, Your Honor.         14:28
 3            THE COURT:  Full exhibit.                      14:28
 4    BY MR. NOVICK:                                         14:28
 5      Q.    All right.  Just to highlight a couple of      14:28
 6    sections, where -- this is an agreement between        14:28
 7    Alstom Power, Inc., and Pacific Resources; is that     14:28
 8    right?                                                 14:28
 9      A.    Yes, sir.                                      14:28
10      Q.    And Pacific Resources is listed as being       14:28
11    located where?                                         14:28
12      A.    United States.                                 14:28
13      Q.    In Bethesda, Maryland, specifically?           14:28
14      A.    Yes, sir.                                      14:28
15      Q.    And the jury has heard reference to multiple   14:28
16    consultancy agreements.  I just want to make sure we   14:28
17    are clear on which one this one is.  We can take a     14:28
18    look at the remuneration section on page 3.  What's   14:28
19    the percentage that this one entailed, the percentage 14:28
20    of the contract?                                       14:28
21      A.    Three percent.                                 14:28
22      Q.    So this was the first of the Sharafi -- the    14:28
23    Pacific Resources agreements?                          14:28
24      A.    Related to the Tarahan Project, yes, sir.      14:28
25      Q.    Okay.  Okay.  Let's switch topics.            14:29
```

1        You heard -- the jury has heard evidence          14:29

2    regarding a change in the Tarahan consultants.  Do     14:29

3    you recall that?                                       14:29

4        A.    Yes, sir.                                    14:29

5        Q.    Did you review documents related to that     14:29

6    issue?                                                 14:29

7        A.    Yes, I did.                                  14:29

8        Q.    And related to consultancy agreements?       14:29

9        A.    Yes, sir.                                    14:29

10       Q.    All right.  Let's switch gears and -- first,  14:29

11   just to orient ourselves here, let's look at 485       14:29

12   which is already in evidence.  And I'll direct you to  14:29

13   the bottom e-mail, the last e-mail which begins at     14:30

14   the bottom of page 1 from Reza Moenaf, top of page 2   14:30

15   to Lawrence Hoskins.  Do you see that?                 14:30

16       A.    Yes, I do.                                   14:30

17       Q.    And that's dated September 30, 2003; is that  14:30

18   right?  I'll take you back to the second page --       14:30

19   excuse me, the first page at the bottom there.         14:30

20       A.    Yes.  There it is.  Thank you.               14:30

21       Q.    All right.  I'm just going to highlight and  14:30

22   ask you to read those couple of lines that I've just   14:30

23   highlighted.                                           14:30

24       A.    "Eko also informed me there has been         14:30

25   discussion between Fred, Marubeni and Pirooz           14:30

1    yesterday where Pirooz committed to convince EM that    14:30

2    one is enough."    14:30

3        Q.    All right.  Now let's take a look at Exhibit    14:31

4    467.  What is this?    14:31

5        A.    This is an e-mail from Pirooz Sharafi to Fred    14:31

6    Pierucci sent on the 8th of October 2003, subject:    14:31

7    "Indonesia."    14:31

8                MR. NOVICK:  I offer 467.    14:31

9                MR. SPEARS:  No objection, Your Honor.    14:31

10                THE COURT:  Full exhibit.    14:31

11    BY MR. NOVICK:    14:31

12        Q.    All right.  Can you please read the    14:31

13    highlighted paragraph?    14:31

14        A.    "The contract is basically fine.  Emir is    14:31

15    trying to verify that in case he has to do horse    14:31

16    trading with Yusril, the expenses are not coming from    14:31

17    my contract, but he has not managed to talk to Eddie    14:31

18    directly in part because he does not want to address    14:31

19    the issue directly."    14:32

20        Q.    This e-mail, October 8, 2003, is a little    14:32

21    more than a week after the prior e-mail we just    14:32

22    looked to, looked at?    14:32

23        A.    Yes, sir.    14:32

24        Q.    Okay.  And now I'll just have you focus on    14:32

25    the next paragraph.  Go ahead and read that.    14:32

1    A.    "I have one minor comment though.  Could you    14:32

2    fix the payment dates for the 30 percent and 70    14:32

3    percent?  First portion at the activation of the    14:32

4    contract when it is signed and the down payment is    14:32

5    made and the second one four or six months    14:32

6    thereafter.  Given the nature of my involvement or    14:32

7    lack thereof with PLN under the new scheme, my friend    14:32

8    and I do not want to be involved in the PLN    14:32

9    performance and payment issues."    14:32

10    Q.    And just again to take you back to that    14:33

11    earlier e-mail, 485.    14:33

12        MR. SPEARS:  Your Honor, I'm going to object    14:33

13    as cumulative.  We've read the e-mail previously,    14:33

14    again today.    14:33

15        THE COURT:  What is the purpose of going back    14:33

16    to 485?    14:33

17        MR. NOVICK:  To lay a foundation and    14:33

18    understanding of what the -- 467 is about, Your    14:33

19    Honor.    14:33

20        MR. SPEARS:  This isn't the witness to talk    14:33

21    about the understanding.    14:33

22        MR. NOVICK:  I'm not asking him for the    14:33

23    understanding.  I'm simply having him read words and    14:33

24    a document that's already in evidence.    14:33

25        THE COURT:  Well, we have 485.  We've had it    14:33

| | | |
|---|---|---|
| 1 | read to the jury.  Can't we move on, please? | 14:33 |
| 2 | MR. NOVICK:  That's fine, Your Honor. | 14:33 |
| 3 | BY MR. NOVICK: | 14:33 |
| 4 | Q.   Let's take a look now at Exhibit 470 for | 14:33 |
| 5 | identification.  What's this? | 14:33 |
| 6 | A.   This is an e-mail from William Pomponi to | 14:34 |
| 7 | Lawrence Hoskins, with a copy to Bruno Kaelin, Reza | 14:34 |
| 8 | Moenaf, Veronique Etienne and Fenge Fengge, sent on | 14:34 |
| 9 | the 13th of October 2003, subject of Tarahan. | 14:34 |
| 10 | MR. NOVICK:  Your Honor, I'd offer 470. | 14:34 |
| 11 | MR. SPEARS:  No objection, Your Honor. | 14:34 |
| 12 | THE COURT:  Full exhibit. | 14:34 |
| 13 | BY MR. NOVICK: | 14:34 |
| 14 | Q.   Is this responding to an earlier e-mail from | 14:34 |
| 15 | Mr. Hoskins? | 14:34 |
| 16 | A.   Yes, it is. | 14:34 |
| 17 | Q.   Take a look at that earlier e-mail on October | 14:34 |
| 18 | 1, 2003, from Mr. Hoskins to Mr. Pomponi.  Can you | 14:34 |
| 19 | read that? | 14:34 |
| 20 | A.   "Bill, my assistant Fengge will fax copy of | 14:34 |
| 21 | letter proposed to Azmin for your comment.  It is | 14:34 |
| 22 | more or less the same format as sent to him | 14:34 |
| 23 | originally on the MT project.  Regards, Lawrence." | 14:34 |
| 24 | Q.   Now take a look at the response from | 14:35 |
| 25 | Mr. Pomponi.  Go ahead and read that. | 14:35 |

1    A.    "Based upon our telecon Sunday, please go       14:35

2  ahead using today's date and issue the fax officially    14:35

3  to Azmin.  Please send copy via LN attachment to         14:35

4  myself."                                                  14:35

5    Q.    And that's from Mr. Pomponi to Mr. Hoskins?     14:35

6    A.    Yes, sir.                                        14:35

7    Q.    Take a look now at 476 and 476-A for            14:35

8  identification.  What is it?                              14:35

9    A.    This is an e-mail from William Pomponi to       14:35

10  Veronique Etienne, copied to Lawrence Hoskins and        14:35

11  Bruno Kaelin, sent on the 20th of January 2004,          14:35

12  subject:  "Pacific Resources, Inc., Pirooz," with        14:36

13  attachment Pacific Resources.zip.                        14:36

14         MR. NOVICK:  I'd move 476, Your Honor.           14:36

15         MR. SPEARS:  No objection.                       14:36

16         THE COURT:  Full exhibit.                        14:36

17  BY MR. NOVICK:                                           14:36

18    Q.    All right.  So on the left-hand side --         14:36

19         THE COURT:  76 and 76-A.  There's no            14:36

20  objection to either, correct, Mr. Spears?                14:36

21         MR. SPEARS:  No objection to either.             14:36

22         THE COURT:  Full exhibits.                       14:36

23  BY MR. NOVICK:                                           14:36

24    Q.    All right.  On the left-hand side is the        14:36

25  e-mail.  On the right-hand side, what is that?           14:36

989

1    A.    On the right-hand side is a business card for                14:36

2    Pirooz Sharafi, president of Pacific Resources, Inc.              14:36

3    Q.    Okay.  And is it the first page of a                         14:36

4    several-page document?                                            14:36

5    A.    Yes, it is.                                                  14:36

6    Q.    That's the attachment to the e-mail 476-A?                   14:36

7    A.    Yes, it is.                                                  14:36

8    Q.    All right.  Let's just look at the e-mail                    14:36

9    first.  What does Mr. Pomponi write here?                         14:36

10    A.    "Please find attached Pirooz Sharafi's                      14:37

11    agreement for Tarahan 3/4 with changes/corrections.              14:37

12    The changes/corrections have been discussed with Fred            14:37

13    Pierucci and are agreed.  Please finalize and submit             14:37

14    back to Fred and I for execution.  Thanks for your               14:37

15    assistance."                                                      14:37

16    Q.    And it notes that there's an attachment                     14:37

17    there, Pacific Resources.pdf; is that right?                      14:37

18    A.    It does, yes.                                               14:37

19    Q.    All right.  And if you would just take a look              14:37

20    at the right-hand side, I'll go to the second page of           14:37

21    476-A.  What is that?                                            14:37

22    A.    This is the consultancy agreement or draft of             14:37

23    the consultancy agreement between Alstom Power, Inc.,            14:37

24    and Pacific Resources, Inc., regarding the Tarahan              14:37

25    Project in Indonesia.                                            14:37

1    Q.    Okay.  And if we scroll to the Article 6.1    14:37
2    section, and I'll highlight that, what's the    14:37
3    consultancy fee in this one?    14:37
4    A.    One percent.    14:38
5    Q.    You said this is a draft of the consultancy    14:38
6    agreement?    14:38
7    A.    Yes, sir.    14:38
8    Q.    All right.  Let's take a look at 477 for    14:38
9    identification.  I'll put 477 on the left-hand side    14:38
10   and 470- -- sorry, 478 -- 477-A on the left-hand    14:38
11   side.  Let me try that again.    14:38
12        We'll do 477 on the left-hand side and 477-A    14:38
13   on the right-hand side.  Do you see that?    14:38
14   A.    Yes, sir.    14:38
15   Q.    Okay.  What is 477?    14:38
16   A.    477 is an e-mail from William Pomponi to    14:38
17   Veronique Etienne, with a copy to Lawrence Hoskins    14:38
18   and Bruno Kaelin, sent on the 20th of January 2004.    14:38
19   Subject is Azmin's agreement, Tarahan 3/4, with an    14:39
20   attachment, Azmin's Agreement.zip.    14:39
21        MR. NOVICK:  I'd move 477 and 477-A.    14:39
22        MR. SPEARS:  No objection, Your Honor.    14:39
23        THE COURT:  Full exhibit -- full exhibits for    14:39
24   both.    14:39
25   BY MR. NOVICK:    14:39

```
1    Q.    Let's take a look now at 477.  You said this    14:39
2  is from Mr. Pomponi to Ms. Etienne, copying          14:39
3  Mr. Hoskins and Mr. Kaelin, correct?                 14:39
4    A.    Yes, sir.                                     14:39
5    Q.    Can you read Mr. Pomponi's message?           14:39
6    A.    "Please find attached Azmin's agreement for  14:39
7  Tarahan 3/4 with associate keys."  And a document.   14:39
8    Q.    Does it read "Azmin's agreement.doc"?         14:39
9    A.    Yes, it does.                                 14:39
10    Q.    And then what's the next line?                14:39
11    A.    "Please create the agreement and submit back 14:39
12  to Fred and I for execution.  Thanks for your        14:39
13  assistance."                                         14:39
14    Q.    And then on 477-A, what's this document       14:39
15  entitled?                                            14:39
16    A.    "Consultancy Agreement Keys."                14:40
17    Q.    All right.  And reads, "Request made by       14:40
18  William Pomponi," correct?                           14:40
19    A.    Yes.                                          14:40
20    Q.    And agreement prepared on behalf of, can you  14:40
21  read just those couple lines?                        14:40
22    A.    "Name of concerned, Alstom sector, Alstom     14:40
23  Power, Inc., USA.  Name of concerned, Alstom business 14:40
24  unit, boiler and environmental."                     14:40
25    Q.    And what's the place of business listed?      14:40
```

1    A.    2000 Day Hill Road, Windsor, Connecticut,    14:40

2    06095, USA.    14:40

3    Q.    And then on -- sorry.  One moment.    14:40

4         Under "the consultant," what's listed?    14:40

5    A.    PT Gajendra Adhi Sakti.    14:40

6    Q.    And name of -- under name?    14:40

7    A.    Azmin Aulia, director.    14:41

8    Q.    Okay.  And then if we scroll down to the    14:41

9    third page under the remuneration and compensation    14:41

10   section, what's the percentage listed in this keys    14:41

11   document?    14:41

12   A.    Two percent.    14:41

13   Q.    And the basis of the remuneration?    14:41

14   A.    The total Alstom contract value.    14:41

15   Q.    All right.  And then it has listed a series    14:41

16   of terms of payment; is that right?    14:41

17   A.    It does, yes.    14:41

18   Q.    Okay.  Let's move on to Exhibit 481 for    14:41

19   identification.  What is this?    14:41

20   A.    This is an e-mail from Veronique Etienne to    14:41

21   William Pomponi, with a copy to Bruno Kaelin and    14:42

22   Lawrence Hoskins, sent on 5th of February 2004,    14:42

23   subject:  "Azmin's agreement."    14:42

24        MR. NOVICK:  I move 481.    14:42

25        MR. SPEARS:  No objection.    14:42

| | | |
|---|---|---|
| 1 | THE COURT:  Full exhibit. | 14:42 |
| 2 | BY MR. NOVICK: | 14:42 |
| 3 | Q.    And what does Ms. Etienne write? | 14:42 |
| 4 | A.    "Dear William, this file is now with L. | 14:42 |
| 5 | Hoskins for approval.  Best regards." | 14:42 |
| 6 | Q.    And it refers "Azmin's agreement," correct? | 14:42 |
| 7 | A.    It does. | 14:42 |
| 8 | Q.    And then 484-A, what's that?  Excuse me.  484 | 14:42 |
| 9 | and 484-A.  What are those? | 14:43 |
| 10 | A.    484 is an e-mail from William Pomponi to | 14:43 |
| 11 | Veronique Etienne, with a copy to Bruno Kaelin, | 14:43 |
| 12 | Lawrence Hoskins, Frederic Pierucci, sent on the 26th | 14:43 |
| 13 | of February 2004, subject:  "Pacific Resources Inc., | 14:43 |
| 14 | Pirooz." | 14:43 |
| 15 | Q.    And -- go ahead. | 14:43 |
| 16 | A.    With an attachment, Pacific Resources Pirooz | 14:43 |
| 17 | Sharafi Agreement.zip. | 14:43 |
| 18 | MR. NOVICK:  I would move admission of 484 | 14:43 |
| 19 | and 484-A, Your Honor. | 14:43 |
| 20 | MR. SPEARS:  No objection to either. | 14:43 |
| 21 | THE COURT:  Full exhibits. | 14:43 |
| 22 | BY MR. NOVICK: | 14:43 |
| 23 | Q.    Can you read Mr. Pomponi's message on 484, | 14:43 |
| 24 | please? | 14:43 |
| 25 | A.    "Agreement was signed yesterday, February | 14:43 |

1    25th, and signed copy is attached for your files.    14:43

2    This now negates the previous agreement with Pacific    14:43

3    Resources which had been signed last year from a" --    14:43

4    "form a total commission of 3 percent.  Please make    14:43

5    note in your files.  Thanks for your assistance."    14:43

6        Q.    And you said that there was an attachment    14:44

7    that was on the right-hand side of the screen.  What    14:44

8    is that?    14:44

9        A.    That is the executed version of a consultancy    14:44

10   agreement between Alstom Power, Inc., and Pacific    14:44

11   Resources, Inc., regarding the Tarahan Project in    14:44

12   Indonesia signed on the 25th of February 2004.    14:44

13       Q.    This is an executed version of the document,    14:44

14   the 3 percent -- excuse me, the 1 percent document we    14:44

15   just looked at?    14:44

16       A.    Yes, it is.    14:44

17       Q.    Okay.    14:44

18           MR. NOVICK:  Your Honor, at this point I    14:44

19   would also move admission of Exhibit 56 which is the    14:44

20   same documents in Alstom's files.    14:44

21           MR. SPEARS:  No objection.    14:44

22           THE COURT:  Full exhibit.    14:44

23   BY MR. NOVICK:    14:45

24       Q.    Next let's take a look at Exhibit 54.  What    14:45

25   is that?    14:45

1    A.    This is a service agreement entered into on    14:45

2    the 9th of December 2003 between Marubeni Corporation    14:45

3    and Pacific Resources, Inc.    14:45

4        MR. NOVICK:   I move admission of Exhibit 54.    14:45

5        MR. SPEARS:  No objection.    14:45

6        THE COURT:  Full exhibit.    14:45

7    BY MR. NOVICK:    14:45

8    Q.    All right.  You said this is between Marubeni    14:45

9    and Pacific Resources, correct?    14:45

10   A.    Yes, sir.    14:45

11   Q.    Okay.  And is that -- if I read this    14:45

12   highlighted portion, "Whereas Marubeni in consortium    14:46

13   with Alstom Power, Inc., USA, desires to be qualified    14:46

14   and awarded the project," correct?    14:46

15   A.    Yes, sir.    14:46

16   Q.    And the project is defined above as the    14:46

17   Tarahan coal-fired steam power plant Units 3 and 4?    14:46

18   A.    Yes, it is.    14:46

19   Q.    And then, "Whereas Marubeni wishes to employ    14:46

20   the services of consultant as an advisor and    14:46

21   consultant with respect to the project"?    14:46

22   A.    Yes, that's what it says.    14:46

23   Q.    And then if we scroll to the second page,    14:46

24   does it list a remuneration here for the consultant?    14:46

25   A.    Yes, it does.    14:46

| | | |
|---|---|---|
| 1 | Q.    And what's that? | 14:46 |
| 2 | A.    One percentage of the Marubeni portion of the | 14:46 |
| 3 | contract price. | 14:46 |
| 4 | Q.    Same as the Alstom Power, Inc., agreement | 14:46 |
| 5 | with Sharafi? | 14:46 |
| 6 | A.    Yes, that's correct. | 14:46 |
| 7 | Q.    Okay.  Let's move on topics. | 14:46 |
| 8 | Do you recall or you've heard testimony | 14:47 |
| 9 | regarding terms of payment for the consultants.  Do | 14:47 |
| 10 | you recall that? | 14:47 |
| 11 | A.    Yes, I do. | 14:47 |
| 12 | Q.    Did you review documents related to that | 14:47 |
| 13 | subject? | 14:47 |
| 14 | A.    Yes, I did. | 14:47 |
| 15 | Q.    Again, on which projects? | 14:47 |
| 16 | A.    On Tarahan and Muara Tawar. | 14:47 |
| 17 | Q.    Let's take a look at Exhibit 486.  What is | 14:47 |
| 18 | this? | 14:47 |
| 19 | A.    This is an e-mail from Lawrence Hoskins to | 14:47 |
| 20 | Yves Mouillet, subject:  "CA Tarahan 3 and 4," sent | 14:47 |
| 21 | on the 3rd of March 2004, with an attachment, | 14:47 |
| 22 | Appendix T-C 7-2 Tarahan.zip. | 14:47 |
| 23 | MR. NOVICK:  Your Honor, I'd move admission | 14:47 |
| 24 | of 46. | 14:47 |
| 25 | MR. SPEARS:  No objection. | 14:48 |

1         THE COURT:  Full exhibit.                              14:48

2  BY MR. NOVICK:                                                14:48

3     Q.    So this, Special Agent Coleman, is this             14:48

4  responding to -- excuse me, or forwarding an earlier         14:48

5  e-mail from Reza Moenaf to Lawrence Hoskins?                 14:48

6     A.    Yes, it is.                                          14:48

7     Q.    Is that on -- and I'll highlight that,              14:48

8  March 3, 2004; is that right?                                14:48

9     A.    It is right, yes.                                    14:48

10    Q.    All right.  Let's focus in on that e-mail for       14:48

11  a moment.  Can you read the first few lines?                14:48

12    A.    "Hi, Lawrence.  As you know, we just resolved       14:48

13  various CA issue on Tg Priok Gilimanuk and MT add-on        14:48

14  but the next one is coming, Tarahan.  The issue is          14:48

15  not much different with the others, payment term."          14:48

16    Q.    All right.  Go ahead and read the next             14:48

17  portion.                                                     14:48

18    A.    "Last Monday we sent Tarahan CA to Azmin.  He       14:48

19  immediately feel cornered after reading the ToP which       14:49

20  said pro rata.  When I talked to him on the phone I         14:49

21  said I will look in -- look at it and I thought it          14:49

22  should not be that bad.  I then looked into the             14:49

23  Tarahan ToP, see attached, and realize that the            14:49

24  project payment is spread over 3 1/2 year.  You would       14:49

25  understand why he is worry, he is willing to               14:49

1   prefinance his scope fulfilling his commitment up          14:49

2   front prior he get paid to get the right influence        14:49

3   but certainly not waiting two to three years to get       14:49

4   paid while most of his scope completed in the             14:49

5   beginning."                                               14:49

6       Q.    Then can you read the last few lines?          14:49

7       A.    "When he called me again today, he asked me    14:49

8   whether we could agree on ToP as per MT add-on.  I        14:49

9   said I doubt it.  He then said since his remuneration     14:49

10  is two and we asked him for help to turn our position     14:49

11  around, at least we should consider to complete the       14:49

12  payment in one year."                                     14:49

13      Q.    Okay.  Now let's take a look, you said that     14:50

14  this was forwarded by Mr. Hoskins to Yves Mouillet,       14:50

15  correct?                                                  14:50

16      A.    Yes, sir.                                       14:50

17      Q.    Can you read that one for us?                   14:50

18      A.    "Yves, can you discuss this with Veronique      14:50

19  and go back to Reza with a suggestion?  Veronique         14:50

20  knows the proposed terms for MT add-on.  These were       14:50

21  special and we must spread more on Tarahan.  Thanks.      14:50

22  Lawrence."                                                14:50

23      Q.    Take a look now at 487 for identification.      14:50

24  What's that?                                              14:50

25      A.    This is an e-mail from Reza Moenaf to           14:50

| | |
|---|---|
| 1 | Lawrence Hoskins sent on the 11th of March 2004, | 14:50 |
| 2 | subject: "CA for Azmin." | 14:50 |
| 3 |         MR. NOVICK: I'd move admission of 487. | 14:50 |
| 4 |         MR. SPEARS: No objection. | 14:50 |
| 5 |         THE COURT: Full exhibit. | 14:51 |
| 6 | BY MR. NOVICK: | 14:51 |
| 7 |   Q.   All right. Is this e-mail forwarding an | 14:51 |
| 8 | earlier chain of e-mails? | 14:51 |
| 9 |   A.   I think it's responding to one that was | 14:51 |
| 10 | forwarded, yes. | 14:51 |
| 11 |   Q.   Okay. Well, let's go backwards in the | 14:51 |
| 12 | document to the first of the e-mails. It starts on | 14:51 |
| 13 | page 2. Do you see an e-mail from Yves Mouillet of | 14:51 |
| 14 | International Network to Reza Moenaf, copying Ion | 14:51 |
| 15 | Sculy, Bill Pomponi, Mr. Hoskins and Veronique | 14:51 |
| 16 | Etienne. Do you see that? | 14:51 |
| 17 |   A.   Yes, I do. | 14:51 |
| 18 |   Q.   The subject is CA Tarahan 3 and 4; is that | 14:51 |
| 19 | right? | 14:51 |
| 20 |   A.   Yes, it is. | 14:51 |
| 21 |   Q.   All right. And then there's a message to | 14:51 |
| 22 | Reza I'll put up on the screen. I'm not going to | 14:51 |
| 23 | have you read this. The jury can see it. But does | 14:52 |
| 24 | it list a series of potential terms of payment? | 14:52 |
| 25 |   A.   It does, yes. | 14:52 |

1    Q.    All right.  Let's go up one in the chain to                 14:52

2    page 1.  Actually, I'll put page 1 on the left-hand               14:52

3    side and page 2 on the right-hand side.                           14:52

4         What is the e-mail in the middle at the                      14:52

5    bottom of page 1?                                                 14:52

6    A.    It's an e-mail from William Pomponi to Reza                 14:52

7    Moenaf, copy to Fred Pierucci, Ion Sculy, Lawrence                14:52

8    Hoskins and Veronique Etienne.                                    14:53

9    Q.    Okay.  And also Yves Mouillet?                              14:53

10   A.    Yes.  Sorry, yes.                                           14:53

11   Q.    It says "Reza."  And then can you read the                  14:53

12   first couple lines?                                               14:53

13   A.    "We from Windsor cannot accept the terms                    14:53

14   posed by Yves.  These are far too negative for                    14:53

15   Windsor from a cash flow during execution."                       14:53

16   Q.    Then again, without reading all of this, is                 14:53

17   there a discussion about alternative terms of                     14:53

18   payment?                                                          14:53

19   A.    Yes, that's correct.                                        14:53

20   Q.    So go to the top of page 2, a continuation of               14:53

21   that e-mail, and go ahead and read the last three                 14:53

22   lines.                                                            14:53

23   A.    "I have discussed the above with Fred and he                14:53

24   is in agreement with my proposal especially since                 14:53

25   this was agreed previously with Pirooz.  Please                   14:53

1    convince Azmin that this is our very best."          14:53

2        Q.    And then from Reza Moenaf to Lawrence       14:54

3    Hoskins, what does Mr. Moenaf write?                  14:54

4        A.    "Lawrence, I would like to talk to you on how  14:54

5    we should handle this.  Please let me know when would  14:54

6    be the best timing for me to call you.  Best regards,  14:54

7    Reza."                                               14:54

8        Q.    All right.  Take a look now at Exhibit 490   14:54

9    for identification.  What is this?                   14:54

10       A.    This is an e-mail from Lawrence Hoskins to   14:54

11   Bill Pomponi, copy to Yves Mouillet, Frederic        14:54

12   Pierucci, Ion Sculy, and Veronique Etienne, sent on   14:54

13   the 18th of March 2004, subject:  "Tarahan CA."      14:55

14           MR. NOVICK:  I'd move admission of Exhibit     14:55

15   490.                                                 14:55

16           MR. SPEARS:  No objection.                    14:55

17           THE COURT:  Full exhibit.                     14:55

18   BY MR. NOVICK:                                       14:55

19       Q.    All right.  Let's take a look at the first --  14:55

20   I should say the first e-mail, the bottom e-mail on   14:55

21   the first page.  Do you see that in the middle of the  14:55

22   page?                                                14:55

23       A.    Yes, sir.                                   14:55

24       Q.    Forwarded by Lawrence Hoskins, but then it   14:55

25   lists an e-mail from William Pomponi to Ion Sculy,    14:55

1    Fred Pierucci copying Mr. Hoskins and Ms. Mouillet?    14:55

2        A.    Yes, sir.    14:55

3        Q.    And it reads, "I have Reza out in Indonesia    14:55

4    negotiating the CA terms with Azmin.  As you know,    14:55

5    the Tarahan estimate cannot tolerate such advance    14:55

6    payments and I'm not sure how we can accommodate    14:55

7    this."    14:55

8            Did I read that correctly?    14:55

9        A.    Yes, you did.    14:55

10       Q.    And can you read Mr. Hoskins' response to    14:55

11   Mr. Pomponi?    14:56

12       A.    "Bill, not sure where we are with this, but    14:56

13   for your info, Azmin is also requesting tougher terms    14:56

14   on other projects at the moment.  I cannot comment on    14:56

15   your cash flow but my advice in this instance is to    14:56

16   go with the latest recommendation of Yves/Reza.    14:56

17   Azmin has a lot of work to do to support us in a    14:56

18   negotiation and he and others are slightly negative    14:56

19   at the moment on Alstom support.  Lawrence."    14:56

20       Q.    All right.  491 is the next exhibit I'll put    14:56

21   in front of you.  What's this?    14:56

22       A.    This is an e-mail from Reza Moenaf to Eko    14:56

23   Sulianto, with a copy to Lawrence Hoskins, dated 18th    14:56

24   of March 2004, subject:  "Eddie."    14:56

25           MR. NOVICK:  I'd offer 491.    14:57

1      MR. SPEARS:  No objection.                          14:57

2      THE COURT:  Full exhibit.                           14:57

3  BY MR. NOVICK:                                          14:57

4      Q.    All right.  You said this is March 18, 2004?  14:57

5      A.    Yes.                                          14:57

6      Q.    From Reza Moenaf to Eko Sulianto, copying     14:57

7  Mr. Hoskins?                                            14:57

8      A.    Yes, that's correct.                          14:57

9      Q.    All right.  And go ahead and read the first   14:57

10  couple lines.                                          14:57

11     A.    "Eko, I have spoken to Eddie Widiono on the   14:57

12  phone as you suggested mainly to discuss two issues."  14:57

13     Q.    All right.  And then I'll have you read       14:57

14  beginning "Eddie said."                                14:57

15     A.    "Eddie said he was disappointed as every time 14:57

16  we go back to him we only asking for support without   14:57

17  showing any further commitment.  One of examples is    14:57

18  he understands from Azmin none CA on Tarahan is firm   14:57

19  to date.  He said we should do better like others      14:57

20  did.  Basically the discussion stop there.  I feel     14:57

21  that I am losing my grip never before.  I have tried   14:57

22  to contact Azmin in Amsterdam but cannot get through.  14:58

23  You should keep checking the temperature on other      14:58

24  project MT and Tuban.  I will talk with Lawrence and   14:58

25  discuss the situation with him."                       14:58

1    Q.    Take a look now at 492.  What's this?                    14:58

2    A.    This is an e-mail from Reza Moenaf to                    14:58

3    Frederic Pierucci, with a copy to Lawrence Hoskins            14:58

4    and William Pomponi, sent on the 22nd of March 2004,          14:58

5    subject:  "Indonesia."                                        14:58

6          MR. NOVICK:  Your Honor, I offer 492.                   14:58

7          MR. SPEARS:  No objection.                              14:58

8          THE COURT:  Full exhibit.                               14:58

9    BY MR. NOVICK:                                                 14:58

10    Q.    All right.  There are three e-mails in this            14:58

11    exhibit.  I want to take you to the second page.  At         14:58

12    the top you see an e-mail from P. Sharafi to Frederic        14:59

13    Pierucci?                                                     14:59

14    A.    Yes, I do.                                             14:59

15    Q.    Could you just read the paragraph beginning,           14:59

16    "We need a very strong support"?                             14:59

17    A.    "We need a very strong support from Eddie to           14:59

18    counter Mitsubishi's lobbying against us.  I am not          14:59

19    convinced that he is happy enough with us to provide         14:59

20    the support.  Emir is also unhappy because he thinks         14:59

21    Alstom has not firmly indicated its support to               14:59

22    Eddie."                                                       14:59

23    Q.    Now let's take a look at the next e-mail up            14:59

24    in the chain on the bottom of page 1 from Fred               14:59

25    Pierucci to Lawrence Hoskins, copying Bill Pomponi.          14:59

1    Do you see that?                                              14:59

2       A.    Yes, sir.                                            15:00

3       Q.    All right.  Could you read the message from         15:00

4    Mr. Pierucci?                                                 15:00

5       A.    "See attached.  Please check this again             15:00

6    urgently with Azmin.  Fred."                                  15:00

7       Q.    And then can you read the response or the           15:00

8    message from Reza to Pierucci?                                15:00

9       A.    "Fred, this is a known situation and it is          15:00

10   true that Eddie slowing down, no happy, in supporting        15:00

11   Alstom.  I have mentioned this in my earlier note to         15:00

12   Lawrence.  But what would you expect with 2 to 3             15:00

13   percent and a prorate ToP.  He shook his head when he        15:00

14   heard that the ToP is spread in three and a half             15:00

15   year.  Let's ask ourself what we have done which             15:00

16   showed our commitment to him.  Talking.  That is what        15:00

17   he said to me.  Be aware Eddie's reaction on Tarahan         15:00

18   is impacting Alstom's other project too.  I suggest          15:00

19   you to discuss this issue with Lawrence.  He is well         15:00

20   informed on the situation.  Unless we are willing to         15:00

21   change our approach, it is useless for me to talk to         15:00

22   Eddie.  Reza."                                               15:01

23      Q.    And just to be clear, this e-mail here was          15:01

24   from Reza to Pierucci, copying Mr. Hoskins and               15:01

25   Mr. Pomponi?                                                 15:01

1    A.    That's correct, yes.                              15:01

2         MR. NOVICK:  Your Honor, I can keep going.         15:01

3    I've got more documents.  I see it's 3 o'clock.  I'm    15:01

4    happy to continue but --                                15:01

5         THE COURT:  You have some more documents?          15:01

6         MR. NOVICK:  I have a few more.                     15:01

7         THE COURT:  I am surprised.                         15:01

8         Ladies and gentlemen, I'm going to let you go      15:01

9    home.  Have a pleasant weekend.  See you at 9 -- at     15:01

10   9:30 on Monday.  We are on track.  Have a pleasant      15:01

11   weekend.                                                15:01

12        (Jury exited the proceedings, 3:01 p.m.)           15:01

13        THE COURT:  All right.  Agent Coleman, you         15:02

14   are excused.  Let me resume -- have a pleasant          15:02

15   weekend.                                                15:02

16        THE WITNESS:  Yes, ma'am.                          15:02

17        THE COURT:  Let me resume my colloquy with         15:02

18   counsel.                                                15:02

19        MR. NOVICK:  Your Honor, before we do that,        15:02

20   just to -- I had spoken to counsel and I don't think    15:02

21   they have an objection, given the scope of Special      15:02

22   Agent Coleman's testimony thus far which is             15:02

23   principally to read documents, I don't think they       15:02

24   have an objection to him to continue to serve as our    15:02

25   case agent over the weekend given that he is our case   15:03

1    agent.  I don't anticipate talking to him about the                    15:03

2    documents that he has read, but it would be useful to                 15:03

3    be able to have him available to us at this point.                    15:03

4         MR. SPEARS:  No objection.                                        15:03

5         THE COURT:  All right.                                            15:03

6         MR. NOVICK:  I don't know that we'll need                         15:03

7    him, Your Honor, but just to be clear.                                 15:03

8         THE COURT:  Okay.  I have considered your                         15:03

9    arguments and the evidence with respect to the                        15:03

10   government's motion to admit Exhibits 453 and 454 --                  15:03

11   you all made be seated -- under 801(d)(2)(E) which                    15:03

12   provides that a statement which is, quote, offered                    15:03

13   against an opposing party and was made by the party's                 15:03

14   coconspirator during and in furtherance of the                       15:03

15   conspiracy is not hearsay.  The defendant objects                     15:04

16   arguing specifically that the statement made by Winan                 15:04

17   Kusno, his e-mail included in those exhibits, is not                  15:04

18   a coconspirator statement admissible under                           15:04

19   801(d)(2)(E) because defendant argues there must be                   15:04

20   independent corroboration of Mr. Kusno's status as a                 15:04

21   coconspirator and no such corroboration has been                     15:04

22   provided.                                                             15:04

23        U.S. versus Tellier states, quote,                              15:04

24   extrajudicial statements by coconspirators may be                    15:04

25   admitted if the government establishes by a                          15:04

1    preponderance of the evidence that there was a          15:04

2    conspiracy that both a declarant and a party against    15:04

3    whom the statements are offered were members of the     15:04

4    conspiracy and that the statements were made during     15:04

5    and in furtherance of the conspiracy, 82 F.3d 578 at    15:05

6    580 2d Circuit 1996 citing *Bourjaily v. United*        15:05

7    *States*, 483 US 171 at 175, 1987.                      15:05

8            As to Mr. Kusno's extrajudicial statement,     15:05

9    defendant only argues that the government has not       15:05

10   sufficiently established that the declarant Mr. Kusno   15:05

11   was a member of the conspiracy.                         15:05

12           Rule 801 provides that the out-of-court        15:05

13   statements at issue here, the e-mail by Mr. Kusno,      15:05

14   quote, must be considered but does not by itself        15:05

15   establish the existence of the conspiracy or            15:06

16   participation in it under Rule 801(d)(2)(E), end        15:06

17   quote, but it doesn't specify whether the, quote,       15:06

18   participation, quote, at issue is that of the           15:06

19   defendant, the declarant Mr. Kusno, or both.            15:06

20           The government urges, argues that the          15:06

21   independent corroboration of the declarant's           15:06

22   participation in the conspiracy is not required and     15:06

23   Mr. Kusno's statement alone may provide sufficient      15:06

24   evidence that Mr. Kusno was a coconspirator.            15:06

25           In support of this position, the government     15:06

1  cites Tellier and *U.S. v. Gigante* 166 F.3d 75 2d  15:06

2  Cir.1999.  But those cases address the separate  15:06

3  question of whether independent corroboration of the  15:06

4  defendant's status as a coconspirator is required and  15:07

5  nearly squarely addresses the question of whether  15:07

6  independent corroboration of the declarant's status  15:07

7  as a coconspirator is required.  15:07

8       Although the current text of Rule 801 doesn't  15:07

9  clearly indicate whose, quote, participation in, end  15:07

10  quote, the conspiracy must be supported by some  15:07

11  independent corroborating evidence.  Prior to its  15:07

12  amendment in 2011, Rule 802 did specify that, quote,  15:07

13  there must be independent corroborating evidence of,  15:07

14  quote, the existence of the conspiracy and the  15:07

15  participation therein of the declarant and the  15:07

16  defendants, *United States v. Saneaux*, 392 F. Supp. 2d  15:07

17  502 at 511, District of Connecticut 2005, quoting  15:07

18  Rule 801(d)(2)(E).  15:08

19       And according to the advisory committee notes  15:08

20  to the 2011 amendments to the Federal Rules of  15:08

21  Evidence, those amendments were a, quote, part of the  15:08

22  general restyling of the evidence rules to make them  15:08

23  more easily understood, quote, and were, quote,  15:08

24  intended to be stylistic only, end quote.  There was  15:08

25  no, quote, intent.  There was, quote, no intent to  15:08

1    change any result in any ruling on evidence                    15:08

2    admissibility, end quote.                                      15:08

3         But even if independent corroborating                     15:08

4    evidence of a declarant's status as a coconspirator           15:08

5    is required by Rule 801, the government argues that           15:08

6    it has provided such corroboration of Mr. Kusno's            15:08

7    status and thus his testimony is admissible under            15:08

8    Rule 801(d)(2)(E).                                            15:09

9         Mr. Puckett testified that Winan Kusno worked            15:09

10   on the efforts to win the Tarahan contract and that          15:09

11   Mr. Kusno knew that Alstom had hired a consultant to         15:09

12   try to win that contract.  Mr. Puckett also testified        15:09

13   that Winan Kusno knew what the consultants were hired        15:09

14   to do, explaining that Mr. Reza Moenaf told                   15:09

15   Mr. Puckett that Mr. Moenaf and Eko Sulianto had             15:09

16   instructed Mr. Kusno, quote, as to who was a                  15:09

17   consultant and what his job was, end quote.                   15:09

18        In Exhibits 453 and 454, Reza Moenaf                     15:09

19   forwarded Mr. Kusno's e-mail to others, including            15:09

20   Frederic Pierucci, Eko Sulianto, Larry Puckett and          15:09

21   the defendant Lawrence Hoskins.  In forwarding               15:09

22   Mr. Kusno's statement to Mr. Hoskins, Mr. Moenaf            15:10

23   wrote below -- wrote, quote, "Below are Winan's (our        15:10

24   PN in Palembang) report from meeting he had with           15:10

25   Marubeni and Marubeni and PLN last night.  As you          15:10

1  will notice, we have a serious agent problem," end                    15:10

2  quote.  That's Government's 454.                                      15:10

3       The Court finds that in combination,                            15:10

4  Mr. Puckett's testimony, Mr. Moenaf's forwarding of                   15:10

5  and comments on Mr. Kusno's e-mail and the e-mail                     15:10

6  itself demonstrate by a preponderance of the evidence                 15:10

7  that Mr. Kusno was a coconspirator, see Bourjaily 483                 15:10

8  U.S. at 176, quote, behold that when the preliminary                  15:10

9  facts relevant to 801(d)(2)(E) are disputed, the                     15:10

10  offering party must prove them by a preponderance of                 15:11

11  the evidence, end quote.                                             15:11

12       Because Mr. Puckett's testimony and                            15:11

13  Mr. Moenaf's e-mail provide independent corroboration                15:11

14  of Mr. Kusno's status as a coconspirator, the Court                  15:11

15  need not determine whether Mr. Kusno's statement                     15:11

16  would be admissible absent such independent                          15:11

17  corroboration.                                                       15:11

18       Winan Kusno is a coconspirator for purposes                    15:11

19  of 801(d)(2)(E) and thus, the defendant's objection                  15:11

20  to the admission of 453 and 454 on that basis is                     15:11

21  overruled.                                                           15:11

22       Now, we still have the issue outstanding of                    15:11

23  what's going to be the -- essentially the scope of                   15:11

24  cross-examination of Agent White with respect to his                 15:11

25  handling of Mr. Sharafi, Sharafi.                                    15:12

1        Could you clarify for me, Mr. Spears or          15:12

2   Mr. Novick, whether Mr. Sharafi has been the source     15:12

3   of evidence in this trial?  He is certainly             15:12

4   mentioned, copied and author of many of the             15:12

5   documents, but --                                        15:12

6        MR. NOVICK:  The answer is no, Your Honor.    15:12

7   We have certainly received documents from him on our     15:12

8   request.  We're not offering any of those into           15:12

9   evidence here.                                           15:12

10       THE COURT:  All right.  So he's not a source   15:12

11  of evidence.  He's not --                                15:12

12       MR. SPEARS:  Your Honor.                       15:13

13       THE COURT:  Yes?                               15:13

14       MR. SPEARS:  I'm sorry to interrupt.  But he   15:13

15  is -- he's certainly involved in the e-mail traffic.     15:13

16       THE COURT:  Yeah.  But that's a little         15:13

17  different question, isn't it?  I said he is certainly    15:13

18  mentioned on the e-mails and in the discussions          15:13

19  necessarily because there's that whole discussion        15:13

20  about cutting his fee.                                   15:13

21       MR. SPEARS:  I'm reminded by Attorney Silver   15:13

22  that he put in a few e-mails from Mr. Sharafi.           15:13

23       MR. NOVICK:  Nope, we didn't.                  15:13

24       MR. SPEARS:  Rothschild.                       15:13

25       MR. NOVICK:  We did not.  There is no          15:13

| | | |
|---|---|---|
| 1 | e-mails -- | 15:13 |
| 2 | MR. SPEARS:  We did. | 15:13 |
| 3 | MR. NOVICK:  That's not my -- | 15:13 |
| 4 | THE COURT:  Well, that was -- still my | 15:13 |
| 5 | question was whether there was anything across the | 15:13 |
| 6 | board.  Okay. | 15:13 |
| 7 | I'm going to assume that the sources of | 15:13 |
| 8 | evidence -- that there are minimal sources of | 15:13 |
| 9 | evidence from Sharafi.  I don't remember anything | 15:13 |
| 10 | that stood out as a significant piece of evidence | 15:13 |
| 11 | from him about -- around which other witness's | 15:14 |
| 12 | testimony was -- that other witness's testimony was | 15:14 |
| 13 | related to. | 15:14 |
| 14 | The other is -- and the reason I keep pushing | 15:14 |
| 15 | at you is that this is not an either/or proposition. | 15:14 |
| 16 | White makes it perfectly clear this is not -- there's | 15:14 |
| 17 | no categorical bar against admitting evidence related | 15:14 |
| 18 | to the basis for prosecution. | 15:14 |
| 19 | The case -- the case of White and the case | 15:14 |
| 20 | of, I guess, Davis from the Supreme Court and | 15:14 |
| 21 | otherwise don't really help here because they are not | 15:14 |
| 22 | the kind of case at all here. | 15:14 |
| 23 | Mr. Sharafi's testimony does not, to my way | 15:15 |
| 24 | of thinking here, bear his -- on whether -- on the | 15:15 |
| 25 | primary defense here of whether the defendant's an | 15:15 |

1    agent.  And so we have Mr. Sharafi who is a U.S.       15:15
2    resident subject to the FCPA with any of the niceties   15:15
3    of whether he's an agent or not.  And I just don't      15:15
4    understand how cross-examination of the agent will      15:15
5    give rise to relevant testimony for the jury.  So       15:15
6    that if I follow Mr. Spears' thinking, he wants to      15:15
7    examine the circumstances of Sharafi's cooperation,     15:16
8    see if Sharafi identified the folks who ultimately      15:16
9    became cooperators and who would be examined by the     15:16
10   investigation to confirm Sharafi's version, they       15:16
11   would be motivated to do that, to help themselves.     15:16
12   But I still am lost on how the fact that Sharafi got    15:16
13   a nonprosecution agreement impacts the decision to --  15:16
14   or impacts the defendant's guilt or innocence or the   15:16
15   central issue of agency.                               15:17
16         And I certainly want to avoid any prejudice      15:17
17   of jury confusion on a 403 basis.  Obviously it's not  15:17
18   a binary situation like White.  In other words,        15:17
19   inquire on cross-examination can't prove that the      15:17
20   defendant was not guilty because Sharafi was guilty.   15:17
21   That's the shorthand on White.                         15:17
22         So the two aren't similarly situated.  The       15:17
23   ultimate question is whether the cooperators are       15:17
24   being truthful themselves.  If Sharafi identified      15:18
25   them as potential cooperators and that was the         15:18

1    direction that the government's investigation took, I        15:18
2    don't see what relevance that is.  And undermining          15:18
3    Sharafi's credibility doesn't undermine the                 15:18
4    cooperating witness's testimony.                            15:18
5          So help me understand your theory a little            15:18
6    better, Mr. Spears.                                         15:18
7          MR. SPEARS:  Thank you, Your Honor.  I think          15:18
8    it really is akin to --                                     15:18
9          THE COURT:  Cases would be good too.                  15:18
10         MR. SPEARS:  Oh, yes.  Would the Court permit          15:18
11   some further research on this over the weekend?             15:18
12         THE COURT:  Yes.                                       15:18
13         MR. SPEARS:  I appreciate that, but --                 15:18
14         THE COURT:  You can send your further                  15:18
15   research to Caroline Davis.                                 15:18
16         MR. SPEARS:  Will do.                                  15:18
17         THE COURT:  She and I will be discussing it.           15:18
18         MR. SPEARS:  Thank you very much.                      15:18
19         THE COURT:  Do you want to make any further            15:19
20   argument at this point?                                     15:19
21         MR. SPEARS:  I just, in response to your               15:19
22   question that I was thinking as I was listening to          15:19
23   it, that it's akin to cross-examination on                  15:19
24   investigative techniques, which of course is                15:19
25   commonplace.  It goes to the quality of the evidence.       15:19

