UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 3:12cr238 (JBA) |
| *v.* | |
| LAWRENCE HOSKINS | February 26, 2020 |

**RULING ON DEFENDANT'S RULE 29(C) AND RULE 33 MOTIONS**

Defendant Lawrence Hoskins moves under Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal on all counts or, in the alternative, under Rule 33 for a new trial. (Def.'s Mot. for Acquittal [Doc. # 589].) The Government opposes. (Gov't Opp. [Doc. # 604].) For the reasons that follow, Defendant's motion is granted in part and denied in part.

## I. Background

The Court assumes the parties' familiarity with the facts of this case. Briefly, Defendant is a British citizen who was employed from 2001 to 2004 by Alstom UK Limited, a British subsidiary of Alstom, but worked primarily for Alstom Resource Management SA, a French subsidiary of Alstom. (Def.'s Mem. Supp. Mot. for Acquittal [Doc. # 589-1] at 3-4.) The charges in this case stem from the Tarahan Project in Indonesia, for which an Indonesian subsidiary of Alstom contracted with Marubeni, a Japanese corporation, and "PLN," a utility company owned by the Indonesian government, to build a power plant in Indonesia. (*Id.* at 3.) Alstom Power Inc. ("API"), based in Windsor, Connecticut, is the American subsidiary of Alstom which headquartered Alstom's international utility boiler business and which was heavily involved in Alstom's bidding on the Tarahan Project. (*Id.* at 4.) In connection with the Tarahan Project, Alstom hired two consultants: Pirooz Sharafi, through his company Pacific Resources, Inc., and Azmin Aulia, through his

company PT Gajendra Adhi Sakti. (*Id.*) The charges of the indictment relate to an effort by Alstom to use those consultants to bribe Indonesian officials in order to secure the Tarahan contract.

Defendant was indicted on July 30, 2013 and charged with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") (Count One), violations of the FCPA (Counts Two through Seven), conspiracy to commit money laundering (Count Eight), and money laundering (Counts Nine through Twelve). (Second Superseding Indictment [Doc. # 50].)

This matter proceeded to trial on October 28, 2019. After the Government concluded its presentation of evidence, Defendant moved for a judgment of acquittal on all counts under Rule 29(a). (Oral Mot. for Acquittal [Doc. # 572].) That motion was denied without prejudice to renew following the jury verdict. On November 8, 2019, the jury returned a verdict finding Defendant guilty on Counts One through Ten and Count Twelve, and not guilty on Count Eleven. (Jury Verdict [Doc. # 583].)

## II. Discussion

Federal Rule of Criminal Procedure 29(a) requires courts to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction" after the presentation of evidence. In considering a motion for acquittal, courts must "view the evidence presented in the light most favorable to the government, and . . . draw all reasonable inferences in its favor." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). Courts should "consider the evidence in its totality, not in isolation." *Id.* The Court must "be careful to avoid usurping the role of the jury" and must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." *Id.* (internal quotation omitted). Rather, the Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt

beyond a reasonable doubt." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) (internal quotation omitted). If "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible," then the Court "must let the jury decide the matter." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). A defendant's motion for acquittal "shoulders a heavy burden in challenging the sufficiency of evidence," and the Court "must uphold the jury's verdict if . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Autuori*, 212 F.3d at 114 (internal quotations omitted).

### A.  Agency and Counts One through Seven

In April 2016, the Government appealed this Court's ruling granting in part Defendant's motion to dismiss and the ruling denying the Government's motion for reconsideration of that decision. (Not. of Appeal [Doc. # 344].) The Second Circuit Court of Appeals concluded, *inter alia*, that "the FCPA clearly dictates that foreign nationals may only violate the statute outside the United States if they are agents, employees, officers, directors, or shareholders of an American issuer or domestic concern." *United States v. Hoskins*, 902 F.3d 69, 97 (2d Cir. 2018). Thus, because Defendant "did not travel [to the United States] while the bribery scheme was ongoing," *id.* at 72, Defendant cannot be liable for violations of the FCPA unless he was an agent of a domestic concern.

Defendant argues that he is entitled to an acquittal on Counts One through Seven, the FCPA counts, because the Government failed to prove that he was an agent of API, the relevant domestic concern. According to Defendant, "[t]here is not a shred of evidence that anyone at API had the right to (or actually did) exercise any control over any work that Mr. Hoskins performed, let alone in connection with the retention of consultants on the Tarahan project." (Def.'s Mem. at 6.) "Because the element of control is fundamental to establishing an agency relationship,"

Defendant argues, no reasonable jury could have concluded that Defendant was an agent of API in the absence of any evidence of API's control over him.

### i.      Agency Defined

"Agency is a legal concept that depends on the existence of three elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; *and* (3) the understanding of the parties that the principal is to be in control of the undertaking." *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 522 (2d Cir. 2006).[1] In other words, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and

---

[1] The parties agreed prior to trial that the definition of agency to control in this case should be drawn from "traditional agency law principles." (Gov't Opp. to Def.'s Mot. for Jury Instr. on Agency [Doc. # 476] at 2; *see* Def.'s Mot. for Jury Instr. on Agency [Doc. # 449] at 2.) Both parties' proposed instructions included language which closely tracked the three elements set out in *Cleveland*, although Defendant advocated for an instruction whose third element included the principal's control "of the agent," rather than "of the undertaking." (Def.'s Mot. for Jury Instr. on Agency at 2.) In order to avoid falsely suggesting that complete control of the agent at all times is required or confusing the jury, the Court's instruction to the jury regarding agency explained:

> An agent is a person who agrees to perform acts or services for another person or company, known as the principal. To create an agency relationship, there must be, one, a manifestation by the principal that the agent will act for it; two, acceptance by the agent of the undertaking; and, three, an understanding between the agent and the principal that the principal will be in control of the undertaking. The undertaking consists of the acts or services which the agent performs on behalf of the principal.