```
1        I appreciate Your Honor's reference to the      15:19
2   jury instructions and I think there's some debate    15:19
3   about that.  I certainly can think of cases in which 15:19
4   I've requested instruction that would ask the jury to 15:19
5   take that under consideration.                        15:19
6        THE COURT:  That's not meant to be              15:19
7   categorical.  It's just absent something about the   15:19
8   circumstances of a particular case.  That would      15:19
9   ordinarily be the charge so that were there no       15:19
10  fingerprints, the jury isn't to dwell on that only.  15:19
11       MR. SPEARS:  Right.                             15:19
12       THE COURT:  Only on what was offered.  But      15:19
13  when you say you want to -- that it's akin to        15:19
14  cross-examining on investigative techniques, that    15:20
15  goes to the quality of offered evidence, right?      15:20
16       MR. SPEARS:  It does.  It goes to the overall   15:20
17  quality of --                                        15:20
18       THE COURT:  Of the ballistics, the             15:20
19  fingerprint, the this, the that.                     15:20
20       MR. SPEARS:  Right.  There's the ballistics    15:20
21  analogy, but then there's the analogy to failure to  15:20
22  record a defendant.  And you have, like we had here, 15:20
23  you know, investigation that involved multiple       15:20
24  recordings of other individuals, Rothschild and the  15:20
25  list -- and Puckett and the list goes on.  There are 15:20
```

1   no recordings of Mr. Hoskins in this case.  That is                 15:20
2   certainly a permissible line of cross-examination                   15:20
3   which I intend to get into.                                         15:20
4           This is an extension of that.  Another                      15:20
5   investigative technique is to sign up someone,                      15:20
6   immunize him and have him available to testify.  And                15:20
7   the way the nonprosecution is structured gave the                   15:20
8   government the power to call him as a witness and                   15:21
9   he's available to them and he's required to testify                 15:21
10  at their direction.  So that was the other direction                15:21
11  I thought would be appropriate to go in.                            15:21
12          THE COURT:  But if you get into the he's                    15:21
13  available for them, he's available to you as well.                  15:21
14  You have an invitation, an engraved invitation from                 15:21
15  the government to call Mr. Sharafi who they would be                15:21
16  pleased to make available for your examination.  I                  15:21
17  don't think --                                                      15:21
18          MR. SPEARS:  The reason I think they're as                  15:21
19  eager to cross-examine him as we were.                              15:21
20          THE COURT:  I think neither side would like                 15:21
21  to have Mr. Sharafi here.                                           15:21
22          Let me just try to understand, it seems to me               15:21
23  that -- okay.  Why don't you go on.  How does failure               15:21
24  to do certain investigative techniques bear on                      15:22
25  Mr. Hoskins' guilt or innocence?                                    15:22

1          MR. SPEARS:  Again, it goes to the overall          15:22

2     quality of the evidence.  You know, for example, this     15:22

3     case involved a number of e-mails, as we've seen for      15:22

4     days now, and a number of individuals that haven't        15:22

5     testified, Reza Moenaf, and the list goes on, that        15:22

6     haven't been interviewed, that haven't been presented     15:22

7     in court.  That to me goes to the quality of the          15:22

8     evidence also.  And I think it's an extension of          15:22

9     that.  I think it's fair game.                            15:22

10          I mean, the government has Agent Coleman on          15:22

11     the stand marshaling their presentation and basically    15:23

12     marshaling their investigation.  We should be able to    15:23

13     counter that by pointing out the failings in the         15:23

14     investigation.                                           15:23

15          THE COURT:  That may be.  But isn't that a          15:23

16     different question than what I thought what we were      15:23

17     after, which is going into the specifics of the          15:23

18     decision to offer Sharafi a nonprosecution agreement?    15:23

19          I don't disagree that you can't go into all         15:23

20     those other things.  But I thought the issue was you     15:23

21     wanted to inquire as to essentially why he was           15:23

22     offered a nonprosecution agreement and what the terms    15:23

23     were.  Have I misunderstood your argument?               15:23

24          MR. SPEARS:  I think you understood it well,        15:23

25     Your Honor, except I don't think that we intended to     15:23

1  get into why he was offered it, just that he was                      15:23

2  offered it and the basic terms of it.  We could just                 15:23

3  offer it into evidence and put the language in front                 15:23

4  of the jury and leave it at that.  It's Government's                  15:24

5  301, so ... but allow me some further research on it,                15:24

6  Your Honor.  I appreciate the opportunity for that.                   15:24

7        THE COURT:  Okay.  You're -- you've sort of                     15:24

8  expanded your argument but that's okay.  Let's get                    15:24

9  this right.  I'm going to be very keen to balance                     15:24

10 under 403 the relevance of any such thing versus the                 15:24

11 risk of confusion and relevance goes to what's the                   15:24

12 relationship between the circumstances of Sharafi's                  15:24

13 cooperation and the evidence of guilt or innocence of                15:24

14 Mr. Hoskins.                                                          15:25

15       Your issue about all of the other failures to                  15:25

16 record people, not calling witnesses who have been                   15:25

17 mentioned, et cetera, I think was a little different                 15:25

18 than what we started arguing before lunch.                           15:25

19       MR. SPEARS:  Understood, Your Honor.                            15:25

20       THE COURT:  All right, Mr. Novick.                              15:25

21       MR. NOVICK:  This is a moving target.                           15:25

22 Counsel spent a good deal of time explaining why the                 15:25

23 admission of this was relevant for the why.                           15:25

24       You know, in the first instance, I can't tell                  15:25

25 at this point what the basis is.  On the one hand, it                15:25

1    is true that impeachment evidence as to a                15:25

2    coconspirator can come in as long, as I explained        15:25

3    earlier in the cases that I hand up -- handed up,         15:25

4    that as long as that happened prior to the relevant      15:25

5    period of time, which isn't the case here.  And so       15:25

6    that's not a basis.  There's no evidentiary, there's     15:26

7    no Federal Rule of Evidence basis for the admission      15:26

8    of the nonprosecution agreement.                          15:26

9         And now we're into the quality of the              15:26

10   investigation.  The quality of the investigation,        15:26

11   defendant is certainly entitled to argue that we have    15:26

12   not met our burden, but it is our burden.  We don't      15:26

13   have a burden to put on any particular thing.  We        15:26

14   don't have a burden to record a particular witness.      15:26

15   We do not have a burden to call a particular witness     15:26

16   or to record one, whatever.                              15:26

17        To the extent that -- I would also object to       15:26

18   him -- to counsel wanting to refer to a failure to       15:26

19   call a particular witness, these are                     15:26

20   equally-available witnesses, or interview a              15:26

21   particular witness.  There is -- they're all equally     15:26

22   available, Your Honor.  There is no basis for him to     15:26

23   start -- for the defense to start attacking the,         15:26

24   quote, quality of the investigation.  This is not a      15:27

25   case where -- involving forensics or involving           15:27

1    ballistics or involving where you would be concerned                    15:27

2    about any particular step.  The --                                      15:27

3         Your Honor, I think that's it.  I don't see                        15:27

4    at all how there's -- and I've seen no evidence or                      15:27

5    cases to support the idea that a legitimate line of                     15:27

6    cross-examination is the, quote, quality of the                         15:27

7    investigation categorically.                                           15:27

8         And as I said earlier, even if it was, the                         15:27

9    lengths to which we would go to show the quality of                     15:27

10   this investigation, which as Your Honor is well aware                   15:27

11   has been going on for a long time, has involved the                     15:28

12   charging of many people, guilty pleas of other                          15:28

13   people, some of whom have testified, some of whom                       15:28

14   have not, the guilty plea and settlement of the                         15:28

15   company, none of which I think is germane to this                       15:28

16   case, none of which do I expect to get into with                        15:28

17   Special Agent Coleman.                                                  15:28

18        Special Agent Coleman is not marshaling                            15:28

19   anything.  I'm asking him to read documents and                         15:28

20   that's it.  I am not asking him -- and I'm going to                      15:28

21   ask him to do some summary charts so that we can                        15:28

22   narrow that binder of documents a little bit, what we                   15:28

23   have to go through, which I understand counsel does                     15:28

24   not object to.  He is not going to be talking about                     15:28

25   the origin of this investigation in any way because I                   15:28

1    don't think it's relevant.                                    15:28

2         THE COURT:  I think the quality of the                   15:28

3    investigation equals whether the government has met           15:28

4    its burden of proof beyond a reasonable doubt.                15:28

5         MR. NOVICK:  Yes, Your Honor.                            15:28

6         THE COURT:  I don't see that there's some                15:28

7    separate finding a jury makes of we find guilt that           15:28

8    it was a crummy investigation.  I mean, that's not            15:29

9    what we're after.                                             15:29

10        But it seems to me that I will only be able              15:29

11   to rule on the questions as they come up.  If there           15:29

12   is some more generalized principle that would help            15:29

13   the parties formulate their questions, that's what I          15:29

14   was looking for.                                              15:29

15        And if you get me whatever it is, Mr. Spears,            15:29

16   as you develop or expand your view of what you ought          15:29

17   to be able to go into with the agent by when?                15:29

18        MR. SPEARS:  Sunday evening.  Sunday --                  15:29

19        MR. NOVICK:  Your Honor, I ask it to be filed           15:29

20   tonight or tomorrow morning.  We need --                      15:29

21        THE COURT:  I think tomorrow morning it's               15:29

22   really going to have to be filed.  So I'm sorry to            15:29

23   ruin your night.  But if you want to file it, I need          15:29

24   to use it.                                                    15:30

25        And then the government's needs to be in by              15:30

1    Saturday night.                                        15:30

2         MR. NOVICK:  Fine, Your Honor.  Can we have       15:30

3    until Sunday morning so we have 24 hours to look at    15:30

4    this and respond to it?  I'll be shocked if there's a  15:30

5    case that actually permits this.  But nonetheless,     15:30

6    we'll get something in by Sunday at 9 a.m.             15:30

7         THE COURT:  Okay.  That does not mean I will      15:30

8    be fully apprised of what every case you cite says,    15:30

9    but I will do my best.                                 15:30

10        MR. NOVICK:  Your Honor, I just add, I            15:30

11   understand Your Honor is saying that we need to        15:30

12   address the questions as they come.  But I would       15:30

13   vehemently oppose counsel being able to ask a          15:30

14   question, a leading question referencing Sharafi's     15:30

15   nonprosecution agreement, assuming the Court --        15:30

16   depending on the Court's ruling here.                  15:30

17        THE COURT:  That's been one discrete              15:30

18   question.  Then there seem to be a number of other     15:30

19   things.                                                15:30

20        MR. NOVICK:  Understand, Your Honor.              15:30

21        THE COURT:  So the first part of the briefing     15:31

22   should be on the -- questioning the existence of the   15:31

23   nonprosecution agreement and the copy of it.  Okay?    15:31

24        MR. NOVICK:  I would ask, Your Honor, that        15:31

25   anything else that counsel plans on getting into that  15:31

1   has to do with this quality of the investigation be          15:31

2   fronted in the motion so that we can address it.             15:31

3          THE COURT:  Well, I don't know that he has to         15:31

4   give you a full road map to his cross-examination.           15:31

5          MR. SPEARS:  I do not.                                15:31

6          MR. NOVICK:  I think these questions are              15:31

7   going to be inflammatory, Your Honor, depending on           15:31

8   what they are.                                               15:31

9          MR. SPEARS:  Your Honor, I see no basis for           15:31

10  the government to try to tease out my entire                 15:31

11  cross-examination.                                           15:31

12         MR. NOVICK:  I'm not talking to the -- I'm            15:31

13  not prepping the agents on these questions.  But I           15:31

14  would like to deal with the legal issues before the          15:31

15  jury has heard something they cannot unhear.                 15:31

16         MR. SPEARS:  The issue that I think Your              15:31

17  Honor is focused on is the relevance of the                  15:31

18  nonprosecution agreement, and that is what I intend          15:31

19  to focus on in the research to the extent that               15:32

20  there's additional authority that supports our               15:32

21  position.                                                    15:32

22         MR. NOVICK:  Counsel has now expanded that to        15:32

23  this broader -- and, in fact, as I understand it, the        15:32

24  nonprosecution agreement is one part of a broader            15:32

25  attack on the quality of the government's                    15:32

1    investigation.  And so I would move to exclude all of          15:32

2    that.  And I think that all of those questions would          15:32

3    be objectionable in the first instance and we ought           15:32

4    to be knowing what's coming rather than having the            15:32

5    jury hear something that they cannot unhear.                  15:32

6         THE COURT:  Tell me what your authority is on            15:32

7    both sides and we'll make this trial as effective,            15:32

8    efficient and fair as possible.  You need to think            15:32

9    about when the defense -- this is your last witness,          15:32

10   right, Mr. Novick?                                            15:32

11        MR. NOVICK:  It is, Your Honor, yes.                     15:32

12        THE COURT:  And any sense of when you're                 15:33

13   finished with him?                                            15:33

14        MR. NOVICK:  It will be during the morning on            15:33

15   Monday, I think.                                              15:33

16        THE COURT:  All right.  Then there will be               15:33

17   cross-examination.  And what, Mr. Spears or others,           15:33

18   will be your witnesses?                                       15:33

19        MR. MORVILLO:  Your Honor, good afternoon.               15:33

20   At this point we are inclined to call Professor               15:33

21   Gilson.  We have notified the government that that is         15:33

22   our intention to do so as our first witness; however,        15:33

23   we are also still considering that and hope to be            15:33

24   able to make a decision, final decision tonight.              15:33

25        THE COURT:  Well, you've said you were                   15:33

1   calling him, right?                                15:33

2         MR. MORVILLO:  I'm sorry?             15:33

3         THE COURT:  You are calling Gilson?    15:33

4         MR. MORVILLO:  That is our current intention,  15:33

5   yes.                                         15:33

6         THE COURT:  Well, here's the question:  Is  15:33

7   there some chance you're not going to call anyone, in  15:33

8   which case we've got to get the charge conference  15:33

9   scheduled, et cetera?                     15:33

10        MR. MORVILLO:  I think there is a chance,  15:33

11   yes.                                      15:33

12        But part of the question, Your Honor, is  15:34

13   whether there will be sufficient documents in  15:34

14   evidence to allow certain arguments to be made  15:34

15   without the necessity of Professor Gilson's  15:34

16   testimony.  I don't know what the rest of the  15:34

17   government's exhibits are.  We have some exhibits we  15:34

18   want to put in through Agent Coleman.  And if that is  15:34

19   all accomplished, it may not be necessary to call  15:34

20   Professor Gilson.                    15:34

21        MR. NOVICK:  I'm not sure what documents  15:34

22   counsel is planning on putting in through Gilson  15:34

23   since he has no association with the case other than  15:34

24   being hired by the defense.             15:35

25        MR. MORVILLO:  That's my point.      15:35

1          THE COURT:  Let's do this:  If the government          15:35
2    finishes Monday and the defendant elects not to               15:35
3    present any evidence, we can start with our charge            15:35
4    conference at 9:30 on Tuesday morning.                        15:35
5          MR. NOVICK:  Okay.                                       15:35
6          THE COURT:  And I will by that time try to             15:35
7    get you a working draft for discussion purposes which        15:35
8    hopefully will make our charge conference more               15:35
9    efficient.  All right?                                        15:35
10          Okay.  Have a nice weekend.  Thank you very           15:35
11    much.                                                         15:35
12          We stand adjourned.                                    15:35
13          (Proceedings adjourned, 3:35 p.m.)                     15:35
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                C E R T I F I C A T E

 2

 3    RE: UNITED STATES OF AMERICA v. LAWRENCE HOSKINS
                No. 3:12-CR-238 (JBA)
 4

 5           I, Melissa J. Cianciullo, RMR, CRR, CRC,

 6   Official Court Reporter for the United States

 7   District Court for the District of Connecticut, do

 8   hereby certify that the foregoing pages 836 through

 9   1027 are a true and accurate transcription of my

10   shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15

16        /s/_Melissa J. Cianciullo_____

17        MELISSA J. CIANCIULLO, RMR, CRR
               Official Court Reporter
18          United States District Court
            141 Church Street, Room 147
19          New Haven, Connecticut  06510
                 (203) 606-1794
20

21

22

23

24

25
```

## $

**$40** [1] - 873:6

## '

**'03** [1] - 924:6
**'13** [1] - 900:18
**'91** [1] - 854:20
**'92** [2] - 854:19, 854:20
**'95** [1] - 905:25

## /

**/s/_Melissa** [1] - 1027:16

## 0

**06095** [1] - 991:2
**06510** [2] - 837:4, 1027:19
**06890** [1] - 837:20

## 1

**1** [10] - 836:5, 893:19, 963:12, 983:14, 986:18, 993:14, 999:2, 999:5, 1003:24
**1/2** [1] - 996:24
**10019-6131** [1] - 837:15
**1026** [1] - 1027:9
**104A** [1] - 840:5
**10th** [1] - 960:16
**11308** [1] - 837:10
**11:06** [2] - 910:16, 910:23
**11:40** [2] - 910:23, 911:3
**11th** [1] - 998:1
**12** [2] - 919:7, 919:14
**12:50** [2] - 911:2, 968:4
**12th** [2] - 918:19, 965:14
**13th** [1] - 986:9
**1400** [1] - 837:9
**141** [2] - 836:7, 1027:18
**147** [1] - 1027:18
**15** [3] - 910:18, 916:15, 964:14
**15-minute** [1] - 910:14
**157** [1] - 837:4
**16** [1] - 871:21
**166** [2] - 840:14,

**1008:1**
**16th** [1] - 921:13
**17/9** [4] - 876:20, 880:10, 880:24, 882:8
**171** [1] - 1007:7
**175** [1] - 1007:7
**176** [1] - 1010:8
**1791221** [1] - 852:21
**18** [5] - 874:24, 876:22, 881:1, 981:10, 1002:4
**18:30** [1] - 876:6
**18th** [3] - 966:14, 1000:13, 1001:23
**1985** [2] - 859:1, 859:5
**1987** [1] - 1007:7
**1991** [1] - 854:19
**1995** [1] - 905:23
**1996** [2] - 839:21, 1007:6
**1999** [1] - 840:15
**1:07** [1] - 979:24

## 2

**2** [12] - 873:5, 893:20, 893:23, 893:24, 952:16, 968:2, 979:22, 983:14, 998:13, 999:3, 999:20, 1004:12
**2.4** [6] - 868:17, 869:13, 869:20, 869:24, 870:3, 871:5
**2000** [1] - 991:1
**20005** [1] - 837:10
**2000s** [1] - 853:19
**2001** [2] - 854:21, 908:5
**2002** [13] - 854:1, 854:21, 908:5, 950:6, 951:25, 952:16, 955:8, 956:23, 957:9, 957:17, 958:13, 960:16, 961:18
**2003** [35] - 862:23, 864:7, 865:25, 867:22, 871:21, 874:24, 876:22, 881:1, 887:1, 889:1, 898:7, 911:14, 912:8, 913:10, 916:2, 917:8, 920:14, 921:13, 925:10, 925:20, 962:23, 963:12, 963:13, 963:22, 964:14, 965:14,

**966:14, 981:10, 981:24, 983:17, 984:6, 984:20, 986:9, 986:18, 994:2
**2004** [13] - 854:1, 987:11, 989:18, 991:22, 992:13, 993:12, 995:21, 996:8, 998:1, 1000:13, 1001:24, 1002:4, 1003:4
**2005** [5] - 895:19, 906:5, 906:7, 970:4, 1008:17
**2007** [1] - 852:21
**2008** [1] - 970:1
**2009** [1] - 919:7
**2011** [4] - 970:8, 970:12, 1008:12, 1008:20
**2012** [4] - 899:6, 900:3, 900:14, 900:18
**2013** [3] - 900:21, 901:3, 901:18
**2015** [1] - 948:4
**2019** [2] - 836:5, 919:15
**203** [5] - 836:25, 837:5, 837:19, 837:20, 1027:19
**20th** [3] - 950:6, 987:11, 989:18
**212** [1] - 837:16
**21st** [1] - 962:23
**22** [3] - 862:23, 864:7, 920:14
**22nd** [1] - 1003:4
**23** [1] - 933:8
**23rd** [1] - 837:4
**24** [1] - 1022:3
**2425** [1] - 837:19
**25** [2] - 887:1, 889:1
**25th** [2] - 925:10, 993:1, 993:12
**26th** [1] - 992:12
**29** [1] - 867:22
**292-9766** [1] - 837:20
**2:10** [1] - 968:6
**2:24** [1] - 979:24
**2:25** [1] - 980:22
**2:45** [1] - 951:25
**2d** [4] - 970:5, 1007:6, 1008:1, 1008:16

## 3

**3** [19] - 862:21, 871:23, 875:1, 888:24, 951:25, 962:23,

**963:13, 963:22, 982:18, 993:4, 993:14, 994:17, 995:20, 996:8, 996:24, 998:18, 1004:12, 1005:3
**3/4** [4] - 965:15, 988:11, 989:19, 990:7
**3/draft** [1] - 886:23
**30** [2] - 983:17, 985:2
**301** [1] - 1018:5
**302** [1] - 919:15
**30th** [1] - 961:17
**36** [1] - 848:11
**392** [2] - 970:4, 1008:16
**3:01** [1] - 1005:12
**3:12-CR-238** [2] - 836:4, 1027:3
**3:35** [1] - 1026:13
**3d** [1] - 840:14
**3rd** [3] - 952:11, 955:8, 995:21