(Trial Tr. Vol. VII at 1246-47; *see also* Ruling on Def.'s Mot. for Instr. on Agency [Doc. # 532].)

the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2005) [hereinafter Third Restatement].[2]

"An essential element of agency is the principal's right to control the agent's actions." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (quoting Third Restatement § 1.01, cmt f). "Agency requires more than mere authorization to assert a particular interest." *Id.* Agency is a "fiduciary relationship." Third Restatement § 1.01; *see Hollingsworth*, 570 U.S. at 713 (quoting Third Restatement in describing fiduciary nature of agency). Thus the agent must "act loyally in the principal's interest as well as on the principal's behalf." Third Restatement § 1.01 cmt. e.

"The right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times." *Cleveland*, 448 F.3d at 522 (quoting Restatement (Second) of Agency § 14 cmt. a (1958).). But control "need not include control at every moment, its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective." *Id.*

Agency analysis is "highly-factual and often nuanced." *Id.* at 523. Nonetheless, there are some factors to consider in making the nuanced determination of whether an agency relationship

---

[2] In *Hollingsworth v. Perry*, the Supreme Court's determination of whether an agency relationship existed was plainly driven in part by the Restatement and its description of the "most basic features of an agency relationship." 570 U.S. at 714. In *Cleveland*, the Second Circuit quoted from and cited to the Second Restatement in outlining the "elements of agency" and the contours of the "right of control by the principal." 448 F.3d at 522; *see also Great Minds v. Fedex Office and Print Servs., Inc.*, 886 F.3d 91, 95 (2d Cir. 2018) (citing Third Restatement § 1.01 cmt. c in support of its description of the "mundane ubiquity of lawful agency relationships").

Thus, in light of the parties' agreement that traditional agency law principles govern here and the Supreme Court's and Second Circuit's reliance on the Restatement in describing those principles, the Court is guided in its consideration of Defendant's motion by the discussions of agency and control in the Third Restatement.

existed. If the purported agent "answer[s] to no one," "decides for [himself], with no review, what" to do, owes no fiduciary obligation to the purported principal, and if "[n]o provision provides for [his] removal," then an agent-principal relationship does not exist. *Hollingsworth*, 570 U.S. at 713. Proof that one party "controlled or supervised" the other "could constitute indicia of agency." *O'Connell Mach. Co., Inc. v. M.V. Americana*, 797 F.2d 1130, 1137 (2d Cir. 1986).

The "right of interim control" of the agent by the principal "is what distinguishes an agency relationship from a mere contractual one." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278 (2d Cir. 2013) (citing Third Restatement § 1.01 cmts. f, g) (distinguishing between the performance of contractual duties and agency relationships).[3] Even where a purported principal "exercise[s] control" over several "important" aspects of a transaction, no agency relationship has been established where he lacks interim control over how the purported agent performs the task "beyond the initial specifications." *Id.* at 278-79. "[W]ithin any relationship of agency the principal initially states what the agent shall and shall not do, in specific or general terms. Additionally, a principal has the right to give interim instructions or directions to the agent once their relationship is established." Third Restatement § 1.01 cmt. f(1). "Many positions and relationships give one person the ability to dominate or influence other persons but not the right to control their actions," and a "position of dominance or influence does not in itself mean that a person is a principal in a relationship of agency with the person over whom dominance or influence may be exercised." *Id.* "The principal's right of control presupposes that the principal retains the capacity throughout the

---

[3] *Priceline* was decided by the Second Circuit using Connecticut state law, and "Connecticut has adopted the Second Restatement of Agency." *Priceline*, 711 F.3d at 277. Thus, the Court views the Second Circuit's discussion of agency principles in *Priceline* as guiding but not controlling, as the Supreme Court and Second Circuit frequently cite to the Restatement in describing general agency principles but have not formally adopted the Restatement as Connecticut did.

relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority." *Id.* "By consenting to act on behalf of the principal, an agent who is an employee consents to do the work that the employer directs and to do it subject to the employer's instructions." *Id.* § 1.01 cmt. g. For example, in the case of an entity negotiating prices on behalf of a customer, that entity cannot be the customer's agent unless the customer "retain[s] control over this negotiation process." *Priceline*, 711 F.3d at 279.

"Coagents" are persons who both "have agency relationships with the same principal." Third Restatement § 1.04. "In a relationship of coagency, neither agent is the other's agent." *Id.* § 1.04 cmt. a. "Coagency is a common phenomenon within organizations." *Id.* But a "superior coagent's right to direct a subordinate coagent does not itself create a relationship of agency between them." *Id.* § 1.04 cmt. i. Examples help further illustrate the concept of coagency in an employment context. Even where a "foreman or supervisor in charge of a crew of laborers exercises full and detailed control over the laborers' work activities," the relationship between foreman and laborer is not an agency relationship "despite the foreman's full control" because both the foreman and the laborers are instead "coagents of a common employer who occupy different strata within an organizational hierarchy." *Id.* § 1.01 cmt. f(1). "The foreman's role of direction, defined by the organization, does not make the laborers the foreman's own agents" because the "laborers act on behalf of their common employer, not the foreman." *Id.* Similarly, "the captain of a ship and its crew are coagents, hierarchically stratified, who have consented to act on behalf of their common principal, the ship's owner." *Id.*

### ii.    Evidence of Agency

Defendant argues that the Government failed to introduce evidence at trial which could support the necessary conclusions that Defendant agreed to act subject to API's control and that

API was in control of the undertaking. (Def.'s Mem. at 8.) He also argues that evidence introduced at trial actually "demonstrates the opposite": that API "had no right to control any of Mr. Hoskins's actions, including any actions undertaken with respect to the Tarahan project." (*Id.*)

Specifically, Defendant suggests that "Alstom's corporate records[,] . . . email correspondence and trial testimony" all demonstrate that API did not have the right to exercise control over him. (*Id.*) He argues that the Alstom corporate records demonstrate that "Mr. Hoskins's reporting hierarchy was [] entirely distinct from API: no one from API reported to Mr. Hoskins, and Mr. Hoskins did not report to anyone from API." (*Id.* at 9 (citing Exs. 612, 911A).) Rather, his role regarding third-party consultants was "to approve certain key commercial terms of their engagement" after such terms had been negotiated by the business unit (here, API) and approved by the compliance teams. (*Id.* at 9-10 (citing Exs. 660B, 659B, 917A).) Defendant's role included "contribut[ing] to the selection of Agents, and approv[ing] the key elements of the related agreements, applying Alstom policy." (Ex. 913.) Defendant argues that these corporate documents "make clear that [his] function in connection with the selection of agents was one of oversight and approval on behalf of Alstom International Network—not on behalf of or as an agent of API." (Def.'s Mem. at 10.)