## 4

**4** [7] - 862:21, 888:24, 956:23, 962:23, 994:17, 995:20, 998:18
**403** [2] - 1013:17, 1018:10
**410** [3] - 950:3, 950:8, 950:14
**421** [3] - 952:14, 952:18, 953:1
**422** [5] - 951:20, 952:23, 953:9, 955:1, 955:18
**423** [3] - 955:3, 955:5, 955:10
**423-T** [3] - 955:6, 955:10, 955:19
**424** [4] - 955:25, 956:2, 957:20, 958:6
**425** [5] - 957:3, 957:4, 957:7, 957:8, 957:11
**425-A** [2] - 957:5, 957:12
**427** [5] - 958:11, 958:15, 960:21, 960:23, 961:1
**428** [5] - 960:12, 960:17, 960:22, 960:23, 961:1
**433** [3] - 961:13, 961:19, 961:21
**437** [2] - 962:19, 962:25

**439** [2] - 965:10, 965:16
**440** [4] - 966:10, 966:19, 981:5, 981:6
**445** [3] - 862:14, 862:25, 920:6
**446** [2] - 867:17, 868:1
**45** [1] - 848:12
**451** [4] - 871:14, 872:1, 872:3, 921:6
**452** [2] - 874:16, 875:4
**453** [9] - 838:13, 876:14, 879:13, 879:17, 881:12, 980:3, 1006:10, 1009:18, 1010:20
**454** [10] - 843:13, 880:20, 881:3, 881:16, 940:7, 980:3, 1006:10, 1009:18, 1010:2, 1010:20
**456** [3] - 886:17, 887:3, 923:17
**457** [3] - 888:18, 889:7, 924:25
**46** [1] - 995:24
**461-T** [1] - 917:19
**467** [3] - 984:4, 984:8, 985:18
**470** [3] - 986:4, 986:10, 989:10
**476** [2] - 987:7, 987:14
**476-A** [3] - 987:7, 988:6, 988:21
**477** [7] - 989:8, 989:9, 989:12, 989:15, 989:16, 989:21, 990:1
**477-A** [4] - 989:10, 989:12, 989:21, 990:14
**478** [1] - 989:10
**481** [2] - 991:18, 991:24
**483** [2] - 1007:7, 1010:7
**484** [4] - 992:8, 992:10, 992:18, 992:23
**484-A** [3] - 992:8, 992:9, 992:19
**485** [4] - 983:11, 985:11, 985:16, 985:25
**486** [1] - 995:17
**487** [2] - 997:23, 998:3
**490** [2] - 1000:8, 1000:15
**491** [2] - 1001:20,

1001:25
**492** [2] - 1003:1, 1003:6

## 5

**5** [2] - 875:14, 957:17
**502** [1] - 1008:17
**506** [1] - 970:5
**511** [1] - 1008:17
**522** [1] - 970:2
**53** [2] - 981:17, 982:1
**54** [2] - 993:24, 994:4
**56** [5] - 842:14, 842:24, 844:10, 848:15, 993:19
**578** [2] - 839:15, 1007:5
**580** [1] - 1007:6
**5K** [4] - 903:18, 903:19, 904:10, 904:14
**5th** [2] - 957:9, 991:22

## 6

**6.1** [1] - 989:1
**606-1794** [2] - 836:25, 1027:19
**660-B** [1] - 933:8

## 7

**7-2** [1] - 995:22
**70** [1] - 985:2
**75** [2] - 840:14, 1008:1
**76** [1] - 987:19
**76-A** [1] - 987:19

## 8

**8** [1] - 984:20
**801** [3] - 1007:12, 1008:8, 1009:5
**801(d)(2)(E** [11] - 839:3, 845:13, 845:14, 879:14, 968:12, 970:8, 1006:11, 1006:19, 1007:16, 1010:9, 1010:19
**801(d)(2)(E)** [2] - 1008:18, 1009:8
**802** [1] - 1008:12
**806** [1] - 850:16
**82** [2] - 840:16, 1007:5
**821-3700** [1] - 837:5
**83** [1] - 839:15
**836** [1] - 1027:8
**878-8000** [1] - 837:16

**8th** [1] - 984:6

## 9

**9** [2] - 1005:9, 1022:6
**9/24/03** [1] - 889:24
**9/26/03** [1] - 890:5
**93** [1] - 970:2
**9:30** [2] - 1005:10, 1026:4
**9:31** [2] - 836:6, 838:1
**9:52** [1] - 853:1
**9th** [3] - 958:13, 958:20, 994:2

## A

**a.m** [9] - 836:6, 838:1, 853:1, 910:16, 910:23, 911:3, 951:25, 1022:6
**A/C** [1] - 965:5
**ABB** [1] - 866:19
**ability** [3] - 975:10, 975:14, 1027:11
**able** [6] - 1006:3, 1017:12, 1021:10, 1021:17, 1022:13, 1024:24
**absence** [3] - 863:25, 864:13, 978:16
**absent** [2] - 1010:16, 1015:7
**absolutely** [2] - 864:13, 920:16
**absurd** [1] - 851:22
**academic** [2] - 847:25, 968:20
**accept** [1] - 999:13
**access** [2] - 925:21, 926:2
**accommodate** [1] - 1001:6
**accomplished** [1] - 1025:19
**according** [1] - 1008:19
**accordingly** [1] - 880:3
**account** [1] - 925:17
**accurate** [1] - 1027:9
**acronym** [1] - 868:25
**act** [3] - 842:16, 848:9, 863:25
**action** [5] - 887:24, 891:12, 891:17, 891:19, 891:23
**actions** [14] - 841:24, 864:14, 866:4, 884:2, 884:4,

884:16, 884:20, 885:7, 885:14, 890:8, 890:21, 920:17, 920:22, 928:15
**activation** [1] - 985:3
**activities** [4] - 866:12, 872:24, 920:23, 920:25
**acts** [1] - 848:15
**actual** [1] - 900:14
**add** [11] - 839:4, 841:13, 848:8, 870:3, 870:5, 871:5, 972:23, 996:13, 997:8, 997:20, 1022:10
**add-on** [2] - 996:13, 997:8, 997:20
**addition** [4] - 840:20, 948:18, 951:10, 968:21
**additional** [4] - 953:17, 968:10, 968:22, 1023:20
**address** [7] - 971:3, 972:8, 975:24, 984:18, 1008:2, 1022:12, 1023:2
**addresses** [1] - 1008:5
**addressing** [1] - 972:14
**Adhi** [1] - 991:5
**adjourned** [2] - 1026:12, 1026:13
**admissibility** [2] - 980:2, 1009:2
**admissible** [5] - 840:9, 842:22, 1006:18, 1009:7, 1010:16
**admission** [11] - 868:3, 872:1, 992:18, 993:19, 994:4, 995:23, 998:3, 1000:14, 1010:20, 1018:23, 1019:7
**admit** [11] - 862:25, 868:1, 875:4, 879:13, 879:17, 881:3, 881:7, 887:3, 889:7, 950:14, 1006:10
**admitted** [4] - 839:23, 940:6, 956:2, 1006:25
**admitting** [1] - 1012:17

**adopting** [1] - 969:3
**advance** [1] - 1001:5
**advanced** [2] - 839:1, 845:2
**advantage** [1] - 868:18
**advice** [5] - 886:7, 956:17, 958:7, 962:5, 1001:15
**advise** [2] - 953:7, 963:18
**advisor** [1] - 994:20
**advisory** [1] - 1008:19
**advocating** [1] - 870:6
**affect** [1] - 942:8
**aforementioned** [1] - 1027:10
**afraid** [1] - 870:8
**Africa** [1] - 970:2
**afternoon** [2] - 846:19, 1024:19
**agency** [1] - 1013:15
**agent** [66] - 841:19, 841:21, 849:12, 882:21, 882:22, 882:23, 883:1, 883:4, 883:7, 883:13, 883:20, 883:21, 883:24, 884:7, 884:10, 884:13, 884:21, 884:24, 884:25, 886:1, 887:10, 887:12, 891:17, 892:6, 892:9, 913:12, 929:10, 929:24, 930:4, 930:20, 930:23, 931:2, 931:24, 932:2, 933:24, 934:12, 934:17, 936:14, 937:12, 941:5, 942:19, 945:9, 945:13, 945:15, 946:3, 947:7, 947:10, 948:3, 948:11, 954:24, 964:1, 964:7, 967:11, 968:5, 969:8, 969:10, 973:3, 975:3, 1005:25, 1006:1, 1010:1, 1013:1, 1013:3, 1013:4, 1021:17
**Agent** [25] - 849:6, 850:25, 851:9, 851:12, 851:16, 944:19, 950:21, 970:21, 971:3,

971:10, 972:8, 977:6, 977:17, 980:6, 980:13, 980:19, 981:4, 996:3, 1005:13, 1005:22, 1010:24, 1017:10, 1020:17, 1020:18, 1025:18
**AGENT** [1] - 945:6
**agent's** [3] - 890:8, 890:20, 928:15
**agent-related** [1] - 936:14
**agents** [9] - 838:18, 933:13, 936:18, 942:17, 942:21, 947:13, 948:8, 948:18, 1023:13
**ago** [6] - 839:2, 846:1, 901:21, 906:2, 906:3, 916:15
**agree** [9] - 891:12, 892:1, 892:5, 898:21, 899:18, 937:14, 937:15, 961:9, 997:8
**agreed** [4] - 891:25, 972:3, 988:13, 999:25
**agreement** [57] - 849:14, 850:1, 850:4, 850:14, 851:2, 891:4, 900:21, 901:18, 903:9, 903:17, 905:9, 937:24, 962:24, 964:19, 965:15, 967:1, 967:5, 967:10, 967:19, 970:24, 971:4, 971:13, 971:25, 972:1, 972:7, 972:19, 974:5, 978:21, 978:23, 979:12, 981:15, 981:19, 982:6, 988:11, 988:22, 988:23, 989:6, 989:19, 990:6, 990:11, 990:20, 991:23, 992:6, 992:25, 993:2, 993:10, 994:1, 995:4, 999:24, 1013:13, 1017:18, 1017:22, 1019:8, 1022:15, 1022:23, 1023:18, 1023:24
**Agreement** [1] -

990:16
**agreement.doc** [1] -
990:8
**Agreement.zip** [2] -
989:20, 992:17
**agreements** [5] -
897:4, 905:12,
982:16, 982:23,
983:8
**ahead** [16] - 950:17,
950:21, 954:15,
954:17, 961:3,
963:24, 964:16,
966:24, 967:7,
984:25, 986:25,
987:2, 992:15,
996:16, 999:21,
1002:9
**air** [2] - 934:5, 937:11
**akin** [3] - 1014:8,
1014:23, 1015:13
**alert** [2] - 886:2,
889:25
**allegations** [1] -
947:11
**allow** [6] - 850:12,
855:8, 904:1, 951:2,
1018:5, 1025:14
**allowed** [2] - 850:7,
978:4
**almost** [5] - 859:10,
873:6, 887:10,
947:4, 975:2
**alone** [3] - 844:18,
857:6, 1007:23
**Alstom** [108] - 843:2,
843:3, 844:13,
844:17, 853:18,
853:21, 856:16,
856:22, 857:6,
857:8, 857:13,
857:15, 858:5,
858:18, 858:23,
858:25, 859:4,
859:22, 860:3,
860:8, 861:1, 861:6,
861:14, 863:8,
864:1, 865:13,
865:22, 866:7,
866:8, 866:19,
869:21, 870:4,
870:17, 870:21,
871:1, 871:3, 872:9,
872:25, 873:18,
874:13, 874:14,
877:7, 884:8, 884:9,
884:19, 884:24,
885:1, 885:3,
886:10, 886:13,
886:15, 888:12,

888:14, 891:11,
891:13, 891:14,
891:17, 895:16,
895:18, 895:24,
896:2, 896:5, 896:8,
896:10, 897:7,
898:9, 898:13,
903:4, 905:20,
906:5, 909:9, 912:3,
912:19, 913:6,
914:18, 915:1,
915:2, 915:7,
921:17, 922:15,
923:14, 924:7,
933:12, 934:6,
936:19, 947:24,
949:15, 959:16,
960:3, 964:4, 965:7,
967:10, 981:19,
982:7, 988:23,
990:22, 990:23,
991:14, 993:10,
994:13, 995:4,
1001:19, 1003:21,
1004:11, 1009:11
**Alstom's** [5] - 869:24,
890:1, 960:1,
993:20, 1004:18
**alternative** [1] -
999:17
**amendment** [1] -
1008:12
**Amendment** [1] -
976:24
**amendments** [2] -
1008:20, 1008:21
**America** [1] - 909:2
**AMERICA** [2] - 836:4,
1027:3
**Amir** [3] - 953:6,
959:15, 961:10
**amply** [1] - 842:4
**Amsterdam** [1] -
1002:22
**analogy** [2] - 1015:21
**AND** [1] - 836:18
**Andalan** [1] - 885:11
**Andi** [2] - 959:13,
960:2
**Andy** [1] - 959:25
**Anglaret** [2] - 959:8,
961:16
**announced** [1] -
972:11
**anonymously** [1] -
842:12
**answer** [8] - 903:1,
934:13, 935:8,
939:6, 939:7, 960:4,
960:10, 1011:6

**answered** [2] - 944:1,
944:5
**answering** [1] - 939:4
**anticipate** [1] - 1006:1
**anyhow** [1] - 853:13
**anyway** [1] - 938:22
**AP** [4] - 860:3, 883:24,
884:7
**AP/MC** [3] - 841:23,
883:25, 884:15
**APESI** [1] - 879:24
**apparent** [1] - 847:1
**appear** [4] - 957:25,
958:4, 961:1, 978:21
**Appendix** [1] - 995:22
**apply** [1] - 934:6
**appoint** [2] - 951:3,
954:24
**appointed** [3] -
883:24, 884:7,
884:10
**appreciate** [4] -
974:25, 1014:13,
1015:1, 1018:6
**apprised** [1] - 1022:8
**approach** [5] - 871:11,
882:21, 919:13,
1004:21
**appropriate** [5] -
901:9, 939:24,
963:18, 978:17,
1016:11
**approval** [15] - 933:11,
933:25, 934:4,
934:8, 934:15,
935:15, 937:3,
937:23, 938:6,
942:16, 942:19,
942:20, 943:22,
967:16, 992:5
**approvals** [4] -
933:17, 933:19,
935:16, 936:23
**approve** [6] - 897:11,
934:24, 934:25,
936:18, 942:17,
942:21
**approved** [2] - 897:4,
934:24
**April** [2] - 900:3, 948:4
**area** [6] - 851:4, 910:9,
911:12, 933:19,
933:20, 933:25
**areas** [2] - 956:18,
958:8
**argue** [2] - 969:19,
1019:11
**argued** [1] - 968:22
**argues** [4] - 1006:19,
1007:9, 1007:20,

1009:5
**arguing** [3] - 971:17,
1006:16, 1018:18
**argument** [8] - 849:9,
935:6, 954:10,
954:11, 976:13,
1014:20, 1017:23,
1018:8
**arguments** [3] -
979:17, 1006:9,
1025:14
**arrangement** [3] -
930:5, 964:21, 965:7
**arranging** [1] - 914:14
**arrived** [1] - 865:25
**ARTERTON** [1] -
836:18
**Article** [1] - 989:1
**articulate** [1] - 852:2
**ASAP** [3] - 873:8,
891:25, 892:4
**Asia** [4] - 859:24,
874:10, 907:16,
911:13
**aside** [3] - 841:14,
898:6, 914:6
**assets** [2] - 947:15,
947:16
**assigned** [4] - 913:10,
946:18, 947:23,
948:2
**assignment** [3] -
908:8, 908:10,
947:19
**assistance** [3] -
988:15, 990:13,
993:5
**assistant** [1] - 986:20
**associate** [1] - 990:7
**association** [1] -
1025:23
**assume** [2] - 896:15,
1012:7
**assuming** [4] -
839:19, 953:24,
965:6, 1022:15
**assumption** [1] -
976:10
**attached** [5] - 988:10,
990:6, 993:1,
996:23, 1004:5
**attachment** [12] -
957:4, 957:10,
957:23, 957:24,
987:3, 987:13,
988:6, 988:16,
989:20, 992:16,
993:6, 995:21
**attack** [1] - 1023:25
**attacking** [1] -

1009:5
**attempt** [2] - 859:11,
970:22
**attend** [4] - 876:1,
892:14, 918:23,
923:2
**attended** [1] - 918:18
**attention** [1] - 932:7
**attorney** [2] - 900:6,
1011:21
**Attorney's** [1] - 837:3
**August** [12] - 862:23,
864:7, 865:25,
867:22, 912:7,
918:19, 919:7,
919:14, 920:14,
932:5, 950:6
**Aulia** [3] - 929:20,
962:6, 991:7
**AUSA** [1] - 837:3
**author** [1] - 1011:4
**authority** [4] - 871:4,
968:11, 1023:20,
1024:6
**auxiliaries** [1] -
857:16
**available** [11] -
903:10, 954:5,
979:2, 1006:3,
1016:6, 1016:9,
1016:13, 1016:16,
1019:20, 1019:22
**Avenue** [1] - 837:9
**avoid** [2] - 904:14,
1013:16
**awarded** [1] - 994:14
**awarding** [1] - 875:19
**aware** [14] - 850:14,
852:6, 869:14,
909:20, 909:21,
911:16, 924:12,
935:19, 936:16,
943:1, 977:14,
978:8, 1004:17,
1020:10
**Azmin** [18] - 929:17,
929:20, 929:24,
930:3, 930:6, 962:6,
986:21, 987:3,
991:7, 996:18,
998:2, 1000:1,
1001:4, 1001:13,
1001:17, 1002:18,
1002:22, 1004:6
**Azmin's** [6] - 989:19,
989:20, 990:6,
990:8, 991:23, 992:6

## B

**B-a-s-c-i-a-n-o** [1] - 852:21
**B-Seg** [1] - 954:23
**background** [1] - 945:19
**backwards** [1] - 998:11
**bad** [2] - 974:21, 996:22
**balance** [2] - 857:22, 1018:9
**ballistics** [3] - 1015:18, 1015:20, 1020:1
**Baltimore** [1] - 964:2
**bank** [1] - 965:5
**bar** [1] - 1012:17
**Basciano** [1] - 852:20
**base** [2] - 855:17, 870:21
**based** [16] - 840:25, 854:16, 855:7, 855:20, 861:15, 861:25, 862:1, 885:3, 888:15, 894:24, 895:6, 908:11, 908:18, 908:20, 974:9, 987:1
**basic** [5] - 858:20, 946:3, 972:6, 974:12, 1018:2
**basing** [1] - 977:3
**basis** [18] - 838:21, 855:2, 894:11, 898:20, 915:10, 930:8, 935:9, 935:18, 951:5, 991:13, 1010:20, 1012:18, 1013:17, 1018:25, 1019:6, 1019:7, 1019:22, 1023:9
**bear** [3] - 849:24, 1012:24, 1016:24
**became** [5] - 847:1, 864:3, 912:6, 913:9, 1013:9
**become** [2] - 860:23, 869:14
**bed** [2] - 856:8, 865:17
**began** [7] - 839:2, 899:6, 916:9, 935:17, 974:4, 977:9
**begin** [2] - 898:18, 929:10
**beginning** [11] - 921:8, 928:10, 931:2, 931:11,

931:12, 931:13, 953:20, 971:9, 997:5, 1002:14, 1003:15
**begins** [1] - 983:13
**behalf** [5] - 925:8, 925:17, 927:7, 940:3, 990:20
**behold** [1] - 1010:8
**believes** [1] - 868:21
**below** [6] - 843:15, 873:4, 873:8, 885:23, 956:16, 1009:23
**Below** [1] - 1009:23
**BENJAMIN** [1] - 837:14
**benjamin.peacock@ cliffordchance.com** [1] - 837:17
**best** [14] - 865:7, 865:9, 876:2, 888:3, 898:2, 900:4, 907:13, 967:18, 992:5, 1000:1, 1000:6, 1022:9, 1027:11
**Bethesda** [2] - 962:18, 982:13
**better** [5] - 930:14, 935:7, 973:24, 1002:19, 1014:6
**between** [11] - 840:17, 850:2, 967:10, 981:19, 982:6, 983:25, 988:23, 993:10, 994:2, 994:8, 1018:12
**Beyer** [7] - 950:6, 957:9, 958:13, 958:23, 958:24, 960:6, 960:15
**beyer** [1] - 961:4
**beyond** [3] - 944:5, 973:11, 1021:4
**bid** [15] - 856:17, 868:15, 868:20, 869:9, 869:10, 869:11, 869:24, 870:4, 871:5, 893:11, 914:10, 916:20, 921:17, 924:18
**bidding** [8] - 869:7, 870:24, 871:2, 893:8, 895:7, 915:16, 916:11, 942:12
**bids** [3] - 870:2, 950:25, 962:1

**Bill** [14] - 861:19, 861:20, 861:22, 861:25, 867:10, 872:20, 874:19, 893:12, 893:14, 986:20, 998:15, 1000:11, 1001:12, 1003:25
**Bill's** [2] - 863:25, 864:13
**binary** [1] - 1013:18
**binder** [2] - 949:20, 1020:22
**bit** [7] - 856:3, 857:11, 866:21, 907:25, 926:25, 958:3, 1020:22
**black** [1] - 970:15
**black-letter** [1] - 970:15
**blow** [1] - 958:2
**blue** [2] - 898:17, 898:23
**board** [2] - 890:4, 1012:6
**boiler** [1] - 857:15, 858:14, 859:3, 861:12, 862:21, 886:10, 935:2, 937:11, 964:5, 990:24
**Boilers** [1] - 861:1
**boilers** [2] - 856:8, 857:16
**bombings** [1] - 970:1
**BOND** [1] - 836:18
**book** [1] - 865:19
**booked** [1] - 875:13
**boss** [11] - 908:25, 909:1, 909:14, 909:19, 911:22, 912:10, 912:20, 912:24, 913:2, 935:1
**bosses** [1] - 912:24
**bottom** [9] - 881:15, 928:14, 955:14, 983:13, 983:14, 983:19, 999:5, 1000:20, 1003:24
**Bourjaily** [3] - 840:4, 1007:6, 1010:7
**box** [1] - 969:21
**branch** [1] - 964:2
**break** [4] - 846:24, 852:5, 968:10, 970:19
**BRIAN** [1] - 837:18
**bribe** [3] - 890:25, 893:24, 904:24
**bribery** [6] - 922:22,

923:3, 923:9, 923:15, 946:6, 947:12
**bribes** [8] - 874:3, 883:10, 895:2, 895:8, 895:11, 897:7, 897:11, 947:14
**brief** [3] - 896:13, 946:1, 951:7
**briefed** [1] - 850:9
**briefing** [1] - 1022:21
**briefings** [1] - 979:15
**briefly** [4] - 843:25, 844:3, 911:11, 941:17
**bring** [11] - 848:18, 852:22, 852:23, 911:1, 917:18, 920:5, 926:22, 928:8, 933:7, 947:15, 980:5
**brings** [1] - 947:20
**broadband** [1] - 925:21
**broader** [3] - 970:25, 1023:23, 1023:24
**broke** [1] - 911:21
**brother** [1] - 955:23
**brought** [4] - 883:22, 930:23, 946:16, 971:11
**Bruno** [20] - 962:22, 963:10, 963:16, 963:21, 964:17, 965:4, 965:12, 965:22, 965:25, 966:1, 966:12, 966:17, 966:25, 967:18, 981:9, 986:7, 987:11, 989:18, 991:21, 992:11
**bspears@ spearsmanning. com** [1] - 837:21
**Buika** [1] - 871:18
**build** [1] - 853:24
**built** [2] - 856:6, 972:16
**bunch** [1] - 921:12
**burden** [6] - 1019:12, 1019:13, 1019:14, 1019:15, 1021:4
**Bureau** [1] - 945:10
**business** [19] - 854:4, 854:7, 854:24, 855:25, 859:15, 861:23, 866:20, 911:19, 914:9,

932:20, 936:24, 937:7, 937:10, 937:16, 937:22, 942:18, 988:1, 990:23, 990:25
**businesses** [3] - 856:15, 947:12, 947:13
**BY** [82] - 853:7, 853:16, 855:14, 863:3, 868:11, 872:4, 875:7, 877:15, 878:3, 878:12, 878:21, 879:21, 880:17, 881:9, 887:6, 889:10, 893:1, 894:7, 894:15, 897:17, 901:16, 902:10, 902:15, 911:8, 917:22, 918:5, 918:14, 919:19, 920:4, 920:10, 921:10, 922:10, 923:22, 925:5, 927:2, 928:12, 929:8, 930:18, 931:22, 933:5, 933:9, 935:4, 936:6, 938:24, 939:11, 939:25, 940:15, 940:24, 941:20, 943:20, 945:7, 950:15, 950:20, 952:21, 954:16, 955:13, 956:9, 957:15, 958:18, 960:20, 961:22, 963:3, 965:19, 966:21, 981:3, 981:7, 982:4, 984:11, 986:3, 986:13, 987:17, 987:23, 989:25, 992:2, 992:22, 993:23, 994:7, 996:2, 998:6, 1000:18, 1002:3, 1003:9
**bye** [1] - 898:17

## C

**CA** [8] - 995:20, 996:13, 996:18, 998:2, 998:18, 1000:13, 1001:4, 1002:18
**cannot** [13] - 848:9, 873:10, 874:4, 886:3, 886:11,

921:8, 967:17, 999:13, 1001:5, 1001:14, 1002:22, 1023:15, 1024:5
**capacity** [1] - 975:25
**card** [1] - 988:1
**care** [1] - 890:24
**careful** [2] - 884:3, 885:7
**Carolina** [1] - 945:21
**Caroline** [1] - 1014:15
**carried** [1] - 890:13
**carry** [1] - 974:22
**case** [54] - 840:12, 845:24, 849:10, 849:16, 849:20, 851:23, 851:24, 852:1, 852:14, 852:15, 887:24, 902:17, 934:7, 938:11, 947:24, 948:3, 948:6, 948:8, 948:9, 948:11, 959:16, 961:24, 967:9, 967:11, 970:1, 970:4, 973:1, 973:3, 974:12, 975:2, 975:8, 976:17, 977:3, 977:16, 979:11, 980:15, 984:15, 1005:25, 1012:19, 1012:22, 1015:8, 1016:1, 1017:3, 1019:5, 1019:25, 1020:16, 1022:5, 1022:8, 1025:8, 1025:23
**cases** [19] - 844:4, 845:2, 845:4, 845:5, 845:8, 847:10, 847:17, 848:20, 946:7, 947:2, 968:12, 968:13, 969:23, 1008:2, 1014:9, 1015:3, 1019:3, 1020:5
**cash** [2] - 999:15, 1001:15
**cashier** [1] - 954:22
**categorical** [2] - 1012:17, 1015:7
**categorically** [1] - 1020:7
**caused** [1] - 848:14
**central** [1] - 1013:15
**certain** [3] - 932:7, 1016:24, 1025:14
**certainly** [20] - 841:6, 844:19, 845:9,

845:23, 849:16, 870:3, 904:12, 916:14, 936:16, 971:13, 980:15, 997:3, 1011:3, 1011:7, 1011:15, 1011:17, 1013:16, 1015:3, 1016:2, 1019:11
**certify** [1] - 1027:8
**cetera** [5] - 843:16, 950:25, 961:25, 1018:17, 1025:9
**CFBs** [1] - 865:17
**chain** [9] - 910:5, 920:9, 938:6, 943:3, 963:6, 963:21, 998:8, 999:1, 1003:24
**chains** [1] - 898:7
**chairman** [1] - 952:5
**challenging** [1] - 974:12
**Chance** [1] - 837:15
**chance** [3] - 887:25, 1025:7, 1025:10
**change** [4] - 970:14, 983:2, 1004:21, 1009:1
**changed** [1] - 850:11
**changes** [5] - 884:2, 885:6, 886:3, 886:12, 970:13
**changes/corrections** [2] - 988:11, 988:12
**characterization** [2] - 844:20, 939:9
**characterize** [1] - 977:2
**charge** [14] - 849:14, 850:3, 850:8, 870:24, 871:1, 876:3, 876:9, 885:2, 952:6, 979:1, 1015:9, 1025:8, 1026:3, 1026:8
**charged** [3] - 840:19, 904:20, 905:12
**charges** [4] - 946:12, 946:15, 971:11, 971:18
**charging** [2] - 849:10, 1020:12
**chart** [3] - 933:12, 933:23, 937:2
**charter** [7] - 934:2, 934:3, 935:24, 935:25, 936:3, 937:6, 937:18
**charts** - 977:25,

1020:21
**check** [4] - 873:8, 950:22, 964:22, 1004:5
**checking** [3] - 868:22, 926:10, 1002:23
**Chin** [1] - 840:14
**choice** [1] - 929:13
**choose** [1] - 959:14
**chooses** [1] - 904:2
**Christmas** [1] - 962:1
**CHRISTOPHER** [1] - 837:13
**christopher.morvillo @cliffordchance. com** [1] - 837:16
**chronology** [2] - 974:3, 974:7
**Church** [3] - 836:7, 837:4, 1027:18
**CIANCIULLO** [1] - 1027:17
**Cianciullo** [3] - 836:24, 1027:5, 1027:16
**Cir.1999** [1] - 1008:2
**Circuit** [6] - 839:18, 839:20, 839:21, 840:15, 970:1, 1007:6
**circulating** [2] - 856:8, 865:16
**circumstances** [6] - 851:1, 895:20, 971:10, 1013:7, 1015:8, 1018:12
**cite** [5] - 839:13, 840:12, 847:11, 848:21, 1022:8
**cited** [1] - 845:3
**cites** [2] - 847:18, 1008:1
**citing** [2] - 840:3, 1007:6
**city** [1] - 873:12
**claim** [1] - 844:21
**claimed** [2] - 914:23, 915:12
**claiming** [2] - 973:22, 974:16
**clarified** [1] - 931:15
**clarify** [2] - 931:19, 1011:1
**classic** [2] - 972:21, 973:2
**clear** [13] - 841:17, 848:10, 850:9, 851:19, 891:2, 938:22, 956:7, 961:10, 970:7,

982:17, 1004:23, 1006:7, 1012:16
**clearly** [3] - 844:15, 849:23, 1008:9
**CLERK** [1] - 944:23
**Clifford** [1] - 837:15
**close** [12] - 870:2, 906:25, 913:20, 914:3, 914:4, 914:8, 929:20, 932:11, 932:15, 932:19, 932:20, 967:7
**closely** [2] - 905:21, 905:25
**closing** [2] - 954:10, 954:11
**coal** [5] - 862:20, 871:23, 875:1, 886:23, 994:17
**coal-fired** [5] - 862:20, 871:23, 875:1, 886:23, 994:17
**coconspirator** [26] - 839:17, 839:22, 842:12, 842:13, 842:17, 842:22, 844:15, 844:19, 844:22, 848:10, 849:18, 849:19, 850:18, 850:21, 969:5, 1006:14, 1006:18, 1006:21, 1007:24, 1008:4, 1008:7, 1009:4, 1010:7, 1010:14, 1010:18, 1019:2
**coconspirators** [2] - 848:13, 1006:24
**COLEMAN** [2] - 945:3, 945:6
**Coleman** [25] - 850:25, 851:9, 851:12, 851:16, 944:19, 945:1, 968:5, 970:22, 971:3, 971:9, 971:10, 972:8, 977:6, 977:18, 980:6, 980:13, 980:19, 980:25, 981:4, 996:3, 1005:13, 1017:10, 1020:17, 1020:18, 1025:18
**Coleman's** [2] - 849:6, 1005:22
**colleague** [1] - 905:19
**colloquy** [2] - 879:18, 1005:17
**combination** [1] -

1010:3
**Combustion** [1] - 859:6
**comfortable** [3] - 883:22, 959:12, 959:25
**coming** [7] - 888:1, 888:6, 959:10, 967:24, 984:16, 996:14, 1024:4
**comment** [3] - 985:1, 986:21, 1001:14
**commenting** [1] - 843:15
**comments** [3] - 848:4, 953:7, 1010:5
**Commission** [2] - 952:6, 956:19
**commission** [9] - 855:19, 855:20, 855:23, 893:19, 893:20, 893:24, 907:22, 952:6, 993:4
**commit** [1] - 967:17
**commitment** [9] - 890:8, 890:20, 928:15, 928:21, 940:2, 941:8, 997:1, 1002:17, 1004:16
**committed** [4] - 848:9, 848:14, 984:1
**committee** [1] - 1008:19
**commonplace** [1] - 1014:25
**communication** [4] - 859:21, 896:15, 898:20
**communications** [3] - 923:7, 923:15, 929:2
**companies** [10] - 856:15, 856:19, 857:2, 857:3, 857:19, 858:17, 859:2, 947:12, 947:13, 947:25
**company** [20] - 858:2, 858:4, 861:13, 864:24, 885:2, 962:14, 964:1, 964:8, 964:10, 964:21, 964:23, 965:5, 965:7, 966:3, 966:5, 966:6, 967:1, 967:11, 981:14, 1020:15
**company's** [1] - 857:12
**compare** [1] - 977:21
**comparing** [2] - 882:2,

955:18
**compensation** [2] -
942:8, 991:9
**competitors** [2] -
856:23, 856:24
**complete** [1] - 997:11
**completed** [2] -
963:25, 997:4
**component** [1] - 978:4
**components** [2] -
858:14, 951:2
**comports** [1] - 921:2
**comprised** [1] - 856:7
**computed** [3] - 855:1,
855:2, 855:16
**concern** [11] - 841:17,
843:17, 882:22,
882:24, 883:7,
883:11, 941:1,
941:3, 959:9,
959:14, 973:8
**concerned** [4] - 962:6,
990:22, 990:23,
1020:1
**concerns** [2] - 882:20,
961:6
**conclusion** [3] -
844:12, 845:12,
845:21
**conditional** [1] -
879:18
**conditionally** [1] -
881:8
**conference** [4] -
876:5, 1025:8,
1026:4, 1026:8
**confidential** [1] -
886:24
**confirm** [2] - 924:14,
1013:10
**confirmed** [1] - 966:6
**confusion** [2] -
1013:17, 1018:11
**CONNECTICUT** [1] -
836:1
**Connecticut** [11] -
836:8, 861:16,
862:1, 870:21,
885:4, 888:16,
891:15, 991:1,
1008:17, 1027:7,
1027:19
**connection** [3] -
862:10, 869:5,
895:13
**consider** [3] - 840:6,
966:7, 997:11
**consideration** [3] -
977:15, 979:4,
1015:5