Defendant also argues that email correspondence and trial testimony "confirmed what the corporate documents . . . make clear: Mr. Hoskins[ had] approval authority in connection with the hiring of outside consultants on the Tarahan project." (*Id.*) Bruno Kaelin, who also worked in Alstom's International Network ("IN"), wrote to Mr. Pierucci that the retention of Pirooz Sharafi as a consultant on the Tarahan Project was "in the approval process in IN (Lawrence Hoskins and Etienne Dé)." (Ex. 440.) Similarly, another employee of International Network informed Mr. Pomponi that the file for Azmin Aulia was "with L. Hoskins for approval." (Ex. 481.) Testimony

8

by witness David Rothschild also confirmed that Defendant was responsible for the "final approval" of agreements with third party consultants, (Trial Tr. Vol. II [Doc. # 596] at 234), and testimony by witness Larry Puckett confirmed that Defendant's role included the "approval of an outside agent," (Trial Tr. Vol. V [Doc. #599] at 943). Defendant argues that this evidence demonstrates that "Mr. Hoskins exercised approval authority over certain aspects of the retention of third-party consultants," and that he "did this on behalf of Alstom's International Network, and no one within API had a right to control or direct his actions." (Def.'s Mem. at 12.)

Defendant also argues that testimony regarding the corporate structure and oversight between API and International Network demonstrates that he could not have been an agent of API. Mr. Puckett testified hypothetically that "if it came down to a real disagreement" between API and IN regarding who to hire as a consultant, the "business [unit] would win out." (Trial Tr. Vol. V at 938). But Mr. Puckett also testified that such a disagreement would have to be resolved by elevating it to the place in the corporate hierarchy where API's and IN's reporting lines met in order to try to overrule each other. (*Id.* at 939.) He explained that if Mr. Pierucci and Mr. Hoskins had disagreed regarding the hiring of a consultant, in order to override Mr. Hoskins, Mr. Pierucci would have had to go up his reporting line to try to find someone senior to Mr. Hoskins in Mr. Hoskins's reporting line. (*Id.* at 943-44.) Mr. Puckett also testified that although Mr. Pierucci "controlled strategy" and "negotiation tactics" regarding the Tarahan Project, (Trial Tr. Vol. V. at 872), Mr. Pierucci could not fire, reassign, nor demote Mr. Hoskins and could not affect his compensation, (*id.* at 943).

Similarly, Mr. Thiessen testified that if there was a disagreement between the business unit and IN regarding the proposed terms of payment for a consultant, the two groups would "[w]ork it out somehow, renegotiate or come up with something new or convince – somebody would

9

convince the other party to go along with it." (Trial Tr. Vol. IV [Doc. # 598] at 646.) He confirmed that the business unit was not able to implement an agreement without approval from International Network. (*Id.*) Defendant argues that this testimony demonstrates that API did not have the authority to control Mr. Hoskins in the manner necessary for an agency relationship.

In response to Defendant's reliance on corporate hierarchy and policy, the Government asserts that the "jury was certainly entitled to give little (if any) weight to a function limited to making sure the boilerplate in the consultancy agreement matched the boilerplate in other Alstom consultancy agreements, particularly when the defendant and his co-conspirators understood they would be ignored." (Gov't Opp. at 19.) The Government cites Mr. Rothschild's testimony that the charts reflecting the corporate hierarchical structure did not capture all relationships that API had with other Alstom employees and that it did not reflect how the Tarahan Project was actually run, (*see* Trial Tr. Vol. II at 284), and Mr. Puckett's testimony that the Tarahan Project was "unique," (Trial. Tr. Vol. V at 934).

The Government also argues that it introduced "overwhelming documentary evidence that proved that the defendant was acceding to, and carrying out, API's instructions in connection with the hiring of consultants on the Tarahan Project, and that API controlled the undertaking." (Gov't Opp. at 2.) It characterizes Defendant's "approval function" as "subservient to that of API" because he "actually exercised no meaningful oversight." (*Id.* at 19.) The Government also argues that any approval authority exercised by Defendant "does not undermine API's well-documented control over the defendant in other aspects of retaining the Tarahan consultants." (*Id.*)

Mr. Rothschild testified that API had ultimate decision-making authority over hiring a consultant, including who to hire, how much to pay, and the terms of the agreement. (Trial Tr. Vol. II at 281-82.) Mr. Puckett testified that "Mr. Hoskins didn't call the shots or the strategy on

Tarahan," but rather Mr. Pierucci was "in control." (Trial Tr. Vol. V at 940). "So, in that sense," Mr. Puckett explained, "Mr. Hoskins would have been reporting to [Mr. Pierucci] on the Tarahan Project." (*Id.*)

The Government argues that emails introduced at trial also demonstrate API's control over Defendant's work on the Tarahan Project. (Gov't Opp. at 16.) For example, the Government relies upon an email from Reza Moenaf, Alstom Country President for Indonesia, to Mr. Pierucci and Mr. Rothschild, and copying Mr. Hoskins, requesting "[y]our position" and "your decision" regarding the hiring of a consultant. (*Id.* (quoting Ex. 411).) The Government also cites an email from Mr. Moenaf to Mr. Pierucci and Mr. Rothschild, copying Mr. Hoskins and Eko Sulianto, indicating that "[a]ccording to Lawrence [Hoskins], Fred [Pierucci] has already given his 'go-ahead' to proceed with the proposed consultant." (Gov't Opp. at 16 (quoting Ex. 412).) The Government also relies upon an email from Mr. Pierucci to Mr. Pomponi, on which Mr. Hoskins was copied, explaining that Marubeni wanted "Alstom Windsor," meaning API, and "particularly Fred Pierucci, to agree to" terminate the agreement with Pirooz Sharafi in favor of a new consultant. (Gov't Opp. at 16 (quoting Ex. 457).) The Government concludes that "[t]hus it was reasonable for the jury to infer from the evidence that, when the defendant told Sharafi his role was being reduced and then hired Aulia, he did so at the behest of API." (Gov't Opp. at 16.)