**considered** [4] -
840:21, 845:15,
1006:8, 1007:14
**considering** [2] -
916:14, 1024:23
**consistently** [1] -
853:12
**consortium** [15] -
856:24, 857:1,
857:8, 858:3,
858:16, 858:24,
863:8, 866:8,
884:11, 884:22,
891:3, 914:19,
915:2, 922:1, 994:12
**consortiums** [1] -
864:24
**conspiracy** [41] -
838:23, 839:10,
839:11, 839:12,
839:25, 840:2,
840:3, 840:11,
840:17, 840:18,
840:22, 840:24,
841:2, 841:3, 841:9,
841:11, 841:16,
842:2, 842:3,
843:11, 843:22,
844:25, 844:5,
845:7, 845:11,
845:17, 847:14,
847:16, 847:20,
848:7, 904:18,
970:10, 1006:15,
1007:2, 1007:4,
1007:5, 1007:11,
1007:15, 1007:22,
1008:10, 1008:14
**consultancy** [14] -
962:24, 965:15,
967:5, 967:19,
981:14, 981:19,
982:16, 983:8,
988:22, 988:23,
989:3, 989:5,
990:16, 993:9
**consultant** [35] -
863:7, 863:8,
866:14, 866:18,
866:22, 867:13,
872:11, 873:25,
874:1, 877:8,
878:18, 879:11,
885:17, 886:14,
892:9, 893:19,
893:22, 893:23,
894:9, 895:9, 896:5,
914:2, 915:9, 917:6,
917:17, 920:1,
943:24, 964:10,

967:1, 991:4,
994:20, 994:21,
994:24, 1009:11,
1009:17
**consultant's** [3] -
891:20, 894:6,
962:14
**consultants** [17] -
877:17, 877:20,
878:5, 878:14,
879:7, 894:21,
894:25, 895:2,
895:8, 936:19,
937:8, 943:23,
951:16, 983:2,
995:9, 1009:13
**consulting** [1] - 897:4
**contact** [4] - 961:6,
963:19, 966:8,
1002:22
**contacted** [4] -
898:12, 898:17,
900:2, 900:5
**contains** [2] - 880:2,
940:20
**contend** [1] - 845:19
**contents** [1] - 928:4
**continuation** [1] -
999:20
**continue** [5] - 911:5,
980:5, 980:24,
1005:4, 1005:24
**continued** [1] - 906:4
**CONTINUED** [2] -
853:6, 941:19
**continues** [2] -
841:22, 959:22
**continuity** [1] - 892:25
**contract** [18] - 859:9,
877:5, 877:8, 884:3,
885:6, 885:9,
885:10, 885:11,
885:12, 981:21,
982:20, 984:14,
984:17, 985:4,
991:14, 995:3,
1009:10, 1009:12
**contrary** [4] - 845:1,
845:21, 848:21
**control** [8] - 857:17,
872:16, 872:23,
921:21, 922:2,
934:5, 937:12,
939:16
**controlled** [2] - 871:9,
871:10
**controller** [1] - 964:18
**controlling** [3] -
873:7, 873:17,
873:18

**conversations** [4] -
867:5, 867:9,
906:17, 906:19
**convince** [5] - 891:11,
891:16, 959:20,
984:1, 1000:1
**convinced** [2] -
872:17, 1003:19
**cooperating** [4] -
849:17, 850:19,
972:25, 1014:4
**cooperation** [10] -
900:20, 901:18,
902:19, 902:22,
903:9, 903:17,
905:9, 977:13,
1013:7, 1018:13
**cooperator** [1] -
849:22
**cooperators** [3] -
1013:9, 1013:23,
1013:25
**coordinate** [5] -
864:14, 866:3,
866:11, 920:17,
920:21
**copied** [17] - 868:5,
896:16, 898:6,
915:21, 916:1,
916:3, 916:4, 924:3,
924:10, 924:15,
927:3, 927:19,
927:20, 961:16,
987:10, 1011:4
**copies** [1] - 839:14
**copy** [26] - 862:18,
871:17, 874:19,
876:17, 888:22,
919:14, 924:6,
927:10, 928:1,
960:15, 962:22,
963:21, 965:13,
966:13, 986:7,
986:20, 987:3,
989:17, 991:21,
992:11, 993:1,
999:7, 1000:11,
1001:23, 1003:3,
1022:23
**copying** [10] - 958:25,
965:1, 965:22,
981:9, 990:2,
998:14, 1001:1,
1002:6, 1003:25,
1004:24
**core** [2] - 973:1,
974:12
**cornered** [1] - 996:19
**corporate** [1] - 909:8
**Corporation** [5] -

856:25, 857:9,
864:18, 884:18,
994:2
**correct** [158] - 847:6,
853:19, 853:20,
856:10, 856:11,
865:22, 865:23,
873:4, 873:8,
878:24, 882:11,
882:12, 894:19,
894:22, 896:23,
897:25, 898:4,
898:15, 899:8,
900:1, 900:18,
900:21, 901:19,
901:25, 902:25,
903:2, 903:5, 903:8,
903:11, 903:24,
903:25, 904:4,
904:6, 904:23,
904:25, 905:1,
905:3, 905:4, 905:7,
907:1, 907:6,
907:19, 908:7,
911:19, 911:20,
911:23, 911:24,
912:4, 912:5, 912:9,
912:12, 913:4,
913:7, 913:8,
913:16, 913:17,
914:16, 915:5,
915:17, 915:22,
915:23, 916:2,
916:16, 917:8,
917:12, 917:24,
918:20, 919:3,
919:4, 920:14,
920:15, 920:19,
920:23, 920:24,
920:25, 921:1,
921:3, 921:4,
921:13, 921:14,
921:22, 922:16,
922:17, 922:25,
924:1, 924:2, 924:3,
924:4, 924:9,
924:19, 925:18,
925:19, 925:23,
926:6, 926:7,
926:12, 927:4,
927:5, 928:16,
928:17, 928:20,
929:11, 929:12,
929:14, 931:11,
933:13, 933:14,
933:15, 933:16,
933:21, 933:22,
936:11, 936:21,
937:1, 938:1, 938:2,
938:4, 938:7, 938:8,
938:11, 939:5,

940:9, 940:17,
940:21, 940:22,
941:8, 941:11,
941:15, 941:24,
941:25, 942:13,
942:14, 942:17,
942:24, 943:8,
943:9, 952:11,
953:9, 954:1, 956:5,
956:11, 957:1,
958:25, 960:7,
962:9, 981:10,
987:20, 990:3,
990:18, 992:6,
994:9, 994:14,
995:6, 997:15,
999:19, 1002:8,
1005:1
**correctly** [3] - 847:22,
952:8, 1001:8
**corroborated** [1] -
842:4
**corroborating** [5] -
840:10, 840:23,
1008:11, 1008:13,
1009:3
**corroboration** [26] -
839:9, 839:11,
841:1, 841:14,
843:10, 844:24,
845:10, 847:13,
847:15, 847:19,
848:5, 848:24,
968:16, 969:13,
969:16, 969:20,
970:9, 970:16,
1006:20, 1006:21,
1007:21, 1008:3,
1008:6, 1009:6,
1010:13, 1010:17
**Corruption** [3] -
946:22, 947:8,
947:20
**corruption** [2] - 947:2,
950:24
**counsel** [17] - 838:4,
842:10, 848:9,
852:6, 900:9,
971:17, 978:9,
1005:18, 1005:20,
1018:22, 1019:18,
1020:23, 1022:13,
1022:25, 1023:22,
1025:22
**count** [1] - 904:18
**counter** [2] - 1003:18,
1017:13
**countries** [1] - 947:17
**country** [4] - 854:13,
860:9, 860:10,

860:12
**couple** [10] - 839:2,
911:9, 952:3,
957:19, 957:20,
982:5, 983:22,
990:21, 999:12,
1002:10
**coupled** [1] - 890:6
**course** [8] - 912:14,
928:3, 930:22,
946:8, 949:1,
951:19, 975:17,
1014:24
**court** [6] - 901:2,
901:20, 902:4,
916:6, 1007:12,
1017:7
**COURT** [172] - 836:1,
838:4, 839:18,
842:24, 843:5,
843:7, 843:24,
844:4, 845:25,
846:3, 846:21,
846:25, 847:3,
847:8, 848:18,
850:2, 850:23,
852:19, 852:22,
853:2, 853:10,
853:15, 855:8,
863:2, 868:6,
868:10, 872:3,
875:6, 877:12,
877:14, 877:24,
878:10, 879:16,
881:7, 887:5, 889:9,
892:22, 894:4,
894:13, 901:14,
902:7, 902:14,
910:9, 910:13,
910:17, 910:21,
910:24, 911:4,
918:1, 918:8,
919:16, 930:8,
930:10, 930:15,
931:18, 933:3,
934:13, 934:19,
935:20, 938:16,
938:20, 939:10,
939:22, 940:11,
940:13, 943:14,
943:18, 944:4,
944:8, 944:11,
944:14, 944:20,
945:4, 950:11,
950:18, 952:20,
953:24, 954:14,
955:12, 956:2,
956:7, 957:14,
958:17, 960:19,
961:21, 963:2,

965:18, 967:25,
968:5, 968:15,
969:1, 969:6,
969:11, 969:23,
970:18, 971:12,
971:19, 971:23,
972:9, 973:6,
973:21, 974:13,
975:13, 975:16,
975:20, 975:25,
976:5, 976:9,
978:13, 979:11,
979:15, 979:21,
979:25, 980:17,
980:21, 980:23,
982:3, 984:10,
985:15, 985:25,
986:12, 987:16,
987:19, 987:22,
989:23, 992:1,
992:21, 993:22,
994:6, 996:1, 998:5,
1000:17, 1002:2,
1003:8, 1005:5,
1005:7, 1005:13,
1005:17, 1006:5,
1006:8, 1011:10,
1011:13, 1011:16,
1012:4, 1014:9,
1014:12, 1014:14,
1014:17, 1014:19,
1015:6, 1015:12,
1015:18, 1016:12,
1016:20, 1017:15,
1018:7, 1018:20,
1021:2, 1021:6,
1021:21, 1022:7,
1022:17, 1022:21,
1023:3, 1024:6,
1024:12, 1024:16,
1024:25, 1025:3,
1025:6, 1026:1,
1026:6
**Court** [22] - 836:24,
838:12, 839:7,
840:6, 842:5, 842:6,
847:24, 850:11,
852:18, 903:23,
968:10, 970:4,
973:15, 1010:3,
1010:14, 1012:20,
1014:10, 1022:15,
1027:6, 1027:7,
1027:17, 1027:18
**Court's** [2] - 980:11,
1022:16
**cover** [2] - 956:17,
958:8
**coverage** [1] - 905:12
**covered** [1] - 944:2

**crash** [1] - 956:13
**CRC** [2] - 836:24,
1027:5
**create** [1] - 990:11
**credibility** [10] -
849:24, 850:15,
850:17, 850:20,
972:19, 973:19,
973:21, 973:23,
974:11, 1014:3
**credits** [1] - 873:22
**crimes** [1] - 905:6
**Criminal** [1] - 837:9
**criminal** [1] - 946:12
**critical** [3] - 871:23,
875:2, 883:24
**cross** [22] - 851:5,
897:15, 901:10,
911:6, 939:1,
972:21, 973:2,
975:2, 975:19,
978:15, 978:17,
1010:24, 1013:4,
1013:19, 1014:23,
1015:14, 1016:2,
1016:19, 1020:6,
1023:4, 1023:11,
1024:17
**CROSS** [2] - 897:16,
941:19
**cross-examination**
[18] - 851:5, 897:15,
901:10, 911:6,
939:1, 972:21,
973:2, 975:2,
978:15, 1010:24,
1013:4, 1013:19,
1014:23, 1016:2,
1020:6, 1023:4,
1023:11, 1024:17
**CROSS-
EXAMINATION** [2] -
897:16, 941:19
**cross-examine** [2] -
975:19, 1016:19
**cross-examining** [1] -
1015:14
**CRR** [3] - 836:24,
1027:5, 1027:17
**crummy** [1] - 1021:8
**CT** [2] - 837:4, 837:20
**culled** [1] - 959:5
**cumulative** [2] -
953:22, 985:13
**current** [3] - 945:8,
1008:8, 1025:4
**customer** [1] - 856:10
**cut** [1] - 893:18
**cutting** [1] - 1011:20

**D**

**D.C** [3] - 837:10,
945:3, 946:25
**Dan** [1] - 897:20
**DANIEL** [2] - 837:6,
837:14
**daniel.kahn@usdoj.**
**gov** [1] - 837:11
**daniel.silver@**
**cliffordchance.com**
[1] - 837:17
**date** [25] - 862:22,
864:5, 867:21,
867:22, 869:10,
869:11, 869:12,
871:20, 871:21,
874:23, 876:21,
880:25, 881:1,
881:19, 886:25,
888:25, 889:1,
918:22, 952:23,
956:22, 957:16,
967:18, 981:23,
987:2, 1002:19
**dated** [4] - 957:9,
958:13, 983:17,
1001:23
**dates** [2] - 881:21,
985:2
**Dave** [3] - 905:17,
905:18, 905:19
**David** [1] - 841:6
**DAVID** [1] - 837:3
**david.novick@usdoj**
**.gov** [1] - 837:5
**Davis** [2] - 1012:20,
1014:15
**days** [5] - 839:2,
957:19, 957:20,
958:20, 1017:4
**deal** [4] - 930:23,
975:8, 1018:22,
1023:14
**dealing** [1] - 964:20
**deals** [1] - 852:15
**Dear** [1] - 965:25
**dear** [2] - 966:1, 992:4
**debate** [1] - 1015:2
**debriefings** [1] -
972:17
**December** [12] -
951:25, 952:11,
952:16, 955:8,
956:23, 957:9,
957:17, 958:13,
958:20, 960:16,
961:18, 994:2
**decide** [3] - 903:17,
903:22, 904:5

**decided** [4] - 850:8, 852:9, 886:13, 901:8
**decision** [28] - 849:13, 849:14, 850:3, 866:25, 871:4, 884:24, 888:1, 888:6, 888:7, 888:9, 914:19, 934:7, 934:8, 934:11, 934:14, 934:16, 934:22, 934:23, 934:25, 938:8, 943:7, 943:24, 978:24, 979:3, 1013:13, 1017:18, 1024:24
**decision-making** [2] - 871:4, 914:19
**decisions** [1] - 849:10
**declarant** [7] - 839:25, 840:17, 845:6, 1007:2, 1007:10, 1007:19, 1008:15
**declarant's** [10] - 839:9, 845:11, 847:14, 847:20, 848:6, 970:10, 970:17, 1007:21, 1008:6, 1009:4
**dedicated** [1] - 857:24
**defendant** [21] - 840:18, 842:2, 842:7, 845:7, 850:7, 882:1, 882:11, 882:16, 885:22, 931:16, 941:13, 970:22, 1006:15, 1006:19, 1007:9, 1007:19, 1009:21, 1013:20, 1015:22, 1019:11, 1026:2
**Defendant** [2] - 836:9, 837:12
**defendant's** [18] - 839:12, 840:10, 840:23, 841:4, 841:10, 842:3, 845:20, 847:15, 847:17, 848:6, 949:25, 951:11, 951:13, 970:11, 1008:4, 1010:19, 1012:25, 1013:14
**defendants** [1] - 1008:16
**defense** [7] - 839:1, 848:20, 980:7, 1012:25, 1019:23, 1024:9, 1025:24
**define** [1] - 858:20

**defined** [1] - 994:16
**degree** [2] - 945:20, 945:22
**delay** [4] - 901:9, 901:12, 901:25, 935:20
**demonstrate** [1] - 1010:6
**demote** [1] - 942:6
**Department** [1] - 837:8
**departure** [1] - 895:21
**depended** [1] - 865:5
**derived** [1] - 973:10
**described** [1] - 902:25
**designed** [1] - 977:22
**desires** [1] - 994:13
**detail** [1] - 900:10
**detailed** [1] - 959:17
**details** [2] - 916:11, 917:1
**determinations** [1] - 840:5
**determine** [1] - 1010:15
**develop** [4] - 913:20, 913:25, 914:3, 1021:16
**dial** [2] - 925:23, 926:5
**dial-up** [2] - 925:23, 926:5
**dialogue** [1] - 851:17
**different** [14] - 845:16, 846:11, 857:2, 857:3, 864:23, 946:10, 948:25, 953:23, 953:25, 954:7, 996:15, 1011:17, 1017:16, 1018:17
**difficulty** [1] - 916:10
**digested** [1] - 845:24
**direct** [20] - 853:3, 888:2, 899:24, 900:24, 907:5, 907:25, 910:5, 912:10, 915:19, 920:12, 922:12, 923:6, 923:24, 925:7, 944:2, 954:25, 971:7, 971:8, 980:25, 983:12
**DIRECT** [2] - 853:6, 945:6
**directed** [1] - 927:6
**direction** [6] - 890:3, 972:4, 978:22, 1014:1, 1016:10
**directly** [6] - 845:13,

893:25, 967:11, 968:13, 984:18, 984:19
**director** [6] - 854:12, 908:22, 908:23, 908:24, 991:7
**directors** [1] - 890:4
**disagree** [2] - 844:19, 1017:19
**disagreement** [4] - 937:16, 937:21, 942:23, 942:24
**disappear** [4] - 841:20, 883:2, 883:14, 941:6
**disappointed** [1] - 1002:15
**disapproved** [1] - 897:1
**disclosed** [1] - 954:8
**discredit** [2] - 974:17, 974:19
**discrete** [1] - 1022:17
**discuss** [13] - 838:12, 852:5, 852:8, 852:17, 886:2, 886:5, 892:1, 892:5, 910:18, 997:18, 1002:12, 1002:25, 1004:19
**discussed** [12] - 845:8, 881:8, 899:20, 899:22, 923:3, 923:24, 924:17, 928:3, 930:20, 966:8, 988:12, 999:23
**discussing** [5] - 911:21, 922:13, 981:12, 981:13, 1014:17
**discussion** [10] - 839:2, 879:17, 890:2, 935:3, 956:16, 983:25, 999:17, 1002:20, 1011:19, 1026:7
**discussions** [9] - 894:21, 894:23, 894:24, 922:21, 922:23, 924:21, 962:6, 963:17, 1011:18
**disputed** [1] - 1010:9
**distinction** [1] - 850:2
**District** [6] - 970:3, 1008:17, 1027:7, 1027:18
**DISTRICT** [2] - 836:1, 836:1

**distrust** [1] - 972:25
**Division** [1] - 837:9
**division** [2] - 886:10, 956:18
**document** [35] - 841:25, 842:22, 862:15, 867:18, 868:4, 871:15, 874:17, 876:15, 880:20, 881:10, 886:18, 888:19, 918:13, 918:15, 918:17, 919:21, 919:22, 919:23, 919:25, 933:10, 950:17, 957:17, 963:4, 963:5, 963:9, 980:12, 985:24, 988:4, 990:7, 990:14, 991:11, 993:13, 993:14, 998:12
**documented** [1] - 967:15
**documents** [35] - 852:1, 852:2, 852:11, 900:23, 916:18, 916:22, 916:23, 916:25, 917:11, 948:13, 948:22, 948:25, 949:5, 949:22, 951:11, 951:12, 955:18, 957:5, 962:13, 976:20, 977:19, 977:20, 983:5, 993:20, 995:12, 1005:3, 1005:5, 1005:23, 1006:2, 1011:5, 1011:7, 1020:19, 1020:22, 1025:13, 1025:21
**domiciliated** [1] - 964:9
**done** [5] - 842:17, 846:1, 931:8, 948:18, 1004:15
**doubt** [3] - 973:12, 997:9, 1021:4
**down** [15] - 865:3, 901:8, 910:4, 910:18, 921:8, 922:8, 922:18, 926:25, 928:10, 937:15, 953:16, 968:6, 985:4, 991:8, 1004:10
**downside** [1] - 961:10
**Dr** [6] - 953:6, 959:9,

959:15, 959:16, 959:24, 960:1
**draft** [5] - 890:4, 924:6, 988:22, 989:5, 1026:7
**drawn** [1] - 845:12
**due** [1] - 869:11
**during** [32] - 840:2, 850:10, 863:25, 864:12, 864:20, 868:22, 870:14, 898:8, 899:24, 900:24, 902:2, 902:12, 908:14, 916:20, 917:24, 918:9, 918:16, 919:8, 919:21, 920:1, 920:11, 922:11, 923:6, 923:24, 925:7, 951:19, 999:15, 1006:14, 1007:4, 1024:14
**dwell** [1] - 1015:10
**Dé** [5] - 909:15, 909:20, 909:25, 911:25, 967:17

## E

**E-mail** [3] - 837:5, 837:16, 837:21
**e-mail** [179] - 838:15, 838:16, 841:15, 841:17, 842:15, 843:2, 844:14, 846:5, 848:3, 848:11, 848:16, 862:16, 862:19, 862:22, 863:5, 863:11, 863:13, 863:16, 863:24, 864:8, 864:10, 867:19, 867:21, 867:22, 869:13, 870:11, 871:16, 871:20, 872:14, 873:2, 874:18, 874:23, 875:9, 876:8, 876:16, 876:19, 876:24, 879:22, 880:6, 880:8, 880:21, 880:23, 881:5, 881:6, 881:16, 881:23, 882:1, 882:10, 885:21, 886:19, 886:22, 886:25, 887:8, 887:22, 888:20, 888:25, 889:1,

889:12, 889:17, 889:18, 889:20, 889:21, 893:4, 896:15, 896:21, 898:7, 898:23, 917:15, 917:21, 917:23, 919:8, 920:8, 920:11, 920:13, 921:8, 921:11, 921:15, 921:20, 923:7, 923:23, 924:5, 924:10, 925:3, 925:6, 925:10, 925:17, 926:1, 926:2, 927:3, 927:13, 928:4, 928:9, 928:13, 940:2, 940:7, 940:16, 940:19, 941:12, 950:5, 951:21, 952:15, 952:24, 953:11, 955:7, 955:15, 955:24, 956:10, 956:22, 956:25, 957:8, 957:17, 957:21, 958:5, 958:7, 958:12, 958:24, 959:4, 959:22, 960:5, 960:6, 960:14, 962:21, 963:6, 963:9, 963:15, 963:20, 963:24, 964:13, 965:1, 965:2, 965:12, 965:21, 966:12, 966:15, 966:16, 966:23, 981:9, 983:13, 984:5, 984:20, 984:21, 985:11, 985:13, 986:6, 986:14, 986:17, 987:9, 987:25, 988:6, 988:8, 989:16, 991:20, 992:10, 995:19, 996:5, 996:10, 997:25, 998:7, 998:13, 999:4, 999:6, 999:21, 1000:10, 1000:20, 1000:25, 1001:22, 1003:2, 1003:12, 1003:23, 1004:23, 1006:17, 1007:13, 1009:19, 1010:5, 1010:13, 1011:15
**e-mailing** [1] - 872:6

**e-mails** [30] - 841:8, 843:19, 851:8, 881:20, 882:2, 896:16, 896:19, 899:23, 899:24, 915:20, 915:25, 923:5, 926:6, 926:10, 927:14, 949:6, 949:8, 949:13, 949:24, 951:18, 954:5, 955:19, 958:20, 998:8, 998:12, 1003:10, 1011:18, 1011:22, 1012:1, 1017:3
**eager** [1] - 1016:19
**earlier)** [1] - 886:1
**early** [3] - 949:25, 977:1, 978:8
**easier** [1] - 919:14
**easily** [1] - 1008:23
**East** [1] - 970:2
**Eastern** [1] - 875:14
**Eddie** [21] - 875:16, 890:7, 890:9, 890:10, 890:11, 890:19, 892:3, 892:12, 892:15, 892:18, 913:21, 961:8, 984:17, 1001:24, 1002:11, 1002:14, 1002:15, 1003:17, 1003:22, 1004:10, 1004:22
**Eddie's** [4] - 956:17, 958:7, 959:19, 1004:17
**Edie's** [1] - 959:18
**educational** [1] - 945:19
**Edward** [1] - 841:8
**effective** [1] - 1024:7
**effectively** [1] - 941:22
**efficient** [2] - 1024:8, 1026:9
**efforts** [11] - 859:9, 877:4, 895:7, 896:1, 896:4, 896:13, 921:25, 922:5, 928:18, 947:16, 1009:10
**Ehren** [2] - 956:11, 961:17
**either** [12] - 848:21, 870:2, 898:3, 916:4, 922:24, 928:4, 950:11, 961:7, 966:5, 987:20, 987:21, 992:20

**either/or** [1] - 1012:15
**Eko** [24] - 859:12, 860:16, 860:18, 860:20, 862:17, 865:20, 867:10, 871:18, 874:20, 875:24, 876:17, 878:16, 886:20, 893:12, 893:13, 950:24, 955:7, 955:22, 983:24, 1001:22, 1002:6, 1002:11, 1009:15, 1009:20
**electricity** [2] - 856:12, 856:14
**elects** [1] - 1026:2
**eleven** [2] - 945:17, 946:8
**elicit** [3] - 851:15, 947:15, 970:23
**elicited** [1] - 971:6
**eliminate** [1] - 977:23
**EM** [1] - 984:1
**Email** [1] - 837:11
**embassies** [1] - 970:2
**emir** [3] - 959:9, 959:16, 959:24
**Emir** [11] - 951:3, 951:8, 952:4, 953:12, 956:19, 957:1, 957:21, 960:1, 961:25, 984:14, 1003:20
**employ** [2] - 976:20, 994:19
**employed** [1] - 945:3
**Employee** [3] - 842:25, 843:2, 844:17
**employee** [4] - 843:1, 843:3, 844:13, 863:20
**employees** [4] - 855:6, 857:24, 887:20, 914:5
**employment** [1] - 944:25
**end** [11] - 842:7, 928:10, 935:13, 951:6, 1007:16, 1008:9, 1008:24, 1009:2, 1009:17, 1010:1, 1010:11
**endeavors** [1] - 866:20
**ended** [1] - 838:14
**Energy** [4] - 857:9, 858:5, 860:11
**enforcement** [2] -

945:24, 946:9
**engage** [2] - 891:5, 968:19
**engineer** [1] - 877:2
**engineering** [1] - 956:18
**Engineering** [1] - 859:6
**engineers** [1] - 878:17
**engraved** [1] - 1016:14
**enjoy** [1] - 968:2
**entailed** [1] - 982:19
**enter** [1] - 901:20
**entered** [6] - 853:1, 900:20, 911:3, 967:20, 980:22, 994:1
**entire** [2] - 910:1, 1023:10
**entirely** [4] - 849:15, 977:2, 977:12, 979:3
**entitled** [6] - 956:13, 973:4, 973:14, 976:15, 990:15, 1019:11
**entity** [3] - 871:1, 886:13, 888:12
**entry** [1] - 851:1
**environmental** [2] - 857:17, 990:24
**equally** [3] - 979:2, 1019:20, 1019:21
**equally-available** [1] - 1019:20
**equals** [1] - 1021:3
**equipment** [4] - 855:18, 855:21, 869:20, 937:12
**era** [1] - 925:20
**especially** [1] - 999:24
**ESQ** [6] - 837:6, 837:7, 837:13, 837:14, 837:14, 837:18
**essence** [1] - 936:2
**essentially** [7] - 901:5, 902:3, 929:2, 969:3, 969:5, 1010:23, 1017:21
**establish** [4] - 845:12, 877:25, 964:18, 1007:15
**established** [2] - 969:20, 1007:10
**establishes** [2] - 839:23, 1006:25
**establishing** [1] - 840:21
**estimate** [1] - 1001:5

**et** [5] - 843:16, 950:25, 961:25, 1018:17, 1025:9
**ETD** [1] - 875:14
**Etienne** [18] - 909:15, 909:20, 911:25, 962:22, 963:22, 965:2, 965:14, 967:17, 986:8, 987:10, 989:17, 990:2, 991:20, 992:3, 992:11, 998:16, 999:8, 1000:12
**evaluate** [1] - 873:14
**evaluated** [1] - 873:5
**evaluating** [3] - 864:23, 865:7, 865:9
**evaluation** [18] - 858:22, 864:22, 864:25, 865:1, 865:2, 865:4, 872:17, 873:13, 873:21, 873:23, 886:24, 890:3, 890:16, 895:4, 921:18, 922:2, 924:7, 924:18
**evaluator** [1] - 956:19
**evening** [4] - 851:6, 889:24, 928:10, 1021:18
**evidence** [71] - 839:24, 840:10, 840:23, 841:9, 841:12, 842:1, 842:5, 849:9, 849:12, 849:16, 849:25, 880:14, 880:15, 890:24, 917:19, 918:12, 920:6, 921:7, 923:18, 924:25, 933:8, 933:11, 951:20, 953:9, 955:3, 955:25, 957:4, 971:14, 972:23, 973:10, 973:20, 973:25, 975:6, 976:18, 976:19, 976:22, 977:16, 977:20, 979:6, 981:5, 983:1, 983:12, 985:24, 1006:9, 1007:1, 1007:24, 1008:11, 1008:13, 1008:22, 1009:1, 1009:4, 1010:6, 1010:11, 1011:3, 1011:9,

1011:11, 1012:8,
1012:9, 1012:10,
1012:17, 1014:25,
1015:15, 1017:2,
1017:8, 1018:3,
1018:13, 1019:1,
1020:4, 1025:14,
1026:3
**Evidence** [3] - 840:5,
1008:21, 1019:7
**evidenced** [1] - 977:4
**evidentiary** [1] -
1019:6
**EW** [3] - 875:11,
875:13, 875:15
**exact** [1] - 918:22
**exactly** [6] - 844:11,
917:9, 922:6,
923:21, 928:25,
938:9
**EXAMINATION** [6] -
853:6, 897:16,
938:23, 941:19,
943:19, 945:6
**examination** [24] -
849:25, 851:5,
853:4, 897:15,
901:10, 911:6,
939:1, 970:21,
971:7, 972:21,
973:2, 975:2,
978:15, 980:25,
1010:24, 1013:4,
1013:19, 1014:23,
1016:2, 1016:16,
1020:6, 1023:4,
1023:11, 1024:17
**examine** [3] - 975:19,
1013:7, 1016:19
**examined** [1] - 1013:9
**examining** [1] -
1015:14
**example** [6] - 914:13,
925:25, 937:22,
971:6, 978:15,
1017:2
**examples** [1] -
1002:17
**except** [1] - 1017:25
**exclude** [1] - 1024:1
**exclusively** [1] -
863:22
**excuse** [7] - 843:19,
848:6, 848:12,
983:19, 992:8,
993:14, 996:4
**excused** [2] - 944:14,
1005:14
**execute** [2] - 887:10,
887:12

executed [2] - 993:9,
993:13
**execution** [3] -
988:14, 990:12,
999:15
**executive** [1] - 892:23
**Exhibit** [47] - 838:13,
862:14, 862:25,
867:17, 868:1,
871:14, 872:1,
874:16, 875:4,
876:14, 879:13,
880:20, 881:3,
881:12, 881:16,
886:17, 887:3,
888:18, 889:7,
920:6, 923:17,
933:8, 940:7, 950:3,
951:20, 952:14,
952:23, 953:9,
957:3, 957:20,
958:6, 958:11,
962:19, 965:10,
965:16, 981:5,
981:17, 981:25,
984:3, 986:4,
991:18, 993:19,
993:24, 994:4,
995:17, 1000:8,
1000:14
**exhibit** [33] - 846:4,
863:2, 872:3, 875:6,
880:18, 887:5,
889:9, 926:22,
929:6, 952:20,
955:3, 956:8,
958:17, 960:12,
960:19, 961:21,
963:2, 965:18,
982:3, 984:10,
986:12, 987:16,
989:23, 992:1,
993:22, 994:6,
996:1, 998:5,
1000:17, 1001:20,
1002:2, 1003:8,
1003:11
**exhibits** [13] - 851:10,
852:6, 852:7, 954:3,
955:12, 957:14,
987:22, 989:23,
992:21, 1006:17,
1009:18, 1025:17
**Exhibits** [1] - 1006:10
**exist** [2] - 851:19,
851:20
**existence** [9] - 840:21,
841:2, 841:10,
842:2, 845:17,
971:13, 1007:15,

1008:14, 1022:22
**exited** [3] - 910:16,
968:4, 1005:12
**expand** [5] - 917:20,
920:7, 921:7,
923:19, 1021:16
**expanded** [2] -
1018:8, 1023:22
**expect** [3] - 868:8,
1004:12, 1020:16
**expectation** [2] -
838:20, 954:20
**expected** [1] - 846:16
**expenses** [1] - 951:4,
984:16
**expensive** [1] - 921:18
**experience** [4] -
859:2, 866:10,
884:12
**explain** [4] - 907:11,
913:23, 973:13,
974:14
**explained** [2] -
838:19, 1019:2
**explaining** [2] -
1009:14, 1018:22
**explanations** [1] -
959:18
**explicitly** [1] - 970:8
**explore** [4] - 850:25,
973:4, 973:14, 978:4
**exposing** [1] - 979:7
**express** [3] - 958:14,
958:23, 960:16
**expressed** [2] -
882:20, 962:3
**extension** [9] -
868:20, 869:9,
869:10, 869:12,
869:24, 870:4,
871:6, 1016:4,
1017:8
**extent** [6] - 843:17,
851:18, 879:17,
976:20, 1019:17,
1023:19
**EXTN** [1] - 868:15
**extrajudicial** [4] -
839:16, 839:22,
1006:24, 1007:8
**extremely** [1] - 904:9

**F**

**F.2d** [1] - 839:15
**F.3d** [3] - 970:2,
1007:5, 1008:1
**fabricator** [1] - 858:13
**face** [5] - 841:15,
841:16, 841:25,