The Government points to other instances where Mr. Pierucci and Mr. Pomponi, representatives of API, "gave the defendant instructions, which he carried out," in support of their position that Mr. Hoskins was an agent of API. (Gov't Opp. at 17.) These include emails to Mr. Hoskins asking him to "[p]lease reissue asap the revised consultancy agreement based on the following" terms and to "pls go ahead, using today's date, and issue the fax official to Azmin [Aulia]," (*id.* (quoting Exs. 469 and 470)), and an email from Mr. Hoskins indicating that "Fred

P[ierucci] asked me to check with Resa [Moenaf] on latest position on Tarahan" and that Mr. Hoskins would "brief" Mr. Pierucci during his upcoming trip to Paris, (Gov't Opp. at 15 (quoting Ex. 410)).

The Government also argues that evidence that Defendant "assisted API in determining the best terms of payment it could obtain" with a consultant demonstrates that Defendant was an agent of API. (Gov't Opp. at 17.) Specifically, the Government cites emails in which Defendant offered "[his] advice," or "recommended that" Alstom adopt certain proposed terms. (*Id.* (quoting Exs. 490 and 500).) Christopher Varney, who worked in finance at API, indicated that the business units made ultimate decisions and were "in charge" of projects, while IN "provide[d] the link to the people on the ground, the local teams." (Trial Tr. Vol. IV at 708-09.) The Government also cites an email from Reza Moenaf to Mr. Hoskins indicating that he felt that he had "responsibility without authority" because the business unit "has the final call." (Gov't Opp. at 18 (quoting Ex. 480).)

### iii.    Agency as a Matter of Law

In sum, the Government argues that the evidence demonstrates that Mr. Hoskins was an agent of API for two primary reasons: 1) API "controlled this undertaking, . . . [m]eaning the hiring of agents," including "who they hired, how they hired them, when they hired them, how much they paid them and what those terms of payment would be," and 2) "all of the back and forth where [API] is giving the defendant instructions and he is following them, . . . coming back to try to meet

those instructions . . . [and] asking for feedback on how to basically carry out his function." (Tr. of

2/19/20 Oral. Arg. [Doc. # 611] at 17-18.) [4]

---

[4] Indeed, the Government's closing argument at trial makes clear that the Government's evidence proved primarily that API controlled the Tarahan Project and that Mr. Hoskins assisted in the efforts to obtain the Tarahan contract:

> [T]he main question for you to answer is whether the defendant entered into this relationship, this undertaking, and whether API controlled the undertaking. Now, the defendant very clearly was doing work on behalf of API, and we have proven beyond a reasonable doubt that API controlled that undertaking. . . . What were the things that the defendant was actually doing for API? He was helping with sales efforts. He was helping identify consultants. He was helping to vet and hire consultants. He was helping to negotiate the terms of payments. And so who controlled that undertaking, ladies and gentlemen? That was API. And you saw that from the very beginning: Fred Pierucci asking Lawrence Hoskins to go look into the Tarahan Project to find out about the status, and Lawrence Hoskins doing it, saying he was going to brief Fred Pierucci the next time he came into town. And remember, Fred Pierucci, an API employee, the head of the boiler business at API. You saw Lawrence Hoskins trying to convince Fred Pierucci to not increase their price, that that could impact the project. But who was in control of that? Can Windsor be persuaded? Why did Windsor need to be persuaded? You heard Larry Puckett tell you why, because Fred Pierucci controlled the strategy. He controlled the negotiation tactics. He controlled the approach. . . . Everytime there was a back and forth, it was API's decision to make. . . . This is what you saw in the documents related to Tarahan over and over again. Fred Pierucci called the shots as far as strategy and as far as the consultant or agent. . . . You saw it in basic instructions, Bill Pomponi telling the defendant to send out the fax to Azmin, to send him a copy, and the defendant did it . . . This is how things were working on the day to day on Tarahan. . . . Again, when Bill Pomponi pushed back more, the defendant again recommends to go with the latest proposal asking Bill Pomponi to give his all clear. Bill Pomponi, API had to give the all clear. They were in control of the undertaking. . . . That formal reporting line, that's what employees have. We're talking about an agent. And you heard the way the things worked on Tarahan, API controlled the process. They controlled the undertaking. . . . Now, remember, it's the Tarahan Project, that relationship that is what you are looking at.

(Trial Tr. Vol. VII at 1338-44.)

Defendant describes the Government's arguments as a "red herring," because the "right to control the overall objectives or direction of a project does not equate to the right to control a putative agent's work in connection with that project." (Def.'s Mem. at 8-9.) Additionally, Defendant argues, an agency relationship cannot be established through evidence indicating that API representatives "asked Mr. Hoskins to assist in various tasks" and that he did so, (*id.* at 9), because "mere agreement to do something at another's request is insufficient to create an agency agreement," (Def.'s Reply [Doc. # 605] at 4).

In "view[ing] the evidence presented in the light most favorable to the government" and "draw[ing] all reasonable inferences in its favor," *Autuori*, 212 F.3d at 114, the Court concludes that the Government introduced evidence which would permit a rational jury to conclude that API both 1) controlled the hiring of consultants for the Tarahan Project, and 2) gave Mr. Hoskins instructions, which he followed. Thus, the question becomes whether, in "draw[ing] justifiable inferences of fact" from that evidence, "a reasonable mind might fairly conclude . . . beyond a reasonable doubt" that Mr. Hoskins agreed to and did act subject to API's control. *Mariani*, 725 F.2d at 865. For the reasons that follow, the Court concludes that even when drawing all reasonable inferences in the Government's favor, the evidence adduced at trial cannot support the conclusion that Mr. Hoskins acted subject to API's control such that Mr. Hoskins was an agent of API.