864:11, 864:20
**fact** [28] - 842:10,
842:18, 844:16,
845:12, 850:4,
883:23, 896:21,
897:24, 904:10,
907:21, 909:25,
913:5, 916:24,
924:7, 924:18,
924:21, 927:25,
930:23, 959:24,
967:19, 968:24,
971:7, 971:25,
972:4, 977:4, 977:9,
1013:12, 1023:23
**factors** [5] - 865:2,
865:3, 865:4,
873:22, 873:23
**facts** [2] - 916:17,
1010:9
**factual** [1] - 840:4
**failings** [1] - 1017:13
**failure** [5] - 1015:21,
1016:23, 1019:18
**failures** [1] - 1018:15
**fair** [7] - 914:14,
914:20, 914:21,
929:3, 929:4,
1017:9, 1024:8
**fairly** [1] - 861:3
**false** [1] - 838:25
**familiar** [7] - 853:21,
859:16, 859:19,
859:20, 860:5,
884:13, 903:19
**family** [1] - 914:4
**far** [15] - 838:24,
850:16, 887:11,
887:13, 890:8,
890:21, 892:8,
914:21, 914:22,
928:15, 977:6,
999:14, 1005:22
**fax** [1] - 889:14,
986:20, 987:2
**faxed** [1] - 889:20
**FBI** [7] - 900:2,
945:16, 945:23,
946:19, 946:24,
947:5, 947:7
**FCPA** [4] - 904:17,
904:21, 972:1,
1013:2
**Feb** [1] - 962:2
**February** [7] - 965:14,
966:14, 981:10,
991:22, 992:13,
992:25, 993:12
**Federal** [4] - 840:5,
945:10, 1008:20,

1019:7
**fee** [3] - 951:4, 989:3,
1011:20
**feedback** [1] - 870:1
**fees** [1] - 907:23
**felt** [1] - 927:23
**Fenge** [1] - 986:8
**Fengge** [2] - 986:8,
986:20
**few** [15] - 849:19,
898:6, 900:17,
901:21, 910:4,
922:18, 931:19,
945:14, 953:19,
958:20, 959:21,
996:11, 997:6,
1005:6, 1011:22
**file** [3] - 967:15, 992:4,
1021:23
**filed** [2] - 1021:19,
1021:22
**files** [3] - 993:1, 993:5,
993:20
**filing** [1] - 847:4
**fill** [2] - 861:17, 861:18
**filling** [2] - 862:3,
908:9
**final** [3] - 842:6,
875:11, 1024:24
**finalize** [2] - 961:11,
988:13
**financial** [1] - 964:17
**fine** [4] - 932:9,
984:14, 986:2,
1022:2
**fingerprint** [1] -
1015:19
**fingerprints** [1] -
1015:10
**finish** [4] - 934:13,
939:6, 939:7, 980:19
**finished** [2] - 943:14,
1024:13
**finishes** [1] - 1026:2
**Finland** [1] - 951:1
**fire** [2] - 886:14, 942:1
**fired** [5] - 862:20,
871:23, 875:1,
886:23, 994:17
**firm** [1] - 1002:18
**Firman** [1] - 880:1
**firmly** [1] - 1003:21
**first** [46] - 838:11,
844:23, 868:12,
872:5, 875:8, 887:7,
889:11, 900:2,
900:5, 900:13,
916:9, 917:14,
920:8, 925:3,
928:14, 944:24,

945:2, 950:3, 952:3, 952:22, 957:16, 959:5, 962:3, 965:2, 965:24, 966:2, 966:22, 969:21, 982:22, 983:10, 983:19, 985:3, 988:3, 988:9, 996:11, 998:12, 999:12, 1000:19, 1000:20, 1000:21, 1002:9, 1018:24, 1022:21, 1024:3, 1024:22
**five** [9] - 848:12, 851:24, 899:14, 899:15, 899:16, 899:17, 901:24, 906:2, 906:3
**fix** [1] - 985:2
**flight** [3] - 875:13, 876:1, 876:7
**Floor** [1] - 837:4
**flow** [2] - 999:15, 1001:15
**fluidized** [2] - 856:8, 865:16
**focus** [5] - 955:21, 965:20, 984:24, 996:10, 1023:19
**focused** [1] - 1023:17
**folks** [1] - 1013:8
**follow** [1] - 1013:6
**followed** [2] - 864:16, 946:4
**following** [7] - 848:15, 879:24, 953:8, 954:25, 956:24, 957:20, 963:16
**follows** [1] - 845:14
**foregoing** [1] - 1027:8
**foreign** [4] - 897:1, 946:6, 947:11, 947:15
**forensics** [1] - 1019:25
**forever** [1] - 888:1
**forget** [2] - 869:19, 967:13
**form** [1] - 993:4
**format** [1] - 986:22
**former** [2] - 859:1, 905:19
**formulate** [1] - 1021:13
**forth** [5] - 847:5, 871:12, 903:16, 927:22, 978:23
**fortunate** [1] - 855:17
**forward** [6] - 843:11,

892:1, 892:6, 892:11, 955:21, 974:7
**forwarded** [6] - 941:13, 968:22, 997:14, 998:10, 1000:24, 1009:19
**forwarding** [13] - 838:16, 843:14, 848:3, 863:11, 863:13, 876:24, 880:6, 889:14, 955:15, 996:4, 998:7, 1009:21, 1010:4
**forwards** [2] - 885:22, 940:8
**Foster** [6] - 856:24, 857:1, 869:4, 869:5, 873:23, 885:17
**foundation** [12] - 846:15, 848:1, 877:10, 877:12, 877:22, 877:25, 894:2, 894:11, 917:25, 930:14, 968:21, 985:17
**foundations** [1] - 851:19
**four** [6] - 906:2, 906:3, 926:15, 926:16, 963:5, 985:5
**four-page** [1] - 963:5
**Fourth** [1] - 976:24
**frame** [1] - 854:1
**Fraud** [1] - 837:9
**Fred** [60] - 843:12, 861:5, 861:9, 862:8, 864:8, 864:16, 865:18, 866:24, 867:19, 868:14, 870:25, 871:7, 871:16, 874:7, 879:23, 879:24, 880:4, 886:2, 886:4, 886:6, 886:19, 888:8, 888:9, 891:11, 891:25, 892:2, 892:5, 892:7, 892:11, 892:25, 912:11, 912:15, 913:2, 934:7, 934:11, 934:16, 934:22, 935:6, 935:9, 935:18, 939:15, 939:17, 950:22, 951:6, 964:4, 966:12, 966:16, 967:3, 981:9, 983:25,

984:5, 988:12, 988:14, 990:12, 999:7, 999:23, 1001:1, 1003:24, 1004:6, 1004:9
**Fred's** [2] - 891:19, 934:25
**Frederic** [11] - 838:15, 862:16, 874:19, 876:16, 965:13, 967:9, 992:12, 1000:11, 1003:3, 1003:12, 1009:20
**Fredric** [1] - 888:20
**Friday** [2] - 872:15, 967:2
**friend** [3] - 883:21, 914:12, 985:7
**friendly** [1] - 906:13
**friends** [5] - 865:5, 873:20, 906:11, 906:12, 906:23
**friends'** [1] - 873:20
**front** [4] - 949:21, 997:2, 1001:21, 1018:3
**fronted** [1] - 1023:2
**fruit** [1] - 976:25
**fuel** [2] - 857:16, 857:17
**fulfill** [1] - 954:19
**fulfilling** [1] - 997:1
**full** [35] - 863:2, 872:3, 875:6, 887:5, 889:9, 908:8, 908:10, 945:1, 952:20, 955:12, 956:8, 957:14, 958:17, 959:15, 960:19, 961:21, 963:2, 965:18, 982:3, 984:10, 986:12, 987:16, 987:22, 989:23, 992:1, 992:21, 993:22, 994:6, 996:1, 998:5, 1000:17, 1002:2, 1003:8, 1023:4
**full-time** [2] - 908:8, 908:10
**fully** [1] - 845:24, 959:20, 1022:8
**function** [6] - 887:10, 887:13, 894:1, 894:6, 942:16, 954:21
**fundamental** [3] - 975:2, 978:3, 978:9
**funding** [3] - 854:23, 855:9, 884:23

**FURTHER** [1] - 943:19
**furtherance** [3] - 840:3, 1006:14, 1007:5
**FW** [3] - 868:18, 868:25, 951:1

**G**

**Gajendra** [2] - 962:6, 991:5
**game** [2] - 950:24, 1017:9
**gather** [1] - 949:8
**gathered** [2] - 948:23, 962:13
**gathering** [1] - 948:12
**Geaney** [2] - 842:7, 848:21
**gears** [1] - 983:10
**general** [5] - 934:6, 945:16, 971:12, 981:15, 1008:22
**generalized** [1] - 1021:12
**generally** [1] - 847:22
**generated** [1] - 856:13
**generator** [1] - 857:23
**genesis** [1] - 972:14
**gentleman** [3] - 859:11, 861:19, 908:16
**gentlemen** [8] - 838:5, 853:3, 910:14, 910:25, 911:5, 980:1, 980:24, 1005:8
**germane** [1] - 1020:15
**Gigante** [2] - 840:14, 1008:1
**Gilimanuk** [1] - 996:13
**Gilson** [4] - 1024:21, 1025:3, 1025:20, 1025:22
**Gilson's** [1] - 1025:15
**Giuseppe** [2] - 959:17, 961:16
**given** [9] - 851:25, 878:7, 879:10, 959:17, 969:22, 972:10, 985:6, 1005:21, 1005:25
**global** [2] - 861:1, 861:11
**good-bye** [1] - 898:17
**Goodwin** [1] - 922:9
**Goran** [2] - 956:11, 961:17
**Government** [1] - 837:2

**government** [74] - 838:6, 839:23, 844:21, 845:19, 846:10, 847:12, 847:18, 849:8, 851:7, 851:11, 851:23, 852:4, 862:24, 867:25, 871:25, 873:21, 875:3, 879:13, 881:3, 887:2, 887:20, 889:6, 895:3, 897:7, 897:12, 899:3, 899:11, 900:21, 901:6, 902:3, 902:24, 903:12, 903:17, 903:22, 904:5, 904:11, 907:15, 914:5, 915:25, 916:10, 916:18, 916:21, 916:22, 917:11, 917:15, 917:23, 918:9, 918:16, 918:19, 918:24, 923:5, 944:15, 947:14, 968:14, 971:5, 972:10, 972:16, 973:9, 974:17, 978:6, 978:20, 979:5, 1006:25, 1007:9, 1007:20, 1007:25, 1009:5, 1016:8, 1016:15, 1017:10, 1021:3, 1023:10, 1024:21, 1026:1
**Government's** [19] - 862:14, 862:25, 867:17, 868:1, 871:14, 872:1, 874:16, 876:14, 879:13, 880:19, 881:3, 881:11, 881:15, 886:17, 887:3, 888:18, 889:7, 940:7, 1018:4
**government's** [19] - 838:14, 841:1, 849:9, 849:13, 850:3, 968:18, 972:4, 972:24, 974:8, 974:12, 976:12, 977:16, 979:2, 1006:10, 1010:2, 1014:1, 1021:25, 1023:25, 1025:17
**grand** [1] - 972:5

**grip** [2] - 954:20, 1002:21
**grounds** [2] - 879:15, 978:17
**group** [5] - 853:22, 861:12, 935:2, 942:18, 946:19
**guarantee** [4] - 841:23, 868:23, 884:1, 884:15
**guaranteeing** [1] - 870:13
**guess** [4] - 845:19, 908:5, 970:23, 1012:20
**guideline** [3] - 937:9, 937:18, 937:19
**guilt** [4] - 1013:14, 1016:25, 1018:13, 1021:7
**guilty** [11] - 901:3, 901:21, 902:5, 902:11, 904:17, 904:20, 905:5, 1013:20, 1020:12, 1020:14
**guy** [12] - 929:16, 930:1, 931:5, 931:7, 931:11, 931:14, 931:17, 932:7, 932:11, 932:19, 932:24, 937:15

**H**

**half** [2] - 917:21, 1004:14
**hand** [21] - 844:4, 852:17, 944:21, 956:1, 960:21, 960:22, 970:5, 987:18, 987:24, 987:25, 988:1, 988:20, 989:9, 989:10, 989:12, 989:13, 993:7, 999:2, 999:3, 1018:25, 1019:3
**handed** [1] - 1019:3
**handle** [2] - 880:3, 1000:5
**handled** [1] - 948:9
**handling** [2] - 952:6, 1010:25
**happy** [6] - 890:22, 968:19, 975:18, 1003:19, 1004:10, 1005:4
**hard** [4] - 907:11, 919:14, 954:23,

957:24
**Hatt** [2] - 959:8, 961:17
**Haven** [3] - 836:8, 837:4, 1027:19
**head** [8] - 860:25, 861:6, 888:10, 909:2, 909:25, 911:22, 935:2, 1004:13
**headings** [1] - 926:24
**headquarters** [3] - 890:4, 909:9, 946:24
**hear** [11] - 843:25, 853:12, 868:25, 870:17, 893:17, 893:21, 893:25, 967:23, 976:9, 976:15, 1024:5
**heard** [11] - 869:2, 893:18, 909:22, 909:23, 971:9, 982:15, 983:1, 995:8, 1004:14, 1023:15
**hearsay** [4] - 840:6, 840:7, 840:20, 1006:15
**help** [17] - 861:2, 861:7, 873:20, 873:21, 873:24, 874:2, 896:4, 914:11, 938:17, 951:5, 951:6, 997:10, 1012:21, 1013:11, 1014:5, 1021:12
**helpful** [2] - 914:14, 914:17
**helping** [1] - 856:1
**hereby** [1] - 1027:8
**hi** [1] - 996:12
**hidden** [3] - 876:17, 888:22, 916:4
**high** [3] - 865:4, 892:23, 913:21
**high-level** [2] - 892:23, 913:21
**highlight** [5] - 928:9, 982:5, 983:21, 989:2, 996:7
**highlighted** [11] - 872:13, 875:22, 879:23, 882:18, 889:22, 953:19, 954:17, 961:23, 983:23, 984:13, 994:12
**Hill** [1] - 991:1
**hire** [1] - 886:13

**hired** [15] - 866:22, 877:7, 877:17, 877:20, 893:19, 894:25, 895:2, 913:14, 913:19, 914:7, 917:6, 943:24, 1009:11, 1009:13, 1025:24
**hiring** [7] - 895:8, 933:13, 933:24, 936:18, 942:17, 942:21, 943:23
**historically** [1] - 866:19
**history** [3] - 865:14, 945:20, 978:1
**hold** [3] - 849:4, 851:3, 854:17
**home** [4] - 870:21, 980:4, 980:9, 1005:9
**Honor** [172] - 838:10, 838:11, 838:19, 838:23, 839:4, 839:13, 839:21, 840:13, 840:25, 841:25, 842:9, 842:16, 843:6, 843:9, 843:23, 844:2, 844:6, 846:2, 846:8, 846:24, 847:7, 847:23, 848:12, 848:17, 849:1, 849:3, 850:6, 850:14, 850:24, 851:21, 852:14, 852:24, 853:5, 853:14, 855:4, 855:5, 855:12, 863:1, 868:2, 868:8, 872:2, 875:5, 877:11, 877:23, 878:19, 879:12, 879:15, 879:20, 881:2, 881:5, 887:4, 892:21, 894:3, 894:12, 897:14, 901:7, 901:11, 901:15, 902:6, 902:13, 910:20, 911:7, 918:4, 918:11, 918:12, 919:13, 919:18, 920:3, 930:7, 930:14, 933:1, 935:9, 935:11, 935:14, 936:5, 937:6, 938:14, 938:15, 938:18, 939:20, 940:23, 941:16, 941:18,

943:13, 943:15, 943:17, 944:3, 944:7, 944:10, 944:13, 944:17, 944:18, 945:5, 950:8, 950:9, 952:18, 952:19, 953:21, 954:2, 954:9, 954:13, 955:11, 956:4, 956:6, 957:11, 958:15, 958:16, 961:19, 965:16, 966:20, 967:24, 968:9, 968:17, 969:19, 969:24, 970:6, 970:15, 971:2, 971:15, 972:13, 972:23, 973:18, 974:2, 974:25, 975:17, 975:22, 976:17, 977:11, 977:13, 978:11, 979:20, 980:10, 981:2, 981:25, 982:2, 984:9, 985:12, 985:19, 986:2, 986:10, 986:11, 987:14, 989:22, 992:19, 993:18, 995:23, 1003:6, 1005:2, 1005:19, 1006:7, 1011:6, 1011:12, 1014:7, 1017:25, 1018:6, 1018:19, 1019:22, 1020:3, 1020:10, 1021:5, 1021:19, 1022:2, 1022:10, 1022:11, 1022:20, 1022:24, 1023:7, 1023:9, 1023:17, 1024:11, 1024:19, 1025:12
**Honor's** [1] - 1015:1
**HONORABLE** [1] - 836:18
**hope** [1] - 1024:23
**hopefully** [4] - 847:25, 853:11, 979:22, 1026:8
**hoping** [1] - 904:13
**horse** [1] - 984:15
**HOSKINS** [2] - 836:8, 1027:3
**Hoskins** [106] - 838:5, 843:14, 859:17, 860:14, 867:19, 880:22, 881:17,

882:2, 882:3, 888:22, 892:2, 892:12, 892:14, 892:16, 896:7, 896:23, 896:25, 897:6, 897:10, 897:21, 897:24, 898:3, 898:8, 898:12, 909:18, 911:12, 911:22, 912:14, 924:10, 924:18, 927:3, 927:10, 927:14, 927:19, 927:20, 928:4, 933:21, 939:1, 939:13, 939:14, 939:16, 940:8, 940:16, 941:14, 941:23, 942:1, 942:4, 942:6, 942:15, 943:4, 950:5, 951:24, 952:15, 953:5, 956:11, 957:8, 958:12, 958:19, 958:25, 960:7, 960:14, 960:15, 961:15, 962:21, 963:10, 963:21, 964:14, 965:1, 965:13, 965:22, 966:9, 966:13, 967:17, 977:3, 981:10, 983:15, 986:7, 986:15, 986:18, 987:5, 987:10, 989:17, 990:3, 991:22, 992:5, 992:12, 995:19, 996:5, 997:14, 998:1, 998:15, 999:8, 1000:3, 1000:10, 1000:24, 1001:1, 1001:23, 1002:7, 1003:3, 1003:25, 1004:24, 1009:21, 1009:22, 1016:1, 1018:14
**Hoskins'** [10] - 859:22, 859:25, 860:2, 909:14, 913:2, 942:8, 943:5, 961:3, 1001:10, 1016:25
**Hoskins's** [1] - 943:22
**hotel** [2] - 926:17, 926:18
**hours** [2] - 899:18, 1022:3
**Houston** [4] - 854:16,

860:25, 893:6, 908:13
**huge** [1] - 873:5
**hundred** [1] - 851:10

**I**

**idea** [1] - 1020:5
**ideas** [1] - 870:15
**identical** [1] - 840:18
**identification** [22] - 862:15, 871:15, 874:16, 876:14, 880:19, 886:17, 888:18, 950:4, 952:13, 958:11, 960:13, 961:14, 962:20, 965:11, 966:11, 981:18, 986:5, 987:8, 989:9, 991:19, 997:23, 1000:9
**identified** [5] - 842:12, 844:15, 844:18, 1013:8, 1013:24
**identify** [2] - 851:14, 852:10
**identifying** [1] - 842:11
**illegitimate** [6] - 913:15, 914:7, 920:25, 922:3, 928:23, 940:3
**imagine** [1] - 851:12
**imbedding** [1] - 958:24
**imbeds** [1] - 960:6
**immediate** [6] - 887:24, 891:3, 891:12, 891:17, 960:4, 960:10
**immediately** [1] - 996:19
**immunity** [1] - 905:11
**immunize** [1] - 1016:6
**impacting** [1] - 1004:18
**impacts** [2] - 1013:13, 1013:14
**impeachment** [1] - 1019:1
**implement** [1] - 964:19
**imply** [1] - 845:9
**important** [13] - 864:15, 865:11, 865:17, 866:4, 874:6, 901:13, 904:9, 904:12, 920:18, 931:18,

967:14, 980:15
**importantly** [2] - 882:22, 883:6
**impose** [1] - 904:2
**improve** [1] - 886:7
**improving** [1] - 868:20
**IN** [7] - 892:17, 908:23, 908:24, 909:2, 933:19, 937:14, 967:16
**inaccurate** [1] - 977:2
**inappropriate** [2] - 842:20, 979:1
**Inc** [51] - 853:18, 856:16, 857:6, 857:9, 857:13, 857:15, 858:18, 858:23, 858:25, 859:4, 860:3, 861:6, 861:14, 870:21, 871:3, 872:9, 872:25, 874:13, 874:14, 884:8, 884:9, 884:19, 885:3, 886:10, 886:15, 888:14, 891:14, 905:20, 912:3, 913:6, 914:18, 915:1, 915:2, 915:7, 947:24, 964:4, 967:10, 981:20, 982:7, 987:12, 988:2, 988:23, 988:24, 990:23, 992:13, 993:10, 993:11, 994:3, 994:13, 995:4
**Inc.'s** [1] - 856:22
**inception** [1] - 948:9
**inclined** [1] - 1024:20
**include** [3] - 869:21, 892:2, 892:11
**included** [1] - 1006:17
**includes** [2] - 902:22, 963:6
**including** [7] - 864:9, 899:23, 921:12, 971:25, 972:2, 972:4, 1009:19
**increase** [6] - 868:16, 868:21, 869:14, 870:6, 870:14, 871:5
**increased** [1] - 870:8
**increasing** [2] - 868:16, 869:23
**increasingly** [1] - 890:2
**independent** [30] - 838:21, 839:9,

839:11, 840:9, 840:22, 843:9, 844:24, 845:10, 847:13, 847:15, 847:19, 848:4, 848:5, 848:23, 968:16, 969:13, 969:16, 969:20, 970:9, 970:16, 974:18, 1006:20, 1007:21, 1008:3, 1008:6, 1008:11, 1008:13, 1009:3, 1010:13, 1010:16
**Indian/Chinese/ Korean** [1] - 951:2
**indicate** [1] - 1008:9
**indicated** [1] - 1003:21
**indicting** [1] - 842:13
**indictment** [6] - 840:19, 842:13, 842:14, 844:11, 844:16, 844:20
**individual** [5] - 844:18, 859:16, 860:5, 860:15, 922:12
**individuals** [4] - 865:20, 865:24, 1015:24, 1017:4
**Indonesia** [56] - 843:2, 843:3, 844:13, 844:17, 856:5, 856:15, 857:10, 858:6, 859:1, 859:3, 859:5, 860:10, 860:11, 860:12, 861:2, 861:8, 862:20, 863:21, 865:14, 865:21, 866:10, 866:20, 872:18, 872:22, 874:10, 876:6, 879:1, 884:12, 887:21, 889:4, 892:24, 893:2, 893:7, 894:17, 895:3, 905:24, 907:16, 926:1, 935:7, 949:11, 950:7, 952:4, 961:18, 962:8, 963:10, 964:6, 964:7, 964:20, 965:5, 965:8, 984:7, 988:25, 993:12, 1001:3, 1003:5
**Indonesian** [3] - 859:13, 966:5, 966:6

**Inez** [6] - 888:20, 889:2, 889:3, 889:13, 889:18, 889:21
**inflammatory** [1] - 1023:7
**influence** [6] - 875:18, 875:21, 890:14, 890:15, 890:17, 997:2
**influencing** [1] - 914:10
**info** [3] - 963:16, 964:24, 1001:13
**informant** [1] - 978:7
**information** [11] - 880:3, 890:6, 893:8, 914:18, 915:4, 921:16, 927:21, 927:24, 953:17, 977:1, 978:7
**informed** [3] - 966:2, 983:24, 1004:20
**infos** [2] - 873:4, 873:8
**initial** [1] - 972:17
**initiation** [1] - 978:4
**initiative** [1] - 959:10
**innocence** [3] - 1013:14, 1016:25, 1018:13
**input** [2] - 854:6
**inquire** [3] - 850:7, 1013:19, 1017:21
**insight** [1] - 914:25
**instance** [4] - 942:25, 1001:15, 1018:24, 1024:3
**instances** [1] - 946:15
**instead** [5] - 866:4, 929:13, 929:24, 931:3, 931:24
**instructed** [3] - 878:16, 879:7, 1009:16
**instruction** [3] - 973:6, 975:21, 1015:4
**instructions** [2] - 879:10, 1015:2
**intelligence** [1] - 859:14
**intend** [10] - 849:11, 850:23, 851:15, 875:25, 901:11, 971:3, 972:8, 977:19, 1016:3, 1023:18
**intended** [3] - 851:5, 1008:24, 1017:25

**intending** [1] - 980:14
**intends** [4] - 851:11, 970:22, 980:7, 980:8
**intent** [3] - 977:5, 1008:25
**intention** [4] - 954:2, 977:17, 1024:22, 1025:4
**interaction** [1] - 910:6
**interactions** [1] - 898:8
**interest** [3] - 884:5, 885:8, 885:14
**interested** [1] - 856:19
**interests** [3] - 885:18, 885:19, 960:1
**internally** [1] - 915:3
**international** [2] - 947:2, 977:12
**International** [43] - 853:22, 853:24, 854:2, 854:3, 854:8, 854:11, 854:14, 854:15, 854:18, 854:22, 854:25, 855:6, 855:15, 859:8, 859:10, 859:12, 860:10, 862:9, 908:1, 909:6, 909:15, 909:19, 909:25, 910:1, 911:10, 911:13, 911:17, 911:23, 913:5, 933:12, 933:18, 933:19, 933:25, 936:8, 936:17, 936:24, 937:22, 942:16, 946:22, 947:8, 947:20, 998:14
**internationally** [1] - 937:9
**interpret** [1] - 954:12
**interrupt** [1] - 1011:14
**intertwined** [1] - 929:3
**interview** [2] - 900:14, 1019:20
**interviewed** [1] - 1017:6
**interviewing** [1] - 948:15
**introduced** [1] - 960:3
**investigate** [1] - 947:11
**Investigation** [1] - 945:10
**investigation** [37] - 948:23, 949:2, 972:15, 972:17, 972:20, 973:4,

973:19, 973:22, 974:3, 974:10, 974:11, 974:18, 974:20, 974:22, 975:3, 976:14, 977:1, 977:7, 977:9, 978:2, 978:5, 979:8, 1013:10, 1014:1, 1015:23, 1017:12, 1017:14, 1019:10, 1019:24, 1020:7, 1020:10, 1020:25, 1021:3, 1021:8, 1023:1, 1024:1

**investigations** [1] - 946:10

**investigative** [8] - 971:22, 972:15, 972:21, 973:9, 1014:24, 1015:14, 1016:5, 1016:24

**invitation** [3] - 959:10, 1016:14

**involved** [13] - 860:23, 864:3, 894:20, 905:16, 936:13, 946:9, 946:15, 962:7, 985:8, 1011:15, 1015:23, 1017:3, 1020:11

**involvement** [6] - 895:8, 895:23, 947:19, 948:6, 962:3, 985:6

**involves** [1] - 977:12

**involving** [5] - 936:23, 947:24, 1019:25, 1020:1

**Ion** [7] - 862:18, 871:17, 888:21, 998:14, 999:7, 1000:12, 1000:25

**irrelevant** [4] - 849:15, 977:10, 977:12, 979:3

**issue** [46] - 838:13, 841:14, 842:10, 845:4, 846:8, 846:17, 849:3, 849:6, 850:8, 850:14, 869:14, 869:15, 869:18, 869:19, 882:24, 883:8, 883:9, 883:22, 886:2, 891:18, 892:6, 901:9, 940:21, 960:4, 960:10, 964:12, 966:2, 966:9, 968:11,

968:12, 968:15, 980:2, 983:6, 984:19, 987:2, 996:13, 996:14, 1004:19, 1007:13, 1007:18, 1010:22, 1013:15, 1017:20, 1018:15, 1023:16

**issues** [10] - 838:18, 850:5, 900:11, 936:14, 951:8, 952:7, 977:12, 985:9, 1002:12, 1023:14

**itself** [5] - 840:20, 845:13, 845:15, 1007:14, 1010:6

---

## J

**jail** [1] - 904:14

**Jakarta** [6] - 863:21, 873:1, 875:14, 888:4, 890:4, 963:17

**Jan** [1] - 962:2

**JANET** [1] - 836:18

**January** [6] - 962:23, 963:12, 963:22, 964:14, 987:11, 989:18

**JBA** [2] - 836:4, 1027:3

**JBIC** [2] - 951:6, 951:8

**Jeffrey** [2] - 944:19, 945:1

**JEFFREY** [2] - 945:2, 945:6

**job** [12] - 841:18, 870:10, 878:18, 882:24, 883:12, 883:15, 883:17, 941:1, 941:4, 945:8, 946:5, 1009:17

**joined** [2] - 945:23, 948:11

**joint** [1] - 959:8

**JONES** [1] - 837:7

**judge** [3] - 904:1, 976:4, 979:1

**July** [1] - 901:21

**Junji** [5] - 863:18, 863:19, 863:24, 874:18, 886:19

**juror's** [1] - 950:18

**jurors** [2] - 838:8, 843:24

**jury** [46] - 847:9, 848:19, 849:4, 851:3, 852:23, 861:10, 864:6,

870:12, 870:23, 872:6, 874:5, 885:1, 886:8, 890:9, 911:1, 945:18, 946:2, 948:22, 972:5, 973:6, 973:8, 974:1, 975:11, 975:12, 976:15, 976:18, 977:15, 977:22, 980:4, 980:5, 980:9, 980:18, 982:15, 983:1, 986:1, 998:23, 1013:5, 1013:17, 1015:2, 1015:4, 1015:10, 1018:4, 1021:7, 1023:15, 1024:5

**Jury** [7] - 838:2, 853:1, 910:16, 911:3, 968:4, 980:22, 1005:12

**JURY** [2] - 836:12, 836:18

**jury's** [2] - 950:12, 979:4

**Justice** [1] - 837:8

**justified** [1] - 967:15

---

## K

**Kaelin** [16] - 962:22, 963:10, 963:21, 965:1, 965:12, 965:22, 966:12, 966:17, 966:23, 981:9, 986:7, 987:11, 989:18, 990:3, 991:21, 992:11

**KAHN** [3] - 837:6, 852:24, 880:14

**keen** [1] - 1018:9

**keep** [4] - 853:13, 1002:23, 1005:2, 1012:14

**keeping** [2] - 853:12, 955:24

**key** [1] - 890:6, 890:11

**Keys** [1] - 990:16

**keys** [4] - 964:3, 965:9, 990:7, 991:10

**kickbacks** [1] - 895:13

**kind** [7] - 869:19, 898:16, 898:19, 907:11, 914:25, 970:15, 1012:22

**kindly** [1] - 886:5

**kinds** [1] - 914:25

**knowing** [2] - 838:22, 1024:4

knowledge [6] - 843:21, 894:5, 930:16, 938:10, 938:12, 943:10

**knowledge/views** [1] - 951:8

**known** [3] - 840:14, 846:5, 1004:9

**knows** [4] - 842:16, 878:1, 878:20, 997:20

**Kusno** [37] - 838:16, 838:22, 842:12, 843:7, 844:14, 844:21, 846:17, 848:16, 876:24, 877:1, 877:2, 877:16, 877:19, 878:4, 878:13, 880:9, 882:5, 922:13, 922:22, 923:3, 923:8, 923:15, 940:9, 969:1, 980:13, 980:16, 1006:17, 1007:10, 1007:13, 1007:19, 1007:24, 1009:9, 1009:11, 1009:13, 1009:16, 1010:7, 1010:18

**Kusno's** [14] - 841:15, 842:1, 843:10, 844:24, 968:24, 1006:20, 1007:8, 1007:23, 1009:6, 1009:19, 1009:22, 1010:5, 1010:14, 1010:15

**Kusunoki** [8] - 863:18, 863:19, 863:24, 874:18, 886:19, 888:3, 888:5, 889:25

**Kusunoki's** [1] - 875:9

---

## L

**laboring** [1] - 838:25

**lack** [1] - 985:7

**ladies** [8] - 838:4, 853:3, 910:14, 910:24, 911:5, 980:1, 980:24, 1005:8

**laid** [3] - 846:15, 895:22, 968:21

**language** [2] - 953:22, 1018:3

**Lapian** [5] - 888:20, 889:2, 889:3, 889:18, 940:2

**laptop** [5] - 889:13, 925:4, 925:11, 925:12, 926:4

**Larry** [6] - 863:25, 864:13, 872:19, 875:24, 920:17, 1009:20

**LARRY** [5] - 853:6, 897:16, 938:23, 941:19, 943:19

**Lars** [1] - 964:18

**LARYEA** [63] - 837:7, 853:5, 853:7, 853:14, 853:16, 855:5, 855:12, 855:14, 862:24, 863:3, 867:25, 868:8, 868:11, 871:25, 872:4, 875:3, 875:7, 877:13, 877:15, 878:2, 878:3, 878:12, 878:21, 879:12, 879:20, 879:21, 880:16, 880:17, 881:2, 881:9, 887:2, 887:6, 889:6, 889:10, 893:1, 894:7, 894:14, 894:15, 897:14, 901:7, 902:6, 902:13, 917:25, 919:18, 930:7, 930:9, 931:15, 933:1, 935:11, 935:14, 938:24, 939:11, 939:21, 939:25, 940:12, 940:14, 940:15, 940:23, 940:24, 941:16, 943:15, 943:20, 944:10

**Laryea** [2] - 853:4, 898:11

**last** [29] - 839:6, 842:9, 843:8, 843:13, 844:9, 846:22, 863:23, 870:11, 874:22, 879:25, 885:5, 885:25, 889:24, 896:21, 928:10, 935:8, 944:25, 945:2, 953:19, 959:21, 969:15, 983:13, 993:3, 996:18, 997:6, 999:21, 1009:25, 1024:9

**late** [1] - 847:4
**latest** [2] - 950:23, 1001:16
**laundering** [5] - 905:3, 905:6, 905:9, 946:7, 972:2
**laundering-related** [1] - 905:6
**Lauren** [1] - 871:18
**law** [9] - 839:1, 840:25, 842:21, 844:25, 849:16, 945:22, 945:24, 946:8, 970:15
**Lawrence** [65] - 859:17, 860:14, 867:19, 870:15, 880:22, 885:23, 888:21, 892:2, 892:12, 892:16, 896:7, 897:20, 927:16, 934:23, 934:24, 941:13, 950:5, 951:9, 951:24, 952:4, 952:15, 955:23, 957:8, 958:12, 958:25, 960:6, 960:14, 961:12, 961:15, 962:21, 963:19, 963:21, 963:25, 964:24, 965:9, 965:13, 965:22, 966:8, 966:13, 967:16, 983:15, 986:7, 986:23, 987:10, 989:17, 991:22, 992:12, 995:19, 996:5, 996:12, 997:22, 998:1, 999:7, 1000:2, 1000:4, 1000:10, 1000:24, 1001:19, 1001:23, 1002:24, 1003:3, 1003:25, 1004:12, 1004:19, 1009:21
**LAWRENCE** [2] - 836:8, 1027:3
**Lawrence's** [2] - 934:8, 934:15
**laws** [1] - 946:5
**lay** [3] - 894:13, 930:13, 985:17
**lead** [12] - 858:16, 858:19, 858:21, 858:23, 861:8, 861:22, 864:1, 872:8, 912:6,