First and foremost, the "essential element of agency is the principal's right to control the *agent's actions*," *Hollingsworth*, 570 U.S. at 713 (emphasis added), not the broader project on which the purported agent works. However, the bulk of the Government's evidence supports only the conclusion that API generally controlled the hiring of consultants for the Tarahan Project. (*See, e.g.*, Trial Tr. Vol. II at 291-82 (Mr. Rothschild's testimony that API had the ultimate decision-making authority over who to hire as a consultant, how much to pay a consultant, and the terms

14

of consultancy agreements), Trial Tr. Vol. V at 872 (Mr. Puckett's testimony that Mr. Pierucci "controlled strategy" and "negotiation tactics" on Tarahan), *id.* at 940 (Mr. Puckett's testimony that "Mr. Hoskins didn't call the shots or the strategy on Tarahan," and that Mr. Pierucci was "in control").) In lieu of evidence that API controlled Mr. Hoskins's actions, the Government argues that this evidence of API's control over the hiring of consultants for the Tarahan Project adequately demonstrates that Mr. Hoskins was an agent of API. (*See, e.g.*, 2/19/20 Tr. at 9 ("I think we would dispute that API had to control the defendant. I think the point being that they had to control the undertaking. And in our view, what we had argued, was that the undertaking was the efforts to secure the Tarahan Project."), 14 (The "notion that [API] ultimately made the decisions there, I think, goes a very long way, if not all the way, to making clear that [Mr. Hoskins] was an agent.").)

But evidence that API, the purported principal, "exercise[d] control over . . . important elements of" the broader project is insufficient to prove agency if API "retain[ed] no right of interim control over" Mr. Hoskins's efforts to achieve the objectives set by API, because "that right of control is what distinguishes an agency relationship from a mere contractual one." *Priceline*, 711 F.3d at 278-79 (citing Third Restatement § 1.01 cmts. f, g). In *Priceline*, the purported principals, Priceline customers, exercised control over four "important elements" of each relevant hotel reservation transaction: date, location, hotel quality, and bid price. *Id.* at 278. But "beyond th[ose] initial specifications," the customers "retain[ed] no right to instruct Priceline as to how it procures hotel reservations." *Id.* at 279. In other words, the Priceline customers had no right or ability to exercise "interim control" over Priceline, the purported agent, in executing the reservation transaction according to the customer's initial specifications. *Id.* As in *Priceline*, the purported principal here, API, controlled key specifications in the efforts to retain consultants on the Tarahan Project, including who to retain, how much to pay them, and additional terms of the consultancy

agreements. But absent any evidence that API had a right of interim control over *Mr. Hoskins's actions* to procure consultants according to API's specifications, a rational jury could not determine beyond a reasonable doubt that Mr. Hoskins was an agent of API.

As evidence of API's authority to control Mr. Hoskins's actions, the Government points to emails "where Mr. Hoskins is out there doing work for" API and "coming back to [API], and asking, does this work, can we do this and them saying, no, we need you to negotiate better terms." (2/19/20 Tr. at 6.) The Government argues that API was "tasking Lawrence Hoskins with things to do" and he was "doing them," "coming back [to API] to try to meet those instructions . . . and asking for feedback on how to basically carry out his function," "all in an effort to help [API] secure the Tarahan Project." (*Id.* at 13, 18.)

However, in reviewing the emails referenced by the Government, the Court sees only a continued demonstration of API's authority to determine the terms upon which consultants would be hired and Mr. Hoskins's assistance in efforts to retain those consultants, not any authority to control Mr. Hoskins's actions. For example, Mr. Pierucci emailed Mr. Hoskins indicating that the "terms of payment" for Pirooz Sharafi had been approved and accepted, and asking Mr. Hoskins to "reissue asap the revised consultancy agreement based on" the accepted terms and to "send the revised agreement" to Mr. Pierucci and Mr. Pomponi. (Ex. 469.) Similarly, Mr. Pomponi emailed Mr. Hoskins to ask that Mr. Hoskins "pls go ahead, using today's date, and issue the official fax to Azmin [Aulia]." (Ex. 470.) The Government also cites emails showing that Mr. Hoskins offered to API his "advice" or "recommend[ation]" to "go with" certain payment terms for a consultant. (Exs. 490, 500.) But agency "requires more than mere authorization to assert a particular interest" or position on behalf of the purported principal. *Hollingsworth*, 570 U.S. at 713. Like the testimony cited by the Government, these emails demonstrate only that API had the power to control the

terms of any consultancy agreement and that Mr. Hoskins at times assisted API or asserted API's position on its behalf in that process, not that API had the right to control Mr. Hoskins's actions. *See Priceline*, 711 F.3d at 278 ("In many agreements to provide services, the agreement between the service provider and the recipient specifies terms and conditions creating contractual obligations that, if enforceable, prescribe or delimit the choices that the service provider has the right to make. . . . The fact that such an agreement imposes constraints on the service provider does not mean that the service recipient has an interim right to give instructions to the provider." (quoting Third Restatement § 1.01 cmt. f)).

Furthermore, none of the indicia of control which are typical of an agency relationship are present here. The Government argues that "the right to hire or fire" and the "right to reassign" are not necessary in an agency relationship but rather are indicia of "an employee/employer relationship." (2/19/20 Tr. at 11.) But contrary to the Government's suggestion, the "principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority." Third Restatement § 1.01 cmt. f; *see Hollingsworth*, 570 U.S. at 713 (agency relationship not present where purported agents "answer to no one" and "decide for themselves, with no review, what arguments to make and how to make them" and where "[n]o provision provides for their removal," among other factors). The principal's authority to terminate the agency relationship is especially important. *See* Third Restatement § 1.01 cmt. c ("The requirement that an agent be subject to the principal's control assumes that the principal is capable of . . . terminating the agent's authority. . . . The chief justifications for the principal's accountability for the agent's acts [include] the principal's ability to . . . terminate the agency relationship."). Here, Mr. Puckett testified that Mr. Pierucci could not fire, reassign, demote, or

impact the compensation of Mr. Hoskins. (Trial Tr. Vol. V at 943.) Moreover, the Government introduced no evidence that would support the conclusion that anyone at API had the power to terminate Mr. Hoskins's authority to participate in the hiring of consultants for the Tarahan Project, to assess Mr. Hoskins's performance, or to otherwise exert control over his actions.