942:12, 948:3, 948:11
**leader** [2] - 866:8, 884:11
**leading** [2] - 967:23, 1022:14
**leads** [1] - 844:11
**learn** [5] - 916:17, 916:21, 917:14, 931:6, 931:10
**learned** [2] - 916:22, 917:10
**least** [7] - 847:21, 848:13, 848:14, 896:12, 912:24, 915:12, 997:11
**leave** [6] - 895:16, 895:18, 910:14, 944:14, 968:6, 1018:4
**leaving** [4] - 896:8, 898:13, 898:23, 950:25
**led** [3] - 946:12, 946:14, 974:5
**left** [17] - 893:7, 895:24, 896:2, 896:5, 896:10, 898:13, 906:4, 955:1, 960:21, 981:4, 981:8, 987:18, 987:24, 989:9, 989:10, 989:12, 999:2
**left-hand** [7] - 960:21, 987:18, 987:24, 989:9, 989:10, 989:12, 999:2
**legal** [1] - 1023:14
**legitimate** [9] - 913:15, 913:18, 914:8, 920:22, 921:25, 922:3, 928:22, 940:3, 1020:5
**lengths** [1] - 1020:9
**lengthy** [1] - 953:11
**less** [4] - 899:14, 926:14, 954:21, 986:22
**letter** [2] - 970:15, 986:21
**level** [3] - 892:23, 913:21, 938:1
**levels** [3] - 910:4, 922:18, 936:23
**lies** [1] - 973:1
**light** [1] - 879:18
**likely** [1] - 950:25
**limine** [1] - 979:16

**line** [12] - 863:17, 863:23, 901:9, 923:20, 925:3, 943:5, 952:3, 955:25, 969:15, 990:10, 1016:2, 1020:5
**lines** [13] - 924:14, 938:1, 938:3, 952:3, 953:19, 959:22, 983:22, 990:21, 996:11, 997:6, 999:12, 999:22, 1002:10
**link** [1] - 974:23
**LINSENMAYER** [1] - 837:8
**list** [6] - 845:16, 994:24, 998:24, 1015:25, 1017:5
**listed** [6] - 844:16, 982:10, 990:25, 991:4, 991:10, 991:15
**listening** [1] - 1014:22
**lists** [1] - 1000:25
**litigate** [1] - 842:19
**live** [1] - 962:17
**lived** [1] - 962:18
**living** [1] - 863:21
**LLC** [1] - 837:19
**LLP** [1] - 837:15
**LN** [3] - 889:14, 889:15, 987:3
**lobby** [1] - 920:23
**lobbying** [6] - 864:14, 866:3, 920:17, 920:22, 921:25, 1003:18
**local** [8] - 854:5, 854:6, 859:13, 859:14, 962:1, 964:21, 965:5, 965:7
**locally** [1] - 964:19
**located** [4] - 856:4, 946:23, 946:24, 982:11
**locations** [1] - 962:14
**log** [1] - 926:5
**look** [46] - 845:13, 847:9, 847:11, 848:25, 881:25, 882:13, 882:14, 918:6, 933:10, 933:17, 950:3, 952:13, 952:22, 955:5, 957:3, 957:24, 958:10, 959:4, 959:21, 961:13, 962:19,

966:10, 966:22, 981:17, 982:18, 983:11, 984:3, 986:4, 986:17, 986:24, 987:7, 988:8, 988:19, 989:8, 990:1, 993:24, 995:17, 996:21, 997:13, 997:23, 1000:8, 1000:19, 1003:1, 1003:23, 1022:3
**looked** [10] - 845:2, 896:19, 896:21, 917:3, 952:24, 958:21, 984:22, 993:15, 996:22
**looking** [9] - 841:13, 841:14, 864:8, 870:11, 937:2, 953:16, 960:23, 975:20, 1021:14
**looks** [1] - 970:7
**loop** [1] - 967:8
**LORINDA** [1] - 837:7
**lorinda.laryea@ usdoj.gov** [1] - 837:11
**lose** [5] - 870:10, 873:10, 874:4, 921:9
**losing** [2] - 974:13, 1002:21
**lost** [1] - 1013:12
**Lotus** [2] - 889:16, 889:21
**low** [1] - 865:5
**lower** [1] - 904:2
**lunch** [4] - 849:2, 968:1, 970:19, 1018:18
**Lunch** [1] - 979:24
**lunchtime** [1] - 851:17

# M

**ma'am** [4] - 918:11, 934:20, 934:21, 1005:16
**mail** [183] - 837:5, 837:16, 837:21, 838:15, 838:16, 841:15, 841:17, 842:15, 843:2, 844:14, 846:5, 848:3, 848:11, 848:16, 862:16, 862:19, 862:22, 863:5, 863:11, 863:13, 863:16, 863:24, 864:8,

864:10, 867:19, 867:21, 867:22, 869:13, 870:11, 871:16, 871:20, 872:14, 873:2, 874:18, 874:23, 875:9, 876:8, 876:16, 876:19, 876:24, 879:22, 880:6, 880:8, 880:21, 880:23, 881:5, 881:6, 881:16, 881:23, 882:1, 882:10, 885:21, 886:19, 886:22, 886:25, 887:8, 887:22, 888:20, 888:25, 889:1, 889:12, 889:17, 889:18, 889:20, 889:21, 893:4, 896:15, 896:21, 898:7, 898:23, 917:15, 917:21, 917:23, 919:8, 920:8, 920:11, 920:13, 921:8, 921:11, 921:15, 921:20, 923:7, 923:23, 924:5, 924:10, 925:3, 925:6, 925:10, 925:17, 926:1, 926:2, 927:3, 927:13, 928:4, 928:9, 928:13, 940:2, 940:7, 940:16, 940:19, 941:12, 950:5, 951:21, 952:15, 952:24, 953:11, 955:7, 955:15, 955:24, 956:10, 956:22, 956:25, 957:8, 957:17, 957:21, 958:5, 958:7, 958:12, 958:24, 959:4, 959:22, 960:5, 960:6, 960:14, 961:15, 962:21, 963:6, 963:9, 963:15, 963:20, 963:24, 964:13, 965:1, 965:2, 965:12, 965:21, 966:12, 966:15, 966:16, 966:23, 981:9, 983:13, 984:5, 984:20, 984:21, 985:11,

985:13, 986:6,
986:14, 986:17,
987:9, 987:25,
988:6, 988:8,
989:16, 991:20,
992:10, 995:19,
996:5, 996:10,
997:25, 998:7,
998:13, 999:4,
999:6, 999:21,
1000:10, 1000:20,
1000:25, 1001:22,
1003:2, 1003:12,
1003:23, 1004:23,
1006:17, 1007:13,
1009:19, 1010:5,
1010:13, 1011:15
**mailing** [1] - 872:6
**mails** [30] - 841:8,
843:19, 851:8,
881:20, 882:2,
896:16, 896:19,
899:23, 899:24,
915:20, 915:25,
923:5, 926:6,
926:10, 927:14,
949:6, 949:8,
949:13, 949:24,
951:18, 954:5,
955:19, 958:20,
998:8, 998:12,
1003:10, 1011:18,
1011:22, 1012:1,
1017:3
**main** [7] - 856:22,
856:24, 884:22,
902:19, 928:9,
956:17, 958:8
**maker** [4] - 888:2,
888:6, 888:7, 888:9
**man** [2] - 867:15,
909:20
**managed** [1] - 984:17
**management** [1] -
874:8
**manager** [6] - 843:4,
860:9, 860:10,
860:12, 863:21,
877:3
**Manning** [1] - 837:19
**manufacture** [1] -
858:13
**map** [1] - 1023:4
**March** [9] - 963:12,
981:24, 995:21,
996:8, 998:1,
1000:13, 1001:24,
1002:4, 1003:4
**margin** [1] - 873:5
**marked** [9] - 862:14,

867:17, 871:14,
874:15, 876:13,
880:13, 880:19,
886:16, 888:17
**marketing** [1] - 861:12
**marshaling** [5] -
975:3, 975:6,
1017:11, 1017:12,
1020:18
**Martini** [1] - 837:19
**Marubeni** [34] - 857:9,
857:18, 857:21,
857:22, 857:24,
863:20, 864:18,
866:6, 868:15,
872:24, 876:3,
876:9, 880:1,
884:18, 884:20,
885:24, 888:4,
891:2, 891:10,
915:7, 923:25,
924:6, 949:17,
951:5, 961:25,
983:25, 994:2,
994:8, 994:12,
994:19, 995:2,
1009:25
**Marubeni's** [1] -
889:24
**Maryland** [3] - 962:18,
964:2, 982:13
**material** [1] - 976:14
**matter** [4] - 875:25,
914:9, 916:24,
1027:10
**matters** [2] - 838:7,
914:10
**MC** [5] - 864:11,
864:17, 864:20,
864:17, 884:18
**mean** [17] - 858:19,
864:17, 885:11,
885:15, 885:16,
887:14, 890:19,
913:23, 913:24,
916:5, 934:4, 937:5,
937:6, 937:18,
1017:10, 1021:8,
1022:7
**meaning** [2] - 925:15,
970:14
**means** [2] - 845:20,
925:12
**meant** [5] - 936:2,
940:3, 942:11,
970:14, 1015:6
**measures** [1] - 891:3
**meet** [2] - 876:3, 876:9
**meeting** [30] - 843:13,
843:16, 875:11,

875:12, 876:1,
876:11, 879:25,
880:5, 882:15,
885:24, 891:25,
892:2, 892:4,
892:11, 892:14,
892:24, 900:10,
900:13, 916:9,
918:18, 919:6,
919:8, 932:2, 962:4,
966:2, 968:25,
969:2, 969:4, 969:9,
1009:24
**meetings** [15] -
892:18, 899:3,
899:6, 899:10,
899:13, 909:10,
909:12, 909:13,
914:14, 918:23,
919:3, 923:2, 926:9,
961:25, 962:4
**meets** [1] - 938:5
**Melissa** [2] - 836:24,
1027:5
**MELISSA** [1] -
1027:17
**member** [3] - 858:16,
952:4, 1007:11
**members** [5] - 840:1,
867:5, 914:19,
915:3, 1007:3
**membership** [7] -
844:24, 845:5,
845:6, 845:11,
847:20, 970:10,
970:17
**memory** [2] - 916:23,
916:24
**mention** [1] - 905:8
**mentioned** [21] -
856:9, 856:16,
857:1, 857:18,
858:2, 860:15,
861:9, 865:21,
866:13, 878:22,
879:6, 880:4, 880:8,
883:23, 889:17,
894:16, 943:22,
1004:11, 1011:4,
1011:18, 1018:17
**mentions** [4] - 869:13,
876:8, 884:6, 884:7
**message** [8] - 925:17,
953:5, 961:4, 990:5,
992:23, 998:21,
1004:3, 1004:8
**messages** [1] - 968:23
**messed** [1] - 935:21
**Messrs** [1] - 875:24
**met** [9] - 891:22,

897:22, 897:24,
900:17, 902:24,
938:3, 966:1,
1019:12, 1021:3
**Michael** [1] - 908:17
**microphone** [1] -
853:11
**mid** [2] - 962:2
**mid-Feb** [1] - 962:2
**mid-Jan** [1] - 962:2
**middle** [4] - 851:22,
852:4, 999:4,
1000:21
**might** [7] - 907:22,
930:4, 930:5,
937:13, 959:11,
959:14, 959:16
**million** [7] - 868:17,
869:13, 869:20,
869:24, 870:3,
871:5, 873:6
**mine** [2] - 905:19,
950:11
**minimal** [1] - 1012:8
**minimum** [1] - 841:7
**minor** [1] - 985:1
**minute** [1] - 940:23
**minutes** [3] - 846:6,
910:18, 910:22
**missing** [2] - 975:20,
978:25
**misunderstanding** [1]
- 839:1
**misunderstood** [1] -
1017:23
**Mitsubishi** [3] -
856:25, 857:2,
885:17
**Mitsubishi's** [1] -
1003:18
**Mitsui** [1] - 950:24
**Mizushima** [7] -
874:21, 889:25,
891:22, 891:25,
892:4, 892:7, 892:10
**MLATs** [1] - 977:13
**modem** [5] - 889:13,
925:4, 925:11,
925:12, 926:5
**modems** [1] - 925:23
**modified** [1] - 970:12
**Moeis** [4] - 952:4,
953:12, 957:1,
957:21
**Moenaf** [65] - 838:15,
843:11, 843:14,
848:3, 860:6,
860:13, 860:19,
860:20, 862:18,
865:21, 866:5,

867:10, 871:18,
874:20, 876:16,
876:23, 877:3,
878:7, 878:16,
879:3, 879:6,
880:21, 881:11,
881:16, 886:21,
888:22, 890:1,
891:10, 891:16,
893:13, 914:1,
915:15, 922:19,
923:13, 927:10,
928:1, 929:9, 931:1,
931:10, 931:23,
951:24, 952:16,
955:7, 955:16,
956:11, 958:25,
960:15, 965:21,
968:23, 983:14,
986:8, 996:5,
997:25, 998:14,
999:7, 1000:2,
1000:3, 1001:22,
1002:6, 1003:2,
1009:14, 1009:15,
1009:18, 1009:22,
1017:5
**Moenaf's** [4] - 860:8,
885:21, 1010:4,
1010:13
**moment** [8] - 839:14,
938:14, 953:18,
962:12, 991:3,
996:11, 1001:14,
1001:19
**Monday** [4] - 996:18,
1005:10, 1024:15,
1026:2
**money** [14] - 841:20,
841:21, 883:1,
883:14, 883:21,
885:20, 887:18,
905:2, 905:5, 905:9,
941:5, 941:10,
946:7, 972:2
**month** [1] - 951:1
**months** [5] - 867:3,
901:21, 945:14,
946:4, 985:5
**moot** [1] - 968:20
**morning** [14] - 838:4,
838:5, 853:8, 853:9,
875:10, 897:18,
897:19, 968:11,
968:14, 1021:20,
1021:21, 1022:3,
1024:14, 1026:4
**MORVILLO** [6] -
837:13, 1024:19,
1025:2, 1025:4,

1025:10, 1025:25
**most** [4] - 884:23,
916:3, 964:11, 997:4
**motion** [10] - 849:8,
903:18, 903:20,
903:23, 904:1,
904:10, 904:14,
979:16, 1006:10,
1023:2
**motivated** [1] -
1013:11
**Mouillet** [6] - 995:20,
997:14, 998:13,
999:9, 1000:11,
1001:1
**move** [22] - 902:9,
910:9, 920:3,
923:17, 933:6,
935:8, 961:7,
962:11, 965:10,
986:1, 987:14,
989:21, 991:18,
991:24, 992:18,
993:19, 994:4,
995:7, 995:23,
998:3, 1000:14,
1024:1
**moved** [1] - 905:24
**moves** [8] - 862:25,
868:1, 872:1, 875:4,
879:13, 881:3,
887:3, 889:7
**moving** [1] - 1018:21
**MR** [282] - 838:10,
839:20, 843:1,
843:6, 843:8, 844:2,
844:6, 844:8, 846:2,
846:8, 846:23,
847:1, 847:6,
847:23, 848:25,
849:3, 850:5,
850:24, 851:21,
852:20, 852:24,
855:3, 863:1, 868:2,
872:2, 875:5,
877:10, 877:22,
878:8, 878:19,
879:14, 880:14,
881:4, 887:4, 889:8,
892:20, 894:2,
894:11, 897:17,
901:11, 901:15,
901:16, 902:9,
902:10, 902:15,
910:12, 911:7,
911:8, 917:20,
917:22, 918:5,
918:12, 918:14,
919:12, 919:19,
920:3, 920:4, 920:7,

920:10, 921:6,
921:10, 922:8,
922:10, 923:19,
923:22, 925:2,
925:5, 926:22,
927:2, 928:7,
928:12, 929:6,
929:8, 930:13,
930:17, 930:18,
931:21, 931:22,
933:4, 933:5, 933:7,
933:9, 935:4, 935:8,
935:12, 935:17,
936:5, 936:6,
938:14, 939:8,
939:19, 941:17,
941:20, 943:13,
943:16, 944:1,
944:7, 944:9,
944:18, 945:5,
945:7, 950:8, 950:9,
950:15, 950:20,
952:18, 952:19,
952:21, 953:21,
954:2, 954:9,
954:11, 954:16,
955:10, 955:11,
955:13, 956:3,
956:5, 956:9,
957:11, 957:13,
957:15, 958:15,
958:16, 958:18,
960:17, 960:18,
960:20, 961:19,
961:20, 961:22,
962:25, 963:1,
963:3, 965:16,
965:17, 965:19,
966:19, 966:20,
966:21, 967:21,
967:22, 967:23,
968:9, 968:17,
968:18, 969:3,
969:7, 969:18,
969:24, 971:2,
971:15, 971:16,
971:21, 971:24,
972:13, 973:18,
974:2, 974:25,
975:15, 975:17,
975:22, 976:2,
976:3, 976:6,
976:17, 978:11,
978:14, 978:19,
978:20, 978:24,
979:5, 979:9,
979:12, 979:14,
979:20, 980:10,
980:20, 981:2,
981:3, 981:6, 981:7,
981:25, 982:2,

982:4, 984:8, 984:9,
984:11, 985:12,
985:17, 985:20,
985:22, 986:2,
986:3, 986:10,
986:11, 986:13,
987:14, 987:15,
987:17, 987:21,
987:23, 989:21,
989:22, 989:25,
991:24, 991:25,
992:2, 992:18,
992:20, 992:22,
993:18, 993:21,
993:23, 994:4,
994:5, 994:7,
995:23, 995:25,
996:2, 998:3, 998:4,
998:6, 1000:14,
1000:16, 1000:18,
1001:25, 1002:1,
1002:3, 1003:6,
1003:7, 1003:9,
1005:2, 1005:6,
1005:19, 1006:4,
1006:6, 1011:6,
1011:12, 1011:14,
1011:21, 1011:23,
1011:24, 1011:25,
1012:2, 1012:3,
1014:7, 1014:10,
1014:13, 1014:16,
1014:18, 1014:21,
1015:11, 1015:16,
1015:20, 1016:18,
1017:1, 1017:24,
1018:19, 1018:21,
1021:5, 1021:18,
1021:19, 1022:2,
1022:10, 1022:20,
1022:24, 1023:5,
1023:6, 1023:9,
1023:12, 1023:16,
1023:22, 1024:11,
1024:14, 1024:19,
1025:2, 1025:4,
1025:10, 1025:21,
1025:25, 1026:5
**MS** [62] - 853:5, 853:7,
853:14, 853:16,
855:5, 855:12,
855:14, 862:24,
863:3, 867:25,
868:8, 868:11,
871:25, 872:4,
875:3, 875:7,
877:13, 877:15,
878:2, 878:3,
878:12, 878:21,
879:12, 879:20,
879:21, 880:16,

880:17, 881:2,
881:9, 887:2, 887:6,
889:6, 889:10,
893:1, 894:7,
894:14, 894:15,
897:14, 901:7,
902:6, 902:13,
917:25, 919:18,
930:7, 930:9,
931:15, 933:1,
935:11, 935:14,
938:24, 939:11,
939:21, 939:25,
940:12, 940:14,
940:15, 940:23,
940:24, 941:16,
943:15, 943:20,
944:10
**MT** [12] - 952:16,
957:10, 958:14,
958:23, 960:16,
961:18, 962:8,
986:23, 996:13,
997:8, 997:20,
1002:24
**MT.doc** [1] - 957:10
**Muara** [6] - 951:13,
952:24, 955:9,
956:13, 962:11,
995:16
**Muliyono** [1] - 880:1
**multiple** [3] - 908:9,
982:15, 1015:23
**multistep** [2] - 936:22,
937:3
**must** [10] - 840:9,
840:22, 845:15,
970:16, 997:21,
1006:19, 1007:14,
1008:10, 1008:13,
1010:10
**myriad** [1] - 841:8
**mystery** [1] - 842:18

# N

**N.W** [1] - 837:9
**name** [28] - 858:3,
859:12, 860:15,
861:19, 870:13,
897:20, 908:16,
909:4, 909:22,
909:23, 917:6,
917:7, 917:16,
917:17, 919:25,
929:17, 930:11,
931:8, 931:9, 932:8,
944:24, 944:25,
945:1, 945:2,
990:23, 991:6

**Name** [1] - 990:22
**named** [5] - 859:16,
860:5, 876:24,
909:20, 922:12
**narrow** [1] - 1020:22
**nature** [2] - 971:14,
985:6
**nearly** [1] - 1008:5
**necessarily** [1] -
1011:19
**necessary** [4] -
933:24, 934:2,
935:23, 1025:19
**necessity** [1] -
1025:15
**need** [31] - 838:24,
840:18, 841:11,
842:6, 844:23,
845:10, 847:13,
847:19, 848:23,
851:3, 864:11,
864:19, 872:17,
891:16, 910:10,
951:5, 961:9,
967:25, 975:23,
976:3, 976:6, 977:5,
977:23, 1003:16,
1003:17, 1006:6,
1010:15, 1021:20,
1021:23, 1022:11,
1024:8
**needed** [3] - 841:2,
843:9, 874:9
**needs** [4] - 839:8,
839:10, 879:18,
1021:25
**negates** [1] - 993:2
**negative** [7] - 873:22,
884:4, 885:7,
885:14, 890:2,
999:14, 1001:18
**negotiate** [1] - 891:4
**negotiating** [1] -
1001:4
**negotiation** [3] -
870:14, 871:9,
1001:18
**negotiations** [1] -
868:22
**nervous** [1] - 872:25
**Network** [37] - 853:22,
853:24, 854:8,
854:11, 854:14,
854:15, 854:18,
855:1, 855:6,
855:16, 859:8,
859:10, 859:13,
860:10, 862:10,
908:1, 909:6,
909:15, 909:19,

909:25, 910:1, 911:10, 911:13, 911:17, 911:23, 913:5, 933:12, 933:18, 933:19, 933:25, 936:8, 936:17, 936:24, 937:22, 942:16, 998:14

**Network's** [3] - 854:2, 854:3, 854:22

**never** [18] - 868:5, 897:22, 897:24, 898:3, 907:16, 909:5, 909:8, 918:13, 919:16, 919:20, 919:22, 924:17, 924:21, 927:14, 928:3, 929:9, 1002:21

**new** [10] - 891:5, 893:19, 893:22, 894:6, 894:8, 895:9, 910:9, 916:17, 946:3, 985:7

**New** [6] - 836:8, 837:4, 837:9, 837:15, 970:3, 1027:19

**new-agent** [1] - 946:3

**next** [30] - 846:15, 849:7, 865:5, 872:18, 878:9, 878:10, 883:11, 891:1, 891:9, 891:21, 936:3, 944:15, 951:1, 951:7, 951:10, 955:24, 960:12, 961:13, 963:17, 963:20, 964:13, 977:23, 984:25, 990:10, 993:24, 996:14, 996:16, 1001:20, 1003:23

**NH** [1] - 837:3

**nice** [1] - 1026:10

**niceties** [1] - 1013:2

**night** [9] - 839:6, 843:13, 846:22, 847:4, 879:25, 885:25, 1009:25, 1021:23, 1022:1

**nobody** [1] - 847:3

**none** [3] - 1002:18, 1020:15, 1020:16

**nonetheless** [2] - 974:22, 1022:5

**nonprosecution** [23] - 849:14, 850:1, 850:4, 850:13,

851:2, 970:24, 971:4, 971:13, 971:25, 972:7, 972:18, 974:5, 978:22, 979:12, 1013:13, 1016:7, 1017:18, 1017:22, 1019:8, 1022:15, 1022:23, 1023:18, 1023:24

**nonresponsive** [2] - 935:13, 939:19

**nonrole** [1] - 891:20

**North** [2] - 909:2, 945:21

**note** [8] - 851:4, 851:6, 853:10, 889:13, 950:10, 971:5, 993:5, 1004:11

**notebooks** [1] - 910:15

**Notes** [2] - 889:16, 889:21

**notes** [7] - 843:15, 918:24, 969:4, 970:13, 988:16, 1018:9, 1027:10

**nothing** [4] - 841:20, 883:19, 883:20, 938:15

**notice** [6] - 842:15, 844:20, 881:19, 881:22, 885:25, 1010:1

**notified** [1] - 1024:21

**November** [1] - 836:5

**Novick** [11] - 838:9, 844:5, 844:10, 844:12, 845:1, 845:3, 953:25, 980:24, 1011:2, 1018:20, 1024:10

**NOVICK** [116] - 837:3, 838:10, 839:20, 843:1, 843:6, 843:8, 844:6, 847:23, 849:3, 850:5, 851:21, 852:20, 944:18, 945:5, 945:7, 950:8, 950:15, 950:20, 952:18, 952:21, 954:2, 954:11, 954:16, 955:10, 955:13, 956:3, 956:9, 957:11, 957:15, 958:15, 958:18, 960:17, 960:20, 961:19,

961:22, 962:25, 963:3, 965:16, 965:19, 966:19, 966:21, 967:22, 968:18, 969:3, 969:7, 969:18, 971:16, 975:17, 976:3, 976:6, 976:17, 978:19, 978:24, 979:9, 979:14, 980:10, 980:20, 981:2, 981:3, 981:6, 981:7, 981:25, 982:4, 984:8, 984:11, 985:17, 985:22, 986:2, 986:3, 986:10, 986:13, 987:14, 987:17, 987:23, 989:21, 989:25, 991:24, 992:2, 992:18, 992:22, 993:18, 993:23, 994:4, 994:7, 995:23, 996:2, 998:3, 998:6, 1000:14, 1000:18, 1001:25, 1002:3, 1003:6, 1003:9, 1005:2, 1005:6, 1005:19, 1006:6, 1011:6, 1011:23, 1011:25, 1012:3, 1018:21, 1021:5, 1021:19, 1022:2, 1022:10, 1022:20, 1022:24, 1023:6, 1023:12, 1023:22, 1024:11, 1024:14, 1025:21, 1026:5

**number** [13] - 848:1, 848:2, 851:25, 864:9, 865:3, 866:6, 873:5, 899:2, 946:9, 948:22, 1017:3, 1017:4, 1022:18

**NY** [2] - 837:15, 837:15

## O

**o'clock** [1] - 1005:3

**object** [7] - 901:7, 943:16, 953:21, 975:5, 985:12, 1019:17, 1020:24

**objection** [61] - 855:3, 863:1, 868:2, 872:2, 875:5, 877:10, 877:22, 878:8, 879:14, 881:4,

887:4, 889:8, 892:20, 894:2, 894:11, 902:6, 902:8, 902:13, 917:25, 930:7, 930:11, 931:15, 933:1, 933:3, 939:8, 939:19, 944:1, 944:5, 950:9, 950:13, 952:19, 955:11, 957:13, 958:16, 960:18, 961:20, 963:1, 965:17, 966:20, 967:21, 967:24, 982:2, 984:9, 986:11, 987:15, 987:20, 987:21, 989:22, 991:25, 992:20, 993:21, 994:5, 995:25, 998:4, 1000:16, 1002:1, 1003:7, 1005:21, 1005:24, 1006:4, 1010:19

**objectionable** [1] - 1024:3

**objections** [4] - 851:18, 852:3, 852:7, 852:12

**objects** [1] - 1006:15

**obligated** [1] - 978:21

**obliged** [1] - 978:6

**obvious** [1] - 845:22

**obviously** [3] - 904:8, 964:8, 1013:17

**October** [4] - 984:6, 984:20, 986:9, 986:17

**OF** [9] - 836:1, 836:4, 853:6, 897:16, 938:23, 941:19, 943:19, 945:6, 1027:3

**offenses** [1] - 904:22

**offer** [22] - 851:15, 865:7, 865:9, 950:8, 952:18, 955:10, 957:11, 958:15, 960:17, 961:19, 962:25, 965:16, 966:19, 971:20, 973:3, 981:25, 984:8, 986:10, 1001:25, 1003:6, 1017:18, 1018:3

**offered** [8] - 840:1, 1006:12, 1007:3, 1015:12, 1015:15, 1017:22, 1018:1,

1018:2

**offering** [3] - 956:4, 1010:10, 1011:8

**office** [4] - 926:17, 926:18, 964:2, 964:8

**Office** [1] - 837:3

**official** [1] - 914:11

**Official** [3] - 836:24, 1027:6, 1027:17

**officially** [1] - 987:2

**officials** [6] - 897:1, 897:8, 897:12, 913:22, 947:14, 947:15

**often** [1] - 929:1

**OLIVIA** [1] - 837:7

**Olssen** [1] - 964:18

**once** [1] - 926:13

**one** [56] - 848:1, 848:13, 848:14, 849:3, 850:17, 852:14, 857:18, 863:4, 864:11, 864:20, 865:4, 874:22, 881:12, 882:3, 884:9, 884:12, 896:22, 899:17, 912:24, 923:10, 923:25, 936:16, 936:17, 938:14, 940:23, 943:2, 943:15, 943:21, 953:17, 959:19, 961:9, 966:4, 969:25, 977:21, 980:10, 982:17, 982:19, 984:2, 985:1, 985:5, 989:3, 989:4, 991:3, 995:2, 996:14, 997:12, 997:17, 998:9, 999:1, 1002:17, 1018:25, 1019:16, 1022:17, 1023:24

**ones** [2] - 851:14, 916:5

**operation** [1] - 910:1

**opinion** [2] - 888:2, 907:3

**opportunity** [2] - 845:23, 1018:6

**oppose** [1] - 1022:13

**opposing** [1] - 1006:13

**opposite** [1] - 844:11

**optimum** [1] - 961:9

**Order** [1] - 838:1

**order** [1] - 846:11

**ordinarily** [1] - 1015:9

orient [1] - 983:11
origin [1] - 1020:25
originally [3] - 915:22, 916:1, 986:23
otherwise [2] - 904:3, 1012:21
ought [3] - 850:11, 1021:16, 1024:3
ourself [1] - 1004:15
ourselves [2] - 951:1, 983:11
out-of-court [1] - 1007:12
outlines [1] - 972:7
outset [1] - 971:5
outside [7] - 913:12, 933:13, 933:24, 936:18, 942:17, 942:19, 942:21
Outside [1] - 838:2
outstanding [1] - 1010:22
overall [2] - 1015:16, 1017:1
override [1] - 943:7
overrule [1] - 938:8
overruled [4] - 939:24, 943:18, 954:15, 1010:21
overseas [1] - 947:14
oversight [1] - 869:21
overt [3] - 842:16, 848:9, 848:15
overview [1] - 946:1
own [5] - 911:16, 911:18, 915:8, 972:24, 974:8
owner [1] - 861:3

## P

p.m [7] - 875:14, 968:4, 979:24, 980:22, 1005:12, 1026:13
P/S [3] - 871:23, 875:1, 886:23
Pacific [17] - 859:24, 911:14, 981:20, 982:7, 982:10, 982:23, 987:12, 987:13, 988:2, 988:17, 988:24, 992:13, 992:16, 993:2, 993:10, 994:3, 994:9
package [1] - 862:21
page [28] - 840:16, 882:14, 940:19, 963:4, 963:5, 963:8,

963:20, 964:25, 982:18, 983:14, 983:18, 983:19, 988:3, 988:4, 988:20, 991:9, 994:23, 998:13, 999:2, 999:3, 999:5, 999:20, 1000:21, 1000:22, 1003:11, 1003:24
pages [1] - 1027:8
paid [6] - 855:6, 874:3, 896:2, 896:5, 997:2, 997:4
Palembang [21] - 873:7, 873:11, 873:12, 873:14, 873:17, 873:19, 875:13, 875:14, 875:25, 876:2, 876:7, 876:20, 879:25, 880:5, 880:10, 880:24, 882:8, 882:15, 885:24, 921:22, 1009:24
paper [2] - 861:4, 861:5
Paragraph [2] - 842:14, 848:11
paragraph [15] - 842:24, 844:10, 848:15, 868:13, 870:11, 882:19, 883:19, 889:23, 891:1, 928:14, 940:20, 965:24, 984:13, 984:25, 1003:15
Paris [7] - 909:5, 909:8, 911:22, 943:3, 951:7, 959:10, 966:8
parliament [1] - 952:5
part [22] - 839:4, 858:2, 868:20, 882:18, 902:23, 903:9, 906:17, 920:8, 920:16, 934:5, 942:18, 942:20, 949:4, 974:19, 977:9, 977:10, 984:18, 1008:21, 1022:21, 1023:24, 1025:12
participant [1] - 838:22
participants [1] - 843:21
participated [2] -

948:12, 948:15
participation [21] - 839:10, 839:12, 840:11, 840:24, 841:5, 841:10, 841:16, 842:1, 842:3, 843:10, 843:20, 845:18, 845:20, 847:14, 847:16, 848:7, 1007:16, 1007:18, 1007:22, 1008:9, 1008:15
particular [13] - 917:2, 917:5, 946:18, 949:9, 951:15, 967:8, 1015:8, 1019:13, 1019:14, 1019:15, 1019:19, 1019:21, 1020:2
particularly [4] - 859:3, 874:10, 891:11
parties [2] - 979:2, 1021:13
partners [1] - 884:23
parts [2] - 858:15, 907:16
party [4] - 839:25, 1006:13, 1007:2, 1010:10
party's [1] - 1006:13
pass [2] - 839:14, 951:6
past [1] - 968:2
patently [1] - 977:8
path [4] - 892:1, 892:5, 892:10, 901:8
pay [6] - 887:18, 895:2, 895:8, 897:7, 932:7, 954:22
paying [3] - 895:11, 897:11, 947:13
payment [11] - 964:10, 985:2, 985:4, 985:9, 991:16, 995:9, 996:15, 996:24, 997:12, 998:24, 999:18
payments [3] - 897:1, 904:24, 1001:6
PEACOCK [1] - 837:14
pending [1] - 878:9
people [12] - 856:14, 864:9, 887:16, 887:19, 895:3, 895:11, 896:22, 905:16, 921:12, 1018:16, 1020:12,