Thus, the Court sees no evidence upon which a rational jury could conclude that Mr. Hoskins agreed or understood that API would control his actions on the Tarahan Project, as would be required to create an agency relationship. Nor does the Court see any evidence upon which a rational jury could conclude that API actually had the authority or ability to control Mr. Hoskins's actions. The Government has thoroughly demonstrated that API was the business leader of the Tarahan Project, that it exercised authority and leadership over which consultants were hired for that project and according to what terms, and that Mr. Hoskins worked with API on that project. The Government has also demonstrated that Mr. Hoskins could not control API, and that he may have performed tasks upon request by API employees. But it has identified no evidence introduced at trial which, even when drawing inferences favorable to the Government, could entitle a rational finder of fact to conclude beyond a reasonable doubt that there was an understanding between Mr. Hoskins and API that API would be in control of Mr. Hoskins's actions on the Tarahan Project or that API did control Mr. Hoskins's actions in a manner consistent with agency relationships. Because Mr. Hoskins cannot be convicted of the FCPA violations charged in Counts One through Seven unless he was an agent of a domestic concern, the Court concludes that the evidence introduced at trial cannot support his conviction on those counts. Thus, Defendant's motion for acquittal under Rule 29(c) is granted as to Counts One through Seven.

### B.  Nexus to United States and Counts Eight, Nine, Ten, and Twelve

Defendant argues that he is entitled to acquittal on Counts Eight, Nine, Ten, and Twelve because "there was insufficient evidence to prove that Mr. Hoskins knew that any funds would be transferred from accounts within the United States, let alone any transfers by Mr. Sharafi from Maryland to Indonesia." (Def.'s Mem. at 19.) Specifically, Defendant argues that even if it was reasonable for the jury to "infer that API would be paying Mr. Sharafi directly or that Mr. Hoskins would have known that," it was nonetheless unreasonable for the jury to infer that Mr. Hoskins knew that those payments would be to or from a location within the United States. (2/19/20 Tr. at 54.) According to Defendant, "it's not unreasonable to conclude that a business like API which is part of the global utility boiler business which has operations in multiple countries . . . would have a payment mechanism to make payments from outside the United States." (*Id.*) The gist of Defendant's argument is that "there's a difference between using a U.S. company and a U.S. bank account," and thus even if the jury could rationally infer that Mr. Hoskins knew that U.S. companies were used, it would be irrational to infer that Mr. Hoskins knew that U.S. bank accounts were used. (*Id.* at 55.) The Government argues that such knowledge is not required by the relevant money laundering statutes. (Gov't Opp. at 20.) In the alternative, if such knowledge was required, the Government argues that sufficient evidence was introduced at trial to permit a rational jury to conclude that Defendant did know that funds would originate in the United States. (*Id.*)

The Government cites testimony from Mr. Varney indicating that consultancy agreements into which API entered would generally be paid via the "treasury" group, based in Windsor, Connecticut, which sent "wire transfers . . . from a banking terminal in Windsor" to satisfy the payments owed to consultants under consultancy agreements. (Trial Tr. Vol. IV at 701-03.) Mr. Varney also indicated that the way most API projects worked was that money to pay the consultant

19

was sent from API in Connecticut, to Alstom Prom in Switzerland, and then to the consultant abroad. (*Id.* at 814). He testified that the money paid to the consultant would originate from the business unit that hired the consultant, and that it was known within the company that consultant payments traveled from the business unit, to Alstom Prom, to the consultant. (*Id.* at 814-15.) Mr. Varney explained that "for any agreement to which Alstom Prom was a party," API "paid Alstom Prom directly" so that Alstom Prom could pay the agent. (*Id.* at 706-07.)

The Government notes that the "revised consultancy agreements for Sharafi were entered into with API (not Alstom Prom), and API was responsible for paying Sharafi directly under both agreements." (Gov't Opp. at 21 (citing Exs. 53 and 56).) Defendant also was among the recipients of an email from Mr. Kaelin which read,

> In this specific case, I propose an agreement between ALSTOM Power Inc and the agent directly. In this case the US Company makes sens[e], although its structure is very weak. Do not forget, that you will have to make sure, that the remuneration, which is quite important, has to be justified and documented. I have prepared the file and it is now in the approval process in IN (Lawrence Hoskins and Etienne Dé.)

(Ex. 440.) Moreover, another email from Mr. Kaelin to Mr. Hoskins, sent less than two months prior, references API's preference not to "have a US domiciled company as consultant, *with payment in the US,*" (Ex. 437 (emphasis added)), indicating that Mr. Hoskins did have reason to know that payment to a U.S.-based company would involve payment to a U.S.-based account. The Government also cites the File Sheet for the agreement between API and Sharafi, which "called for payments being made to Sharafi's account at SunTrust Bank, a regional U.S. institution," (Gov't Opp. at 23 (citing Ex. 120)), although Defendant disputes the timing of the inclusion of that information on the File Sheet.

Defendant cites a different portion of Mr. Varney's testimony, which indicated that the arrangement by which API paid Pirooz Sharafi directly, rather than via Alstom Prom, was unusual. (Trial Tr. Vol. IV at 777 ("[T]his was something unusual for me. I'd never seen any process where we were paying an agent in the U.S. directly.").) Defendant also points to the agreement between API, Alstom Prom, and Azmin Aulia, which specified that payment "shall not be made either to or via the United States," (Ex. 55 ¶ 6.2(a)), and the "*initial* consultancy agreement" with Pirooz Sharafi, which included the same prohibition on payments made through the United States, (Ex. 53). Defendant cites an email in which he indicated that between the initial and amended consultancy agreements with Mr. Sharafi, "all other terms [were] unchanged" besides the payment amount. (Ex. 461T.) Defendant argues that this email demonstrates that he "understood that no payments would be made to Mr. Sharafi in the United States." (Def.'s Mem. at 25.) Defendant argues that "there is no evidence in the record that Mr. Hoskins ever approved or was even aware of" the removal of the prohibition on payments made through the United States in the amended agreement with Mr. Sharafi. (*Id.*) Defendant also argues that even if he was aware of that change, there is no evidence to suggest that he knew the payment would be made through the United States simply because it was no longer prohibited. (*Id.* at 26.)