1020:13
per [1] - 997:8
percent [13] - 893:19, 893:20, 893:23, 893:24, 982:21, 985:2, 985:3, 989:4, 991:12, 993:4, 993:14, 1004:13
percentage [4] - 982:19, 991:10, 995:2
perfectly [1] - 1012:16
performance [1] - 985:9
perhaps [2] - 851:3, 851:17
period [11] - 864:12, 864:21, 864:22, 864:25, 865:1, 896:13, 902:2, 902:12, 908:15, 912:7, 1019:5
periodic [1] - 946:5
permissible [1] - 1016:2
permit [3] - 855:10, 954:14, 1014:10
permits [1] - 1022:5
person [3] - 911:25, 912:11, 922:25
personal [1] - 884:5, 885:8, 885:14, 885:18, 885:19, 906:8, 906:9, 915:10, 922:23, 932:21, 965:5
personally [2] - 895:13, 922:21
personnel [3] - 884:4, 885:7, 885:13
persons [2] - 876:3, 876:9
persuaded [2] - 870:15, 870:23
pertaining [1] - 947:11
pertinent [1] - 927:21
phase [2] - 869:25, 871:6
Philippe [2] - 959:17, 961:16
philosophy [1] - 945:21
phone [4] - 898:3, 922:25, 996:20, 1002:12
physically [1] - 926:5
piece [2] - 855:18, 1012:10
piecemeal [2] - 842:19, 954:4

Pierucci [74] - 838:16, 843:12, 861:5, 861:9, 861:13, 861:15, 862:8, 862:16, 863:10, 863:16, 864:19, 865:10, 865:18, 866:2, 866:3, 866:24, 867:20, 870:25, 871:7, 871:16, 872:6, 872:21, 873:16, 874:4, 874:19, 876:6, 876:17, 886:20, 888:8, 888:9, 888:12, 888:15, 888:21, 891:11, 892:5, 912:12, 912:15, 913:2, 920:13, 920:21, 921:12, 921:15, 921:21, 924:1, 934:7, 934:11, 934:16, 934:22, 935:10, 939:2, 939:13, 939:15, 941:23, 942:11, 943:2, 964:4, 965:13, 966:13, 966:16, 966:23, 981:9, 984:6, 988:13, 992:12, 999:7, 1000:12, 1001:1, 1003:3, 1003:13, 1003:25, 1004:4, 1004:8, 1004:24, 1009:20
Pierucci's [2] - 863:24, 935:18
pincite [1] - 840:15
Pirooz [41] - 863:7, 866:13, 867:13, 872:11, 883:5, 884:13, 890:22, 890:24, 891:8, 896:1, 907:1, 913:11, 913:14, 953:6, 953:14, 953:17, 954:18, 956:25, 959:11, 959:12, 959:14, 959:16, 959:25, 960:3, 961:7, 962:3, 962:7, 962:15, 964:23, 965:4, 965:7, 966:1, 983:25, 984:1, 984:5, 987:12, 988:2, 988:10, 992:14, 992:16,

999:25
**pitcher** [1] - 938:21
**placate** [1] - 872:24
**place** [2] - 963:18, 990:25
**plaintiff** [1] - 836:5
**plan** [5] - 868:6, 873:9, 950:24, 951:3, 979:21
**planned** [1] - 962:1
**planning** [1] - 1025:22
**plans** [1] - 1022:25
**plant** [9] - 855:18, 856:7, 856:10, 856:13, 857:22, 858:12, 865:16, 874:12, 994:17
**plants** [1] - 859:3
**plea** [4] - 900:21, 901:21, 905:8, 1020:14
**plead** [4] - 901:3, 902:5, 902:11, 905:5
**pleas** [1] - 1020:12
**pleasant** [3] - 1005:9, 1005:10, 1005:14
**pleased** [3] - 890:7, 890:20, 1016:16
**pled** [2] - 904:17, 904:20
**PLN** [36] - 856:9, 856:12, 864:12, 864:20, 864:23, 865:6, 866:10, 873:12, 873:13, 873:21, 875:17, 875:19, 875:20, 876:10, 880:2, 882:15, 882:20, 884:4, 885:7, 885:13, 885:16, 885:25, 887:20, 890:4, 890:5, 890:10, 890:13, 893:2, 893:3, 895:3, 924:7, 954:20, 961:25, 985:7, 985:8, 1009:25
**PLN/TEPCO** [1] - 876:4
**plus** [2] - 880:1, 951:4
**PM** [2] - 879:24, 885:23
**PN** [1] - 1009:24
**pocket** [5] - 841:19, 883:1, 883:13, 941:5, 941:10
**pocketing** [1] - 907:22
**point** [23] - 842:9, 843:8, 843:25,

844:9, 844:23, 848:8, 849:18, 849:20, 850:11, 852:16, 874:7, 931:13, 947:23, 968:19, 969:22, 974:7, 993:18, 1006:3, 1014:20, 1018:25, 1024:20, 1025:25
**pointing** [2] - 954:5, 1017:13
**poisonous** [1] - 976:25
**politically** [2] - 865:18, 937:14
**pollution** [2] - 934:5, 937:11
**Pomponi** [32] - 861:19, 861:25, 862:17, 867:10, 871:17, 872:7, 872:8, 874:20, 886:20, 888:21, 893:12, 893:14, 924:1, 986:6, 986:18, 986:25, 987:5, 987:9, 988:9, 989:16, 990:2, 990:18, 991:21, 992:10, 998:15, 999:6, 1000:11, 1000:25, 1001:11, 1003:4, 1003:25, 1004:25
**Pomponi's** [4] - 861:20, 861:22, 990:5, 992:23
**poorly** [1] - 924:19
**portion** [8] - 872:13, 875:22, 955:14, 961:23, 985:3, 994:12, 995:2, 996:17
**posed** [1] - 999:14
**position** [16] - 838:14, 841:1, 847:17, 850:9, 854:10, 854:17, 859:22, 861:10, 891:2, 908:21, 908:22, 950:23, 968:18, 997:10, 1007:25, 1023:21
**positions** [2] - 847:21, 979:18
**positive** [1] - 907:4
**possible** [3] - 892:3, 966:3, 1024:8
**Post** [1] - 837:19

postponed [1] - 875:12
**potential** [2] - 998:24, 1013:25
**potentially** [2] - 849:5, 976:15
**power** [6] - 856:7, 856:10, 856:13, 952:7, 994:17, 1016:8
**Power** [47] - 853:18, 856:16, 856:22, 857:6, 857:8, 857:13, 857:15, 858:18, 858:23, 858:25, 859:4, 860:3, 861:6, 861:14, 862:21, 866:8, 870:21, 871:3, 872:9, 872:25, 874:13, 874:14, 884:8, 884:9, 884:19, 884:24, 885:3, 886:10, 886:15, 888:14, 891:14, 905:20, 912:3, 913:6, 914:18, 915:1, 915:2, 915:7, 947:24, 967:10, 981:20, 982:7, 988:23, 990:23, 993:10, 994:13, 995:4
**PPE** [1] - 956:18
**precede** [1] - 846:12
**precisely** [1] - 952:5
**preclude** [1] - 849:8
**predicted** [1] - 886:1
**prefer** [1] - 900:6
**preference** [1] - 962:3
**preferred** [1] - 959:19
**prefinance** [1] - 997:1
**prejudice** [1] - 1013:16
**preliminary** [2] - 840:4, 1010:8
**prep** [3] - 915:24, 919:21, 920:1
**preparation** [4] - 852:5, 899:9, 917:24, 918:10
**prepare** [1] - 851:23
**prepared** [5] - 948:21, 967:15, 980:1, 980:2, 990:20
**preparing** [2] - 916:7, 917:11
**preponderance** [5] - 839:24, 841:12,

1007:1, 1010:6, 1010:10
**prepping** [1] - 1023:13
**presence** [2] - 838:2, 968:8
**present** [4] - 843:25, 975:10, 975:14, 1026:3
**presentation** [1] - 1017:11
**presented** [3] - 953:23, 968:14, 1017:6
**president** [14] - 859:23, 860:11, 861:11, 875:16, 875:20, 890:10, 890:13, 892:17, 892:24, 893:2, 893:3, 911:13, 988:2
**pressed** [1] - 891:10
**pressing** [1] - 868:15
**pressure** [1] - 951:5
**presumably** [3] - 915:12, 916:6, 926:8
**presumptively** [1] - 840:8
**previous** [3] - 952:25, 953:2, 993:2
**previously** [3] - 951:4, 985:13, 999:25
**price** [12] - 868:16, 868:17, 868:18, 868:20, 869:13, 869:24, 870:4, 870:5, 870:7, 870:9, 886:23, 995:3
**primarily** [1] - 946:6
**primary** [1] - 1012:25
**principally** [3] - 949:13, 949:15, 1005:23
**principle** [3] - 839:13, 868:19, 1021:12
**Priok** [1] - 996:13
**privy** [1] - 916:19
**pro** [1] - 996:20
**problem** [6] - 839:5, 842:19, 886:1, 969:8, 969:10, 1010:1
**problematic** [1] - 842:20
**problems** [2] - 975:7, 979:8
**proceed** [10] - 847:8, 853:3, 868:10, 879:19, 901:14, 936:3, 945:4, 950:19, 954:18,

981:1
**proceeding** [1] - 903:13
**proceedings** [7] - 853:1, 902:17, 910:16, 911:3, 968:4, 980:22, 1005:12
**Proceedings** [1] - 1026:13
**process** [17] - 868:21, 870:24, 893:8, 895:1, 914:20, 916:11, 921:18, 922:2, 933:11, 934:4, 935:15, 935:16, 936:22, 937:3, 937:5, 942:12, 967:16
**produced** [1] - 949:15
**product** [1] - 857:21
**products** [3] - 856:1, 857:13, 858:11
**Professor** [3] - 1024:20, 1025:15, 1025:20
**profile** [1] - 964:1
**program** [1] - 956:14
**Project** [60] - 838:17, 856:4, 856:17, 856:20, 857:7, 857:25, 860:1, 860:2, 860:21, 860:24, 861:7, 861:21, 862:4, 862:7, 862:11, 863:9, 863:22, 864:3, 865:25, 866:14, 866:23, 867:7, 868:25, 869:6, 869:8, 869:16, 872:9, 872:12, 877:17, 878:6, 878:15, 883:17, 885:2, 885:12, 886:14, 890:17, 893:5, 894:17, 894:20, 895:14, 895:24, 896:13, 896:14, 903:4, 905:16, 912:2, 912:16, 913:10, 936:11, 939:5, 939:12, 939:18, 939:23, 941:22, 943:25, 949:9, 949:25, 982:24, 988:25, 993:11
**project** [53] - 843:4,

856:4, 857:14, 858:15, 859:11, 860:4, 861:3, 861:4, 861:5, 864:15, 865:8, 865:11, 865:12, 865:13, 865:15, 865:18, 865:19, 866:4, 866:15, 867:1, 867:3, 870:10, 871:2, 871:11, 873:10, 874:5, 874:8, 874:9, 877:2, 879:4, 887:25, 888:11, 890:7, 890:16, 892:8, 895:1, 895:5, 913:12, 920:18, 921:9, 923:12, 942:12, 953:20, 954:18, 966:4, 986:23, 994:14, 994:16, 994:21, 996:24, 1002:24, 1004:18
**project's** [2] - 890:3, 890:12
**projects** [6] - 866:18, 875:19, 936:19, 949:11, 995:15, 1001:14
**Projects** [1] - 878:23
**Prom** [1] - 965:7
**promised** [1] - 874:7
**promises** [3] - 887:15, 887:17, 890:22
**proof** [1] - 1021:4
**proper** [5] - 841:23, 884:1, 884:15, 884:20, 890:25
**proposal** [5] - 858:21, 869:22, 959:18, 959:19, 999:24
**proposals** [2] - 864:23, 873:14
**propose** [1] - 967:9
**proposed** [4] - 872:19, 961:9, 986:21, 997:20
**proposition** [4] - 840:13, 847:18, 848:23, 1012:15
**prorate** [1] - 1004:13
**prosecuted** [1] - 972:1
**prosecution** [1] - 1012:18
**prove** [4] - 841:11, 841:15, 1010:10, 1013:19
**provide** [14] - 849:1,

854:3, 854:6, 856:14, 857:14, 858:11, 858:14, 859:13, 915:4, 948:21, 968:10, 1003:19, 1007:23, 1010:13
**provided** [5] - 884:23, 916:23, 978:7, 1006:22, 1009:6
**provides** [3] - 924:6, 1006:12, 1007:12
**providing** [3] - 857:15, 857:22, 914:17
**province** [1] - 973:17
**provisions** [1] - 972:3
**psharafi@msn.com** [3] - 863:5, 863:6, 872:10
**PT** [4] - 857:9, 858:5, 860:11, 991:5
**PTESI** [8] - 857:10, 858:10, 858:11, 858:13, 915:8, 915:15, 922:16, 923:14
**Puckett** [63] - 846:12, 846:14, 846:19, 852:23, 853:4, 853:17, 856:3, 860:23, 861:24, 862:13, 863:4, 863:10, 863:23, 864:2, 867:16, 868:12, 868:24, 869:9, 870:16, 871:13, 872:5, 876:23, 878:22, 880:12, 881:10, 883:3, 887:7, 890:1, 891:10, 894:16, 895:12, 896:7, 897:18, 899:2, 902:17, 904:18, 907:10, 910:17, 911:6, 911:9, 915:18, 920:12, 921:11, 923:24, 924:15, 925:6, 930:19, 932:22, 933:6, 933:10, 935:23, 936:7, 938:25, 940:25, 941:12, 941:21, 943:21, 944:11, 1009:9, 1009:12, 1009:15, 1009:20, 1015:25
**PUCKETT** [5] - 853:6, 897:16, 938:23,

941:19, 943:19
**Puckett's** [2] - 1010:4, 1010:12
**pull** [4] - 921:6, 924:13, 925:2, 926:23
**pulp** [2] - 861:4, 861:5
**purpose** [3] - 902:19, 954:8, 985:15
**purposes** [3] - 941:21, 1010:18, 1026:7
**Pusat** [1] - 890:5
**pushed** [1] - 954:23
**pushing** [10] - 870:5, 931:2, 931:5, 931:7, 931:10, 931:13, 931:17, 931:24, 932:6, 1012:14
**put** [24] - 844:20, 851:11, 851:23, 852:11, 865:18, 951:5, 951:19, 955:1, 955:2, 960:21, 963:17, 976:22, 977:19, 977:25, 978:6, 980:13, 989:9, 998:22, 999:2, 1001:20, 1011:22, 1018:3, 1019:13, 1025:18
**Put** [1] - 979:12
**puts** [1] - 870:13
**putting** [3] - 841:14, 914:6, 1025:22

**Q**

**qualified** [1] - 994:13
**quality** [16] - 973:19, 973:25, 977:15, 1014:25, 1015:15, 1015:17, 1017:2, 1017:7, 1019:9, 1019:10, 1019:24, 1020:6, 1020:9, 1021:2, 1023:1, 1023:25
**Quantico** [1] - 946:4
**QUESTION** [1] - 935:25
**questioned** [2] - 962:4, 966:7
**questioning** [4] - 849:12, 935:22, 954:15, 1022:22
**questions** [14] - 898:11, 903:3, 905:15, 911:10, 922:11, 931:20,

977:22, 980:7, 1021:11, 1021:13, 1022:12, 1023:6, 1023:13, 1024:2
**quickly** [1] - 845:2
**quite** [7] - 845:1, 865:14, 866:21, 921:15, 967:14, 970:6, 973:7
**quote** [25] - 1006:12, 1006:23, 1007:14, 1007:17, 1007:18, 1008:9, 1008:10, 1008:12, 1008:14, 1008:21, 1008:23, 1008:24, 1008:25, 1009:2, 1009:16, 1009:17, 1009:23, 1010:2, 1010:8, 1010:11, 1019:24, 1020:6
**quoting** [1] - 1008:17

**R**

**RACHELLE** [1] - 837:8
**Ragagnin** [2] - 959:7, 961:16
**rainy** [1] - 968:3
**raise** [3] - 838:7, 852:13, 944:20
**raised** [6] - 842:10, 844:10, 846:8, 846:18, 846:23, 968:11
**raising** [1] - 839:5
**ranked** [2] - 921:17, 924:8
**rata** [1] - 996:20
**rate** [2] - 842:5, 842:21
**rather** [3] - 845:6, 959:12, 1024:4
**RE** [1] - 1027:3
**re** [6] - 958:23, 960:16, 961:24, 963:10, 963:19, 970:1
**reached** [1] - 851:7
**react** [1] - 960:1
**reaction** [1] - 1004:17
**read** [73] - 863:5, 863:23, 864:5, 864:9, 868:12, 870:12, 872:13, 873:2, 875:8, 875:22, 879:22, 882:18, 883:18, 885:21, 887:7, 887:22, 889:5, 889:11, 889:22, 891:1, 891:9,

891:21, 915:20, 918:3, 940:25, 941:2, 950:17, 952:8, 953:18, 954:17, 957:24, 959:5, 961:3, 961:23, 963:15, 963:24, 965:2, 965:24, 967:7, 969:24, 977:19, 977:20, 981:13, 983:22, 984:12, 984:25, 985:13, 985:23, 986:1, 986:19, 986:25, 990:5, 990:8, 990:21, 992:23, 994:11, 996:11, 996:16, 997:6, 997:17, 998:23, 999:11, 999:21, 1001:8, 1001:10, 1002:9, 1002:13, 1003:15, 1004:3, 1004:7, 1005:23, 1006:2, 1020:19
**reading** [5] - 845:9, 868:4, 954:1, 996:19, 999:16
**reads** [5] - 920:16, 952:4, 973:8, 990:17, 1001:3
**ready** [2] - 967:2, 979:22
**real** [1] - 937:15
**realize** [1] - 996:23
**realized** [3] - 846:9, 846:14, 846:15
**really** [9] - 870:5, 898:6, 898:24, 905:23, 934:24, 970:15, 1012:21, 1014:8, 1021:22
**rearrange** [1] - 876:4
**reason** [6] - 866:11, 927:9, 927:11, 979:5, 1012:14, 1016:18
**reasonable** [2] - 973:12, 1021:4
**reasons** [2] - 866:6, 901:12
**reassign** [1] - 942:4
**receive** [6] - 893:8, 895:12, 895:13, 904:3, 905:11, 926:6
**received** [11] - 855:19, 855:20, 881:11, 882:3, 882:4, 921:16, 923:10,

945:20, 945:23,
946:3, 1011:7
**receiving** [2] - 923:7,
965:9
**recent** [2] - 890:6,
963:16
**recently** [1] - 899:10
**recess** [6] - 910:10,
910:14, 910:22,
911:2, 979:23,
979:24
**Recess** [1] - 910:23
**recipients** [1] - 863:4
**recollection** [6] -
898:2, 900:4, 919:5,
919:9, 919:17,
979:17
**recommend** [3] -
841:22, 883:25,
884:14
**recommendation** [2] -
929:15, 1001:16
**reconfirm** [1] - 875:10
**record** [8] - 944:24,
969:22, 969:25,
971:8, 1015:22,
1018:16, 1019:14,
1019:16
**recorded** [2] - 906:19,
906:21
**recording** [2] -
906:17, 974:6
**recordings** [3] -
978:16, 1015:24,
1016:1
**records** [1] - 956:8
**recover** [1] - 873:9
**recross** [1] - 944:6
**redirect** [2] - 938:14,
944:3
**REDIRECT** [2] -
938:23, 943:19
**refer** [2] - 928:13,
1019:18
**reference** [12] -
848:16, 865:16,
869:2, 870:19,
874:11, 886:9,
953:14, 971:18,
980:16, 982:15,
1015:1
**referenced** [2] -
848:11, 883:15
**references** [1] -
842:14
**referencing** [1] -
1022:14
**referred** [4] - 857:10,
858:7, 870:20,
885:10

**referring** [8] - 864:21,
864:22, 920:18,
920:22, 921:25,
928:18, 928:21,
978:9
**refers** [1] - 992:6
**reflected** [1] - 933:23
**reflecting** [1] - 924:7
**reflects** [2] - 937:3,
937:5
**refresh** [3] - 919:5,
919:9, 979:16
**refreshed** [1] - 916:23
**regard** [12] - 838:17,
839:3, 841:8,
849:13, 850:13,
851:25, 852:16,
931:20, 949:5,
951:15, 956:17,
967:5
**regarding** [19] -
844:23, 849:13,
864:14, 865:10,
866:4, 893:10,
896:16, 916:11,
919:2, 920:17,
940:20, 953:11,
958:13, 968:11,
970:21, 983:2,
988:24, 993:11,
995:9
**regards** [9] - 851:7,
882:23, 883:8,
888:3, 967:18,
981:21, 986:23,
992:5, 1000:6
**region** [2] - 859:24,
911:14
**regional** [4] - 854:6,
859:15, 908:23,
908:24
**reinforced** [1] - 843:21
**reinforcing** [1] -
968:23
**reiterated** [1] - 843:20
**rejogged** [1] - 916:24
**related** [19] - 849:9,
849:25, 902:17,
905:6, 915:21,
923:9, 936:14,
946:5, 947:24,
949:24, 951:11,
951:12, 962:13,
982:24, 983:5,
983:8, 995:12,
1012:13, 1012:17
**relation** [2] - 949:9,
952:23
**relationship** [8] -
898:24, 906:8,

906:9, 915:9,
932:11, 932:15,
932:20, 1018:12
**relationships** [16] -
854:5, 859:14,
907:15, 913:20,
913:25, 914:3,
914:4, 914:8, 915:1,
915:7, 915:8,
915:11, 915:13,
954:6
**relative** [1] - 866:25
**relatively** [2] - 851:25,
852:1
**relevance** [5] - 855:3,
1014:2, 1018:10,
1018:11, 1023:17
**relevant** [11] - 849:21,
850:17, 971:21,
972:10, 972:14,
977:14, 1010:9,
1013:5, 1018:23,
1019:4, 1021:1
**reliability** [1] - 843:18
**rely** [1] - 926:4
**remainder** [2] -
883:18, 887:22
**remaining** [1] - 851:8
**remember** [4] -
918:21, 939:2,
940:4, 1012:9
**remembered** [1] -
916:25
**remembering** [1] -
916:10
**remind** [7] - 861:10,
870:23, 872:6,
874:5, 885:1, 886:8,
890:9
**reminded** [2] - 909:21,
1011:21
**remove** [3] - 928:7,
929:6, 941:18
**remuneration** [6] -
967:14, 982:18,
991:9, 991:13,
994:24, 997:9
**repatriate** [1] - 947:17
**repatriated** [1] - 893:6
**repeat** [3] - 855:13,
878:2, 909:17
**rephrase** [1] - 894:5
**replace** [3] - 872:19,
891:24, 917:7
**report** [32] - 843:13,
843:16, 860:13,
860:18, 862:9,
876:10, 876:20,
879:25, 880:2,
880:5, 880:11,

880:24, 882:4,
882:7, 882:8,
882:11, 882:14,
882:15, 885:22,
885:24, 886:4,
886:24, 890:3,
890:5, 912:14,
912:16, 913:6,
919:6, 924:7, 940:8,
968:24, 1009:24
**reported** [6] - 860:14,
860:19, 912:3,
912:11, 939:1,
941:23
**Reporter** [3] - 836:24,
1027:6, 1027:17
**reporting** [10] - 862:6,
908:14, 908:16,
911:18, 937:25,
938:3, 939:17,
943:5, 943:7, 969:9
**reports** [1] - 919:2
**represent** [1] - 897:20
**representative** [2] -
888:3, 891:5
**representatives** [1] -
923:25
**represented** [1] -
960:2
**representing** [1] -
872:9
**request** [4] - 868:3,
886:5, 990:17,
1011:8
**requested** [2] - 962:2,
1015:4
**requesting** [2] - 902:4,
1001:13
**required** [11] - 839:3,
968:16, 969:14,
969:16, 969:19,
970:9, 1007:22,
1008:4, 1008:7,
1009:5, 1016:9
**requiring** [2] - 960:4,
960:9
**reredirect** [1] - 943:16
**research** [5] - 839:6,
1014:11, 1014:15,
1018:5, 1023:19
**reserved** [1] - 970:21
**resident** [1] - 1013:2
**resolved** [1] - 996:12
**Resources** [13] -
981:20, 982:7,
982:10, 982:23,
987:12, 988:2,
988:24, 992:13,
992:16, 993:3,
993:11, 994:3, 994:9

**Resources.pdf** [1] -
988:17
**Resources.zip** [1] -
987:13
**respect** [10] - 884:20,
893:4, 933:12,
939:13, 939:23,
970:23, 980:7,
994:21, 1006:9,
1010:24
**respectfully** [1] -
851:21
**respective** [2] -
937:25, 979:18
**respond** [3] - 845:24,
978:12, 1022:4
**responding** [6] -
926:10, 966:15,
966:16, 986:14,
996:4, 998:9
**response** [10] - 848:8,
961:1, 964:13,
965:21, 967:4,
976:12, 986:24,
1001:10, 1004:7,
1014:21
**responsibilities** [4] -
855:10, 947:9,
947:10, 949:5
**responsive** [2] -
936:1, 968:13
**rest** [2] - 873:2,
1025:16
**restricted** [1] - 868:4
**restyling** [1] - 1008:22
**result** [2] - 875:11,
1009:1
**resultingly** [1] -
976:14
**resume** [1] - 1005:14,
1005:17
**retained** [1] - 900:9
**retyped** [1] - 889:21
**revealed** [1] - 919:25
**revert** [1] - 964:24
**review** [6] - 949:8,
949:24, 951:12,
959:8, 983:5, 995:12
**reviewed** [5] - 915:20,
920:11, 949:1,
949:6, 949:14
**reviewing** [3] -
916:18, 948:12,
951:10
**rewards** [8] - 841:18,
882:23, 882:25,
883:8, 883:9,
883:12, 940:20,
941:4
**Reza** [105] - 838:15,

843:11, 843:14,
860:6, 860:8,
860:19, 860:20,
862:18, 865:20,
867:10, 868:17,
868:21, 870:5,
870:13, 871:18,
874:20, 876:16,
877:3, 878:7,
878:16, 879:3,
879:6, 879:9,
879:10, 879:22,
880:3, 880:4, 880:6,
880:21, 881:11,
881:16, 885:21,
886:7, 886:20,
888:22, 891:22,
891:23, 893:12,
893:13, 913:25,
915:15, 922:18,
923:13, 927:15,
929:20, 930:3,
930:5, 931:1,
931:13, 931:16,
931:23, 932:6,
932:10, 932:11,
932:15, 932:18,
932:23, 932:24,
940:8, 940:16,
941:13, 950:22,
950:23, 951:24,
952:16, 953:5,
955:7, 955:16,
955:22, 956:10,
958:25, 959:13,
959:23, 960:15,
961:6, 961:8,
961:11, 962:5,
964:17, 964:22,
965:4, 965:6,
965:21, 968:23,
983:14, 986:7,
996:5, 997:19,
997:25, 998:14,
998:22, 999:6,
999:11, 1000:2,
1000:7, 1001:3,
1001:22, 1002:6,
1003:2, 1004:8,
1004:22, 1004:24,
1009:14, 1009:18,
1017:5
**RI-1** [1] - 956:19
**Riau** [1] - 885:11
**right-hand** [8] - 956:1,
960:22, 987:25,
988:1, 988:20,
989:13, 993:7, 999:3
**ripe** [1] - 846:17
**rise** [1] - 1013:5

**risk** [1] - 1018:11
**RM** [1] - 957:10
**RMR** [3] - 836:24,
1027:5, 1027:17
**road** [2] - 926:9,
1023:4
**Road** [2] - 837:19,
991:1
**Roger** [10] - 950:6,
950:22, 957:9,
958:13, 958:23,
958:24, 960:4,
960:6, 960:15, 961:5
**role** [20] - 854:2,
854:3, 859:8,
859:10, 859:13,
859:25, 860:2,
860:8, 860:20,
861:20, 861:22,
891:20, 893:5,
912:11, 937:23,
942:15, 942:20,
949:25, 951:11,
951:13
**roles** [2] - 857:12,
936:17
**Room** [2] - 837:10,
1027:18
**Rothschild** [13] -
841:7, 905:17,
905:18, 905:19,
905:21, 906:11,
906:13, 906:25,
971:6, 971:8, 974:6,
1011:24, 1015:24
**route** [2] - 961:9,
965:9
**ruin** [1] - 1021:23
**Rule** [11] - 840:5,
845:13, 850:16,
970:7, 1007:16,
1008:8, 1008:12,
1008:18, 1009:5,
1009:8, 1019:7
**rule** [6] - 845:22,
970:12, 970:14,
978:9, 1007:12,
1021:11
**rules** [2] - 847:24,
1008:22
**Rules** [1] - 1008:20
**ruling** [4] - 980:2,
980:11, 1009:1,
1022:16

---

## S

**Saito** [4] - 874:21,
876:2, 876:8, 880:1
**Sakti** [1] - 991:5

**salary** [6] - 855:1,
855:2, 855:7,
855:16, 855:17
**sale** [1] - 860:4
**Salerno** [1] - 908:17
**sales** [17] - 854:4,
854:12, 855:23,
855:24, 858:21,
861:1, 861:6,
861:11, 861:23,
863:20, 864:1,
877:2, 878:17,
888:10, 912:2, 912:6
**salesman** [2] - 861:8,
872:8
**salesperson** [1] -
861:23
**Salim** [3] - 959:13,
959:25, 960:2
**salvageable** [1] -
891:24
**Saneaux** [2] - 970:4,
1008:16
**satisfactory** [4] -
841:19, 882:25,
883:13, 941:4
**satisfied** [2] - 969:14,
973:11
**Saturday** [1] - 1022:1
**saw** [4] - 900:23,
919:16, 927:1,
951:18
**scandal** [1] - 950:25
**scheduled** [4] - 876:5,
890:5, 892:3, 1025:9
**scheme** [1] - 985:7
**scope** [5] - 944:6,
997:1, 997:4,
1005:21, 1010:23
**scores** [1] - 850:6
**screen** [10] - 873:3,
950:10, 950:12,
950:16, 950:18,
955:1, 955:2, 956:1,
993:7, 998:22
**screenshot** [4] -
957:25, 958:3,
958:4, 958:5
**scroll** [4] - 926:25,
989:1, 991:8, 994:23
**Scully** [7] - 862:18,
871:17, 888:21,
998:15, 999:7,
1000:12, 1000:25
**search** [1] - 976:24
**seated** [8] - 838:7,
853:2, 910:24,
911:4, 944:23,
979:25, 980:23,
1006:11

**Second** [4] - 839:18,
839:21, 840:15,
969:25
**second** [18] - 839:20,
840:12, 844:9,
882:14, 896:4,
917:6, 917:17,
920:1, 921:18,
924:8, 930:19,
930:23, 940:19,
983:18, 985:5,
988:20, 994:23,
1003:11
**secretary** [7] - 875:11,
889:3, 896:22,
925:8, 925:11,
925:16, 927:6
**secretly** [2] - 906:19,
906:21
**section** [4] - 954:17,
982:18, 989:2,
991:10
**Section** [1] - 837:9
**sections** [1] - 982:6
**sector** [1] - 990:22
**secure** [5] - 884:5,
885:8, 885:14,
885:18, 895:4
**secured** [1] - 935:6
**see** [34] - 849:23,
863:10, 873:3,
876:23, 880:4,
881:12, 881:17,
882:4, 883:6,
890:23, 918:7,
940:10, 957:5,
958:2, 963:9,
964:23, 983:15,
989:13, 996:23,
998:13, 998:16,
998:23, 1000:21,
1003:12, 1004:1,
1004:5, 1005:3,
1005:9, 1010:7,
1013:8, 1014:2,
1020:3, 1021:6,
1023:9
**seeing** [1] - 951:21
**seek** [1] - 886:6
**seem** [1] - 1022:18
**Seg** [1] - 954:23
**segment** [3] - 951:4,
960:3, 960:9
**segment's** [1] - 959:9
**seize** [1] - 947:16
**select** [1] - 931:11
**selected** [3] - 913:12,
931:3, 931:24
**selection** [1] - 951:16
**sell** [3] - 855:18,

856:1, 859:11
**selling** [2] - 855:20,
937:11
**send** [7] - 896:22,
898:22, 925:16,
926:5, 927:16,
987:3, 1014:14
**sending** [2] - 844:14,
927:13
**senior** [8] - 859:23,
892:16, 911:12,
933:20, 938:1, 943:4
**sense** [6] - 847:25,
939:16, 964:7,
967:12, 973:24,
1024:12
**sensitive** [6] - 864:12,
864:21, 864:25,
865:1, 880:2, 927:23
**sent** [34] - 843:2,
848:16, 863:14,
881:17, 882:10,
882:11, 886:4,
925:8, 927:7,
927:14, 940:2,
950:6, 952:16,
953:8, 955:8,
960:16, 961:17,
962:22, 963:25,
964:4, 965:14,
966:13, 984:6,
986:8, 986:22,
987:11, 989:18,
991:22, 992:12,
995:20, 996:18,
998:1, 1000:12,
1003:4
**sentence** [11] - 875:8,
883:11, 885:5,
887:8, 889:11,
891:9, 891:21,
904:2, 941:1, 941:2,
941:7
**sentenced** [1] -
903:24
**separate** [6] - 848:5,
911:18, 968:25,
975:23, 1008:2,
1021:7
**separately** [3] - 886:4,
891:22, 961:11
**September** [12] -
871:21, 874:24,
876:22, 881:1,
887:1, 889:1, 912:7,
921:13, 924:5,
925:10, 932:5,
983:17
**series** [4] - 898:11,
899:10, 991:15,

998:24
**serious** [4] - 886:1, 969:7, 969:10, 1010:1
**seriously** [3] - 841:23, 884:1, 884:15
**serve** [2] - 976:8, 1005:24
**service** [1] - 994:1
**services** [1] - 994:20
**sessions** [2] - 915:24, 920:1
**set** [2] - 854:5, 903:16
**sets** [1] - 978:23
**settlement** [2] - 891:5, 1020:14
**seven** [1] - 862:5
**several** [3] - 867:3, 949:16, 988:4
**several-page** [1] - 988:4
**shall** [3] - 876:2, 888:1, 888:5
**Sharafi** [72] - 849:11, 849:20, 862:17, 863:7, 866:13, 866:15, 866:22, 867:6, 867:13, 871:17, 872:11, 883:5, 884:13, 890:23, 891:8, 893:15, 896:2, 907:1, 907:3, 913:11, 913:14, 914:7, 914:13, 915:4, 917:7, 921:3, 929:9, 929:14, 929:24, 931:3, 931:25, 953:17, 956:25, 959:11, 959:25, 962:15, 963:19, 970:23, 971:8, 972:1, 972:11, 972:18, 973:23, 974:4, 974:14, 974:18, 975:9, 976:1, 976:11, 976:21, 977:1, 977:4, 978:18, 982:22, 984:5, 988:2, 992:17, 995:5, 1003:12, 1010:25, 1011:2, 1011:22, 1012:9, 1013:1, 1013:8, 1013:12, 1013:20, 1013:24, 1016:15, 1016:21, 1017:18
**Sharafi's** [13] - 851:1,