Defendant points to some evidence which suggests he might not have known that the payments at issue would pass through the United States, and he offers an alternative inference that the jury could have drawn about API's global nature and its use of domestic or international bank accounts. But the Government introduced evidence which suggests that Defendant did know that payments would pass through API in Windsor, Connecticut or Mr. Sharafi in the United States. Mr. Hoskins's role at Alstom included oversight of the retention of consultants, and Mr. Varney testified that it was known within Alstom that payments to consultants began in Connecticut, even

when those payments passed through Alstom Prom before eventually reaching the consultant. Mr. Hoskins received an email from Mr. Kaelin discussing the possibility of using a "US domiciled company as consultant, with payment in the US," and later received another email from Mr. Kaelin highlighting the proposal of a direct agreement between API and Mr. Sharafi, and the resulting need to "justif[y] and document[]" the "remuneration." (Exs. 437 and 440 (noting that Mr. Kaelin had "prepared the file and it is now in the approval process in IN (Lawrence Hoskins and Etienne Dé).")

The jury was well within its rights to credit this evidence and reach the conclusion that Defendant was aware that the relevant payments would pass through the United States, even if, as Defendant argues, other reasonable inferences and conclusions may also have been available to the jury based on the evidence. Where, as here, either conclusion on the part of the jury was "fairly possible," the Court must leave that decision to the jury. *Guadagna*, 183 F.3d at 129. Because a rational jury could conclude, based on the evidence at trial, that Defendant knew the payments charged in Counts Eight, Nine, Ten and Twelve would pass through the United States, Defendant has not demonstrated that acquittal is proper under Rule 29, and the Court need not address the parties' legal arguments regarding whether such knowledge was required.

### C.  Venue and Counts Nine, Ten, and Twelve

Defendant argues that there was "no evidence by which the jury could have concluded that the transfer by Mr. Sharafi from Maryland to Indonesia constituted a 'continuing transaction' that began in Connecticut," and thus that the venue requirements of 18 U.S.C. § 1956(i)(3) cannot have been satisfied. (Def.'s Mem. at 27.) Thus, Defendant argues, he is entitled to acquittal on the money laundering charges in Counts Nine, Ten and Twelve.

Venue is proper for those counts where "the financial or monetary transaction [wa]s conducted." 18 U.S.C. § 1956(i)(1)(A). For purposes of determining proper venue, "a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction." *Id.* § 1956(i)(3). "Any person who conducts . . . any portion of the transaction may be charged in any district in which the transaction takes place." *Id.* Venue provisions should be narrowly construed. *See United States v. Cabrales*, 524 U.S. 1 (1998).

Defendant argues that the charged transfer of funds, from API in Connecticut to Mr. Sharafi in Maryland and then to Indonesia, did not constitute a "single, continuing transaction." Rather, Defendant argues, the procedure involved two separate transactions—one from API in Connecticut to Mr. Sharafi in Maryland, and one from Mr. Sharafi in Maryland to Indonesia. Thus, he explains, the transactions at issue in Counts Nine, Ten and Twelve—from Mr. Sharafi in Maryland to Indonesia—are separate from the transactions which began in Connecticut, and venue for charges relating to those transfers to Indonesia is improper in Connecticut.

Defendant identifies "only one case analyzing the meaning of the term 'continuing transaction' as used in § 1956(i)(3)." (Def's Mem. at 32.) In *United States v. King*, 259 F. Supp. 3d 1267 (W.D. Okla. 2014), the court determined that venue was improper under § 1956(i)(3) because the transactions at issue were not continuing transactions. But the relevant question in that case was entirely distinct from the question presented here. The government in *King* did "not assert, and the record d[id] not show . . . that any of the transactions comprising the laundering offenses were begun, continued or completed in" the district where the case was brought. *Id.* at 1268-69. Rather, in that case the government "seem[ed] to suggest that the reference to a 'continuing transaction' should be held to reach back to the [underlying illegal activities] in the venue district so as to tie the laundering transaction," which did not involve the venue district, "to those

23

activities." *Id.* at 1286. The *King* court rejected that proposition, concluding that "plainly, the only 'transfer' contemplated by this provision is a transfer integral to the laundering activity." *Id.* Thus, Defendant's argument finds no support in *King,* which did not consider whether two wire transfers, both integral to the laundering activity, constitute a single, continuing transaction for purposes of determining venue.

In *United States v. Harris*, 79 F.3d 223 (2d Cir. 1996), the Second Circuit "consider[ed]" the "movement of funds from New York to Switzerland," which involved transfers from New York to Connecticut and then from Connecticut to Switzerland, to be "single transfers that served to conceal the location of the funds from the banks" because "[w]hile the scheme was implemented in two stages, each stage was an integral part of a single plan to transfer funds 'from a place in the United States to or through a place outside the United States.'" *Id.* at 231. But *Harris* considered whether those multiple stages constituted one single transaction for purposes of § 1956(a)(2), which sets out the substance of the crime of money laundering and which Counts Nine, Ten, and Twelve charge Defendant with violating, not for purposes of § 1956(i)(3), which sets out the venue provisions. Thus, Defendant argues, the *Harris* definition of "transaction" does not govern the meaning of "transaction" in the venue subsection. Defendant also seeks to distinguish *Harris* on its facts. The defendants in *Harris* themselves transferred funds from New York to Connecticut and then from Connecticut to Switzerland. *Id.* But Defendant argues that he is only arguably responsible for the transfer from API in Connecticut to Mr. Sharafi in Maryland, while Mr. Sharafi, a third party over whom Defendant had no control, is responsible for the transfer from Maryland to Indonesia. (Def.'s Mem. at 34.)