852:16, 893:18, 928:18, 964:8, 981:14, 988:10, 1012:23, 1013:7, 1013:10, 1014:3, 1018:12, 1022:14
**share** [1] - 839:7
**Sheckler** [1] - 871:19
**shocked** [1] - 1022:4
**Shoji** [1] - 874:21
**shook** [1] - 1004:13
**short** [4] - 861:2, 870:17, 912:7, 981:13
**shorthand** [5] - 858:7, 858:9, 886:8, 1013:21, 1027:10
**shot** [3] - 889:13, 925:11, 925:13
**shots** [2] - 892:7, 939:14
**show** [9] - 838:22, 862:13, 864:11, 864:19, 881:10, 892:25, 919:12, 940:6, 1020:9
**showed** [10] - 899:23, 915:25, 916:5, 916:6, 917:15, 917:23, 918:9, 919:6, 923:6, 1004:16
**showing** [11] - 867:16, 871:13, 874:15, 876:13, 880:12, 880:18, 886:16, 888:17, 950:10, 950:11, 1002:17
**shown** [16] - 841:20, 883:20, 899:24, 917:10, 918:2, 918:7, 918:15, 918:17, 919:7, 919:21, 919:23, 919:25, 954:18, 958:6, 969:17, 972:24
**shy** [1] - 847:3
**side** [20] - 864:1, 930:5, 955:1, 955:2, 956:1, 960:21, 960:22, 987:18, 987:24, 987:25, 988:1, 988:20, 989:9, 989:11, 989:12, 989:13, 993:7, 999:3, 1016:20
**sides** [1] - 1024:7
**sideshow** [1] - 977:11

**sign** [1] - 1016:5
**signed** [9] - 884:3, 885:6, 885:9, 901:17, 985:4, 992:25, 993:1, 993:3, 993:12
**significance** [1] - 869:23
**significant** [2] - 868:18, 1012:10
**Silver** [10] - 844:1, 897:20, 910:10, 911:6, 931:19, 938:25, 939:6, 940:1, 943:22, 1011:21
**SILVER** [88] - 837:14, 844:2, 844:8, 846:2, 846:8, 846:23, 847:1, 847:6, 848:25, 855:3, 863:1, 868:2, 872:2, 875:5, 877:10, 877:22, 878:8, 878:19, 879:14, 881:4, 887:4, 889:8, 892:20, 894:2, 894:11, 897:17, 901:11, 901:15, 901:16, 902:9, 902:10, 902:15, 910:12, 911:7, 911:8, 917:20, 917:22, 918:5, 918:12, 918:14, 919:12, 919:19, 920:3, 920:4, 920:7, 920:10, 921:6, 921:10, 922:8, 922:10, 923:19, 923:22, 925:2, 925:5, 926:22, 927:2, 928:7, 928:12, 929:6, 929:8, 930:13, 930:17, 930:18, 931:21, 931:22, 933:4, 933:5, 933:7, 933:9, 935:4, 935:8, 935:12, 935:17, 936:5, 936:6, 938:14, 939:8, 939:19, 941:17, 941:20, 943:13, 943:16, 944:1, 944:7, 944:9, 968:9, 968:17, 969:24
**similar** [1] - 954:21
**similarly** [1] - 1013:22
**simplest** [1] - 965:8

**simply** [1] - 985:23
**simultaneously** [1] - 922:5
**Singapore** [4] - 964:22, 964:23, 965:6, 966:5
**single** [1] - 904:17
**Sirait** [1] - 880:1
**situated** [1] - 1013:22
**situation** [12] - 850:22, 871:24, 875:2, 883:25, 886:7, 891:6, 891:24, 932:3, 1002:25, 1004:9, 1004:20, 1013:18
**six** [8] - 862:5, 899:16, 899:17, 901:24, 946:4, 985:5
**six-year** [2] - 901:24
**skill** [1] - 1027:11
**Slide** [1] - 933:8
**slightly** [2] - 970:12, 1001:18
**slowing** [1] - 1004:10
**small** [2] - 852:1, 964:1
**smartphone** [2] - 926:19, 926:20
**someone** [11] - 848:10, 866:7, 866:8, 872:23, 872:25, 876:24, 914:1, 915:4, 922:15, 943:4, 1016:5
**sometime** [2] - 867:2, 875:12
**sometimes** [1] - 912:24
**somewhere** [2] - 937:21, 938:5
**soon** [4] - 846:9, 846:14, 846:18, 892:3
**sorry** [22] - 839:21, 842:9, 848:12, 848:20, 854:21, 861:24, 878:19, 880:16, 889:5, 893:3, 894:4, 909:11, 935:20, 940:12, 980:10, 980:17, 989:10, 991:3, 999:10, 1011:14, 1021:22, 1025:2
**sort** [9] - 908:9, 925:12, 926:16, 930:5, 932:24,

972:20, 975:1, 1018:7
**sounds** [1] - 954:9
**source** [2] - 1011:2, 1011:10
**sources** [4] - 949:18, 949:19, 1012:7, 1012:8
**Southeast** [1] - 874:10
**Southern** [1] - 970:3
**Southport** [1] - 837:20
**speaking** [1] - 935:17
**SPEARS** [74] - 837:18, 850:24, 950:9, 952:19, 953:21, 954:9, 955:11, 956:5, 957:13, 958:16, 960:18, 961:20, 963:1, 965:17, 966:20, 967:21, 967:23, 971:2, 971:15, 971:21, 971:24, 972:13, 973:18, 974:2, 974:25, 975:15, 975:22, 976:2, 978:11, 978:14, 978:20, 979:5, 979:12, 979:20, 982:2, 984:9, 985:12, 985:20, 986:11, 987:15, 987:21, 989:22, 991:25, 992:20, 993:21, 994:5, 995:25, 998:4, 1000:16, 1002:1, 1003:7, 1006:4, 1011:12, 1011:14, 1011:21, 1011:24, 1012:2, 1014:7, 1014:10, 1014:13, 1014:16, 1014:18, 1014:21, 1015:11, 1015:16, 1015:20, 1016:18, 1017:1, 1017:24, 1018:19, 1021:18, 1023:5, 1023:9, 1023:16
**Spears** [9] - 837:19, 850:23, 971:1, 971:20, 987:20, 1011:1, 1014:6, 1021:15, 1024:17
**Spears'** [2] - 976:13, 1013:6
**spec** [1] - 951:1
**Special** [15] - 849:6, 850:25, 851:9,

851:12, 851:16, 944:18, 950:21, 977:6, 977:17, 980:13, 981:4, 996:3, 1005:21, 1020:17, 1020:18
**SPECIAL** [1] - 945:6
**special** [5] - 945:9, 945:12, 945:15, 947:7, 997:21
**specific** [5] - 878:7, 904:21, 904:24, 962:14, 967:9
**specifically** [5] - 840:19, 923:14, 933:18, 982:13, 1006:16
**specification** [1] - 869:11
**specifics** [1] - 1017:17
**specify** [2] - 1007:17, 1008:12
**speculate** [2] - 929:25, 930:2
**speculation** [1] - 892:20
**speed** [1] - 961:25
**spelled** [1] - 945:2
**spelling** [1] - 944:24
**spend** [2] - 841:21, 883:21
**spent** [1] - 1018:22
**spoken** [2] - 1002:11, 1005:20
**spread** [3] - 996:24, 997:21, 1004:14
**squarely** [1] - 1008:5
**stage** [1] - 868:19
**stages** [2] - 950:1, 978:8
**stand** [7] - 846:3, 847:18, 848:22, 910:21, 979:23, 1017:11, 1026:12
**Standard** [1] - 876:6
**standard** [2] - 973:11, 978:14
**start** [8] - 844:8, 905:17, 963:8, 974:21, 976:13, 1019:23, 1026:3
**started** [7] - 867:1, 867:2, 867:6, 869:15, 935:22, 939:4, 1018:18
**starting** [5] - 875:22, 883:19, 905:23, 905:25
**starts** [1] - 998:12
**state** [2] - 944:24,

969:22
**statement** [11] - 840:20, 842:23, 843:18, 845:15, 1006:12, 1006:16, 1006:18, 1007:8, 1007:23, 1009:22, 1010:15
**statements** [20] - 839:3, 839:16, 839:22, 840:1, 840:2, 840:6, 840:7, 840:8, 848:5, 849:18, 849:19, 849:22, 850:17, 850:19, 850:21, 968:25, 1006:24, 1007:3, 1007:4, 1007:13
**STATES** [3] - 836:1, 836:4, 1027:3
**States** [10] - 839:14, 840:13, 852:20, 908:11, 947:16, 982:12, 1007:7, 1008:16, 1027:6, 1027:18
**states** [2] - 848:13, 1006:23
**Station** [1] - 862:21
**stationed** [2] - 873:13
**status** [6] - 1006:20, 1008:4, 1008:6, 1009:4, 1009:7, 1010:14
**statutes** [1] - 946:5
**stay** [3] - 906:4, 930:15, 934:23
**steam** [3] - 857:23, 937:11, 994:17
**Stefan** [1] - 961:17
**step** [9] - 861:6, 901:17, 910:18, 933:24, 934:2, 935:23, 952:10, 968:6, 1020:2
**Steven** [1] - 871:18
**still** [16] - 838:13, 851:9, 878:20, 882:25, 883:12, 884:2, 885:5, 906:13, 917:16, 940:13, 941:4, 954:22, 1010:22, 1012:4, 1013:12, 1024:23
**stolen** [1] - 947:18
**stood** [1] - 1012:10
**stop** [4] - 883:3, 967:25, 968:1,

1002:20
**story** [1] - 977:10
**straighten** [1] - 932:2
**strange** [2] - 898:16, 898:22
**strategy** [7] - 858:20, 858:21, 858:22, 871:9, 871:12, 892:8, 939:15
**Street** [3] - 836:7, 837:4, 1027:18
**strictly** [1] - 864:16
**strike** [1] - 935:8
**strong** [2] - 1003:16, 1003:17
**stronger** [2] - 915:12, 915:13
**strongly** [4] - 841:22, 883:25, 884:14, 934:25
**struck** [1] - 975:8
**structure** [2] - 911:18, 967:12
**structured** [1] - 1016:7
**stylistic** [2] - 970:13, 1008:24
**subject** [48] - 841:4, 862:19, 862:20, 867:23, 867:24, 871:22, 874:25, 875:1, 876:19, 880:9, 880:10, 880:23, 881:22, 881:24, 886:22, 888:23, 888:24, 890:2, 891:25, 950:6, 951:16, 952:16, 955:8, 957:9, 961:18, 962:8, 962:12, 962:23, 964:18, 965:9, 965:15, 966:14, 966:23, 967:8, 984:6, 986:9, 987:12, 989:19, 991:23, 992:13, 995:13, 995:20, 998:2, 998:18, 1000:13, 1001:24, 1003:5, 1013:2
**subjects** [1] - 960:24
**submit** [2] - 988:13, 990:11
**submitted** [2] - 890:5, 962:2
**subpoena** [4] - 976:1, 976:3, 976:6, 976:8
**subsequent** [2] - 900:10, 962:5

**subsequently** [1] - 972:16
**subsidiaries** [1] - 949:16
**substance** [4] - 881:25, 882:13, 969:12, 972:6
**substantive** [2] - 900:13, 904:21
**success** [2] - 890:7, 890:12
**sufficient** [3] - 968:21, 1007:23, 1025:13
**sufficiently** [1] - 1007:10
**suggest** [2] - 851:22, 1004:18
**suggested** [5] - 844:12, 891:23, 959:13, 966:4, 1002:12
**suggesting** [1] - 959:23
**suggestion** [1] - 997:19
**Suguru** [1] - 874:21
**Suite** [1] - 837:19
**Sulianto** [22] - 859:12, 860:16, 860:18, 860:20, 862:17, 865:20, 866:5, 867:10, 871:18, 874:20, 876:17, 878:16, 886:20, 890:1, 893:13, 955:8, 956:12, 956:13, 1001:23, 1002:6, 1009:15, 1009:20
**Sumatra** [4] - 856:5, 856:15, 873:12, 873:14
**summary** [4] - 954:3, 977:24, 977:25, 1020:21
**summer** [2] - 899:14, 900:14
**Sunday** [5] - 987:1, 1021:18, 1022:3, 1022:6
**supervisor** [1] - 909:19
**supervisory** [2] - 945:9, 945:12
**Supp** [2] - 970:5, 1008:16
**supply** [2] - 857:17, 964:5
**support** [16] - 849:17, 854:4, 860:3, 861:7,

942:18, 959:15, 1001:17, 1001:19, 1002:16, 1003:16, 1003:17, 1003:20, 1003:21, 1007:25, 1020:5
**supported** [1] - 1008:10
**supporting** [1] - 1004:10
**supports** [2] - 868:19, 1023:20
**supposed** [8] - 857:14, 858:11, 878:5, 878:14, 879:8, 893:22, 893:23, 928:22
**Supreme** [1] - 1012:20
**surely** [1] - 978:16
**surprised** [1] - 1005:7
**surrounding** [1] - 851:1
**suspected** [3] - 907:21, 930:3, 930:9
**suspicions** [1] - 930:15
**sustain** [4] - 902:7, 930:10, 933:3, 944:8
**sustained** [3] - 892:22, 902:14, 939:10
**SVP** [2] - 934:1, 942:15
**swing** [1] - 865:2
**switch** [2] - 982:25, 983:10
**SWORN** [1] - 944:22
**system** [2] - 857:17
**systems** [1] - 963:18
**Systems** [4] - 857:10, 858:5, 860:11

**T**

**tactics** [1] - 871:10
**taint** [2] - 976:23, 976:24
**tainted** [2] - 976:14, 976:15
**Takeshi** [1] - 874:22
**tales** [1] - 907:17
**talks** [1] - 941:10
**tall** [1] - 907:17
**tangible** [1] - 907:12
**Tarahan** [128] - 838:17, 856:4, 856:17, 856:20, 857:7, 857:25, 859:9, 859:25, 860:2, 860:21,

860:24, 861:7,
861:21, 862:4,
862:7, 862:10,
862:20, 863:8,
863:22, 864:3,
865:11, 865:25,
866:14, 866:23,
867:6, 867:24,
868:25, 869:6,
869:7, 869:15,
870:24, 871:2,
871:23, 872:9,
872:12, 873:15,
874:6, 875:1,
875:19, 876:20,
877:4, 877:17,
878:5, 878:14,
878:23, 880:10,
880:24, 882:7,
883:4, 883:17,
885:2, 885:12,
886:14, 886:23,
888:24, 890:17,
893:5, 893:8,
893:10, 894:17,
894:20, 894:25,
895:6, 895:14,
895:23, 896:13,
896:14, 896:17,
897:4, 903:4,
905:16, 912:2,
912:16, 913:10,
915:21, 916:11,
916:20, 920:18,
924:22, 929:10,
930:20, 934:6,
936:11, 936:14,
938:11, 939:5,
939:12, 939:15,
939:17, 939:23,
941:22, 943:11,
943:24, 949:9,
949:25, 950:7,
950:23, 951:11,
961:11, 962:12,
962:23, 963:19,
964:5, 965:15,
966:14, 966:23,
981:21, 982:24,
983:2, 986:9,
988:11, 988:24,
989:19, 990:7,
993:11, 994:17,
995:16, 995:20,
996:14, 996:18,
996:23, 997:21,
998:18, 1000:13,
1001:5, 1002:18,
1004:17, 1009:10
**Tarahan.zip** [1] -
995:22

**target** [1] - 1018:21
**targets** [2] - 855:23,
855:24
**tasks** [1] - 954:19
**Tatsuya** [1] - 874:21
**Tawar** [6] - 951:13,
952:24, 955:9,
956:13, 962:11,
995:16
**TC** [1] - 995:22
**team** [6] - 867:5,
868:22, 873:13,
912:2, 915:16,
954:20
**tease** [1] - 1023:10
**technique** [2] -
978:15, 1016:5
**techniques** [10] -
972:15, 972:22,
973:5, 973:9,
973:11, 973:14,
973:15, 1014:24,
1015:14, 1016:24
**technology** [2] -
865:17, 874:12
**telecon** [1] - 987:1
**telephone** [1] - 876:5
**Tellier** [4] - 839:15,
848:22, 1006:23,
1008:1
**TELLIER** [1] - 839:15
**temperature** [1] -
1002:23
**temporarily** [1] - 913:9
**ten** [4] - 846:6, 910:22,
947:3, 968:2
**tender** [1] - 954:20
**term** [4] - 870:17,
903:19, 940:2,
996:15
**terminate** [1] - 891:4
**terms** [20] - 842:24,
854:4, 854:5,
871:12, 894:5,
971:4, 971:12,
971:24, 979:7,
981:15, 991:16,
995:9, 997:20,
998:24, 999:13,
999:17, 1001:4,
1001:13, 1017:22,
1018:2
**terrorist** [1] - 970:1
**testified** [9] - 853:17,
902:16, 907:25,
913:11, 972:5,
1009:9, 1009:12,
1017:5, 1020:13
**testify** [10] - 846:16,
902:20, 903:10,

903:13, 972:3,
972:11, 973:24,
979:14, 1016:6,
1016:9
**testifying** [3] - 899:3,
902:23, 977:7
**testimony** [38] -
838:21, 841:6,
841:7, 849:6,
852:16, 899:9,
899:21, 899:22,
899:25, 900:24,
904:8, 910:19,
915:18, 916:7,
917:12, 919:16,
919:20, 919:24,
920:12, 922:12,
923:6, 923:24,
925:7, 941:24,
971:6, 975:11,
980:6, 995:8,
1005:22, 1009:7,
1010:4, 1010:12,
1012:12, 1012:23,
1013:5, 1014:4,
1025:16
**Texas** [2] - 893:6,
908:13
**text** [7] - 845:14,
845:22, 923:20,
928:9, 969:11,
1008:8
**Tg** [1] - 996:13
**THE** [186] - 836:18,
838:4, 839:18,
842:24, 843:5,
843:7, 843:24,
844:4, 845:25,
846:3, 846:21,
846:25, 847:3,
847:8, 848:18,
850:2, 850:23,
852:19, 852:22,
853:2, 853:10,
853:15, 855:8,
863:2, 868:6,
868:10, 872:3,
875:6, 877:12,
877:14, 877:24,
878:10, 879:16,
881:7, 887:5, 889:9,
892:22, 892:23,
894:4, 894:13,
901:14, 902:7,
902:14, 910:9,
910:13, 910:17,
910:20, 910:21,
910:24, 911:4,
918:1, 918:3, 918:8,
918:11, 918:13,

919:16, 930:8,
930:10, 930:15,
931:18, 933:3,
934:13, 934:18,
934:19, 934:20,
935:20, 938:16,
938:18, 938:20,
938:22, 939:10,
939:22, 940:11,
940:13, 943:14,
943:18, 944:4,
944:8, 944:11,
944:13, 944:14,
944:17, 944:20,
944:23, 945:1,
945:4, 950:11,
950:18, 952:20,
953:24, 954:14,
955:12, 956:2,
956:7, 957:14,
958:17, 960:19,
961:21, 963:2,
965:18, 967:25,
968:5, 968:15,
969:1, 969:6,
969:11, 969:23,
970:18, 971:12,
971:19, 971:23,
972:9, 973:6,
973:21, 974:13,
975:13, 975:16,
975:20, 975:25,
976:5, 976:9,
978:13, 979:11,
979:15, 979:21,
979:25, 980:17,
980:21, 980:23,
982:3, 984:10,
985:15, 985:25,
986:12, 987:16,
987:19, 987:22,
989:23, 992:1,
992:21, 993:22,
994:6, 996:1, 998:5,
1000:17, 1002:2,
1003:8, 1005:5,
1005:7, 1005:13,
1005:16, 1005:17,
1006:5, 1006:8,
1011:10, 1011:13,
1011:16, 1012:4,
1014:9, 1014:12,
1014:14, 1014:17,
1014:19, 1015:6,
1015:12, 1015:18,
1016:12, 1016:20,
1017:15, 1018:7,
1018:20, 1021:2,
1021:6, 1021:21,
1022:7, 1022:17,
1022:21, 1023:3,

1024:6, 1024:12,
1024:16, 1024:25,
1025:3, 1025:6,
1026:1, 1026:6
**themselves** [3] -
840:7, 1013:11,
1013:24
**theory** [1] - 1014:5
**thereafter** [2] - 974:19,
985:6
**therefore** [4] - 868:19,
925:16, 959:23,
967:17
**therein** [2] - 842:4,
1008:15
**thereof** [1] - 985:7
**they've** [1] - 899:20
**Thiessen** [2] - 841:8,
846:16
**thinking** [3] - 1012:24,
1013:6, 1014:22
**thinks** [1] - 1003:20
**third** [5] - 858:2,
858:3, 963:8,
981:24, 991:9
**thirty** [1] - 848:12
**thirty-five** [1] - 848:12
**three** [14] - 858:17,
899:18, 926:15,
926:16, 932:1,
932:4, 956:17,
958:8, 963:4,
982:21, 997:3,
999:21, 1003:10,
1004:14
**three-page** [1] - 963:4
**throughout** [2] -
907:15
**Thursday** [1] - 967:2
**tied** [3] - 855:23,
855:24, 855:25
**timeline** [1] - 901:13
**timing** [1] - 1000:6
**title** [1] - 945:8
**titles** [1] - 969:25
**today** [13] - 888:3,
899:4, 915:19,
915:20, 916:6,
919:20, 947:21,
948:21, 949:2,
961:12, 980:19,
985:14, 997:7
**today's** [2] - 875:10,
987:2
**together** [2] - 857:4,
857:5
**tolerate** [1] - 1001:5
**tomorrow** [4] -
868:15, 873:9,
1021:20, 1021:21

**tonight** [5] - 875:12, 876:4, 876:5, 1021:20, 1024:24
**took** [4] - 906:17, 918:24, 937:9, 1014:1
**top** [13] - 864:8, 881:12, 917:21, 920:7, 923:20, 938:20, 960:23, 964:25, 965:1, 983:14, 999:20, 1003:12
**ToP** [5] - 996:19, 996:23, 997:8, 1004:13, 1004:14
**topic** [1] - 911:11
**topics** [3] - 929:2, 982:25, 995:7
**tops** [1] - 960:23
**Toru** [1] - 874:21
**total** [2] - 991:14, 993:4
**touch** [1] - 906:4
**tougher** [1] - 1001:13
**towards** [2] - 864:11, 864:20
**town** [1] - 944:25
**track** [1] - 1005:10
**trading** [1] - 984:16
**traffic** [1] - 1011:15
**training** [4] - 945:24, 946:1, 946:3, 946:5
**transcription** [1] - 1027:9
**transfers** [1] - 904:24
**transition** [1] - 977:21
**translation** [1] - 955:6
**traveling** [1] - 925:25
**tree** [1] - 976:25
**TRIAL** [1] - 836:12
**trial** [16] - 841:4, 842:7, 846:7, 850:10, 850:15, 899:21, 902:20, 902:23, 904:9, 951:19, 951:21, 976:18, 977:3, 978:5, 1011:3, 1024:7
**tricky** [1] - 938:20
**tried** [3] - 875:10, 975:5, 1002:21
**true** [8] - 930:3, 932:9, 932:22, 971:18, 977:8, 1004:10, 1019:1, 1027:9
**trust** [6] - 867:15, 882:23, 883:7, 907:6, 907:7, 907:9

**trustworthy** [1] - 974:15
**truth** [1] - 907:18
**truthful** [2] - 903:6, 1013:24
**try** [16] - 847:11, 857:6, 877:8, 886:6, 930:13, 937:13, 937:14, 938:8, 943:4, 943:7, 955:4, 989:11, 1009:12, 1016:22, 1023:10, 1026:6
**trying** [6] - 851:23, 857:25, 918:3, 961:6, 969:18, 984:15
**Tsuzaki** [1] - 874:21
**Tuban** [1] - 1002:24
**Tuesday** [1] - 1026:4
**turbine** [2] - 857:23, 937:11
**turn** [4] - 891:5, 915:3, 959:16, 997:10
**turned** [2] - 853:10, 929:16
**twice** [3] - 848:3, 966:1, 968:22
**two** [25] - 843:18, 843:19, 848:2, 850:5, 856:8, 857:2, 857:3, 865:17, 865:20, 865:24, 882:2, 883:23, 884:22, 899:17, 912:24, 929:2, 932:1, 932:4, 955:18, 968:12, 991:12, 997:3, 997:10, 1002:12, 1013:22
**types** [2] - 922:4, 948:25
**typically** [1] - 914:2

# U

**U.S** [21] - 837:3, 837:8, 854:16, 908:18, 908:20, 937:8, 947:12, 947:13, 964:6, 964:9, 964:10, 966:3, 966:25, 967:11, 970:2, 970:4, 981:14, 1006:23, 1008:1, 1010:8, 1013:1
**U.S.D.J** [1] - 836:18
**ultimate** [2] - 943:23,

1013:23
**ultimately** [5] - 895:4, 895:16, 930:22, 938:5, 1013:8
**unable** [1] - 954:19
**unavailable** [1] - 976:11
**under** [18] - 838:25, 840:5, 842:21, 872:16, 922:18, 933:17, 972:18, 978:21, 985:7, 991:4, 991:6, 991:9, 1006:11, 1006:18, 1007:16, 1009:7, 1015:5, 1018:10
**undergraduate** [1] - 945:20
**undermine** [2] - 850:20, 1014:3
**undermining** [1] - 1014:2
**understandable** [1] - 916:14
**understood** [7] - 883:10, 885:16, 935:10, 961:5, 1008:23, 1017:24, 1018:19
**uneasy** [1] - 964:20
**unfortunately** [1] - 887:9
**unhappy** [1] - 1003:20
**unhear** [2] - 1023:15, 1024:5
**unidentified** [1] - 844:13
**unique** [1] - 934:7
**Unit** [3] - 946:22, 947:8, 947:20
**unit** [6] - 861:23, 936:24, 937:10, 937:16, 937:22, 990:24
**UNITED** [3] - 836:1, 836:4, 1027:3
**United** [9] - 839:14, 840:13, 852:20, 947:16, 982:12, 1007:6, 1008:16, 1027:6, 1027:18
**Units** [1] - 994:17
**units** [7] - 854:4, 854:7, 854:24, 855:25, 859:15, 911:19, 937:7
**universe** [1] - 852:1
**University** [2] - 945:21, 945:22
**unless** [2] - 872:25,

1004:20
**unnecessary** [1] - 969:21
**unreliable** [1] - 840:8
**unreported** [1] - 852:15
**untrustworthy** [1] - 974:10
**up** [54] - 839:14, 844:4, 846:19, 849:5, 850:10, 851:3, 852:10, 852:17, 853:10, 853:12, 853:13, 854:6, 865:2, 883:22, 884:19, 898:22, 901:17, 904:5, 906:1, 906:2, 917:18, 920:5, 921:6, 924:13, 925:2, 925:23, 926:5, 926:23, 928:8, 930:13, 933:7, 935:21, 937:25, 938:6, 940:13, 943:3, 950:16, 950:18, 951:19, 955:2, 958:2, 961:24, 963:20, 964:13, 970:5, 997:1, 998:22, 999:1, 1003:23, 1016:5, 1019:3, 1021:11
**update** [1] - 961:24
**upper** [1] - 874:8
**upset** [1] - 921:16
**urgently** [1] - 1004:6
**urges** [1] - 1007:20
**US** [2] - 837:15, 1007:7
**USA** [3] - 990:23, 991:2, 994:13
**USD** [1] - 964:11
**useful** [1] - 1006:2
**useless** [1] - 1004:21
**utility** [1] - 861:12

# V

**valuable** [1] - 979:7
**value** [1] - 991:14
**various** [4] - 915:20, 915:25, 949:16, 996:13
**vehemently** [1] - 1022:13
**verbally** [1] - 903:1
**verify** [1] - 984:15
**verifying** [1] - 843:12

**Veronique** [14] - 962:22, 963:22, 965:2, 965:14, 986:8, 987:10, 989:17, 991:20, 992:11, 997:18, 997:19, 998:15, 999:8, 1000:12
**version** [4] - 881:5, 993:9, 993:13, 1013:10
**versus** [4] - 847:16, 850:3, 1006:23, 1018:10
**via** [6] - 889:14, 925:17, 926:5, 959:12, 960:2, 987:3
**vice** [5] - 859:23, 861:11, 892:16, 911:12, 952:5
**view** [5] - 923:8, 941:22, 972:20, 977:5, 1021:16
**VIII** [2] - 952:6, 956:19
**violations** [1] - 972:2
**Virginia** [2] - 945:22, 946:4
**visit** [4] - 876:20, 880:10, 880:24, 882:7
**visitors** [1] - 953:6
**voice** [1] - 853:13
**voices** [1] - 853:12
**VOLUME** [1] - 836:13
**VP** [3] - 933:20

# W

**wait** [4] - 888:1, 888:5, 934:13, 944:4
**waiting** [4] - 852:9, 901:5, 902:3, 997:3
**wants** [5] - 866:7, 914:11, 976:20, 1013:6
**Washington** [4] - 837:10, 945:3, 946:25, 964:3
**water** [1] - 938:17
**ways** [1] - 954:3
**weak** [1] - 967:12
**week** [4] - 872:18, 951:7, 963:17, 984:21
**weekend** [6] - 1005:9, 1005:11, 1005:15, 1005:25, 1014:11, 1026:10
**weeks** [5] - 851:24, 862:5, 932:1, 932:4

**welcome** [1] - 852:12
**Wheeler** [5] - 856:25,
857:1, 869:4,
873:23, 885:17
**Wheeler's** [1] - 869:5
**Whereas** [2] - 994:12,
994:19
**White** [1] - 1010:24
**white** [4] - 1012:16,
1012:19, 1013:18,
1013:21
**whole** [3] - 912:23,
927:1, 1011:19
**Widiono** [10] - 875:16,
875:18, 890:10,
890:11, 890:20,
892:18, 913:21,
959:11, 959:13,
1002:11
**William** [15] - 862:17,
872:7, 874:19,
886:20, 888:21,
986:6, 987:9,
989:16, 990:18,
991:21, 992:4,
992:10, 999:6,
1000:25, 1003:4
**willing** [5] - 841:21,
883:21, 902:11,
996:25, 1004:20
**win** [11] - 857:7,
857:25, 859:9,
874:8, 874:9, 877:4,
877:8, 895:4,
896:13, 1009:10,
1009:12
**Winan** [23] - 838:16,
843:5, 876:24,
877:1, 877:2,
878:17, 879:7,
880:6, 880:8, 882:4,
882:10, 922:12,
922:22, 923:2,
923:8, 923:15,
940:9, 968:24,
980:13, 1006:16,
1009:9, 1009:13,
1010:18
**Winan's** [8] - 843:12,
843:15, 879:24,
880:5, 882:13,
882:14, 885:23,
1009:23
**Windsor** [24] - 861:16,
862:1, 868:16,
870:14, 870:17,
870:20, 870:22,
872:18, 872:22,
872:23, 885:3,
886:3, 886:9,

886:11, 888:16,
891:11, 891:13,
891:14, 891:17,
912:3, 991:1,
999:13, 999:15
**winning** [2] - 856:20,
895:5
**wire** [1] - 904:24
**wireless** [1] - 925:21
**wiretap** [1] - 978:5
**wish** [1] - 868:16
**wished** [1] - 897:3
**wishes** [2] - 852:18,
994:19
**witness** [36] - 838:3,
838:21, 846:3,
846:5, 846:10,
846:12, 848:2,
849:5, 849:7,
850:15, 852:11,
868:3, 878:20,
901:8, 901:12,
919:12, 935:12,
935:17, 944:16,
953:23, 954:3,
968:8, 973:1, 974:9,
974:21, 975:21,
977:24, 978:25,
985:20, 1016:8,
1019:14, 1019:15,
1019:19, 1019:21,
1024:9, 1024:22
**WITNESS** [14] -
892:23, 910:20,
918:3, 918:11,
918:13, 934:18,
934:20, 938:18,
938:22, 944:13,
944:17, 944:22,
945:1, 1005:16
**witness's** [4] - 935:15,
1012:11, 1012:12,
1014:4
**witnesses** [10] -
948:16, 954:4,
972:25, 974:8,
974:23, 976:19,
976:21, 1018:16,
1019:20, 1024:18
**WL** [1] - 852:21
**won** [9] - 841:18,
865:13, 865:15,
882:24, 883:12,
890:17, 935:6,
941:1, 941:3
**word** [1] - 941:7
**words** [4] - 922:1,
953:1, 985:23,
1013:18
**world** [1] - 936:19

**worry** [1] - 996:25
**worst** [1] - 959:15
**write** [4] - 955:22,
988:9, 992:3, 1000:3
**writing** [1] - 863:16
**written** [1] - 859:21
**wrote** [2] - 1009:23

**Y**

**Yamamoto** [2] -
874:22, 889:24
**year** [10] - 901:22,
901:24, 908:5,
918:19, 936:10,
993:3, 996:24,
997:12, 1004:15
**years** [10] - 842:16,
905:22, 906:2,
906:3, 916:15,
945:17, 946:8,
947:3, 949:16, 997:3
**yesterday** [12] -
838:15, 838:19,
846:9, 846:23,
851:6, 853:17,
856:9, 900:24,
915:19, 961:6,
984:1, 992:25
**York** [3] - 837:9,
837:15, 970:3
**yourself** [5] - 864:9,
912:6, 921:12,
936:7, 938:17
**Yusril** [1] - 984:16
**Yves** [7] - 995:20,
997:14, 997:18,
998:13, 999:9,
999:14, 1000:11
**Yves/Reza** [1] -
1001:16

**Z**

**zero** [1] - 978:3
**zoomed** [1] - 873:3