The Court disagrees with Defendant's suggestion that the *Harris* definition of "transaction" has no bearing on the venue subsection of § 1956(i)(3) simply because it addressed the meaning of

24

"transaction" in a substantive subsection of § 1956(a)(2). *See Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972) ("The rule of in pari materia—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a later act can be regarded as a legislative interpretation of an earlier act in the sense that it aids in ascertaining the meaning of words as used in their contemporary setting, and is therefore entitled to great weight in resolving any ambiguities and doubts.") (internal quotations and alterations omitted); *see also Guerrero-Clavijo v. United States*, 242 F. Supp. 3d 57, 62-63 (D. Mass. 2017) (citing *Erlenbaugh* in support of conclusion that discussion of "single, continuing transaction" in § 1956(i)(3) "guides the interpretation" of the meaning of transaction in § 1956(c)(4)). Thus, the question was properly left to the jury to determine whether the movement of funds from Connecticut to Maryland to Indonesia constituted one single, continuing transaction conducted in multiple stages, or two separate transactions. (*See* Trial Tr. Vol. VII [Doc. # 601] at 1283-84.)

Defendant argues that a rational jury could not have concluded that the transfers constituted one continuing transaction because there was no "evidence that anyone at API in Connecticut knew how, when, or even whether Mr. Sharafi would transfer funds to Indonesia," because of the "length of time between payments" from Connecticut and payments to Indonesia, and because some funds from API were commingled with other funds from Marubeni in Maryland before being transferred to Indonesia. (Def.'s Mem. at 32-33.) But defense counsel made exactly those points in closing argument, suggesting, "These don't look like single transactions. Money is sent days, weeks, months later. It's also commingled with money from Marubeni. That can't be money laundering. It has to come from API first. That's the charge." (Trial Tr. Vol. VII at 1430.) And the jury was clearly attuned to the possible meaning of any commingling or lengthy delay,

acquitting Defendant on Count Eleven for which the incoming Marubeni funds closely preceded the transfer to Indonesia and the incoming API funds arrived many months prior. (*See* Ex. 1 (Transfer Chart) to Def.'s Mem. [Doc. # 589-2].)

The Government cites "ample evidence that the plan from the beginning was for Sharafi to transfer money that [he] received from API to Moeis in Indonesia," (Gov't Opp. at 24), including testimony from Mr. Rothschild that the purpose of payments from API to consultants was "[s]o that [the consultants] could make their bribery payments to the government officials in Indonesia" and that the understanding was that with the money he received from API, Mr. Sharafi would "[m]ake bribery payments to Emir Moeis" in Indonesia, (Trial Tr. Vol. I [Doc. # 595] at 122-23). The Government argues that the transactions charged in Counts Nine, Ten, and Twelve "followed the blueprint devised by the defendant and his co-conspirators" wherein API transferred money to Mr. Sharafi so that he could transfer a portion of that money to Emir Moeis. (Gov't Opp. at 25.)

Defendant points to some evidence which might suggest that the transfers at issue were separate. But the Government also presented evidence which supports the conclusion that the payments from Connecticut to Maryland and from Maryland to Indonesia were each one single, continuing transaction. The jury was entitled to credit that evidence, despite Defendant's arguments and some evidence to the contrary. Moreover, the jury's verdict of not guilty on Count Eleven suggests that they thoroughly considered Defendant's arguments regarding timing and commingling of funds, and yet nonetheless the jury returned a verdict of guilty on Counts Nine, Ten, and Twelve. The Court must "be careful to avoid usurping the role of the jury" and must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." *Autuori*, 212 F.3d at 114. Defendant has not demonstrated that the evidence at trial was

insufficient to support the jury's weighing of the evidence as to the venue requirement for Counts Nine, Ten, and Twelve.

### D.  Rule 33 Motion for New Trial

In the alternative, Defendant requests a new trial under Federal Rule of Criminal Procedure 33, which permits courts to "vacate any judgment and grant a new trial if the interest of justice so requires." A Rule 33 motion should be granted if "letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). Considering "the entire case," including "all facts and circumstances," and making an "objective evaluation," a court should grant a Rule 33 motion only if there is "a real concern that an innocent person may have been convicted." *Id.* Although courts have "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," the authority to grant a new trial must nonetheless be exercised only "sparingly and in the most extraordinary circumstances." (*Id.* (internal quotation omitted).) When a court grants a Rule 29 motion for acquittal, Rule 29(d)(1) requires the court to "conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed" and to "specify the reasons for that determination."

Defendant argues that his motion for a new trial should be granted for the same reasons as his motion for acquittal—because "the record does not contain competent satisfactory evidence to support the jury's verdict." (Def.'s Mem. at 36.) The Government responds that "if the Court finds the evidence sufficient to support the jury's guilty verdicts, the defendant has pointed to no other issue that would warrant a new trial." (Gov't Opp. at 30.) The Court agrees that as to Counts Eight, Nine, Ten and Twelve, because there was sufficient evidence at trial to support the jury's verdict, Defendant has not demonstrated that it would be a "manifest injustice" to permit that verdict to stand and thus has not demonstrated his entitlement to a new trial under Rule 33.

As to Counts One through Seven, Defendant's arguments regarding the insufficiency of the evidence at trial apply with equal or greater force to his motion for a new trial, for which the Court is "free to weigh the evidence [it]self and need not view it in the light most favorable to the verdict winner." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998). Permitted to view the evidence objectively and without the duty view it in the light most favorable to the Government, the Court harbors significant doubt that Defendant acted as an agent of API in connection with the Tarahan Project, in the absence of persuasive evidence demonstrating that API had authority to control Mr. Hoskins or that he agreed to be so controlled. The Court agrees with Defendant that the Government primarily demonstrated that API generally controlled the Tarahan Project, but not that API had control over Mr. Hoskins's actions sufficient to demonstrate agency. Thus, for substantially the same reasons stated above with regard to Defendant's Rule 29 motion, the Court finds the jury's verdict on Counts One through Seven against the weight of the evidence adduced at trial. Defendant's Rule 33 motion for a new trial is conditionally granted with respect to Counts One through Seven. His motion is denied with respect to Counts Eight, Nine, Ten, and Twelve.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Acquittal is GRANTED as to Counts One through Seven and DENIED as to Counts Eight, Nine, Ten, and Twelve. His motion for a new trial is conditionally GRANTED as to Counts One through Seven and DENIED as to Counts Eight, Nine, Ten, and Twelve.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of February 2020.